The Honorable Richard A. Jones
The Honorable Magistrate J. Richard Creatura

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

IAN SIMMERS,

Plaintiff,

vs.

KING COUNTY, et al.,

Defendants.

No. 2:21-CV-00100-RAJ-JRC

DECLARATION OF SAMANTHA KANNER IN SUPPORT OF KING COUNTY'S FCRP 12(c) MOTION TO DISMISS

*Noted for April 16, 2021*

I, Samantha D. Kanner, declare under penalty of perjury under the laws of the United States and the State of Washington that, to the best of my knowledge, the following is true and correct:

1. I am over eighteen years of age. I have personal knowledge of the facts contained in this declaration and am otherwise competent to testify to the matters in this declaration.

2. I am a Senior Deputy Prosecuting Attorney at the King County Prosecuting Attorney's Office and am counsel for King County in this matter.

3. Attached as Exhibits A- M are copies of court records from King County Superior Court Cause No. 95-1-02102-2 SEA, State v. Ian Simmers.  The documents attached are as follows:

DECLARATION OF KANNER IN SUPPORT OF
KING COUNTY'S FCRP 12(c) MOTION TO DISMISS
(2:21-cv-00100-RAJ-JRC)- 1

**Daniel T. Satterberg**, Prosecuting Attorney
CIVIL DIVISION, Litigation Section
900 King County Administration Building
500 Fourth Avenue
Seattle, Washington  98104
(206) 296-0430  Fax (206) 296-8819

A. Trial Transcripts (VRP 3/11/1996; 3/12- 3/13/1996- pretrial motions including CrR 3.5 hearing).
B. Sub 90B- Defense Brief Regarding CrR 3.5.
C. Sub 116- Findings of Fact and Conclusions of Law.
D. Sub 90J- Trial Court Minutes.
E. Sub 100F- Trial witness list.
F. Sub 100 A-C- Jury Verdict Forms.
G. Sub 113- Judgment and Sentence.
H. Post-Trial Hearing Transcripts (VRP 11/4- 12/9/1997; 11/6/1997).
I. Sub 149- Findings of Fact.
J. Sub 153- Mandate and Opinion of COA.
K. Sub 158- Defense Motion.
L. Sub 159- State's Motion.
M. Sub 162- Order Vacating.

4. Attached as Exhibits N- O are copies of court records from King County Superior Court Cause No. 95-1-05833-3 SEA, State v. Ian Simmers.  The documents attached are as follows:

N. Sub 45- Statement of Defendant on Plea of Guilty.
O. Sub 57- Judgment and Sentence.

5. Pursuant to FRCP 5.2 the month and day of Simmers' date of birth is redacted from all of the exhibits.

6. Pursuant to Judge Jones' chambers procedures regarding civil motions, the parties conducted a meet and confer conference regarding defendants' intent to file motions to dismiss pursuant to FRCP 12(c).  During the approximately 45-50-minute video/telephone conference (Mr. Owens, Mr. Triesch, and I participated via both audio and video while Mr. Hazinski and Mr. Grindeland participated via audio only), held on March 24, 2021, counsel for each of the defendants explained the legal and factual bases for the motions and counsel for the Plaintiff provided Plaintiff's positions in response. The parties were unable to come to any agreement that would resolve all of the issues

DECLARATION OF KANNER IN SUPPORT OF
KING COUNTY'S FCRP 12(c) MOTION TO DISMISS
(2:21-cv-00100-RAJ-JRC)- 2

**Daniel T. Satterberg**, Prosecuting Attorney
CIVIL DIVISION, Litigation Section
900 King County Administration Building
500 Fourth Avenue
Seattle, Washington  98104
(206) 296-0430  Fax (206) 296-8819

without motions practice as the parties interpret the application of federal and state law to this matter differently. However, with regard to the statute of limitations issue defense raised to Plaintiff's Fourth Amendment claim, it appears that the parties may be in agreement that a Fourth Amendment claim based on Plaintiff's arrest and detention prior to being charged with a crime is time barred and that only a Fourth Amendment claim based on a detention that followed the initiation of criminal charges is not subject to that bar. However, because Plaintiff's complaint does not articulate that his Fourth Amendment claim is based only on his detention after criminal charges were initiated, King County has included a short discussion of this issue in its motion in an abundance of caution. Following the call, both myself and Plaintiff's counsel, Mr. Owens, provided each other and the other defense attorneys some additional case citations in support of our relative positions via email. I reviewed the cited cases before filing the instant motion.

I certify under penalty of perjury under the laws of the State of Washington and the United States that the foregoing is true and correct.

DATED this 25th day of March, 2021.

_____
SAMANTHA D. KANNER

DECLARATION OF KANNER IN SUPPORT OF
KING COUNTY'S FCRP 12(c) MOTION TO DISMISS
(2:21-cv-00100-RAJ-JRC)- 3

**Daniel T. Satterberg**, Prosecuting Attorney
CIVIL DIVISION, Litigation Section
900 King County Administration Building
500 Fourth Avenue
Seattle, Washington  98104
(206) 296-0430  Fax (206) 296-8819

# Exhibit A

Trial Transcripts (VRP 3/11/1996; 3/12-3/13/1996- pretrial motions including CrR 3.5 hearing)

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

IN AND FOR KING COUNTY

---

STATE OF WASHINGTON,     )
                             )
         PLAINTIFF,     )     KING COUNTY CAUSE
                             )     NO. 95-1-02102-2
         VS.           )
                             )     COURT OF APPEALS
IAN MONROE SIMMERS,      )     38620-4-I
                             )
         DEFENDANT.     )
                             )

---

VERBATIM PROCEEDINGS
MARCH 11, 1996

---

BEFORE THE HONORABLE ANN SCHINDLER

APPEARANCES:

FOR THE PLAINTIFF:        SUSAN L. MAHONEY AND
                            JAMES MARNER,
                            DEPUTY PROSECUTING ATTORNEYS
                            KING COUNTY COURTHOUSE
                            SEATTLE, WASHINGTON 98104

FOR THE DEFENDANT:        JOHN TAYLOR HICKS, ESQ.

JANE LAMERLE, C.S.R.

1        **W I T N E S S    I N D E X**

2                              <u>DE</u>       <u>CE</u>       <u>RD</u>       <u>RC</u>

3    PRETRIAL WITNESSES:

4    OFF. ORVILLE M. FULLER        53        58

5    SGT. CLEMENT D. RUSK          60       105       118

6    DET. PATRICK H. RAFTIS       121       127       131       131

7    DET. AMY JARBOE              134

8    DET. EDWARD HOPKINS       142/157

9    ROBERT WESLEY SETZER, JR.    143       156

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1
## E X H I B I T    I N D E X
2

3    <u>PRETRIAL EXHIBIT NO</u>.                                <u>EVID</u>

4    EXHIBIT NO. 1

5    EXHIBIT NO. 2                                          77

6    EXHIBIT NO. 3

7    EXHIBIT NO. 4                                          103

8    EXHIBIT NO. 5                                          104

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           MORNING SESSION

2                                       MARCH 11, 1996

3                     (THE FOLLOWING PROCEEDINGS WERE
                      HELD OUTSIDE THE PRESENCE OF
4                     THE JURY.)

5           MS. MAHONEY:  YOUR HONOR, WOULD YOU LIKE ME

6    TO CALL THE CASE FOR THE RECORD?

7           THE COURT:  YES, PLEASE.  AND THEN I WOULD

8    SUSPECT THE FIRST MOTION THAT SHOULD BE ADDRESSED

9    WOULD BE THE MOTION TO AMEND.

10          MS. MAHONEY:  THANK YOU, YOUR HONOR.  THIS

11   IS THE STATE OF WASHINGTON VS. IAN MONROE SIMMERS,

12   95-1-02102-2.

13          SUSAN MAHONEY FOR THE STATE OF WASHINGTON

14   AND JIM MARNER FOR THE STATE OF WASHINGTON, AND

15   JOHN HICKS HERE ON BEHALF OF THE DEFENDANT WHO IS

16   PRESENT IN COURT.

17          YOUR HONOR, THE FIRST MOTION WOULD BE THE

18   STATE'S MOTION TO AMEND TO ADD A COUNT TWO OF

19   MURDER IN THE SECOND DEGREE COMMITTED BY THE

20   ALTERNATIVE MEANS OF EITHER INTENTIONAL MURDER

21   AND/OR FELONY MURDER.

22          MR. HICKS HAS ALREADY BEEN GIVEN A COPY OF

23   THE AMENDED INFORMATION, AND HE HAS BEEN AWARE OF

24   THIS MOTION TO AMEND SINCE HE CAME ON BOARD WITH

25   THIS CASE OVER THREE MONTHS AGO.

4

1    I AM HANDING FORWARD THE MOTION TO AMEND AND

2    A COPY OF THE AMENDED INFORMATION, AND I WOULD ASK

3    IF MR. HICKS IS WILLING TO WAIVE FURTHER FORMAL

4    READING AT THIS TIME.

5         MR. HICKS:  YES.

6         THE COURT:  ALL RIGHT.  IS THERE ANY

7    ARGUMENT THAT THE DEFENSE WISHED TO MAKE ABOUT THE

8    MOTION TO AMEND?

9         MR. HICKS:  NO.  DEFER TO THE COURT, YOUR

10   HONOR.

11        THE COURT:  IT APPEARS THAT THE DEFENSE HAS

12   BEEN ON NOTICE THAT THERE IS THIS MOTION TO AMEND,

13   THAT THE FACTS AND CIRCUMSTANCES THAT RELATE TO THE

14   MOTION TO AMEND ARE THE SAME FACTS AND CIRCUM-

15   STANCES THAT ARE RELATED TO THE ORIGINAL CHARGE.

16        AND, THEREFORE, THE COURT GRANTS THE STATE'S

17   MOTION TO AMEND TO CHARGE MURDER IN THE SECOND

18   DEGREE.  AND GIVEN THE FACT THAT MR. HICKS HAS

19   WAIVED FURTHER FORMAL READING, THE STATE -- I'M

20   SORRY -- THE COURT WILL ENTER A PLEA OF NOT GUILTY

21   AS TO MURDER IN THE SECOND DEGREE.

22        MS. MAHONEY:  THANK YOU.

23        THE COURT:  AND IF I UNDERSTAND, FROM

24   READING THE INFORMATION, THE FELONY THAT UNDERLIES

25   MURDER IN THE SECOND DEGREE IS ASSAULT IN THE

1    SECOND DEGREE?

2         MS. MAHONEY:  CORRECT.

3         THE COURT:  THE STATE HAD OTHER MOTIONS -- I

4    KNOW THERE IS A 3.5; HOWEVER, THERE WERE OTHER

5    MOTIONS THAT WE WERE GOING TO TRY TO ADDRESS BEFORE

6    BEGINNING THAT.

7         THE FIRST ONE IS A MOTION TO EXCLUDE

8    WITNESSES PURSUANT TO THE RULE.  DID THE DEFENSE

9    HAVE ANY OBJECTION TO THAT?

10         MR. HICKS:  NO.  THE DEFENSE JOINS IN THE

11    MOTION.

12         MS. MAHONEY:  YOUR HONOR, THAT WOULD BE THE

13    EXCEPTION AS NOTED IN MY BRIEF, OF GLORIA

14    GOCHANOUR.  AND DOES MR. HICKS HAVE ANY OBJECTION

15    TO HER BEING PRESENT?

16         MR. HICKS:  THE VICTIM'S MOTHER?

17         MS. MAHONEY:  YES.  SHE IS NOT A FACT

18    WITNESS; SHE WILL JUST IDENTIFY SOME PROPERTY.

19         MR. HICKS:  YES.  ASSUMING THAT IS THE CASE,

20    IF SHE IS SIMPLY TESTIFYING TO HER SON'S EFFECTS

21    AND IS NOT, UNDERSTANDABLY IN THIS CASE, A WITNESS,

22    DESPITE MS. MAHONEY'S GOOD FAITH INSTRUCTIONS, SHE

23    MIGHT BE ATTEMPTED TO LET LOOSE SOME EMOTIONAL

24    CONDUCT, AND I WOULD HAVE THE UNCOMFORTABLE JOB OF

25    OBJECTING TO THAT IF SHE REMAINS IN THE COURTROOM.

1          MS. MAHONEY:  SHE WILL JUST TESTIFY TO WHAT

2   I HAVE SUMMARIZED IN THE BRIEF.

3          MR. HICKS:  THAT'S CORRECT, BUT I WOULD JUST

4   LIKE TO --

5          THE COURT:  SHE SHOULD BE CAUTIONED ABOUT

6   HER BEHAVIOR DURING THE COURSE OF TRIAL SO SHE

7   DOESN'T PUT MR. HICKS IN THE POSITION OF NEEDING TO

8   OBJECT TO ANY MANIFESTATIONS OF HER BEHAVIOR.

9          I WILL GRANT THE MOTION; HOWEVER, I WOULD

10   CAUTION COUNSEL THAT BY GRANTING THIS MOTION, WHAT

11   IT MEANS IS THAT THE WITNESSES WHO TESTIFY CANNOT

12   DISCUSS THEIR TESTIMONY WITH OTHER POTENTIAL

13   WITNESSES.

14          AND THAT IS PARTICULARLY A POINT OF CONCERN

15   WHICH MUST BE MONITORED BY THE STATE WITH THE

16   WITNESSES FOR THE STATE, SINCE THE POLICE OFFICERS

17   AND DETECTIVES TEND TO HAVE MORE CONTACT.

18          AND SO THEY ALL NEED TO BE ADMONISHED THEY

19   MAY NOT DISCUSS THEIR TESTIMONY OR POTENTIAL

20   TESTIMONY WITH EACH OTHER.

21          MR. HICKS:  THE SAME ADMONISHMENT TO

22   DETECTIVE HOPKINS.  AND I AM NOT GOING TO OBJECT TO

23   HIS PRESENCE AT COUNSEL TABLE.

24          THE COURT:  ALL RIGHT.  AND THE COURT GRANTS

25   THAT MOTION.  OF COURSE, THERE SHOULD BE THE SAME

1  ADMONISHMENT TO THE DETECTIVE THAT HAS CHOSEN TO

2  SIT WITH THE STATE AND REPRESENT THE STATE.

3        THE MOTION TO ADMIT CRIME SCENE AND AUTOPSY

4  PHOTOGRAPHS, I WILL RESERVE RULING ON IT.  AND I

5  WOULD ASK THE STATE, HOWEVER, PROVIDE TO THE COURT

6  DUPLICATIVE PHOTOS.

7        AND SO I WILL LOOK AT THOSE, AS WILL

8  MR. HICKS, AFTER THE STATE HAS HAD AN OPPORTUNITY

9  TO LOOK AT WHICH PHOTOS THEY ARE SEEKING TO OFFER

10  AND CAN ARTICULATE ON WHAT BASIS THEY ARE SEEKING

11  TO HAVE ADMISSION OF THOSE PHOTOGRAPHS.

12        MS. MAHONEY:  I HAVE ALREADY DONE THAT WITH

13  THE AUTOPSY PHOTOS, YOUR HONOR.  THERE ARE JUST A

14  FEW PHOTOS STILL IN QUESTION, AND I HAVE ALREADY

15  SHOWN THEM TO MR. HICKS.

16        THE COURT:  IF YOU WANT TO PROVIDE THEM TO

17  THE STATE, OR I'M SORRY, TO THE COURT, PLEASE DO

18  THAT.  AND I WILL LOOK AT THEM AND RESERVE RULING

19  ON THEM.

20        MS. MAHONEY:  I WILL PROVIDE AT LEAST THE

21  AUTOPSY PHOTOS AT THIS TIME.  AND WHAT I WILL STATE

22  TO THE COURT, SO YOU CAN SEE I HAVE BEEN

23  SELECTIVE -- THE SMALL CLIP ARE THOSE I WOULD

24  PROPOSE AND THE LARGE CLIP ARE THOSE I HAVE

25  EXCLUDED.

1           AND, OBVIOUSLY, I WOULD BE CROPPING THE

2     PHOTOS.  THERE IS NO NEED TO SHOW HIS GENITALIA.  I

3     WILL BE CUTTING THAT OFF.

4           MR. HICKS HAS LOOKED AT THE ONE I PROPOSED,

5     AND AS STATED IN MY BRIEF, I HAVE GONE THROUGH

6     THOSE WITH DR. THIERSCH, THE ONES THAT HE SAID HE

7     WOULD NEED TO EXPLAIN INJURIES.

8           THE COURT:  ALL RIGHT.  DEFENDANT'S

9     POST-ARREST STATEMENTS WE WILL HOLD OFF ON.

10           MOTION TO EXCLUDE DEFENDANT'S SELF-SERVING

11     STATEMENTS:  THE STATE BELIEVES THAT THE DEFENSE IS

12     ANTICIPATING CALLING WITNESSES TO TESTIFY THAT THE

13     DEFENDANT TOLD THEM HE DID NOT COMMIT THE CRIME,

14     AND THE STATE IS MOVING TO EXCLUDE SUCH TESTIMONY.

15           MR. HICKS:  WELL, YEAH.  ALL RIGHT, YOUR

16     HONOR.  THAT IS EXTREMELY UNLIKELY.  THIS IS ONE

17     OF THOSE INVESTIGATIONS WHERE I FOUND IT SAFER TO

18     THROW THE WHOLE POT IN, WITHOUT USING TOO MUCH

19     DISCRETION, AS WE PROCEEDED TO TRIAL.

20           BASICALLY, I CAN SEE THIS CASE PROCEEDING IN

21     A VARIETY OF WAYS:  FOR ONE THING, IT IS A

22     CONFESSION CASE.  AND OBVIOUSLY PUT INTO QUESTION

23     IS HOW LIKELY THE DEFENDANT WOULD CONFESS TO THE

24     POLICE WHEN HE AND OTHERS -- INCLUDING THE JAIL

25     HOUSE SNITCH, UNDER THE STATE'S THEORY THAT HE

1    LIKES TO BRAG -- HOW LIKELY WOULD IT BE THAT HE

2    WOULD DENY IT TO HIS COLLEAGUES HE RUNS WITH.

3         AND IN THAT CASE IT IS PROBATIVE, AND IT IS

4    NOT SIMPLY A SELF-SERVING STATEMENT WHEN OFFERED

5    FOR THE PROBATIVE QUESTION WHETHER OR NOT HE WOULD

6    INDEED MAKE A STATEMENT LIKE THAT, SINCE IT IS A

7    QUESTION OF FACT, AT LEAST TO THE SNITCH, AND SINCE

8    IT IS DISPUTED WHETHER THE VERACITY OF THE

9    STATEMENT STANDS UP TO 3.5.

10        IN THIS TYPE OF CASE, I THINK WE HAVE TWO

11   WITNESSES, MIKAELA BAULDAUF AND ANOTHER GAL BY THE

12   NAME OF DIANE PARKER.  AND THAT'S IT.

13        THE COURT:  DIANE?

14        MS. MAHONEY:  PARKER.

15        MR. HICKS:  PARKER.  IT'S ON MY LIST.  AND

16   OBVIOUSLY I COULD HAVE, YOU KNOW, THROWN IN THE

17   KITCHEN SINK AND DRUG IN PROBABLY A HUNDRED, BUT I

18   PICKED THESE TWO AS ALTERNATIVE EXAMPLES.

19        AND I THINK IN THIS CASE, MY POSITION DOES

20   STAND UP, GIVEN THE STATE'S THEORY OF THE CASE AND

21   THE ENTIRE DEFENSE THEORY OF THE CASE.

22        THANK YOU.

23        MS. MAHONEY:  YOUR HONOR, JUST BRIEFLY, NOT

24   ONLY AM I CONCERNED ABOUT THE TWO WITNESSES, BUT

25   ALSO BEING CALLED AS WITNESSES IN THIS CASE ARE THE

1    DEFENDANT'S MOTHER, AND STEPFATHER, AND HIS STEP-

2    BROTHER AND OTHER FAMILY FRIENDS.

3        I AM CONCERNED THAT -- I REALIZE THROUGH

4    INTERVIEWING THEM, THEY ALL SAY THAT THE DEFENDANT

5    HAS DENIED THE CRIME TO THEM.  AND THOSE CLEARLY

6    ARE SELF-SERVING STATEMENTS, AND CLEARLY HEARSAY,

7    AND NOT BEING OFFERED BY A PARTY OPPONENT.

8        THEY ARE SELF-SERVING.  AND THE ENTIRE

9    DOCTRINE BEHIND THE SELF-SERVING TESTIMONY RULE IS

10   THAT THAT ALLOWS THE DEFENDANT TO PUT ON HIS

11   DEFENSE WITHOUT EVER TAKING THE STAND AND BEING

12   SUBJECTED TO CROSS-EXAMINATION.

13       THAT SIMPLY IS CLEARLY AGAINST CASE LAW.

14   AND I WOULD ASK THAT ANY SUCH TESTIMONY BE EXCLUDED

15   AND THAT THE WITNESSES BE ADMONISHED THAT THEY ARE

16   NOT TO TESTIFY TO THAT.

17       MR. HICKS:  MY RESPONSE, YOUR HONOR -- IT IS

18   THE STATE'S THEORY THAT THE REASON THEY GOT THIS

19   CONFESSION OUT OF HIM IS BECAUSE HE LIKES TO BRAG.

20   AND, FRANKLY, IF YOU WILL READ HIS TRANSCRIBED

21   STATEMENT, YOU WILL SEE PRECISELY THE MECHANISM

22   USED TO GET THE CONFESSION.

23       HE CLAIMED, ACCORDING TO THE POLICE, THAT HE

24   HAS KILLED 13 GANGSTERS.  AND, OF COURSE, IT IS

25   PREPOSTEROUS, AND THE POLICE TAKE THAT POSTURE

1    THEMSELVES.

2         AND, THEREFORE, I AM PUT IN A POSITION, IF

3    HE IS LIKE THIS, WHY WOULD I NOT CALL WITNESSES WHO

4    HE WOULD NATURALLY BRAG TO, NAMELY, THE CROWD HE

5    RUNS AROUND WITH, AND SHOW THAT TO A JURY.

6         FURTHERMORE, TO ARGUE TO THE JURY, IF HE IS

7    GOING TO CONFESS TO A SNITCH -- SOMEONE HE WOULD

8    NOT NECESSARILY WISH TO BRAG TO -- WOULDN'T HE ALSO

9    DO IT WITH HIS COLLEAGUES?

10        AND, AGAIN, THIS IS DIFFERENT THAN THE USUAL

11   SELF-SERVING STATEMENT TO REBUT THE STATE'S THEORY

12   HE IS THIS TYPE AND WOULD INDEED SIMPLY CONFESS TO

13   A CRIME HE DIDN'T DO SIMPLY BECAUSE HE BRAGS.  AS

14   OPPOSED TO CONFESSING TO SOMETHING HE DID NOT DO,

15   HE BRAGS.

16        I KNOW THAT SOUNDS LIKE TWISTED LOGIC, BUT

17   THE POINT IS IF THE STATE'S THEORY IS CORRECT, I

18   CAN REBUT IT BY SHOWING A COUPLE OF COLLEAGUES OF

19   HIS THAT SWEAR HE DENIES IT.

20        THE COURT:  AND WHAT IS THE EVIDENTIARY RULE

21   THAT YOU WOULD RELY ON TO COUNTER THE STATE'S

22   ARGUMENT THAT THIS IS HEARSAY AND IT IS SELF-

23   SERVING HEARSAY?

24        MR. HICKS:  STATE OF MIND.

25        THE COURT:  OKAY.

1      MR. HICKS:  AND, AGAIN, SPECIFIC STATE OF

2  MIND IN AN INDIVIDUAL WHO BRAGS ABOUT THE CRIMES HE

3  COMMITTED.

4      THE COURT:  ALL RIGHT.  WELL, I WILL RESERVE

5  RULING ON THIS MOTION, SINCE I AM NOT IN A POSITION

6  TO KNOW WHAT STATEMENTS AT THIS TIME ARE COMING IN

7  FROM THE DEFENDANT, IF ANY.  AND I'M NOT IN A

8  POSITION TO ASCERTAIN WHAT THE STATE'S POSITION IS,

9      HOWEVER, THERE WILL BE NO -- THE STATE'S

10  POSITION AS TO THEIR THEORY OF THE CASE, HOWEVER,

11  THERE WILL BE NO REFERENCE TO THIS DENIAL UNTIL I

12  HAVE AN OPPORTUNITY TO RULE ON THIS --

13      MR. HICKS:  OF COURSE, YOUR HONOR.

14      THE COURT:  -- AND UNTIL THERE IS THE

15  STATE'S OPPORTUNITY TO PRESENT THEIR THEORY AND WE

16  GO THROUGH THE 3.5.

17      MOTION TO EXCLUDE VICTIM'S CRIMINAL HISTORY

18  AND/OR PRIOR BAD ACTS:  AS I UNDERSTAND IT FROM THE

19  STATE'S BRIEF, THE VICTIM IN THIS CASE HAD A

20  MISDEMEANOR HISTORY OF TRAFFIC-RELATED OFFENSES AND

21  A HISTORY OF DRUG AND ALCOHOL ABUSE.

22      MR. HICKS:  I CAN RESPOND TO THAT AND MAKE

23  IT EASY.  FOR PURELY TACTICAL REASONS, I DID NOT

24  ATTEMPT TO ELICIT INFORMATION ABOUT THE VICTIM'S

25  CRIMINAL PROBLEMS.

1          NOW, THERE IS SOMETHING THAT TIES IN.  WHERE

2     ARE WE ON THE BRIEF HERE?

3          THE COURT:  PAGE 14.  IT IS MY UNDERSTANDING

4     THAT THE STATE IS WILLING TO STIPULATE TO THE

5     TOXICOLOGIST'S REPORT OF THE VICTIM'S ALCOHOL USE.

6          MR. HICKS:  APPARENTLY NOT ENTIRELY, AND I

7     THOUGHT THEY WOULD.  THEY TOLD ME -- I READ FOR THE

8     FIRST TIME IN THEIR BRIEF THEY DON'T WANT ME TO

9     ELICIT INFORMATION ABOUT A CERTAIN NUMBER OF DRUGS

10    IN THE STOMACH.

11         THE COURT:  NO, THE NEXT ONE.

12         MR. HICKS:  RIGHT.  MOTION TO EXCLUDE

13    MENTION OF BENZOYLECGONINE, WHATEVER, AT THE TIME

14    OF THE AUTOPSY.

15         WELL, THIS IS CONTRARY TO WHAT WE THOUGHT WE

16    AGREED ON.  NEVERTHELESS, I WILL ADDRESS IT, YOUR

17    HONOR.

18         THE INDIVIDUAL WAS IN FACT LIT TO THE GILLS

19    ON COCAINE AND SEVERAL OTHER SUBSTANCES, INCLUDING

20    ALCOHOL.

21         I INTERVIEWED THE PATHOLOGIST ABOUT THAT,

22    AND PATHOLOGISTS ARE QUALIFIED TO SPEAK TO CONTENT

23    OF TOXICITY AND ALCOHOL.  I THINK THIS IS EXTREMELY

24    RELEVANT BECAUSE SHOULD THE JURY CONCLUDE

25    MR. SIMMERS DID INDEED, OR AT LEAST WAS PRESENT AND

1    ENGAGED IN THE HOMICIDE AND IS RESPONSIBLE FOR IT

2    IN TERMS OF THE PERSON THAT INFLICTED IT, THERE IS

3    STILL A COLORABLE ELEMENT OF SELF-DEFENSE.

4         AND AT THE VERY LEAST, THE STATE AMENDED TO

5    INCLUDE A LESSER CHARGE.

6         BASICALLY, THE STATE'S THEORY IS THERE WAS

7    AN ALTERCATION BETWEEN MR. SIMMERS AND

8    MR. GOCHANOUR.  IN MR. SIMMERS' STATEMENT TO THE

9    POLICE, HE ALLEGEDLY STATES THAT MR. GOCHANOUR AND

10   HE GOT IN A VERBAL TIFF.  AND MR. GOCHANOUR SLUGGED

11   HIM IN THE RIBS, AND HE IS MUCH LARGER THAN

12   MR. SIMMERS.  HE IS A RATHER SURLY INDIVIDUAL WITH

13   A MUSTACHE AND BEARD, AND HE IS NOT GREAT BIG BUT

14   BIGGER THAN THE DEFENDANT.

15        AND, THEREFORE, I THINK THE FACT HE WAS IN A

16   STATE IN WHICH HE MAY NOT HAVE BEEN UNDER HIS BEST

17   BEHAVIOR AND WAS AGGRESSIVE IS EXTREMELY LIKELY.

18        NOW, BARBITURATES -- I DID NOT COME HERE

19   FRANKLY TO TRY TO CLASSIFY THIS AS A DRUG.  BUT IT

20   IS A DRUG, AND WE SHOULD EXPLORE THE EFFECTS WITH

21   OTHER DRUGS.

22        AND, FRANKLY, I WOULDN'T HAVE INCLUDED THIS

23   AREA OF INQUIRY IN MY INVESTIGATION, BUT BECAUSE

24   THE STATE, I THOUGHT, STIPULATED TO IT, I DID NOT.

25        BUT THE BOTTOM LINE, THERE IS PROBABLY A

1    GREAT DEAL THE TOXICOLOGIST CAN STATE ABOUT THE

2    PROBABLE EFFECT OF ONE'S DEMEANOR AND STATE OF MIND

3    AND CERTAINLY PHYSICAL CAPABILITIES IF ONE IS, A,

4    DRUNK, AND, B, STIMULATED BY COCAINE AND

5    BARBITURATES.

6            THE COURT:  THANK YOU.

7            MS. MAHONEY:  MAY I RESPOND?

8            THE COURT:  YES.

9            MS. MAHONEY:  AS FAR AS THE ALCOHOL GOES, WE

10   HAVE AGREED TO THAT.  THERE IS A .17 ALCOHOL.  IT

11   IS A MEASURABLE NUMBER.

12           AND THE BARBITURATES -- IT IS THE BY-PRODUCT

13   OF COCAINE.  THERE IS NO BENZOYLECGONINE IN THE

14   URINE, AND THERE IS AN UNDETERMINED AMOUNT IN THE

15   BLOOD.

16           THE TOXICOLOGIST AND DR. THIERSCH BOTH STATE

17   THEY WOULD NOT BE ABLE TO SAY HOW MUCH WAS IN HIS

18   SYSTEM AND WHEN HE HAD INGESTED IT.  IT COULD HAVE

19   BEEN ANYWHERE FROM A COUPLE OF HOURS BEFORE DEATH

20   TO THE MORNING BEFORE DEATH, OR LONGER.

21           QUITE FRANKLY, MR. SIMMERS IN HIS

22   CONFESSION, DESCRIBED THE VICTIM AS BEING TWEAKED

23   OUT LIKE HE WAS ON COCAINE.

24           BUT I CAN'T TIE IN HOW MUCH THERE WAS, AND

25   IT SEEMED APPROPRIATE TO EXCLUDE IT.

1        AND AS TO THE BARBITURATES, THE SAME THING,

2   THERE IS NO DETERMINATION OF WHAT TYPE -- AND

3   BARBITURATES INCLUDES A VARIETY OF DRUGS.  AND IN

4   ADDITION, AGAIN, THERE IS NO KNOWN QUANTITIES.

5   THERE WOULDN'T BE ANY WAY TO SAY WHEN THOSE HAD

6   BEEN INGESTED AND STAY IN THE SYSTEM MUCH LONGER.

7        AND THAT IS WHY I MAKE THE MOTION.  I DON'T

8   FEEL STRONG ABOUT IT.  IT CAN'T BE TIED TO ANY

9   CLOSE TIME IN DEATH -- TO ANY TIME CLOSE TO THE

10  CRIME.

11       BUT THE ALCOHOL CERTAINLY CAN BE.  AND THE

12  OTHER THING I SHOULD SAY IS THAT COCAINE CONTINUES

13  TO BREAK DOWN IN THE SYSTEM EVEN AFTER DEATH.

14       MR. HICKS:  YOUR HONOR, TO THE EXTENT IT IS

15  RELEVANT AND TO THE EXTENT SOMEONE ON THE JURY

16  COULD CONCLUDE IF SOMEONE USES A FAIR OR GREAT

17  AMOUNT OF ALCOHOL, THEY ARE LIKELY TO HAVE INGESTED

18  A FAIR OR GREAT AMOUNT OF DRUGS -- THE BLOOD

19  ALCOHOL WHEN PERFORMED WAS .17.  AND THAT IS A HECK

20  OF A LOT OF BLOOD ALCOHOL TO BE IN A STIFF THAT WAS

21  IN THERE SO LONG AFTER THE OFFENSE.

22       AND THE URINE TEST RESULTS -- LET ME STATE

23  THE WORD I CAN'T PRONOUNCE BENZOYL, FOR

24  BARBITURATES, AND GLUCOSE -- I OBVIOUSLY THINK THAT

25  IS SOMETHING THAT IS FAIR GAME.

1    THE COURT:  THANK YOU.

2    MS. MAHONEY:  ONE THING ABOUT THE

3    SELF-DEFENSE THAT BOTHERS ME IS THAT BEFORE SELF-

4    DEFENSE CAN COME BEFORE THE JURY, THE DEFENDANT HAS

5    TO ADMIT TO HAVING COMMITTED THE CRIME.

6    THE COURT:  WELL, NO.  THERE NEEDS TO BE

7    SUFFICIENT EVIDENCE.

8    MS. MAHONEY:  AN AFFIRMATIVE PUT FORWARD BY

9    THE DEFENSE.  AND UNTIL THAT BECOMES AN ISSUE, I

10   DON'T THINK THAT CAN BE CONSIDERED AS TO WHY THESE

11   SHOULD BE LET IN.

12   WE HAVE NO KNOWN AMOUNT TO KNOW WHAT THE

13   FACTS WOULD BE, AND IT WOULD BE PREJUDICIAL TO MAKE

14   THOSE INFERENCES.  IT WOULDN'T BE FAIR TO ASSUME

15   THAT'S A LOT.  THAT ISN'T A FAIR ASSUMPTION AND

16   THAT'S MY POINT.

17   THE COURT:  I BELIEVE THE STATE'S ARGUMENTS

18   GO TO THE WEIGHT OF THE ANTICIPATED TESTIMONY

19   CONCERNING THE TOXICOLOGIST'S REPORT, AND THAT THE

20   JURY IS ENTITLED TO, AND THE DEFENSE IS ENTITLED TO

21   UNDERSTAND THE EXTENT OF WHAT THE VICTIM HAD TAKEN.

22   THE TOXICOLOGIST EXPERT WILL NO DOUBT

23   TESTIFY AS TO THE AMOUNTS  AND I WILL DENY THE

24   STATE'S MOTION TO EXCLUDE THE MENTION OF THE OTHER

25   DRUGS THAT WERE PRESENT IN THE VICTIM'S SYSTEM.

1            AND I WILL GRANT THE STATE'S MOTION TO

2    EXCLUDE CRIMINAL PRIOR BAD ACTS, UNLESS MR. HICKS

3    WISHES TO ADDRESS THE PRIOR BAD ACTS OF WHICH I'M

4    NOT AWARE.

5            MR. HICKS:  IN THE VICTIM?

6            THE COURT:  YES.

7            MR. HICKS:  NO.

8            THE COURT:  I WILL GRANT THE MOTION TO

9    EXCLUDE THE VICTIM'S CRIMINAL HISTORY AND OTHER

10   PRIOR BAD ACTS AS ARTICULATED TODAY.

11           AND IT IS MY UNDERSTANDING THAT THE STATE

12   AGREES THAT THE TOXICOLOGIST'S REPORT AND USE OF

13   ALCOHOL WILL COME IN.  AND I DENY THE STATE'S

14   MOTION TO EXCLUDE THE EVIDENCE IN THAT TOXICOLOGY

15   REPORT AS TO OTHER DRUGS THAT ARE PRESENT IN THE

16   VICTIM'S SYSTEM.

17           MR. HICKS:  I'M SORRY.  I CAN'T GO INTO ALL

18   THE DRUGS PRESENT?

19           THE COURT:  YOU CAN.

20           MR. HICKS:  I CAN, C-A-N?

21           THE COURT:  YES.

22           MR. HICKS:  COULD I ASK THE STATE FOR A

23   PROFFER ON ANY OTHER BAD ACTS WE ARE COVERING?  AND

24   I'M ASSUMING IT IS THE VICTIM'S RELATIVELY MINOR

25   CRIMINAL BACKGROUND, AND THERE ARE OTHER MATTERS

1    THAT I CAN'T GO INTO?

2          MS. MAHONEY:  I'M NOT AWARE OF ANY BAD ACTS.

3    I WOULD ASK FOR AN OFFER OF PROOF OF ANYTHING THE

4    DEFENSE WISHES TO OFFER.  I AM JUST MAKING A

5    GENERAL BLANKET STATEMENT.  NONE SHOULD COME UP

6    UNLESS WE SPECIFICALLY DISCUSS THEM.

7          THE COURT:  COULD YOU ARTICULATE WHAT THE

8    STATE KNOWS ABOUT THE PRIOR BAD ACTS?

9          MS. MAHONEY:  WHAT THE STATE KNOWS -- I KNOW

10   OF NONE OTHER THAN HIS PRIOR CRIMINAL OR

11   MISDEMEANOR HISTORY, AS WELL AS THE FACT THAT HE

12   HAS HAD A DRUG AND ALCOHOL PROBLEM, WHICH IS NOT

13   RELEVANT TO THIS CASE WHATSOEVER.

14         THE COURT:  NOW, HIS PRIOR CRIMINAL HISTORY

15   IS WHAT?

16         MS. MAHONEY:  HE HAS GOT LIKE A D.W.I., A

17   MISDEMEANOR.  THERE ARE NO FELONIES, NO CRIMES OF

18   DISHONESTY.

19         THE COURT:  AND DID THE VICTIM HAVE A CON-

20   VICTION FOR DRUG USE?

21         MS. MAHONEY:  NO.

22         THE COURT:  ALL RIGHT.  MR. HICKS?

23         MR. HICKS:  THAT IS WHAT I WAS FISHING FOR.

24         THE COURT:  THAT IS AS MUCH AS THE COURT

25   KNOWS AND YOU KNOW AT THIS POINT.

1        MR. HICKS:  YES.

2        THE COURT:  MOTION TO EXCLUDE IMPROPER

3   OPINION TESTIMONY OR CHARACTER EVIDENCE REGARDING

4   THE DEFENDANT:  SHALL WE HOLD THAT UNTIL WE GET

5   THROUGH THE OTHER ONES AND THEN TAKE THAT UP BEFORE

6   WE TAKE UP THE 3.5?

7        MS. MAHONEY:  THANK YOU.

8        THE COURT:  AGREED STIPULATIONS:  FOR

9   PURPOSES OF THE RECORD, IT IS MY UNDERSTANDING THAT

10  THE STATE AND THE DEFENSE HAVE AGREED TO STIPULATE

11  TO THE RESULTS OF THE D.N.A. TESTING PERFORMED ON

12  THE MURDER WEAPON.

13       MR. HICKS:  CORRECT.

14       THE COURT:  AND IT IS ALSO MY UNDERSTANDING

15  THAT TESTING CONCLUDES THAT THE BLOOD ON THE KNIFE

16  IS THE VICTIM'S AND COULD NOT BE MR. SIMMERS'.

17       MR. HICKS:  CORRECT.

18       THE COURT:  AND IT IS AGREED ALSO THERE WILL

19  BE NO MENTION OF THE D.N.A. TESTING PERFORMED ON

20  THE DEFENDANT'S PANTS?

21       MR. HICKS:  CORRECT.

22       THE COURT:  THE STATE AND THE DEFENDANT HAVE

23  ALSO AGREED TO STIPULATE THAT THE BLOOD FOUND ON

24  THE VICTIM'S GLASSES IS THE VICTIM'S BLOOD.

25       MR. HICKS:  RIGHT.

1    THE COURT:  AND, FINALLY, THE STATE AND THE

2    DEFENSE HAVE AGREED TO STIPULATE TO THE TESTIMONY

3    OF THE METRO SCHEDULE COORDINATOR.

4    ARE YOU DOING THAT AND ARE YOU DOING THIS

5    STIPULATION ABOUT THE D.N.A. TESTING BY FORMAL

6    STIPULATION THAT YOU WISH THE COURT TO READ TO THE

7    JURY?

8    MR. MARNER:  YOUR HONOR, I HAVE PREPARED A

9    STIPULATION ON THE FIRST AND SECOND MATTER AND ALSO

10   THE BLOOD ON THE EYEGLASSES.  I PROVIDED MR. HICKS

11   WITH A COPY OF THAT LAST WEEK, AND HE DIDN'T HAVE

12   ANY TROUBLE WITH IT.

13   AND I BELIEVE MR. HICKS IS GOING TO PROVIDE

14   THE COURT AND THE STATE WITH A COPY OF THE

15   STIPULATION REGARDING THE BUS SCHEDULER.

16   MR. HICKS:  WHAT THEY WANT TO DO IS

17   SEPARATELY DRAFT THAT, AND I HAVE AGREED TO DO

18   THAT.  BUT THE WORDING -- WELL, WE AGREED ON IT.

19   MR. MARNER:  OBVIOUSLY, YOUR HONOR, WE WOULD

20   DO THAT AT THE END OF OUR CASE.  I THINK I LEFT

21   SOME EMPTY BLANKS FOR EXHIBIT NUMBERS AND I DON'T

22   KNOW WHAT THAT IS GOING TO BE.

23   MS. MAHONEY:  WE WILL PUT IT ON THE REST OF

24   OUR CRIME SCENE EVIDENCE.

25   THE COURT:  THERE IS A MOTION TO EXCLUDE

22

1    REFERENCE TO STATEMENTS OR REACTIONS OF JONATHAN

2    WYATT.  DOES THE DEFENSE OPPOSE THIS MOTION?

3         MR. HICKS:  FRANKLY, THE DEFENSE WAS GOING

4    TO BRING THAT MOTION.  I AM A LITTLE SUSPICIOUS

5    WHERE THEY ARE GOING, BUT I AM GOING TO LET IT RIDE

6    FOR NOW.

7         IT IS TOO GOOD TO BE TRUE.  AGREED.

8         THE COURT:  THE COURT IS GRANTING THE

9    MOTION.  AS I UNDERSTAND IT FROM READING THE TRIAL

10   BRIEFS, MR. WYATT WAS ALSO ARRESTED AND MADE SOME

11   STATEMENTS, BEFORE SEEING AN ATTORNEY WHILE IN

12   CUSTODY.

13        AND SO THERE WILL BE NO REFERENCE TO

14   MR. WYATT AND ANY OF THOSE STATEMENTS AS I

15   UNDERSTAND IT?

16        MS. MAHONEY:  RIGHT.  YOUR HONOR, WHAT I

17   WOULD INTEND TO DO, BECAUSE OBVIOUSLY MR. WYATT IS

18   THERE, AND HE BECOMES -- HE IS SOMEONE THAT THE

19   JURY IS GOING TO HAVE TO HEAR ABOUT TO A CERTAIN

20   EXTENT.

21        I WOULD LIKE TO STATE FOR THE RECORD, AS

22   MR. HICKS AND I HAVE DISCUSSED -- WE HAVE DISCUSSED

23   NOT BRINGING HIM OUT FROM ECHO GLEN WHERE HE IS

24   CURRENTLY IN CUSTODY.

25        HE PLED GUILTY TO OTHER MATTERS RELATED TO

1    THIS CASE, AND HE HAS NOT BEEN CHARGED IN THE

2    MURDER.

3        AND HE HAS CONTINUALLY ASSERTED HIS FIFTH

4    AMENDMENT PRIVILEGE SINCE THE TIME OF THE INITIAL

5    INTERVIEW THAT NIGHT, AND SO HE IS UNAVAILABLE TO

6    EITHER SIDE AS A WITNESS.

7        I WOULD LIKE TO STATE THAT, AND THROUGH

8    SCRAP'S REPRESENTATION, HE WOULD NOT BE TAKING THE

9    STAND, AND HE WOULD NOT BE TESTIFYING IF WE BROUGHT

10   HIM HERE.

11       THE COURT: IS THAT YOUR UNDERSTANDING?

12   WOULD YOU LIKE THE LAWYER TO COME IN AND STATE THAT

13   ON THE RECORD OR WOULD YOU AGREE?

14       MR. HICKS: I WILL DEFER TO THE COURT. I DO

15   NOT PLAN IN ANY WAY, SHAPE OR FORM ATTEMPTING TO

16   GET MR. WYATT HERE FOR ANY PURPOSE.

17       WHETHER OR NOT I CAN AGREE, THE COURT IS

18   APPARENTLY LABORING UNDER THE ASSUMPTION THAT

19   MR. WYATT WAS A NONENTITY. THESE TWO KIDS CAME

20   INTO CONTACT WITH THE POLICE TOGETHER, AND IT WILL

21   BE IMPOSSIBLE NOT TO MENTION HIM.

22       MS. MAHONEY: COULD I GIVE A LIMITED OFFER

23   OF PROOF WHAT I INTEND TO BRING FORWARD? IN

24   ADDITION TO THE FACT HE IS UNAVAILABLE -- AND IF

25   THE COURT WOULD LIKE WE CAN BRING IN AN ATTORNEY

1    FROM SCRAP TO STATE THEY REPRESENT HIM -- BUT

2    BASICALLY HE WAS ARRESTED -- THEY WERE ARRESTED

3    TOGETHER, AND THEY WERE SEPARATELY TAKEN TO THE

4    MARINA, AND THAT AFTER DISCUSSIONS WITH MR. WYATT,

5    THEY THEN SPOKE WITH MR. SIMMERS.

6         WE WOULD NOT GET INTO THE CONTENT OF THOSE

7    DISCUSSIONS, OR HIS DEMEANOR DURING THAT TIME.  AND

8    THE REASON FOR THAT, I THINK IF YOU GO PART WAY YOU

9    HAVE TO GO THE WHOLE WAY.  AND IT SEEMS BETTER TO

10   AVOID IT ALTOGETHER.

11        BUT I DON'T THINK -- YOU CAN'T TALK AROUND

12   THE FACT HE WAS THERE, AND CERTAINLY AFTER

13   DISCUSSIONS WITH HIM -- AND THERE IS THESE BIG

14   BLOCKS OF TIME MR. SIMMERS IS LEFT SITTING IN A

15   HOLDING CELL AND THEY TALK TO MR. WYATT.

16        AND THERE IS NO MENTION OF WHAT EXACTLY HE

17   SAID OR HIS DEMEANOR DURING THAT TIME.  AND FROM

18   THAT POINT ON, NO MENTION OF WHAT HIS STATUS IS IN

19   THIS CASE, AND HE HAS NEVER BEEN CHARGED.

20        I THINK ALL OF THAT SHOULD BE EXCLUDED FROM

21   TESTIMONY BECAUSE HE IS UNAVAILABLE, AND THE JURY

22   SHOULD NOT BE SPECULATING AS TO WHY OR WHAT

23   HAPPENED, OR CHARGING PROCEDURES OR ANYTHING LIKE

24   THAT.

25        THE COURT:  ALL RIGHT.  BEFORE HEARING FROM

1    MR. HICKS, IT IS MY UNDERSTANDING THAT THE STATE

2    DOES NOT INTEND TO CALL MR. WYATT, WHETHER HE IS

3    AVAILABLE OR NOT?

4         MS. MAHONEY:  WE WOULD IF HE WERE AVAILABLE

5    BUTS HE IS UNAVAILABLE.

6         THE COURT:  BUT AT THIS POINT, YOU ARE NOT

7    CALLING HIM.  FOR WHATEVER REASON, YOU ARE

8    ARTICULATING YOU ARE NOT CALLING HIM.

9         I UNDERSTAND YOU ARE SAYING HE IS

10   UNAVAILABLE, BUT THAT IS A SEPARATE ANALYTICAL

11   ISSUE AND PROPOSITION.  AT THIS POINT YOU HAVE MADE

12   A DECISION YOU CAN'T CALL HIM; YOU ARE NOT CALLING

13   HIM.

14        AND MR. HICKS ALSO, AS I UNDERSTAND IT,

15   WOULD NOT BE CALLING MR. WYATT ON BEHALF OF THE

16   DEFENSE?

17        MR. HICKS:  VERY SAFE ASSUMPTION.

18        THE COURT:  SO NEITHER OF YOU ARE GOING TO

19   CALL HIM.  BOTH OF YOU ACKNOWLEDGE, HOWEVER, THERE

20   WILL BE MENTION OF HIM BECAUSE HE WAS ARRESTED

21   AND/OR DETAINED AT THE SAME TIME THAT THE DEFENDANT

22   WAS?

23        MR. HICKS:  CORRECT.  AND EVEN THOUGH I'M

24   SURE THE COURT IS GOING TO GRANT OUR MUTUAL REQUEST

25   THAT ANY MENTION OR ANY STATEMENT HE GAVE THE

1    POLICE SHOULD BE SUPPRESSED, ANY OTHER MENTION OF

2    HIM OTHER THAN THE NECESSARY CONTACT THAT IS

3    REQUIRED TO SHOW THAT THEY WERE TOGETHER AT THE

4    TIME OF THE ARREST -- AND THAT'S THE REASON CERTAIN

5    LAPSES OF TIME TOOK PLACE, BECAUSE THE POLICE ARE

6    OBVIOUSLY TALKING TO THEM -- WHY, THAT'S FINE.

7         BUT YOUR HONOR, I DO PLAN ON POSSIBLY

8    CALLING MRS. WYATT, THE MOTHER OF THE CHILD.    I

9    WILL BE VERY CAREFUL, BUT THIS IS WHY, NO MATTER

10   HOW CAREFUL -- AND I'M SURE COUNSEL WILL BE VERY

11   CAREFUL -- NO MATTER HOW CAREFUL I AM, THE JURY

12   WILL GET THE IMPRESSION, BECAUSE OF THEIR INTERVIEW

13   TOGETHER, THAT IT IS VERY POSSIBLE, AND, INDEED, IT

14   WAS THE STATE'S ORIGINAL THEORY, THEY WERE TOGETHER

15   AT THE TIME OF THE HOMICIDE.

16        TO REBUT THAT, I AM GOING TO CALL MRS. WYATT

17   TO TESTIFY.   AND SHE WILL TESTIFY -- MY

18   INVESTIGATOR HAS ALREADY TALKED TO HER -- THAT HER

19   SON WAS HOME THE ENTIRE EVENING OF THE HOMICIDE,

20   THE ENTIRE EVENING.

21        NOW, I'M GOING TO BE VERY CAREFUL IN PUTTING

22   HER ON THE STAND AND TELL HER NOT TO EXTRAPOLATE ON

23   ANYTHING.

24        SHE IS VERY NERVOUS, AND SHE IS NOT A

25   TERRIBLY COOPERATIVE WITNESS, EVEN THOUGH I FOUND

1    HER POLITE WITH ME.   BUT THAT IS THE EXTENT I WILL

2    BE CALLING HER.

3            I WANT IT CLEAR, I AM NOT OPENING ANY DOORS

4    WHATSOEVER, AND I WILL TELL HER NOT TO -- JUST HER

5    STATEMENT THAT HER SON WAS HOME THAT EVENING.

6            MS. MAHONEY:   I HAVE NO PROBLEM WITH THAT

7    BECAUSE WE MAY CALL HER AS WELL.   SHE SAYS HE COULD

8    HAVE SNUCK OUT; SHE JUST KNOWS HE WAS HOME UNTIL

9    SHE WENT TO BED.   AND SO I HAVE NO PROBLEM WITH

10   THAT.

11           THE COURT:   ALL RIGHT.   ON THIS QUESTION OF

12   UNAVAILABILITY, THAT DOESN'T END THE INQUIRY.   AND

13   HAVING COUNSEL COME IN AND PUT SOMETHING ON THE

14   RECORD IS NOT THE BEGINNING AND THE END OF THE

15   INQUIRY.

16           OBVIOUSLY, MR. WYATT CANNOT TAKE A BLANKET

17   FIFTH AMENDMENT.   HE CANNOT ASSERT A BLANKET FIFTH

18   AMENDMENT PRIVILEGE AS TO ANY AND ALL QUESTIONS.

19           BUT GIVEN THE POSTURE OF MR. WYATT AS BEING

20   SOMEONE THAT NEITHER SIDE AT THIS POINT, FOR

21   REASONS STATED, ANTICIPATE CALLING, I DON'T BELIEVE

22   THAT WE NEED TO HAVE A SEPARATE HEARING AS TO

23   MR. WYATT AND HAVE HIS ATTORNEY HERE.

24           I WILL GRANT THE MOTION TO EXCLUDE ANY

25   REFERENCE TO THE STATEMENTS OR REACTIONS OF

1    JONATHAN WYATT, RECOGNIZING THAT BOTH COUNSEL

2    ANTICIPATE THERE WILL BE THE NECESSITY OF

3    ACKNOWLEDGING, AND THERE WILL BE TESTIMONY TO THE

4    EXTENT THAT HE WAS WITH MR. SIMMERS, AND THAT THEY

5    WERE BOTH TOGETHER AT THE TIME THAT THEY WERE

6    DETAINED OR ARRESTED.

7         AND IT IS MY UNDERSTANDING THAT MRS. WYATT

8    MAY BE CALLED BY THE DEFENSE, AND THAT THE STATE

9    HAS NO OBJECTION TO THAT.

10        I DON'T BELIEVE THAT THE DEFENSE WOULD BE IN

11   ANY WAY OPENING ANY DOORS AS TO STATEMENTS OR

12   REACTIONS OF MR. WYATT, WITH THE OFFER OF PROOF

13   MADE; HOWEVER, MR. HICKS, YOU ARE OBVIOUSLY AWARE

14   OF THE POTENTIAL FOR CONCERN RELATED TO

15   MRS. WYATT'S TESTIMONY, AND THAT IT WOULD HAVE TO

16   BE DONE IN SUCH A MANNER, AND SHE WOULD HAVE TO BE

17   CAREFULLY PREPARED, SUCH THAT SHE DID NOT ON HER

18   OWN SOMEHOW OPEN UP THAT ISSUE.

19        PARENTHETICALLY, I AM GOING TO TALK TO

20   COUNSEL BEFORE WE BEGIN THE TRIAL, IN CHAMBERS,

21   ABOUT GENERAL PROCEDURES AND SUCH TO FOLLOW DURING

22   TRIAL.  BUT I WOULD AT THIS POINT ASK THAT IF

23   EITHER SIDE BELIEVES THAT AN ISSUE HAS BEEN OPENED

24   UP, THAT IS, AN ISSUE THAT THE COURT HAS RULED ON,

25   THAT YOU RAISE IT AT SIDE-BAR BEFORE YOU EVER RAISE

1    IT THROUGH QUESTIONING OR ANY OTHER REFERENCE

2    BEFORE THE JURY.

3         AND SO I SIMPLY USE THIS AS AN OPPORTUNITY

4    TO MAKE THAT OBSERVATION.

5         THE MOTION TO EXCLUDE REFERENCE TO OTHER

6    SUSPECTS:  THERE HAS BEEN A SEPARATE BRIEF PROVIDED

7    BY THE STATE ON THAT -- MR. HICKS, ON BEHALF OF

8    MR. SIMMERS, HAS ALSO PROVIDED THE COURT WITH A

9    BRIEF, AND I AM GOING TO NEED TIME TO GO THROUGH

10   THE CASE AUTHORITIES CITED, AND I WILL RESERVE

11   RULING ON THAT UNTIL I HAVE HAD THAT OPPORTUNITY.

12        I THINK IT IS PROBABLY PRUDENT THAT I ALSO

13   RESERVE RULING ON IT UNTIL I HAVE HAD AN

14   OPPORTUNITY TO READ THE CASE LAW BEFORE HEARING

15   ARGUMENT FROM COUNSEL TO THE EXTENT YOU WISH TO

16   HIGHLIGHT CASE LAW.  THEN I WOULD HAVE IT IN MIND.

17        THE MOTION IN LIMINE ABOUT KEVIN OLSON --

18        MR. HICKS:  YOUR HONOR, CAN YOU REFERENCE

19   THE PAGE?

20        THE COURT:  PAGE 15, NO. 12.

21        MS. MAHONEY:  YOUR HONOR, REGARDING KEVIN

22   OLSON --

23        THE COURT:  WHO IS HE?

24        MS. MAHONEY:  I'M SURE YOU GATHERED FROM THE

25   STATE'S TRIAL BRIEF, HE IS A JAIL INMATE.

1    THE COURT:  HE IS THE PERSON TO WHOM

2    MR. SIMMERS ALLEGEDLY MADE STATEMENTS IN THE JAIL?

3    MS. MAHONEY:  THAT'S CORRECT.  MR. OLSON HAS

4    AN EXTENSIVE CRIMINAL HISTORY, AND I HAVE IT LAID

5    OUT.  AND THE STATE WOULD AGREE UNDER THE CASE LAW

6    AND THE RULES, THE ONES THAT I HAVE -- THE

7    CONVICTIONS THAT I HAVE LAID OUT, WOULD CERTAINLY

8    BE ADMISSIBLE.

9    THE COURT:  THE UNDERLYING CRIMES FOR

10    BURGLARY IN THE SECOND DEGREE --

11    MS. MAHONEY:  THEY ARE THEFT-RELATED OR

12    INTENDED -- ACTUALLY, MR. OLSON CANDIDLY SAID,

13    "GIVEN MY CURRENT STATE OF MIND, I COULDN'T TELL

14    YOU WHAT I WAS DOING," BUT WE WILL STIPULATE THEY

15    COME IN.

16    THE COURT:  THAT'S ONE, TWO, THREE, FOUR,

17    FIVE, SIX --

18    MS. MAHONEY:  THERE ARE ADDITIONAL ONES ON

19    HIS CRIMINAL HISTORY THAT HAS BEEN PROVIDED BY

20    MR. HICKS THAT I WOULD OBJECT TO.  AND BEFORE WE GO

21    ANY FURTHER, I WOULD ASK MR. HICKS IF THERE IS A

22    DISAGREEMENT IN WHAT I HAVE SET OUT HERE?

23    DID YOU INTEND TO ELICIT ANYTHING FURTHER

24    THAN WHAT HAS BEEN SET OUT HERE?

25    MR. HICKS:  WHAT OTHER OFFENSES HAS HE BEEN

1    TALKING ABOUT?

2         MS. MAHONEY:  HE HAS TWO BURGLARIES OVER TEN

3    YEARS OLD, AND SO THOSE SHOULD BE EXCLUDED UNDER

4    E.R. 609.

5         AND THE FIRST TWO, I HAVE NOT -- I WOULD NOT

6    BE AGREEING TO BECAUSE THEY ARE OVER TEN YEARS.

7    AND THE ESCAPE CHARGES, I'M OBJECTING TO IN THE

8    VUCSA BECAUSE THEY ARE CRIMES OF DISHONESTY.  AND

9    THEY ARE NOT -- IT WOULD BE MY POSITION THAT

10   THEY DON'T GO TO IMPEACHMENT.

11        AND THE FACT THAT HE HAS BEEN -- HAS HAD

12   DRUG AND ALCOHOL PROBLEMS BECAUSE HE WAS NOT ON

13   DRUGS AND ALCOHOL AT THE TIME THAT HE SPOKE WITH

14   MR. SIMMERS -- I WOULD MOVE THAT THAT IS ALSO NOT

15   RELEVANT AND WOULD MOVE TO EXCLUDE IT.  IT IS MORE

16   PREJUDICIAL THAN PROBATIVE.

17        THE COURT:  MR. HICKS, DID YOU WANT TO

18   RESPOND TO THIS NOW OR RESPOND TO IT LATER?

19        MR. HICKS:  WELL, I WOULD LIKE SOME TIME ON

20   THAT ONE.

21        THE COURT:  I THOUGHT YOU MIGHT.  AND SO WHY

22   DON'T YOU -- AND YOU WILL HAVE THE OPPORTUNITY TO

23   LOOK AT THE INFORMATION YOU HAVE BEEN PROVIDED, AND

24   WE WILL TAKE THAT UP LATER.

25        MR. HICKS:  I WAS DISTRACTED ON COUNSEL'S

1    LAST POINT.

2            MS. MAHONEY:  HIS DRUG AND ALCOHOL HISTORY,

3    I WILL MOVE TO EXCLUDE THAT.

4            THE COURT:  THE STATE IS MOVING TO EXCLUDE

5    DRUG AND ALCOHOL ABUSE HISTORY.  THE ARGUMENT IS

6    THAT AT THE TIME OF THE ALLEGED STATEMENTS BEING

7    MADE, MR. OLSON WAS NOT ON DRUGS OR ALCOHOL.

8            MR. HICKS:  OKAY.

9            THE COURT:  NOW, LET ME TURN TO THE DEFENSE

10   LIST OF MOTIONS IN LIMINE.

11           MS. MAHONEY:  YOUR HONOR, JUST BRIEFLY UNDER

12   13, I PUT OTHER MOTIONS.  THERE ARE TWO THAT I

13   NOTED FROM THE BRIEFING MAY BE FAIRLY QUICK.

14           THE COURT:  OKAY.

15           MS. MAHONEY:  ACTUALLY, I ALREADY DEALT WITH

16   JONATHAN WYATT BEING UNAVAILABLE, BUT MR. HICKS HAS

17   LISTED AS A WITNESS, KATE GARMAN, WHICH I WAS AWARE

18   OF.  I WOULD MOVE TO EXCLUDE HER TESTIMONY, AND I

19   WILL STATE THE BASIS:  AND IF THE COURT WANTS TO

20   RESERVE, IT WILL GIVE MR. HICKS TIME --

21           SHE IS APPARENTLY A FRIEND OF DONNA BERUBE,

22   THE DEFENDANT'S MOTHER.  MRS. BERUBE ATTENDED A

23   GARDENING SEMINAR AT MOLBEK'S NURSERY THAT MORNING

24   AND NEVER SPOKE WITH THE DEFENDANT THAT DAY.  AND

25   SHE NEVER SAW THE DEFENDANT THAT DAY.

1           AND IT IS MY UNDERSTANDING THAT MS. GARMAN

2      IS BEING OFFERED SIMPLY TO TESTIFY TO THE HEARSAY

3      TESTIMONY THAT MRS. BERUBE COMMENTED TO HER THAT

4      IAN WAS HOME FRIDAY NIGHT WHEN SHE ARRIVED, WHICH

5      SURPRISED HER, AND WAS HOME THAT MORNING.

6           AND BECAUSE IT IS CLEARLY HEARSAY TESTIMONY,

7      AND IT IS EVEN DOUBLE HEARSAY BECAUSE IT COMES FROM

8      MRS. BERUBE TO HER, I WOULD MOVE TO EXCLUDE THAT.

9           MR. HICKS:  IT IS NOT DOUBLE HEARSAY, AND

10     THE MOST AUTOMATIC RESPONSE IS STATE OF MIND.  THE

11     DEFENSE'S ALIBI -- THIS IS THE ONLY WITNESS THAT

12     STATES MRS. BERUBE -- UNDER TOTALLY TRUSTWORTHY

13     CIRCUMSTANCES, FOUR DAYS BEFORE MR. SIMMERS WAS

14     EVEN CONTACTED BY THE POLICE -- STATED HER SON WAS

15     HOME THAT NIGHT.

16          OBVIOUSLY STATE OF MIND, AND IT IS CERTAINLY

17     NOT DOUBLE HEARSAY.  AND SHE IS BASING IT ON THE

18     FACT THAT SHE REMEMBERS HER SON BEING HOME THAT

19     NIGHT, AND THEREFORE IT IS NOT HEARSAY.

20          MS. MAHONEY:  MAY I BRIEFLY RESPOND?  THE

21     STATE OF MIND OF THE MOTHER IS NOT AT ISSUE HERE.

22     SHE IS NOT CHARGED WITH THE CRIME; HER STATE OF

23     MIND IS IRRELEVANT.

24          IT MIGHT BE A PRIOR INCONSISTENT STATEMENT

25     IF I WERE TO CHALLENGE THE FACT MRS. BERUBE SAID

1    SOMETHING DIFFERENT ON A DIFFERENT DATE.  BUT I

2    DON'T HAVE THE INTENTION TO DO THAT, AND I WOULD

3    ASK THEY BE EXCLUDED UNTIL THE COURT HEARS FROM

4    MRS. BERUBE.

5         BUT HER STATE OF MIND IS NOT AT ISSUE IN

6    THIS CASE.

7         MR. HICKS:  THERE IS NO RULE WHATEVER THE

8    STATE OF MIND IS CONFINED TO THE DEFENDANT.  AND

9    OBVIOUSLY THE JURY WILL LOOK AT THE FAMILY MEMBERS

10   WHO COMPRISE THE ALIBI AND TRY TO DECIDE IF THEY

11   ARE TRUTHFUL ALIBI WITNESSES.

12        HERE IS A LAY PERSON THAT MRS. BERUBE, FOR

13   WHATEVER REASON, SAW FIT TO MENTION CON-

14   VERSATIONALLY, UNDER NOT SELF-SERVING CONDITIONS,

15   THAT HER SON WAS HOME THAT NIGHT.

16        THE COURT:  ALL RIGHT.  I WILL RESERVE

17   RULING ON WHETHER OR NOT THIS WITNESS CAN TESTIFY

18   UNTIL AFTER HEARING FROM -- HEARING THE TESTIMONY

19   OF MRS. BERUBE.

20        I KNOW THAT PERHAPS PUTS THE DEFENSE IN AN

21   AWKWARD POSITION, SINCE THEY MUST CALL MRS. BERUBE

22   FIRST, BUT IT SEEMS THAT WOULD BE THE LOGICAL WAY

23   TO PROCEED.

24        MR. HICKS:  COULD I ASK THE COURT'S -- UNDER

25   WHAT THEORY THE COURT IS CONDITIONING ITS RULING ON

1    MRS. BERUBE FIRST TESTIFYING?

2         THE COURT:  TO ASCERTAIN WHAT MRS. BERUBE'S

3    TESTIMONY WOULD BE, AND THEREFORE WHETHER OR NOT

4    THE OTHER WITNESS WOULD TESTIFY BASED ON WHAT SHE

5    TESTIFIED TO BEFORE THE JURY.

6         MR. HICKS:  WHAT I CAN SEE COMING IS HAVING

7    TO ELICIT FROM MRS. BERUBE IN FRONT OF THE JURY --

8    OBVIOUSLY WE SHOULD NOT DO THAT -- "DID YOU SAY

9    THIS TO THIS WOMAN, MS. GARMAN"?  AND WE SHOULD DO

10   THAT OUTSIDE THE PRESENCE OF THE JURY.

11        THE COURT:  I WILL RESERVE RULING ON THIS TO

12   THE END OF THE STATE'S CASE SO I DON'T PUT THE

13   DEFENSE IN THE AWKWARD POSITION OF HAVING TO DO

14   THAT.

15        MS. MAHONEY:  THAT'S ALL I HAVE AT THIS

16   TIME.

17        THE COURT:  MR. HICKS' MOTIONS ARE ON PAGE

18   3, MOTIONS IN LIMINE.

19        MS. MAHONEY:  I'VE AGREED TO SEVERAL --

20        MR. HICKS:  WHY DON'T WE COVER THE PRIORS

21   FIRST, NO. 1 ON PAGE 3.

22        THE COURT:  YES.  MR. SIMMERS' PRIOR

23   CONVICTIONS.  IT IS MY UNDERSTANDING THAT THEY ARE

24   ASSAULT 4 --

25        MS. MAHONEY:  I WILL AGREE TO ALL OF HIS

1    JUVENILE CONVICTIONS, WITH THE RESERVATION --

2    UNLESS HE TAKES THE STAND AND OPENS THE DOOR.  BUT

3    IN OUR CASE-IN-CHIEF, I AGREE TO ALL OF THE

4    JUVENILE CONVICTIONS.

5        MR. HICKS:  WELL, OBVIOUSLY THERE IS AN

6    ISSUE ON THE ADULT CONVICTIONS HAVING TO DO WITH

7    THE BOAT PROWLS AND THE ARSONS, UNDER THE FACTS THE

8    STATE IS CONTESTING AND WANTS TO INTRODUCE EVIDENCE

9    THAT HE DID PLEAD GUILTY TO RECENT BOAT PROWLS AND

10   ARSON.

11       MS. MAHONEY:  I DON'T INTEND TO OFFER THAT

12   IN MY CASE-IN-CHIEF, OTHER THAN THE FACT

13   MR. SIMMERS WAS ARRESTED ON OTHER MATTERS, AND

14   OTHER MATTERS WERE DISCUSSED.  I THINK THAT IS RES

15   GESTAE.  THAT CLEARLY COMES IN AS PART OF WHAT WE

16   ARE TALKING ABOUT.

17       BUT SPECIFICALLY WHAT HE WAS CHARGED AND

18   WHAT HE HAS PLED TO, THE STATE DOES NOT INTEND TO

19   INTRODUCE; HOWEVER, THE STATE DOES ANTICIPATE THAT

20   THE ENTIRE DEFENSE IN THIS CASE WILL BE BASED ON

21   THE FACT THAT MR. SIMMERS GAVE A FALSE CONFESSION

22   TO THE MURDER, AND WOULD LIKE TO RESERVE THE

23   OPPORTUNITY TO BRING THEM UP IN REBUTTAL BECAUSE

24   THE FACT OF THE MATTER IS, HE DID ALSO CONFESS TO

25   SEVERAL OTHER CRIMES THAT DAY -- THE ONES HE HAS

1    PLED GUILTY TO AS WELL AS OTHERS THAT HAD

2    PHYSICALLY CORROBORATING EVIDENCE, SUCH AS

3    FINGERPRINTS, AND SHOE PRINTS, AND THINGS OF THAT

4    NATURE, WHICH CORROBORATE HE WAS TELLING THE TRUTH

5    ABOUT THAT CONFESSION.

6         AND IT MAY COME UP UNDER THAT.  BUT AS FAR

7    AS THE STATE'S CASE-IN-CHIEF, EVIDENCE RULE 609,

8    THE STATE DOES NOT INTEND TO MENTION THAT UNTIL WE

9    HAVE ADDRESSED IT WITH THE COURT.

10         MR. HICKS:  OBVIOUSLY, THAT PUTS ME IN AN

11   ABSOLUTELY IMPOSSIBLE POSITION.  FIRST OF ALL, TO

12   STATE THE OBVIOUS -- AND IT HAS HAPPENED IN MANY

13   HOMICIDE CASES -- THEY CAN OBVIOUSLY WORK AROUND

14   THE FACT THAT MR. SIMMERS WAS ARRESTED AND

15   CONFESSED TO A WHOLE STRING OF HEINOUS CRIMES AS A

16   JUVENILE.

17         THESE ARE ARSONS AND PROPERTY CRIMES, AND

18   THERE'S A WHOLE LOT OF THEM.  AND THEY DO HAPPEN TO

19   STATE MR. SIMMERS WAS IN CONTACT WITH THE POLICE

20   WHEN HE GAVE THESE STATEMENTS, BUT THERE IS NO

21   REQUIREMENT THE JURY HAS TO HEAR WHY -- NO

22   REQUIREMENT WHATSOEVER.

23         I AM NOT GOING TO RAISE THE ISSUE THEY HAD

24   PROBABLE CAUSE TO ARREST HIM OR THEY DIDN'T HAVE A

25   SUSPICION.  BUT THERE IS NO REASON -- OTHER THAN TO

1    POSSIBLY PREJUDICE THE JURY OR TO REBUT A DEFENSE

2    CLAIM THEY HAD NO REASON TO ARREST HIM, WHICH IS

3    NOT GOING TO HAPPEN -- FOR THEM TO INTRODUCE THESE

4    ARSONS OR INTRODUCE THE FACT HE WAS UNDER ARREST

5    FOR OTHER CRIMES AS A MEANS OF INTRODUCING THE

6    STATEMENT.  AND THAT WOULD BE THE ONLY REASON THEY

7    COULD.

8         AND I DON'T BELIEVE THAT IS NECESSARY.  I

9    DON'T HAVE TO GET IN A 403 VERSUS A 401 ARGUMENT.

10   THE OBVIOUS PREJUDICE IS BEFORE THE COURT, AND ITS

11   PROBATIVE VALUE IS LITERALLY NON-EXISTENT.

12        IT WOULD BE SIMPLY FOR THE REASON OF SHOWING

13   HOW MR. SIMMERS CAME IN CONTACT WITH THE POLICE,

14   AND THAT'S NOT NECESSARY.

15        THE COURT:  ALL RIGHT.

16        MS. MAHONEY:  AGAIN, I DON'T INTEND TO GO

17   THROUGH THE LITANY OF EVERYTHING HE WAS CHARGED

18   WITH THAT DAY, BUT RES GESTAE TOO IS THE FACT HE

19   WAS ARRESTED AND HOW HE CAME IN CONTACT WITH THE

20   POLICE.

21        AND WE DON'T RELITIGATE THE 3.5 IN FRONT OF

22   THE JURY WHY HE WAS IN CUSTODY, AND WHY THEY WERE

23   DOING ALL THESE THINGS BACK AND FORTH FOR SEVERAL

24   HOURS -- TEN HOURS.

25        AND SO I THINK THAT TO THE EXTENT THAT WE

1    TALK ABOUT HE WAS, YOU KNOW, ARRESTED OR DETAINED

2    WITH JONATHAN WYATT FOR SHOOTING THE FLARE GUNS,

3    AND THEN INVESTIGATED FOR OTHER MATTERS, THAT'S

4    FINE.

5         THEY CAN TALK ABOUT THEM AS "OTHER MATTERS,"

6    AND THAT THEY WERE TAKEN TO THE MARINA AND SUCH FOR

7    THE INVESTIGATION OF OTHER MATTERS, BUT I DON'T

8    NEED TO SPECIFICALLY GET INTO THEM.

9         AND I HAVE NO INTENTION OF SITTING DOWN AND

10   GOING THROUGH QUESTIONS LIKE:  "YOU DID 22 BOAT

11   PROWLS, AND HOW MANY THEFTS"?  "HOW MANY ARSONS"?

12        THAT'S NOT MY POINT.  MY POINT IS JUST TO

13   GET THROUGH SETTING UP WHAT THEY ARE DOING, AND I

14   HAVE NO PROBLEM TALKING ABOUT THEM AS JUST OTHER

15   INCIDENTS.

16        THE COURT:  AND SO, MR. HICKS, IT IS MY

17   UNDERSTANDING THAT THE STATE WOULD LIKE TO BE ABLE

18   TO HAVE THE JURY KNOW THAT MR. SIMMERS AND

19   MR. WYATT WERE DETAINED OR ARRESTED AND THAT THEY

20   WENT TO THE MARINA IN CONNECTION WITH THEIR

21   INVESTIGATION.

22        DOES DEFENSE HAVE AN OBJECTION TO THAT?

23        MR. HICKS:  YES.

24        MS. MAHONEY:  BY THE WAY, SOME OF THE

25   STATEMENTS FROM MR. SIMMERS COME ON THE WAY TO THE

1    MARINA.  THAT'S WHY IT IS IMPORTANT.

2           THE COURT:  WHAT IS THE OBJECTION OF THE

3    DEFENSE TO THE STATEMENT AS ARTICULATED?

4           MR. HICKS:  YOUR HONOR, THEY ARE NOT

5    INTRODUCING THE TRIP IN THE AUTOMOBILE AS PART OF

6    THE INVESTIGATION OF THE HOMICIDE.  IT WOULD BE

7    PART OF THE INVESTIGATION OF THE BOAT PROWLS AND

8    ARSONS.

9           THE COURT:  SO THERE WERE NO STATEMENTS MADE

10   IN THE CAR RELATED TO THE CHARGE?

11          MR. HICKS:  UNFORTUNATELY, THERE WERE.  YOU

12   KNOW, THE POLICE SHOULDN'T HAVE BEEN DOING THAT,

13   BUT THAT'S A SEPARATE ISSUE.

14          IN ANY EVENT, YEAH, THERE IS SOME VERY BRIEF

15   ABSOLUTELY INCIDENTAL QUESTIONING, BECAUSE THE

16   POLICE KNEW THESE TWO INDIVIDUALS WERE RUNNING

17   AROUND THE BURKE-GILMAN TRAIL, THEY KNEW ABOUT THE

18   RECENT HOMICIDE.

19          BOTHELL APPARENTLY DOES NOT HAVE THEIR FAIR

20   SHARE OF HOMICIDES, COMPARED TO OTHER CITIES, BUT

21   IN ANY EVENT, YES, ONE POLICE OFFICER ASKED

22   SOMETHING TO THE EFFECT:  "WERE YOU ON THE

23   BURKE-GILMAN TRAIL LAST NIGHT?  DO YOU KNOW

24   ANYTHING ABOUT THE DEATH OF THIS MAN"?  -- I DON'T

25   KNOW THE EXACT WORDS.

1          BUT REALLY THAT'S IT.  WHY DO WE HAVE TO

2     HAVE THE PRECISE NATURE OF WHY THESE TWO YOUNG GUYS

3     WERE BEING DETAINED TO GET THAT OUT?

4          I DON'T BUY THIS ARGUMENT THE JURY GETS TO

5     HEAR EVERYTHING SO THEY UNDERSTAND.  JURIES ARE HIP

6     TO THE FACT THEY ARE NOT GOING TO HEAR EVERYTHING,

7     AND I DON'T SEE THE PROBATIVE VALUE OUTWEIGHING THE

8     PREJUDICE.

9          THE COURT:  UNTIL I LISTEN TO THE TESTIMONY

10    ON THE 3.5, I AM NOT CERTAIN ABOUT WHAT THE

11    STATEMENTS ARE OTHER THAN WHAT COUNSEL HAS BEEN

12    ABLE TO TELL ME.

13          AND, THEREFORE, I AM NOT CERTAIN ABOUT HOW

14    CRITICAL BEING ABLE TO EXPLAIN THAT THEY WERE GOING

15    TO THE MARINA IS OR IS NOT AT THIS POINT.

16          IT DOES APPEAR TO ME THAT IT IS NOT AT ALL

17    NECESSARY TO HAVE BEFORE THE JURY ANY SPECIFIC

18    REFERENCE OF ANY NATURE TO THE PRECISE REASONS THAT

19    MR. WYATT AND MR. SIMMERS WERE DETAINED AND

20    ARRESTED.

21          THEREFORE, THERE WOULD BE NO MENTION ABOUT

22    FLARE GUNS AND THINGS OF THAT NATURE RELATED TO

23    THOSE.

24          AND WHETHER OR NOT THE STATE CAN INDICATE

25    THAT THEY WERE DETAINED FOR OTHER MATTERS AND THEN

1    GO TO THE MARINA, SINCE THOSE ARE INTEGRALLY

2    RELATED -- I WILL RESERVE RULING ON THAT PORTION

3    UNTIL HEARING THE 3.5 TESTIMONY.

4         BUT IT IS MY UNDERSTANDING, SO WE ARE ALL

5    CLEAR, FOR PURPOSES OF THE TRIAL, THE STATE IN NO

6    WAY IN THEIR CASE-IN-CHIEF WILL BE MENTIONING ANY

7    OF MR. SIMMERS' CRIMINAL HISTORY, OR THE PLEAS

8    RELATED TO THE ARSON AND BOAT AND VEHICLE PROWLS AT

9    ALL.

10        SO THERE WILL BE NO REFERENCE TO THAT IN THE

11   CASE-IN-CHIEF.  THE STATE IS, HOWEVER, CONCERNED

12   THAT THERE MAY BE A NECESSITY OF RAISING THIS ON

13   REBUTTAL, AND OBVIOUSLY THE COURT CANNOT RULE ON

14   THAT AT THIS POINT.

15        MR. HICKS:  YOUR HONOR, TO STATE THE

16   OBVIOUS, THE STATE HAS ALSO AGREED NOT TO MENTION

17   HIS OTHER PREVIOUS OFFENSES, JUST SO WE ARE CLEAR

18   ON THAT.

19        THE COURT:  THANK YOU.  MS. MAHONEY, DO YOU

20   NEED TO TAKE A BREAK?

21        MS. MAHONEY:  FINE, THANK YOU.

22        MR. HICKS:  YOUR HONOR, THANK YOU, NOW THAT

23   YOU MENTION IT.

24        THE COURT:  I THINK THE CORRECTION OFFICERS

25   NEED AT LEAST 15 OR 20 MINUTES, AND WE WILL BE IN

1    RECESS UNTIL THEY COME BACK.

2                    (RECESS.)

3         THE COURT:  ALL RIGHT.  THE NEXT MOTION IN

4    LIMINE THAT THE DEFENSE HAS IS TO EXCLUDE EVIDENCE

5    THAT MR. SIMMERS WAS LISTED AS A RUNAWAY, WITH

6    OUTSTANDING WARRANTS.

7         MS. MAHONEY:  I HAVE NO OBJECTION TO THAT.

8    WE JUST RESERVE IT IN CASE IT BECOMES RELEVANT

9    BASED UPON THEIR TESTIMONY, BUT WE WOULD RAISE THAT

10   OUTSIDE THE PRESENCE OF THE JURY.  BUT AT THIS

11   POINT I AGREE.

12        MR. HICKS:  OKAY.

13        THE COURT:  ALL RIGHT.  NO. 3 IS OBSERVATION

14   BY OFFICERS THAT MR. SIMMERS SEEMS TO LIKE CRIMES,

15   AND BRAGS ABOUT SELLING DOPE, BEING A GANG MEMBER

16   AND SEEMS PROUD OF IT.

17        MR. HICKS:  WELL, I CHANGED MY MIND --

18        THE COURT:  THIS IS WITHDRAWN?

19        MR. HICKS:  YEAH, IT IS WITHDRAWN IN THAT

20   CONTEXT.

21        I'M TALKING ABOUT THE BRAGGING.  AND THE

22   REASON I SAY THAT -- THIS IS A VERY, VERY DIFFICULT

23   CALL FOR ME, AND I FRANKLY HAVE NEVER DONE IT

24   BEFORE, BUT GIVEN THE PARTICULAR POSTURE OF OUR

25   KIND OF DEFENSE -- AND I THINK THE STATE COULD

1    ARGUE THAT WOULD BE INCOMPATIBLE, MY ARGUING ABOUT

2    HIS LOVE OF BRAGGING --

3        THE COURT:  I WILL RESERVE RULING ON THIS.

4    UNTIL I RULE ON THE MOTION THAT HAS BEEN MADE

5    RELATING TO REPETITION AND/OR HABIT EVIDENCE.  I

6    WILL RESERVE RULING ON THIS, AND WE SHOULD TAKE

7    THIS UP AT THE CONCLUSION OF AND IN THE CONTEXT OF

8    THAT MOTION.

9        MS. MAHONEY:  IF IT WILL HELP, WE ONLY PLAN

10   ON BRINGING IN THE STATEMENTS HE MADE DURING THE

11   COURSE OF HIS CONFESSION.  I DON'T THINK OPINIONS

12   ARE PROPER.

13       THE COURT:  STATEMENTS MADE BY MR. SIMMERS?

14       MS. MAHONEY:  EXACTLY.  OPINION EVIDENCE

15   WOULD BE IMPROPER, AND I WILL NOT ELICIT IT.

16       THE COURT:  SO THERE WOULD BE NO TESTIMONY

17   BY DETECTIVE RAFTIS ABOUT WHAT MR. SIMMER SAID,

18   EXCEPT IN THE CONTEXT OF WHAT HE SPECIFICALLY

19   STATED IN HIS STATEMENT?

20       MS. MAHONEY:  CORRECT.  I DON'T EVEN KNOW IF

21   THE STATE WILL BE CALLING RAFTIS IN THEIR CASE-

22   IN-CHIEF.  HE IS PROBABLY A 3.5 WITNESS.

23       MR. HICKS:  I WANT IT ON THE RECORD --

24   TYPICALLY, I HAVE A WITNESS LIST, BUT I HAVE

25   ENDORSED ALL WITNESSES FROM THE STATE.  AND I DON'T

1    WANT ANY WITNESSES EXCUSED FROM A SUBPOENA UNLESS I

2    AM NOTIFIED.  I MAY VERY WELL CALL THEM IN THE

3    DEFENSE CASE.

4            THE COURT:  NO. 4, THAT THE DEFENDANT

5    SUFFERS FROM MANIC DEPRESSION, AND IS UNDER

6    PSYCHOLOGICAL CARE AND HAS RECEIVED SIMILAR

7    TREATMENT IN THE PAST.

8            MS. MAHONEY:  THE STATE AGREES.

9            THE COURT:  GRANTED.  NO REFERENCE BY ANYONE

10   IN ANY FASHION.

11           NO. 5, THE COURT HAS RESERVED ON, AND I

12   THINK I DO NEED AN EXPLANATION.  I HAVE LOOKED AT

13   THE PHOTOGRAPHS OVER THE BREAK, OF THE RELEVANCE OF

14   PROBABLY ALL OF THEM, TO PUT IT IN CONTEXT, BUT

15   THERE ARE A COUPLE THAT NEED TO BE EXPLAINED.  AND

16   SO WE CAN DO THAT LATER.

17           NO. 6 HAS ALREADY BEEN GRANTED.  THIS IS

18   THAT JONATHAN WYATT GAVE A STATEMENT AT LEAST

19   INFERRING GUILT ON THE PART OF MR. SIMMERS.

20           THERE WILL BE NO REFERENCE IN ANY FASHION TO

21   STATEMENTS MADE BY MR. WYATT, NO MATTER WHAT

22   REFERENCE THERE MAY BE MADE TO MR. WYATT AS SOMEONE

23   WHO WAS WITH MR. SIMMERS AT THE TIME THEY WERE

24   DETAINED OR ARRESTED.

25           NO. 7, THAT THE DEFENDANT NORMALLY CARRIES A

1    KNIFE, A FLAT THROWING KNIFE ACCORDING TO HIS

2    TRANSCRIBED STATEMENTS.  DID HE SAY THIS IN THE

3    STATEMENT?

4         MS. MAHONEY:  YES, HE DOES.  AND SO I THINK

5    I WOULD ASK THE COURT RESERVE THAT UNTIL AFTER THE

6    3.5.

7         THE COURT:  I WILL.

8         MR. HICKS, ARE THERE ANY OTHER MOTIONS THAT

9    YOU WISH TO ADD, AS THE STATE DID? I KNOW THERE IS

10   AN ISSUE ABOUT THE REPUTATION TESTIMONY, AND THERE

11   IS ALSO A MOTION RELATED TO -- IN A SEPARATE BRIEF

12   ABOUT OTHER SUSPECTS.

13        MR. HICKS:  WELL, YEAH, IF YOU CARE TO

14   RECEIVE IT.

15        THE COURT:  AS I STATED, AS TO THE OTHER

16   SUSPECTS, I'M GOING TO LOOK AT THE CASE LAW CITED

17   ON THAT.  AND AS TO REPUTATION, IF YOU WOULD LIKE

18   -- REPUTATION AND/OR HABIT, IF YOU WOULD LIKE TO

19   ADDRESS THAT ARGUMENT NOW, YOU MAY.

20        MR. HICKS:  SURE.

21        MS. MAHONEY:  YOUR HONOR, IF THAT'S THE

22   CASE, CAN I LET THE WITNESSES IN THE HALL GO,

23   BECAUSE IT IS GOING TO TAKE A WHILE.

24        THE COURT:  DO YOU THINK THIS WILL TAKE A

25   WHILE?

1          MS. MAHONEY: YES. THERE ARE A NUMBER OF

2     WITNESSES WE HAVE TO GO THROUGH.

3          THE COURT: WHY DON'T WE MOVE TO THE 3.5,

4     AND THEN TAKE THAT UP AFTER.

5          MS. MAHONEY: THANK YOU.

6          THE COURT: WE WILL MOVE TO THE 3.5.

7          MS. MAHONEY: YOUR HONOR, I DON'T THINK

8     THERE IS ANY -- AS LONG AS WE HAVE THE STATE'S

9     WITNESSES HERE, I DON'T KNOW IF YOU WANT TO DEAL

10    NOW WITH OUR OBJECTION TO THE CALLING OF CERTAIN

11    WITNESSES.

12         MR. HICKS HAS PUT ME ON NOTICE THAT HE WOULD

13    BE CALLING MRS. BERUBE, THE DEFENDANT'S MOTHER, AND

14    POSSIBLY THE STEPFATHER, MR. BERUBE, AND SOME OF

15    THESE OTHER WITNESSES TO DEAL WITH THE 3.5 ABOUT

16    THE FACT THAT MR. SIMMERS BRAGS.

17         I DON'T NECESSARILY -- AGAIN, MY MAIN REASON

18    FOR OBJECTION IN THIS CASE IS FROM IMPROPER

19    CHARACTER OR OPINION TESTIMONY. CLEARLY, WITHIN

20    THE CASE LAW, THE ONLY QUESTION THE COURT NEEDS TO

21    DETERMINE IS WAS HE PROPERLY ADVISED OF HIS RIGHTS,

22    AND DID HE MAKE A KNOWING AND INTELLIGENT WAIVER OF

23    THOSE RIGHTS WHEN HE MADE THE STATEMENT.

24         A WHETHER OR NOT THE STATEMENT IS TRUE,

25    UNLESS THE CASE LAW SPECIFICALLY STATES THAT IS NOT

1    THE QUESTION, AND THE FACT THAT HE MAY BRAG AT

2    OTHER TIMES HAS NO BEARING ON THIS ISSUE.

3         MR. HICKS:  MAY I RESPOND TO THAT?

4         THE COURT:  YOU MAY.

5         MR. HICKS:  IF YOU READ THE TRANSCRIBED

6    STATEMENT, IT WILL BE IMPOSSIBLE -- FIRST OF ALL,

7    I'M SORRY, I HAVE TO ASK THE WITNESS TO WAIT

8    OUTSIDE.  THE WITNESS JUST WALKED IN, YOUR HONOR.

9         I CAN SEE THIS IS AN UNUSUAL 3.5.  I MIGHT

10   NOT EVER DO IT HERE, BUT IF YOU TAKE A LOOK AT THE

11   TRANSCRIBED STATEMENT, YOU SEE WHAT I AM TALKING

12   ABOUT.  IT IS A RED LIGHT TO ANYBODY WITH ANY

13   EXPERIENCE.

14        MR. SIMMERS, IN THE STATEMENT, CLAIMS HE HAS

15   KILLED 13 PEOPLE, ALL GANGSTERS.  AND, AGAIN, THIS

16   WASN'T EVEN ADDRESSED.  AND THE DETECTIVE WILL

17   TESTIFY HE CONSIDERED IT SO ABSURD, HE DIDN'T EVEN

18   BOTHER FOLLOWING UP.

19        AND THERE IS OTHER PUFFING, AND OTHER

20   THINGS -- LIKE HE BRAGGED HE WAS A BIG TIME

21   GANGSTER, AND A MEMBER OF NORTHWEST GANGSTERS,

22   WHICH DETECTIVE ROGER RUSNESS WILL TESTIFY DOESN'T

23   EVEN EXIST.

24        AND THE BOTTOM LINE, WHAT COUNSEL IS OVER-

25   LOOKING IS THIS FOCUSES ON A JUVENILE CONFESSION,

1    WHETHER DECLINED OR NOT.  THE FOCUS IS TO TAKE IN

2    ALL THE TYPE OF CHARACTERISTICS THAT COME WITHIN

3    THE STORY.

4         THERE IS A WIDE VARIETY OF CASES IT

5    ADDRESSES.  AND I DID MY OWN RESEARCH, BUT FOR THIS

6    BRIEF, I HIRED A VERY TALENTED LAWYER FOR ME, AND

7    HE WENT TO TOWN IN THIS FOUR-PAGE BRIEF.

8         AS YOU CAN SEE, IT IS EXTREMELY PROBATIVE IN

9    TERMS OF WHETHER OR NOT THE STATEMENT TO THE

10   OFFICER SHOULD HAVE TAKEN ADDITIONAL STEPS TO

11   VERIFY IT WAS KNOWING, INTELLIGENT -- UNDERLINE

12   INTELLIGENT -- AND VOLUNTARY, OR THE PRODUCT OF

13   COERCION, OR, YOU KNOW, SOMETHING THAT SHOULD HAVE

14   ALERTED THE OFFICERS THAT THEY WERE NOT GETTING AN

15   ACCURATE STATEMENT.

16        THAT IS PROBATIVE AS TO WHETHER OR NOT IT

17   COMES IN.  A 3.5 IS NOT SIMPLY JUST TO ASCERTAIN

18   WHETHER SIGNATURES ARE MADE AND RIGHTS WERE GIVEN,

19        IT HAS TO BE KNOWING AND INTELLIGENT AND

20   VOLUNTARY -- FREE WITHOUT ONE'S FREE WILL BEING

21   OVERBORNE.

22        AND THE BOTTOM LINE IS MR. SIMMERS'

23   UNQUESTIONABLY, BY THE STATE'S OWN THEORY OF THE

24   CASE, HAS A CHARACTERISTIC THAT MAKES IT UNLIKELY

25   THAT HE MADE A KNOWING, VOLUNTARY AND INTELLIGENT

1    STATEMENT.

2          AND YOU NEED ALL THREE.  THAT IS WHY THE

3    SIMPLE WAIVER IN MIRANDA AND SO FORTH IS NOT THE

4    SOLE FOCUS FOR THE 3.5, PARTICULARLY WITH A

5    JUVENILE.  AND THAT'S WHY THESE WITNESSES ARE

6    PROBATIVE.

7          THE COURT:  ALL RIGHT.  THE CASE LAW IS

8    CLEAR THAT IN DETERMINING THE VOLUNTARINESS OF A

9    JUVENILE'S CONFESSION, THE COURT MUST CONSIDER THE

10   TOTALITY OF THE CIRCUMSTANCES, INCLUDING THE

11   JUVENILE'S AGE, THE JUVENILE'S EXPERIENCE, AND THE

12   CAPACITY TO UNDERSTAND THE WARNINGS GIVEN TO THE

13   JUVENILE, THE NATURE OF THE FIFTH AMENDMENT RIGHTS,

14   AND THE CONSEQUENCES OF WAIVING THESE RIGHTS.

15         AND SO WHEN THE CASE LAW STATES THE

16   JUVENILE'S AGE, EXPERIENCE, EDUCATION, BACKGROUND

17   AND INTELLIGENCE ARE NECESSARY FOR THE COURT TO

18   LOOK AT IN MAKING THE DETERMINATION, AND TO THE

19   EXTENT YOU WISH TO CALL WITNESSES TO TESTIFY AS TO

20   THOSE FACTORS, MR. HICKS, YOU MAY.

21         AS TO WHETHER OR NOT THE FACT THAT HE BRAGS

22   WOULD GO TO ANY OF THOSE FACTORS, I'M NOT CERTAIN

23   THAT IT WOULD.

24         MR. HICKS:  NOT JUST BRAGGING, FABRICATION

25   TOO.

1          THE COURT:  I HAVE LAID OUT THE FACTORS, AND

2     YOU MAY PRESENT WITNESSES THAT RELATE TESTIMONY AS

3     TO THESE FACTORS.  AND, AGAIN, THE FACTORS AS I

4     HAVE GLEANED FROM THE CASE LAW DURING THE BREAK

5     THAT I TOOK THIS MORNING ARE HIS AGE, HIS

6     EXPERIENCE, HIS EDUCATION, HIS BACKGROUND AND HIS

7     INTELLIGENCE.

8          MR. HICKS:  WAIT, YOUR HONOR, IF I COULD

9     ADDRESS THAT RIGHT NOW?

10          THE COURT:  SURE.

11          MR. HICKS:  YOU ARE STATING THAT AS IF

12     THAT'S THE SOLE FOCUS.  THOSE ARE JUST EXAMPLES.

13          THE COURT:  THOSE ARE FACTORS FROM THE CASE

14     LAW THAT THE COURT LOOKS AT.

15          MR. HICKS:  BUT, OBVIOUSLY, WHEN THE COURT

16     CITES THINGS -- PHYSICAL CONDITION, AGE,

17     EXPERIENCE, MENTAL ABILITIES --

18          THE COURT:  THAT WOULD BE INTELLIGENCE.

19          MR. HICKS:  RIGHT.  MENTAL ABILITIES, OR

20     FRANKLY MENTAL STATE EVEN, BUT MENTAL ABILITIES IS

21     MENTIONED.  AND THE BOTTOM LINE IS THAT THAT LIST

22     IS NOT EXHAUSTIVE.

23          WHAT WE ARE OBVIOUSLY CONCERNED WITH IS THE

24     QUALITY OF THE STATEMENT, FRANKLY, ENVISIONED BY

25     MIRANDA.  MIRANDA DESCRIBED CIRCUMSTANCES WHERE

1    EVEN DECEPTION IS NOT ALLOWED, ALTHOUGH CASE LAW IN

2    WASHINGTON SUGGESTS IT IS.

3        THE BOTTOM LINE IS WHEN IT IS A JUVENILE,

4    THEY DO APPLY TOTALITY OF CIRCUMSTANCES TO

5    DETERMINE NOT WHETHER THE KID KNEW HE WAS SIGNING A

6    WAIVER OF RIGHTS BUT WHETHER OR NOT THE POLICE

7    RESPONSIBLY ELICITED AN INTELLIGENT STATEMENT.

8        AND, CERTAINLY, AN OBVIOUS CAPACITY OR

9    PROCLIVITY TO FABRICATE, TO MAKE UP STORIES THAT

10   THE POLICE ACKNOWLEDGE, AT LEAST COMES INTO PLAY AS

11   TO WHETHER OR NOT THEY TOOK A STATEMENT RESPONSIBLY

12   AND THEREFORE WAS KNOWING, INTELLIGENT AND

13   VOLUNTARY.

14       THE COURT:  WELL, AGAIN, I AGREE WITH YOU.

15   THE LIST IS NOT EXHAUSTIVE, AND MENTAL CAPACITY IS

16   CERTAINLY A PART OF INTELLIGENCE, AND THE DEFENSE

17   HAS AN OPPORTUNITY TO PRESENT WITNESSES THAT WILL

18   OFFER TESTIMONY RELATED TO THE CIRCUMSTANCES THE

19   COURT NEEDS TO CONSIDER, BUT I LEAVE IT TO YOU TO

20   LAY THE FOUNDATION FOR THAT PURPOSE WHEN YOU CALL

21   YOUR WITNESSES.

22       MR. HICKS:  ALL RIGHT.  I WILL.

23       THE COURT:  AND SO WE SHOULD PROCEED WITH

24   THE STATE'S WITNESSES.

25       MS. MARNER:  OFFICER FULLER.

1    ORVILLE M. FULLER,         HAVING BEEN DULY SWORN,
                                WAS EXAMINED AND TESTIFIED
2                               AS FOLLOWS:

3                    DIRECT EXAMINATION

4         BY MR. MARNER:

5    Q.   GOOD MORNING, OFFICER.  THANK YOU FOR YOUR

6         PATIENCE.  STATE YOUR NAME AND SPELL IT FOR THE

7         RECORD.

8    A.   ORVILLE M. FULLER, F-U-L-L-E-R.

9    Q.   YOU ARE WITH KING COUNTY?

10   A.   KING COUNTY POLICE DEPARTMENT.

11   Q.   HOW LONG?

12   A.   A LITTLE OVER 15 YEARS.

13   Q.   WHEN WE DO THIS EXCHANGE, MAKE SURE I AM DONE

14        TALKING, AND THAT WAY WE WON'T GIVE THE COURT

15        REPORTER A HARD TIME.

16             OFFICER FULLER, WERE YOU ON DUTY ON MARCH

17        15, 1995?

18   A.   YES, I WAS.

19   Q.   IN THE PATROL UNIT, REGULAR PATROL --

20   A.   CORRECT.  I WORKED PATROL.

21   Q.   WERE YOU WEARING THE UNIFORM YOU ARE WEARING NOW OR

22        SOMETHING SIMILAR?

23   A.   YES.

24   Q.   WHERE WAS YOUR PATROL VEHICLE?

25   A.   IN THE AREA OF -- KENMORE AREA AND PINE HILL,

1      UNINCORPORATED KING COUNTY.

2  Q.  AND DO YOU RECALL BEING CALLED TO -- I GUESS A

3      REPORT OF A JUVENILE SHOOTING OFF FLARE GUNS?

4  A.  YES, I DO.

5  Q.  DO YOU REMEMBER WHEN THAT CALL CAME IN?

6  A.  NO, I DON'T REMEMBER EXACTLY.  I DON'T HAVE THE

7      TIME.

8  Q.  WHAT TIME OF DAY?

9  A.  I WAS ON DAY SHIFT PROBABLY IN THE MORNING.

10 Q.  AND WHAT DID YOU DO?

11 A.  WELL, I RESPONDED, ALONG WITH OFFICER JANASZ, TO

12     INVESTIGATE THE REPORT OF SOMEBODY SETTING OFF

13     FLARE GUNS BEHIND ONE OF THE APARTMENT BUILDINGS

14     NEAR WHERE THE PRECINCT WAS LOCATED.

15 Q.  WERE YOU RIDING IN SEPARATE UNITS?

16 A.  YES.

17 Q.  CAN YOU GIVE THE JUDGE JUST A GENERAL GEOGRAPHICAL

18     DESCRIPTION?

19 A.  THE NORTH END OF LAKE WASHINGTON, THE CROSS STREETS

20     WERE APPROXIMATELY NORTHEAST 182ND STREET AND 73RD

21     AVENUE NORTHEAST, AND THAT'S PRECINCT 2.

22 Q.  YOU RESPONDED TO THAT AREA, AND WHAT DID YOU SEE?

23 A.  WE WERE DIRECTED TO TWO BOYS THAT WERE WALKING

24     WESTBOUND FROM 73RD NORTHEAST ON 182ND, WHICH WOULD

25     BE A BLOCK NORTH OF THE PRECINCT.

1    Q.  I TAKE IT YOU WENT THERE?

2    A.  THAT'S CORRECT.

3    Q.  DID YOU SEE ANYBODY THAT MATCHED THE DESCRIPTION --

4    A.  THERE WERE TWO BOYS, AND WE STOPPED AND CONTACTED

5         THEM.

6    Q.  THE COURT REPORTER IS GIVING ME THE SIGNAL -- MAKE

7         SURE I AM DONE TALKING BEFORE YOU START YOUR

8         ANSWER.  WAS ONE OF THE JUVENILES YOU CONTACTED

9         MR. SIMMERS RIGHT THERE?

10   A.  YES, IT IS.

11   Q.  THE PERSON SITTING NEXT TO MR. HICKS AT COUNSEL

12        TABLE?

13   A.  YES, IT IS.

14   Q.  DID YOU OR OFFICER JANASZ INITIATE THE CONTACT?

15   A.  I BELIEVE WE WERE TOGETHER WHEN THE CONTACT WAS

16        MADE.  WE WERE IN SEPARATE CARS, AND WE PULLED UP

17        TOGETHER AND BOTH EXITED OUR VEHICLES TOGETHER.

18   Q.  ALL RIGHT.  DID EITHER ONE OF YOU ASSUME A PRIMARY

19        VERSUS A SUPPORT ROLE AT THAT POINT?

20   A.  OFFICER JANASZ WAS MORE PRIMARY.

21   Q.  OKAY.  DID YOU HAVE ANY CONTACT WITH MR. SIMMERS?

22   A.  NOT DIRECTLY.

23   Q.  WHAT DID YOU OBSERVE OFFICER JANASZ DO?

24   A.  HE HAD CONTACT WITH SIMMERS, AND I HAD CONTACT WITH

25        THE OTHER JUVENILE.

1  Q.  OKAY.  AND WHAT DID YOU DISCOVER?

2  A.  WELL, AS I SAID, WE WERE INVESTIGATING KIDS

3      SHOOTING OFF FLARE GUNS, AND SO WE WERE DIRECTED TO

4      THE SPECIFIC KIDS.  AND WE CONTACTED THEM, AND I

5      TALKED TO THE YOUNG KID WYATT THAT I HAD CONTACT

6      WITH, WHO ADMITTED THAT THEY HAD BEEN SHOOTING

7      FLARE GUNS.  AND HE SAID HE HAD A FLARE GUN.

8           WELL, THEN WE SHOOK THEM DOWN BASICALLY AND

9      CAME UP WITH A FLARE GUN AND FLARES.  I TOOK THE

10     FLARE GUN, AND I BELIEVE A FLARE AND A RADIO OFF

11     THE KID THAT I WAS DEALING WITH.

12 Q.  OFF OF JOHN WYATT?

13 A.  CORRECT.

14 Q.  ALL RIGHT.  OFFICER FULLER, DID YOU OR OFFICER

15     JANASZ PLACE THESE TWO INDIVIDUALS UNDER ARREST?

16 A.  WELL, THEY WERE IDENTIFIED, AND THEIR NAMES WERE

17     RUN THROUGH THE RADIO AND CAME BACK WITH WARRANTS

18     FOR BOTH OF THEM.  AT THAT TIME, OFFICER JANASZ

19     PLACED THEM UNDER ARREST AND ADVISED THEM OF THEIR

20     MIRANDA RIGHTS.

21 Q.  LET ME BACK UP A LITTLE BIT:  YOU INDICATED THAT

22     YOU RAN THEIR NAME OVER THE RADIO?

23 A.  CORRECT.

24 Q.  HOW DID YOU GET THEIR NAMES?

25 A.  FROM INFORMATION THEY GAVE US.

1   Q.   ALL RIGHT.  HAD YOU DONE THIS BEFORE, BROADCAST THE

2        NAME OF AN INDIVIDUAL YOU CONTACTED IN THE FIELD

3        AND CHECKED THEM FOR EXISTING WARRANTS?

4   A.   YES.  IT'S NORMAL PROCEDURE.

5   Q.   HAVE YOU RELIED ON THIS IN THE PAST?

6   A.   TO BE ACCURATE?

7   Q.   RIGHT.

8   A.   YES.

9   Q.   HAVING LEARNED THAT THEY WERE BOTH THE SUBJECT OF

10       WARRANTS AND ARRESTING THEM, YOU INDICATED OFFICER

11       JANASZ ADVISED BOTH OF THEM OF THEIR MIRANDA

12       RIGHTS?

13  A.   YES.  THEY WERE TOGETHER AT THAT TIME AND THEY WERE

14       ADVISED OF THEIR RIGHTS.

15  Q.   WERE THEY STANDING TOGETHER?

16  A.   WITHIN FIVE FEET.

17  Q.   DID YOU HEAR OFFICER JANASZ ADVISE THESE

18       INDIVIDUALS OF THEIR RIGHTS?

19  A.   YES, I DID.

20  Q.   AND HOW MANY TIMES HAVE YOU ADVISED PEOPLE OF THEIR

21       RIGHTS?

22  A.   WELL, HUNDREDS OF TIMES.

23  Q.   IN YOUR 15 YEARS AS A POLICE OFFICER?

24  A.   CORRECT.

25  Q.   AS YOU WERE PAYING ATTENTION TO OFFICER JANASZ, DID

1       YOU HEAR HIM ADVISE THEM THAT THEY HAD THE RIGHT TO

2       REMAIN SILENT?

3   A.  I DON'T REMEMBER SPECIFIC RIGHTS HE GAVE THEM, BUT

4       THE WAY I ADVISE RIGHTS IS FROM A CARD THAT I

5       CARRY.

6   Q.  OKAY.  WAS THERE ANYTHING OUT OF THE ORDINARY THAT

7       YOU HEARD OR SAW WHEN OFFICER JANASZ ADVISED THESE

8       TWO INDIVIDUALS OF THEIR RIGHTS?

9   A.  NO.  I DON'T REMEMBER ANYTHING OUT OF THE ORDINARY.

10  Q.  AS FAR AS YOU CAN RECALL, DID OFFICER JANASZ ADVISE

11      THESE INDIVIDUALS OF THEIR RIGHTS PURSUANT TO KING

12      COUNTY POLICE DEPARTMENT PROTOCOL?

13  A.  YES.

14  Q.  AND WHAT WAS YOUR INVOLVEMENT AFTER THAT?

15  A.  WELL, AT THAT POINT, THE BOYS WERE TRANSPORTED TO

16      THE PRECINCT.  AND SO I TRANSPORTED ONE AND JANASZ

17      TRANSPORTED THE OTHER.  AND THEY WERE PLACED IN

18      HOLDING CELLS.

19          AND THEN I HELPED DOCUMENTING EVIDENCE, AND

20      THAT WAS THE END OF MY INVOLVEMENT.

21  Q.  WHICH OF THESE TWO INDIVIDUALS DID YOU TRANSPORT?

22  A.  WYATT.

23          MS. MARNER: THANK YOU.

24          THE COURT: MR. HICKS?

25                  CROSS-EXAMINATION

1           BY MR. HICKS:

2    Q.  GOOD MORNING, OFFICER.

3    A.  GOOD MORNING.

4    Q.  DO YOU HAVE YOUR REPORT WITH YOU, DATED 3-16-95?

5    A.  NO, I DO NOT.  I LOANED IT TO ANOTHER OFFICER TO GO

6        DOWN AND GET COPIED.  SHE MAY BE BACK AND IT MAY BE

7        OUT IN THE HALL.

8           MR. MARNER:  I HAVE A COPY.

9           MR. HICKS:  NOW, YOU DON'T.

10          THE CLERK:  DEFENDANT'S EXHIBIT 1 MARKED FOR

11       IDENTIFICATION.

12                 (DEFENDANT'S EXHIBIT NO. 1
                    MARKED FOR IDENTIFICATION.)
13

14          THE COURT:  FOR PRETRIAL PURPOSES, IS THERE

15       ANY OBJECTION?

16          MR. MARNER:  I'M SORRY.  NO OBJECTION.

17          THE COURT:  JUST FOR PRETRIAL PURPOSES.

18          BY MR. HICKS:

19   Q.  COULD YOU READ THAT TO YOURSELF?

20   A.  OKAY.

21   Q.  AS I UNDERSTAND IT, YOU ADVISED -- WELL, DOES THE

22       STATEMENT INDICATE THAT YOU ADVISED THESE YOUNG MEN

23       AS TO THEIR RIGHTS AFTER THEY HAD BEEN STOPPED,

24       QUESTIONED AND SEARCHED.  IS THAT CORRECT?

25   A.  I DIDN'T ADVISE THEM OF THEIR RIGHTS, BUT THEY HAD

1       BEEN STOPPED AND ASKED IF THEY HAD ANY INFORMATION

2       ABOUT THE MATTER, ABOUT THE FLARES.

3   Q.  AND SEARCHED FOR FLARES?

4   A.  YES.

5   Q.  AND THEY WERE ADVISED OF THEIR RIGHTS?

6   A.  YES.

7              MR. HICKS:  ALL RIGHT.  NOTHING FURTHER.

8              MR. MARNER:  NOTHING FURTHER.

9              THE COURT:  THANK YOU.  MAY THIS WITNESS BE

10      EXCUSED FOR NOW?

11             MR. HICKS:  YES.

12             MR. MARNER:  YES.

13             MS. MAHONEY:  YOUR HONOR, I WILL CALL

14      DETECTIVE RAFTIS.  HE WILL BE A LITTLE OUT OF ORDER

15      BECAUSE HE HAS A DOCTOR'S APPOINTMENT.

16             (SHORT PAUSE IN THE PROCEEDINGS.)

17             MS. MAHONEY:  WELL, YOUR HONOR, I HAVE TWO

18      WITNESSES THAT DISAPPEARED, AND SO I GUESS WE WILL

19      TAKE DETECTIVE RUSK INSTEAD.

20      CLEMENT D. RUSK,            HAVING BEEN DULY SWORN,
                                    WAS EXAMINED AND TESTIFIED
21                                  AS FOLLOWS:

22                      DIRECT EXAMINATION

23             BY MS. MAHONEY:

24  Q.  DETECTIVE RUSK, COULD YOU PLEASE STATE YOUR FULL

25      NAME FOR THE RECORD.

1   A.   CLEMENT D. RUSK, R-U-S-K.

2   Q.   AND YOUR OCCUPATION?

3   A.   I AM A SERGEANT WITH THE KING COUNTY POLICE

4        DEPARTMENT.

5   Q.   HOW LONG HAVE YOU BEEN WITH THE KING COUNTY POLICE?

6   A.   21 YEARS.  A LITTLE OVER 21 YEARS.

7   Q.   AROUND MARCH 15TH OF 1995, WHERE WERE YOU ASSIGNED?

8   A.   I WAS ASSIGNED AS THE DETECTIVE SUPERVISOR OF

9        PRECINCT 2 IN KENMORE.

10  Q.   HOW LONG HAVE YOU HELD THAT POSITION?

11  A.   EITHER THREE OR FOUR YEARS.  I STARTED THERE IN

12       1992, I BELIEVE, AND SO -- OR 1993.  THREE YEARS.

13  Q.   AND HAD YOU PRIOR TO THAT BEEN A DETECTIVE?

14  A.   YES, I HAD.

15  Q.   FOR HOW LONG?

16  A.   I SPENT THREE YEARS AS A BURGLARY-LARCENY DETECTIVE

17       AND APPROXIMATELY NINE YEARS, I BELIEVE, AS A

18       DETECTIVE ASSIGNED TO MAJOR CRIMES IN THE ARSON

19       UNIT.

20  Q.   ALL RIGHT.  AND BY MAJOR CRIMES, DID YOU

21       INVESTIGATE VARIOUS HOMICIDE AND ASSAULT CASES

22       WHILE YOU WORKED ON THAT UNIT?

23  A.   SOME.  MY PRIMARY FOCUS WAS INVESTIGATION OF FIRES.

24  Q.   OVER THE YEARS OF YOUR CAREER, HOW MANY TIMES DO

25       YOU THINK YOU HAVE TAKEN A TAPED CONFESSION?

62

1   A.   I DON'T REALLY KNOW.

2   Q.   OVER 50?

3   A.   MOST OF MY STATEMENTS HAVE BEEN HANDWRITTEN, JUST

4        BECAUSE IN THE UNIT I WAS IN, WE DIDN'T HAVE PEOPLE

5        AVAILABLE TO DO THE TYPING.

6   Q.   HAVE YOU HAD TRAINING IN HOW TO TAKE CONFESSIONS OR

7        STATEMENTS FROM SUSPECTS?

8   A.   YES, I HAVE.

9   Q.   AND OVER THE YEARS, HOW MANY OCCASIONS DO YOU THINK

10       YOU HAVE HAD THE OPPORTUNITY TO DO THAT?

11  A.   TO TAKE STATEMENTS FROM SUSPECTS?   THOUSANDS WOULD

12       BE MY GUESS, OVER 20 YEARS.

13  Q.   AND HAVE YOU, IN THE PAST, PRIOR TO MARCH 15TH OF

14       1995, TAKEN STATEMENTS FROM JUVENILES?

15  A.   YES, I HAVE.

16  Q.   DO YOU EMPLOY DIFFERENT TECHNIQUES WHEN YOU ARE

17       SPEAKING WITH A JUVENILE VERSUS AN ADULT?

18  A.   NO, WITH THE EXCEPTION THERE IS A PORTION OF THE

19       MIRANDA RIGHTS FORM WHICH IS DIFFERENT.

20  Q.   ALL RIGHT.   DO PARENTS --

21  A.   -- IT RELATES SPECIFICALLY TO JUVENILES.

22  Q.   DO PARENTS SOMETIMES BECOME INVOLVED IN JUVENILE

23       CASES WHEN YOU ARE DEALING WITH JUVENILES AND

24       STATEMENTS?

25  A.   AT TIMES, YES.

1   Q.  HAVE YOU HAD THAT HAPPEN IN CASES YOU HAVE BEEN

2       INVOLVED WITH?

3   A.  TO A CERTAIN DEGREE, YES.

4   Q.  NOW, DIRECTING YOUR ATTENTION TO MARCH 15TH OF

5       1995, WERE YOU ON DUTY THAT DAY?

6   A.  YES, I WAS.

7   Q.  AND SOMETIME IN THE EARLY AFTERNOON, WERE YOU MADE

8       AWARE THAT TWO SUSPECTS BY THE NAME OF WYATT AND

9       SIMMERS WERE IN CUSTODY?

10  A.  YES, I WAS.

11  Q.  COULD YOU EXPLAIN TO THE COURT HOW YOU BECAME AWARE

12      OF THAT AND WHAT INFORMATION YOU HAD?

13  A.  I WAS TOLD THAT PATROL OFFICER JANASZ AND OFFICER

14      FULLER HAD JUST PICKED UP TWO KIDS UP THE STREET

15      FROM THE PRECINCT THAT HAD BEEN SHOOTING FLARE GUNS

16      AND WERE IN POSSESSION OF FLARE GUNS.

17  Q.  WERE YOU GIVEN OTHER INFORMATION FROM OTHER

18      OFFICERS?

19  A.  YES.  I WAS TOLD THAT IT APPEARED THAT THE SHOE

20      PRINTS OF ONE OF THE JUVENILES MATCHED THAT SEEN AT

21      THE SITE OF A RESTROOM THAT HAD BEEN SET ON FIRE

22      WITH FLARE GUNS, IN THE WOODINVILLE AREA.

23  Q.  AND WHAT DID YOU DO -- WHY WERE YOU TOLD THAT

24      INFORMATION AND WHAT DID YOU DO AS A RESULT?

25  A.  I WOULD BE TOLD THAT INFORMATION BECAUSE I'M THE

1        DETECTIVE SERGEANT, AND I WOULD BE RESPONSIBLE FOR

2        COORDINATING AND ACTING ON THAT INFORMATION.

3  Q.  ALL RIGHT.  AND SO WHAT DID YOU DO WHEN YOU

4        RECEIVED THAT INFORMATION?

5  A.  I ASKED DETECTIVE MCSWAIN, I BELIEVE, TO TALK TO

6        ONE OF THE JUVENILES AND I WOULD TALK TO THE OTHER

7        ONE.

8  Q.  WHICH ONE DID YOU SPEAK WITH?

9  A.  ULTIMATELY, I ENDED UP SPEAKING WITH IAN SIMMERS.

10  Q.  AND DO YOU RECALL WHAT TIME YOU FIRST MADE CONTACT

11        WITH MR. SIMMERS?

12  A.  I BELIEVE SHORTLY BEFORE 1345 HOURS.

13  Q.  WHERE DID YOU MEET WITH HIM; WHERE WAS HE WHEN YOU

14        FIRST MET WITH HIM?

15  A.  WELL, I BELIEVE HE WAS IN THE HOLDING CELL AT

16        PRECINCT 2.

17  Q.  WHEN YOU SAY IN A HOLDING CELL, WHAT IS A HOLDING

18        CELL?

19  A.  A HOLDING CELL IS A SMALL SECURE ROOM, AND IT IS

20        PROBABLY TWELVE FEET BY TEN FEET, OR TEN FEET BY

21        TEN FEET -- SOMEWHERE IN THERE.  IT'S FAIRLY SMALL,

22        AND IT HAS A BUILT-IN WOODEN BUNK, AND IT HAS A

23        TOILET AND SINK IN THERE.

24  Q.  ALL RIGHT.  WAS HE BEING HELD WITH ANYONE ELSE IN

25        THAT CELL OR WAS HE ALONE?

1    A.  HE WAS ALONE.

2    Q.  DURING THE TIME SINCE HE HAD BEEN ARRESTED UP UNTIL

3        THE TIME YOU CONTACTED HIM AT 1:45, HAD HE BEEN

4        KEPT SEPARATE FROM MR. WYATT?

5    A.  IT WOULD BE MY UNDERSTANDING THAT HE WAS, BUT I

6        DON'T KNOW THAT FOR SURE.

7            MR. HICKS:  I DIDN'T HEAR THE QUESTION; I

8        HEARD THE ANSWER.

9            MS. MAHONEY:  I ASKED IF HE HAD BEEN KEPT

10       SEPARATE FROM MR. WYATT.

11           MR. HICKS:  THANK YOU.

12           BY MS. MAHONEY:

13   Q.  DETECTIVE RUSK, ONCE YOU SAW HIM IN THE HOLDING

14       CELL, DID YOU MOVE HIM ANYWHERE?

15   A.  MOVED HIM TO A SMALL INTERVIEW ROOM.

16   Q.  WHEN YOU SAY "SMALL," WHAT'S IN THAT ROOM?

17   A.  IT'S A SMALL INTERVIEW ROOM.  IT'S PROBABLY SIX

18       FOOT BY EIGHT FOOT, OR SOMEWHERE IN THERE -- SEVEN

19       BY SEVEN, SOMEWHERE IN THAT AREA.  AND USUALLY

20       THERE IS A SMALL TABLE AND TWO CHAIRS, SOMETIMES

21       THREE CHAIRS.

22   Q.  ALL RIGHT.  WAS MR. SIMMERS HANDCUFFED IN THE

23       INTERVIEW ROOM?

24   A.  NO.

25   Q.  WAS HE STILL IN HIS OWN CLOTHES IN THE INTERVIEW

1    ROOM?

2  A.  YES.

3  Q.  WAS ANYONE WITH YOU WHEN YOU PLACED HIM IN THE

4     INTERVIEW ROOM?

5  A.  NO.

6  Q.  AND SO IN THE INTERVIEW ROOM WOULD BE YOURSELF AND

7     MR. SIMMERS?

8  A.  YES.

9  Q.  AND AT THAT TIME, DID YOU READ MR. SIMMERS HIS

10     RIGHTS?

11  A.  YES.

12  Q.  HAD YOU CHECKED WITH THE OTHER DETECTIVES TO SEE

13     WHETHER OR NOT HE HAD PREVIOUSLY BEEN READ HIS

14     RIGHTS?

15  A.  I DON'T THINK I HAD, NO.

16  Q.  DID YOU HAVE ANY INFORMATION AT THE TIME YOU TOOK

17     HIM INTO THE INTERVIEW ROOM AT 1:45, THAT HE HAD

18     EVER EXERCISED HIS RIGHT TO REMAIN SILENT?

19  A.  NO.

20  Q.  WERE YOU EVER TOLD HE HAD ASKED FOR AN ATTORNEY?

21  A.  NO.

22  Q.  WERE YOU EVER TOLD HE HAD ASKED FOR A PARENT TO BE

23     PRESENT?

24  A.  NO.

25  Q.  AT THE TIME YOU ADVISED HIM OF HIS RIGHTS, HOW DID

1        YOU DO THAT?

2    A.  OFF A STANDARD DEPARTMENTAL FORM, B-118, I BELIEVE.

3            MS. MAHONEY:  IF YOU COULD WAIT JUST A

4        MOMENT -- I ASK THAT THAT BE MARKED AS A PRETRIAL

5        EXHIBIT.

6            THE CLERK:  STATE'S EXHIBIT 2 MARKED FOR

7        IDENTIFICATION.

8                        (STATE'S EXHIBIT NO. 2
                          MARKED FOR IDENTIFICATION.)
9

10           THE COURT:  MR. HICKS?

11           MR. HICKS:  NO OBJECTION.

12           THE COURT:  FOR PURPOSES OF PRETRIAL.

13           BY MS. MAHONEY:

14   Q.  HANDING YOU WHAT HAS BEEN MARKED AS STATE'S EXHIBIT

15       NO. 2, DO YOU RECOGNIZE THAT?

16   A.  THIS IS A COPY OF THE FORM AND STATEMENT THAT I

17       TOOK FROM IAN SIMMERS ON THAT DAY.

18   Q.  DID YOU MARK A TIME ON THERE?

19   A.  1345 HOURS IN THE UPPER LEFT-HAND CORNER.

20           MR. HICKS:  WHAT IS THE NUMBER OF THAT

21       EXHIBIT?

22           MS. MAHONEY:  NO. 2.

23   Q.  AND IS THAT THE SAME FORM YOU JUST REFERRED TO IN

24       YOUR TESTIMONY.

25   A.  YES.

1    Q.    ALL RIGHT.  AND DOES THAT HAVE, AS YOU READ THEM TO

2          MR. SIMMERS, THE RIGHTS AS YOU READ THEM TO HIM ON

3          MARCH 15, 1995?

4    A.    YES.

5    Q.    DID YOU READ THEM VERBATIM AS THEY ARE PRINTED ON

6          THAT PAGE?

7    A.    YES.

8    Q.    DID YOU READ ALL THE WARNINGS, INCLUDING THE

9          JUVENILE ADMONISHMENT?

10   A.    YES, I DID.

11   Q.    AT THE TIME YOU SAW MR. SIMMERS, DID YOU MAKE ANY

12         OBSERVATIONS ABOUT HIS PERSON THAT MIGHT INDICATE

13         TO YOU HE WOULD BE UNDER THE INFLUENCE OF ALCOHOL

14         OR ANY OTHER SUBSTANCES?

15   A.    NO, I DIDN'T.  HE WAS NOT UNDER THE INFLUENCE OF

16         ALCOHOL.

17              MR. HICKS:  OBJECTION.  MOVE TO STRIKE THAT

18         AS CALLING FOR EXPERT SPECULATION.

19              THE COURT:  OVERRULED TO THE EXTENT HE CAN

20         TESTIFY TO HIS OBSERVATIONS.

21              MR. HICKS:  YOUR HONOR, HE MADE A BLANKET

22         STATEMENT THAT HE WASN'T UNDER THE INFLUENCE.

23              MS. MAHONEY:  HE WAS TRYING TO TESTIFY --

24              THE COURT:  REPHRASE THE QUESTION TO THE

25         DETECTIVE.

1          MS. MAHONEY:  CERTAINLY.

2    Q.  TELL US ABOUT YOUR OBSERVATIONS THAT WOULD LEAD YOU

3        TO BELIEVE HE WAS NOT UNDER THE INFLUENCE?

4    A.  I SMELLED NO ODOR OF INTOXICANTS ON HIS BREATH, AND

5        HIS SPEECH WAS NOT SLURRED.  HE DID NOT HAVE ANY

6        TROUBLE FORMING WORD OR THOUGHT PATTERNS.  HIS

7        MUSCLE COORDINATION WAS FINE, HE HAD NO PROBLEMS

8        WITH MUSCLE COORDINATION.

9              AND HE WALKED, TALKED, SPOKE NORMALLY; THERE

10       WAS NO INDICATION THAT THERE WAS ANY IMPAIRMENT OF

11       HIS PERSON.

12   Q.  DID HE APPEAR TO SPEAK THE ENGLISH LANGUAGE AND

13       UNDERSTAND IT AS YOU SPOKE IT TO HIM?

14   A.  YES, YES.

15   Q.  DID YOU ASK HIM WHETHER OR NOT HE COULD READ?

16   A.  LATER I DID, YES.

17   Q.  AND WHAT WAS HIS RESPONSE?

18   A.  THAT HE COULD.

19   Q.  NOW, WHEN YOU WENT OVER THIS RIGHTS FORM WITH HIM,

20       DID YOU READ IT OUT LOUD TO HIM?

21   A.  YES, I DID.

22   Q.  COULD YOU EXPLAIN TO THE COURT HOW YOU DID IT?

23       WHERE IS MR. SIMMERS, AND WHERE ARE YOU, AND WHAT

24       DID YOU DO?

25   A.  HE WAS IN A CHAIR AND SO WAS I.  AND I WOULD FILL

```
 1        OUT THE TOP PORTION, WHICH WOULD BE THE DATE AND

 2        TIME, AND HIS AND MY NAME, AND THEN READ THE

 3        PRINTED INFORMATION ON THE FORM.

 4   Q.   YOU READ THAT VERBATIM?

 5   A.   YES, I DID.

 6   Q.   AT THE BOTTOM, THE LAST RIGHT, NO. 5, THERE IS A

 7        SIGNATURE THERE.  WHOSE SIGNATURE IS THAT?

 8   A.   IAN SIMMERS'.

 9   Q.   HOW DO YOU KNOW THAT?

10   A.   I WATCHED HIM SIGN IT.

11   Q.   WHEN DID HE DO THAT?

12   A.   RIGHT AFTER I FINISHED READING HIM HIS RIGHTS.

13   Q.   ALL RIGHT.  AND THE SECOND PORTION THERE IS A

14        WAIVER PORTION THERE.  DID YOU READ THAT VERBATIM

15        TO MR. SIMMERS?

16   A.   YES, I DID.

17   Q.   DID HE SIGN THAT PORTION AS WELL?

18   A.   YES, HE DID.

19   Q.   DID HE EVER STOP YOU OR ASK YOU ANY QUESTIONS ABOUT

20        HIS RIGHTS OR ANYTHING OF THAT NATURE?

21   A.   NO.  I READ FROM THE FORM AND THEN ASKED HIM IF HE

22        UNDERSTOOD HIS RIGHTS, AND HE SAID HE DID.  AND

23        THEN I ASKED, "IS THERE ANYTHING YOU DON'T

24        UNDERSTAND ABOUT YOUR RIGHTS"?  AND HE SAID THERE

25        WASN'T.
```

1    Q.  DID YOU THEN ASK HIM IF HE WOULD BE WILLING TO MAKE

2        A STATEMENT TO YOU?

3    A.  YES, I DID.

4    Q.  NOW, PRIOR TO TAKING THE ACTUAL WRITTEN STATEMENT,

5        DID YOU DISCUSS WITH HIM HIS POTENTIAL INVOLVEMENT

6        IN A SERIES OF ARSONS?

7    A.  AT THAT TIME, JUST THE ONE FIRE IN THE RESTAURANT.

8    Q.  DID HE AGREE TO GIVE YOU A STATEMENT REGARDING

9        THAT?

10   A.  YES, HE DID.

11   Q.  AFTER YOU TOOK THE STATEMENT REGARDING THAT ARSON,

12       WHAT DID YOU DO WITH IT?  I SHOULD CLARIFY:  IN

13       STATE'S EXHIBIT NO. 2, THE STATEMENT, IS THAT IN

14       YOUR HANDWRITING?

15   A.  YES.

16   Q.  HE GAVE YOU THE INFORMATION TO PUT IN THAT?

17   A.  YES.

18   Q.  WHOSE INITIALS ARE THOSE?

19   A.  IAN SIMMERS'.

20   Q.  HOW DID THOSE GET THERE?

21   A.  I ASKED HIM TO PUT THE INITIALS THERE SO I COULDN'T

22       ADD OR SUBTRACT ANYTHING FROM THE STATEMENT.

23   Q.  DID YOU TELL HIM WHY YOU WERE DOING THAT?

24   A.  YES.

25   Q.  AFTER HE MADE THE FIRST PART OF THAT STATEMENT TO

1       YOU, DID YOU HAVE HIM REVIEW IT?

2  A.   YES.

3  Q.   HOW DID HE DO THAT?

4  A.   I ASKED HIM TO READ IT AND SEE IF IT WAS CORRECT OR

5       NOT.  AND THEN I HAD HIM READ THE FIRST COUPLE OF

6       SENTENCES TO ME.

7  Q.   WAS HE ABLE TO?

8  A.   YES, HE WAS.

9  Q.   AFTER HE REVIEWED IT, DID HE ASK YOU TO MAKE ANY

10      CHANGES?

11 A.   NO.  HE SAID IT WAS FINE.  AND THEN I ADDED:  "THE

12      ABOVE STATEMENT IS TRUE AND CORRECT AND GIVEN BY ME

13      FREELY AND VOLUNTARILY."  AND THEN I ASKED HIM TO

14      SIGN IT.

15 Q.   AND DID HE DO SO?

16 A.   HE DID.

17 Q.   ALL RIGHT.  NOW, AT THE TIME YOU TOOK THAT PORTION

18      OF THE STATEMENT, DID YOU MAKE ANY THREATS OR

19      PROMISES TO HIM?

20 A.   NO.

21 Q.   AND DO YOU RECALL HIM ASKING YOU ANY QUESTIONS AT

22      THAT POINT?

23 A.   NO.

24 Q.   NOW, AFTER YOU TOOK THE FIRST PART OF THE

25      STATEMENT, WHICH IS IN THE MIDDLE -- I'M LOOKING AT

1        THE MIDDLE OF THE SECOND PAGE OF STATE'S EXHIBIT 2.

2        THERE IS A SIGNATURE IN THE MIDDLE OF THE PAGE.

3        DID THAT PARTICULAR PORTION OF THE STATEMENT STOP

4        THERE ORIGINALLY?

5   A.   YES.

6   Q.   OKAY.  COULD YOU THEN EXPLAIN TO THE COURT WHAT YOU

7        NEXT DID?

8   A.   I WAS DONE WITH THAT STATEMENT, AND I WENT OUT,

9        BACK INTO THE PRECINCT AREA AND WAS CONTACTED BY

10       ONE OF THE OFFICERS.

11  Q.   LET ME STOP YOU FOR A MOMENT:  WHEN YOU WENT BACK

12       INTO THE PRECINCT AREA, WHERE WAS MR. SIMMERS?

13  A.   I BELIEVE THAT I PLACED HIM BACK IN THE HOLDING

14       CELL BUT I'M NOT ABSOLUTELY POSITIVE.

15          THE COURT:  WE MAY WANT TO PAUSE WHILE THE

16       JURY IN OUR OTHER CASE LEAVES.

17          (SHORT PAUSE IN THE PROCEEDINGS.)

18          BY MS. MAHONEY:

19  Q.   SO YOU WENT BACK OUT INTO THE PRECINCT, AND WHAT

20       DID YOU DO?

21  A.   I WAS PART OF A DISCUSSION WITH SOME OTHER

22       OFFICERS, AND THEY ADVISED ME THEY THOUGHT THERE

23       HAD BEEN SOME CAR PROWLS IN THE SAME AREA THAT THE

24       RESTROOM FIRE WAS.

25  Q.   WHAT DID YOU DO UPON LEARNING ABOUT THAT INFOR-

74

1      MATION?

2  A.  WENT BACK TO TALK TO MR. SIMMERS.

3  Q.  ALL RIGHT.  TO YOUR KNOWLEDGE, HAD ANY OTHER

4      DETECTIVE OR OFFICER SPOKEN WITH MR. SIMMERS

5      BETWEEN THE TIME YOU HAD TAKEN THE FIRST STATEMENT

6      AND WENT BACK TO HIM?

7  A.  NO.

8  Q.  APPROXIMATELY HOW MUCH TIME ELAPSED BEFORE YOU WENT

9      BACK?

10  A.  FIVE MINUTES MAYBE.

11  Q.  IS IT POSSIBLE YOU ACTUALLY LEFT HIM SITTING IN THE

12      INTERVIEW ROOM?

13  A.  COULD HAVE BEEN.

14  Q.  WOULD A REVIEW OF YOUR REPORT HELP?

15  A.  IT COULD; I COULD REVIEW IT.

16          WELL, IT DOES SAY I LEFT SIMMERS IN THE

17      INTERVIEW ROOM.  IF I WROTE THAT DOWN AT THE TIME,

18      THAT'S CORRECT.

19  Q.  YOU MEAN AT THE TIME OF THE INTERVIEW ON THE 15TH?

20  A.  RIGHT.

21  Q.  ALL RIGHT.  NOW, WHEN YOU RECONTACTED MR. SIMMERS,

22      DID HE -- DID YOU GO BACK OVER HIS RIGHTS WITH HIM?

23  A.  NO.

24  Q.  DID HE ASK TO SEE AN ATTORNEY?

25  A.  NO.

1   Q.   DID HE ASK TO HAVE A PARENT PRESENT?

2   A.   NO.

3   Q.   DID HE TELL YOU THAT -- DID HE INDICATE WHETHER OR

4        NOT HE WOULD TALK WITH YOU FURTHER?

5   A.   HE SAID HE WOULD, YES.

6   Q.   HOW DID YOU ELICIT THAT FROM HIM; WHAT DID YOU SAY

7        TO HIM?

8   A.   I JUST TOLD HIM THERE WERE A COUPLE MORE THINGS

9        THAT I WOULD LIKE TO CLEAR UP WITH HIM AND COULD WE

10       TALK SOME MORE ABOUT THIS.

11  Q.   AND HIS RESPONSE WAS?

12  A.   "SURE."

13  Q.   THEN WHAT DID YOU DO?

14  A.   TALKED SOME MORE ABOUT SOME VEHICLE PROWLS IN THAT

15       AREA.

16            THE COURT:   WHAT TIME IS THIS?

17            THE WITNESS:   THIS WOULD HAVE BEEN PROBABLY

18       WITHIN FIVE MINUTES OF THE END OF THAT FIRST

19       PORTION OF THE STATEMENT.

20            THE COURT:   THANK YOU.

21            BY MS. MAHONEY:

22  Q.   DO YOU KNOW HOW LONG IT TOOK YOU TO READ THAT FIRST

23       STATEMENT?   1345 WAS THE TIME YOU READ HIM HIS

24       RIGHTS, BUT HOW LONG PASSED --

25  A.   20 OR 30 MINUTES.

1           MR. HICKS: THE FIRST PART?

2           MS. MAHONEY: 20 OR 30 MINUTES.

3  Q.  YOU ARE SAYING YOU HAD 20 OR 30 MINUTES, AND YOU

4      LEAVE FOR FIVE MINUTES AND THEN RETURN? WOULD THAT

5      BE ACCURATE.

6  A.  IN THE BALLPARK. I WASN'T LOOKING AT MY WATCH AND

7      I CAN'T BE A HUNDRED PERCENT SURE.

8  Q.  THEN AFTER YOU TALKED TO HIM ABOUT THE CAR PROWLS

9      AND HE GAVE YOU ADDITIONAL INFORMATION, DID YOU ASK

10     HIM WHETHER OR NOT YOU COULD ADD THAT TO THE

11     STATEMENT?

12  A.  YES, I DID.

13  Q.  HOW DID YOU ASK HIM THAT?

14  A.  I SAID, "CAN WE -- YOU KNOW, WE NEED TO TALK SOME

15     MORE ABOUT THIS BECAUSE I FOUND OUT THERE WERE SOME

16     MORE THINGS YOU WERE PROBABLY INVOLVED IN." AND WE

17     ADDED TO THE STATEMENT.

18  Q.  AND, AGAIN, DID YOU ADD THAT IN YOUR WRITING?

19  A.  YES, I DID.

20  Q.  AND DID YOU START THAT RIGHT AFTER WHERE HE HAD

21     SIGNED THE FIRST STATEMENT?

22  A.  YES, I DID.

23  Q.  DID YOU HAVE HIM REVIEW IT?

24  A.  YES.

25  Q.  HOW DID YOU DO THAT?

1  A.  I ASKED HIM TO REVIEW IT AND SEE IF IT WAS ALL

2      CORRECT.

3  Q.  DID HE DO THAT?

4  A.  YES, HE DID. AND THEN I ASKED HIM TO SIGN IT.

5  Q.  AND DID HE DO THAT?

6  A.  YES, HE DID.

7  Q.  WHAT DID YOU DO AT THAT POINT?

8  A.  WENT BACK OUT INTO THE PRECINCT AREA AGAIN.

9  Q.  WHERE DID YOU LEAVE MR. SIMMERS?

10 A.  I MAY HAVE TO REVIEW -- I DON'T RECALL. IT COULD

11     HAVE BEEN EITHER THE HOLDING CELL OR THE INTERVIEW

12     ROOM, I'M JUST NOT SURE. I WOULD HAVE TO REVIEW MY

13     REPORT TO SEE IF I HAVE INDICATED THAT.

14 Q.  AND DURING THESE TWO INTERVIEWS THAT TOOK PLACE

15     FROM 1:45 ON, WAS ANYONE ELSE PRESENT WITH YOU WHEN

16     YOU TOOK THESE TWO STATEMENTS FROM MR. SIMMERS?

17 A.  NO.

18          MS. MAHONEY: THE STATE WOULD MOVE TO OFFER

19     AT THIS TIME FOR PRETRIAL PURPOSES, STATE'S EXHIBIT

20     NO. 2.

21          THE COURT: ANY OBJECTION FOR PRETRIAL

22     PURPOSES?

23          MR. HICKS: NO.

24          THE COURT: IT IS ADMITTED.

25               (STATE'S EXHIBIT NO. 2
                 ADMITTED IN EVIDENCE.)

78

1

2          BY MS. MAHONEY:

3    Q.   SERGEANT RUSK, DURING THOSE CONVERSATIONS THAT YOU

4         HAD WITH MR. SIMMERS, THE TWO THAT WE HAVE JUST

5         REFERRED TO, DID HE OFFER TO GO ANYWHERE WITH YOU?

6    A.   HE DID AFTER THAT.   THERE WAS A THIRD PORTION OF

7         THE STATEMENT WHERE I FOUND OUT THAT HE WAS

8         PROBABLY ALSO INVOLVED IN SOME BOAT PROWLS DOWN AT

9         DAVIDSON'S MARINA.

10   Q.   COULD YOU EXPLAIN TO THE COURT HOW THAT TRANSPIRED?

11   A.   I FOUND OUT HE MOST LIKELY HAD BEEN INVOLVED IN

12        SOME BOAT PROWLS DOWN BY DAVIDSON'S MARINA.   I

13        ASKED HIM IF HE WAS INVOLVED IN THOSE, AND HE SAID

14        THAT HE WAS.   AND HE STARTED TRYING TO TELL ME,

15        WELL, I WAS ON THIS BOAT AND NOT ON THAT BOAT, AND

16        I WAS ON THIS ONE BUT NOT THAT ONE, YOU KNOW.

17              AND IT WAS VERY CONFUSING, AND I ASKED HIM

18        WOULD IT BE ALL RIGHT IF WE WENT DOWN TO

19        DAVIDSON'S, "AND YOU SHOW ME WHICH BOATS YOU WERE

20        ON."   AND HE SAID, "SURE, LET'S DO THAT."

21   Q.   AND, NOW, WAS THIS DURING THE SECOND INTERVIEW WITH

22        HIM OR DID YOU HAVE ANOTHER CONTACT WITH HIM?

23   A.   IT WOULD BE DURING THE THIRD CONTACT THAT I HAD

24        WITH HIM, WHICH WOULD HAVE BEEN ABOUT FIVE MINUTES

25        AFTER THE END OF THE SECOND CONTACT.

1          THE COURT:  WHENEVER THERE IS A LOGICAL

2     POINT --

3          MS. MAHONEY:  THIS MIGHT BE A GOOD PLACE

4     BEFORE I GO INTO THE NEXT PHASE.

5          THE COURT:  WE WILL RECESS UNTIL 1:30.

6                         (NOON RECESS.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                           AFTERNOON SESSION

2                                        MARCH 11, 1996
                                         1:30 P.M.
3

4                              (THE FOLLOWING PROCEEDINGS WERE
                               HELD OUTSIDE THE PRESENCE OF
5                              THE JURY.)

6              THE COURT:   GO AHEAD, MS. MAHONEY.

7              BY MS. MAHONEY:

8    Q.   DETECTIVE RUSK, WE WERE TALKING JUST BEFORE LUNCH

9         ABOUT THE THIRD STATEMENT THAT YOU TOOK.  AND JUST

10        TO BRIEFLY -- SO THAT I UNDERSTAND, YOU TOOK THE

11        FIRST STATEMENT FOR 20 TO 25 MINUTES, LEFT FIVE

12        MINUTES, AND THEN WENT BACK AND TOOK A SECOND

13        STATEMENT ON THE SAME SHEET OF PAPER.  HOW LONG DO

14        YOU ESTIMATE THAT TOOK?

15   A.   15 TO 20 MINUTES.

16   Q.   ALL RIGHT.

17   A.   MAYBE A LITTLE MORE, MAYBE A LITTLE LESS.  PROBABLY

18        A LITTLE MORE.

19   Q.   THEN YOU LEFT MR. SIMMERS AGAIN AND WENT BACK INTO

20        THE PRECINCT.  AND WHAT HAPPENED THEN?

21   A.   SPOKE WITH SOME OTHER PEOPLE WHO ADVISED ME THERE

22        HAD BEEN A BOAT SET ON FIRE, ROUGHLY DURING THE

23        SAME TIME FRAME, WITH FLARES.  AND I ASKED

24        MR. SIMMERS ABOUT THAT AT THAT TIME.

25   Q.   AND IS THAT THE THIRD TIME YOU THEN CONTACTED HIM?

81

1    A.    RIGHT.

2    Q.    HOW MUCH TIME TRANSPIRED BETWEEN THE SECOND AND THE

3          THIRD CONTACT?

4    A.    MAYBE ANOTHER FIVE MINUTES.

5    Q.    DURING THAT TIME, WERE THERE ANY OTHER DETECTIVES

6          OR OFFICERS WITH MR. SIMMERS QUESTIONING HIM?

7    A.    NO.

8    Q.    ALL RIGHT.  NOW, ON SECTION 2, IS THAT THIRD PART

9          OF THE STATEMENT ALSO INCLUDED ON HERE?

10   A.    YES, IT IS.

11   Q.    ALL RIGHT.  WOULD THAT BE ON PAGE 3?

12   A.    YES.

13   Q.    ALL RIGHT.  NOW, ON THIS FINAL EXHIBIT, THERE IS

14         ALSO -- THERE IS HIS SIGNATURE AND THEN ONE MORE

15         SENTENCE WRITTEN WITH ANOTHER SIGNATURE.

16   A.    THAT WAS AFTER HE HAD SIGNED IT.  AND THEN I WAS

17         ASKING, "WELL, YOU KNOW, WE HAVE BEEN THROUGH THIS

18         A COUPLE OF TIMES.  IS THERE ANYTHING MORE YOU

19         WOULD LIKE TO TELL ME ABOUT"?  AND IT WAS "WELL,

20         YEAH.  I TAGGED THE GROUND."

21   Q.    "I TAGGED THE GROUND"?

22   A.    I'M SORRY.  THAT IS KIND OF WHAT PEOPLE ARE USING

23         NOW, WHEN INDIVIDUALS THAT ARE IN A GANG HAVE WHAT

24         THEY CALL A NAME, A MONIKER OR GANG NAME, THEY WILL

25         USE THE MONIKER OR THEIR NAME, WHICH IS USUALLY

1    SOMETHING THAT IS NOT READILY DECIPHERABLE.  IN

2    OTHER WORDS, IT HAS THE LETTERS BUT IT IS DONE IN

3    VERY FLOWERY SCRIPT OR SOMETHING SO YOU CAN'T

4    REALLY TELL WHAT IT IS BY LOOKING AT IT.

5         IT IS SO THAT PEOPLE WHO ARE IN A GANG CAN

6    READILY LOOK AT IT AND IDENTIFY IT, BUT PEOPLE WHO

7    AREN'T IN A GANG DON'T UNDERSTAND IT.  AND WHEN YOU

8    DRAW IT ON THE PAVEMENT, OR WALL, OR FENCE, IT IS

9    CALLED TAGGING.  AND I GUESS I USED THE STREET

10   VERNACULAR, "TAGGED," OR HE DID.

11  Q.  AND SO DID HE THEN ADD THAT TO THE STATEMENT AS

12   WELL?

13  A.  I DID, BUT HE SIGNED IT.

14  Q.  ALL RIGHT.  AND WAS THAT ALSO THEN DURING THE THIRD

15   CONTACT?

16  A.  CORRECT.

17  Q.  ALL RIGHT.  AND HOW LONG DO YOU THINK YOU SPENT

18   WITH HIM ON THAT THIRD CONTACT?

19  A.  OH, ANOTHER 15 OR 20 OR 25 MINUTES.

20  Q.  NOW, DURING THAT TIME YOU HAVE EXPLAINED TO US THAT

21   HE STARTED TALKING ABOUT THE BOATS, AND THERE WERE

22   SO MANY, YOU ASKED HIM IF HE WOULD GO TO THE

23   MARINA.  WHEN DID THAT TOOK PLACE?

24  A.  AFTER WE WERE DONE WITH THE WRITTEN STATEMENT.

25  Q.  TO YOUR KNOWLEDGE, DID ANYONE ELSE BESIDES YOURSELF

1    INTERVIEW THE DEFENDANT BETWEEN THE TIME YOU

2    FINISHED THE STATEMENT, AS SHOWN HERE IN STATE'S

3    EXHIBIT NO. 2, AND YOU TOOK HIM TO THE MARINA?

4  A. NO.

5  Q. DO YOU RECALL ABOUT WHAT TIME YOU LEFT FOR THE

6    MARINA?

7  A. NOT SPECIFICALLY.  I WENT WITH DETECTIVE RAFTIS,

8    AND I'M NOT POSITIVE OF THE EXACT TIME THAT WE

9    LEFT.

10  Q. HOW LONG DO YOU ESTIMATE HAD TRANSPIRED BETWEEN THE

11    FINISHING OF THE STATEMENT IN STATE'S EXHIBIT NO. 2

12    AND LEAVING FOR THE MARINA?

13  A. OH, PROBABLY 20 MINUTES OR SO.

14  Q. ALL RIGHT.  AND DURING THIS TIME, DID YOU ALSO

15    CONSULT WITH DETECTIVE MCSWAIN WHO HAD BEEN

16    INTERVIEWING JOHN WYATT?

17  A. YES, I DID.

18  Q. WERE YOU AWARE OF WHAT HAD TRANSPIRED THERE AS

19    WELL?

20  A. YES, I WAS.

21  Q. AND HAD MR. WYATT ALSO AGREED TO GO TO THE MARINA?

22  A. YES, HE DID.

23  Q. DID MR. WYATT PUT A CONTINGENCY ON THAT?

24  A. I'M NOT AWARE OF ONE, NO.

25  Q. WERE MR. SIMMERS AND MR. WYATT TAKEN TOGETHER?

1   A.   NO.

2   Q.   DO YOU KNOW WHY?

3   A.   BECAUSE I PERSONALLY WOULD NOT WANT THEM TO BE

4       TOGETHER SO THAT THEY COULD CONCOCT A STORY BETWEEN

5       THEM.  AND IT WOULD BE REAL EASY FOR ONE TO SAY,

6       "YEAH, WE DID THAT BOAT," AND THEN THE OTHER GUY

7       NODS HIS HEAD AND SAYS, "YEAH, WE DID THAT BOAT."

8           IT'S FAR BETTER TO MAKE SURE THAT WE HAVE

9       THEM THERE INDEPENDENTLY SO THAT WHEN YOU ASK THEM,

10      "DID YOU GO ON THAT BOAT"? ONE OF THEM CAN SAY

11      "YES."  AND THEN LATER YOU CAN ASK THE OTHER PERSON

12      THE SAME QUESTION, "DID YOU GO ON THAT BOAT"?  AND

13      THEN YOU GET AN INDEPENDENT STATEMENT.

14   Q.   ALL RIGHT.  DID YOU TAKE MR. SIMMERS OR MR. WYATT

15      FIRST?

16   A.   MR. SIMMERS.

17   Q.   ALL RIGHT.  NOW, WHILE YOU WERE ON THE WAY TO THE

18      MARINA, DID YOU SPEAK AT ALL WITH MR. SIMMERS?

19   A.   YES, I DID.

20   Q.   ALL RIGHT.  WHO WAS DRIVING THE CAR, BY THE WAY?

21   A.   DETECTIVE RAFTIS.

22   Q.   DID YOU RE-MIRANDIZE HIM AT THAT POINT?

23   A.   NO.

24   Q.   BETWEEN THE TIME HE HAD LAST BEEN MIRANDIZED AND

25      WHEN YOU WERE IN THE CAR ON THE WAY TO THE MARINA,

| | | |
|---|---|---|
| 1 | | HAD HE EVER ASKED TO SPEAK WITH AN ATTORNEY, OR TO |
| 2 | | SPEAK WITH HIS ATTORNEY, OR INDICATED TO YOU IN ANY |
| 3 | | WAY THAT HE WISHED TO STOP TALKING? |
| 4 | A. | NO, NO, NO. |
| 5 | Q. | ON THE WAY TO THE MARINA, DID YOU ASK MR. SIMMERS |
| 6 | | ABOUT WHETHER OR NOT HE KNEW ANYTHING ABOUT A |
| 7 | | STABBING ON THE BURKE-GILMAN TRIAL? |
| 8 | A. | YES, I DID. |
| 9 | Q. | COULD YOU TELL THE JUDGE HOW THAT TRANSPIRED? |
| 10 | A. | I JUST -- THEY HAD -- HE AND WYATT BOTH HAD STATED |
| 11 | | THAT THEY HAD BEEN USING THE TRAIL FOR TRANSIT |
| 12 | | BETWEEN WOODINVILLE AND THE KENMORE AREA.  AND I |
| 13 | | JUST ASKED HIM IF HE KNEW ANYTHING ABOUT A GUY |
| 14 | | NAMED "GOUCHER" THAT HAD BEEN STABBED ALONG THE |
| 15 | | BURKE-GILMAN TRAIL. |
| 16 | Q. | WHY DID YOU USE THE NAME "GOUCHER"? |
| 17 | A. | BECAUSE I DIDN'T KNOW THE PERSON'S REAL NAME.  I |
| 18 | | HAD READ A SMALL ARTICLE IN THE NEWSPAPER, AND IT |
| 19 | | TURNED OUT, I BELIEVE THE VICTIM'S NAME WAS |
| 20 | | GOCHANOUR.  BUT I COULD NOT RECALL THE NAME, AND I |
| 21 | | ASKED IF HE HAD STABBED SOMEBODY NAMED "GOUCHER." |
| 22 | Q. | HAD YOU BEEN INVOLVED AT ALL IN THAT INVESTIGATION? |
| 23 | A. | NO. |
| 24 | Q. | DO YOU HAVE ANY OTHER DETAILS ABOUT THE CRIME OTHER |
| 25 | | THAN WHERE IT HAD TAKEN PLACE AND THAT IT WAS A |

1     STABBING?

2  A.  NONE.  NOT EVEN WHERE IT HAD TAKEN PLACE OTHER THAN

3     ALONG THE TRIAL IN BOTHELL.

4  Q.  WHEN YOU ASKED HIM ABOUT WHETHER OR NOT HE KNEW

5     ANYTHING ABOUT A MAN NAMED "GOUCHER" BEING STABBED,

6     WHAT WAS HIS RESPONSE?

7  A.  HIS RESPONSE WAS THAT HE HADN'T STABBED NO OLD BUM.

8  Q.  AND WHAT DID YOU RESPOND?

9  A.  I DIDN'T REALLY RESPOND.

10  Q.  DO YOU REMEMBER ASKING HIM WHERE HE GOT THE

11     INFORMATION HE WAS A BUM?

12  A.  NO.

13  Q.  DO YOU THINK YOUR STATEMENT MIGHT HELP REFRESH YOUR

14     RECOLLECTION?

15  A.  WELL, WHAT I DID -- I DIDN'T -- I ASKED HIM WHERE

16     HE HAD HEARD THAT THE GUY WAS A BUM, AND HE SAID

17     THAT I HAD TOLD HIM THAT.  AND I HADN'T.  I

18     REFERRED TO HIM AS "GOUCHER."

19  Q.  DO YOU REMEMBER HIM TELLING YOU ANYTHING ELSE IN

20     THE CAR?

21  A.  WELL, WE HAD TALKED ABOUT ON OUR ROUTE DOWN TO

22     DAVIDSON'S -- IT'S A VERY SHORT DRIVE, PROBABLY

23     FIVE OR SIX BLOCKS -- WE HAD TALKED ABOUT WHAT

24     BOATS HE HAD GONE ON AND WHAT HE HAD TAKEN.

25  Q.  ALL RIGHT.  WAS THIS ALL DONE VERBALLY?

1   A.  YES.

2   Q.  WHILE YOU WERE ON THE DOCK, DID THAT CONVERSATION

3      CONTINUE?

4   A.  YES.

5   Q.  DID MR. SIMMERS POINT OUT SPECIFIC BOATS TO YOU?

6   A.  YES, HE DID.

7   Q.  WHAT DID HE TELL YOU ABOUT THE BOATS?

8   A.  HE TOLD US WHICH BOATS HE HAD BROKEN INTO, AND WHAT HE

9      HE REMEMBERED TAKING FROM THE BOATS, AND WHAT HE

10     HAD DONE WITH SOME OF THE PROPERTY -- JUST THAT

11     TYPE OF INFORMATION.

12   Q.  ALL RIGHT.  AND WAS THIS ALL TAKEN VERBALLY AT THAT

13     TIME?

14   A.  YES, IT WAS.

15   Q.  HOW LONG DO YOU THINK YOU SPENT AT THE MARINA?

16   A.  I DON'T KNOW.  WE WENT FROM THAT MARINA TO THE

17     MARINA NEXT DOOR, AND ALL TOLD, PROBABLY CLOSE TO

18     45 MINUTES.

19   Q.  AND WHAT DID YOU DO THEN?

20   A.  WENT BACK TO THE PRECINCT.

21   Q.  WHAT DID YOU DO WITH MR. SIMMERS THEN?

22   A.  PLACED HIM BACK IN THE HOLDING CELL.

23   Q.  WHAT DID YOU DO THEN?

24   A.  WENT WITH DETECTIVE MCSWAIN DOWN TO DAVIDSON'S,

25     ALONG WITH JON WYATT.

```
1   Q.  ALL RIGHT.  AND ON THE WAY TO THE MARINA WITH JON
2       WYATT -- DO YOU RECALL WHAT TIME THAT WAS?
3   A.  NO, I DON'T.  DETECTIVE MCSWAIN WAS KEEPING TRACK
4       OF THE TIME, AND I'M NOT SURE WHAT THE TIME WAS.  I
5       COULD LOOK AT HIS REPORT AND BE PRETTY ACCURATE
6       WITH IT.
7   Q.  WOULD THAT HELP REFRESH YOUR RECOLLECTION?
8   A.  YES.
9   Q.  WERE YOU AWARE THAT HE WAS DOING THAT?
10  A.  YES, I WAS.  LET ME SEE, WE LEFT FROM THERE --
11          MR. HICKS:  SORRY.  LEFT FROM WITH WHERE?
12  A.  WE LEFT FROM THE PRECINCT AT 5 P.M.
13  Q.  NOW, ON THE WAY TO THE MARINA, DID YOU ALSO ASK JON
14      WYATT IF HE WAS AWARE OF WHETHER OR NOT -- IF HE
15      KNEW ANYTHING ABOUT A STABBING.
16  A.  YES, I DID.
17  Q.  AND BASED ON CONVERSATIONS THAT YOU HAD WITH HIM,
18      DID YOU THEN HAVE FURTHER INTEREST IN MR. SIMMERS
19      AS A SUSPECT?
20  A.  YES.
21  Q.  ALL RIGHT.  AT THE TIME THAT YOU SPOKE WITH
22      MR. WYATT IN THE CAR, WHEN YOU WERE TALKING ABOUT
23      THE STABBING ON THE BURKE-GILMAN TRAIL AND HIS
24      POTENTIAL INVOLVEMENT, DID MR. WYATT EVER ASK FOR
25      AN ATTORNEY?
```

1  A.  HE ASKED FOR AN ATTORNEY LATER, WHEN WE ARRIVED

2      DOWN AT THE MARINA.

3  Q.  ALL RIGHT.  AT THE TIME MR. WYATT ASKED FOR AN

4      ATTORNEY, DID YOUR INTERROGATION CEASE AT THAT

5      POINT?

6  A.  YES, IT DID.

7  Q.  DID YOU EVER EVEN TAKE HIM ONTO THE DOCKS?

8  A.  NO.  WE RETURNED TO THE PRECINCT AND THEN CALLED --

9      I BELIEVE IT'S EITHER CAROL BENNETT OR BERTRAND-

10     BENNETT -- WHO WAS HIS ATTORNEY.

11 Q.  MR. WYATT'S ATTORNEY?

12 A.  YES.

13 Q.  AFTER WHAT YOU HAD LEARNED FROM MR. WYATT, DID YOU

14     MAKE ANY CONTACT WITH ANYONE ELSE BESIDES THE

15     ATTORNEY FOR MR. WYATT?

16 A.  YES, I DID.

17 Q.  AND WHO WAS THAT?

18 A.  I NOTIFIED MAJOR BEARD AT THE PRECINCT THAT I

19     BELIEVED WE HAD SOME INFORMATION RELEVANT TO THE

20     BOTHELL HOMICIDE, AND I BELIEVE HE THEN CALLED

21     SOMEONE WITH THE BOTHELL POLICE DEPARTMENT,

22     PROBABLY THEIR DISPATCH CENTER.

23 Q.  WERE YOU NOTIFIED THAT A DETECTIVE FROM BOTHELL

24     WOULD BE IN TRANSIT TO PRECINCT 2?

25 A.  YES.

1    Q.   DID YOU OR ANYONE ELSE SPEAK WITH MR. SIMMERS

2         DURING THE TIME YOU WERE WAITING TO CONTACT AN

3         ATTORNEY FOR MR. WYATT AND FOR THE BOTHELL

4         DETECTIVE TO GET THERE?

5              MR. HICKS:  OBJECTION, ONLY IF HE KNOWS

6         HIMSELF.

7              THE COURT:  SUSTAINED.

8              BY MS. MAHONEY:

9    Q.   DETECTIVE RUSK, AT THIS POINT, ARE YOU AWARE OF HOW

10        MR. SIMMERS IS BEING HANDLED?

11   A.   DURING THAT TIME, HE WAS BACK IN ONE OF THE HOLDING

12        CELLS.  I DID PERSONALLY GO TO MCDONALD'S AND GET

13        SOME SORT OF A MEAL.

14             MR. HICKS:  A HAPPY MEAL?  YOUR HONOR, I

15        OBJECT AS NOT RESPONSIVE.

16             THE COURT:  SUSTAINED.

17             MS. MAHONEY:  I WILL GET TO THAT PART IN A

18        MOMENT, DETECTIVE.

19   Q.   WHAT I'M ASKING YOU IS, TO YOUR KNOWLEDGE, BETWEEN

20        THE TIME THAT YOU GOT BACK FROM THE MARINA WITH

21        MR. WYATT AND NOW HAVE SUSPICIONS ABOUT MR. SIMMERS

22        AND THE MURDER -- TO YOUR KNOWLEDGE, DID ANYONE

23        INTERROGATE MR. SIMMERS ABOUT THOSE POTENTIAL --

24        ABOUT THAT INCIDENT BETWEEN THE TIME THAT YOU GOT

25        BACK FROM THE MARINA AND DETECTIVE HOPKINS ARRIVED?

1    A.   TO MY KNOWLEDGE, NO.  AND ALSO, TO MY KNOWLEDGE, I

2         ASKED DETECTIVE RAFTIS TO WAIT IN THE HALLWAY RIGHT

3         OUTSIDE THE HOLDING CELL.

4    Q.   DURING THAT TIME PERIOD, WAS MR. SIMMERS HELD WITH

5         ANYONE ELSE?  I MEAN, WAS HE IN A CELL WITH ANYONE

6         ELSE?

7    A.   NO, HE WAS NOT.

8    Q.   WAS HE KEPT SEPARATE FROM MR. WYATT?

9    A.   YES.

10   Q.   ALL RIGHT.  NOW, DID IT TAKE SOMETIME TO CONTACT

11        MR. WYATT'S ATTORNEY?

12   A.   YES, IT DID.

13   Q.   COULD YOU BRIEFLY IF AT ALL POSSIBLE DESCRIBE TO

14        THE COURT -- ARE WE TALKING HERE -- WE ARE TALKING

15        ACTUALLY A TWO OR THREE-HOUR TIME PERIOD; IS THAT

16        RIGHT?

17   A.   YES, WE ARE.

18   Q.   COULD YOU BRIEFLY EXPLAIN TO THE COURT WHY THAT

19        WAS?

20   A.   WE CALLED HER AND ADVISED HER WHAT WE WERE

21        INVESTIGATING -- WELL, FIRST, WE HAD A HARD TIME

22        GETTING AHOLD OF HER.  AND WE FINALLY REACHED HER

23        AND ADVISED HER WE HAD SOMEONE WHO STATED THAT THEY

24        WANTED HER TO BE THEIR ATTORNEY, OR THAT SHE WAS

25        THEIR ATTORNEY.  IT WAS MR. WYATT, AND THAT HE

```
 1        WANTED TO TALK TO HER.

 2             SHE DIDN'T WANT TO TALK TO HER CLIENT, AND

 3        WE HAD TO SPENT SOME TIME TRYING TO CONVINCE HER TO

 4        TALK TO HER CLIENT.

 5   Q.   ALL RIGHT.  AND DID YOU ACTUALLY HAVE TO GET A

 6        SUPERVISOR AND A PROSECUTOR INVOLVED TO ACCOMPLISH

 7        THAT PROCESS?

 8   A.   YES.

 9   Q.   AND DID YOU ALSO EVENTUALLY HAVE TO HAVE HER COME

10        TO THE STATION?

11   A.   YES.

12   Q.   DID THAT TAKE SOME TIME AS WELL?

13   A.   IT TOOK A LOT OF TIME.

14   Q.   ALL RIGHT.  WHAT TIME DID SHE ACTUALLY ARRIVE?

15   A.   I'M NOT POSITIVE BUT I BELIEVE IT WAS CLOSE TO

16        8:00.

17   Q.   COULD IT HAVE BEEN LATER?

18   A.   YES.  DETECTIVE MCSWAIN WAS KEEPING TRACK OF THE

19        TIME.

20   Q.   ARE YOU AWARE OF THAT?

21   A.   YES.

22   Q.   DO YOU HAVE NOTES AS TO THE ACTUAL TIME SHE

23        ARRIVED?

24   A.   YES, 1942.

25   Q.   WHICH IN PEOPLE TIME IS --
```

1    A.   IT WOULD BE 7:42.

2    Q.   HAD DETECTIVE HOPKINS ARRIVED YET?

3    A.   YES, HE HAD.

4    Q.   AND HAD HE YET MADE CONTACT WITH SIMMERS, TO YOUR

5         KNOWLEDGE?

6    A.   HE HAD NOT.

7    Q.   WERE YOU WAITING TO TALK TO WYATT FIRST?

8    A.   YES, WE WERE.

9    Q.   WHY?

10   A.   BECAUSE WYATT INDICATED THAT HE HAD KNOWLEDGE OF

11        THE HOMICIDE.

12   Q.   ONCE THE ATTORNEY ARRIVED, DO YOU KNOW HOW LONG SHE

13        SPENT WITH HER CLIENT, APPROXIMATELY?

14   A.   I WOULD SAY TEN TO FIFTEEN MINUTES.

15   Q.   AND AFTER THAT TIME, WHAT WERE YOU ADVISED?

16   A.   WE WERE ADVISED THAT SHE DID NOT WANT HIM TO GIVE

17        US A STATEMENT.  AND THEN SHE LEFT.

18   Q.   ALL RIGHT.  NOW, I WANT TO BACK UP FOR A MOMENT

19        BACK TO THE TIME BETWEEN THE TIME YOU RETURNED FROM

20        THE MARINA AND YOU WERE DOING ALL THIS TO GET MR.

21        WYATT'S ATTORNEY PRESENT.  YOU HAVE ALREADY STATED

22        THAT MR. SIMMERS WAS IN A HOLDING CELL.  TO YOUR

23        KNOWLEDGE, WAS HE PROVIDED WITH FOOD?

24   A.   YES, HE WAS.

25   Q.   HOW DO YOU KNOW THAT?

1   A.   BECAUSE I WENT TO MCDONALD'S AND BOUGHT IT.

2   Q.   AND WAS HE GIVEN -- DID HE HAVE A PLACE TO SLEEP IF

3        HE WANTED?

4   A.   YES.

5   Q.   ARE YOU AWARE OF WHETHER OR NOT HE WAS GIVEN A

6        BLANKET?

7   A.   YES.

8   Q.   DURING THE TIME HE WAS GIVEN THE FOOD, WAS HE BEING

9        INTERROGATED?

10  A.   NO.

11  Q.   HOW WAS THAT FOOD PROVIDED TO HIM?

12  A.   IT WAS A STANDARD PAPER BAG AND A PAPER CUP OR

13       CARDBOARD CUP.

14  Q.   THE CIRCUMSTANCES -- WAS IT HANDED TO HIM AND HE

15       LEFT TO EAT ALONE?

16  A.   YES.

17  Q.   DURING ANY OF THESE CHECK-IN'S ON HIM WHEN YOU

18       BROUGHT HIM THE FOOD, DID HE EVER ASK TO SPEAK TO

19       AN ATTORNEY, OR HAVE YOU CONTACT HIS PARENTS, OR

20       ANYTHING LIKE THAT?

21  A.   NO.

22  Q.   AFTER YOU LEARNED THAT JONATHAN WYATT WOULD NO

23       LONGER BE SPEAKING WITH YOU, WHAT DID YOU NEXT DO?

24  A.   DETECTIVE HOPKINS AND I DECIDED TO SPEAK TO IAN

25       SIMMERS.

1    Q.   AND DO YOU RECALL WHAT TIME THAT TOOK PLACE?

2    A.   IT WOULD HAVE BEEN -- I BELIEVE IT WAS 9:00 IN

3         PEOPLE TIME, OR 9:45.

4    Q.   OKAY.  IS THAT P.M.

5    A.   P.M., YES.

6    Q.   AND TO YOUR KNOWLEDGE, IS THIS THE FIRST TIME THAT

7         MR. SIMMERS HAD BEEN RECONTACTED --

8    A.   OTHER THAN FOR THE FOOD.

9    Q.   -- TO BE INTERVIEWED?

10   A.   YES.

11   Q.   AND WHERE DID YOU TAKE HIM?

12   A.   TO AN INTERVIEW ROOM RIGHT ACROSS THE HALL.

13   Q.   ALL RIGHT.  WHO WAS PRESENT AT THAT TIME?

14   A.   DETECTIVE HOPKINS AND MYSELF.

15   Q.   HAD DETECTIVE HOPKINS FILLED YOU IN AT THAT POINT

16        ON ANY OF THE DETAILS OF THIS CRIME?

17   A.   TO A CERTAIN DEGREE, YES, BUT NOT IN GREAT DETAIL,

18        NO.

19   Q.   AND HAD YOU FILLED IN DETECTIVE HOPKINS ON WHAT HAD

20        HAPPENED?

21   A.   YES.

22   Q.   ALL RIGHT.  WAS THIS TO YOUR KNOWLEDGE THE FIRST

23        TIME DETECTIVE HOPKINS HAD MET MR. SIMMERS?

24   A.   AS FAR AS I KNOW, YES.

25             MR. HICKS:  OBJECTION, MOVE TO STRIKE.

1    THERE IS NO FOUNDATION FOR BASIS OF KNOWLEDGE.

2            THE COURT:  SUSTAINED, LACK OF FOUNDATION.

3            BY MS. MAHONEY:

4    Q.   NOW, DETECTIVE RUSK, WHEN YOU AND DETECTIVE HOPKINS

5         AGAIN CONTACTED MR. SIMMERS, COULD YOU TELL THE

6         COURT WHAT YOU DID?

7    A.   I WENT INTO THE HOLDING CELL AND ASKED IAN IF HE

8         WOULD BE WILLING TO TALK TO US SOME MORE, AND IF HE

9         WAS OKAY WITH TALKING TO US SOME MORE, AND IF HE

10        STILL REMEMBERED HIS RIGHTS.

11   Q.   HOW DID HE RESPOND?

12   A.   HE SAID IT WAS OKAY TO TALK TO US, AND THAT HE

13        REMEMBERED HIS RIGHTS.

14   Q.   DID YOU AND DETECTIVE HOPKINS THEN SPEAK WITH HIM?

15   A.   YES, WE DID.

16   Q.   HOW DID THAT CONVERSATION START, TO THE BEST OF

17        YOUR RECOLLECTION?

18   A.   WE TOLD HIM THAT WE BELIEVED THAT HE WAS INVOLVED

19        IN A -- IN THE STABBING ON THE TRAIL AND INTIMATED

20        THAT MR. WYATT HAD INDICATED THAT HE HAD COMMITTED

21        IT, THAT HE WAS INVOLVED IN IT.

22   Q.   ALL RIGHT.  HOW DID MR. SIMMERS RESPOND?

23   A.   HIS RESPONSE WAS THAT HE HADN'T DONE THAT, THAT HE

24        WOULDN'T KILL SOMEBODY WHO WAS A REGULAR GUY AND

25        NOT A GANGSTER.

1   Q.   AND THEN WHAT HAPPENED?

2   A.   WE CONTINUED TO TALK.  MR. SIMMERS REQUESTED THAT

3        HE BE PROVIDED WITH A CIGARETTE.  AND SO I LEFT THE

4        ROOM TO SEE IF -- OSTENSIBLY, TO SEE IF I COULD

5        FIND A CIGARETTE FOR HIM.

6   Q.   WHY DO YOU SAY "OSTENSIBLY"?

7   A.   I WOULDN'T GIVE HIM A CIGARETTE; I DON'T BELIEVE IN

8        DOING THAT.

9   Q.   HOW LONG WERE YOU GONE?

10  A.   THREE OR FOUR MINUTES.

11  Q.   WHEN YOU LEFT TO GET HIM A CIGARETTE, DID YOU SAY,

12       "IF I GET YOU A CIGARETTE, WILL YOU TALK"?  OR

13       ANYTHING ALONG THOSE LINES?

14  A.   NOPE.

15  Q.   DID YOU LEAVE DETECTIVE HOPKINS WITH HIM AT THAT

16       POINT?

17  A.   YES, I DID.

18  Q.   NOW, WHAT WAS GOING ON?

19  A.   HE AND DETECTIVE HOPKINS WERE TALKING STILL.

20  Q.   DO YOU REMEMBER WHAT THEY WERE TALKING ABOUT?

21  A.   NO, I DON'T.

22  Q.   AND WHAT DO YOU NEXT RECALL?

23  A.   I USED A DIFFERENT INTERVIEW THEME.  I MENTIONED TO

24       MR. SIMMERS THAT I HAD HEARD THAT THE VICTIM IN

25       THIS CRIME HAD BEEN BOTHERING OTHER PEOPLE ON THE

1      TRAIL AND WONDERED IF MAYBE HE HADN'T STABBED THE

2      GUY WHEN THE GUY STARTED BOTHERING HIM, OR

3      SOMETHING LIKE THAT.

4   Q.  AND WHAT DID MR. SIMMERS THEN RESPOND?

5   A.  HE SAID, YEAH, THAT WAS IT, THAT THE GUY HAD

6      ACCOSTED HIM ON THE TRAIL AND THAT IS WHY HE HAD

7      GOTTEN STABBED.

8   Q.  ALL RIGHT.  WHAT TOOK PLACE THEN -- LET ME STOP YOU

9      FOR ONE MOMENT:  IS THAT THE FIRST TIME HE ADMITTED

10     HAVING ANYTHING TO DO WITH THE STABBING?

11  A.  YES.

12  Q.  AND WHEN YOU TOLD HIM THIS, WAS IT TRUE?

13  A.  NO.

14  Q.  DID YOU BELABOR THE POINT OR JUST KIND OF BRING IT

15     UP ONCE?

16  A.  BROUGHT IT UP ONCE.

17  Q.  AND WHAT WAS YOUR TONE OF VOICE LIKE?

18  A.  PROBABLY LOW.  NOT ACCUSATORY, JUST LOW AND MAYBE

19     CONFIDENTIAL.

20  Q.  DID YOU EVER SAY ANYTHING TO HIM WHEN YOU WERE

21     TELLING HIM THAT IF THIS WAS TRUE, YOU WOULDN'T BE

22     HELD RESPONSIBLE, OR ANYTHING LIKE THAT?

23  A.  NO.

24  Q.  CAN YOU REMEMBER -- IT IS BASICALLY JUST WHAT YOU

25     TOLD THE COURT, THE GIST OF WHAT WAS SAID?

1   A.   YES.

2   Q.   AND AFTER HE SAID, YEAH, THAT'S WHAT HAPPENED, CAN

3        YOU TELL THE COURT THE NEXT PART OF THE CONVER-

4        SATION?

5   A.   HE MENTIONED HOW HE HAD PULLED THE KNIFE OUT FROM

6        BEHIND HIS BACK, AND HE HAD SLASHED THE VICTIM

7        ACROSS THE JAW, AND THEN HAD TURNED THE KNIFE AND

8        STABBED HIM IN THE BACK, GRABBED HIM IN THE

9        SHOULDER AND STABBED HIM UP AND DOWN THE BACK.

10        AND THEN HE DEMONSTRATED ON DETECTIVE

11       HOPKINS HOW HE HAD DONE THAT.

12   Q.   ALL RIGHT.  COULD YOU SEE THAT DEMONSTRATION?

13   A.   SOMEWHAT.  THE DEMONSTRATION WAS PARTIALLY OBSCURED

14       BY THEIR BODIES.  I COULD SEE IAN MOVING FROM

15       BEHIND HIS BACK OUT WITH AN IMAGINARY KNIFE, AND

16       SLASHING, WHICH WOULD HAVE BEEN WITH A BACK-HANDED

17       SLASH.  AND THEN HE FLIPPED THE IMAGINARY KNIFE

18       AGAIN, BECAUSE HE DIDN'T HAVE A KNIFE, AND THEN

19       STABBED HIM DOWN THE BACK.

20   Q.   ALL RIGHT.

21   A.   AND THAT WAS PARTIALLY OBSCURED.

22   Q.   AND AFTER THAT DEMONSTRATION, WHAT HAPPENED?

23   A.   I WENT TO FIND A TAPE-RECORDER TO -- WE ASKED

24       MR. SIMMERS IF IT WOULD BE ALL RIGHT IF WE COULD

25       TAPE IT, AND HE SAID THAT WOULD BE FINE.  AND I

1      WENT TO FIND A TAPE-RECORDER.

2    Q.  AND DID YOU LEAVE HIM WITH DETECTIVE HOPKINS AGAIN,

3        ALONE?

4    A.  YES, I DID.

5    Q.  NOW, LET ME ASK YOU WHEN YOU WERE IN THIS INTERVIEW

6        ROOM, WAS MR. SIMMERS HANDCUFFED?

7    A.  NO.

8    Q.  WAS HE STILL IN HIS REGULAR CLOTHES?

9    A.  YES.

10   Q.  AT ANY POINT IN TIME UNTIL YOU LEFT THE

11       TAPE-RECORDER, OR WHEN YOU MENTIONED GETTING THE

12       TAPE-RECORDER, DID HE EVER ASK FOR AN ATTORNEY?

13   A.  NO.

14   Q.  DID HE EVER DISPLAY ANY HESITANCY TO CONTINUE

15       SPEAKING WITH YOU, OR DID HE EVER ASK TO SPEAK TO

16       HIS PARENTS OR ANYTHING LIKE THAT?

17   A.  NO.

18   Q.  UP UNTIL THE TIME YOU WENT TO GET THE RECORDER --

19       FROM THE TIME YOU AND DETECTIVE HOPKINS FIRST WENT

20       IN THERE UNTIL YOU LEFT TO GET THE RECORDER, DO YOU

21       HAVE ANY ESTIMATE HOW LONG A TIME TRANSPIRED?

22   A.  PROBABLY 35 TO 40 MINUTES.

23   Q.  ALL RIGHT.  HOW LONG DO YOU THINK IT TOOK YOU TO

24       FIND A TAPE-RECORDER?  AGAIN, I KNOW YOU ARE

25       ESTIMATING.

1    A.   PROBABLY ABOUT TEN MINUTES BECAUSE I HAD TO FIND A

2         TAPE-RECORDER, AND THEN I WANTED TO MAKE SURE I HAD

3         A CLEAN, FRESH TAPE, AND THEN I WANTED TO MAKE SURE

4         I HAD FRESH BATTERIES IN THE TAPE-RECORDER.

5    Q.   WHEN YOU RETURNED WITH THE TAPE-RECORDER, WHAT

6         HAPPENED?

7    A.   WE READVISED MR. SIMMERS OF HIS MIRANDA RIGHTS FROM

8         A STANDARD -- I THINK IT WAS A KING COUNTY

9         DEPARTMENT FORM.

10   Q.   WHEN YOU SAY "WE," WHO DO YOU MEAN?

11   A.   DETECTIVE HOPKINS DID.  I'M SORRY.

12   Q.   WERE YOU PRESENT WHEN HE DID THAT?

13   A.   YES, I WAS.

14   Q.   DID YOU PROVIDE HIM A FORM TO DO THAT?

15   A.   YES, I DID.

16             THE CLERK:  STATE'S EXHIBIT 3 IS MARKED FOR

17        IDENTIFICATION.

18                  (STATE'S EXHIBIT NO. 3
                    MARKED FOR IDENTIFICATION.)
19

20             BY MS. MAHONEY:

21   Q.   SHOWING YOU WHAT HAS BEEN MARKED AS PRETRIAL

22        EXHIBIT NUMBER 3, DO YOU RECOGNIZE THAT?

23   A.   YES.

24   Q.   WHAT DO YOU RECOGNIZE IT TO BE?

25   A.   THIS APPEARS TO BE THE ORIGINAL, I THINK, OF THE

1          STATEMENT THAT DETECTIVE HOPKINS USED TO READ HIM

2          HIS RIGHTS.  AND IT IS OUR -- THE KING COUNTY

3          POLICE DEPARTMENT FORM.

4     Q.   ALL RIGHT.  AND YOU WERE PRESENT WHEN THAT FORM WAS

5          FILLED OUT?

6     A.   YES, I WAS.

7     Q.   AND THE TIME ON THAT?

8     A.   2240 HOURS.

9     Q.   ALL RIGHT.  AGAIN, WAS MR. SIMMERS READ EACH RIGHT

10         AS PRINTED ON THAT FORM, VERBATIM?

11    A.   WHILE THE TAPE WAS RUNNING, YES.

12    Q.   AND DID HE SIGN THAT?

13    A.   YES, HE DID.

14    Q.   AND DID HE SIGN IT IN YOUR PRESENCE?

15    A.   YES.

16    Q.   WAS THE WAIVER OF CONSTITUTIONAL RIGHTS READ TO

17         MR. SIMMERS?

18    A.   YES, IT WAS.

19    Q.   AND DID HE ALSO SIGN THAT IN YOUR PRESENCE?

20    A.   YES.

21    Q.   AND YOU STATED THIS IS ALSO ON THE TAPE-RECORDING?

22    A.   YES.

23    Q.   AND THEN HE PROCEEDED TO TELL YOU ABOUT THE CASE;

24         IS THAT CORRECT?

25    A.   DETECTIVE HOPKINS AND MYSELF, YES.

1    Q.   AND YOU WERE BOTH PRESENT WHEN THAT OCCURRED?

2    A.   YES.

3    Q.   DURING THE TAPED PORTION OF THE CONVERSATION, DID

4         EITHER ONE OF YOU EVER LEAVE?

5    A.   NO.

6              MS. MAHONEY:  AT THIS POINT, I WOULD MOVE TO

7    OFFER -- TO HAVE THIS MARKED AS A PRETRIAL EXHIBIT.

8    IT IS THE TAPE, BUT WE DIDN'T BRING UP A RECORDER.

9              WE CAN CERTAINLY DO DETECTIVE HOPKINS AND

10   THEN PLAY IT, IF THAT'S ACCEPTABLE.

11             MR. HICKS:  EXHIBIT 4?

12             THE COURT:  YES.  IS THERE ANY OBJECTION,

13   MR. HICKS?

14             MR. HICKS:  NOT FOR PRETRIAL PURPOSES.

15                  (STATE'S EXHIBIT NO. 4
                     ADMITTED IN EVIDENCE.)
16

17             THE COURT:  IS THERE A TRANSCRIPT?

18             MS. MAHONEY:  I WOULD ASK THAT THE

19   TRANSCRIPTION BE MARKED, AND I WOULD ASK THAT

20   THIS -- OFFER IT AS STATE'S EXHIBIT, PRETRIAL

21   EXHIBIT NUMBER 5.

22             AND I WILL HAVE DETECTIVE RUSK LAY A

23   FOUNDATION, IF NECESSARY, JUST ON THE BASIS THAT

24   THE COURT CAN SEE HOW THE QUESTIONING WENT.  AND I

25   THINK IT IS ALSO IMPORTANT TO LISTEN TO THE TAPE AS

1    WELL AND SEE THE RESPONSES, AND THE COHERENCY, ET

2    CETERA.

3         MR. HICKS:  JUST SO WE ARE CLEAR, EXHIBIT 5

4    IS THE TRANSCRIBED STATEMENT?

5         THE COURT:  YES.  ANY OBJECTION FOR PRETRIAL

6    PURPOSES, MR. HICKS?

7         MR. HICKS:  NO, YOUR HONOR.

8              (STATE'S EXHIBIT NO. 5
              ADMITTED IN EVIDENCE.)
9

10        MS. MAHONEY:  DO YOU WANT ME TO HAVE

11   DETECTIVE RUSK GO OVER THIS, OR DO YOU AGREE IT IS

12   A COMPLETE AND ACCURATE COPY OF THE TAPED

13   STATEMENT?

14        MR. HICKS:  YOUR HONOR, PAGE 9 OF THIS

15   STATEMENT WAS MISSING UNTIL TODAY.  NO OBJECTION

16   FOR PRETRIAL PURPOSES.

17        THE COURT:  DO YOU HAVE AN EXTRA COPY?

18        MS. MAHONEY:  I DO, AND IT IS MARKED.  THIS

19   ONE IS CLEAN AND I CAN MAKE ANOTHER COPY.

20        MR. HICKS:  I HAVE GOT A MARKED COPY.  YOU

21   CAN LOOK AT MINE.  I WOULD ASK OVER THE BREAK

22   PERHAPS A COPY BE MADE.

23        MS. MAHONEY:  SURE.  IF I COULD HAVE JUST

24   ONE MOMENT --

25   Q.  JUST TO RECAP, AT ANY TIME DURING YOUR ENTIRE

1          CONTACT WITH MR. SIMMERS, OFF AND ON OVER SEVERAL

2          HOURS, DID HE EVER EXPRESS A HESITANCY TO TALK TO

3          YOU.

4     A.   NO.

5     Q.   WAS THERE EVER ANY INDICATION TO YOU FROM YOUR

6          OBSERVATIONS THAT MR. SIMMERS WAS NOT AWARE OF HIS

7          SURROUNDINGS, OR THE TIME AND PLACE OF WHAT WAS

8          GOING ON?

9     A.   NO.

10    Q.   DID HE EVER ASK FOR HIS PARENTS OR EVEN MENTION HIS

11         PARENTS?

12    A.   NO.

13    Q.   DID HE EVER ASK FOR AN ATTORNEY?

14    A.   NO.

15              MS. MAHONEY:  I HAVE NO FURTHER QUESTIONS OF

16         THIS WITNESS.

17              THE COURT:  MR. HICKS?

18                   CROSS-EXAMINATION

19              BY MR. HICKS:

20    Q.   GOOD AFTERNOON, SERGEANT.  WE HAVE MET ONCE BEFORE,

21         HAVE WE NOT?

22    A.   YES.

23    Q.   DETECTIVE, HOW MANY OTHER JUVENILES HAVE YOU

24         INTERROGATED FOR PURPOSES OF BEING A HOMICIDE

25         SUSPECT -- JUVENILES, UNDER 18?

1    A.    OF BEING A HOMICIDE SUSPECT, I'M NOT SURE OF ANY AT

2          THIS TIME, IN THAT SPECIFIC INSTANCE.

3    Q.    AND YOU TOOK NO NOTES; IS THAT CORRECT?

4    A.    CORRECT.

5    Q.    YOU HAVE NO NOTES; IS THAT CORRECT?

6    A.    CORRECT.

7    Q.    AND YOU REMEMBER ALL THIS DETAIL ABOUT MR. SIMMERS

8          BEING SOBER AND TOTALLY COOPERATIVE, NOT REQUESTING

9          AN ATTORNEY OR HIS PARENTS, IN SPITE OF THE FACT

10         THIS WAS A YEAR AGO?

11   A.    I WROTE A 7-PAGE STATEMENT THE NEXT DAY.

12   Q.    BUT YOU MADE NO NOTES?

13   A.    CORRECT.

14   Q.    ALL RIGHT.  AND YOU ARE RELYING ON THE FACT -- AS

15         LONG AS YOU MENTIONED YOUR REPORT -- YOU ARE

16         RELYING TO SOME EXTENT ON THE REPORT, AND THE

17         REPORT INDICATED HE DIDN'T ASK FOR HIS PARENTS OR

18         AN ATTORNEY OR ANYTHING; IS THAT CORRECT?

19   A.    MY REPORT COVERS WHAT HAPPENED.  THINGS THAT DIDN'T

20         HAPPEN, SUCH AS -- IF HE WOULD HAVE ASKED FOR AN

21         ATTORNEY, THEN QUESTIONING CEASES, YOU KNOW.  THERE

22         ARE CERTAIN RULES WE ARE BOUND BY.

23              IF HE HAD ASKED FOR HIS PARENTS, I WOULD

24         HAVE NOTED THAT, BUT SOMETHING AS SIGNIFICANT AS

25         ASKING FOR AN ATTORNEY, QUESTIONING WOULD HAVE JUST

1    CEASED AT THAT POINT.

2  Q.  YOU ARE SURE YOU WOULD REMEMBER AND PUT IT IN IF HE

3      ASKED FOR HIS PARENTS?

4  A.  HE DIDN'T.  YES, BUT HE DIDN'T.

5  Q.  AND YOU ALSO CLAIM THAT HE APPEARED NOT TO BE UNDER

6      THE INFLUENCE OF INTOXICANTS; IS THAT CORRECT?

7  A.  YES.

8  Q.  DID YOU NOTE THE CONTENTS OF HIS POCKET CONTAINING

9      THREE LITTLE VIALS OF BOOZE?

10 A.  I BELIEVE HE MAY HAVE HAD THAT, BUT THERE WAS NO

11     ODOR OF ALCOHOL ON HIM.  I WAS SITTING AT A SMALL

12     TABLE WHERE HE WAS, NO MORE THAN PROBABLY TWO FEET

13     AWAY FROM HIM, AND I COULD SMELL ALCOHOL IF HIS

14     BREATH HAD ALCOHOL ON IT.

15 Q.  WHAT DOES GIN SMELL LIKE?

16 A.  JUNIPER BERRIES.

17 Q.  IT DOESN'T HAVE AN ODOR; WERE YOU AWARE OF THAT?

18          MS. MAHONEY:  OBJECTION, YOUR HONOR.

19          THE COURT:  SUSTAINED.  LACK OF FOUNDATION.

20          BY MR. HICKS:

21 Q.  BEFORE MR. SIMMERS WAS ACTUALLY INTERVIEWED, THAT

22     IS TO SAY ACTUALLY HIS TRANSCRIBED STATEMENT, DID

23     YOU ASCERTAIN EXACTLY HOW LONG HE HAD BEEN IN

24     CUSTODY AT THAT TIME?

25 A.  NO.

1   Q.   WERE YOU AWARE IT WAS TWELVE HOURS?

2   A.   I DON'T BELIEVE THAT'S CORRECT.

3   Q.   AND SO YOU DID NOTHING TO ASCERTAIN WHAT HE HAD

4        ESSENTIALLY BEEN THROUGH PRIOR TO TAKING THE

5        STATEMENT?

6   A.   IT WAS MY UNDERSTANDING HE WAS BROUGHT DIRECTLY TO

7        THE PRECINCT UPON HIS ARREST, WHICH WOULD HAVE BEEN

8        JUST BEFORE I INTERVIEWED HIM, WHICH WOULD HAVE

9        BEEN ABOUT 1:30 IN PEOPLE TIME.  AND SO MY

10       UNDERSTANDING OF THAT IS THAT IT IS CLOSER TO ABOUT

11       EIGHT HOURS.

12  Q.   AND YOU DID NOTHING TO ASCERTAIN HIS CONDITION,

13       OTHER THAN DETERMINING HOW SOBER HE WAS.  WOULD

14       THAT BE ACCURATE?

15  A.   I'M NOT SURE I UNDERSTOOD THE QUESTION.

16  Q.   LET ME PUT IT THIS WAY:  DID YOU KNOW HE WAS A

17       RUNAWAY AT THE TIME AND THEN BASICALLY LIVING ON

18       HIS OWN ON THE STREETS?

19  A.   THAT'S WHY I FED HIM, YES.

20  Q.   YOU WERE AWARE OF THAT?

21  A.   YES.

22  Q.   AND DURING THIS ENTIRE TIME PERIOD, YOU DID NOT SEE

23       FIT TO CALL HIS PARENTS?

24  A.   NO, I DID NOT.

25  Q.   ALL RIGHT.  AND YOU WERE AWARE THAT MR. SIMMERS WAS

1     16 YEARS OLD AT THE TIME?

2  A.  I BELIEVE HE WAS, YES.

3  Q.  DID YOU ASCERTAIN HIS AGE YOURSELF?

4  A.  I ASKED HIS DATE OF BIRTH AND SO I KNEW THAT HE WAS

5     A JUVENILE.  I DON'T THINK I DID THE MATH.

6  Q.  AS I UNDERSTAND IT, ONE OF THE REASONS YOU AND

7     DETECTIVE HOPKINS BECAME SUSPICIOUS IS BECAUSE WHEN

8     YOU ASKED HIM -- YOU ASKED HIM THE QUESTION IN THE

9     CAR REGARDING THE HOMICIDE, AND HE SAID, "I DIDN'T

10    KILL NO BUM"; IS THAT CORRECT?

11  A.  CORRECT.

12  Q.  HE ALSO CLAIMED, HOWEVER, THAT HE DID KILL 13

13    PEOPLE, ALL GANGSTERS; IS THAT CORRECT?

14  A.  YES, HE DID.

15  Q.  DID YOU INVESTIGATE THAT?

16  A.  NO.

17  Q.  ALL RIGHT.  WOULD YOU PLEASE TURN TO -- IT IS YOUR

18    NARRATIVE, AND I WILL HAVE TO COUNT THE PAGES --

19    ONE, TWO, THREE, FOUR, FIVE -- PAGE 6.  WELL, I'M

20    SORRY.  BEGINNING WITH "DETECTIVE HOPKINS --" ARE

21    YOU WITH ME?

22  A.  NO.  EXCUSE ME, COULD I ASK YOU AGAIN WHAT PAGE ARE

23    WE ON?

24  Q.  BY MY COUNT IT IS PAGE 6 -- ON THE BOTTOM OF THE

25    PAGE, THERE SHOULD BE "PAGE 6 OUT OF 7" IN THE

1       LOWER RIGHT-HAND CORNER?

2   A.  THERE OUGHT TO BE BUT THERE'S NOT.

3           MS. MAHONEY:   THAT GOT CUT OFF.

4           BY MR. HICKS:

5   Q.  ARE YOU WITH ME BEGINNING WITH "DETECTIVE HOPKINS"?

6   A.  THE SENTENCE THAT STARTS "AT APPROXIMATELY 2145

7       HOURS"?

8   Q.  YES.  AND GOING DOWN ABOUT FOUR LINES BEGINNING

9       WITH "DETECTIVE HOPKINS," CAN YOU READ WITH ME AS

10      FOLLOWS:  "DETECTIVE HOPKINS AND I ASKED HIM ABOUT

11      THE STABBING, AND HE DENIED IT SAYING THAT THE

12      VICTIM WAS A REGULAR GUY AND NOT A GANGSTER."

13  A.  YES.

14  Q.  WELL, THAT IS AT ODDS WITH HIS PREVIOUSLY

15      DESCRIBING HIM AS A BUM?  WOULD YOU AGREE WITH ME?

16  A.  NO.  HE DIFFERENTIATED PEOPLE INTO REGULAR GUYS,

17      WHICH INVOLVED EVERYBODY ELSE IN THE WORLD, AND

18      PEOPLE THAT WERE MEMBERS OF A GANG.  TO HIM,

19      THERE'S THE WHOLE WORLD AND THEN THERE'S GANGSTERS.

20      IF YOU'RE NOT A GANGSTER, YOU ARE A REGULAR GUY.  I

21      MEAN, YOU CAN BE ANYBODY AS A REGULAR GUY EXCEPT A

22      GANGSTER.  AND IF YOU ARE A GANGSTER, YOU ARE NOT A

23      REGULAR GUY.

24  Q.  GIVEN THE FACT YOU DIDN'T TAKE NOTES, WOULD IT BE

25      FAIR TO SAY WHAT YOU REMEMBER ABOUT THIS CASE IS

1        MEMORIALIZED IN YOUR POLICE NARRATIVE?

2   A.   MEMORIALIZED?  I DID WRITE THAT THE NEXT DAY, YES.

3   Q.   WOULD YOU PLEASE SHOW ME WHERE IN THIS REPORT, IF I

4        MAY, THAT THAT PSYCHOLOGICAL CONCLUSION IS POINTED

5        OUT OR MENTIONED IN YOUR REPORT, ABOUT MR. SIMMERS

6        DIFFERENTIATING BETWEEN GANGSTERS AND THE REST OF

7        THE WORLD?

8   A.   THERE ARE CERTAIN THINGS THAT I DID NOT WRITE DOWN.

9   Q.   BUT YOU ARE CERTAIN THAT MR. SIMMERS CONCLUDES THAT

10       EVERYBODY BASICALLY DIFFERENTIATES BETWEEN

11       GANGSTERS AND EVERYONE ELSE IN THE WORLD?

12  A.   THAT'S WHAT HE -- WELL, WHAT HE SAID WAS -- I ASKED

13       HIM WHAT'S A REGULAR GUY AND HE SAID, "ANYBODY THAT

14       IS NOT A GANGSTER."

15  Q.   AND IT ALSO SAYS TWO LINES DOWN THAT THEY WERE

16       GANGSTERS WHO DESERVED KILLING, REFERRING TO THE 13

17       PEOPLE; IS THAT CORRECT?

18  A.   CORRECT.

19  Q.   BUT YOU CONCEDE NOWHERE IN YOUR REPORT DOES HE

20       SPECIFICALLY EITHER STATE DIRECTLY OR EVEN

21       PARAPHRASE THAT HE DISTINGUISHES GANGSTERS FROM

22       EVERYONE ELSE ON THE PLANET?

23  A.   NO, SIR, IT DOESN'T.

24  Q.   DO YOU CONCEDE YOU USED DECEPTION IN TERMS OF YOUR

25       INTERROGATION TECHNIQUE; IS THAT A FAIR STATEMENT?

1    A.   YES.

2    Q.   YOU INDICATED TO MR. SIMMERS YOU HAD EVIDENCE YOU

3         REALLY DIDN'T HAVE, IS THAT CORRECT?  JUST SAY

4         CORRECT OR INCORRECT, PLEASE.

5              MS. MAHONEY:  I OBJECT.  HE CAN'T ANSWER THE

6         QUESTION THAT WAY.

7    A.   I DID NOT SAY I HAD EVIDENCE.  I SAID I HAD HEARD

8         THAT THE VICTIM HAD BOTHERED OTHER PEOPLE.  I DON'T

9         THINK THAT THAT WOULD BE CONSIDERED HARD EVIDENCE;

10        THAT WOULD BE A STATEMENT.

11   Q.   BUT THAT'S NOT ALL YOU DID.  YOU INDICATED VERY

12        CLEARLY THAT MR. WYATT INDICATED THAT MR. SIMMERS

13        COMMITTED THIS HOMICIDE?

14   A.   CORRECT.

15   Q.   IN FACT YOU ALSO INDICATED THAT -- YOU DIDN'T

16        TESTIFY TO THIS, BUT I BELIEVE IT IS IN YOUR REPORT

17        AND DETECTIVE HOPKINS' REPORT -- THAT MR. WYATT, OR

18        AT LEAST YOU TOLD MR. SIMMERS, MR. WYATT CLAIMED

19        THAT MR. SIMMERS COMMITTED THE HOMICIDE.

20              AND IN FACT YOU KNEW WHERE THE KNIFE WAS

21        BECAUSE SUPPOSEDLY MR. WYATT TOLD YOU WHERE

22        MR. SIMMERS THREW IT; IS THAT CORRECT?

23   A.   CORRECT.

24   Q.   AND NONE OF THAT WAS TRUE; IS THAT CORRECT?

25   A.   CORRECT.

113

```
 1              MR. HICKS:  MAY I HAVE A MOMENT, YOUR HONOR?
 2              THE WITNESS:  IF I COULD CLARIFY THAT LAST
 3         ANSWER, SIR --
 4              MR. HICKS:  WHY DON'T YOU LET THE STATE DO
 5         THAT.  THEY WILL GET ANOTHER CHANCE.
 6    Q.   NOW, WHAT HE ACTUALLY SAID -- THAT IS, MR. SIMMERS,
 7         WAS THAT YOU HAD HEARD THE VICTIM WAS ASSAULTING
 8         OTHER PEOPLE; ISN'T THAT CORRECT?  NOT BOTHERING,
 9         ASSAULTING?
10    A.   ACCOSTED.
11    Q.   ACCOSTED.  ALL RIGHT, FINE.  ACCOSTED, NOT
12         BOTHERED?
13    A.   BOTHERING OR ACCOSTED, YES.
14    Q.   IT COULD BE ACCOSTED OR ASSAULTED; WOULD YOU AGREE
15         WITH THAT?
16    A.   ACCOSTED.
17    Q.   WAS THAT A TACTIC?  WAS THE PURPOSE OF THAT TACTIC
18         TO GET MR. SIMMERS TO AGREE THAT THE INCIDENT DID
19         OCCUR AND TRY TO GET HIM TO PUT FORTH A
20         SELF-DEFENSE CLAIM IN ORDER TO SHOW THAT HE WAS AT
21         THE SCENE AND INDEED COMMITTED THE HOMICIDE?
22    A.   YES.
23    Q.   ALL RIGHT.  AND THAT CAN FAIRLY BE CHARACTERIZED AS
24         DECEPTION, TOO, BECAUSE YOU KNEW PERFECTLY WELL
25         THERE WAS NO RUMORS ABOUT THIS PARTICULAR VICTIM
```

1        ACCOSTING OR BOTHERING ANYBODY?

2    A.  THAT'S CORRECT.

3    Q.  AND, IN FACT, WHAT MR. SIMMERS STATED WAS THAT HE

4        HAD BEEN SOCKED IN THE RIBS BY THIS GUY BEFORE THE

5        ALTERCATION STARTED; IS THAT CORRECT?

6    A.  AS PART OF THE ALTERCATION, YES.

7    Q.  DID YOU TAKE ANY PHOTOGRAPHS OF HIS RIBS?

8    A.  YES, WE DID.

9    Q.  YOU DID?

10   A.  YES.

11   Q.  ALL RIGHT.  AND WHERE ARE THOSE PHOTOGRAPHS?

12   A.  I PRESUME THEY WERE DEVELOPED SOMEWHERE.  I DO NOT

13       HAVE THEM IN MY POSSESSION.

14   Q.  YOU KNOW WHO DOES?

15           MS. MAHONEY:  I DO.  AND YOU HAVE COPIES.

16           MR. HICKS:  JUST A MOMENT.  YOUR HONOR --

17   Q.  YOU DON'T SEEM TO KNOW THE EXACT POINT THAT

18       MR. SIMMERS WAS BROUGHT TO THE POLICE STATION OR

19       TAKEN INTO POLICE CUSTODY INITIALLY; IS THAT A FAIR

20       STATEMENT?

21   A.  FAIR STATEMENT?  I ASSUME IT WAS JUST PRIOR TO MY

22       CONTACTING HIM --

23   A.  RIGHT.

24   Q.  AND IF YOU HAD REASON TO THINK THAT HE HAD BEEN

25       THERE SUBSTANTIALLY LONGER, I TAKE IT YOU WOULD

1      HAVE INQUIRED TO DETERMINE WHAT KIND OF SHAPE HE

2      MIGHT BE IN?  WOULD THAT BE FAIR?

3   A.  IT IS MY FEELING THAT I CAN TELL WHAT KIND OF SHAPE

4      SOMEONE IS IN BY LOOKING AT THEM AND TALKING TO

5      THEM.

6   Q.  I SEE.  SO YOU CONCLUDED RIGHT OFF THE BAT HE

7      DIDN'T KILL 13 GANGSTERS.  WOULD THAT BE FAIR, FROM

8      LOOKING AT HIM?

9   A.  NO, NO.  THAT'S NOT AN ACCURATE RENDITION OF WHAT I

10      SAID AT ALL.

11   Q.  WHY DIDN'T YOU INVESTIGATE THAT?

12   A.  I THINK WE ARE GOING TWO DIFFERENT DIRECTIONS.  I'M

13      NOT SURE I UNDERSTAND.  I THOUGHT YOU WERE TALKING

14      ABOUT HIS PHYSICAL OR MENTAL STATE.

15   Q.  I WAS.  OKAY, I WILL MOVE ON.  WHEN YOU ASKED

16      MR. SIMMERS ABOUT WHETHER OR NOT THE VICTIM HAD

17      SUPPOSEDLY ACCOSTED HIM, YOU IN FACT ASKED

18      SPECIFICALLY IF HE WAS ACCOSTED AND ONLY DEFENDING

19      HIMSELF; IS THAT CORRECT?

20   A.  I ASKED HIM IF IT COULD HAVE HAPPENED THAT WAY,

21      THAT I HAD HEARD THAT THE GUY HAD ACCOSTED OR

22      BOTHERED SOME OTHER PEOPLE ON THE TRAIL, AND ASKED

23      IF THIS IS MAYBE WHAT HAPPENED.

24   Q.  DID YOU MAKE ANY OBSERVATIONS OR REMEMBER ANY

25      OBSERVATIONS ABOUT MR. SIMMERS' DEMEANOR AND HOW HE

1     PRESENTED HIMSELF WHEN HE SPOKE?

2  A.  THE BIGGEST THING THAT STUCK IN MY MIND WAS THAT

3     HIS EYES SEEMED TO JUST LIGHT UP WHEN HE WAS

4     REENACTING THE STABBING.

5  Q.  LIKE HE WAS ENJOYING BRAGGING ABOUT IT?

6  A.  LIKE HE WAS RELIVING IT.

7  Q.  IN OTHER WORDS, RELIVING IT WOULD TELL YOU THAT HE

8     WAS TELLING THE TRUTH ABOUT WHAT HAPPENED?

9  A.  I'M SORRY, I COULDN'T HEAR YOU.

10  Q.  IN OTHER WORDS, BY RELIVING IT, THAT WOULD INDICATE

11     TO YOU THAT HE WAS TELLING YOU THE TRUTH ABOUT WHAT

12     HAPPENED; IS THAT CORRECT?

13  A.  NOT -- I DON'T KNOW IF I WOULD DRAW THAT

14     CONCLUSION.  IT JUST SEEMED LIKE THE KEY THING I

15     REMEMBERED ABOUT HIM WAS WHEN HE WAS REENACTING THE

16     STABBING, HIS WHOLE -- I DON'T KNOW, IT JUST SEEMED

17     LIKE HIS EYES CAME ALIVE.

18  Q.  AS IF HE ENJOYED TALKING ABOUT IT?

19  A.  YES.

20  Q.  BUILDING HIMSELF UP?

21  A.  YES, IT COULD BE.

22  Q.  WHAT DAY DID THE HOMICIDE OCCUR?

23  A.  I DON'T KNOW.

24  Q.  SO YOU ARE SAYING AT THE TIME YOU INTERVIEWED

25     MR. SIMMERS, YOU DID NOT KNOW WHEN THE HOMICIDE

1     OCCURRED?

2  A.  NO, SIR, I DIDN'T.

3  Q.  YOU HAVE COME TO KNOW IN THE PAST YEAR THAT IT IN

4     FACT OCCURRED ON A FRIDAY; ISN'T THAT CORRECT?

5  A.  I BELIEVE IT DID, BUT I'M NOT POSITIVE.

6  Q.  MR. SIMMERS, IN THE STATEMENT THAT YOU TOOK,

7     CLAIMED IT OCCURRED ON A SATURDAY; DIDN'T HE?

8  A.  IN THE STATEMENT THAT I TOOK FROM MR. SIMMERS, HE

9     INDICATED THAT EVERYTHING HAPPENED ON ONE DAY,

10    INCLUDING THE BOAT PROWLS, A WHOLE STRING OF BOAT

11    PROWLS, WHICH ENCOMPASSED ABOUT 22 TO 25 BOATS,

12    VEHICLE PROWLS, AN AUTO THEFT OR AN ATTEMPTED AUTO

13    THEFT -- ALL OF THAT HAD OCCURRED ON ONE DAY.

14    EVERYTHING WAS COMPRESSED INTO ONE DAY.

15  Q.  ONE MORE TIME:  YOU SAY HE SAID THE HOMICIDE

16    OCCURRED ON SATURDAY?

17  A.  I BELIEVE HE DID, YES.

18  Q.  AND IN INVESTIGATING THIS CASE OR THE PART HE

19    PLAYED IN IT, DID YOU COME TO LEARN ABOUT THE

20    WEAPON USED, THE MURDER WEAPON?

21  A.  YES.

22  Q.  IT IS A DOUBLE-PRONGED KNIFE, ISN'T IT?

23  A.  YES.

24  Q.  TWO POINTS ON THE END OF IT; IS THAT RIGHT?

25  A.  YES.

1    Q.  BLADE APPROXIMATELY THAT LONG -- FOR THE RECORD

2        INDICATING 10 TO 12 INCHES ROUGHLY?

3    A.  10 OR 12 INCHES FOR THE BLADE, YES.

4    Q.  AND IN HIS STATEMENT, HE SAID A SINGLE POINT KNIFE

5        WITH ONLY A 4-INCH BLADE, DIDN'T HE?

6    A.  YES.

7    Q.  THIS DIDN'T ALERT YOU THAT SOMETHING MIGHT BE WRONG

8        WITH THE STATEMENT?

9            MS. MAHONEY:  OBJECTION AT THIS POINT.

10       AGAIN, WHETHER IT IS ACTUALLY TRUE OR NOT IS

11       IRRELEVANT.

12           THE COURT:  OVERRULED TO THE QUESTION

13       IMPOSED.

14           BY MR. HICKS:

15   Q.  DIDN'T THIS ALERT YOU THERE MIGHT BE SOMETHING

16       WRONG WITH MR. SIMMERS' STATEMENT AND THE WAY IT

17       WAS GATHERED?

18   A.  NO.

19           MR. HICKS:  THANK YOU.  NOTHING FURTHER.

20           THE COURT:  MS. MAHONEY?

21               REDIRECT EXAMINATION

22           BY MS. MAHONEY:

23   Q.  I WANTED TO ASK YOU -- MR. HICKS ASKED YOU ABOUT

24       SOME BOTTLES OF ALCOHOL.  DO YOU HAVE ANY PERSONAL

25       KNOWLEDGE MR. SIMMERS HAD ANYTHING TO DRINK WHILE

1    HE WAS AT THE PRECINCT?

2  A.  NO, HE DID NOT, EXCEPT FOR A DIET COKE OR A COKE.

3  Q.  TYPICALLY, WHEN SOMEONE IS BROUGHT IN, AREN'T THEY

4      SEARCHED?

5  A.  YES.

6  Q.  WOULD YOU LEAVE HIM IN THE HOLDING CELL WITH

7      WEAPONS OR ALCOHOL OR ANYTHING LIKE THAT?

8  A.  NO.

9  Q.  AND TO YOUR KNOWLEDGE, DID YOU EVER SEE ANYTHING

10     LIKE THAT THERE?

11 A.  NO.

12 Q.  I SHOULD ALSO ASK YOU, DURING THE TIME YOU WERE

13     WITH DETECTIVE HOPKINS, DID YOU EVER HEAR HIM IN

14     ANY WAY THREATEN THE DEFENDANT?

15 A.  NO.

16 Q.  DID HE IN ANY WAY TRY TO COERCE THE DEFENDANT INTO

17     SAYING CERTAIN THINGS?

18 A.  NO.

19 Q.  DID YOU HEAR THE DETECTIVE EVER FEEDING HIM

20     INFORMATION AND TRYING TO GET HIM --

21          MR. HICKS:  OBJECTION.  BEYOND THE SCOPE,

22     AND I WOULD APPRECIATE COUNSEL STOPPING WHEN I

23     OBJECT.

24          THE COURT:  SUSTAINED.  IT WENT BEYOND THE

25     SCOPE AS TO WHAT HE HEARD DETECTIVE HOPKINS SAYING.

1          MS. MAHONEY:  I WOULD MOVE TO REOPEN; I

2     MISSED A LINE OF QUESTIONING.

3          THE COURT:  MOTION GRANTED.

4          BY MS. MAHONEY:

5  Q.  DID YOU EVER AT ANY POINT HEAR DETECTIVE HOPKINS

6     TRY TO COACH MR. SIMMERS INTO WHAT TO SAY ON THAT

7     TAPE?

8  A.  NO.

9          MS. MAHONEY:  NO FURTHER QUESTIONS.

10          MR. HICKS:  NOTHING FURTHER.

11          THE COURT:  THANK YOU.

12          MS. MAHONEY:  I ASK THAT YOU REMAIN IF YOU

13     COULD.

14          MR. HICKS:  YOUR HONOR, ALONG THAT LINE,

15     COULD I BRING A MATTER TO THE COURT'S ATTENTION?

16          YOUR HONOR, AS I MENTIONED, A WITNESS WE HAD

17     FOR 3.5 PURPOSES FLEW OVER FROM SPOKANE.  AND HIS

18     PLANE LEAVES AT 7:00, AND I WAS HOPING TO GET HIM

19     ON TODAY.

20          I REALIZE WE HAVE AN EVIDENCE MATTER AS TO

21     WHETHER OR NOT I CAN EVEN EXAMINE THIS WITNESS, BUT

22     I AM PRETTY SURE I CAN LAY A FOUNDATION TO THE

23     COURT'S SATISFACTION.  IT DOESN'T HAVE TO BE NOW.

24          THE COURT:  WELL, IF IT DOESN'T HAVE TO BE

25     NOW, DO YOU ANTICIPATE WE WILL TRY TO DO IT BEFORE

```
1         THE END OF THE DAY?  WHAT DO YOU ANTICIPATE THE

2    LENGTH OF THE TESTIMONY TO BE?

3             MR. HICKS:  FIVE TO TEN MINUTES.

4             THE COURT:  OKAY.

5             MS. MAHONEY:  DETECTIVE RAFTIS.

6    PATRICK H. RAFTIS,        HAVING BEEN DULY SWORN,
                               WAS EXAMINED AND TESTIFIED
7                              AS FOLLOWS:

8                    DIRECT EXAMINATION

9             BY MS. MAHONEY:

10   Q.  DETECTIVE RAFTIS, COULD YOU PLEASE STATE YOUR FULL

11       NAME FOR THE RECORD.

12   A.  PATRICK H. RAFTIS.

13   Q.  SPELL THE LAST.

14   A.  R-A-F-T-I-S.

15   Q.  WHAT IS YOUR OCCUPATION?

16   A.  KING COUNTY POLICE DETECTIVE.

17   Q.  HOW LONG HAVE YOU BEEN A KING COUNTY POLICE

18       DETECTIVE?

19   A.  A DETECTIVE FOR TWO AND A HALF YEARS.

20   Q.  HOW LONG HAVE YOU BEEN A POLICE OFFICER?

21   A.  SINCE 1988.

22   Q.  OKAY.  NOW, DETECTIVE, WERE YOU ON DUTY ON MARCH 15

23       OF 1995?

24   A.  YES.

25   Q.  AND WERE YOU WORKING THE DAY SHIFT THEN?
```

1    A.  I WAS WORKING 8:00 TO 4:00 THAT DAY, YES.

2    Q.  8:00 TO 4:00, AND DO YOU RECALL WHETHER OR NOT TWO

3        INDIVIDUALS WERE BROUGHT IN BY THE NAME OF WYATT

4        AND SIMMERS?

5    A.  YES, THEY WERE.

6    Q.  WHAT WAS YOUR ROLE IN THAT?

7    A.  I ASSISTED SERGEANT RUSK IN AN INVESTIGATION.

8    Q.  DID YOU EVER PERSONALLY INTERVIEW MR. SIMMERS?

9    A.  YES.

10   Q.  OKAY.  WHO WERE YOU WITH WHEN THAT HAPPENED?

11   A.  SERGEANT RUSK.

12   Q.  AND WHEN DID THAT TAKE PLACE?

13   A.  DURING THE DAYTIME.

14   Q.  LET ME BACK UP A LITTLE BIT:  WHEN DETECTIVE RUSK

15       FIRST CONTACTED YOU, WAS THAT TO TAKE YOU TO THE

16       MARINA WITH MR. SIMMERS?

17   A.  YES, IT WAS.

18   Q.  WAS THAT THE FIRST TIME YOU HAD CONTACT WITH

19       MR. SIMMERS THAT DAY?

20   A.  YES.

21   Q.  WHO WAS DRIVING THE CAR?

22   A.  I WAS.

23   Q.  AND DID YOU PERSONALLY INTERVIEW MR. SIMMERS, OR

24       WERE YOU JUST PRESENT WHILE THIS WAS GOING ON?

25   A.  I WAS PRESENT WHILE IT WAS GOING ON.

1        MR. HICKS:  YOUR HONOR, I'M SORRY.  I WASN'T

2    CLEAR ABOUT WHETHER OR NOT IT WAS GOING TO THE

3    MARINA OR HE WAS BEING PICKED UP AND GOING TO THE

4    STATION.

5        THE WITNESS:  WE ARE GOING TO THE MARINA.

6        MS. MAHONEY:  GO AHEAD.

7  A.  MY CONVERSATION WITH MR. SIMMERS TOOK PLACE AT THE

8    MARINA FOR THE MOST PART.

9  Q.  OKAY.  NOW, ON THE WAY TO THE MARINA WHILE YOU ARE

10    ACTUALLY IN THE CAR, ON THE WAY TO THE MARINA, DID

11    YOU HAVE CONVERSATION WITH MR. SIMMERS?  OR WERE

12    YOU JUST PRESENT WHILE DETECTIVE RUSK AND

13    MR. SIMMERS SPOKE?

14  A.  NO.  I WAS NOT INTERVIEWING IN THE CAR.

15  Q.  ALL RIGHT.  DURING THE RIDE IN THE CAR, DID YOU

16    EVER NOTICE SERGEANT RUSK MAKING ANY THREATS OR

17    ANYTHING TOWARDS MR. SIMMERS?

18  A.  NO.

19  Q.  NOW, ONCE YOU GOT TO THE MARINA, WERE YOU PRESENT

20    WHILE MR. SIMMERS WAS POINTING OUT THE VARIOUS

21    BOATS, ET CETERA?

22  A.  YES.

23  Q.  AND DID YOU PERSONALLY ASK HIM QUESTIONS AT THAT

24    TIME?

25  A.  YES.

1    Q.   WAS SERGEANT RUSK RIGHT THERE AT THAT TIME?

2    A.   YES.

3    Q.   ALL RIGHT.  WHILE YOU WERE WITH MR. SIMMERS IN THE

4         CAR AND AT THE MARINA, DID YOU MAKE ANY

5         OBSERVATIONS ABOUT HIS DEMEANOR IN REGARD TO

6         WHETHER OR NOT HE SEEMED TO SPEAK AND UNDERSTAND

7         THE ENGLISH LANGUAGE?  DID HE SEEM TO?

8    A.   HE SEEMED TO UNDERSTAND THE ENGLISH LANGUAGE, YES.

9    Q.   AND WHAT MADE YOU BELIEVE THAT?

10   A.   FROM LISTENING TO HIM TALKING AND RESPOND TO

11        QUESTIONS.

12   Q.   DID HE SEEM COHERENT TO YOUR OBSERVATIONS?

13   A.   YES.

14   Q.   AND WHAT MADE YOU THINK THAT?

15   A.   BY HIS CONVERSATION.

16   Q.   OKAY.  DID HE ANSWER APPROPRIATELY?

17   A.   YES.

18   Q.   WAS HE ABLE TO SPEAK IN SENTENCES?

19   A.   HE WAS.

20   Q.   DID YOU EVER NOTICE ANY ODOR OF INTOXICANTS ON HIM?

21   A.   NOT THAT I REMEMBER, NO.

22   Q.   ANYTHING ABOUT HIS MANERISMS OR SPEECH OR DEMEANOR

23        THAT CAUSED YOU CONCERN THAT HE MIGHT NOT

24        UNDERSTAND WHAT HE WAS TALKING ABOUT?

25   A.   NO.

1    Q.    NOW, ONCE YOU LEFT THE MARINA, DID YOU ALSO

2          ACCOMPANY SERGEANT RUSK AND MR. SIMMERS BACK TO THE

3          PRECINCT?

4    A.    YES.

5    Q.    AND WHAT WERE YOU ASSIGNED TO DO THEN?

6    A.    TO WATCH THE HOLDING CELL.

7    Q.    THE HOLDING CELL WITH WHO?

8    A.    WHERE MR. SIMMERS WAS BEING HELD AT THAT TIME.

9    Q.    WAS MR. SIMMERS BEING HELD WITH ANYONE ELSE?

10   A.    NO.

11   Q.    HOW LONG DO YOU THINK HE REMAINED OUTSIDE HIS DOOR

12         AFTER YOU RETURNED FROM THE MARINA?

13   A.    AN HOUR TO TWO HOURS.

14   Q.    WHAT TIME DID YOU GO OFF SHIFT THAT NIGHT?

15   A.    I BELIEVE AROUND 9:00 P.M.

16   Q.    AND BETWEEN THE TIME YOU RETURNED FROM THE MARINA

17         AND YOU WENT OFF SHIFT, WERE YOU AASSIGNED THAT

18         ENTIRE TIME TO WATCH MR. SIMMERS' CELL?

19   A.    NO, I DON'T BELIEVE SO.

20   Q.    WHAT ELSE DID YOU DO?

21   A.    NOT MUCH RELATING TO THE CASE.  I WAS PROBABLY AT

22         MY DESK WORKING ON OTHER THINGS AT THE TIME.

23   Q.    DURING THE TIME THAT YOU ACTUALLY WATCHED HIM WAS

24         MR. SIMMERS BROUGHT FOOD?

25   A.    YES.

1    Q.   AND SO YOU WERE WITH HIM THEN FROM THE TIME YOU GOT

2         BACK FROM THE MARINA, AT LEAST UNTIL THE TIME HE

3         WAS FED?

4    A.   YES.

5    Q.   DURING THAT TIME, DID ANYONE ELSE ATTEMPT TO

6         INTERVIEW MR. SIMMERS?

7    A.   I CAN'T RECALL.

8    Q.   YOU CAN'T RECALL?

9    A.   NO.

10   Q.   DID YOU EVER INTERVIEW MR. SIMMERS?

11   A.   I DIDN'T.

12   Q.   DID YOU EVER SEE ANYONE ENTER THE HOLDING CELL TO

13        SPEAK TO MR. SIMMERS WHILE YOU WERE OUTSIDE?

14   A.   NOT WHILE I WAS WATCHING, NO.

15   Q.   DID HE EVER COMPLAIN OF BEING COLD, OF WANTING TO

16        TAKE A NAP?

17   A.   HE COMPLAINED OF BEING COLD.

18   Q.   WHAT DID YOU DO?

19   A.   GOT HIM A BLANKET.

20   Q.   AND DO YOU REMEMBER WHETHER HE TOOK A NAP OR LAID

21        DOWN OR ANYTHING?

22   A.   I BELIEVE HE TOOK A NAP.

23            MS. MAHONEY:  THANK YOU.  I HAVE NO FURTHER

24        QUESTIONS.

25            THE COURT:  MR. HICKS?

```
 1                    CROSS-EXAMINATION

 2              BY MR. HICKS:

 3    Q.  GOOD AFTERNOON, DETECTIVE.

 4    A.  HI.

 5    Q.  WHAT WAS THE TIME MR. SIMMERS INITIALLY CAME INTO

 6        CONTACT WITH THE POLICE ON THE 15TH, IF YOU KNOW?

 7    A.  I DON'T KNOW.

 8    Q.  ALL RIGHT.  WHAT TIME WAS IT WHEN YOU HAD YOUR

 9        FIRST CONTACT WITH HIM?

10    A.  IT WAS IN THE AFTERNOON; I DON'T KNOW THE EXACT

11        TIME.  IT WAS WHEN SERGEANT RUSK REQUESTED MY

12        ASSISTANCE IN THE CASE.

13    Q.  ALL RIGHT.  NOW, YOU SAY YOU DID NOT -- DO NOT

14        RECALL ANY ODOR OF INTOXICANTS ON MR. SIMMERS'; IS

15        THAT CORRECT?

16    A.  YES, SIR.

17    Q.  MR. SIMMERS WAS SITTING WHERE IN THE AUTOMOBILE?

18    A.  IN THE BACK SEAT.

19    Q.  ALL RIGHT.  YOU WERE DRIVING AND SO YOU WERE IN THE

20        FRONT SEAT?

21    A.  YES.

22    Q.  AND I TAKE IT DETECTIVE RUSK WAS IN THE BACK SEAT

23        WITH MR. SIMMERS?

24    A.  I BELIEVE HE WAS IN THE FRONT SEAT WITH ME.

25    Q.  ALL RIGHT.  AND SO NEITHER OF YOU WERE SITTING NEXT
```

1          TO HIM DURING THE RIDE; IS THAT CORRECT?

2     A.   CORRECT.

3     Q.   ALL RIGHT.  DO YOU HAVE YOUR NARRATIVE WITH YOU?

4     A.   YES, I DO.

5     Q.   THE FIRST PARAGRAPH, THIRD TO THE LAST LINE DOWN --

6          EXCUSE ME, THE FOURTH, BEGINNING WITH:  "BEGAN

7          POINTING OUT BOATS --"  DO YOU SEE THAT?

8     A.   YES, I DO.

9     Q.   THIS IS REFERRING TO THE BOATS.  FIRST OF ALL, LET

10         ME ASK A GENERAL QUESTION:  APPROXIMATELY HOW MANY

11         BOATS DID MR. SIMMERS INDICATE THAT HE AND

12         MR. WYATT PILFERED?

13    A.   APPROXIMATELY 32.

14    Q.   YEAH.  AND DOESN'T HE SAY THERE IN THE STATEMENT I

15         JUST POINTED OUT, FURTHER ALONG IN THE PARAGRAPH,

16         HE SAID THAT HE TOOK MOSTLY JUST LIQUOR OUT OF THE

17         BOATS; IS THAT CORRECT?

18    A.   YES.

19    Q.   NOW, LET'S GO DOWN THIS TOGETHER:  GO DOWN ABOUT

20         THREE LINES BEGINNING WITH "THE THIRD BOAT."  DO

21         YOU SEE THAT?

22    A.   I DO.

23    Q.   "THE THIRD BOAT WAS LICENSED.  IAN SAID HE GOT WINE

24         OFF THIS BOAT.  HE DID NOT LIKE THE WINE HE GOT."

25    A.   YES.

1  Q.  DOWN WHERE IT SAYS THE 11TH BOAT, DO YOU SEE THAT?

2  A.  I DO.

3  Q.  IAN SAID HE GOT ALCOHOL OFF THIS BOAT; IS THAT

4      CORRECT?

5  A.  YES.

6  Q.  WHERE IT SAYS 14TH BOAT, MID-PARAGRAPH, "IAN SAID

7      HE GOT TWO HARD LIQUOR BOTTLES OFF THIS BOAT.  HE

8      SAID THAT HE WAS DRINKING BEER HERE, PUT THE BEER

9      DOWN.  MYSELF AND SERGEANT RUSK RECOVERED BEER CANS

10      AND BOTTLES OFF THE PIER NEXT TO THE BOAT."

11  A.  YES.

12  Q.  BEGINNING WITH THE 18TH BOAT.  "IAN SAID HE GOT

13      ALCOHOL OFF THAT BOAT"; IS THAT CORRECT?

14  A.  YES.

15  Q.  THE 20TH BOAT ON PAGE 2, DO YOU SEE THAT?

16  A.  I DO.

17  Q.  AND THAT SAYS FURTHER ON HE SAID HE GOT, QUOTE,

18      MAJOR ALCOHOL, END QUOTE, SEVEN BOTTLES, END QUOTE,

19      OFF THIS BOAT.  SAID HE GOT IT NEXT TO THE BLUE

20      JAR?

21  A.  YES.

22  Q.  NOW, BEGINNING WITH THE 23RD BOAT, DO YOU SEE THAT

23      TWO LINES DOWN?

24  A.  I DO.

25  Q.  THE 23RD BOAT WAS CALLED "THE PRIME TIME."  IAN

1        SAID, I GOT MORE ALCOHOL OUT OF THAT BOAT THAN I

2        EVER SEEN IN MY LIFE, END QUOTE?

3   A.   YES.

4   Q.   TO SAVE THE COURT SOME TIME, THERE ARE SEVEN OTHER

5        REFERENCES TO LARGE AMOUNTS OF ALCOHOL STOLEN OFF

6        THE OTHER BOATS; IS THAT CORRECT?

7   A.   YES.

8   Q.   BASED UPON YOUR KNOWLEDGE OF THE STATEMENTS AND

9        ACTUALLY WITNESSING CONVERSATIONS, WOULD IT BE FAIR

10       TO SAY YOU WOULD EXPECT MR. SIMMERS TO BE EXAMINED

11       PRIOR TO HIS STATEMENT TO DETERMINE THE ALCOHOL

12       CONTENT IN HIS BODY BASED UPON WHAT YOU KNOW THAT

13       MR. SIMMERS SAID ABOUT ALCOHOL?

14   A.   TO BE EXAMINED?

15   Q.   UH-HUH, TO DETERMINE IF HE WAS INTOXICATED?

16   A.   I GUESS I DON'T UNDERSTAND WHAT YOU ARE ASKING.

17       YOU ARE ASKING ME IF I SHOULD HAVE EXAMINED HIM?

18   Q.   NO. DO YOU THINK IT WOULD HAVE BEEN WISE TO

19       EXAMINE HIM PRIOR TO TAKING HIS STATEMENT, TO

20       DETERMINE WHETHER OR NOT HE WAS INTOXICATED, JUST

21       TO BE SURE?

22   A.   I DON'T KNOW. I DIDN'T TAKE THE STATEMENT.

23          MR. HICKS: NOTHING FURTHER.

24          THE COURT: MS. MAHONEY?

25             REDIRECT EXAMINATION

```
 1              BY MS. MAHONEY:

 2   Q.   HE HAD TAKEN ALCOHOL FROM NUMEROUS PLACES.  DID HE

 3        EVER INDICATE WHETHER HE CONSUMED THAT, WHETHER OR

 4        NOT HE DID?

 5   A.   NO, I DON'T BELIEVE HE DID.

 6   Q.   DETECTIVE RAFTIS, HAVE YOU HAD TRAINING IN YOUR

 7        YEARS AS A POLICE OFFICER TO HELP YOU LOOK FOR

 8        SIGNS TO DETECT THE USE OF ALCOHOL OR DRUGS?

 9   A.   YES.

10   Q.   WHAT TYPES OF SIGNS DO YOU LOOK FOR?

11   A.   SLURRED SPEECH, STABILITY IN STANDING, BALANCE,

12        EYES, THE COLOR OF THEIR EYES, ODOR OF ALCOHOL OFF

13        THE PERSON --

14   Q.   DID YOU SEE ANY OF THESE SIGNS APPARENT WHEN YOU

15        WERE WITH MR. SIMMERS?

16   A.   NOT APPARENT, NO.

17   Q.   WAS THAT SOMETHING YOU WOULD HAVE NOTED?  WAS THAT

18        IMPORTANT TO YOU?

19   A.   I MAY HAVE NOTED THAT, YES.

20              MS. MAHONEY:  NO FURTHER QUESTIONS.

21                  RECROSS-EXAMINATION

22              BY MR. HICKS:

23   Q.   ALL THIS INFORMATION REGARDING ALCOHOL, I TAKE IT

24        RUSK WAS PRESENT AS WELL?

25   A.   HE WAS WITH ME.
```

1    Q.    AND SO YOU WOULD EXPECT TO SEE THESE OBSERVATIONS

2          IN HIS REPORT REGARDING MR. SIMMERS' CLAIM THAT HE

3          HAD HAD ALL THIS ALCOHOL; IS THAT CORRECT?

4    A.    I DON'T KNOW ABOUT HIS REPORT.

5    Q.    YOU SAY YOU WOULDN'T EXPECT HIM TO MAKE THOSE

6          OBSERVATIONS OR YOU JUST DON'T KNOW?

7    A.    I DON'T KNOW WHAT HE WRITES IN HIS REPORTS.  HE IS

8          MY SERGEANT AND SO --

9    Q.    GOT YOU.  BUT, AGAIN, DETECTIVE RUSK WAS AWARE OF

10         ALL THESE CLAIMS?

11   A.    SERGEANT RUSK WAS WITH ME DURING THE TIME WE SPENT

12         WITH MR. SIMMERS THAT I WAS PRESENT.

13   Q.    ALL RIGHT.  WHEN YOU -- HAVE YOU EVER ARRESTED

14         SOMEONE FOR D.W.I.?

15   A.    YES.

16   A.    ALL RIGHT.  IN POINT OF FACT, IF YOU SEE SOMEONE

17         DRIVING ERRATICALLY OR OTHERWISE GIVING YOU

18         PROBABLE CAUSE TO PULL THEM OVER, THAT THEY MIGHT

19         BE INTOXICATED, YOU DON'T HAVE TO SMELL BOOZE ON

20         THEIR BREATH IN ORDER TO ADMINISTER A FIELD

21         SOBRIETY TEST, DO YOU?

22   A.    WELL, GENERALLY I DO, WHEN I AM RUNNING A TEST ON

23         ANYBODY.

24   Q.    IS THAT REQUIRED?

25   A.    I DON'T KNOW WHETHER IT IS REQUIRED OR NOT.  IT IS

1     FOR ME.

2  Q.  IF YOU SAW SOMEONE DRINK 13 BEERS BUT DID NOT SMELL

3     THE ODOR OF ALCOHOL ON THEIR BREATH, WOULD YOU

4     STILL GIVE THEM A BREATHALYZER, OR FIELD SOBRIETY

5     TEST, IF YOU PULLED THEM OVER, EVEN THOUGH YOU

6     DIDN'T SMELL ALCOHOL ON THEIR BREATH?

7  A.  THAT'S A TOUGH QUESTION.  EVERY CASE IS DIFFERENT.

8           MR. HICKS:  THANK YOU.

9           THE COURT:  MS. MAHONEY?

10          MS. MAHONEY:  NOTHING FURTHER.

11          THE COURT:  ALL RIGHT.  THANK YOU.

12          MR. MARNER:  SHALL WE DO ONE MORE WITNESS

13  BEFORE THE BREAK, YOUR HONOR?

14          THE COURT:  HOW MUCH MORE DO YOU HAVE?

15          MS. MAHONEY:  WE HAVE THREE.  IF WE CAN TAKE

16  DETECTIVE JARBOE, I DON'T HAVE A PROBLEM WITH

17  TAKING HIS WITNESS OUT OF ORDER.

18          MR. HICKS:  I APPRECIATE IT.

19          THE COURT:  IT WILL DEPEND ON THE FOUNDATION

20  MR. HICKS WILL LAY, AND SO WE WILL LET HIM CALL THE

21  WITNESS ANYWAY.

22          MS. MAHONEY:  YOUR HONOR, THERE'S A LOT OF

23  PEOPLE IN AND OUT OF THE COURTROOM, AND THERE ARE A

24  NUMBER OF FRIENDS.  I'M CONCERNED THEY NOT DO

25  ANYTHING INADVERTENTLY WRONG, AND I WOULD LIKE TO

1    ASK THAT THEY BE CAUTIONED.

2         MR. HICKS:  I ALREADY DID.

3    AMY JARBOE,                    HAVING BEEN DULY SWORN,
                                    WAS EXAMINED AND TESTIFIED
4                                   AS FOLLOWS:

5              DIRECT EXAMINATION

6         BY MR. MARNER:

7  Q.  GOOD AFTERNOON, DETECTIVE.

8  A.  GOOD AFTERNOON.

9  Q.  STATE YOUR NAME AND SPELL YOUR LAST NAME FOR THE

10     RECORD.

11 A.  AMY JARBOE, J-A-R-B-O-E.

12 Q.  I JUMPED THE GUN THERE.  YOU ARE A DETECTIVE FOR

13     THE KING COUNTY POLICE DEPARTMENT?

14 A.  YES.

15 Q.  HOW LONG HAVE YOU BEEN A DETECTIVE?

16 A.  SIX MONTHS LAST YEAR AND SINCE JANUARY THIS YEAR.

17 Q.  CONGRATULATIONS.  HOW LONG HAVE YOU BEEN WITH THE

18     KING COUNTY POLICE DEPARTMENT?

19 A.  ELEVEN AND A HALF YEARS.

20 Q.  DETECTIVE JARBOE, GOING BACK ACTUALLY A LITTLE LESS

21     THAN A YEAR AGO, MARCH 15TH, 1995, IN THE AFTERNOON

22     HOURS, WERE YOU ON DUTY?

23 A.  YES, I WAS.

24 Q.  ALL RIGHT.  OBVIOUSLY, YOU KNOW WHAT WE ARE HERE

25     FOR?

1    A.   YES.

2    Q.   THE IAN SIMMERS' CASE.  HAVE YOU REVIEWED YOUR

3         REPORT IN THIS MATTER?

4    A.   YES, I HAVE.

5    Q.   DETECTIVE JARBOE, WHAT WAS YOUR ASSIGNMENT THAT

6         DAY; DO YOU RECALL?

7    A.   I AM A BURGLARY-LARCENY DETECTIVE.  PATROL HAD

8         BROUGHT IN TWO SUSPECTS THAT WERE IN POSSESSION OF

9         SOME PROPERTY THAT WAS TAKEN PROBABLY FROM BOATS.

10        AND IT WAS IN MY DISTRICT, AND SO I WAS THE ONE

11        ASSIGNED TO TALK TO THE PEOPLE THEY HAD BROUGHT IN.

12   Q.   DID YOU SEE THE PATROL OFFICERS BRING THESE PEOPLE

13        IN?

14   A.   NO.  THEY BROUGHT THEM AND PUT THEM IN A HOLDING

15        CELL, AND CAME AND BROUGHT ME IN.  AND IT WAS A

16        MATTER OF A FEW MINUTES.

17   Q.   WHO WERE THE PATROL OFFICERS?

18   A.   OFFICERS FULLER AND JANASZ.

19   Q.   DO YOU RECALL WHEN THEY CAME IN?

20   A.   NO, I REALLY DON'T.  I KNOW IT WAS BEFORE NOON.

21   Q.   ALL RIGHT.  AND WAS ONE OF THE INDIVIDUALS IAN

22        SIMMERS?

23   A.   YES, IT WAS.

24   Q.   THE PERSON SITTING NEXT TO MR. HICKS AT THE DEFENSE

25        TABLE?

1    A.  YES, IT WAS.

2    Q.  DID YOU SPEAK -- AND THE OTHER INDIVIDUAL WAS JON

3        WYATT?

4    A.  YES, JONATHAN WYATT.

5    Q.  DID YOU SPEAK TO EITHER ONE OR BOTH OF THEM?

6    A.  YES.  I STARTED OUT WITH JONATHAN WYATT AND SPOKE

7        TO BOTH.

8    Q.  LET'S SWITCH OVER TO MR. SIMMERS.  YOU KNEW HIM

9        BEFORE THIS INCIDENT?

10   A.  YES, I DID.

11   Q.  HOW DID YOU KNOW HIM?

12   A.  I CONTACTED HIM AT "JUVY" DETENTION CENTER ON

13       ANOTHER BURGLARY I WAS WORKING ON A COUPLE OF

14       MONTHS PRIOR TO THIS.

15   Q.  AT THAT TIME, IN THIS UNRELATED INCIDENT OBVIOUSLY,

16       HAD YOU TRIED TO TALK TO HIM ABOUT IT?

17   A.  ABOUT THE OTHER INCIDENT?

18   Q.  YES.

19   A.  YES.  IT WAS ANOTHER BURGLARY REPORT, AND HE BECAME

20       VERY AGITATED WITH ME AT "JUVY."

21   Q.  AND WHEN YOU DID -- GOING BACK TO THIS OTHER

22       INCIDENT, DID YOU MIRANDIZE HIM?

23   A.  YES.

24   Q.  YOU INSTRUCTED HIM AS TO HIS RIGHTS?

25   A.  YES, I DID.

1    Q.   AND THAT WAS THE ONLY OTHER TIME YOU HAD HAD

2         CONTACT WITH HIM?

3    A.   I THINK I TALKED TO HIM ONCE BEFORE ON PATROL,

4         YEARS AGO, BUT I THINK IT WAS JUST A SUSPICIOUS

5         CIRCUMSTANCES CASE, AND I DON'T REMEMBER THAT MUCH

6         ABOUT IT.

7    Q.   LET'S GO BACK TO MARCH 15TH AT THE NORTH PRECINCT?

8    A.   OKAY.

9    Q.   YOU INDICATED THAT YOU WERE BACK IN THE DETECTIVE

10        AREA WHEN OFFICERS JANASZ AND FULLER CAME IN?

11   A.   THAT'S RIGHT.

12   Q.   AND FROM YOUR UNDERSTANDING IT WAS A MATTER OF

13        MINUTES FROM WHEN THEY CAME IN TO WHEN THEY

14        CONTACTED YOU?

15   A.   RIGHT.

16   Q.   DETECTIVE JARBOE, WHEN YOU DID CONTACT MR. SIMMERS,

17        WHAT HAPPENED?

18   A.   I BROUGHT HIM INTO AN INTERVIEW ROOM, AND I GAVE

19        HIM HIS MIRANDA RIGHTS PER ONE OF OUR DEPARTMENT

20        FORMS.  AND HE STATED HE UNDERSTOOD IT AND SIGNED

21        THE PART THAT SAID HE UNDERSTOOD IT.  AND HE ALSO

22        STATED HE WAIVED THOSE RIGHTS AND SIGNED THE PART

23        ON THE PAPER THAT WOULD STATE THAT HE WAIVED HIS

24        RIGHTS.

25   Q.   ALL RIGHT.  YOU WERE AWARE THAT HE WAS A JUVENILE

1       AT THE TIME?

2   A.  YES, I WAS.

3   Q.  AND YOU GAVE HIM THE JUVENILE ADMONITION?

4   A.  YES, THAT'S PART OF, I THINK, NO. 2 ON THE LIST OF

5       THE FOUR.

6   Q.  I AM NOT GOING TO SHOW YOU THAT ONE IN PARTICULAR,

7       I'M GOING TO SHOW YOU WHAT HAS BEEN MARKED AS

8       STATE'S EXHIBIT NO. 2, AND I WOULD LIKE TO SHOW YOU

9       THE FRONT OF THE PAGE.  HANDING YOU WHAT HAS BEEN

10      MARKED AS PRETRIAL EXHIBIT NO. 2, IS THAT THE SAME

11      TYPE OF FORM THAT IS USED?

12  A.  YES, IT IS.

13  Q.  ACTUALLY -- WE HAVE GOT TO MAKE SURE WE DON'T

14      OVERRUN EACH OTHER HERE.  IS THAT THE KING COUNTY

15      POLICE DEPARTMENT STANDARD FORM?

16  A.  RIGHT.  WE CALL IT A B-1-1-8, AND IT SAYS THAT AT

17      THE BOTTOM OF THE FORM.  IT IS AN EXPLANATION OF

18      RIGHTS WE GIVE TO BOTH JUVENILES AND ADULTS.  IT

19      HAS BOTH FORMATS ON THERE.

20  Q.  DETECTIVE JARBOE, WHEN YOU DID SPEAK TO MR. SIMMERS

21      ON THAT DAY, DID YOU READ THIS VERBATIM?

22  A.  YES, I DID.

23  Q.  THAT'S YOUR PRACTICE?

24  A.  THAT'S MY PRACTICE.

25  Q.  WHAT DID HE SAY WHEN YOU READ HIM HIS RIGHTS AFTER

1      HE SIGNED THEM?

2   A.  ACTUALLY, HE GOT IN MY FACE AND BECAME VERY UPSET

3       WITH ME OVER THE INCIDENT AT THE "JUVY" DETENTION

4       CENTER AND ARGUED WITH ME A LOT OVER THAT LAST

5       INCIDENT.

6   Q.  ARGUED -- WAS THIS A UNILATERAL ARGUMENT?  WAS HE

7       YELLING?

8   A.  HE WAS SCREAMING AT ME.

9   Q.  DID YOU HAVE ANY INPUT?

10  A.  I TRIED TO EXPLAIN THE REASON WHY.  I WENT DOWN AND

11      TALKED TO HIM, LIKE I'M TALKING TO YOU NOW, BUT HE

12      WAS EXTREMELY AGITATED AT ME.

13  Q.  AND SO, DETECTIVE JARBOE, FOR CLARIFICATION FOR THE

14      COURT, YOUR CONVERSATION WITH THE DEFENDANT AFTER

15      YOU ADVISED HIM OF HIS RIGHTS IN WRITING WAS MAINLY

16      TRYING TO CALM HIM DOWN FROM AN UNRELATED PREVIOUS

17      INCIDENT?

18  A.  RIGHT.

19  Q.  DID YOU EVER TALK ABOUT THE INCIDENT SURROUNDING

20      THIS ARREST; THAT IS, THE BOAT PROWLS-ARSONS?

21  A.  NO, I DID NOT.

22  Q.  WHAT HAPPENED?

23  A.  HE TOLD ME THAT I WAS A FUCKING BITCH.

24  Q.  I TAKE IT THAT'S A QUOTE?

25  A.  YEAH, THAT'S A QUOTE, AND THAT HE DIDN'T WANT TO

1    TALK TO ME ANYMORE.

2  Q.  DID HE SAY, "GET ME A LAWYER"?

3  A.  NO, HE JUST SAID HE DIDN'T WANT TO TALK TO ME

4     ANYMORE.

5  Q.  HE SAID HE DIDN'T WANT TO TALK TO YOU?

6  A.  AND HE LOOKED STRAIGHT AT ME WHEN HE SAID THAT.

7  Q.  DID HE SAY, "I DON'T WANT TO TALK TO ANY COPS"?

8  A.  NO, HE DIDN'T SAY ANYTHING ABOUT COPS; HE JUST SAID

9     ME.

10 Q.  HAVING GOTTEN THAT FROM THE DEFENDANT, WHAT DID YOU

11    DO?

12 A.  WELL, I PUT HIM BACK IN HIS HOLDING CELL.  I KNEW

13    THERE WAS NO REASON TO SIT THERE AND HAVE HIM

14    SCREAM AND YELL AT ME ANY LONGER, AND I HAD ALREADY

15    ARRANGED TO TAKE THE REST OF THE AFTERNOON OFF, DUE

16    TO A CHILD'S SICKNESS.  AND I TURNED OVER WHAT I

17    HAD DONE TO THIS POINT TO MY SERGEANT, SERGEANT

18    RUSK, AND I LEFT FOR THE DAY.

19 Q.  WHEN YOU LEFT, DID YOU SEE ANYBODY CONTACTING THE

20    DEFENDANT?

21 A.  NO, I DIDN'T.  I JUST LEFT.  I DIDN'T EVEN GO BACK

22    OUT THROUGH THAT SAME DIRECTION.

23 Q.  AND SO THE LAST YOU SAW OF HIM, DID YOU ACTUALLY

24    PUT HIM BACK IN THE HOLDING CELL?

25 A.  I PUT HIM IN THE HOLDING CELL, UH-HUH.

1  Q.  ACTUALLY, YOU WERE ASSIGNED BY DETECTIVE RUSK TO

2       TALK TO IAN SIMMERS FIRST, WEREN'T YOU?

3  A.  YES, I WAS.

4  Q.  IT WAS YOUR UNDERSTANDING DETECTIVE RUSK HADN'T

5       SPOKEN TO HIM AT THAT POINT?

6  A.  NO, HE HADN'T.  NO.

7          MR. MARNER:  THANK YOU.  NOTHING FURTHER.

8          MR. HICKS:  NO QUESTIONS.

9          THE COURT:  THE UNRELATED INCIDENT AT

10  "JUVY," DID HE TALK TO YOU THEN AFTER YOU READ HIM

11  HIS RIGHTS?

12         THE WITNESS:  AT "JUVY," IT WAS MORE OF A

13  SCREAMING MATCH.  HE AGREED HE WAS GOING TO -- HE

14  WAIVED HIS RIGHTS.  IT WAS MORE WHY AM I TALKING TO

15  HIM?  THAT HE DIDN'T DO IT.

16         THE COURT:  DO YOU HAVE ANY FOLLOW-UP

17  QUESTIONS, THE STATE?

18         MR. MARNER:  NO.

19         THE COURT:  THE DEFENSE?

20         MR. HICKS:  NO.

21         THE COURT:  ALL RIGHT, THANK YOU.

22         MS. MAHONEY:  YOUR HONOR, THE NEXT WITNESS

23  WILL BE DETECTIVE HOPKINS, WHOM I THINK MIGHT BE IN

24  JUDGE SCOTT'S COURT.  AND SO I HAVE NO PROBLEM IN

25  TAKING THE DEFENSE WITNESS.

1          THE COURT:  WE WILL TAKE A BREAK AND THEN

2     TAKE THE DEFENSE WITNESS.  AND THEN WE WILL GET TO

3     DETECTIVE HOPKINS.

4          WE WILL BE IN RECESS FOR 15 TO 20 MINUTES

5     AND START WHEN THE CORRECTION OFFICERS RETURN.

6                                    (RECESS.)

7          MR. MARNER:  MR. HICKS' WITNESS ISN'T HERE

8     NOW.  THE STATE CAN CALL DETECTIVE EDWARD HOPKINS

9     TO THE STAND.

10         THE COURT:  MR. HICKS, WOULD YOU CHECK FOR

11    WHEN YOUR WITNESS COMES BACK, AND WE WILL TAKE

12    ANOTHER WITNESS IN THE MEANTIME.

13    EDWARD HOPKINS,              HAVING BEEN DULY SWORN,
                                   WAS EXAMINED AND TESTIFIED
14                                 AS FOLLOWS:

15                   DIRECT EXAMINATION

16         MR. MARNER:

17    Q.  SIR, PLEASE STATE YOUR FULL NAME AND SPELL YOUR

18        LAST NAME FOR THE RECORD.

19    A.  EDWARD HOPKINS, H-O-P-K-I-N-S.

20    Q.  YOU ARE A DETECTIVE FOR THE BOTHELL POLICE

21        DEPARTMENT; IS THAT CORRECT?

22    A.  YES, I AM.

23    Q.  HOW LONG HAVE YOU BEEN SO EMPLOYED, DETECTIVE

24        HOPKINS?

25    A.  EIGHT YEARS.

```
 1   Q.  AND YOU HAVE BEEN A DETECTIVE FOR HOW LONG?

 2   A.  TWO YEARS.

 3   Q.  DETECTIVE HOPKINS, WERE YOU THE PRIMARY DETECTIVE

 4       ON THE MURDER INVOLVING RODNEY GOCHANOUR, IN WHICH

 5       HE WAS THE VICTIM?

 6   A.  YES, I WAS.

 7   Q.  WHEN WAS YOUR FIRST INVOLVEMENT IN THIS CASE?

 8   A.  THAT WAS A SATURDAY AFTERNOON, THE 11TH OF MARCH OF

 9       1995, AT APPROXIMATELY 4:00 P.M.  I WAS PAGED AND

10       ADVISED OF A BODY FOUND ON THE BIKE TRAIL, THE

11       BURKE-GILMAN.

12           MR. HICKS:  YOUR HONOR, OUR WITNESS IS BACK.

13           MR. MARNER:  DETECTIVE HOPKINS, WE WILL HAVE

14       YOU STEP DOWN FOR NOW, AND THANK YOU.

15           THE COURT:  ALL RIGHT.  BRING IN YOUR

16       WITNESS, MR. HICKS.

17           MR. HICKS:  FOR 3.5 PURPOSES, THE DEFENSE

18       CALLS BOB SETZER.

19   ROBERT W. SETZER, JR.,   HAVING BEEN DULY SWORN,
                               WAS EXAMINED AND TESTIFIED
20                             AS FOLLOWS:

21                 DIRECT EXAMINATION

22           BY MR. HICKS:

23   Q.  MR. SETZER, STATE YOUR FULL NAME, INCLUDING MIDDLE

24       NAME, AND SPELL YOUR LAST NAME FOR THE COURT

25       REPORTER, PLEASE.  AND GIVE YOUR ADDRESS.
```

1    A.    ROBERT WESLEY SETZER, JR., S-E-T-Z-E-R.

2    Q.    AND YOUR ADDRESS, PLEASE.

3    A.    1111 WEST 15TH SPOKANE, 99203.

4    Q.    OKAY.  AND YOUR RELATIONSHIP WITH IAN SIMMERS?

5    A.    I WAS IAN'S YOUTH PASTOR FOR ABOUT FIVE YEARS --

6          PARDON ME, FOUR YEARS.

7    Q.    AND WHAT PERIOD OF TIME?

8    A.    1992 TO JUNE OF 1995.

9    Q.    ALL RIGHT.  AND IS MR. SIMMERS PRESENT IN COURT?

10   A.    YES, HE IS.

11   Q.    AND IS THAT HIM I AM POINTING TO AT COUNSEL TABLE,

12         IN THE BLUE SWEATER?

13   A.    YES, IT IS.

14   Q.    ALL RIGHT.  WHEN WAS THE LAST TIME YOU SAW HIM?

15   A.    SEVERAL WEEKS AGO WHEN HE WAS IN THE ADULT

16         CORRECTION FACILITY IN KING COUNTY.

17   Q.    OKAY.  AND WHERE IS MR. SIMMERS' RESIDENCE WHEN HE

18         IS NOT RESIDING IN JAIL?

19   A.    IN CARNATION.

20   Q.    DO YOU KNOW HOW LONG HE HAS LIVED THERE?

21   A.    SEVERAL YEARS.  I REALLY DON'T KNOW.

22   Q.    YOU NOW LIVE IN SPOKANE; IS THAT CORRECT?

23   A.    THAT'S RIGHT.  I MOVED THERE 8 MONTHS AGO IN JUNE.

24   Q.    PRIOR TO THAT, WHERE DID YOU LIVE?

25   A.    IN DUVALL.

1   Q.  DID THAT HAVE A BEARING ON YOUR CONTACT WITH

2        MR. SIMMERS, THE FACT THAT THEY LIVED IN CARNATION

3        AND YOU LIVED IN DUVALL?

4   A.  WE WERE ABLE TO SEE EACH OTHER AS MUCH AS I WANTED

5        OR AS MUCH AS IAN WANTED.

6   Q.  OKAY.  HOW CLOSE ARE YOU TO MR. SIMMERS IN YOUR

7        ESTIMATION?

8   A.  I FEEL LIKE I KNOW IAN PRETTY WELL.  AND WHENEVER I

9        SAW HIM AT CHURCH, OR, YOU KNOW, ON THE STREET, WE

10       WOULD CONVERSE.  AND HE WAS PRETTY OPEN TO ME, AND

11       I WAS PRETTY OPEN TO HIM.

12   Q.  YOU INDICATED YOU WERE HIS PASTOR FOR ABOUT A

13       THREE-YEAR PERIOD, AND IS THAT ABOUT THE PERIOD OF

14       TIME YOU HAVE KNOWN MR. SIMMERS?

15   A.  I THOUGHT I SAID FOUR.

16   Q.  I SEE.  HAVE YOU ACTUALLY KNOWN HIM LONGER THAN

17       FOUR YEARS OR WAS THAT THE PERIOD OF TIME YOU WERE

18       HIS PASTOR?

19   A.  THAT WAS THE SAME PERIOD OF TIME.

20   Q.  OKAY.  COULD YOU JUST DESCRIBE IN A LITTLE BIT MORE

21       DETAIL HOW YOU CAME TO KNOW HIM?

22   A.  HE WOULD COME TO YOUTH GROUP OR TO CHURCH WITH HIS

23       PARENTS AND COME TO YOUTH GROUP.

24   Q.  CAN YOU GIVE AN ESTIMATION ON HOW OFTEN YOU WOULD

25       SEE MR. SIMMERS DURING THIS FOUR-YEAR PERIOD?

1  A.  ON A WEEKLY BASIS UNTIL HE WAS -- UNTIL HE -- SOME

2      OF THE TIMES HE WOULD BE IN JUVENILE, AND THEN I

3      WOULD VISIT HIM AT LEAST ONCE EACH TIME HE WOULD BE

4      IN FOR, SAY, A PERIOD OF TIME OF THIRTY DAYS.

5  Q.  IN A GIVEN MONTH, HOW MANY TIMES WOULD YOU SEE HIM?

6  A.  THREE TO FOUR TIMES.

7  Q.  OKAY.  NOW, COULD YOU GIVE THE COURT SOME IDEA IN

8      WHAT CAPACITY YOU WOULD INTERACT WITH IAN; WHAT YOU

9      WOULD TALK ABOUT?

10 A.  WE TALKED ABOUT SCHOOL, AND WE TALKED ABOUT HIS

11     FAMILY, AND HIS BROTHER AND HIS SISTER, AND HOW

12     THINGS WERE GOING, YOU KNOW.  MY LEVEL OF CONTACT,

13     OF COURSE, AS A PASTOR, WAS TO FIND OUT WHERE HE

14     WAS IN TERMS OF HIS RELATIONSHIP WITH THE LORD.

15     AND SO IT WOULD PERTAIN TO SOME OF THOSE THINGS.

16 Q.  DO YOU HAVE AN OPINION AS TO WHETHER OR NOT

17     MR. SIMMERS POSSESSES -- FIRST OF ALL, YOU ALREADY

18     FEEL YOU KNOW HIM PRETTY WELL; IS THAT RIGHT?

19 A.  YES.

20 Q.  IN YOUR ESTIMATION, DOES HE HAVE ANY PERSONAL

21     CHARACTERISTICS THAT WOULD INTERFERE WITH HIS

22     ABILITY TO GIVE A KNOWING AND INTELLIGENT STATE-

23     MENT?

24         MS. MAHONEY:  OBJECTION, LACK OF FOUNDATION.

25     HE IS NOT A PROFESSIONAL HEALTH EXPERT, AND WE

1    DON'T KNOW WHEN HE HAD CONTACT.  MOSTLY, HE IS NOT

2    A PROFESSIONAL HEALTH EXPERT.  HE DOESN'T EVEN MEET

3    THAT REQUIREMENT.

4          MR. HICKS:  I NEVER SUGGESTED HE WAS.

5          THE COURT:  YOUR OBJECTION GOES TO THE

6    WEIGHT.

7          BY MR. HICKS:

8  Q.  OKAY.  DO YOU WANT THE QUESTION REPEATED OR DO YOU

9    UNDERSTAND?

10  A.  COULD YOU REPEAT THE QUESTION?

11          MS. MAHONEY:  YOUR HONOR, MAY I ASK THEN IF

12    I MAY VOIR DIRE?

13          THE COURT:  YOU MAY.

14          BY MS. MAHONEY:

15  Q.  MR. SETZER, YOU DO NOT HAVE ANY PARTICULARIZED

16    TRAINING OR KNOWLEDGE IN THE PROFESSIONAL MENTAL

17    HEALTH FIELD, DO YOU.

18          THE WITNESS:  EXCUSE ME, WHAT'S A VOIR DIRE?

19          THE COURT:  THAT MEANS SHE CAN ASK YOU

20    QUESTIONS.

21  A.  I TOOK FRENCH BUT I DON'T UNDERSTAND.  OR IF THAT'S

22    LATIN, OKAY.  PARDON?

23  Q.  DO YOU HAVE ANY PARTICULAR TRAINING IN THE MENTAL

24    HEALTH FIELD?

25  A.  NO.

1   Q.   OR THE --

2   A.   EXCEPT PSYCHOLOGY 100 IN COLLEGE.   DO YOU COUNT

3        THAT?

4   Q.   HOW LONG AGO DID YOU TAKE THAT?

5   A.   20 YEARS.

6   Q.   AND WHEN YOU WORKED WITH IAN, YOU WEREN'T TREATING

7        HIM IN A MENTAL HEALTH CAPACITY; IS THAT CORRECT?

8   A.   NO.

9   Q.   AND YOU NEVER DID DISCUSS IAN WITH ANYONE OTHER

10       THAN HIS PARENTS, OR IAN HIMSELF; ISN'T THAT

11       CORRECT?

12  A.   THAT IS MOSTLY CORRECT.

13  Q.   OKAY.   AND WHEN YOU SAY "MOSTLY," WHAT DO YOU MEAN

14       BY THAT?

15  A.   I MEAN THERE WERE OPPORTUNITIES THAT I HAD TO TALK

16       ABOUT IAN, YOU KNOW, JUST IN PASSING, MENTIONING

17       HIM AND PRAYING FOR HIM.

18  Q.   BUT AS TO TALKING TO OTHER PEOPLE, MAYBE OTHER

19       AUTHORITIES THAT DEALT WITH IAN, OR OTHER PASTORS,

20       ABOUT IAN, SPECIFICALLY IN REGARD TO HIS MENTAL

21       HEALTH STATUS OR HIS PSYCHOLOGICAL STATUS, YOU

22       NEVER DID ANY OF THAT, IS THAT CORRECT, OTHER THAN

23       HIS PARENTS OR IAN HIMSELF?

24  A.   YOU MEAN, DO I HAVE AN OPINION, OR DO OTHER PEOPLE?

25       HAVE THEY MENTIONED IT?

1  Q.  HAVE YOU EVER DISCUSSED THAT SPECIFIC TOPIC WITH

2      OTHER PEOPLE, BESIDES IAN'S PARENTS OR IAN HIMSELF?

3  A.  AGAIN, I'M GOING TO ASK YOU A QUESTION:  ARE YOU

4      ASKING IF ANY OPINIONS WERE SHARED?  THAT WOULD BE

5      A PART OF THE DISCUSSION, WOULD IT NOT?

6  Q.  ALL RIGHT.  LET ME ASK YOU THIS:  WELL, GO AHEAD

7      AND ANSWER THE QUESTION THE WAY YOU UNDERSTAND IT.

8  A.  WELL, I ALREADY ASKED YOU A QUESTION.  I NEED TO

9      KNOW THAT.

10 Q.  GO AHEAD AND ANSWER THE QUESTION THAT WAY.  HAS

11     SOMEONE EXPRESSED OPINIONS TO YOU ABOUT IAN?

12 A.  YES.

13 Q.  AND WHO WOULD THOSE PEOPLE BE?

14 A.  I DON'T REALLY REMEMBER.

15 Q.  WHEN WE SPOKE THE OTHER DAY, IT WAS MY UNDER-

16     STANDING THE MAJORITY OF YOUR CONVERSATIONS TAKING

17     PLACE WITH MR. SIMMERS HAVE HAD STRICTLY TO DO WITH

18     HIS PARENTS; IS THAT CORRECT?

19 A.  NOT STRICTLY.

20 Q.  OKAY.  SO THAT IS INCORRECT.  I TOOK THAT

21     INFORMATION FROM YOU INCORRECTLY?

22         MR. HICKS:  YOUR HONOR, I REALIZE COUNSEL IS

23     VOIR DIRING, BUT AS TO RELEVANCE, WE ARE NOT

24     PRESENTING THIS WITNESS AS ANY PROFESSIONAL MENTAL

25     HEALTH EXPERT, OR ANYTHING OF THE TYPE.  I PRETTY

1    MUCH LAID OUT THE TYPE OF QUESTIONING I PLANNED TO

2    ELICIT.

3        MS. MAHONEY:  IT WAS GOING MORE TO THE

4    COMMUNITY WHICH HE MAY HAVE INFORMATION FROM, BUT I

5    WILL MOVE ON TO ANOTHER SET OF QUESTIONS WHICH IS,

6    MR. SETZER, DID YOU SEE IAN ON MARCH 15TH OR SPEAK

7    WITH IAN ON MARCH 15TH OF 1995?

8  A.  WHAT DAY WOULD THAT BE?

9  Q.  IT WOULD HAVE BEEN A THURSDAY OR A WEDNESDAY.

10 A.  AND WHAT IS THE SIGNIFICANCE OF THAT DATE?

11 Q.  I'M ASKING YOU IF YOU RECALL SPEAKING WITH HIM AT

12     THAT TIME.

13 A.  I DON'T REMEMBER.

14 Q.  DID YOU EVER SPEAK WITH HIM WHILE HE WAS IN POLICE

15     CUSTODY WHILE BEING INTERROGATED ON A MATTER OF

16     SEVERAL CRIMES AROUND MARCH OF 1995?

17 A.  I DON'T KNOW WHEN THE POLICE WOULD HAVE

18     INTERROGATED HIM.  AS I STATED BEFORE, I DID SEE

19     HIM SEVERAL WEEKS AGO WHEN HE WAS IN ADULT

20     CORRECTION.  AND I SAW HIM WHILE HE WAS IN JUVENILE

21     CORRECTION, KING COUNTY JUVENILE CORRECTION, FOR

22     THIS SAME -- WHATEVER YOU CALL IT.

23 Q.  AND SO IT WOULD HAVE BEEN AFTER HE WAS ARRESTED ON

24     THE MURDER; IS THAT CORRECT?

25 A.  YES.

1   Q.  AND PRIOR TO THE TIME THAT HE WAS ARRESTED ON THE

2       MURDER, DO YOU RECALL WHETHER OR NOT HE WAS IN

3       JUVENILE DETENTION IN FEBRUARY OR MARCH OF 1995?

4           MR. HICKS:  YOUR HONOR, AGAIN, RELEVANCE.

5   A.  YOU KNOW --

6           MR. HICKS:  JUST A SECOND.  I OBJECTED.

7           THE COURT:  OVERRULED.  YOU NEED TO ANSWER

8       THE QUESTION, IF YOU CAN.

9   A.  AS TO THE SPECIFIC DATES, I DON'T KNOW.  BUT I WILL

10      SAY THAT I BELIEVE EVERY TIME THAT HE WAS IN

11      CORRECTIONAL -- IN "JUVY," I VISITED HIM AT LEAST

12      ONE TIME.

13  Q.  BUT YOU DON'T HAVE A SPECIFIC RECOLLECTION OF THAT,

14      OF WHAT DATE IT WOULD BE?

15  A.  I WOULD NEED MY APPOINTMENT BOOK TO FIND THAT OUT.

16      I COULD PINPOINT THAT IF THAT WOULD BE RELEVANT.

17          MS. MAHONEY:  YOUR HONOR, AT THIS POINT

18      AGAIN, I RENEW MY OBJECTION.  WE DON'T KNOW WHEN HE

19      LAST SPOKE WITH MR. SIMMERS PRIOR TO THE TIME THE

20      CONFESSION WAS TAKEN, AND THAT IS ABSOLUTELY

21      CRITICAL.

22          THE COURT:  I THINK THAT OBJECTION GOES TO

23      THE WEIGHT.

24          WHAT IS THE QUESTION AGAIN THOUGH, MR.

25      HICKS?

1          MR. HICKS:  WELL, I WILL DO MY BEST; I WILL

2    REPHRASE IT.

3    Q.  DO YOU HAVE AN OPINION AS TO MR. SIMMERS' CAPACITY

4    EITHER TO MAKE UP STORIES OR EXAGGERATE?

5    A.  YES.

6    Q.  AND WHAT IS THAT OPINION?

7    A.  WELL, I BELIEVE --

8          MS. MAHONEY:  AGAIN, YOUR HONOR, JUST FOR

9    THE RECORD, I WOULD OBJECT TO THE FACT THAT IT IS

10   IMPROPER OPINION TESTIMONY.  JUST FOR THE RECORD.

11         THE COURT:  SUSTAINED TO THE QUESTION AS

12   PHRASED.  YOU NEED TO ASK A DIFFERENT QUESTION.

13         MR. HICKS:  I DO NOT UNDERSTAND THE BASIS OF

14   THE OBJECTION, YOUR HONOR.

15         THE COURT:  YOU ARE ASKING FOR OPINION

16   TESTIMONY, AND YOU NEED TO REPHRASE THE QUESTION.

17         MR. HICKS:  ALL RIGHT.

18   Q.  HAVE YOU HAD AN OPPORTUNITY TO OBSERVE MR. SIMMERS

19   IN A CAPACITY OF EITHER MAKING UP STORIES OR

20   EXAGGERATING?

21   A.  YES, I HAVE.

22   Q.  COULD YOU DESCRIBE EXAMPLES OF THAT?

23   A.  JUST IN GENERAL, IAN WAS ALWAYS -- ON AN ONGOING

24   BASIS -- TALKING ABOUT PICKING UP CLOTHES, THAT HIS

25   GANG WOULD NEED CLOTHES, AND THEY WERE ALWAYS GOING

1    OUT TO GET CLOTHES.  AND I BELIEVE THAT WAS, YOU

2    KNOW, SHOPLIFTING.  AND I PERSONALLY DIDN'T OBSERVE

3    A GREAT AMOUNT OF CLOTHING THAT WOULD BE NEW OR

4    CONSIDERED NEW TO IAN, YOU KNOW, FROM WEEK TO WEEK

5    AS I SAW HIM.

6  Q.  WELL, GIVE AN EXAMPLE OF THE VOLUME OF CLOTHES HE

7    CLAIMED TO HAVE TAKEN, IF YOU CAN?

8  A.  ONE TIME HE SAID THAT HE WAS ARRESTED FOR HAVING

9    $250 WORTH OF CLOTHING, PERSONALLY SHOPLIFTED

10   HIMSELF.

11 Q.  UH-HUH.

12 A.  AND, YOU KNOW, AS I UNDERSTAND THAT ACTUAL EVENT,

13   THE ARREST WAS FOR A BANDANA AND A BELT.  AND, TO

14   ME, THAT WOULD NOT CONSTITUTE $250 WORTH OF

15   CLOTHING.

16 Q.  ANY OTHER EXAMPLES YOU CAN THINK OF?

17 A.  HE MENTIONED A COUPLE DIFFERENT TIMES THAT HE WAS

18   INVOLVED IN GUN RUNNING.

19 Q.  GUN RUNNING.  CAN YOU DESCRIBE THAT?

20 A.  WHAT HE INSINUATED WAS THAT HE WAS INVOLVED IN SOME

21   PRETTY WEIGHTY CONTRABAND.  I MEAN, IT WOULDN'T

22   SEEM TO ME THE WAY HE WAS PAINTING THE PICTURE IT

23   WOULD BE, YOU KNOW, JUST STEALING A GUN OR

24   SOMETHING LIKE THAT.  IT WAS LIKE A SIGNIFICANT

25   AMOUNT OF WEAPONS, GUNS SPECIFICALLY.

1    AND, YOU KNOW, TO MY KNOWLEDGE, HE WAS NEVER

2   FOUND WITH A GUN, NEVER ARRESTED WITH A GUN. AND I

3   ASKED MR. BERUBE IF HE'D EVER BROUGHT A GUN HOME.

4   AND HE SAID, NO, HE HADN'T.

5 Q. YOU KNOW THE BERUBE FAMILY OBVIOUSLY THEN; IS THAT

6   CORRECT?

7 A. YES.

8 Q. THAT WAS IAN'S FAMILY?

9 A. YES.

10 Q. HAVE YOU KNOWN THEM FOR ROUGHLY THE SAME PERIOD OF

11   TIME?

12 A. YES.

13 Q. HAVE YOU EVER KNOWN THE FAMILY TO HAVE GUNS?

14 A. NO.

15 Q. ANY OTHER EXAMPLES?

16 A. THAT'S ABOUT IT, AS FAR AS HARD CORE SPECIFIC

17   THINGS.

18 Q. I'M SORRY?

19 A. I DON'T WANT TO SAY ANYTHING THAT I AM DOUBTFUL

20   ABOUT. I HAVE OTHER THINGS THAT I'M A LITTLE LESS

21   SURE OF, BUT THOSE ARE THE EXAMPLES I'M ABSOLUTELY

22   SURE OF.

23 Q. BESIDES THESE EXAMPLES YOU RECALL, IS IT YOUR

24   TESTIMONY THERE WERE OTHER EXAMPLES DURING THAT

25   THREE- OR FOUR-YEAR PERIOD?

1    A.   YES, THERE ARE, BUT I'M NOT WILLING TO SAY EXACTLY

2         WHAT THEY ARE.  I DON'T WANT TO SAY ANYTHING THAT

3         WOULD BE --

4    Q.   WOULD YOU SAY MR. SIMMERS DID OR DID NOT EXHIBIT A

5         GENERAL PATTERN OF MAKING UP STORIES AND EXAG-

6         GERATING?

7    A.   YES, I DO.

8    Q.   YOU DO WHAT?  I'M SORRY.

9    A.   I DO BELIEVE THAT IAN, TO GAIN PERSONAL SIGNIFI-

10        CANCE, WOULD BRAG --

11             MS. MAHONEY:  -- YOUR HONOR, I OBJECT.

12             MR. HICKS:  JUST A SECOND.  WHEN SHE OBJECTS

13        YOU HAVE TO STOP.

14             THE COURT:  WHAT IS THE OBJECTION?

15             MS. MAHONEY:  YOUR HONOR, I OBJECT, THE FACT

16        HE IS BASING THIS ON HIS BELIEF.

17             THE COURT:  SUSTAINED UNDER 701.

18             MR. HICKS:  ALL RIGHT.  BUT I TAKE IT THE

19        TESTIMONY OF A PATTERN HE OBSERVED CAN STAND

20        BECAUSE HE DID NOT BASE THAT ON HIS --

21             THE COURT:  IT WENT INTO IMPERMISSIBLE

22        OPINION TESTIMONY.  IF YOU WANT TO REPHRASE THE

23        QUESTION, YOU CAN.

24             BY MR. HICKS:

25    Q.   DID YOU OR DID YOU NOT OBSERVE, OVER THE FOUR-YEAR

1    PERIOD, A PATTERN OF MAKING UP STORIES AND

2    BRAGGING, INCLUDING INCIDENTS THAT YOU SIMPLY DON'T

3    RECALL?  YES OR NO.

4  A.  YES.

5        MR. HICKS:  THANK YOU.  NOTHING FURTHER.

6        THE COURT:  MS. MAHONEY?

7              CROSS-EXAMINATION

8        BY MS. MAHONEY:

9  Q.  IN FACT, YOU REALLY HAVE NO PERSONAL WAY OF KNOWING

10    IF WHAT IAN TOLD YOU WAS OR WAS NOT TRUE, ISN'T

11    THAT RIGHT?  YOU PERSONALLY HAVE NOT BEEN WITH IAN

12    EVERY SINGLE DAY TO KNOW WHETHER OR NOT HE HAS EVER

13    SHOPLIFTED; IS THAT RIGHT.

14  A.  NOBODY HAS.

15  Q.  AND YOU PERSONALLY HAVEN'T BEEN WITH HIM EVERY DAY

16    TO KNOW WHETHER OR NOT HE DID HAVE GUNS OR WAS

17    DEALING IN GUNS?

18  A.  NOBODY HAS.

19        MS. MAHONEY:  THANK YOU.  NO FURTHER

20    QUESTIONS.

21        MR. HICKS:  NOTHING FURTHER.

22        THE COURT:  ALL RIGHT.  THANK YOU.

23        MR. HICKS:  YOUR HONOR, CAN I WALK THIS

24    WITNESS OUT?

25        THE COURT:  YOU MAY.  AND DETECTIVE HOPKINS

1     WILL TAKE THE STAND.

2          YOU ARE STILL UNDER OATH, DETECTIVE HOPKINS.

3     EDWARD HOPKINS,        HAVING BEEN DULY SWORN,
                            WAS EXAMINED AND TESTIFIED

4                            AS FOLLOWS:

5              DIRECT EXAMINATION

6          MR. MARNER:

7     Q.  DETECTIVE HOPKINS, I LEFT OFF AT THE POINT YOU

8          INDICATED YOU WERE THE PRIMARY DETECTIVE ON THE

9          HOMICIDE WHO RESPONDED TO THE SCENE?

10    A.  YES, I WAS.

11    Q.  WE ARE NOT GOING TO GO INTO YOUR INVOLVEMENT IN

12         THAT.  WE WILL DO THAT IN THE CASE-IN-CHIEF.  OUR

13         CONCERN HERE IS ADMISSIBILITY OF STATEMENTS.  LET'S

14         GO INTO YOUR FIRST CONTACT WITH IAN SIMMERS:  HOW

15         DID YOU COME INTO CONTACT WITH IAN SIMMERS?

16    A.  MARCH 15TH AT APPROXIMATELY 5:30, I WAS PAGED BY MY

17         DEPARTMENT.  ON MY RETURN CALL, I WAS TOLD TO

18         CONTACT MAJOR BEARD AT PRECINCT 2 IN KENMORE.

19    Q.  AND YOU DID THIS?

20    A.  YES.

21    Q.  WERE YOU GIVEN ANY DETAIL BY MAJOR BEARD?

22    A.  YES.  HE TOLD ME HE HAD TWO SUSPECTS IN CUSTODY

23         THAT THEIR DETECTIVES WERE SPEAKING WITH, AND HE

24         FELT THERE WAS THE POSSIBILITY OF A CONNECTION WITH

25         A HOMICIDE THAT HAD RECENTLY OCCURRED ON THE

```
 1          BURKE-GILMAN TRIAL.  AND I TOLD HIM I WOULD RESPOND

 2          THERE.

 3     Q.   AND SO YOU GOT THE PAGE AT 5:30 P.M. AND WHAT TIME

 4          DID YOU GET TO THE NORTH PRECINCT?

 5     A.   APPROXIMATELY TEN MINUTES TO 6:00.

 6     Q.   5:50 PUT YOU AT THE NORTH PRECINCT?

 7     A.   YES.

 8     Q.   UPON YOUR ARRIVAL, DID YOU IMMEDIATELY CONTACT THE

 9          DEFENDANT?

10     A.   NO, I DID NOT.

11     Q.   WHO DID YOU CONTACT FIRST?

12     A.   THERE WAS A GROUP OF DETECTIVES:  SERGEANT RUSK,

13          DETECTIVE PAT RAFTIS, AND DETECTIVE JOHN MCSWAIN,

14          AND OTHER PEOPLE WERE PRESENT.  AND I BELIEVE THERE

15          WAS A FIRE-ARSON INVESTIGATOR ALSO PRESENT IN THE

16          GROUP.

17               I SPOKE WITH THE GROUP, AND I COULDN'T TELL

18          YOU EXACTLY WHO TOLD ME WHAT DETAILS, BUT THEY

19          EXPLAINED HOW THEY CAME IN CONTACT WITH THESE TWO

20          INDIVIDUALS.

21     Q.   AND DURING THIS ROUND-ROBIN CONVERSATION, DID YOU

22          LEARN THAT PERHAPS ONE OR BOTH OF THESE INDIVIDUALS

23          MIGHT BE INVOLVED IN THE MURDER OF RODNEY

24          GOCHANOUR?

25     A.   YES, I DID.
```

1    Q.  HOW LONG DID THIS CONVERSATION LAST?

2    A.  THE INITIAL CONVERSATION?

3    Q.  RIGHT, WITH DETECTIVE RUSK, AND MCSWAIN, AND THE

4        FIRE MARSHALL -- IF IT IS NOT IN YOUR NOTES, DO YOU

5        RECALL?

6    A.  RIGHT.  I BELIEVE THERE WAS A PERIOD THAT SPECIFIC

7        CONVERSATION CONTINUED -- AND IT WAS SOMEWHAT

8        CASUAL -- OVER THE COURSE OF THE NEXT FEW HOURS, A

9        COUPLE OF HOURS.  DURING THAT TIME THERE WERE OTHER

10       EVENTS TAKING PLACE.

11   Q.  I'LL TELL YOU WHAT WE WILL DO:  GO TO THE TIME WHEN

12       YOU FIRST CONTACTED IAN SIMMERS AND WE WILL

13       BACKTRACK AND FILL IN THE TIME.  WHEN DID YOU FIRST

14       CONTACT IAN SIMMERS?

15   A.  IF YOU DON'T MIND, I WILL REFER TO MY NOTES.

16   Q.  FINE.  I TAKE IT WHEN YOU PREPARED THOSE NOTES, YOU

17       DID SO TRYING TO ACCURATELY REFLECT WHAT HAPPENED?

18   A.  I DID.

19   Q.  AND REFERRING TO THEM WILL OBVIOUSLY REFRESH YOUR

20       MEMORY?

21   A.  IT WILL.  SO THE COURT IS AWARE, I'M INVOLVED IN

22       ANOTHER TRIAL AT THE SAME TIME, AND THE NOTES WILL

23       HELP ME DIFFERENTIATE THE TWO.

24   Q.  LET ME KNOW WHEN YOU'RE READY.

25   A.  OKAY.

1    A.    I BELIEVE IT WAS APPROXIMATELY 9:00 P.M.  I DON'T

2          HAVE THE EXACT TIME IN MY NOTES.

3                MR. HICKS:  I DIDN'T HEAR THAT.

4    A.    I BELIEVE IT WAS APPROXIMATELY 9:00 P.M. AROUND

5          THAT TIME FRAME.

6    Q.    WHAT IS YOUR MARGIN OF ERROR EITHER WAY?

7    A.    8:30, 9:30.

8    Q.    NOW, OBVIOUSLY IN THE INTERIM, SOMETHING HAPPENED.

9          WHAT HAPPENED?

10   A.    INITIALLY, SERGEANT RUSK HAD TOLD ME THAT JONATHAN

11         WYATT, THE OTHER INDIVIDUAL WHO WAS IN CUSTODY, HAD

12         REQUESTED HIS ATTORNEY.  AND WE MADE THE PHONE CALL

13         TO HIS ATTORNEY, AND WAITED.  IT WAS DECIDED THAT

14         WE WOULD WAIT FOR HIS ATTORNEY IN AN ATTEMPT TO

15         SPEAK WITH HIM FIRST.  AND THAT CREATED SOME OF THE

16         DELAY.

17               INITIALLY, OF COURSE, THERE WAS MY BEING

18         BROUGHT UP TO SPEED AS TO WHAT HAD OCCURRED.  AND

19         THEN AFTER THE ATTORNEY CAME AND DECLINED TO ALLOW

20         HIM TO SPEAK WITH US -- MR. WYATT THAT IS -- MYSELF

21         AND OTHER DETECTIVES WENT ACROSS THE STREET TO THE

22         MCDONALD'S AND SECURED SOME FOOD FOR THE TWO

23         INDIVIDUALS.  AND WE HAD A SANDWICH OURSELVES.

24   Q.    DISCUSSING THE CASE IN THE INTERIM?

25   A.    CORRECT.  DISCUSSING WHAT OUR PLANNED STRATEGY

1      WOULD BE FOR INTERVIEW.

2   Q.  YOU WERE IN HERE AND YOU HEARD DETECTIVE RUSK

3      TESTIFY?

4   A.  YES.

5   Q.  AND HE INDICATED THERE WAS SOME RELUCTANCE AND

6      CONFUSION ON THE DEFENSE ATTORNEY'S PART FOR

7      MR. WYATT; IS THAT CORRECT?

8   A.  CORRECT.

9   Q.  AND WAS HIS RENDITION, MAYBE A COUPLE OF HOURS

10      DELAY, ACCURATE IN YOUR RECOLLECTION?

11   A.  FOR THE MOST PART, YES.

12   Q.  AND SO YOU WENT THROUGH THIS -- I GUESS WE WILL

13      CALL IT RIGMAROLE -- FOR THE DEFENSE ATTORNEY FOR

14      MR. WYATT, AND WENT AND ATE, AND WHAT HAPPENED WHEN

15      YOU CAME BACK?

16   A.  IT WAS DECIDED WE WOULD CONTACT MR. SIMMERS AND

17      SPEAK WITH HIM REGARDING THE INCIDENT ON THE TRAIL,

18      THE STABBING.

19   Q.  OKAY.  AND YOU SAID YOU BROUGHT SOME FOOD BACK.

20      DID YOU ALLOW MR. SIMMERS TIME TO EAT FIRST, OR HOW

21      DID THAT WORK?

22   A.  RIGHT.  IN FACT, I BELIEVE ONE OF THE DETECTIVES --

23      AND I'M NOT SPECIFIC AS TO WHICH ONE -- BROUGHT

24      THEIR FOOD BACK WHILE THE REST OF US REMAINED AT

25      THE RESTAURANT FOR A PERIOD OF TIME.

1  Q.  THAT BRINGS US TO ROUGHLY 9:00 OR 9:30 FOR YOUR

2      INITIAL CONTACT WITH MR. SIMMERS.  AND FOR THE

3      RECORD, IS MR. SIMMERS THE YOUNG MAN SITTING AT THE

4      TABLE SITTING NEXT TO MR. HICKS?

5  A.  YES, IN A BLUE SHIRT AND TAN PANTS.

6  Q.  WHAT HAPPENED AT THAT INITIAL CONTACT?

7  A.  INITIALLY, SERGEANT RUSK ASKED MR. SIMMERS IF HE

8      REMEMBERED HIS MIRANDA WARNINGS, AND HE STATED HE

9      DID, AND HE WAS STILL WILLING TO TALK WITH US.

10 Q.  SO, DETECTIVE, BEFORE YOU WENT ON, IT WAS YOUR

11     UNDERSTANDING THAT SERGEANT RUSK HAD MIRANDIZED THE

12     DEFENDANT?

13 A.  CORRECT.  I HAD ASKED HIM PRIOR TO OUR INTERVIEW IF

14     HE HAD BEEN MIRANDIZED, AND I WAS TOLD HE HAD.  AND

15     WHEN WE FIRST ENTERED THE ROOM WITH MR. SIMMERS,

16     SERGEANT RUSK ASKED HIM AND REMINDED HIM HE HAD

17     BEEN READ HIS MIRANDA WARNINGS AND ASKED HIM IF HE

18     WAS STILL WILLING TO SPEAK TO US.

19         MR. HICKS:  YOUR HONOR, I'M HAVING TROUBLE

20     HEARING.  MAYBE IT'S THE MICROPHONE.

21         THE WITNESS:  IS THIS BETTER?

22         MR. HICKS:  YES.

23         THE WITNESS:  AND SO IT WAS MY IMPRESSION

24     FROM THE WAY SERGEANT RUSK BEGAN OUR CONVERSATION

25     THAT HE HAD BEEN ADVISED OF HIS MIRANDA.

1              BY MR. MARNER:

2    Q.   AND YOU WENT INTO AN INTERVIEW ROOM; IS THAT

3         CORRECT?

4    A.   CORRECT.

5    Q.   AND THE INTERVIEW ROOM, HOW BIG WAS IT?

6    A.   APPROXIMATELY 9 OR 10 FEET, BY 6 OR 8 FEET.

7    Q.   DID IT REEK OF LIQUOR?

8    A.   IT DID NOT.

9    Q.   DID IT SMELL OF MARIJUANA?

10   A.   IT DID NOT.

11   Q.   DETECTIVE HOPKINS, IN YOUR BELIEF, 8 YEARS AS A

12        POLICE OFFICER, HAVE YOU HAD THE OPPORTUNITY TO

13        SMELL MARIJUANA?

14   A.   I HAVE HAD THAT OPPORTUNITY MANY TIMES.

15   Q.   AND YOU FEEL YOU CAN RECOGNIZE THAT SMELL?

16   A.   YES.  I WOULD LIKE TO BELIEVE I COULD.

17   Q.   AND IN YOUR PROFESSIONAL AND PERSONAL LIFE MAYBE

18        YOU KNOW WHAT ALCOHOL SMELLS LIKE?

19   A.   I DO.

20   Q.   YOU DIDN'T SMELLED THAT THERE EITHER?

21   A.   I SMELLED NO INTOXICANTS.

22   Q.   DETECTIVE, WHEN YOU FIRST CAME IN, YOU SAW IAN

23        SIMMERS SITTING AT THAT TABLE, AND WAS HE ASLEEP?

24   A.   NO, HE WAS AWAKE AND ALERT, APPEARED TO UNDERSTAND

25        WHAT WAS GOING ON.

1    Q.  DID HE APPEAR TO BE DOPEY BY IT ALL, ANYTHING LIKE

2        THAT?

3    A.  HE DID NOT IN MY OPINION.

4    Q.  AND AGAIN IN YOUR EXPERIENCE, HAVE YOU SEEN PEOPLE

5        THAT YOU EITHER BELIEVE OR SUBSEQUENTLY CONFIRMED

6        WERE UNDER THE INFLUENCE OF DRUGS OR ALCOHOL?  HAVE

7        YOU SEEN PEOPLE LIKE THAT?

8    A.  YES, I HAVE.

9    Q.  HOW OFTEN, OR HOW MANY TIMES?

10   A.  NUMEROUS TIMES.  I SPENT SOME TIME WORKING

11       NARCOTICS AND I WAS AROUND THAT.

12   Q.  OVER A HUNDRED, WOULD THAT BE A FAIR ESTIMATE?

13   A.  OVER A HUNDRED, SURE.

14   Q.  DID IAN SIMMERS HAVE ANY OF THESE PHYSICAL

15       MANIFESTATIONS?

16   A.  NO, HE DID NOT.

17   Q.  NOW, YOU WALKED IN THERE AND IAN SIMMERS LOOKED UP

18       AT YOU ALERTLY?

19   A.  YES.

20   Q.  WHAT HAPPENED?

21   A.  WE ASKED SIMMERS ABOUT THE STABBING STRAIGHT AWAY.

22       WE HAD DECIDED THAT WHEN WE INTERVIEWED HIM, WE

23       WOULD JUST AVOID A LOT OF SMALL TALK LEADING UP TO

24       THE FACTS, AND WE WOULD JUST DIRECTLY ASK HIM ABOUT

25       THE STABBING.

1  Q.  AND THIS WAS AFTER DETECTIVE RUSK HAD CLARIFIED,

2      "HEY, YOU HAVE BEEN MIRANDIZED, AND IS IT STILL

3      OKAY TO TALK"?

4  A.  YES.

5  Q.  AND YOU AND DETECTIVE RUSK CAME UP WITH THIS

6      STRATEGY PRIOR TO GOING IN?

7  A.  LOOSELY.

8  Q.  ALL RIGHT.  YOU WENT IN THERE AND YOU SAY YOU HIT

9      IT STRAIGHT ON.  WHAT EXACTLY DID YOU DO?

10 A.  IAN WAS ASKED IF HE HAD ANYTHING TO DO WITH THE

11     STABBING.  AND WE SUGGESTED THAT WE HAD INFORMATION

12     INDICATING THAT HE WAS INVOLVED.  INITIALLY, HE

13     DENIED ANY INVOLVEMENT, AND HE MADE THE STATEMENT

14     THAT HE WOULD NEVER KILL A REGULAR GUY.

15 Q.  NOW, ACTUALLY, YOU DID HAVE SOME INFORMATION

16     IMPLICATING MR. SIMMERS AT THAT POINT, DIDN'T YOU?

17          MR. HICKS:  OBJECTION, LEADING.  MOVE TO

18     STRIKE THE QUESTION.

19          MS. MAHONEY:  I WILL STRIKE THE QUESTION.

20          THE COURT:  SUSTAINED.

21          BY MR. MAHONEY:

22 Q.  DETECTIVE HOPKINS, DID YOU HAVE ANY INFORMATION

23     IMPLICATING --

24 A.  THE INFORMATION I HAD BEEN GIVEN BY THE KING COUNTY

25     OFFICERS UPON MY ARRIVAL WAS THAT MR. WYATT SPOKE

1    OF A FLEXIBLE-BLADED, KITCHEN-TYPE KNIFE WITH A

2    BLACK HANDLE THAT WYATT CLAIMED WAS IN SIMMERS'

3    POSSESSION WHILE THEY WERE ON THE TRAIL.

4         I WAS AWARE THAT THE KING COUNTY DETECTIVES

5    WERE NOT AWARE THAT A KNIFE WAS RECOVERED NEAR THE

6    CRIME SCENE AND THAT KNIFE MATCHED THAT

7    DESCRIPTION.

8    Q.   AND SO YOU DID HAVE THIS INFORMATION?

9    A.   YES, I DID.

10   Q.   NOW THEN, WHEN HE FIRST DENIED IT AND SAID HE

11        WOULDN'T KILL A REGULAR GUY, WHAT WAS YOUR

12        REACTION?

13   A.   WELL, PRIOR TO HAVING A REACTION, HE WENT ON TO

14        STATE THAT HE -- HE REFERRED TO A REGULAR GUY

15        SAYING THAT HE WOULDN'T KILL A CIVILIAN.  HE USED

16        THAT WORD ALSO, AND HE REFERRED TO THE VICTIM AS A

17        CIVILIAN AND NOT A GANGSTER.

18   Q.   ALL RIGHT.

19   A.   IT WAS MY IMPRESSION AT THAT TIME --

20             MR. HICKS:  OBJECTION, SPECULATION.

21             THE COURT:  SUSTAINED AS TO IMPRESSIONS?

22             BY MR. MARNER:

23   Q.   ALL RIGHT.  WHAT SIGNIFICANCE DID YOU GIVE THAT

24        STATEMENT, BASED ON YOUR TRAINING AND EXPERIENCE AS

25        A POLICE OFFICER.

1    A.   FROM MY EXPERIENCE IN CONDUCTING INTERVIEWS, I

2         FOUND THAT TO BE -- THAT MR. SIMMERS LIKELY DID

3         HAVE INFORMATION ABOUT THIS INCIDENT, AS HE

4         REFERRED TO HIM AS A REGULAR GUY.

5    Q.   ALL RIGHT.  DID THIS DEVELOP INTO ANYTHING FURTHER?

6    A.   IT DID.

7    Q.   WHAT HAPPENED?

8    A.   MR. SIMMERS RELAYED THAT -- HE HAD SPOKE OF KILLING

9         13 OTHER PEOPLE, AND REFERRING TO THEM AS

10        GANGSTERS, AGAIN DENYING INVOLVEMENT IN THIS

11        HOMICIDE.

12             AS SERGEANT RUSK AND I CONTINUED TO SPEAK

13        WITH HIM, MR. SIMMERS WAS SOMEWHAT QUIET AND JUST

14        CONTINUED TO DENY.  AND WE THEN SPOKE TO HIM AND

15        SUGGESTED WE HAD EVIDENCE THAT WOULD LIKELY LINK

16        HIM TO THIS CRIME.

17   Q.   HOW DID HE RESPOND TO THAT, DETECTIVE?

18             MR. HICKS:  OBJECTION, YOUR HONOR.  I THINK

19        THE DETECTIVE FINISHED HIS STATEMENT.  I COULD BE

20        INCORRECT; I THOUGHT HE WAS ABOUT TO MENTION THOSE

21        DETAILS THAT HE WAS ABOUT TO DESCRIBE.

22   A.   NO, I DID.  I FINISHED THE THOUGHT.

23             MR. MARNER:  ACTUALLY, JUDGE, I WAS TRYING

24        TO AVOID A NARRATIVE.  THAT IS WHY I ASKED THE

25        QUESTION.

1          THE COURT:  COULD YOU PULL THE MIKE CLOSER?

2          BY MR. MARNER:

3    Q.  OKAY.  DETECTIVE, HOW DID YOU RESPOND TO THAT?

4          THE COURT:  WHO?  JUST TO GET US BACK ON

5      TRACK.

6          BY MR. MARNER:

7    Q.  JUST TO GET US BACK ON TRACK, I BELIEVE THE LAST

8      ANSWER OF DETECTIVE HOPKINS INDICATED THAT HE AND

9      DETECTIVE RUSK TOLD THE DEFENDANT THAT THEY HAD

10     SOME EVIDENCE THAT WOULD LIKELY IMPLICATE HIM IN

11     THE KILLING OF RODNEY GOCHANOUR.

12   A.  MR. SIMMERS SAID HE COULDN'T REMEMBER STABBING

13     ANYBODY AND THEN SAID IT WASN'T IN HIS MEMORY.

14   Q.  NOW, DETECTIVE, YOU HAVE HAD TRAINING IN INTERVIEW

15     TECHNIQUES, HAVE YOU NOT?

16   A.  YES, I HAVE.

17   Q.  IN FACT, YOU HAVE HAD FORMALIZED TRAINING, HAVE YOU

18     NOT?

19   A.  I CERTAINLY HAVE.

20   Q.  COULD YOU TELL THE JUDGE, BRIEFLY -- WE DON'T NEED

21     THE WHOLE C.V. HERE -- WHAT THAT TRAINING IS?

22   A.  I ATTENDED THE BASIC CLASSES IN TECHNIQUES OF

23     INTERVIEWING, AND ALSO THE ADVANCED CLASS, AS WELL

24     AS ADDITIONAL INTERVIEWING TRAINING THROUGH

25     NARCOTICS CLASSES, ET CETERA.

1   Q.   AND BASED ON WHAT YOU LEARNED IN THOSE CLASSES AND

2        SUBSEQUENT APPLICATION OF YOUR LEARNING, WHAT

3        SIGNIFICANCE IF ANY DID YOU GIVE THE STATEMENT THAT

4        MR. SIMMERS MADE ABOUT NOT HAVING IT IN HIS MEMORY?

5             MR. HICKS:  EXCUSE ME?

6             BY MR. MARNER:

7   Q.   WHAT SIGNIFICANCE DID YOU GIVE THE STATEMENT MADE

8        BY MR. SIMMERS ABOUT NOT HAVING ANY MEMORY OF THE

9        MURDER?

10  A.   IN MY EXPERIENCE IN INTERVIEWING SUSPECTS, AND

11       CONSISTENT WITH MY TRAINING, I RECOGNIZED THAT AS A

12       SIGN OF POSSIBLE DECEPTION.

13  Q.   DID YOU SEIZE ON THAT?

14  A.   I DID.

15  Q.   WHAT DID YOU DO?

16  A.   WE CONTINUED TO SPEAK ALONG THAT LINE.  I SUGGESTED

17       TO MR. SIMMERS THAT HE SHOULD TRY HARDER TO

18       REMEMBER, AND I REFERRED BACK TO THE LIKELIHOOD OF

19       THE EVIDENCE MATCHING AND LINKING HIM TO THE CRIME.

20       AND HE CONTINUED TO MAINTAIN THAT HE HAD NO MEMORY

21       OF STABBING ANYONE, AND HE APPEARED TO GET SOMEWHAT

22       UPSET.  HE REQUESTED A CIGARETTE TO HELP CALM HIS

23       NERVES.

24  Q.   NOW, DETECTIVE HOPKINS, YOU SAID YOU SUGGESTED HE

25       TRY TO REMEMBER?

1    A.    UH-HUH.

2    Q.    AND DID YOU USE ANY COERCION IN MAKING THIS

3          SUGGESTION?

4    A.    NO, I DID NOT.

5    Q.    WHAT WAS YOUR TONE OF VOICE?  DO YOU THINK YOU CAN

6          REENACT IT?

7    A.    MUCH THE SAMES AS IT IS NOW.  WHEN I SPEAK WITH

8          SUBJECTS IN AN INTERVIEW, I FIND THAT A

9          PROFESSIONAL, COURTEOUS APPROACH IS USUALLY THE

10         BEST.

11   Q.    WERE YOU SEATED OR STANDING?  CAN YOU REMEMBER?

12   A.    I WAS SEATED.

13   Q.    AND SO IT WASN'T LIKE LOOPING OVER SIMMERS, LIKE

14         THIS, SUGGESTING THAT HE REMEMBER --

15         MR. HICKS:  YOUR HONOR, I OBJECT I DON'T

16         THINK THIS IS APPROPRIATE.  THIS IS THE PROSECUTOR,

17         AND THIS IS THE DETECTIVE.

18         THE COURT:  SUSTAINED.

19         BY MR. MARNER:

20   Q.    DETECTIVE HOPKINS, DID THE DEFENDANT EVER PROVIDE

21         FURTHER INFORMATION ABOUT ANY KNOWLEDGE OF THE

22         MURDER OF RODNEY GOCHANOUR?

23   A.    HE DID.

24   Q.    WHAT DID HE PROVIDE YOU?

25   A.    I SPOKE TO MR. SIMMERS AND TOLD HIM I DID NOT

1        BELIEVE HE ACTED ALONE IN THIS. I USED THAT AS A

2        POTENTIAL THEME TO GET HIM TO PROVIDE MORE INFOR-

3        MATION.

4  Q.  DID HE RESPOND TO THAT THEME?

5  A.  I'M LOOKING FOR HIS QUOTE. I ALSO -- JUST TO

6        CONTINUE THAT, I EXPLAINED TO HIM THAT -- AN

7        INTERVIEW THEME THAT I USED WAS ALSO THAT -- I

8        ASKED HIM IF HE WANTED PEOPLE TO THINK OF HIM AS

9        SOMEONE WHO KILLED FOR NO REASON, OR IF THERE WAS A

10       REASON BEHIND THIS, I SUGGESTED THAT HE TELL ME

11       THAT REASON. WHEN I -- THEN I TOLD HIM THAT

12       MR. WYATT HAD ALREADY ADMITTED INVOLVEMENT AND

13       SHOWED US WHERE THE KNIFE WAS THROWN. AND AFTER

14       SAYING THIS, MR. SIMMERS APPEARED TO GET

15       INTERESTED, MUCH MORE SO IN THE CONVERSATION, AND I

16       REITERATED THAT I BELIEVED THE EVIDENCE ON THE

17       KNIFE WOULD LINK HIM TO THE KILLING.

18  Q.  WHAT DID HE SAY TO THAT?

19  A.  I AGAIN ALSO SAID THAT I DIDN'T BELIEVE HE ACTED

20       ALONE, AND, QUOTE, YEAH, I DON'T WANT TO GO DOWN

21       FOR THIS ALONE.

22  Q.  ALL RIGHT. HAVING HEARD HIM SAY THAT, DID YOU TAKE

23       ANY FURTHER ACTION?

24  A.  AT THAT TIME, I BELIEVE SERGEANT RUSK CONTINUED TO

25       SPEAK WITH HIM, AND SIMMERS STATED AGAIN THAT'S

1      WHAT HAPPENED -- SAID THAT THE GENTLEMAN HAD

2      ACCOSTED HIM -- MR. GOCHANOUR ACCOSTED HIM.  AND HE

3      SAID THE DUDE SOCKED ME UP IN MY RIBS, AND PAUSED

4      BETWEEN THE WORDS "UP IN MY" AND THEN HE SAID

5      "RIBS" AS IF HE WAS THINKING OF WHERE HE WAS HIT.

6  Q.  AND IN THE INTERIM SERGEANT RUSK -- IN BETWEEN THAT

7      SET OF FACTS, SERGEANT RUSK HAD SUGGESTED TO THE

8      DEFENDANT PERHAPS SOMEBODY HAD ACCOSTED HIM?

9  A.  CORRECT.  RUSK LEFT THE ROOM WHEN SIMMERS HAD ASKED

10     FOR A CIGARETTE, AND RETURNED TO THE ROOM BRIEFLY

11     AND USED THAT ALSO AS AN INTERVIEW THEME,

12     SUGGESTING THIS INDIVIDUAL ON THE TRIAL MAY HAVE

13     ACCOSTED OTHER PEOPLE.

14         ONCE WE -- FROM MY TRAINING AND EXPERIENCE,

15     WHEN YOU PROVIDE A THEME AND THE SUSPECT APPEARS

16     INTERESTED IN THAT THEME, THEN YOU CONTINUE ALONG

17     THAT SAME THEME FOR THE INTERVIEW.

18  Q. DETECTIVE HOPKINS, AT ANY TIME, DID THE DEFENDANT

19     IN ANY WAY MANIFEST THAT HE DIDN'T WANT TO TALK

20     ANYMORE, EITHER VERBALLY OR PHYSICALLY?

21  A.  NO, HE DID NOT.

22  Q.  HE DIDN'T PUT HIS HEAD DOWN, DIDN'T PUSH YOU AWAY?

23  A.  NO.

24  Q.  DID HE EVER ASK FOR AN ATTORNEY?

25  A.  NO, HE DID NOT.

1    Q.    OTHER THAN ASKING FOR A CIGARETTE DID HE ASK FOR A

2          DRINK OF WATER, OR TO TAKE A NAP, OR USE THE

3          BATHROOM?

4               MR. HICKS:   OBJECTION, COMPOUND.   MOVE TO

5          STRIKE.

6               THE COURT:   SUSTAINED.

7               BY MR. MARNER:

8    Q.    DID HE EVER ASK TO USE THE BATHROOM?

9    A.    NO.

10   Q.    DID HE EVER ASK TO TAKE A NAP?

11   A.    NO.

12   Q.    DID HE EVER ASK TO GET UP AND BE ALLOWED TO

13         STRETCH?

14   A.    NO, SIR.

15   Q.    NOW, THEN, I BELIEVE WE LEFT OFF WITH THE STATEMENT

16         WHERE HE SAID, "YEAH, THE DUDE SOCKED ME UP IN THE

17         RIBS."  WHAT HAPPENED AFTER THAT, DETECTIVE?

18   A.    MR. SIMMERS TOLD ME HE PULLED THE KNIFE HE WAS

19         CARRYING IN HIS RIGHT REAR POCKET AREA, AND HE SAID

20         "BACK HERE" AND POINTED TO THE AREA ABOVE HIS RIGHT

21         HIP POCKET.  AND HE SAID HE PULLED THE KNIFE AND

22         USED THE KNIFE TO CUT THE FACE OF THE VICTIM.

23               AND HE SAID THAT AFTER HE CUT THE VICTIM'S

24         FACE, HE REALIZED THAT HE HAD TO FINISH THE JOB,

25         AND DECIDED THAT THE INDIVIDUAL WOULD LIKELY GO TO

1       THE POLICE, AND HE COULD GET INTO, QUOTE, DEEP

2       SHIT.  AND HE STATED HE HAD TO FINISH THE JOB AND

3       DECIDED TO KILL THE INDIVIDUAL.

4   Q.  ALL RIGHT.  AT THAT POINT, DID YOU DECIDE TO

5       TAPE-RECORD A CONFESSION?

6   A.  YES, WE DID.

7   Q.  AND IN THE CHAIN OF EVENTS, WHAT HAPPENED THERE?

8   A.  WE OBTAINED A TAPE-RECORDER -- I DO NOT RECALL IF

9       WE HAD TAKEN ONE INTO THE ROOM INITIALLY WITH US OR

10      NOT.  AT 2242 HOURS, I PREPARED A KING COUNTY

11      DEPARTMENT OF PUBLIC SAFETY MIRANDA FORM.

12  Q.  I AM GOING TO HAND YOU WHAT HAS BEEN MARKED AS

13      STATE'S EXHIBIT NO. 3.

14          MR. HICKS, I WILL BRING IT OVER TO YOU

15      LATER.

16  A.  THIS IS THE FORM I PREPARED.

17  Q.  AND YOU DO RECOGNIZE STATE'S EXHIBIT NO. 3,

18      PRETRIAL EXHIBIT NO. 3?

19  A.  YES, I DO.

20  Q.  IS THAT THE FORM YOU PREPARED?

21  A.  YES, IT IS.

22  Q.  DETECTIVE HOPKINS, I SEE THE NAME "IAN MONROE

23      SIMMERS" PRINTED, AND DETECTIVE HOPKINS PRINTED IT?

24  A.  CORRECT.

25  Q.  AND I SEE A SIGNATURE, MR. SIMMERS'.  DID YOU SEE

1      WHO SIGNED THAT?

2   A.  MR. SIMMERS.

3   Q.  DID HE SIGN THAT?

4   A.  YES.

5   Q.  DID IAN SIMMERS SIGN THE WAIVER OF CONSTITUTIONAL

6       RIGHTS?

7   A.  YES, HE DID.

8   Q.  WHEN YOU WENT THROUGH THIS, DID YOU GO THROUGH THIS

9       ON THE TAPE MACHINE?

10  A.  YES, WE DID.

11  Q.  WE WILL HEAR IT, BUT I TAKE IT YOU READ VERBATIM

12      OFF OF THIS?

13  A.  I MOST CERTAINLY DID.

14  Q.  DETECTIVE, I WILL SHOW YOU WHAT HAS BEEN MARKED AS

15      STATE'S EXHIBIT NO. 4.  DO YOU RECOGNIZE THAT TO BE

16      A COPY OF THE TAPE THAT YOU TOOK OF MR. SIMMERS?

17  A.  YES.  I WILL HAVE TO HEAR IT.  THAT'S THE TYPE OF

18      TAPES WE USE AT THE DEPARTMENT.

19          MR. MARNER:  YOUR HONOR, WITH THE COURT'S

20      PERMISSION, CAN I PLAY THE TAPE?

21          THE COURT:  TO SAVE TIME, I WILL LISTEN TO

22      IT MYSELF.

23          MR. MARNER:  THE STATE WOULD OFFER --

24          MR. HICKS:  WELL, YOUR HONOR, I WANT TO PLAY

25      IT ON THE RECORD.

1    THE COURT:  YOU WANT TO PLAY IT WITH THE

2    TRANSCRIPT?

3    MR. HICKS:  I DON'T CARE ABOUT THE

4    TRANSCRIPT TO IT, BUT I WANT YOU TO HEAR IT ON THE

5    RECORD FOR 3.5 PURPOSES.

6    THE COURT:  I WILL LISTEN THEN.

7    BY MR. MARNER:

8  Q.  DETECTIVE HOPKINS, HANDING YOU STATE'S EXHIBIT NO.

9    5, DO YOU RECOGNIZE THAT?

10 A.  YES, I DO.

11 Q.  WHAT IS THAT?

12 A.  THIS APPEARS TO BE A TRANSCRIBED COPY OF THE TAPE,

13   OF THE INTERVIEW SERGEANT RUSK AND I CONDUCTED.

14 Q.  AND YOU HAVE HAD AN OPPORTUNITY TO REVIEW THIS, AS

15   A MATTER OF FACT MANY TIMES, HAVE YOU NOT?

16 A.  I HAVE.

17 Q.  DOES IT ACCURATELY TRANSCRIBE WHAT WAS HEARD ON THE

18   TAPE?

19 A.  YES.

20 Q.  DOES IT ACCURATELY TRANSCRIBE WHAT WAS SAID IN THAT

21   ROOM BY YOU, DETECTIVE RUSK, AND THE DEFENDANT IAN

22   MONROE SUMMERS?

23 A.  YES.

24    MR. HICKS:  MAY I VOIR DIRE?

25 Q.  NOW THAT WE HAVE PAGE 9, IT ACCURATELY REFLECTS THE

1      INTERVIEW, DOES IT?

2  A.  YES, INITIALLY THE COPY MACHINE DIDN'T COPY PAGE 9.

3           THE COURT:  HOW LONG IS THE TAPE?

4           MS. MAHONEY:  ABOUT 20 MINUTES.

5           THE COURT:  DID YOU HAVE AN OPPORTUNITY TO

6  MAKE A COPY OF THE TRANSCRIPT?

7           WELL, THAT'S OKAY.  I WILL USE THE ORIGINAL.

8           MR. HICKS:  MAY I APPROACH SO I CAN HEAR THE

9  TAPE?

10          (TAPE PLAYING.)

11          MR. HICKS:  YOUR HONOR, I DON'T THINK YOU

12  ARE HEARING ALL OF THIS.

13          THE COURT:  YES, I AM.  AS FAR AS I AM

14  CONCERNED, WE ARE PLAYING IT TWICE:  ONCE FOR THE

15  RECORD AND ANOTHER TIME WHEN I WILL LISTEN TO IT

16  TONIGHT.

17          MR. HICKS:  OKAY.

18          THE COURT:  CAN YOU STOP IT FOR A MINUTE?

19          OKAY.  PUSH THE BUTTON AGAIN.

20          (TAPE STOPPED AT 5 MINUTES AFTER 4:00.

21          THE COURT:  YOU ARE REWINDING IT?

22          MR. MARNER:  I AM.

23          THE COURT:  WE WILL RECESS FOR THE DAY.

24          I DO WANT TO SHOW COUNSEL A HARDSHIP

25  QUESTIONNAIRE SO MS. FLIGELTAUB CAN PREPARE IT.

1        AND WE WILL RESUME TOMORROW MORNING WITH DETECTIVE

2    HOPKIN'S TESTIMONY.

3                                          (RECESS.)

1       IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

2              IN AND FOR KING COUNTY

3   _____

4   STATE OF WASHINGTON,     )
                          )

5           PLAINTIFF,    )     KING COUNTY CAUSE
                          )     NO. 95-1-02102-2

6         VS.          )
                          )     COURT OF APPEALS

7   IAN MONROE SIMMERS,      )     38620-4-I
                          )

8         DEFENDANT.    )
                          )

9   _____

10

11

12           VERBATIM REPORT OF PROCEEDINGS
                MARCH 12 & 13, 1996

13

14   - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
       BEFORE THE HONORABLE ANN SCHINDLER AND A JURY

15

16

17   APPEARANCES:

18   FOR THE PLAINTIFF:       SUSAN L. MAHONEY AND
                          JAMES MARNER,

19                       DEPUTY PROSECUTING ATTORNEYS
                       KING COUNTY COURTHOUSE

20                       SEATTLE, WASHINGTON 98104

21   FOR THE DEFENDANT:       JOHN TAYLOR HICKS, ESQ.

22

23
   JANE LAMERLE, C.S.R.

24

25

1            **W I T N E S S    I N D E X**

2                        DE          CE          RD          RC

3    PRETRIAL WITNESSES:

4    DET. EDWARD HOPKINS          3           7          20          28

5    OFF. MICHAEL JANASZ         31          38

6    DONNA L. BERUBE             40          47          49          51

7    BRIAN MICHAEL BERUBE        53          58          64

8    STEVEN JOHN CARRIER         65

9    DAVID ARTHUR BERUBE         75          80          83

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# E X H I B I T    I N D E X

| EXHIBIT NO. | EVID. |
|---|---|
| EXHIBIT NO. 6 | 16 |
| EXHIBIT NO. 8 | 38 |

1                    MORNING SESSION

2                                    MARCH 12, 1996

3                         (THE FOLLOWING PROCEEDINGS WERE
                          HELD OURSIDE THE PRESENCE OF
4                         THE JURY.)

5          THE COURT:  GOOD MORNING.  PLEASE BE SEATED.

6          MR. HICKS:  YOUR HONOR, THERE IS A WITNESS

7    MENTIONED IN THE STATE'S DISCOVERY I WILL CALL IF

8    ALLOWED.  AND THAT IS RICHARD SHERMAN, WHO IS THE

9    BLOOD HANDLER WHO WAS USED BY THE POLICE TO

10   INVESTIGATE THIS GUY THAT WAS MESSING AROUND ON THE

11   TRAIL AT THE CRIME SCENE.  AND HE BASICALLY WENT TO

12   THE SCENE AFTER GETTING THE SAMPLE FROM THIS

13   INDIVIDUAL.

14          THE OTHER PERSON IS DARRYL CLOUD, AND I MAY

15   CALL HIM -- I DON'T KNOW.  MR. CLOUD WAS IN THE

16   CELL ADJOINING THE SNITCH AND MR. SIMMERS, AND THAT

17   WOULD BE TO REBUT ANY CLAIM OF OBVIOUS CONFESSION

18   BY MR. SIMMERS.

19          THANK YOU.

20          MS. MAHONEY:  YOUR HONOR, OBVIOUSLY, WE

21   WOULD LIKE TO KNOW ON THAT AS SOON AS POSSIBLE,

22   BECAUSE CLEARLY WE WILL HAVE TO TALK TO THE

23   ATTORNEY, AND WE'RE ENTITLED TO INTERVIEW HIM.

24          AND THERE IS ALSO SOMEONE ON THE OTHER SIDE

25   OF THE CELL WE ARE AWARE OF, AS WELL, AND IT COULD

1    MAKE A BIG DIFFERENCE, AND THE SOONER WE KNOW THAT

2    THE BETTER.

3          MR. HICKS:  WHO WAS ON THE OTHER SIDE?

4          MS. MAHONEY:  KEN WHITE.

5          MR. HICKS:  THANK YOU.

6          MR. MARNER:  YOUR HONOR, MAY I PROCEED WITH

7    QUESTIONING OF DETECTIVE HOPKINS?

8          THE COURT:  YOU MAY.

9    EDWARD HOPKINS,              HAVING BEEN DULY SWORN,
                                  WAS EXAMINED AND TESTIFIED
10                                AS FOLLOWS:

11                    DIRECT EXAMINATION

12         MR. MARNER:  GOOD MORNING, DETECTIVE.  YOU

13   REALIZE YOU ARE STILL UNDER OATH.

14         THE WITNESS:  YES, SIR.

15   Q.  WHEN WE LEFT OFF YESTERDAY, I BELIEVE WE CONCLUDED

16   BY PLAYING THE TAPE.  AND I ASK YOU NOW, DOES THAT

17   TAPE ACCURATELY -- IS THAT AN ACCURATE RECORD?

18   A.  YES, IT IS.

19         MR. MARNER:  YOUR HONOR, I'M NOT SURE BUT AT

20   THIS TIME THE STATE WOULD OFFER NO. 4, THE TAPE,

21   AND EXHIBIT NO. 5, FOR PRETRIAL PURPOSES.

22         MR. HICKS:  NO OBJECTION.

23         THE COURT:  I THINK THEY WERE ADMITTED BUT

24   IF THEY WERE NOT, THEY ARE.

25         MR. MARNER:

1   Q.   DETECTIVE HOPKINS, AT ONE PART DURING THE TAPE, IT

2        SOUNDS LIKE A DEMONSTRATION WAS DONE.   CAN YOU

3        DESCRIBE THAT DEMONSTRATION?

4   A.   YES.   AT ONE POINT, I BELIEVE SERGEANT RUSK ASKED

5        ME TO STAND AND IAN TO STAND.   WE WERE TRYING TO

6        GET AN APPROXIMATE HEIGHT OF THE INDIVIDUAL, THE

7        HEIGHT OF THE INDIVIDUAL MR. SIMMERS HAD CONTACT

8        WITH ON THE TRAIL.   AND MR. SIMMERS REFERRED TO HIM

9        AS A COUPLE OF INCHES SHORTER THAN ME.

10            MR. HICKS:   EXCUSE ME, FOR CLARITY, "ME"

11       MEANING WHO?

12            THE WITNESS:   ME, DETECTIVE HOPKINS.   DURING

13       THE INTERVIEW WITH MR. SIMMERS, I ASKED HIM TO --

14       SINCE THE SERGEANT DIDN'T KNOW WHAT HAD OCCURRED OR

15       HOW THE VICTIM HAD BEEN STABBED, I ASKED HIM TO

16       SHOW, DEMONSTRATE ON ME HOW THAT WAS DONE.   THAT

17       WAS DONE ONCE DURING THE INITIAL INTERVIEW AND THEN

18       I BELIEVE WE DEMONSTRATED IT DURING THE TAPE

19       PORTION.

20            BY MR. MARNER:

21  Q.   OKAY.   SO IT WAS DONE TWICE?

22  A.   YES.

23  Q.   IN THOSE DEMONSTRATIONS, EITHER/OR, ACTUALLY IN THE

24       FIRST ONE, DID THE DEFENDANT ACTUALLY MAKE CONTACT

25       WITH YOUR BACK?

1    A.   DURING THE DEMONSTRATION?  WOULD YOU LIKE ME TO

2         STAND AND I CAN SHOW YOU.

3    Q.   YES.

4    A.   DURING THAT -- IF YOU WILL STAND LIKE THIS.  DURING

5         THE INTERVIEW, I ASKED HIM TO SHOW ME WHAT HAD

6         OCCURRED.  AND HE SAID THAT AFTER THE GUY HIT HIM,

7         HE SAID HE REACHED BACK AND GRABBED UP ON THE KNIFE

8         AND CAME ACROSS AND CUT THE INDIVIDUAL ABOUT HIS

9         FACE AND CHEEK, WHICH WOULD HAVE BEEN THE LEFT SIDE

10        OF THE VICTIM.  AND HE SAID THEN THE GUY SWIVELLED

11        ON HIS RIGHT FOOT, AND HE GRABBED HIM ON THE

12        SHOULDER AND SHANKED HIM UP AND ABOUT -- I BELIEVE

13        HE SAID ABOUT SIX TIMES.

14   Q.   WHEN YOU DID THAT DEMONSTRATION, YOU ACTUALLY MADE

15        PHYSICAL CONTACT WITH ME.  DID THE DEFENDANT DO

16        THAT WITH YOU?

17   A.   HE DID.  AND THE LOCATIONS HE CONTACTED ON MY BACK

18        WERE CONSISTENT WITH THE LOCATIONS I HAD OBSERVED

19        INJURY TO THE VICTIM DURING THE AUTOPSY.

20   Q.   THANK YOU, DETECTIVE HOPKINS.  LET'S BACK UP A

21        LITTLE BIT AND GIVE THE JUDGE A CLEAR PICTURE OF

22        THE TIME LINE.  WHAT TIME, IN YOUR RECOLLECTION,

23        DID WYATT'S ATTORNEY LEAVE THE PRECINCT?

24   A.   I REVIEWED THAT FURTHER OVERNIGHT, AND HIS ATTORNEY

25        LEFT, I BELIEVE, AFTER 8:00 P.M.

1    Q.  ALL RIGHT.  AND WHAT DID YOU DO AT THAT POINT?

2    A.  THAT WAS WHEN THE INVESTIGATORS ASSEMBLED AND

3        DISCUSSED THE CASE FURTHER.  AFTER DOING THAT, I

4        WAS INTRODUCED TO JON WYATT.

5            AND I DIDN'T ASK HIM ANY QUESTIONS.  I WENT

6        IN AND TOLD HIM -- I COMMENDED HIM FOR WANTING TO

7        DO THE RIGHT THING.  AND IT WAS AT THAT TIME WE

8        ASKED THEM WHAT THEY WANTED FOR DINNER, AND WE WENT

9        OVER TO MCDONALD'S.

10   Q.  AND THAT WAS IN BETWEEN, SAY, A LITTLE BIT AFTER

11       8:00, THE TIME WHEN MS. BENNETT-BERTRAND LEFT, AND

12       THE CONFESSION?

13   A.  CORRECT.

14   Q.  HOW FAR IS MCDONALD'S?

15   A.  ACROSS THE STREET AND DOWN A BLOCK.

16   Q.  DID YOU WALK?

17   A.  YES, WE ALWAYS WALKED.

18   Q.  AND IN THAT INTERIM, THAT'S WHERE YOU WERE?

19   A.  CORRECT.

20   Q.  UPON YOUR ARRIVAL BACK AT THE PRECINCT, THAT'S WHEN

21       YOU STARTED THE INTERVIEW THAT WE SPOKE OF AT

22       LENGTH YESTERDAY?

23   A.  YES.  ACTUALLY, WE PROVIDED THE FOOD TO THE

24       INDIVIDUALS, AND A FEW MINUTES LATER WE BEGAN THE

25       INTERVIEW.

7

```
 1   Q.  AND THEY WERE DONE EATING BY THE TIME YOU SPOKE TO

 2       MR. SIMMERS?

 3   A.  I BELIEVE THEY WERE.  I THINK MR. SIMMERS STILL HAD

 4       HIS BEVERAGE, I THINK.  I'M NOT SURE.

 5           MR. MARNER:  I BELIEVE THAT'S ALL I HAVE AT

 6       THIS TIME.  THANK YOU, DETECTIVE.

 7           THE COURT:  ALL RIGHT.  MR. HICKS?

 8                   CROSS-EXAMINATION

 9           MR. HICKS:  THANK YOU.

10   Q.  GOOD MORNING, DETECTIVE.

11   A.  GOOD MORNING, SIR.

12   Q.  DETECTIVE, IS THIS ACTUALLY YOUR FIRST MURDER

13       TRIAL?

14   A.  YES, IT IS.

15   Q.  ALL RIGHT.  AND YOUR PREVIOUS EXPERIENCE WITH

16       HOMICIDE WAS ONE DRUG OVERDOSE AND ONE ATTEMPTED

17       MURDER; IS THAT CORRECT?

18   A.  I WAS INVOLVED IN A KIRKLAND HOMICIDE, CONTACTING

19       AND ARRESTING THE SUSPECT, BUT NOT ANY BOTHELL

20       CASES.

21   Q.  WAS THE SUSPECT DEEMED -- I'M SORRY, WAS THE CASE

22       DEEMED A HOMICIDE?

23   A.  YES.

24   Q.  AND WAS THE PERSON WHO DIED, WAS THAT FROM THE DRUG

25       OVERDOSE?
```

1  A.  NO.  ACTUALLY, THAT WAS A STRANGULATION AND SEXUAL

2      ASSAULT.

3  Q.  AND, BASICALLY, WOULD IT BE FAIR TO SAY THAT

4      MR. SIMMERS, FROM YOUR OBSERVATIONS, ENJOYED

5      BRAGGING AND BUILDING HIMSELF UP, GIVEN CERTAIN

6      THINGS HE SAID?

7  A.  NO, I WOULDN'T SAY THAT HE ENJOYED BRAGGING, PER

8      SE.  HE INITIALLY WAS DENYING INVOLVEMENT WITH

9      THIS.

10 Q.  I'M TALKING ABOUT WHEN HE DID TALK?

11 A.  WHEN HE DID -- IN MY OPINION, IF I MAY, WHEN HE

12     BEGAN TO SPEAK ABOUT HIS INVOLVEMENT IN THIS, HE

13     DIDN'T HIDE ANYTHING AT THAT POINT.  HE DIDN'T --

14     LET ME REPHRASE THAT:  HE DIDN'T APPEAR SHY ABOUT

15     TALKING ABOUT IT, BUT HE DIDN'T APPEAR TO ADD TO

16     IT.

17 Q.  ALL RIGHT.  WELL, I TAKE IT YOU DID SOMETHING TO

18     LOOK INTO THESE 13 GANGSTERS HE SAID HE KILLED?

19 A.  NO, WE DID NOT.

20 Q.  WOULD YOU AGREE WITH ME THAT IS, IN ALL LIKELIHOOD,

21     AN OVERSTATEMENT AT BEST?

22 A.  I WOULD.

23 Q.  THANK YOU.  NOW, AS I UNDERSTAND IT, ONE OF THE

24     THINGS YOU TOLD MR. SIMMERS WAS YOU UNDERSTOOD HE

25     HAD NO DESIRE TO KILL A CIVILIAN BUT THAT EVIDENCE

```
 1        WOULD LINK HIM, AND BASICALLY YOU WANTED TO GIVE

 2        HIM A CHANCE TO RESPOND SO PEOPLE WOULDN'T THINK HE

 3        WOULD KILL SOMEONE FOR NO REASON.  IS THAT KIND OF

 4        A FAIR SYNOPSIS OR THEME YOU TOOK?

 5   A.   THE THEME WE TOOK WAS, YES, TO GIVE HIM A SORT OF A

 6        SELF-DEFENSE THEME, TO GET HIM TO START TALKING

 7        ABOUT THIS.

 8   Q.   AND THAT IS ALLOWABLE POLICE PROCEDURE, I TAKE IT,

 9        USING DECEPTION TO BASICALLY INTERROGATE SOMEONE

10        YOU FEEL IS BEING DECEPTIVE?

11   A.   CORRECT.

12   Q.   OKAY.  AND YOU ALSO STATED THAT YOU DIDN'T THINK HE

13        NECESSARILY ACTED ALONE; IS THAT CORRECT?

14   A.   IT WAS ONE OF THE THEMES THAT I HAD USED, CORRECT.

15   Q.   AND THERE WERE A VARIETY OF THESE THEMES; WOULD

16        THAT BE FAIR?

17   A.   CENTERED AROUND THE SAME TOPIC, BUT YES.

18   Q.   AND BASICALLY YOU HAD NO BASIS TO AT LEAST BELIEVE

19        ON YOUR ON THAT HE ACTED IN CONCERT WITH ANYBODY,

20        DID YOU?

21   A.   I HAD NO EVIDENCE THAT WOULD INDICATE THERE WAS

22        MORE THAN ONE ASSAILANT.

23   Q.   AND THAT IS EVEN THOUGH MR. WYATT, BY YOUR OWN

24        CHARACTERIZATION, WAS EXTREMELY NERVOUS AND GUILT-

25        RIDDEN, AND YOU FINALLY MANAGED TO ENCOURAGE HIM TO
```

1       DO THE RIGHT THING?  WOULD THAT BE CORRECT?

2    A.  THAT WOULD BE CORRECT.

3    Q.  YOU ALSO TOLD MR. SIMMERS THAT EVIDENCE ON THE

4       KNIFE, PRESUMABLY SOME FIBER OR SOMETHING, WOULD

5       LINK HIM --

6    A.  I SAID IT WOULD LIKELY LINK HIM.

7    Q.  YOU HAD NO KNOWLEDGE, DID YOU, THAT ANY EVIDENCE ON

8       THE KNIFE WOULD LINK MR. SIMMERS?

9    A.  NO, I DID NOT.

10   Q.  AND I GUESS IT WAS SERGEANT RUSK THAT STATED HE'D

11      HEARD RUMORS OF THE VICTIM ACCOSTING OTHERS ON THE

12      TRIAL, AND SO MR. SIMMERS WAS BASICALLY ASKED IF HE

13      WAS DEFENDING HIMSELF; IS THAT CORRECT?

14   A.  YES.

15   Q.  ALL RIGHT.  AND, AGAIN, THERE WERE NO SUCH RUMORS?

16   A.  THERE WERE NOT.

17   Q.  THERE WERE NOT.  ALL RIGHT.  AND ISN'T THAT WHAT

18      PROMPTED MR. SIMMERS THEN TO SAY THAT MR. GOCHANOUR

19      HIT HIM IN THE RIBS CAUSING MR. SIMMERS TO GO FOR

20      HIS KNIFE; IS THAT CORRECT?

21   A.  IT WAS THAT STATEMENT THAT ALLOWED HIM TO OPEN UP

22      AND BEGIN SPEAKING FREELY ABOUT THE INCIDENT, YES.

23   Q.  AND BY SPEAKING FREELY, YOU MEAN CONFESSING TO THE

24      CRIME?

25   A.  RIGHT.

1   Q.   ACCURATELY AND FULLY CONFESSING TO THE CRIME?

2   A.   CORRECT.

3   Q.   AND YOU KNOW THE MURDER WEAPON, FROM HAVING

4        RETRIEVED IT, IS A DOUBLE-PRONGED, SERRATED-BLADE,

5        GINSU-TYPE KNIFE; IS THAT CORRECT?

6   A.   YES, I DO.

7   Q.   BY THE WAY, THE BLADE IS APPROXIMATELY 12 INCHES

8        LONG, IS IT NOT, THE BLADE, 10 TO 12 INCHES?

9   A.   8 TO 10, APPROXIMATELY 10 -- IN THAT AREA.

10  Q.   ALL RIGHT.  MR. SIMMERS DESCRIBED A KNIFE WITH A

11       SINGLE POINT, DIDN'T HE?

12  A.   HE DID.

13  Q.   AND HE ALSO DESCRIBED A BLADE THAT WAS

14       APPROXIMATELY FOUR OR FIVE INCHES LONG, DIDN'T HE?

15  A.   IF I CAN READ FROM MY NOTES?

16  A.   YES, HE DID.

17  Q.   AND HE ALSO STATED THE CRIME OCCURRED ON A

18       SATURDAY; ISN'T THAT CORRECT?

19  A.   THAT'S CORRECT.

20  Q.   AND THE ACTUAL DATE OF THE HOMICIDE WAS FRIDAY; WAS

21       IT NOT?

22  A.   THAT IS ALSO CORRECT.

23  Q.   AND YOU ARE STILL SATISFIED THAT HE GAVE A FULL

24       ACCURATE ACCOUNTING OF WHAT HAPPENED?

25  A.   I BELIEVE HE GAVE AN ACCURATE ACCOUNTING OF HOW HE

1      STABBED THE INDIVIDUAL, AND THE OTHER PERIPHERAL

2      INFORMATION WAS NOT SPECIFIC.  I MEAN, THE DATE OF

3      THE HOMICIDE WAS OBVIOUSLY ON A FRIDAY -- FRIDAY

4      NIGHT, SATURDAY MORNING -- AND HIS CLAIM IT WAS

5      SATURDAY NIGHT COULD BE ATTRIBUTED TO THE FACT HE

6      WAS ON THE STREET AND UNAWARE --

7   Q. YOU ARE AWARE THAT MR. SIMMERS CLAIMS HE TOOK A

8      KNIFE ON SATURDAY NIGHT FROM THE CABANA; IS THAT

9      CORRECT?

10  A. HE CLAIMED THIS INCIDENT, INCLUDING THAT, OCCURRED

11     ON SATURDAY.

12  Q. AND SO YOUR ANSWER IS YES?

13  A. YES.

14  Q. AND I BELIEVE ON PAGES 3 TO 4 OF YOUR NARRATIVE,

15     YOU DO DESCRIBE THAT MR. SIMMERS SUFFERED FROM

16     CONFUSION ABOUT THE DATE; ISN'T THAT CORRECT?

17  A. I BELIEVE I DID SAY THAT.

18  Q. YES.  AND THAT IS BASED ON THE FACT THAT IT IS

19     OBVIOUSLY THE WRONG DATE; IS THAT CORRECT?

20  A. CORRECT.

21  Q. AND SO HE GAVE A STATEMENT AND YOU KNEW HE DID IT

22     BASED ON HIS DESCRIPTIONS, BUT CERTAIN THINGS WERE

23     NOT CORRECT; WOULD THAT BE FAIR?

24  A. CERTAIN THINGS WERE NOT SPECIFIC, CORRECT.

25  Q. NOW, YOU ARE DESCRIBING CONFUSION REGARDING

1       FORGETTING WHAT DAY IT ACTUALLY OCCURRED, IN YOUR

2       MIND?

3  A.  OKAY.

4  Q.  WELL, IS THAT FAIR?

5  A.  YES, THAT'S FAIR.

6  Q.  AND I TAKE IT YOU ARE ALSO SAYING HE WAS CONFUSED

7       AS TO THE LENGTH OF THE KNIFE?

8  A.  WHETHER HE WAS CONFUSED OR -- I CAN'T SPECULATE

9       WHAT WAS IN HIS MIND, WHETHER HE WAS CONFUSED OR

10      WAS JUST CHOOSING NOT TO GIVE AN ACCURATE

11      DESCRIPTION.

12          HE DID DESCRIBE THE SERRATED BLADE BEING

13      CONSISTENT WITH THE KNIFE THAT WAS FOUND, AND THE

14      BLACK HANDLE. AND AS FAR AS THE DESCRIPTION OF THE

15      BLADE ITSELF, IT COULD BE THAT WAS AN EFFORT AT

16      DECEPTION ON HIS PART. IT WAS ONE WE CHOSE NOT TO

17      GO BACK AND CONTINUE WITH.

18  Q.  AS LONG AS WE MENTION THE SERRATIONS, DO YOU HAVE A

19      COPY OF THE DRAWING HE MADE OF THE KNIFE?

20  A.  I DO.

21  Q.  COULD YOU PRODUCE IT?

22          THE COURT: IT IS AN EXHIBIT ON BACK OF AN

23      EXHIBIT, MR. HICKS.

24          THE WITNESS: THE STATEMENT FORM.

25          THE COURT: THE DRAWING IS ON THE BACK OF

1    THE EXPLANATION OF RIGHTS.

2        THE WITNESS:  THE ORIGINAL OF THE RIGHTS

3    FORM.

4        THE COURT:  WELL, THERE AREN'T MANY

5    EXHIBITS, TURN THAT ONE OVER -- THERE YOU GO.  TURN

6    IT ALL THE WAY OVER.

7        MR. HICKS:  ALL RIGHT.

8        THE COURT:  BECAUSE OF YOUR CONCERN ABOUT

9    THE INTERRUPTION YESTERDAY WITH THE TAPE, I WENT

10    BACK THROUGH THE TAPE LAST NIGHT AND WENT THROUGH

11    THE EXHIBITS.  AND THAT'S THE REASON I KNOW.

12        BY MR. HICKS:

13  Q.  NOW, THIS IS A LONG SHOT.  DO WE HAVE THE KNIFE?

14  A.  THE KNIFE IS NOT WITH US; IT'S AT THE LABORATORY

15    TODAY.

16  Q.  OR PHOTOGRAPHS OF THE KNIFE?

17  A.  NO.

18        THE COURT:  I THINK EVERYBODY AGREES, IT

19    DOESN'T LOOK LIKE THE DRAWING.

20        BY MR. HICKS:

21  Q.  REGARDING THOSE SERRATIONS, HANDING YOU WHAT HAS

22    BEEN MARKED AS STATE'S EXHIBIT NO. 3 FOR PRETRIAL,

23    ON THE BACK, IS THERE A PICTURE OF THE KNIFE?

24  A.  YES, THERE IS.

25  Q.  DRAWING YOUR ATTENTION TO THIS, PLEASE, THESE

15

1    SERRATIONS HE DRAWS ARE LITTLE STRAIGHT LINES; IS

2    THAT CORRECT?

3  A.  WELL, AT THAT TIME HE ILLUSTRATED SERRATIONS.  HE

4    DESCRIBED THEM IN HIS NARRATIVE.

5  Q.  ON THIS PICTURE, THEY ARE A STRAIGHT LINE; IS THAT

6    CORRECT?

7  A.  ON THE PICTURE.

8  Q.  HE DREW LITTLE LINES TO ILLUSTRATE THE SERRATIONS?

9  A.  YES, I WOULD AGREE.

10  Q.  AND THE ACTUAL EDGE OF THE BLADE IS STRAIGHT, ISN'T

11    IT, THAT HE DRAWS?

12  A.  WHEN YOU SAY STRAIGHT --

13  Q.  I MEAN, THE EDGE OF THE BLADE IS STRAIGHT AS

14    OPPOSED TO HAVING INDENTATIONS ON THE EDGE OF THE

15    BLADE ITSELF?

16  A.  HE DID NOT DRAW INDENTATIONS, NO.

17  Q.  ALL RIGHT.  WELL, DETECTIVES HOPKINS, YOU WILL SEE

18    WHY THE NUNS DIDN'T LET ME DRAW IN SIXTH GRADE.

19          COULD YOU MARK THIS AS AN EXHIBIT?

20          THE CLERK:  DEFENDANT'S EXHIBIT 6 IS MARKED

21    FOR IDENTIFICATION.

22                  (DEFENDANT'S EXHIBIT NO. 6
                  MARKED FOR IDENTIFICATION.)
23

24          BY MR. HICKS:

25  Q.  DETECTIVE HOPKINS, YOU HAVE SEEN THE ALLEGED MURDER

1      WEAPON; HAVE YOU NOT?

2  A.   I HAVE.

3  Q.   ALL RIGHT.  DOESN'T THE BLADE INVOLVE INDENTATIONS

4      OF THE BLADE ITSELF, THE EDGE OF THE BLADE, IN A

5      SERIES OF CURVES ON THE EDGE OF THE BLADE, AS I

6      HAVE ILLUSTRATED, ROUGHLY?

7  A.   THAT IS A MORE ACCURATE DRAWING OF THE ACTUAL

8      BLADE, IN MY OPINION, YES.

9          MR. HICKS:  MOVE FOR ADMISSION OF EXHIBIT 6.

10          MR. MARNER:  YOUR HONOR, I OBJECT.  THIS HAS

11      NOTHING TO DO WITH THE ADMISSIBILITY OF THE

12      STATEMENTS.  THIS APPEARS TO ME ANYWAY TO BE AN

13      ATTEMPT TO PERHAPS HAVE A LITTLE BIT OF AMMUNITION

14      AGAINST DETECTIVE HOPKINS ON CROSS, AND IT IS

15      IRRELEVANT.

16          THE COURT:  THE OBJECTION IS OVERRULED.

17      ADMITTED FOR PURPOSES OF PRETRIAL AND THIS HEARING

18      ONLY.  THAT EXHIBIT IS NOT IN EVIDENCE FOR PURPOSES

19      OF THE TRIAL, AT THIS TIME.

20              (DEFENDANT'S EXHIBIT NO. 6
              ADMITTED IN EVIDENCE.)
21

22          MR. HICKS:  THANK YOU, YOUR HONOR.

23  Q.   TO THE BEST OF YOUR KNOWLEDGE, HAD MR. SIMMERS

24      EATEN AT THE TIME, PREVIOUS TO YOUR GETTING HIM THE

25      FOOD FROM MCDONALD'S?

1   A.   I WAS UNAWARE IF HE HAD EATEN PRIOR TO THAT.

2   Q.   HOW WAS IT YOU CAME TO BUY HIM FOOD IF YOU DIDN'T

3       KNOW WHETHER HE HAD PREVIOUSLY EATEN OR NOT?

4   A.   THE KING COUNTY DETECTIVES ADVISED THEY HAD BEEN

5       THERE FOR SOME TIME.

6   Q.   HOW LONG?

7   A.   I DIDN'T ASK SPECIFICALLY HOW LONG THEY WERE THERE,

8       NOR WAS I TOLD.  WE WERE GOING OVER TO EAT AND WE

9       THOUGHT IT RIGHT WE BRING SOMETHING BACK FOR THE

10      TWO DEFENDANTS AS THEY HAD BEEN IN CUSTODY FOR SOME

11      TIME.  HOWEVER LONG THAT WAS, IT SEEMED LIKE THE

12      APPROPRIATE THING TO DO?

13   Q.   THE TRANSCRIBED INTERVIEW BEGIN AT 10:40 P.M.; IS

14      THAT CORRECT?

15   A.   THAT'S CORRECT.

16   Q.   DO YOU HAVE ANY IDEA OR DID YOU ASCERTAIN HOW LONG

17      MR. SIMMERS HAD BEEN IN CUSTODY AT THE TIME THE

18      TRANSCRIBED INTERVIEW TOOK PLACE?

19   A.   I DID NOT.

20   Q.   AND YOU NEVER TRIED TO GET AHOLD OF MR. SIMMERS'

21      PARENTS; IS THAT CORRECT?

22   A.   THAT'S ALSO CORRECT.  I PERSONALLY DID NOT.

23   Q.   AND YOU FIRST MET MR. SIMMERS AT AROUND 9:00 P.M.

24   A.   YEAH, I BELIEVE IT MIGHT HAVE BEEN EVEN AFTER THAT.

25      MIGHT HAVE BEEN CLOSER TO 9:30, BUT PRIOR TO THE

```
 1        BEGINNING OF THE TAPED STATEMENT, WE BEGAN THE

 2        NONRECORDED PORTION OF THE INTERVIEW.  AND THAT WAS

 3        THE FIRST TIME I HAD EVER MET HIM.

 4   Q.   NOW, AS I UNDERSTAND IT, SERGEANT HOPKINS DIDN'T

 5        WASTE ANY TIME WITH FORMAL SOCIAL AMENITIES?  HE

 6        SAID RIGHT OFF THE BAT, QUOTE, WE KNOW YOU ARE

 7        INVOLVED IN THE HOMICIDE.  IS THAT ESSENTIALLY

 8        ACCURATE?

 9   A.   THAT IS THE STRATEGY THAT HE ELECTED TO USE FOR THE

10        INTERVIEW.

11   Q.   THAT'S FINE, BUT IS MY STATEMENT CORRECT?

12   A.   THAT WE DIDN'T SPEND A LOT OF TIME SOCIALIZING WITH

13        MR. SIMMERS?

14   Q.   THAT RUSK SAID WE KNOW -- QUOTE, WE KNOW YOU ARE

15        INVOLVED IN THE HOMICIDE, END QUOTE?

16   A.   SOMETHING TO THAT EFFECT.

17   Q.   ALL RIGHT.  COULD YOU REFER TO YOUR INTERVIEW ON

18        PAGE 4, PLEASE, OR EXCUSE ME, STRIKE THAT.  THAT

19        WAS MY ERROR, DETECTIVE, I'M SORRY.

20             THE COURT:  IS THAT IN THE TRANSCRIPT YOU

21        ARE REFERRING TO?

22             MR. HICKS:  NO, THAT WAS MY ERROR.  IT WAS

23        IN THE DEFENSE INTERVIEW.  I'M SORRY, THAT'S WRONG.

24             THE COURT:  OKAY.

25             BY MS. HICKS:
```

1  Q.  AND YOU YOURSELF TOLD IAN THAT YOU DIDN'T BELIEVE

2      HIM WHEN HE DENIED THE CRIME; IS THAT CORRECT?

3  A.  YES, I DID.

4  Q.  ONE OF THE THINGS YOU SAID TO MR. SIMMERS WAS:

5      "WOULD A CIGARETTE MAKE YOU REMEMBER MORE"; IS THAT

6      RIGHT?

7  A.  YES.  MR. SIMMERS SAID HE WAS HAVING TROUBLE

8      REMEMBERING WHAT HAD OCCURRED, AND HAD ASKED FOR A

9      CIGARETTE.  AND RUSK, I BELIEVE, GOT UP TO GET HIM

10     A CIGARETTE, AND I ASKED HIM IF THAT WOULD HELP HIM

11     REMEMBER IT ALL, YES.

12 Q.  WAS HE GIVEN A CIGARETTE?

13 A.  NO, HE WAS NOT.

14 Q.  AND, ALSO, YOU TOLD HIM THAT MR. WYATT BASICALLY

15     ADMITTED, NOT HIS INVOLVEMENT IN THE CRIME BUT YOU

16     TOLD HIM THAT MR. WYATT ADMITTED MR. SIMMERS' ROLE

17     IN THE CRIME, AND THAT THE KNIFE HAD BEEN THROWN BY

18     MR. SIMMERS AFTER THE CRIME; IS THAT ACCURATE?

19 A.  YES, I DID.

20 Q.  AND WE ALSO -- WE COVERED THAT, BUT TO BRING IT

21     INTO CONTEXT, ONE OF THE THINGS YOU TOLD HIM WAS

22     THAT YOU FELT PHYSICAL EVIDENCE OF THE CRIME ITSELF

23     WOULD LINK MR. SIMMERS TO THE CRIME?

24 A.  WOULD LIKELY LINK, CORRECT.

25 Q.  AND, BASICALLY, YOU ALSO KIND OF CHANGED THINGS AT

1    ONE POINT, DID YOU NOT, AND INDICATED MR. SIMMERS'

2    COOPERATION WOULD NAIL THE OTHER PERSON INVOLVED?

3    IN OTHER WORDS, MR. SIMMERS DID NOT NEED TO GO DOWN

4    ALONE.  WASN'T THAT ANOTHER THEME YOU TOOK?

5    A.  IT HAS BEEN MY EXPERIENCE IN INTERVIEWING

6    DEFENDANTS, OR SUSPECTS IN CRIMES, THAT IF THEY ARE

7    ALLOWED TO HAVE A SECOND PARTY INVOLVED WITH THEM,

8    IT IS EASIER FOR THEM TO CONFESS.

9    Q.  YOUR ANSWER IS "YES" THEN, YOU USED THAT THEME?

10   A.  ONE OF THE THEMES I USED, YES.

11   Q.  HOW MANY THEMES DID YOU USE TOTAL IN THIS INTER-

12   ROGATION?

13   A.  I DIDN'T COUNT THEM.

14   Q.  QUITE A FEW THOUGH, WEREN'T THERE?

15   A.  CERTAINLY.

16        MR. HICKS:  THAT'S ALL I HAVE FOR NOW, YOUR

17   HONOR.

18        THE COURT:  THANK YOU.

19        MR. MARNER?

20             REDIRECT EXAMINATION

21        BY MR. MARNER:

22   Q.  DETECTIVE HOPKINS, MR. HICKS ASKED YOU ABOUT SOME,

23   I GUESS, NONCORROBORATED STATEMENTS THAT THE

24   DEFENDANT MADE; IS THAT CORRECT?

25   A.  THAT'S CORRECT.

1    Q.  HE ASKED YOU ABOUT THE SATURDAY NIGHT VS. FRIDAY

2        NIGHT?

3    A.  THAT'S CORRECT.

4    Q.  AND HE ASKED YOU ABOUT THE DOUBLE-PRONG VS.

5        SINGLE-PRONG KNIFE?

6    A.  YES.

7    Q.  AND EVEN DREW YOU A PICTURE OF THE SERRATIONS, DID

8        HE?

9    A.  YES, HE DID.

10   Q.  HOWEVER, YOU FOUND THAT DURING YOUR INTERVIEW,

11       MR. SIMMERS --

12            MR. HICKS:  I'M GOING TO OBJECT TO THE

13       LEADING TONE OF THE QUESTION.

14            THE COURT:  SUSTAINED.

15            BY MR. MARNER:

16   Q.  DID YOU FIND DURING YOUR INTERVIEW THAT MR. SIMMERS

17       PROVIDED QUITE A BIT OF CORROBORATED STATEMENTS?

18   A.  YES.

19            MR. HICKS:  OBJECTION.  MOVE TO STRIKE THE

20       ANSWER AGAIN AS LEADING.

21            THE COURT:  SUSTAINED.  MOTION GRANTED.

22            BY MR. MARNER:

23   Q.  DETECTIVE, FOR THE NONCORROBORATED STATEMENTS THAT

24       THE DEFENDANT MADE, WERE THERE ANY CORROBORATED

25       STATEMENTS THAT MADE YOU CONTINUE WITH YOUR

1          SUSPICIONS ABOUT THE DEFENDANT BEING A MURDER

2          SUSPECT?

3     A.   YES, THERE WERE.

4     Q.   DO YOU HAVE A COPY OF THE TRANSCRIPT?

5     A.   I DO.

6     Q.   NOW, IF YOU COULD TURN TO PAGE 6, PLEASE?

7     A.   OKAY.

8     Q.   THERE'S A RATHER LENGTHY PARAGRAPH NEAR THE BOTTOM

9          TITLED "SIMMERS." AND IT STARTS: "RIGHT ON MY" --

10              COULD YOU READ THAT, PLEASE?

11    A.   "RIGHT ON MY -- RIGHT IN BETWEEN MY POCKET AND MY

12         BELT, AND I PUT IT IN MY WAIST THERE, I NORMALLY

13         HAVE A FLAT THROWING KNIFE. AND I GRABBED FOR IT.

14         AND I KNEW I DIDN'T HAVE MY KNIFE, BUT

15         SUBCONSCIOUSLY I KNEW THERE WAS A KNIFE THERE. AND

16         SO I THOUGHT, OKAY. I GRABBED IT.

17              AND WHEN THE DUDE CAME AT ME AGAIN, I JUST

18         PULLED IT OUT AND WENT UP TOWARDS HIS FACE AND

19         CAUGHT HIM LIKE IN HIS CHIN, AND A LITTLE BIT ON

20         HIS CHEEK.

21              HE LOOKED SURPRISED AND STUPID. IT WAS

22         LIKE, OH, SHIT. AND HE TURNED ON HIS RIGHT HEEL,

23         AND I JUST JUMPED FORWARD, AND I SHANKED HIM ABOUT

24         SIX TIMES FROM THE SHOULDER BLADE TO MID-BACK AND

25         THEN BACK UP. HE BENT THE BLADE WHEN I STABBED HIM

1          IN THE SHOULDER."

2    Q.    NOW, WERE YOUR OBSERVATIONS OF RODNEY GOCHANOUR ON

3          THE 11TH WHEN YOU RESPONDED TO THE MURDER SCENE --

4          WERE YOUR OBSERVATIONS OF THE WOUNDS CONSISTENT

5          WITH THAT STATEMENT?

6    A.    YES, THEY WERE.

7    Q.    WERE YOUR OBSERVATIONS OF THE KNIFE WHEN YOU

8          RECOVERED IT ON MARCH 12TH CONSISTENT WITH THAT

9          STATEMENT?

10   A.    YES, IT WAS.

11   Q.    GO TO PAGE 8, PLEASE.

12   A.    OKAY.

13   Q.    IN THE MIDDLE WHERE RUSK SAYS:  "WHAT DID HE LOOK

14         LIKE"?

15              SIMMERS SAID, "I WANT TO SAY DARK-HAIRED,

16         BUT IT WASN'T REALLY."

17              RUSK:  "MEDIUM HAIR"?

18              "YES, ALMOST LIKE MINE BUT NOT REALLY."

19              CAN YOU TAKE A LOOK AT THE DEFENDANT'S HAIR?

20   A.    YES, SIR.

21   Q.    CAN YOU REMEMBER WHAT RODNEY GOCHANOUR'S HAIR

22         LOOKED LIKE?

23   A.    YES.

24   Q.    IS THAT AN ACCURATE DESCRIPTION?

25   A.    YES, IT IS.

1    Q.   STAY ON THE SAME PAGE, PLEASE.   SIMMERS DESCRIBED

2         RODNEY AS BEING WHITE; IS THAT CORRECT?

3    A.   YES.

4    Q.   WAS HE WHITE?

5    A.   YES.

6    Q.   AND IT DESCRIBES -- SIMMERS SAYS -- WHEN ASKED HOW

7         OLD HE THINKS HIS VICTIM WAS, HE SAID, "I'D SAY

8         LIKE MID-30'S."  DO YOU KNOW HOW OLD HE WAS?

9    A.   I BELIEVE 34 YEARS OLD.

10   Q.   SAME PAGE, ABOUT CLOTHES.  YOU ASKED HIM IF THE

11        CLOTHES WERE LIGHT-COLORED, OR DARK.  AND SIMMERS

12        SAID DARK.

13             WHAT COLOR CLOTHES WAS RODNEY WEARING WHEN

14        HE WAS MURDERED?

15   A.   HE WAS WEARING JEANS AND A SHIRT THAT WAS, I

16        BELIEVE, PURPLE AND DARK GREEN, POSSIBLY DARK BLUE,

17        MULTI-COLORS BUT DARK.

18   Q.   NEXT PAGE:  YOU OBSERVED THE CRIME SCENE DID YOU

19        NOT?

20   A.   YES, I DID.

21   Q.   DID YOU SEE ANY EVIDENCE OF ANY TRAIL BEING BEATEN

22        AND THE SHRUBBERY SURROUNDING THE TRAIL?

23   A.   YES, I DID.

24   Q.   WHICH DIRECTION, TOWARDS OR AWAY FROM THE SLOUGH?

25   A.   ACTUALLY, IT STARTED OUT TOWARDS THE SLOUGH AND

1          THEN TURNED BACK AWAY FROM THE SLOUGH.

2    Q.    I BELIEVE YOU ASKED HIM ABOUT A THIRD OF THE WAY

3          DOWN, "IN WHAT DIRECTION"?  AND HE SAID, "TOWARDS

4          THE SLOUGH."

5                IS THAT CONSISTENT WITH YOUR OBSERVATIONS OF

6          THE MURDER SCENE?

7    A.    YES, IT IS.

8    Q.    AND HE ALSO SAID ON THAT HE KIND OF STUMBLED TO THE

9          GROUND.  DID YOU EXAMINE THE MURDER SCENE WITH

10         DETECTIVE MINER AND THE TRACKERS?

11   A.    YES, I DID.

12   Q.    WAS THERE ANY EVIDENCE THAT WAS INTERPRETED

13         INDICATING SOMEBODY HAD STUMBLED ON THE GROUND?

14                MR. HICKS:  OBJECTION, LEADING AND ASSUMES

15         FACTS NOT IN EVIDENCE.  AND FURTHERMORE CALLS FOR

16         SPECULATION NOT ONLY ON THE PART OF THIS WITNESS

17         BUT ON THE PART OF HIS COLLEAGUES.

18                THE COURT:  SUSTAINED.

19                MR. MARNER:  I WILL MOVE ON.

20   Q.    GO TO PAGE 13, PLEASE, ACTUALLY PAGE 14, THE TOP OF

21         PAGE 14.  WE DISCUSSED THIS EARLIER IN A PREVIOUS

22         EXAMINATION.  THE DEFENDANT SAYS WHEN YOU ASKED HOW

23         TALL, "THE VICTIM MIGHT HAVE BEEN 6'2" OR 6'1"

24         BECAUSE I'M 5'10."

25                DO YOU KNOW HOW TALL RODNEY GOCHANOUR WAS?

1  A.  I BELIEVE 6 FOOT OR 6 FOOT 1.

2  Q.  WERE ANY BOOTS RECOVERED ON THE SCENE?

3  A.  YES, THERE WERE.

4  Q.  AND THE SAME PAGE, IT SAYS SOMETHING ABOUT THE

5     BLADE, AND SIMMERS SAID, "THE BLADE BENT LIKE A

6     BIT."  AND YOU SAID, "THE BLADE BENT IN KIND OF AN

7     ARC"?  AND SIMMERS:  "IT WAS STILL IN AN ARC ANYWAY

8     SO I WAS HITTING IT STRAIGHT."

9        WHEN YOU EXAMINED THE BLADE WHEN YOU

10    RECOVERED IT, WAS IT BENT OR STRAIGHT?

11 A.  IT WAS BENT IN AN ARC.

12 Q.  THANK YOU.  SO YOU DID FIND QUITE A BIT OF COR-

13    ROBORATION.

14 A.  YES, I DID.

15        MR. HICKS:  YOUR HONOR, I MOVE TO STRIKE HIS

16    OBSERVATIONS --

17        THE COURT:  SUSTAINED.

18        MR. HICKS:  THERE IS NO BASIS FOR THAT.

19        MR. MARNER:  I'M SORRY.  THE OBJECTION, I

20    DIDN'T GET IT?

21        MR. HICKS:  I WAS AN OBJECTION ON THE BASIS

22    IT WAS LEADING AND THERE WAS NO BASIS IN FACT --

23        THE COURT:  IT ASSUMES FACTS NOT IN EVIDENCE

24    YET.

25        BY MR. MARNER:

1    Q.   YOU SPOKE OF EMPLOYING THEMES WHEN YOU WERE

2         INTERVIEWING SIMMERS; IS THAT CORRECT?

3    A.   YES, IT IS.

4    Q.   IN ANY OF YOUR THEMES, DID THREATS, COERCION, OR

5         PROMISES OF LENIENCY, OR NONPROSECUTION PLAY ANY

6         PART?

7    A.   NO.

8    Q.   ALL RIGHT.  YOU AND DETECTIVE RUSK PROVIDED SOME

9         EMBELLISHMENT, DID YOU NOT, IN THE FORM OF

10        ACCOSTING PEOPLE ON THE TRAIL, THAT TYPE OF THING?

11   A.   YES, WE DID.

12   Q.   DID THE DEFENDANT IN HIS TAPE-RECORDED CONFESSION

13        PROVIDE ANY EMBELLISHMENT?

14   A.   IT APPEARED THAT KILLING 13 GANGSTERS WAS

15        EMBELLISHMENT ON HIS PART; HOWEVER, I HAVE NO WAY

16        OF KNOWING WHETHER THAT WAS ACCURATE OR NOT.

17   Q.   ANYTHING FURTHER THAN THAT?

18   A.   I WOULD HAVE TO REVIEW THE STATEMENT.

19   Q.   ANYTHING REACHING OUT AND GRABBING YOU OTHER THAN

20        THE THINGS POINTED OUT BY MR. HICKS?

21   A.   THERE WAS NO OTHER OBVIOUS -- THE DATE WAS IN

22        QUESTION, POSSIBLY BECAUSE HE WAS -- DIDN'T DESIRE

23        TO TELL US THE CORRECT DATE, POSSIBLY BECAUSE HE

24        WASN'T SURE, BUT NO OTHER OBVIOUS EMBELLISHMENTS

25        THAT SERGEANT RUSK AND I NOTICED.

1   Q.  AND AT THE TIME YOU WERE TALKING TO HIM, HAD YOU

2       BEEN AWARE OF HIS RUNAWAY STATUS EARLIER THROUGH

3       THE WEEK?

4   A.  NO, I WAS NOT.

5           MR. MARNER:  THANK YOU.

6           THE COURT:  MR. HICKS?

7                   RECROSS-EXAMINATION

8           BY MR. HICKS:

9   Q.  YOU READ THE AUTOPSY REPORT OF THE VICTIM?

10  A.  I HAVE.

11  Q.  DO YOU HAVE IT WITH YOU?

12  A.  LET ME LOOK THROUGH THESE NOTES.  I DIDN'T BRING

13      THE ENTIRE CASE FILE, JUST THE ITEMS I FELT WERE

14      GOING TO BE PERTINENT.  I DO HAVE PAGE -- YES, I DO

15      HAVE IT WITH ME.

16  Q.  ALL RIGHT.  ACCORDING TO THE TRANSCRIBED STATEMENT,

17      MR. SIMMERS STATED THE VICTIM WAS 6'2" OR 6'1"

18      BECAUSE HE IS 5'10"; IS THAT CORRECT?

19  A.  THAT'S CORRECT.

20  Q.  NOW, PLEASE TURN TO PAGE 3, THE SECOND LINE DOWN,

21      THE PARAGRAPH BEGINNING "FURTHER EVIDENT TO THE

22      RIGHT."  DOESN'T THAT SAY THE LENGTH IS FIVE FEET

23      ELEVEN-AND-A-HALF INCHES, DESCRIBING THE HEIGHT OF

24      THE VICTIM?

25  A.  IT DOES SAY THAT.

```
 1              THE COURT:  WHAT WAS IT AGAIN?

 2              MR. HICKS:  FIVE FEET ELEVEN-AND-A-HALF

 3    INCHES, AND THAT IS THE HEIGHT.

 4              COULD WE SEE THE VICTIM'S PHOTOGRAPHS?

 5              THE COURT:  THE ONES I HAVE HAVE BEEN

 6    DIVIDED INTO TWO CATEGORIES, AND SO IF YOU COULD

 7    KEEP THOSE SEPARATE.

 8              MR. HICKS:  I APPRECIATE THE COURT'S

 9    INDULGENCE.

10              THE CLERK:  DEFENDANT'S EXHIBIT 7 MARKED FOR

11    IDENTIFICATION.

12                        (DEFENDANT'S EXHIBIT NO. 7
                           MARKED FOR IDENTIFICATION.)
13

14

15              MR. HICKS:  YOUR HONOR, AFTER PRETRIAL

16    HEARING, I HAVE NO OBJECTION TO HAVING THIS REJOIN

17    THE OTHERS, AS LONG AS THE NOTATION IS MADE --

18              THE COURT:  IT IS NOT IN THE PILE BEING

19    OFFERED BY THE STATE?

20              MS. MAHONEY:  NO.  THANK YOU.

21              BY MR. HICKS:

22    Q.  HANDING YOU WHAT HAS BEEN MARKED AS THE DEFENSE

23         PRETRIAL EXHIBIT NO. 7?

24    A.  CORRECT.

25    Q.  VIEWING THAT, IS IT STILL YOUR TESTIMONY THAT
```

1          MR. SIMMERS' HAIR IS SIMILAR TO MR. GOCHANOUR'S?

2     A.   YES.  CAN I EXPLAIN FURTHER?

3     Q.   NO.  THANK YOU.

4               THE COURT:  MS. MAHONEY, JUST TO KEEP THESE

5          STRAIGHT.  THE ONES WITH THE CLIPS WERE THE ONES

6          THAT --

7               MS. MAHONEY:  THE SMALL CLIP?

8               THE COURT:  THAT'S WHAT I UNDERSTOOD THE

9          STATE WAS OFFERING, AND SO MR. HICKS REMOVED THAT

10         FROM THE LARGE CLIPPED PACKAGE.

11              MR. HICKS:  CORRECT.  NOTHING FURTHER.

12              THE COURT:  THANK YOU.

13              MR. MARNER?

14              MR. MARNER:  NOTHING, JUDGE.  THANK YOU.

15              THE COURT:  I HAVE ONE QUESTION:  DO YOU

16         RECALL WHEN YOU GOT THE MCDONALD'S MEAL, THE TIME.

17              THE WITNESS:  SPECIFICALLY, I'M NOT SURE.  I

18         BELIEVE IT WAS AFTER THE DEFENSE ATTORNEY HAD LEFT,

19         AND PRIOR TO OUR BEGINNING THE INTERVIEW.  AND I

20         REALLY DIDN'T KEEP TRACK OF WHAT THAT WAS.

21              BY MR. HICKS:

22    Q.   ONE OTHER QUESTION:  IT WAS A HAPPY MEAL, WASN'T

23         IT?

24    A.   YEAH, I BELIEVE IT WAS.

25              THE COURT:  THANK YOU, DETECTIVE.

1    MR. MARNER:  THE DEFENSE CALLS MIKE JANASZ.

2    MICHAEL JANASZ,                HAVING BEEN DULY SWORN,
                                    WAS EXAMINED AND TESTIFIED
3                                   AS FOLLOWS:

4                    DIRECT EXAMINATION

5         BY MR. MARNER:

6    Q.  OFFICER, STATE YOUR NAME AND SPELL YOUR LAST NAME

7        FOR THE RECORD.

8    A.  MICHAEL B. JANASZ, J-A-N-A-S-Z.

9    Q.  AND YOU ARE A KING COUNTY POLICE OFFICER; ARE YOU

10       NOT?

11   A.  YES, I AM.

12   Q.  HOW LONG HAVE YOU BEEN SO EMPLOYED?

13   A.  18 YEARS.

14   Q.  OFFICER JANASZ, LET ME CUT TO THE CHASE HERE:  ON

15       MARCH 15TH, LAST YEAR, AT APPROXIMATELY 1:15 P.M.

16       WERE YOU ON DUTY?

17   A.  YES, I WAS.

18   Q.  I MIGHT BE WRONG ABOUT THAT TIME AND SO CAN YOU GO

19       AHEAD AND CHECK?

20   A.  THAT'S CORRECT.

21   Q.  ALL RIGHT.  PRIOR TO 1:15, DID YOU RESPOND TO A

22       REPORT OF FLARE GUNS BEING FIRED?

23   A.  YES, I DID.

24   Q.  HOW EXACTLY DID YOU GET THE INFORMATION TO RESPOND?

25   A.  I WAS DISPATCHED BY THE DISPATCHER TO THE AREA OF

1          NORTHEAST 181ST OR 182ND AND 73RD NORTHEAST.

2     Q.   THAT'S RIGHT AROUND THE CORNER FROM THE PRECINCT

3          HOUSE?

4     A.   THAT'S CORRECT.

5     Q.   AND WHAT INFORMATION WERE YOU PROVIDED BY THE

6          DISPATCHER?

7     A.   TWO JUVENILES WERE SEEN SHOOTING FLARE GUNS OFF IN

8          THE NEIGHBORHOOD.

9     Q.   WHEN YOU RESPONDED TO THAT AREA, DID YOU SEE

10         ANYTHING THAT GAVE YOU ANY REASON TO INVESTIGATE

11         FURTHER?

12    A.   YES.  AS SOON AS I CAME INTO THE AREA, THE WITNESS

13         WHO HAD WATCHED THEM SHOOT OFF THE FLARE GUNS

14         FLAGGED ME DOWN AND SAID "THERE THEY ARE WALKING UP

15         NORTHEAST 182ND."  AND THEY WERE WALKING WEST FROM

16         73RD.

17    Q.   AND YOU SAW THE WITNESS POINT TO TWO INDIVIDUALS?

18    A.   TWO INDIVIDUALS, YES.

19    Q.   DID YOU RESPOND?

20    A.   YES.  WE WENT OVER AND CONTACTED THE TWO

21         INDIVIDUALS.

22    Q.   WAS ONE OF THEM THE DEFENDANT SITTING THERE AT THE

23         TABLE NEXT TO MR. HICKS?

24    A.   YES, MR. IAN SIMMERS.

25    Q.   WHAT HAPPENED AT THAT CONTACT?

1  A.  WE HAD THE TWO YOUTHS PUT THEIR HANDS ON OUR PATROL

2      CAR, AND WE DID A PAT-DOWN.  WHILE I WAS PATTING

3      DOWN THE INDIVIDUAL, I FOUND A FLARE GUN IN HIS

4      WAISTBAND.

5  Q.  ALL RIGHT.  AND WHICH INDIVIDUAL WAS THAT?

6  A.  MR. SIMMERS.

7          THE CLERK:  STATE'S EXHIBIT 8 IS MARKED FOR

8      IDENTIFICATION.

9              (STATE'S EXHIBIT NO. 8

               MARKED FOR IDENTIFICATION.)

10

11         MR. HICKS:  NO OBJECTION FOR PRETRIAL

12      PURPOSES.

13         MR. MARNER:  I WILL OFFER IT IN A MINUTE,

14      JUDGE.  WE WILL GET TO THAT IN A MINUTE.

15  Q.  AFTER FINDING THE FLARE GUN, DID YOU MAKE ANY

16      DECISION TO ARREST MR. SIMMERS?

17  A.  YES.  WE PLACED BOTH INDIVIDUALS INTO CUSTODY.

18  Q.  YOU SAY "WE."  WHO ELSE WAS WITH YOU?

19  A.  OFFICER SKIP FULLER WAS ALSO WITH ME.

20  Q.  AND AT ANY TIME, DID YOU ADVISE EITHER/OR OF THEIR

21      MIRANDA RIGHTS?

22  A.  YES, I DID.

23  Q.  AND DID YOU ADVISE SPECIFICALLY MR. SIMMERS OF HIS

24      MIRANDA RIGHTS?

25  A.  YES, I DID.

1   Q.   WHERE DID YOU DO THAT?

2   A.   I BELIEVE I ADVISED THEM BY READING FROM MY CARD

3        WHEN I INITIALLY PLACED THEM IN THE PATROL CAR, AND

4        READVISED THEM AT THE PRECINCT VIA OUR RIGHTS

5        STATEMENT FORM.

6   Q.   WHEN YOU ADVISED THEM FROM YOUR CARD, DO YOU HAVE

7        THAT WITH YOU?

8   A.   YES, IN MY POCKET.

9   Q.   IS THAT EITHER THE SAME CARD OR A COPY OF THE CARD

10       THAT YOU USED THAT DAY?

11  A.   YES.  THIS IS THE SAME CARD, THE ONE I'VE CARRIED

12       FOR 18 YEARS.

13            MR. MARKER:  MR. HICKS, ABSENT A STIPULATION

14       TO THE SUFFICIENCY OF THE CARD, I WILL HAVE THE

15       OFFICER READ IT INTO THE RECORD.

16            MR. HICKS:  WAIT A MINUTE.  LET ME TAKE A

17       LOOK AT IT.

18            MS. MAHONEY:  YOUR HONOR, MAY I BE EXCUSED

19       MOMENTARILY?

20            THE COURT:  YES.  THROUGHOUT THE TRIAL.

21            MR. HICKS:  MAY I VOIR DIRE?

22            THE COURT:  YOU MAY.

23                 VOIR DIRE EXAMINATION

24            BY MR. HICKS:

25  Q.   THIS IS 18 YEARS OLD?

1    A.   YES.

2    Q.   ALL RIGHT.   REGARDING THE PROVISION THAT REFERS TO

3         JUVENILES, IT STATES:   "ADD," MEANING YOU ADD

4         "INCLUDING A CRIMINAL PROSECUTION IN THE EVENT THAT

5         JUVENILE COURT DECLINES JURISDICTION IN YOUR CASE"?

6    A.   CORRECT.

7    Q.   ALL RIGHT.   THIS WAS DRAFTED BEFORE THERE WAS A

8         MANDATORY MINIMUM AND AUTOMATIC DECLINE FOR MURDER

9         IN THE FIRST DEGREE IN JUVENILES; ISN'T THAT

10        CORRECT?

11   A.   I BELIEVE SO, YES, BECAUSE THAT'S 18 YEARS OLD.

12             MR. MARNER:   I WILL HAVE YOU READ IT INTO

13        THE RECORD.

14   A.   OKAY.   (READING.)   YOU HAVE THE RIGHT TO REMAIN

15        SILENT.   ANYTHING YOU SAY OR SIGN CAN BE USED

16        AGAINST YOU IN A CRIMINAL COURT OF LAW, INCLUDING

17        CRIMINAL PROSECUTION IN THE EVENT JUVENILE COURT

18        DECLINES JURISDICTION IN YOUR CASE.

19             YOU HAVE THE RIGHT AT THIS TIME TO AN

20        ATTORNEY OF YOUR OWN CHOOSING, TO HAVE HIM PRESENT

21        BEFORE AND DURING QUESTIONING AND THE SIGNING OF

22        ANY STATEMENT.   IF YOU CANNOT AFFORD AN ATTORNEY,

23        YOU ARE ENTITLED TO HAVE AN ATTORNEY APPOINTED FOR

24        YOU BY THE COURT AND HAVE HIM PRESENT BEFORE AND

25        DURING QUESTIONING AND THE MAKING OF ANY STATEMENT.

```
 1              YOU HAVE THE RIGHT TO EXERCISE THE ABOVE
 2       RIGHTS AT ANY TIME DURING ANY QUESTIONING OR THE
 3       MAKING OF ANY STATEMENT.
 4              DO YOU UNDERSTAND EACH OF THESE RIGHTS AS I
 5       HAVE READ THEM TO YOU?
 6   Q.  HOW DID MR. SIMMERS RESPOND TO THAT?
 7   A.  I BELIEVE HE SAID, "YES."  I DON'T ACTUALLY RECALL
 8       BECAUSE I DIDN'T DO ANY QUESTIONING OF HIM AT THAT
 9       TIME.
10   Q.  AT ANY TIME YOU WERE IN CONTACT WITH MR. SIMMERS,
11       DID HE ASK TO SPEAK TO AN ATTORNEY?
12   A.  NO.
13   Q.  AT ANY TIME YOU WERE IN CONTACT WITH HIM, DID HE
14       EXPRESS TO YOU ANY CONFUSION ABOUT HIS RIGHTS?
15   A.  NO.
16   Q.  IN YOUR 18 YEARS AS A POLICE OFFICER, HAVE YOU COME
17       INTO CONTACT WITH PEOPLE WHO ARE INTOXICATED OR
18       UNDER THE INFLUENCE OF DRUGS?
19   A.  YES, I HAVE.
20   Q.  AND DID IAN SIMMERS SHOW ANY PHYSICAL
21       MANIFESTATIONS THAT WOULD LEAD YOU TO BELIEVE HE
22       WAS UNDER THE INFLUENCE OF ALCOHOL OR DRUGS AT THAT
23       TIME?
24   A.  NO.
25   Q.  NOW, THEN, YOU INDICATE THAT YOU WENT TO THE
```

1      PRECINCT HOUSE?

2  A.  THAT'S CORRECT.

3  Q.  AND YOU ADVISED MR. SIMMERS OF HIS RIGHTS AGAIN?

4  A.  YES, I DID.

5  Q.  AND I BELIEVE THAT'S STATE'S PRETRIAL 8?

6  A.  YES.

7  Q.  REVIEW THAT.  IS THAT A COPY OF THE MIRANDA FORM,

8      THE RIGHTS FORM THAT YOU REVIEWED WITH MR. SIMMERS?

9  A.  YES, IT IS.

10  Q.  IS THERE A SIGNATURE ON THERE?

11  A.  YES.

12  Q.  WHAT DOES THAT SIGNATURE READ?

13  A.  IAN M. SIMMERS.

14  Q.  AND IS YOUR SIGNATURE ON THERE AS WELL?

15  A.  MY NAME IS PRINTED UP AT THE TOP AS THE ONE

16      ADVISING HIM OF HIS RIGHTS.

17  Q.  AND THERE IS A WAIVER FORM ON THERE AS WELL?

18  A.  YES, THERE IS.

19  Q.  IS THERE ANOTHER SIGNATURE THERE?

20  A.  NO, THERE IS NOT.

21          MR. MARNER:  ALL RIGHT.  AT THIS TIME I

22      OFFER STATE'S EXHIBIT 8.

23          THE COURT:  ANY OBJECTION FOR PRETRIAL

24      PURPOSES.

25          MR. HICKS:  FOR ADMISSION, NO.

1                    (STATE'S EXHIBIT NO. 8
                     ADMITTED IN EVIDENCE.)
2

3            BY MR. MARNER:

4    Q.   OFFICER JANASZ, IT IS YOUR TESTIMONY THAT YOU DID

5         NOT TAKE ANY STATEMENTS FROM IAN SIMMERS; IS THAT

6         CORRECT?

7    A.   THAT'S CORRECT.

8    Q.   ALSO YOUR TESTIMONY IS THAT AT NO TIME DID HE

9         REQUEST AN ATTORNEY OR SAY HE DIDN'T WANT TO TALK

10        TO THE POLICE?

11   A.   WELL, WHEN I ADVISED HIM, I ASKED HIM IF HE WANTED

12        TO GIVE ME A STATEMENT, AND HE SAID NO.

13   Q.   WHEN WAS THAT, AT THE PRECINCT HOUSE?

14   A.   YES, AT THE PRECINCT HOUSE.

15   Q.   AT WHAT TIME DID THAT OCCUR?

16   A.   IT WAS CLOSE TO SHIFT CHANGE, PROBABLY AROUND 1:30

17        OR 1:00.

18   Q.   WOULD THE TIME BE INDICATED ON STATE'S EXHIBIT 8?

19   A.   YES.

20   Q.   LOOK AT THAT?

21   A.   1:15.

22            MR. MARNER:  THANK YOU.  NOTHING FURTHER.

23            THE COURT:  MR. HICKS?

24            MR. HICKS:  THANK YOU.

25                    CROSS-EXAMINATION

1          BY MR. HICKS:

2     Q.   OFFICER, WERE YOU THE FIRST LAW ENFORCEMENT PERSON

3          TO HAVE CONTACT WITH MR. SIMMERS TO THE BEST OF

4          YOUR KNOWLEDGE?

5     A.   OFFICER FULLER AND I HAD CONTACTED THE TWO PEOPLE

6          TOGETHER AT THE SAME TIME.

7     Q.   WHEN YOU COMBINED -- YOU TWO COMBINED WERE THE

8          FIRST INITIAL LAW ENFORCEMENT CONTACT WITH SIMMERS

9          AND WYATT?

10    A.   YES.

11              MR. HICKS:  NOTHING FURTHER.

12              MR. MARNER:  NOTHING FURTHER FROM THE STATE,

13         YOUR HONOR.

14              THE COURT:  ALL RIGHT, THANK YOU.

15              THE WITNESS:  MAY I BE EXCUSED, YOUR HONOR?

16              THE COURT:  YES, YOU MAY FOR THIS HEARING.

17         YOU WILL NEED TO COORDINATE WITH THE PROSECUTORS,

18         SINCE YOU ARE STILL UNDER SUBPOENA.

19              MR. HICKS:  I APOLOGIZE, AND THE OFFICER

20         TESTIFIED, BUT I DID NOT WRITE DOWN THE TIME THIS

21         WAS.

22    Q.   COULD I JUST ASK THE TIME?  DID YOU TESTIFY WHAT

23         TIME THIS WAS?

24    A.   THE INITIAL CONTACT WAS, I BELIEVE, AT AROUND 11:30

25         OR SO.

1  Q.  11:30 A.M.?

2  A.  YES.  AND WHEN I ADVISED HIM OF HIS RIGHTS AT THE

3      PRECINCT, IT WAS AT 1:15.  I WILL HAVE TO CHECK MY

4      STATEMENT.

5  Q.  SO WE ARE CLEAR, HE WAS ACTUALLY IN CUSTODY FROM

6      11:30 A.M.?

7  A.  APPROXIMATELY 11:30 A.M. IS WHEN WE HAD THE INITIAL

8      CALL, AND HE WAS PROBABLY IN CUSTODY BY 11:45.

9          MR. HICKS:  THANK YOU.

10          MS. MAHONEY:  YOUR HONOR, THE STATE WOULD

11      REST.

12          THE COURT:  ALL RIGHT.  THANK YOU.

13      MR. HICKS, DO YOU WISH ME TO ADVISE YOUR CLIENT

14      ABOUT THE PURPOSE OF THE HEARING NOW OR WAIT UNTIL

15      YOU CALL YOUR OTHER WITNESSES?

16          MR. HICKS:  CAN I TAKE A LOOK AT THE

17      WITNESSES OUT IN THE HALL AND SEE WHERE I STAND?

18          THE COURT:  SURE.

19          MR. HICKS:  YOUR HONOR, THE DEFENSE CALLS

20      DONNA BERUBE.

21          THE COURT:  RAISE YOUR RIGHT HAND.

22  DONNA L. BERUBE,          HAVING BEEN DULY SWORN,
                              WAS EXAMINED AND TESTIFIED
23                            AS FOLLOWS:

24              DIRECT EXAMINATION

25      BY MR. HICKS:

1  Q.  STATE YOUR NAME AND SPELL YOUR LAST NAME, AND GIVE

2      YOUR ADDRESS.

3  A.  DONNA L. BERUBE, B-E-R-U-B-E.  THE ADDRESS IS 6511

4      WEST SNOQUALMIE VALLEY ROAD NORTHEAST, CARNATION,

5      WASHINGTON.  98014.

6  Q.  AND YOUR RELATIONSHIP WITH IAN SIMMERS?

7  A.  HE IS MY SON.

8  Q.  BIRTH MOTHER?

9  A.  YES.

10  Q.  AND IS MR. SIMMERS PRESENT IN COURT?

11  A.  HE IS.

12  Q.  AND WHEN DID YOU LAST SEE HIM?

13  A.  SATURDAY MORNING.

14  Q.  WAS THAT VISITING HIM IN THE KING COUNTY JAIL?

15  A.  I'M SORRY, THAT'S A MISTAKE.  I SAW HIM YESTERDAY

16      WALKING THROUGH THE HALL, AND I DID VISIT HIM

17      SATURDAY MORNING IN JAIL.

18  Q.  WHEN MR. SIMMERS IS NOT IN THE KING COUNTY JAIL,

19      WHAT IS HIS RESIDENCE?

20  A.  HE LIVES WITH ME.

21  Q.  HOW LONG HAS HE LIVED WITH YOU?

22  A.  ALWAYS.

23  Q.  AND WHERE DO YOU GUYS LIVE?

24  A.  IN CARNATION.

25  Q.  HOW CLOSE WOULD YOU DESCRIBE YOUR RELATIONSHIP WITH

1        IAN?

2   A.   I THINK WE ARE VERY CLOSE.  WE HAVE DISAGREEMENTS,

3        BUT I THINK I UNDERSTAND HIM VERY WELL.

4   Q.   THIS MIGHT SOUND DIFFICULT TO ANSWER, BUT AS YOU

5        QUALIFY IT, HOW OFTEN DO YOU SEE IAN WHEN HE IS

6        LIVING WITH YOU?

7   A.   USUALLY ON A DAILY BASIS.

8   Q.   OKAY.  OTHER THAN IN A MATERNAL CAPACITY, WHAT

9        CAPACITY DO YOU INTERACT WITH IAN -- COMMUNICATE

10       WITH HIM, SOCIALIZE, ET CETERA?

11  A.   I'M NOT SURE I UNDERSTAND THAT QUESTION.

12  Q.   ALL RIGHT.  WHAT SORT OF THINGS DO YOU GUYS TALK

13       ABOUT?

14  A.   WE TALK ABOUT THE THINGS HE LIKES TO DO.  WE TALK

15       ABOUT HIS ART, AND WE SOMETIMES TALK ABOUT HIS

16       FRIENDS, AND WE TALK ABOUT RELIGIOUS THINGS FROM

17       TIME TO TIME, AND THE THINGS HE LIKES TO DO AND THE

18       THINGS HE DOESN'T LIKE TO DO.

19  Q.   OTHER THAN CERTAIN MATTERS OF TEENAGE DISCRETION,

20       IS THERE ANYTHING YOUR SON DOES NOT TALK TO YOU

21       ABOUT?

22  A.   NOT THAT I'M AWARE OF.

23  Q.   DO YOU HAVE AN OPINION, OR STRIKE THAT -- HAVE YOU

24       HAD OBSERVATIONS OF YOUR OWN REGARDING YOUR SON'S

25       CAPACITY TO EITHER MAKE UP STORIES OR EXAGGERATE?

1   A.   YES.

2   Q.   COULD YOU DESCRIBE EXAMPLES OF THIS?

3   A.   SOMETHING I HAVE WITNESSED HIS ENTIRE CHILDHOOD AND

4        ADOLESCENCE, FROM EVEN WHEN HE WAS VERY YOUNG -- I

5        REMEMBER SOMETHING FROM WHEN HE WAS FIVE OR SIX,

6        ONE OF HIS FRIENDS CAME TO ME AND ASKED ME IF HIS

7        DAD OWNED "TOYS R US" BECAUSE APPARENTLY THAT'S

8        WHAT HE TOLD HIM.

9   Q.   IAN SAID HIS DAD OWNED "TOYS R US"?

10  A.   WE WERE DIVORCED AND HIS DAD HAD LEFT.

11  Q.   AND ANY OTHER EXAMPLES?

12  A.   HE TALKED ABOUT, WITH FRIENDS, ABOUT THE QUANTITY

13       OF G. I. JOE GUYS HE HAD.  AND HE TALKED IN THE

14       40'S AND THE 50'S, AND HE MIGHT HAVE HAD 10.

15  Q.   WHEN YOU SAY G. I. JOE GUYS?

16  A.   THE ACTION FIGURES.

17  Q.   HOW OLD WAS HE WHEN HE WOULD DO THIS?

18  A.   I THINK HE WAS PROBABLY SIX.

19  Q.   AND HOW RECENT WAS HIS STATING THAT HIS FATHER

20       OWNED "TOYS R US"?

21  A.   I THINK HE WAS FIVE THEN.

22  Q.   CAN YOU GIVE SOME MORE RECENT EXAMPLES?

23  A.   YES.  IN JUNIOR HIGH, HE HAD TALKED TO FRIENDS

24       ABOUT A TRIP TO DISNEYLAND, AND ABOUT HIS FAVORITE

25       RIDE, AND ALL THE THINGS THAT HE DID WHEN HE WAS

1    THERE.  AND WE'VE NEVER BEEN TO DISNEYLAND.

2    Q.  ANY OTHER EXAMPLES?

3    A.  SINCE HIGH SCHOOL, HE HAS TALKED ABOUT OUR PROPERTY

4        AS NINE ACRES OF SWAMP LAND.  AND THOUGH IN FACT WE

5        DO HAVE SOME AREAS THAT ARE A LITTLE BOGGY, THE

6        ENTIRE PROPERTY ISN'T BOG.

7    Q.  HOW BIG IS IT?

8    A.  IT IS ABOUT NINE ACRES, AND WE DO HAVE THAT MUCH

9        BUT ALL OF IT IS NOT CONSUMED WITH THE SWAMP LAND.

10       AND HE HAS TALKED ABOUT -- WHEN HE WAS ON A

11       TRACK TEAM, HE TALKED ABOUT BEING THE FASTEST

12       PERSON ON THE TEAM.  AND THAT IN FACT WASN'T TRUE.

13   O.  WHEN WAS THIS?

14   A.  I THINK THAT WAS PROBABLY IN FIFTH GRADE.  WHEN WE

15       MOVED TO CARNATION AND HE MOVED TO THE SCHOOL HE

16       WAS ATTENDING, HE FOUND THAT HAVING A MACHO

17       DEMEANOR KEPT PEOPLE FROM HURTING HIM AS MUCH.  AND

18       HE TALKED ABOUT BEING A BAD GUY, AND HE TALKED

19       ABOUT THE PEOPLE HE HAD BEAT UP.  AND ONE INSTANCE

20       THAT I WITNESSED WHERE SOMEBODY ASSAULTED HIM, AND

21       HE DIDN'T BEAT THEM UP.  HE ALLOWED THEM JUST TO

22       WALK AWAY.

23       AND HE TOLD ME OF AN EPISODE WHERE HE WAS

24       AWAY FROM HOME, AND AFTER SOME WORDS WERE EXCHANGED

25       WITH SOME PEOPLE IN A CAR, AND THEY HAD FIRED SOME

1    SHOTS AT HIM, HE RAN ALL THE WAY FROM BOTHELL TO

2    KENMORE AND OUTRAN THE CAR.

3  Q.  WHEN DID HE SAY THIS?

4  A.  THIS WAS A YEAR BEFORE LAST.

5  Q.  ALL RIGHT.  AND ARE YOU BASING YOUR DISBELIEF JUST

6    ON THE GENERAL UNBELIEVABILITY OF THE STORY, OR DO

7    YOU HAVE SPECIFIC KNOWLEDGE THAT IT IS NOT TRUE?

8  A.  I KNOW HE CAN'T OUTRUN A VEHICLE.

9  Q.  ANY OTHER EXAMPLES?

10  A.  WELL, I CAN REMEMBER AN EPISODE WHERE IAN TOLD ME

11    HE HAD DONE SOMETHING THAT HE HADN'T ACTUALLY DONE.

12  Q.  WHAT WAS THAT?

13  A.  THERE WAS MONEY MISSING FROM MY WALLET, AND HE HAD

14    ASKED ME FOR MONEY FOR SCHOOL FOR LUNCH, AND I WENT

15    TO MY WALLET KNOWING I HAD $5 IN THERE, AND IT

16    WASN'T THERE.  AND I ASKED HIM IF HE TOOK IT, AND

17    HE SAID NO.  AND I COULD SEE IN MY WALLET THAT IT

18    WASN'T THERE, AND SO I KNEW HE HAD TAKEN IT.  AND

19    EVERY TIME I ASKED HIM, HE SAID NO.

20        AND LATER ON, HE TOLD ME THAT, YES, IN FACT

21    HE HAD TAKEN IT.

22        LATER ON IN THE DAY, I FOUND THE MONEY IN A

23    PLACE WHERE I HAD HIDDEN IT SO HE WOULDN'T TAKE IT.

24    AND WHEN I WENT BACK TO HIM AND ASKED HIM WHY HE

25    HAD TOLD ME HE HAD TAKEN IT, HE SAID BECAUSE I

1    DIDN'T BELIEVE HIM WHEN HE SAID HE DIDN'T, AND THAT

2    HE KNEW THAT I WOULD KEEP -- THAT WE WOULDN'T

3    FINISH THE CONVERSATION UNTIL HE ADMITTED THAT HE

4    DID IT.

5  Q.  ANY OTHER EXAMPLES -- JUST SO WE ARE CLEAR, HOW

6    LONG AGO WAS THAT?

7  A.  THAT WAS IN 9TH GRADE.

8  Q.  WOULD YOU CHARACTERIZE HIS BEHAVIOR, THE PATTERN

9    YOU HAVE DESCRIBED AS PREVALENT, NORMAL FOR HIM, OR

10    IS THAT A DEVIATION?

11  A.  I THINK THAT IS PRETTY CONSISTENT ALL THROUGH HIS

12    LIFE, WHEN HE IS UNSURE OF A SITUATION, IF HE IS

13    UNSURE OF THE PEOPLE HE IS WITH, HE SAYS GRAND

14    THINGS TO IMPRESS THEM.  AND IF HE'S A LITTLE

15    UNSURE IF THE PEOPLE ARE A THREAT TO HIM, THEN HE

16    COMES ON IN THIS STRONG THREATENING WAY TO IMPRESS

17    THEM.

18  Q.  MRS. BERUBE, HAVE YOU EVER KEPT GUNS IN YOUR HOUSE?

19  A.  NO.

20  Q.  HAS IAN EVER HAD A GUN, TO THE BEST OF YOUR

21    KNOWLEDGE?

22  A.  NO.  HE HAS HAD A WATER -- HE BROUGHT A WATER

23    PISTOL HOME FROM SCHOOL.

24  Q.  WAS THERE EVER A TIME WHEN IAN CAME HOME WITH A

25    BUNCH OF BRAND-NEW CLOTHING, WITH NO EXPLANATION?

47

1    A.  NO.

2              MR. HICKS:  NOTHING FURTHER.

3              THE COURT:  MS. MAHONEY, IS THIS YOUR

4        WITNESS?

5              MS. MAHONEY:  YES.  THANK YOU.

6                    CROSS-EXAMINATION

7              BY MS. MAHONEY:

8    Q.  HI, MS. BERUBE.  IN THE YEAR PRIOR TO MARCH OF 1995

9        WHEN IAN WAS ARRESTED FOR THIS INCIDENT, HE

10       ACTUALLY HAD BEEN IN "JUVY" A NUMBER OF TIMES AND

11       RAN AWAY FROM HOME FREQUENTLY ALSO; HAD HE NOT.

12   A.  THERE WERE TIMES WHEN HE WAS NOT AT HOME, AND HE

13       WAS DETAINED IN DETENTION A NUMBER OF TIMES.

14   Q.  AND THERE ARE TIMES WHEN HE WOULD DISAPPEAR AND YOU

15       WOULDN'T KNOW WHERE HE WAS; IS THAT RIGHT?

16   A.  I DIDN'T ALWAYS KNOW WHERE HE WAS.

17   Q.  AND THIS WAS HAPPENING WITH INCREASING PERIODS OVER

18       1994 TO 1995, INCREASING FREQUENCY; ISN'T THAT

19       CORRECT?

20             MR. HICKS:  YOUR HONOR, I OBJECT.  THE

21       OBJECTION IS BEYOND THE SCOPE.

22             THE COURT:  SUSTAINED.

23             MS. MAHONEY:  YOUR HONOR, IT GOES TO SOME OF

24       THE QUESTIONS THAT HE JUST ASKED ABOUT HER

25       KNOWLEDGE OF THINGS.  AND I'M TRYING TO ESTABLISH

1          THAT SHE DIDN'T ALWAYS KNOW WHERE HER SON WAS.

2               THE COURT:  TO THAT EXTENT, YOU MAY INQUIRE.

3               BY MS. MAHONEY:

4     Q.   AND SO IT WAS ACTUALLY INCREASING WITH FREQUENCY

5          DURING THAT TIME PERIOD, ISN'T THAT RIGHT, THAT HE

6          WOULD DISAPPEAR OR WAS IN "JUVY" MORE OFTEN.

7     A.   WHEN HE WAS IN "JUVY," IT WAS AT MY REQUEST.

8     Q.   BECAUSE HE HAD NOT --

9     A.   -- VIOLATED HIS PROBATION.

10    Q.   BY NOT COMING HOME AND YOUR NOT KNOWING WHERE HE

11         WAS?

12    A.   BY BEING LATE FOR CURFEW OR LEAVING FROM SCHOOL

13         WITH HIS FRIENDS AND GOING TO THEIR HOME INSTEAD.

14    Q.   THERE WERE ACTUALLY PERIODS OF TIME WHEN HE DIDN'T

15         COME HOME FOR A DAY OR TWO AT ALL; IS THAT RIGHT?

16    A.   THERE WERE THOSE PERIODS.

17    Q.   YOU DON'T KNOW WHAT HE WAS DOING DURING THAT TIME

18         PERIOD, DO YOU?

19    A.   NO MORE THAN I KNOW WHAT MY HUSBAND IS DOING WHEN

20         HE IS AT WORK.

21    Q.   NOW, IAN, HE READS AND UNDERSTANDS AND SPEAKS THE

22         ENGLISH LANGUAGE; IS THAT TRUE?

23    A.   THAT'S TRUE.

24               MR. HICKS:  I'M SORRY.  I COULDN'T HEAR THE

25         QUESTION.

1          MS. MAHONEY:  IAN READS AND SPEAKS AND

2     UNDERSTANDS THE ENGLISH LANGUAGE.

3  Q.  AND HE IS ACTUALLY FAIRLY BRIGHT, ISN'T HE?

4  A.  HE IS.

5  Q.  HE HAS BEEN IN SCHOOL OFF AND ON UP UNTIL THE TIME

6     OF HIS ARREST, ISN'T THAT RIGHT?

7  A.  THAT'S TRUE.

8  Q.  AND WHEN HE APPLIES HIMSELF, HE ACTUALLY DOES

9     PRETTY WELL; DOESN'T HE?

10 A.  YES.

11         MS. MAHONEY:  THANK YOU.  I HAVE NO FURTHER

12    QUESTIONS.

13         THE COURT:  MR. HICKS?

14              REDIRECT EXAMINATION

15         BY MR. HICKS:

16 Q.  WHEN YOU SAY YOUR SON IS BRIGHT, ARE YOU INDICATING

17    HE GENERALLY MAKES THE RIGHT CHOICES?

18 A.  NO.  HE RARELY MAKES THE RIGHT CHOICES.

19 Q.  EXPLAIN WHAT YOU MEAN, PLEASE.

20 A.  IAN HAS ATTENTION DEFICIT DISORDER.  AND BECAUSE OF

21    THAT, HE IS USUALLY IMPULSIVE AND ACTS WITHOUT

22    THOUGHT.  THE TIMES THAT IAN IS ABLE TO SIT DOWN

23    AND WEIGH CONSEQUENCES FOR BEHAVIOR, HE WILL MAKE

24    GOOD CHOICES.  BUT BECAUSE OF THE IMPULSIVENESS OF

25    THE ATTENTION DEFICIT DISORDER, HE FREQUENTLY ISN'T

```
1         ABLE TO ATTEND TO THE TASK LONG ENOUGH TO PROCESS

2         THE INFORMATION TO MAKE A GOOD CHOICE.

3              THE ATTENTION DEFICIT, THE FAILURE TO ATTEND

4         TO TASKS IS SOMETHING THAT HAS BEEN REPORTED ON HIS

5         REPORT CARD SINCE KINDERGARTEN.

6    Q.   IN FACT, WHEN YOU FOUND OUT MR. SIMMERS MADE THIS

7         STATEMENT TO THE POLICE, ONE OF THE THINGS IAN TOLD

8         YOU WAS, "YOU KNEW I WOULD DO IT, DIDN'T YOU, MOM"?

9         MEANING, "YOU KNEW I WOULD MAKE IT UP"?

10   A.   CERTAINLY.  HE SAID IN FACT, "YOU SHOULD HAVE KNOWN

11        I WOULD LIE TO THE POLICE."

12             MS. MAHONEY:  OBJECTION, YOUR HONOR.

13             THE COURT:  SUSTAINED.

14             BY MR. HICKS:

15   Q.   AND HE IS GETTING TREATMENT AND CARE FOR ATTENTION

16        DEFICIT DISORDER?

17   A.   YES.

18             MS. MAHONEY:  OBJECTION AT THIS POINT

19        WITHOUT PROPER FOUNDATION, MEDICAL RECORDS THAT HE

20        IS CURRENTLY BEING TREATED BY A QUALIFIED

21        PHYSICIAN.

22             MR. HICKS:  SHE OPENED IT UP.

23             THE COURT:  EXCUSE ME.  WE ARE NOT GOING TO

24        ARGUE ABOUT IT.

25             MR. HICKS, YOU MAY INQUIRE AS TO THIS
```

1    WITNESS'S KNOWLEDGE ABOUT TREATMENT AS TO THE

2    ATTENTION DEFICIT DISORDER, A.D.D., NOTHING ELSE.

3    I DON'T THINK THIS OPENS UP ANYTHING AS TO THE

4    MEDICAL RECORDS.  THIS IS THE DEFENDANT'S MOTHER

5    AND SHE MAY TESTIFY ABOUT WHAT SHE KNOWS.

6         BY MR. HICKS:

7    Q.  HOW LONG HAS HE BEEN TREATED FOR A.D.D. TO THE BEST

8    OF YOUR KNOWLEDGE?

9    A.  HE WAS FIRST DIAGNOSED IN SECOND GRADE.

10   Q.  BEFORE HIS ARREST, WAS HE STILL UNDER TREATMENT?

11   A.  YEAH.  THE TREATMENT WE WERE USING WAS MODIFIED

12   SCHOOL ENVIRONMENT.

13   Q.  HOW WOULD YOU DESCRIBE THIS MODIFIED SCHOOL

14   ENVIRONMENT?

15   A.  REDUCED CLASS SIZES, HIGHER STUDENT-TO-TEACHER

16   RATIOS.

17         MR. HICKS:  NOTHING FURTHER.  THANK YOU.

18         THE COURT:  MS. MAHONEY?

19              RECROSS-EXAMINATION

20         BY MS. MAHONEY:

21   Q.  AND HE RESPONDED WELL TO THAT SORT OF SITUATION,

22   DIDN'T HE.

23   A.  IN SOME ACADEMIC ENVIRONMENTS, HE DID.  I DON'T

24   KNOW THAT IT PROVIDED THE BEST ENVIRONMENT.

25   Q.  IT DOESN'T AFFECT HIS ABILITY TO ACTUALLY READ

1          SOMETHING AND UNDERSTAND IT, DOES IT?

2   A.   I THINK TO UNDERSTAND ALL THE NUANCES AND THE

3        LONG-TERM RAMIFICATIONS OF SOMETHING, I THINK THAT

4        IT WOULD AFFECT THAT UNDERSTANDING.  I THINK HE

5        WOULD UNDERSTAND --

6   Q.   LET ME STOP YOU THERE AND REPHRASE THE QUESTION:

7              MR. HICKS:  OBJECTION.  SHE WAS ANSWERING

8        THE QUESTION; IT WAS NOT UNRESPONSIVE.

9              THE COURT:  THE OBJECTION IS SUSTAINED.  SHE

10       MAY FINISH HER ANSWER.

11             THE WITNESS:  I THINK THAT HE WOULD BE ABLE

12       TO UNDERSTAND THE WORDS, WHAT THE WORDS MEAN, BUT

13       I'M NOT AT ALL CERTAIN THAT HE WOULD UNDERSTAND

14       WHAT ALL IS INVOLVED IN A PARTICULAR ACTION.

15             BY MS. MAHONEY:

16  Q.   OKAY.  SO IF I UNDERSTAND YOU THEN, WHAT YOU ARE

17       SAYING IS THAT YOU THINK, FOR INSTANCE, IF HE WERE

18       TOLD:  "YOU HAVE THE RIGHT TO REMAIN SILENT," HE

19       WOULD UNDERSTAND THOSE WORDS, BUT POTENTIALLY NOT

20       THE LONG TERM CONSEQUENCES IF HE DID NOT REMAIN

21       SILENT.  IS THAT A FAIR THING TO SAY?

22  A.   I THINK SO.

23             MS. MAHONEY:  OKAY.  NO FURTHER QUESTIONS.

24             MR. HICKS:  I HAVE NOTHING FURTHER.

25             THE COURT:  WHAT WAS THE LAST GRADE THAT

1     YOUR SON WAS IN?

2          THE WITNESS:  HE ATTENDED 10TH GRADE AND

3     THEN TOOK HIS G.E.D. WHILE HE WAS IN THE JUVENILE

4     FACILITY.

5          THE COURT:  AND WAS HE SUCCESSFUL WITH IT?

6          THE WITNESS:  YES.  THE LAST YEAR -- WELL,

7     IN THE 11TH GRADE, HE WAS IN THE SEATTLE SCHOOL

8     DISTRICT AT THE YOUTH CENTER.  THE SCHOOL PROGRAM

9     AT THE YOUTH CENTER IS WHERE HE TOOK HIS 11TH

10    GRADE.

11         THE COURT:  ANY FOLLOW-UP QUESTIONS TO THE

12    COURT'S QUESTIONS?

13         MR. HICKS:  NO.

14         MS. MAHONEY:  NO.

15         THE COURT:  THANK YOU.

16         MR. HICKS:  THE DEFENSE CALLS BRYAN BERUBE.

17         THE COURT:  PLEASE BE SEATED.

18    BRYAN MICHAEL BERUBE,      HAVING BEEN DULY SWORN,
                                 WAS EXAMINED AND TESTIFIED
19                               AS FOLLOWS:

20                    DIRECT EXAMINATION

21         BY MR. HICKS:

22    Q.   BRYAN, WOULD YOU STATE YOUR FULL, MIDDLE AND LAST

23    NAMES, AND GIVE YOUR ADDRESS FOR THE RECORD.  AND

24    TAKE YOUR TIME.

25    A.   BRYAN MICHAEL BERUBE, 18508 - 71ST AVENUE

54

```
 1        NORTHEAST, PUYALLUP, WASHINGTON, 98373.
 2   Q.   WHAT GRADE ARE YOU IN, BRYAN?
 3   A.   9TH.
 4   Q.   ARE YOU A LITTLE NERVOUS?
 5   A.   A LITTLE BIT, YES.
 6   Q.   ALL RIGHT.  WE WILL TAKE OUR TIME.  THIS IS, AS FAR
 7        AS COURT GOES, RATHER INFORMAL.  COULD YOU TELL US
 8        YOUR RELATIONSHIP WITH IAN SIMMERS?
 9   A.   STEPBROTHER.
10   Q.   AND YOU CURRENTLY RESIDE IN PUYALLUP; IS THAT
11        CORRECT?
12   A.   YES.
13   Q.   HOW LONG HAVE YOU RESIDED THERE?
14   A.   ABOUT FOUR OR FIVE YEARS.
15   Q.   FOUR OR FIVE YEARS.  ALL RIGHT.  DO YOU ALWAYS STAY
16        THERE OR DO YOU STAY SOMETIMES WITH YOUR FAMILY IN
17        CARNATION?
18   A.   I STAY WITH MY DAD IN CARNATION EVERY OTHER
19        WEEKEND, USUALLY, UNLESS SOMETHING COMES UP.
20   Q.   WHO IS YOUR DAD?
21   A.   DAVE BERUBE.
22   Q.   AND THAT'S IAN'S --
23   A.   STEPFATHER.
24   Q.   NOW, WHEN DID YOU LAST SEE IAN?
25   A.   IF YOU DON'T COUNT NOW, I WOULD SAY ABOUT A MONTH
```

55

1      AGO.

2  Q.  HOW LONG HAVE YOU KNOWN IAN?

3  A.  SINCE MY DAD GOT MARRIED TO DONNA, AND I GUESS THAT

4      WOULD BE SOMEWHERE AROUND SEVEN YEARS AGO.

5  Q.  THE SUMMER OF SEVEN YEARS AGO?

6  A.  YEAH.

7  Q.  WHEN IAN IS LIVING IN CARNATION, HOW OFTEN DO YOU

8      SEE IAN?

9  A.  EVERY OTHER WEEKEND.

10  Q.  WAS THERE A PERIOD OF TIME YOU WOULD SEE HIM MORE,

11      AND PLAY WITH HIM MORE, AND SO FORTH?

12  A.  I USUALLY COME OVER FOR CHRISTMAS A LITTLE BIT

13      LONGER, AND IN THE SUMMERS I STAY FOR ABOUT A

14      COUPLE OF WEEKS TO A MONTH.

15  Q.  AND WHAT CAPACITY, IF YOU UNDERSTAND WHAT I MEAN,

16      DO YOU INTERACT OR SOCIALIZE WITH IAN?  WHAT DO YOU

17      GUYS LIKE TO DO AND TO WHAT EXTENT DO YOU DO IT?

18  A.  WHEN HE'S AT MY DAD'S HOUSE, WE USUALLY PLAY CARDS

19      MOSTLY EVERY NIGHT AND STAY UP.

20  Q.  AND WHAT ELSE DO YOU GUYS DO?

21  A.  WE PLAY VIDEO GAMES A LOT, AND WE TALK SOMETIMES,

22      AND WE CUT WOOD TOGETHER, AND WE DO WORK OUT IN THE

23      YARD.

24  Q.  AND BESIDES THE FACT THAT HE IS YOUR STEPBROTHER,

25      HOW ELSE WOULD YOU CHARACTERIZE YOUR RELATIONSHIP

1       WITH HIM?

2   A.  A FRIEND.

3   Q.  A GOOD FRIEND OR A BAD FRIEND?

4   A.  GOOD FRIEND.

5   Q.  HOW WELL DO YOU FEEL YOURSELF THAT YOU KNOW IAN

6       SIMMERS?

7   A.  FAIRLY WELL, YEAH.

8   Q.  ALL RIGHT.  BRYAN, HAVE YOU HAD OCCASION TO WITNESS

9       IN YOUR OWN JUDGMENT IAN'S EXAGGERATING OR MAKING

10      UP STORIES?

11  A.  YEAH.

12  Q.  COULD YOU GIVE THE COURT SOME EXAMPLES OF THAT, AND

13      IF YOU REMEMBER THE APPROXIMATE TIME OR YEAR THAT

14      IT WAS AND WHAT IT WAS THAT HE SAID?

15  A.  SOMETIME LAST YEAR, HE WAS TALKING ABOUT GOING TO

16      THE BLACK MARKET AND BUYING A KNIFE OR A GUN.

17  Q.  WHAT ELSE?

18  A.  AND ONE TIME HE SAID HE WAS -- HE ROBBED SOME

19      CHINESE PLACE WITH HIS FRIENDS.

20  Q.  HOW DID HE SAY HE ROBBED THEM?

21  A.  HE STOLE RICE AND STUFF AND IT ENDED UP -- THEY

22      ENDED UP GOING OUT OF BUSINESS.

23  Q.  THE CHINESE PLACE WENT OUT OF BUSINESS BECAUSE HE

24      ROBBED THEM?

25  A.  YEAH.

1  Q.  WHEN WAS THIS?

2  A.  IT WAS ABOUT --

3  Q.  THE CONVERSATION, I MEAN?

4  A.  SPRING OR SUMMER LAST YEAR.

5  Q.  ANY OTHER EXAMPLES?

6  A.  NOT THAT I CAN REMEMBER.

7  Q.  ALL RIGHT.  BASED ON YOUR KNOWLEDGE OF YOUR

8      STEPBROTHER, WERE THESE STATEMENTS TYPICAL FOR HIM?

9      THAT IS TO SAY, WOULD HE NORMALLY MAKE UP THOSE

10     KINDS OF STATEMENTS?

11  A.  FAIRLY OFTEN, YEAH.

12  Q.  AND IS IT YOUR TESTIMONY THAT THERE ARE OTHER

13     EXAMPLES THAT YOU SIMPLY CAN'T REMEMBER OR THERE

14     ARE NO OTHER EXAMPLES?

15          MS. MAHONEY:  OBJECTION, LEADING.

16          THE COURT:  OVERRULED, AS PHRASED.  I THINK

17     YOU HAVE TO REPEAT IT.

18          BY MR. HICKS:

19  Q.  BRYAN, IS IT YOUR TESTIMONY THAT THERE ARE OTHER

20     EXAMPLES AND YOU CAN'T REMEMBER, OR THAT THESE ARE

21     THE ONLY EXAMPLES THERE ARE THAT YOU TESTIFIED TO?

22  A.  I BELIEVE THERE ARE MORE.

23  Q.  OKAY.  HAS THIS BEHAVIOR BEEN PRETTY CONSISTENT AS

24     LONG AS YOU HAVE KNOWN HIM, OR DID HE NOT DO THIS

25     AT A CERTAIN TIME IN THE DURATION OF TIME YOU HAVE

1      KNOWN HIM?

2   A.  IT WAS FAIRLY CONSISTENT.

3           MR. HICKS:  ALL RIGHT.  NOTHING FURTHER.

4           THE COURT:  MS. MAHONEY?

5                  CROSS-EXAMINATION

6           BY MS. MAHONEY:

7   Q.  HI, BRYAN.  DO YOU REMEMBER WHEN WE MET BACK IN

8       OCTOBER, WE HAD AN INTERVIEW WITH MR. SEARS, YOUR

9       ATTORNEY AT THE TIME, AND YOUR PARENTS WERE THERE.

10  A.  AT THE POLICE STATION?

11  Q.  AT BOTHELL.  AND THE BASEBALL GAME WAS GOING, AND

12      YOU WERE OUT IN THE CAR, AND YOU CAME IN FOR THE

13      INTERVIEW DURING THE PLAY-OFFS.  DO YOU REMEMBER

14      THAT?

15  A.  YES.

16  Q.  YOU REMEMBER THAT TIME WE TALKED ABOUT YOUR

17      RELATIONSHIP WITH IAN, AND DO YOU REMEMBER TELLING

18      ME YOU HAVE ACTUALLY SORT OF COVERED FOR IAN IN THE

19      PAST?

20  A.  YEAH.

21  Q.  AND AS A MATTER OF FACT, ON THE FIRST SATURDAY

22      NIGHT THAT HE TOOK OFF AND DIDN'T COME HOME AGAIN

23      UNTIL THE 15TH, FROM THAT WEEKEND ON THE 11TH, THAT

24      YOU HAD ACTUALLY LIED TO YOUR PARENTS ABOUT KNOWING

25      HE HAD TAKEN OFF; IS THAT RIGHT?

```
 1   A.   YES.

 2   Q.   WE ALSO TALKED ABOUT -- IF YOU RECALL, ABOUT

 3        WHETHER OR NOT IAN WOULD BRAG TO YOU ABOUT DOING

 4        STUFF.  DO YOU REMEMBER THAT?

 5   A.   WOULD YOU REPEAT THAT, PLEASE?

 6   Q.   I ASKED YOU ABOUT WHETHER OR NOT YOU REMEMBERED

 7        WHETHER IAN WOULD BRAG TO YOU ABOUT DOING STUFF.

 8        DO YOU REMEMBER THAT BY ANY CHANCE?

 9   A.   A LITTLE BIT.

10   Q.   DO YOU REMEMBER US TAPE-RECORDING THAT INTERVIEW?

11   A.   YES.

12   Q.   WOULD YOU LIKE TO SEE A TRANSCRIPT FROM THAT?

13        WOULD THAT HELP YOU?

14   A.   YES, PLEASE.

15             MR. HICKS:  COULD I ASK THE STATE IF I HAVE

16        BEEN GIVEN A COPY OF THIS?

17             MS. MAHONEY:  YOU HAVE THE TAPES.

18             MR. HICKS:  I HAVE NOT BEEN GIVEN A

19        TRANSCRIBED COPY.

20             THE COURT:  WOULD YOU LIKE TO LOOK AT IT?

21             MR. HICKS:  I SURE WOULD.

22             MS. MAHONEY:  HE HAS HAD THE TAPE.

23             THE COURT:  GIVE THE WHOLE TRANSCRIPT TO THE

24        WITNESS AND LET THE WITNESS LOOK AT IT.

25             BY MS. MAHONEY:
```

1    Q.    SHOWING YOU WHAT HAS BEEN MARKED AS STATE'S EXHIBIT

2          9, AND IT IS A TRANSCRIPTION OR TAPE OF BRYAN

3          BERUBE, AND IF YOU WANT TO TAKE A LOOK AT IT.    THE

4          "BRYAN B." WOULD BE YOU, AND THE "S. M." WOULD BE

5          ME.

6                DO YOU THINK THAT'S ACCURATE AS FAR AS YOU

7          CAN REMEMBER HOW THE CONVERSATION WENT?

8                MR. HICKS:    OBJECTION, YOUR HONOR, UNLESS

9          THE CONVERSATION IS ITSELF MADE CLEAR FOR THE

10         RECORD.

11               THE COURT:    SUSTAINED.

12               BY MS. MAHONEY:

13   Q.    WE ARE LOOKING AT PAGE 1, JUST AS FAR AS THE

14         INTRODUCTIONS AND THE TAPE-RECORDING, ET CETERA.

15         DOES THAT SEEM TO BE WHAT YOU REMEMBER GOING ON,

16         BRYAN.

17   A.    YES.

18   Q.    ALL RIGHT.    LET ME SHOW YOU THE SPECIFIC PORTION

19         THAT I WAS REFERRING TO EARLIER WHEN I ASKED ABOUT

20         THE BRAGGING.    I'M REFERRING TO PAGE 13, AND COULD

21         I HAVE YOU LOOK AT 13 AND 14 AT THE BOTTOM ACTUALLY

22         WHERE HE STARTS WITH:    "DID HE EVER BRAG TO YOU

23         ABOUT DOING STUFF, BEING A GANGSTER OR ANYTHING

24         LIKE THAT."    WHAT WAS YOUR RESPONSE?

25   A.    "NOT REALLY.    HE WOULD SOMETIMES TELL ME THAT HE

1      REALLY DIDN'T LIKE IT."

2   Q.  AND THEN I ASKED YOU:  "LIKED WHAT"?

3          MR. HICKS:  OBJECTION, YOUR HONOR.  HE NEEDS

4      TO KEEP READING THE ANSWER.  IT IS NOT COMPLETE.

5          MS. MAHONEY:  THAT WAS THE END FOR THAT

6      PART.  AND THE NEXT PART, I SAY "LIKE WHAT"?

7          THE COURT:  ALL RIGHT.  GO ON AND FINISH THE

8      ANSWER AFTER THE "LIKE WHAT"?

9          BY MS. MAHONEY:

10  Q.  WHAT DOES THE NEXT LINE SAY?

11  A.  "BEING IN A GANG, HOW HE WANTED TO GET OUT OF BEING

12      IN A GANG."

13  Q.  AND WHAT WAS THE NEXT QUESTION TO YOU?

14  A.  "SO HE DID TELL YOU HE WAS LIKE A PART OF A GANG.

15      DID HE TELL YOU WHAT THE NAME OF IT WAS"?

16  Q.  AND WHAT DID YOU RESPOND?

17  A.  "SOMETHING LIKE THE EASTSIDE MOBSTERS, OR SOMETHING

18      LIKE THAT.  I CAN'T REMEMBER."

19  Q.  ALL RIGHT.  AND WHY DON'T YOU KEEP READING FOR A

20      COUPLE OF LINES.

21  A.  OKAY.  "DID HE EVER BRAG TO YOU ABOUT DOING LIKE

22      BAD STUFF, CRIMES OR ANYTHING LIKE THAT"?

23  Q.  AND WHAT DID YOU ANSWER?

24  A.  "NOT REALLY, NO."

25  Q.  "WHEN YOU SAY 'NOT REALLY,' IS THAT LIKE NO OR HE

1    DIDN'T DO IT?"

2          AND THEN YOUR ANSWER?

3    A.   "HE DIDN'T REALLY TALK ABOUT THEM THAT MUCH.  BUT

4         HE WOULD SOMETIMES, YEAH."

5    Q.   "DID HE EVER TALK ABOUT HURTING PEOPLE"?

6    A.   NO.

7    Q.   AND THEN IT GOES ON TO DETECTIVE HOPKINS.  OKAY.

8          MR. HICKS:  YOUR HONOR, IF THAT'S IT, I WILL

9         MOVE TO STRIKE IT AS IMPROPER.  MR. SIMMERS DID NOT

10        COVER THAT SUBJECT MATTER ON HIS DIRECT

11        EXAMINATION.  IT IS AN ENTIRELY DIFFERENT SUBJECT

12        MATTER.

13          MS. MAHONEY:  HE ASKED HIM IF HE TALKED

14        ABOUT BAD STUFF.

15          MR. HICKS:  I DID NOT SAY THAT.

16          THE COURT:  THE OBJECTION IS OVERRULED AS TO

17        THE EXAGGERATION.  AND TO THE EXTENT IT GOES TO

18        THAT, THE OBJECTION IS OVERRULED.

19          BY MS. MAHONEY:

20    Q.   BRYAN, ONE LAST QUESTION:  AT THE BOTTOM OF THAT,

21        DETECTIVE HOPKINS -- DETECTIVE HOPKINS ASKED YOU:

22        "DO YOU THINK HE MAYBE KIND OF LIKE WAS INVOLVED IN

23        BAD STUFF, BUT HE DIDN'T WANT TO -- BUT HE DIDN'T

24        WANT TO BRING YOU INTO IT OR EXPOSE YOU TO THAT

25        KIND OF STUFF"?

1   A.   "KIND OF.  HE PRETTY MUCH KEPT IT TO HIMSELF.  HE

2        DIDN'T REALLY WANT TO TALK ABOUT IT.  I DIDN'T

3        REALLY WANT TO BRING IT UP, WE JUST HAD FUN."

4            MS. MAHONEY:  THANK YOU.  I HAVE NO FURTHER

5        QUESTIONS OF THIS WITNESS.

6            THE COURT:  MR. HICKS, DID YOU WANT A MINUTE

7        TO LOOK AT THAT TRANSCRIPT?

8            MS. MAHONEY:  I WILL OFFER IT FOR PRETRIAL

9        PURPOSES SO WE HAVE IT FOR THE RECORD.

10           THE COURT:  MR. HICKS, ANY OBJECTION TO THE

11       TRANSCRIPT BEING OFFERED FOR PRETRIAL PURPOSES?

12           MR. HICKS:  YES.  I HAVE NOT RECEIVED A COPY

13       OF IT AND READ IT AT ALL.

14           THE COURT:  WOULD YOU LIKE TO TAKE A MOMENT

15       TO READ IT AND TELL ME IF YOU HAVE ANY CONCERNS, OR

16       IF YOU WOULD LIKE AN OPPORTUNITY TO COMPARE IT TO

17       THE TAPE --

18           MR. HICKS:  I WOULD LIKE AN OPPORTUNITY TO

19       READ IT AFTER CROSS-EXAMINATION.  WE CAN MOVE ON

20       FOR NOW.

21           MS. MAHONEY:  I JUST WANT IT FOR THE RECORD,

22       THAT'S ALL.

23           THE COURT:  WELL, I WILL RESERVE RULING ON

24       IT UNTIL MR. HICKS HAS AN OPPORTUNITY TO COMPARE IT

25       TO THE TAPE AND MAKE ANY OBJECTIONS HE WANTS TO

1    MAKE.

2                    REDIRECT EXAMINATION

3         BY MR. HICKS:

4    Q.   BRYAN, WHEN YOU GAVE THAT TRANSCRIBED STATEMENT AND

5         YOU STATED THAT IAN WANTED OUT OF THE GANG, BY THAT

6         YOU MEANT HE WASN'T BRAGGING, HE WAS SAYING HE

7         WANTED OUT OF THE GANG; IS THAT RIGHT?

8    A.   SOMEWHAT, YES.

9    Q.   AND IN FACT YOU SUBSEQUENTLY LEARNED THIS SUPPOSED

10        GANG WAS CALLED SOMETHING LIKE NORTHWEST MOBSTERS;

11        IS THAT CORRECT?

12   A.   YES.

13   Q.   AND YOU ALSO LATER LEARNED IN FACT THAT YOUR

14        BROTHER IS NOT A MEMBER OF A GANG, AND THERE IS NO

15        SUCH THING AS NORTHWEST MOBSTERS; IS THAT CORRECT?

16   A.   YES, I DID.

17   Q.   THANK YOU.  AND SO ALL THAT TIME HE WAS TALKING

18        ABOUT -- POSTURING ABOUT, "OH, I'M TIRED OF THE

19        GANG LIFE," AND ALL THAT STUFF, HE WAS ACTUALLY

20        MAKING IT UP BECAUSE THERE WAS NO SUCH GANG?  AND

21        YOU REALIZED THAT LATER AFTER THIS INTERVIEW; IS

22        THAT CORRECT?

23             MS. MAHONEY:  I OBJECT.  MR. HICKS IS

24        TESTIFYING, AND IT IS LEADING.

25             THE COURT:  SUSTAINED.  LACK OF FOUNDATION.

1          MR. HICKS:  I WILL WITHDRAW IT.  NOTHING

2     FURTHER.

3          THE COURT:  MS. MAHONEY?

4          MS. MAHONEY:  NOTHING FURTHER.

5          THE COURT:  ALL RIGHT, THANK YOU.

6          MR. HICKS, DID YOU HAVE ANY ADDITIONAL

7     WITNESSES?

8          MR. HICKS:  YES.

9          WE WILL NOW CALL STEVEN CARRIER.

10    STEVEN J. CARRIER,          HAVING BEEN DULY SWORN,
                                  WAS EXAMINED AND TESTIFIED
11                                AS FOLLOWS:

12                    DIRECT EXAMINATION

13         BY MR. HICKS:

14    Q.  MR. CARRIER, COULD YOU PAY ATTENTION TO THE

15        MICROPHONE TO YOUR LEFT, AND GIVE YOUR FULL NAME

16        AND ADDRESS FOR THE RECORD, PLEASE.

17    A.  STEVEN JOHN CARRIER, 31004 NORTHEAST 132ND, DUVALL,

18        WASHINGTON, 98019.

19    Q.  YOUR RELATIONSHIP WITH THE SIMMERS FAMILY OR BERUBE

20        FAMILY?

21    A.  FRIEND.

22    Q.  YOUR RELATIONSHIP WITH IAN SIMMERS, IF ANY?

23    A.  FRIEND.

24    Q.  IS MR. SIMMERS PRESENT IN COURT TODAY?

25    A.  YES.

1   Q.   AND YOU ARE IDENTIFYING MR. SIMMERS SEATED AT

2        COUNSEL TABLE WITHOUT COUNSEL PRESENT; IS THAT

3        CORRECT?

4   A.   YES.

5   Q.   WHEN WAS THE LAST TIME YOU SAW MR. SIMMERS?

6   A.   ABOUT A MONTH AGO.

7   Q.   WHERE DID YOU VISIT HIM?

8   A.   IN THE COUNTY JAIL.

9   Q.   BEFORE THAT, WHEN WAS THE LAST TIME YOU SAW HIM?

10  A.   ABOUT 13 MONTHS AGO.

11  Q.   ALL RIGHT.  PRIOR TO MR. SIMMERS BEING IN CUSTODY,

12       WOULD YOU SEE HIM MORE THAN YOU SEE HIM NOW?

13  A.   OH, YES.

14  Q.   APPROXIMATELY HOW MANY TIMES IN A GIVEN MONTH,

15       PRIOR TO HIS BEING IN CUSTODY, WOULD YOU SEE

16       MR. SIMMERS?

17  A.   THREE OR FOUR TIMES A MONTH.

18  Q.   HOW MANY YEARS HAVE YOU KNOWN MR. SIMMERS?

19  A.   A LITTLE LESS THAN FOUR.

20  Q.   LESS THAN FOUR YEARS?

21  A.   LESS THAN FOUR.  THREE TO FOUR YEARS, YES.

22  Q.   HOW DID YOU COME TO KNOW THE BERUBE FAMILY AND

23       MR. SIMMERS?

24  A.   DAVE AND DONNA BERUBE COME TO OUR HOME FIRES GROUP,

25       AND QUITE OFTEN IAN WOULD COME WITH THEM.  AND IN

1       ADDITION I WOULD SEE IAN AT CHURCH.

2   Q.  IN WHAT CAPACITY THOUGH SPECIFICALLY DO YOU

3       INTERACT WITH IAN SIMMERS?

4   A.  I THINK AS A FRIEND.

5   Q.  WHAT SORT OF THINGS WOULD YOU DO AND TALK ABOUT?

6   A.  TALK A GOOD DEAL ABOUT ART AND ARCHITECTURE, AN

7       INTEREST WE HAVE IN COMMON.

8   Q.  WOULD YOU HAVE CONVERSATIONS WITH IAN THAT YOU

9       NORMALLY WOULDN'T HAVE WITH A RUN-OF-THE-MILL

10      TEENAGER?

11  A.  I'M SORRY?

12  Q.  WOULD YOU HAVE CONVERSATIONS WITH IAN THAT YOU

13      NORMALLY WOULDN'T HAVE WITH A TEENAGER YOU DIDN'T

14      KNOW AS WELL?  WOULD THAT BE FAIR?

15  A.  I DON'T THINK SO.  NORMAL CONVERSATIONS.

16  Q.  HOW WELL DO YOU FEEL YOU KNOW IAN?

17  A.  FAIRLY WELL.

18  Q.  ALL RIGHT.  HAVE YOU HAD OCCASION TO OBSERVE

19      BEHAVIOR BY MR. SIMMERS THAT SHOWS A CAPACITY TO

20      EITHER MAKE UP STORIES OR EXAGGERATE STORIES?

21  A.  YES.

22  Q.  WOULD YOU GIVE THE COURT SOME EXAMPLES, AND IF YOU

23      REMEMBER THE APPROXIMATE YEAR OR MONTH, THROW THAT

24      IN TOO?

25  A.  NEARLY THREE YEARS AGO, IAN AND HIS FATHER,

1      STEPFATHER, WERE HAULING CARPET AND STORING IT IN

2      OUR HOUSE.  AND I RECALL IAN BRAGGING ABOUT

3      CARRYING HUGE ROLLS OF CARPETS, AND THE ROLLS WERE

4      PROBABLY TOO LARGE FOR ONE MAN TO CARRY.

5   Q.  HOW MUCH WOULD THEY WEIGH?

6   A.  OH, A COUPLE OF HUNDRED POUNDS, BUT VERY AWKWARD,

7      LONG AWKWARD ROLLS.

8   Q.  AND THIS WAS HOW LONG AGO?

9   A.  TWO AND A HALF OR THREE YEARS.  I BELIEVE IT WAS

10      SUMMERTIME.

11  Q.  AND MR. SIMMERS WOULD HAVE BEEN APPROXIMATELY

12      THIRTEEN OR FOURTEEN YEARS OF AGE?

13  A.  YES.

14  Q.  WHAT OTHER EXAMPLES?

15  A.  WE TALKED A LOT ABOUT ARCHITECTURE AND THE HOUSE HE

16      WOULD LIKE TO BUILD SOME DAY.  AND IT WAS AN

17      EXAGGERATED HOUSE -- 45 ROOMS, AND A SWIMMING POOL

18      ON THE TOP FLOOR, AND A WONDERFUL, EXAGGERATED

19      HOUSE.

20  Q.  HOW LONG AGO WAS THIS?

21  A.  IT WAS A RECENT CONVERSATION IN JAIL, WHEN I

22      VISITED HIM IN JAIL.

23  Q.  ANY OTHER EXAMPLES?

24  A.  THERE HAS BEEN A LOT OF EXAMPLES, BUT I'M AFRAID I

25      CAN'T GIVE YOU THE SPECIFICS.  I REMEMBER THE

1    EXAGGERATIONS, GENERALLY.

2  Q.  WHAT SORT OF SUBJECT MATTERS, IF YOU CAN REMEMBER,

3    WOULD THEY INCLUDE?

4  A.  PERSONAL FEATS, SOME BRAGGADOCIO.

5  Q.  AND HOW LONG -- STRIKE THAT.  OVER HOW LONG A

6    PERIOD OF TIME WOULD YOU SAY YOU OBSERVED THESE

7    TENDENCIES ON BEHALF OF MR. SIMMERS?

8  A.  OH, I THINK VERY NEARLY FROM THE BEGINNING.

9  Q.  AND AS I UNDERSTAND YOUR TESTIMONY, THERE ARE MANY

10    OTHER EXAMPLES, YOU JUST CAN'T REMEMBER THEM

11    SPECIFICALLY?

12  A.  OH, YES, MANY -- ALMOST EVERY TIME WE TALKED.

13         MR. HICKS:  ALL RIGHT.  NOTHING FURTHER.

14         ONE OTHER QUESTION.  I'M SORRY.

15  Q.  HAVE YOU EVER KNOWN THE SIMMERS FAMILY, ANY OF

16    THEM, TO HAVE GUNS?

17  A.  NO.

18         MR. HICKS:  THANK YOU.

19         THE COURT:  MR. MARNER?

20         MR. MARNER:  I HAVE NO QUESTIONS.  THANK

21    YOU.

22         THE COURT:  THANK YOU.

23         MR. HICKS:  YOUR HONOR, MAY I MAKE A

24    SUGGESTION?  I CAN STILL CALL MR. BERUBE.  AND

25    FRANKLY, I FORGOT THIS MORNING TO CALL CHARLOTTE

1    JUDD, AND SHE IS THE WITNESS WE AGREED TO HAVE

2    TESTIFY FROM HOME, BECAUSE OF HER CONDITION.  AND I

3    WONDER IF WE CAN TAKE A 15-MINUTE BREAK, AND I CAN

4    TAKE CARE OF THAT.

5            THE COURT:  THAT'S FINE, BUT THIS WITNESS IS

6    EXCUSED FOR NOW.

7            MS. MAHONEY:  YOUR HONOR, JUST BEFORE WE DO

8    THAT, THE OTHER THING I WAS THINKING ABOUT --

9            THE COURT:  -- BEFORE WE HAVE A DISCUSSION,

10   CAN WE LET THIS WITNESS GO?

11           MS. MAHONEY:  RIGHT.  BEFORE WE LET HIM GO,

12   I WANTED TO ASK SOMETHING:  ONE OF THE NEXT

13   WITNESSES WE HAVE IS ABOUT THE POTENTIAL CHARACTER

14   TESTIMONY AT THE TIME OF TRIAL.

15           SINCE MR. HICKS ALREADY HAS ALL OF THESE

16   WITNESSES HERE THIS MORNING, AND ONE OF THE THINGS

17   THE COURT WILL HAVE TO DETERMINE IS THRESHOLD -- I

18   MEAN, THERE ARE A NUMBER OF THINGS THE COURT WILL

19   NEED TO GO THROUGH, BUT ONE OF THEM IS THE

20   THRESHOLD AS TO WHETHER OR NOT THEY QUALIFY AS

21   BEING ABLE TO BASE IT ON WHAT THEY KNOW IN THE

22   COMMUNITY VERSUS THEIR PERSONAL OPINION.

23           AND WOULD THE COURT BE INCLINED TO TAKE

24   OFFERS OF PROOF THIS MORNING WHILE THESE WITNESSES

25   ARE HERE, SINCE THEY WON'T HAVE TO COME BACK A

1    SECOND TIME?

2         MR. HICKS:  YOUR HONOR, I AM FOCUSING THIS

3    ENTIRE LINE OF QUESTIONING IN MY PREPARATION, FOR

4    3.5 PURPOSES.  AND I DON'T WANT TO APPROACH THAT

5    RIGHT NOW.

6         MS. MAHONEY:  I MEANT AFTER THE HEARING BUT

7    WHILE THEY ARE STILL HERE, BEFORE WE LET THEM GO,

8    SO WE ARE NOT IN THE MIDDLE OF THE TRIAL STOPPING

9    FOR TESTIMONY OUTSIDE THE PRESENCE OF THE JURY.

10   BUT IT IS UP TO THE COURT.  THAT'S THE REASON WHY I

11   SUGGESTED IT.

12        MR. HICKS:  I AM ALL FOR CONVENIENCING THE

13   COURT AS MUCH AS POSSIBLE, BUT I THINK THIS IS

14   IMPORTANT.

15        THE COURT:  I'M NOT GOING TO HOLD A SEPARATE

16   HEARING ON REPUTATION EVIDENCE.  THAT ISSUE HASN'T

17   BEEN ARGUED, AND THERE IS NO RESOLUTION ABOUT

18   WHETHER THAT EVIDENCE WOULD BE ADMITTED IN THE

19   TRIAL.

20        THIS WITNESS MAY STEP DOWN.

21        MR. HICKS:  THANK YOU.

22        THE COURT:  ALL RIGHT, THANK YOU.

23        MR. HICKS, TO SEEK CLARIFICATION, YOU HAVE

24   ONE ADDITIONAL WITNESS YOU HAVE LINED UP THAT YOU

25   WANT TO CONTACT BY PHONE.  YOU WANT TO USE THE

1    BREAK FOR THAT?  WE WILL CONTACT THE PERSON BY

2    PHONE AT THE END OF THE BREAK.

3         I ALSO NEED TO ADVISE YOUR CLIENT.  IT SEEMS

4    TO ME I SHOULD DO THAT NOW, PRIOR TO THE BREAK, SO

5    YOU WILL HAVE THE OPPORTUNITY TO MEET WITH YOUR

6    CLIENT PERHAPS DURING THE BREAK ABOUT THAT ISSUE.

7         IT IS MY UNDERSTANDING THEN THAT YOU JUST

8    HAVE THE ONE WITNESS AND PERHAPS THE DEFENDANT?

9         MR. HICKS:  AND MR. BERUBE, DAVID BERUBE,

10   IAN'S STEPFATHER.

11        THE COURT:  WHY ARE WE NOT PUTTING HIM ON

12   NOW?

13        MR. HICKS:  I THOUGHT IT WOULD BE A GOOD

14   TIME FOR A RECESS.

15        THE COURT:  HOW LONG IS HE?

16        MR. HICKS:  I IMAGINE IT WILL TAKE AS LONG

17   AS MRS. BERUBE.

18        THE COURT:  WHY DON'T WE PUT HIM ON SO WE

19   CAN HAVE THAT DONE, AND WE CAN COORDINATE THE

20   TELEPHONE CONFERENCE, AND YOU CAN TALK TO YOUR

21   CLIENT.

22        MR. HICKS:  ALL RIGHT.  BUT JUST SO YOU

23   UNDERSTAND, MR. BERUBE -- THEY ARE GOING TO BE

24   AROUND ALL DAY.

25        THE COURT:  I THOUGHT THEY WERE GOING TO

1    LEAVE.

2              MR. HICKS:   NO.   THEY WANT TO STICK AROUND.

3              THE COURT:   WELL, THAT'S FINE.   IF IT'S NOT

4    A PROBLEM FOR THEM, THEN THAT'S FINE.

5              MR. SIMMERS, THE PURPOSE OF THIS HEARING IS

6    TO DETERMINE WHETHER OR NOT THE STATEMENTS YOU HAVE

7    MADE WILL BE USED IN COURT DURING THE TRIAL.   I

8    ADVISE YOU FOR THE PURPOSES OF THIS HEARING AS

9    FOLLOWS:

10             FIRST, YOU MAY IF YOU WISH TO TESTIFY AT

11   THIS HEARING, BUT YOU ARE NOT REQUIRED TO DO SO IF

12   YOU DO NOT WISH TO.

13             IF YOU DO TESTIFY, YOU WILL BE SUBJECT TO

14   CROSS-EXAMINATION ABOUT THE CIRCUMSTANCES UNDER

15   WHICH YOU MADE THE STATEMENTS AND ALSO ANY OTHER

16   MATTERS WHICH MAY AFFECT YOUR BELIEVABILITY AS A

17   WITNESS.

18             EVEN IF YOU DO TESTIFY AT THIS HEARING, YOU

19   WILL RETAIN YOUR RIGHT TO REMAIN SILENT AND NOT

20   TESTIFY AT THE TRIAL.   HOWEVER, IF YOU DO TESTIFY

21   AT THIS HEARING, THE FACT THAT YOU HAVE DONE SO

22   WILL NOT BE MENTIONED OR TOLD TO THE JURY UNLESS

23   YOU ALSO BECOME A WITNESS ON THESE STATEMENTS AT

24   THE TRIAL.

25             I'M ADVISING YOU OF THE PURPOSE OF THIS

1    HEARING SO THAT YOU WILL HAVE THE OPPORTUNITY TO

2    DISCUSS WITH MR. HICKS WHETHER OR NOT YOU WISH TO

3    TAKE THE STAND AS PART OF THIS HEARING.

4         WE WILL BE IN RECESS.

5         MR. HICKS, IT IS MY UNDERSTANDING THAT YOU

6    WILL COORDINATE THIS TELEPHONE CALL THAT WE ARE

7    GOING TO DO AFTER THE BREAK.  WE WILL BE IN RECESS

8    FOR APPROXIMATELY FIFTEEN MINUTES.

9         MR. HICKS:  YOUR HONOR, I WILL NEED SOME

10   ASSISTANCE, I HAVE NO KNOWLEDGE ABOUT YOUR

11   CONFERENCE CALL CAPACITY.

12        THE COURT:  ALL RIGHT.  THAT'S FINE.

13                        (RECESS.)

14        MR. HICKS:  YOUR HONOR, MR. SIMMERS WILL NOT

15   BE TAKING THE STAND FOR 3.5 PURPOSES.

16        YOUR HONOR, MS. JUDD'S ANSWERING MACHINE IS

17   ON, AND I WOULD LIKE TO EXPLAIN:  SHE KNEW SHE WAS

18   SUPPOSED TO BE ON STANDBY, BUT ON THE OTHER HAND

19   SHE ALSO EXPLAINED SHE OFTEN HAS TO MAKE SUDDEN

20   TRIPS TO HER DOCTOR BECAUSE OF HER CONDITION.  AND

21   IN TERMS OF HER CLOSE SPATIAL MEMORY, THE TERM THE

22   EXPERTS USE, SHE TENDS TO FORGET THINGS THAT WERE

23   TOLD TO HER LIKE A DAY BEFORE THAT ARE RELATIVELY

24   INCONSEQUENTIAL.

25        AND I CAN PROCEED WITH DAVE BERUBE.

1      THE COURT:  DO YOU MEAN YOU WILL CHECK WITH

2  HER ANSWERING MACHINE?

3      MR. HICKS:  I HAVE MRS. BERUBE CONTINUING TO

4  TRY TO GET AHOLD OF HER.

5      AND I ALSO HAVE A DISCOVERY REQUEST:

6  MS. MAHONEY IS IN RECEIPT OF A LETTER, MRS. GOATER

7  AND MS. MAHONEY HAVE ACCESS TO A LETTER WHICH

8  SUPPOSEDLY KENNY WYATT WROTE TO MS. GOATER, OR

9  SOMEBODY IN S.A.U., DETAILING THE DESIRE TO TESTIFY

10  AGAINST MR. SIMMERS FOR A DEAL.

11      I NEVER HEARD ABOUT IT UNTIL THIS DAY, AND I

12  WOULD LIKE A COPY OF THE LETTER AND TO RESERVE ANY

13  POTENTIAL MOTION ON IT.

14      THE COURT:  FINE.

15  DAVID BERUBE,              HAVING BEEN DULY SWORN,
                               WAS EXAMINED AND TESTIFIED
16                             AS FOLLOWS:

17              DIRECT EXAMINATION

18      BY MR. HICKS:

19  Q.  SIR, WOULD YOU STATE YOUR FULL NAME, AND SPELL YOUR

20  LAST NAME, AND THEN GIVE YOUR ADDRESS FOR THE

21  RECORD, PLEASE.

22  A.  DAVID ARTHUR BERUBE, B-E-R-U-B-E.  AND MY ADDRESS

23  IS 6511 WEST SNOQUALMIE VALLEY ROAD, NORTHEAST,

24  CARNATION, WASHINGTON.  98014.

25  Q.  OKAY.  WHAT IS YOUR RELATIONSHIP, IF ANY, WITH IAN

1        SIMMERS?

2   A.   I'M HIS STEPFATHER.

3   Q.   OKAY.  HOW LONG HAVE YOU BEEN MARRIED TO HIS

4        MOTHER?

5   A.   SEVEN -- A LITTLE OVER SEVEN YEARS.  SEVEN AND A

6        HALF YEARS.

7   Q.   OKAY.  HAVE YOU SEEN MR. SIMMERS SINCE HE HAS BEEN

8        IN CUSTODY?

9   A.   YES.

10  Q.   HOW OFTEN?

11  A.   NORMALLY, ONCE A WEEK.

12  Q.   OKAY.  WHEN MR. SIMMERS IS NOT IN CUSTODY, WHERE

13       DOES HE LIVE?

14  A.   HE LIVES AT MY HOUSE, OUR HOUSE.

15  Q.   WITH THE EXCEPTION OF WHEN HE MIGHT TAKE OFF FOR A

16       NIGHT OR A TRIP WITH FRIENDS?

17  A.   CORRECT.

18  Q.   HAS HE GENERALLY RESIDED THERE AS LONG AS YOU HAVE

19       BEEN MARRIED TO MRS. BERUBE?

20  A.   YES.

21  Q.   ALL RIGHT.  DID YOU KNOW IAN FOR ANY LONGER PERIOD

22       OF TIME THAN THE DURATION OF THE MARRIAGE?

23  A.   YES.  I MET IAN WHEN I FIRST STARTED DATING HIS

24       MOTHER.

25  Q.   HOW MANY YEARS AGO WAS THAT?

77

1    A.   THAT WAS ABOUT TEN YEARS AGO.

2    Q.   SORRY?

3    A.   NINE OR TEN YEARS.

4    Q.   AND IN WHAT CAPACITY GENERALLY HAVE YOU INTERACTED

5         WITH IAN OVER THE YEARS?

6    A.   WE TALK.  JUST, I GUESS, ACTING A LITTLE BIT --

7         TELLING HIM WHAT TO DO.

8    Q.   WOULD YOU TALK ABOUT THINGS OTHER THAN TYPICAL

9         FAMILY THINGS?

10   A.   WE OCCASIONALLY WOULD.

11   Q.   HOW WELL DO YOU FEEL YOU KNOW IAN?

12   A.   I GUESS FAIRLY WELL.

13   O.   OKAY.  HAVE THERE BEEN INSTANCES IN HIS BEHAVIOR

14        THAT YOU HAVE OBSERVED THAT SUGGEST A PATTERN OR

15        TENDENCY TO EXAGGERATE OR MAKE STORIES UP?

16   A.   YES.

17   Q.   ALL RIGHT.  WOULD YOU GIVE SOME EXAMPLES TO THE

18        JUDGE, AND IF YOU CAN NARROW IT DOWN TO WHATEVER

19        TIME FRAME YOU CAN?

20   A.   OKAY.  I GUESS THE ONE THAT IS NOT A SPECIFIC TIME

21        FRAME, BUT IN THE PAST HE HAS TALKED ABOUT MOVIES

22        HE HAS GONE AND SEEN, AND HE WASN'T SUPPOSED TO

23        SEE, BUT HE HAS SEEN THIS AND THAT, AND SOMETIMES

24        WE BRING MOVIES HOME, AND HE WOULDN'T KNOW ANYTHING

25        ABOUT THEM.

1          AND HE ALSO -- AT ONE POINT WE WERE TALKING

2     ABOUT -- SOMEHOW WE GOT ON THE DISCUSSION OF MOON-

3     SHINE, AND HE WAS SAYING HOW SOME FRIENDS OF HIS --

4  Q.  YOU'LL HAVE TO SPEAK UP, DAVE.

5  A.  HE WAS SAYING HOW FRIENDS OF HIS USED TO MAKE MOON-

6     SHINE IN CARNATION.  AND, YOU KNOW, THE PEOPLE HE

7     TOLD ME ABOUT LIVED IN THE MIDDLE OF TOWN.  AND,

8     YOU KNOW, THAT CAN'T BE TRUE.  HE SAID THEY LIVED A

9     WAY OUTSIDE OF TOWN, BUT HE TOOK ME TO THEIR HOUSE

10     ONCE, OR TOOK DONNA TO THEIR HOUSE, OR SHE PICKED

11     HIM UP.

12  Q.  AGAIN, I WILL ASK YOU TO SPEAK INTO THE MIKE IF YOU

13     CAN.  CAN YOU THINK OF OTHER EXAMPLES?

14  A.  THERE WAS ONE TIME WE WERE TALKING TO HIM ON THE

15     PHONE, AND TALKING ABOUT MONEY.  AND HE SAID HE HAD

16     $17,000 SITTING IN FRONT OF HIM ON THE TABLE, AND

17     HE WAS TALKING ABOUT THAT.

18          IAN NEVER HAD MONEY; HE HAD TO STEAL

19     CIGARETTES, AND THERE WAS NO INDICATION HE EVER HAD

20     EXTRA MONEY AT HOME OR ANYTHING.

21  Q.  HOW LONG AGO WAS THAT?

22  A.  THAT WAS ABOUT TWO YEARS AGO -- TWO TO THREE YEARS

23     AGO.

24  Q.  DURING ALL THESE YEARS, HAVE YOU EVER OBSERVED GUNS

25     IN YOUR RESIDENCE?

1   A.   NO.   WELL, THE ONLY GUN THAT I'VE SEEN IAN EVER HAD

2        WAS A PLASTIC SQUIRT GUN THAT HE HAD THAT LOOKED

3        LIKE A GUN -- MORE LIKE A GUN.

4   Q.   THANK YOU FOR CLEARING THAT UP.   HOW ABOUT, WAS

5        THERE EVER AN INSTANCE WHERE HE CAME HOME

6        UNEXPECTEDLY WITH AN UNEXPLAINED AMOUNT OF CLOTHING

7        THAT YOU WOULDN'T THINK THAT HE WOULD BE ABLE TO

8        BUY ON HIS OWN?

9   A.   NO.   THE ONLY TIME HE CAME HOME WITH CLOTHING THAT

10       HE DIDN'T OWN WAS -- IT WAS USED, LIKE, YOU KNOW

11       SOMEBODY ELSE CLOTHES.   HE SWITCHED CLOTHES WITH

12       SOMEBODY.

13  Q.   CAN YOU THINK OF ANY OTHER EXAMPLES REGARDING WHAT

14       WE ARE TALKING ABOUT?

15  A.   RECENTLY, I WAS TALKING TO IAN, AND HE TALKED TO ME

16       ABOUT HE WOULD SNEAK UP IN THE MIDDLE OF THE NIGHT

17       IN MY BEDROOM AND TAKE MONEY OUT OF MY WALLET,

18       WHICH WAS ON THE NIGHTSTAND.   AND HE WOULD DO THIS

19       QUITE OFTEN.   AND I SLEPT SO SOUNDLY, HE WOULD BE

20       ABLE TO GET IN THERE.

21            BUT I WAS -- THE REASON MY WALLET WAS ON MY

22       NIGHTSTAND WAS BECAUSE I WAS AFRAID HE WOULD TAKE

23       MONEY AND I ALWAYS KEPT TRACK AND KNEW HOW MUCH

24       MONEY I HAD IN THERE.

25  Q.   DID YOU EVER NOTICE ANY AMOUNT MISSING?

1    A.  NO.

2    Q.  ANY OTHER EXAMPLES -- INCIDENTALLY, HOW LONG AGO

3        WAS THAT?  OVER WHAT PERIOD OF TIME?

4    A.  THAT WAS -- I TALKED TO HIM RECENTLY BUT IT WAS

5        PROBABLY -- WITHIN THE LAST COUPLE OF YEARS HE HAD

6        SAID HE HAD DONE IT SEVERAL TIMES.

7    Q.  ALL RIGHT.  ANY OTHER EXAMPLES THAT YOU CAN THINK

8        OF?

9    A.  NOT THAT I CAN THINK OF, NO.

10   Q.  ALL RIGHT.  DO YOU CONSIDER THIS BEHAVIOR SOMETHING

11       ISOLATED FOR HIM, OR SOMETHING YOU HAVE SEEN A

12       GENERAL PATTERN OF OVER THE YEARS?

13   A.  I HAVE SEEN IT AS A GENERAL PATTERN SINCE THE FIRST

14       TIME I MET HIM.

15           MR. HICKS:  NOTHING FURTHER.

16                   CROSS-EXAMINATION

17           BY MS. MAHONEY:

18   Q.  HI, MR. BERUBE.  DO YOU RECALL US MEETING BEFORE?

19   A.  YES.

20   Q.  AT THAT INTERVIEW, WE TALKED ABOUT IAN'S TENDENCY

21       TO BRAG.  DO YOU RECALL THAT?

22   A.  NOT SPECIFICALLY.

23   Q.  OKAY.  WOULD IT BE FAIR TO SAY THAT WHEN IAN WOULD,

24       YOU KNOW, BRAG ABOUT STUFF TO YOU, THAT HE WOULDN'T

25       REALLY GIVE YOU MANY DETAILS, AND YOU WOULD KIND OF

1        BLOW IT OFF AS BLUSTERING?  IS THAT A FAIR

2        STATEMENT?

3    A.  I WOULD BLOW IT OFF AS BLUSTERING BUT NOT BECAUSE

4        HE DIDN'T GIVE A LOT OF DETAILS, NO.

5    Q.  YOU SAID HE HAD TALKED ABOUT, YOU KNOW, HAVING HIS

6        FRIENDS BE SHOT AT AND THINGS LIKE THAT; IS THAT

7        RIGHT?

8    A.  YES.

9    Q.  AND YOU SAY YOU WOULD BLOW THAT OFF AS BLUSTERING.

10       AND ONE OF THE THINGS THAT MADE YOU THINK THAT WAS

11       BECAUSE EITHER HE WOULDN'T KNOW THEIR NAMES, OR HE

12       WOULD CHANGE THEIR NAMES, AND THINGS LIKE THAT

13       WOULDN'T BE CONSISTENT OR ADD UP; IS THAT RIGHT?

14   A.  YES.

15   Q.  AND SO, BASICALLY, A LOT OF THE TIMES YOU KNEW HE

16       WAS EXAGGERATING BECAUSE THE THINGS THAT HE TOLD

17       YOU COULDN'T BE CORROBORATED, THEY JUST DIDN'T MAKE

18       SENSE; ISN'T THAT RIGHT?

19           MR. HICKS:  OBJECTION.  HE DIDN'T TESTIFY TO

20       THAT.  HE DID NOT SAY THAT, YOUR HONOR, IN HIS

21       TESTIMONY.

22           THE COURT:  SUSTAINED AS PHRASED.

23           BY MS. MAHONEY:

24   Q.  OKAY.  LET ME DO GO THROUGH SPECIFIC EXAMPLES:  YOU

25       TOLD US ABOUT THE MOONSHINE EXAMPLE, AND THE REASON

1      THAT DIDN'T MAKE SENSE IS BECAUSE THEY LIVED IN THE

2      MIDDLE OF TOWN NOT OUT OF TOWN LIKE HE SAID; IS

3      THAT RIGHT?

4  A.   AND ALSO HE TOLD ME -- I TALKED TO HIM ABOUT IT,

5      THAT YOU CAN'T MAKE MOONSHINE IN TOWN.  AND HE SAID

6      THEY LIVED OUT OF TOWN, AND HE DIDN'T KNOW THE

7      RIGHT PLACE.

8  Q.   AND YOU KNEW THAT NOT TO BE TRUE AND YOU BLEW IT

9      OFF THAT HE'S EXAGGERATING AGAIN?

10 A.   YES.

11 Q.   OKAY.  AND ABOUT THE MONEY, HE WOULD SAY THAT HE

12     TOOK THIS MONEY, BUT, AGAIN, THERE WAS NOTHING TO

13     CORROBORATE THAT HE TOOK THE MONEY.  AND SO YOU

14     DIDN'T BELIEVE HIM; IS THAT RIGHT?

15 A.   CORRECT.

16 Q.   AND ISN'T IT FAIR TO SAY THEN, IN A LOT OF THE

17     EXAMPLES YOU GAVE, THE REASON WHY YOU FELT HE WAS

18     EXAGGERATING OR NOT TELLING THE TRUTH IS BECAUSE

19     THE FACTS DIDN'T ADD UP; IS THAT RIGHT?

20 A.   IN THE EXAMPLES THAT I GAVE?

21 Q.   UH-HUH.

22 A.   THE FACTS DIDN'T ADD UP.

23          MS. MAHONEY:  ALL RIGHT.  THANK YOU.  NO

24     FURTHER QUESTIONS.

25          THE COURT:  MR. HICKS?

REDIRECT EXAMINATION

        BY MR. HICKS:

Q.  WHAT YOU ARE SAYING IS THAT, GENERALLY, SOME OF

    IAN'S STATEMENT ARE SO ABSURD YOU WOULD NOT PRESS

    FOR MORE DETAIL, IS THAT ACCURATE?  DO I UNDERSTAND

    YOUR TESTIMONY?

A.  CORRECT.

Q.  AND IF SOMEBODY DID PRESS HIM FOR DETAIL, WHO WAS

    INTERESTED IN WHAT HE HAD TO SAY, WOULD IT BE YOUR

    TESTIMONY THAT HE WOULD BE CONSISTENT IN CONTINUING

    TO FABRICATE DETAILS?

A.  YES.

        MR. HICKS:  NOTHING FURTHER.

        THE COURT:  MS. MAHONEY?

        MS. MAHONEY:  I HAVE NOTHING FURTHER.

        THE COURT:  THANK YOU.

        MR. HICKS:  WELL, HERE WE ARE THEN, YOUR

HONOR.  I AM AFRAID I HAVE RUN OUT OF WITNESSES.

AND CHARLOTTE JUDD REMAINS, BUT MRS. BERUBE WOULD

HAVE COME IN IF SHE HAD GOTTEN AHOLD OF HER.

        MS. MAHONEY:  WE MAY BE ABLE TO STIPULATE TO

WHAT SHE WOULD TESTIFY IF MR. HICKS WANTS TO TALKS

TO US.

        THE COURT:  YOU WANT TO TAKE A BREAK AND

TALK TO THE PROSECUTOR, AND FOR THE PURPOSES OF THE

84

```
 1        RECORD MAKE AN OFFER OF PROOF AS TO WHAT THIS

 2        WITNESS WOULD SAY IF YOU CALLED THIS WITNESS.

 3              MR. HICKS:  YES, YOUR HONOR.

 4              THE COURT:  WE WILL TAKE A TWO-MINUTE BREAK

 5        TO DO THAT.

 6                                  (RECESS.)

 7              THE COURT:  COUNSEL, I AM INFORMED THERE IS

 8        NO AGREEMENT ABOUT WHAT THIS WITNESS WOULD SAY.

 9              MR. HICKS:  AFRAID NOT.

10              THE COURT:  WHO WAS THE WITNESS AGAIN?

11              MR. HICKS:  CHARLOTTE JUDD, J-U-D-D-.

12        AGAIN, MRS. BERUBE IS TRYING TO GET AHOLD OF HER.

13              THE COURT:  ALL RIGHT:  YOU WILL HAVE UNTIL

14        2:00 TO GET AHOLD OF MS. JUDD, AND IF YOU HAVE NOT,

15        I AM GOING TO GO AHEAD AND RULE.

16              MR. HICKS:  ALL RIGHT.

17              THE COURT:  IF YOU WISH TO MAKE A FORMAL

18        OFFER OF PROOF OF WHAT SHE WOULD HAVE SAID, ABSENT

19        A STIPULATION, FOR PURPOSES OF THE RECORD, YOU CAN

20        PROVIDE THAT IN WRITING.

21              MR. HICKS:  WELL, I WON'T HAVE TIME.  IF I

22        CAN DO IT IN HANDWRITING, THAT'S FINE.  I WON'T

23        HAVE TIME TO TYPE IT UP.

24              MS. MAHONEY:  WILL WE BE ABLE TO DO THE

25        SAME?
```

1    MR. HICKS:  I WANT TO COMPLETE THE RECORD.

2    MS. JUDD WAS PROPERLY SUBPOENAED, AND I TRIED TO

3    MAKE A RECORD ABOUT HER MEDICAL CONDITION.

4        THE COURT:  YOU HAVE UNTIL 2:00 TO MAKE HER

5    A PART OF THE RECORD.  ABSENT THAT, YOU MAY SUBMIT

6    YOUR OFFER OF PROOF OF WHAT SHE WOULD HAVE SAID,

7    AND THE STATE CAN IN WRITING OFFER THEIR RENDITION,

8    BASED UPON THE INTERVIEW, OF WHAT SHE WOULD HAVE

9    SAID.

10       MR. HICKS:  I APPRECIATE THAT.

11       THE COURT:  ALL RIGHT.  THAT THEN CONCLUDES

12   THIS PORTION OF THE HEARING, WHICH IS THE 3.5

13   HEARING, SUBJECT TO MS. JUDD TESTIFYING, AND THE

14   RECORD BEING INCOMPLETE AS TO MS. JUDD, I WILL

15   RESERVE RULING UNTIL WE ARE ABLE TO CLARIFY AS TO

16   MRS. JUDD.

17       HAVING SAID THAT -- I DIDN'T BRING OUT THE

18   OTHER PLEADINGS, AND LET ME DO THAT SO WE CAN TURN

19   TO THE OTHER MOTIONS.

20       I NEED ONE MINUTE, COUNSEL.

21       (SHORT PAUSE IN THE PROCEEDINGS.)

22       THE COURT:  ALL RIGHT.  WE HAVE TWO OTHER

23   MOTIONS THAT WE CAN TAKE UP:  ONE IS A MEMORANDUM

24   IN SUPPORT OF MOTION IN LIMINE TO INCLUDE MENTION

25   OF OTHER SUSPECTS.

1        AND I HAVE RECEIVED FROM MR. HICKS ON BEHALF

2   OF HIS CLIENT A MEMORANDUM REGARDING OTHER SUSPECT

3   EVIDENCE.  WE CAN ADDRESS THAT.

4        THERE IS ALSO THE ISSUE OF INTRODUCING

5   EITHER CHARACTER EVIDENCE AS CHARACTERIZED PURSUANT

6   TO EVIDENCE RULE 404(A) AND 405, AND THE

7   ALTERNATIVE ARGUMENT THAT I BELIEVE MR. HICKS WILL

8   MAKE ON BEHALF OF THE DEFENDANT PURSUANT TO

9   EVIDENCE RULE 406 ON HABIT.

10        AND SO WE HAVE THOSE TWO MOTIONS THAT WE CAN

11   ADDRESS NOW, AND DOES COUNSEL HAVE A PREFERENCE AS

12   TO WHICH ONE WE DO FIRST?

13        MR. HICKS:  I PREFER TO ADDRESS THE OTHER

14   SUSPECT EVIDENCE.

15        THE COURT:  WE WILL TAKE UP THE OTHER

16   SUSPECT EVIDENCE AND THEN TURN TO THE CHARACTER

17   EVIDENCE.

18        MR. HICKS:  IT IS THE STATE'S MOTION.

19        MR. MARNER:  YOUR HONOR, THANK YOU.  I

20   REREAD -- I ALREADY READ IT BUT I WENT AND REREAD

21   THE CASE LAW CITED IN BRADFIELD AND KEPT GOING

22   BACK TO STATE V. MAK.  AND I THINK IF THEY

23   SPECIFICALLY TAUGHT THIS IN LAW SCHOOL, READING

24   THAT CASE WOULD BE ALL TELLING.  THE MOST -- I

25   THINK THE MOST COMPELLING STATEMENT IN THERE IN

1    STATE V. MAK WAS AS FOLLOWS:

2         "BEFORE SUCH TESTIMONY CAN BE RECEIVED,

3    THERE MUST BE SUCH PROOF OF CONNECTION WITH THE

4    CRIME, SUCH A TRAIN OF FACTS OR CIRCUMSTANCES AS

5    TEND TO CLEARLY POINT OUT SOMEONE BESIDES THE

6    ACCUSED IS THE GUILTY PARTY."

7         YOUR HONOR, I THINK THE REASON WHY WE HAVE

8    JUST BEEN BEATING THIS 3.5 ISSUE TO DEATH IS THERE

9    IS NO PHYSICAL EVIDENCE LINKING ANYONE TO THIS

10   CRIME.  WE HAVE IAN SIMMERS CONFESSING TO THE

11   CRIME, CONFESSING IT WITH GREAT DETAIL.  NOTHING

12   ELSE.

13        MR. HICKS CITES JOSEPH BUTCHER.  JOSEPH

14   BUTCHER, I BELIEVE PERHAPS IS JUST ONE OF THOSE ODD

15   PEOPLE -- OR MAYBE NOT TOO ODD -- WHO IS DRAWN TO

16   CRIME SCENES.

17        YOU GO TO ANY CRIME OR FIRE SCENE YOU WILL

18   SEE -- I BELIEVE IN A DISCUSSION WITH MR. MAHONEY

19   YESTERDAY, SHE CALLED THEM LOOKY-LOUS.

20        AND I THINK THAT'S WHAT WE HAVE HERE.

21   MR. BUTCHER, WHO WAS AT THE CRIME SCENE, AND THE

22   CRIME SCENE WAS ON A WELL-TRAVELED PUBLIC PATH, AND

23   MR. HICKS EVEN UNDERLINED THE FACT THAT THE

24   BLOODHOUND REACTED AND INDICATED THAT HIS SCENT MAY

25   HAVE BEEN NEAR THE SCENE OF THE MURDER.

1       HOWEVER, I THINK MR. HICKS ALSO HAS READ

2   REBECCA MINER'S WORK-UP.  SHE IS A DETECTIVE WHO

3   DID THE CRIME SCENE WORK-UP.  AND REBECCA MINER

4   TALKING TO RICK SHERMAN, THE K-9 HANDLER, WAS

5   INFORMED BY MR. SHERMAN HE WALKED MR. BUTCHER RIGHT

6   BY THE CRIME SCENE.  AND IT IS VERY LIKELY OR

7   HIGHLY PROBABLE THAT IS WHAT THE ANIMAL IN THIS

8   CASE -- I BELIEVE HER NAME WAS MAGGIE -- WAS

9   REACTING TO.  THAT'S IT.

10      AND IF YOU TAKE THAT AND APPLY MAK AND DOWNS

11  AND RUSSELL AND THE OTHERS, THAT IT JUST DOESN'T

12  WASH.

13      IN MY FACTUAL PORTION OF THE BRIEF, I THINK

14  IT WAS -- IT MAY BE APPARENT I WAS GEARING IT MORE

15  TOWARDS INDIVIDUALS INVOLVED IN MR. GOCHANOUR'S

16  LIFESTYLE.

17      THE COURT:  RIGHT.

18      MR. MARNER:  HOWEVER, MR. HICKS FROM HIS

19  MOTION, ISN'T CONTESTING ANY OF THOSE WOULD-BE

20  OTHER SUSPECTS, BUT THIS MR. BUTCHER.  I THINK HIS

21  EVIDENCE ON MR. BUTCHER IS EVEN LESS.  AND,

22  CLEARLY, IT WON'T HOLD UP TO THAT VERY CLEAR

23  STATEMENT OF FACT.  I MEAN, VERY CLEAR STATEMENT

24  ELICITED BY OUR SUPREME COURT IN MAK.

25      A SNIFF FROM A DOG OF A PERSON WHO WAS

1    WALKED BY THE CRIME SCENE DOES NOT CLEARLY POINT

2    OUT SOMEONE BESIDES IAN SIMMERS, WHO CONFESSED AND

3    GAVE A LENGTHY, DETAILED CONFESSION BOTH TO THE

4    OFFICERS AND LATER CORROBORATED IT TO A JAIL HOUSE

5    INFORMANT THAT HE IS GUILTY.  I DON'T THINK THERE

6    IS ANY WAY AROUND IT.

7         THE COURT:  ALL RIGHT.  THANK YOU.

8         MR. HICKS, IF I COULD MAKE TWO OBSERVATIONS:

9    ONE, THAT IN READING YOUR BRIEF, YOU DO TALK ABOUT

10   MR. BUTCHER SPECIFICALLY, BUT YOU ALSO TALK ABOUT

11   INQUIRY INTO THE QUALITY OF THE INVESTIGATION.

12        MR. HICKS:  THAT'S RIGHT.

13        THE COURT:  AND YOUR REQUEST THAT YOU BE

14   ABLE TO CROSS-EXAMINE ON THAT.  BUT YOU ALSO SEEM

15   TO BE ARGUING THAT MR. BUTCHER WAS A SUSPECT.  AND

16   I THINK FOR PURPOSES OF THE ARGUMENT, IF YOU COULD,

17   WITH AS MUCH SPECIFICITY AS YOU CAN, LAY OUT WHAT

18   THE FACTS AND CIRCUMSTANCES ARE THAT TEND TO

19   CLEARLY POINT TO MR. BUTCHER INSTEAD OF THE

20   DEFENDANT --

21        MR. HICKS:  YOUR HONOR, MAY I HAVE JUST A

22   MINUTE?

23        THE COURT:  BEFORE YOU DO THAT, I NEED TO

24   TALK TO MS. FLIGELTAUB.

25        MR. HICKS:  ALL RIGHT.  YOUR HONOR, I AM

1    WELL AWARE OF THE BURDEN OF OTHER SUSPECT

2    INFORMATION.  BUT IN THIS CASE, I THINK THE STATE

3    IN -- WHAT THE STATE IN EFFECT IS DOING IS ASKING

4    THIS COURT TO AVERT PART OF THE EVIDENTIARY BURDEN

5    OF THE STATE AND THEN LOOKING TO ME AND SAYING,

6    "WELL, MR. HICKS, WHERE IS THE EVIDENCE THAT

7    CLEARLY LINKS HIM TO THE CRIME"?

8        YOUR HONOR, AS I HAVE TRIED TO POINT OUT IN

9    MY BRIEF, IT MIGHT VERY WELL BE BECAUSE OF A POOR

10   POLICE INVESTIGATION THAT THERE IS NO FURTHER

11   EVIDENCE REGARDING BUTCHER.

12       AND THE NEXT ARGUMENT OF THE STATE WILL BE,

13   "WELL, THE DEFENSE COULD HAVE DONE THIS."  NO, WE

14   CAN'T AS A PRACTICAL REALITY -- IN A PUBLIC DEFENSE

15   CASE, WE CAN'T GET ENOUGH FUNDING AUTHORIZED TO

16   JUSTIFY ANOTHER SUSPECT INVESTIGATION.

17       PLEASE CONSIDER THIS:  I HAVE TRIED TO

18   SYNOPSIZE THE EVIDENCE PERTAINING TO MR. BUTCHER IN

19   MY STATEMENT OF FACTS.  BUT IN ADDITION, WHICH IS

20   NOT IN MY BRIEF, IS THE FACT THAT LAST SATURDAY

21   MR. SHERMAN, THE BLOODHOUND HANDLER, AND I SAT DOWN

22   AND SPOKE.  AND HE WILL TESTIFY IN FACT WHEN THIS

23   VERY NERVOUS MR. BUTCHER RELUCTANTLY PROVIDED AN

24   ARTICLE OF CLOTHING TO HAVE THE BLOODHOUND REACT,

25   THE BLOODHOUND WENT IMMEDIATELY TO THE SCENE WHERE

1    THE BODY WAS LOCATED.

2         INDEED, IN ONE OF THE POLICE FOLLOW-UPS, ONE

3    OF THE OFFICER'S COMMENTS WAS THAT THIS COULD BE

4    EXPLAINED IF MR. BUTCHER HAD RECENTLY, YOU KNOW,

5    WALKED THROUGH THAT AREA.  NO EVIDENCE SUGGESTS HE

6    WALKED THROUGH OR CAME NEAR THAT AREA.

7         AND THIS GUY WAS OBSERVED.  HE WAS SEEN AWAY

8    FROM THIS AREA FORGING AROUND.  HE WAS TAKING AN

9    INTEREST BECAUSE HE WAS BEYOND THE MARKINGS THAT

10   ARE SUPPOSED TO CUT OFF THE PUBLIC FROM THE CRIME

11   SCENE, REFERRING ARGUABLY TO TAPES WHICH ARE

12   USUALLY USED, YELLOW TAPES.

13        BUT, YOUR HONOR, THERE WAS MORE THAN THAT.

14   THIS GUY WAS EXTREMELY SUSPICIOUS, AND THE

15   DETECTIVES SAID SO, AND I QUOTED IT FROM THE

16   REPORT.

17        HE WAS VERY RELUCTANT TO TAKE A POLYGRAPH,

18   AND NONE WAS GIVEN TO HIM.  THERE WAS APPARENTLY NO

19   FOLLOW-UP INVESTIGATION DONE.

20        I ASKED DETECTIVE HOPKINS TO RUN A RAP

21   SHEET, AND HE INDICATED HE WOULD GET BACK TO ME.

22   AND I AM TOLD NOW, NOTHING PRINTS OUT IN RESPONSE

23   FOR A REQUEST FOR A RAP SHEET.

24        THAT HAS NOT BEEN MY EXPERIENCE IN THE PAST,

25   BUT THAT'S FINE.  THE BOTTOM LINE IS THESE OFFICERS

1   WERE SO SUSPICIOUS OF THIS INDIVIDUAL, BASED UPON

2   HIS BEHAVIOR AND BASED ON THE BLOODHOUND -- WHICH

3   YOU CAN'T FOOL THOSE BLOODHOUNDS.

4        AND BASED UPON HIS BEHAVIOR AT THE TIME OF

5   THE INTERVIEW -- HE KEPT STATING, "I'M EXTREMELY

6   NERVOUS," AND "I'M NERVOUS ABOUT POLYGRAPHS," AND

7   HIS EXPLANATION DOESN'T MAKE SENSE BECAUSE HE

8   DOESN'T LIVE BASICALLY WHERE HE INDICATED HE WOULD

9   LIVE TO HAVE THAT STRONG AN INTEREST IN THE

10  BURKE-GILMAN TRAIL.  AND I CAN'T BE REAL CLEAR ON

11  HOW CLOSE HIS RESIDENCE IS TO THE TRAIL, BUT THE

12  OFFICERS CONCLUDED HE DOES NOT LIVE THAT CLOSE, IN

13  CONTRADICTION TO WHAT THE STATE SAID.

14        I WOULD ALSO COMMENT, FURTHERMORE, PHYSICAL

15  EVIDENCE DOES NOT MATCH DETAILS HE GAVE TO POLICE

16  OFFICERS AND DETECTIVES.  AND THAT'S HOPKINS'

17  REPORT.  AND HE ANSWERED THAT HE DOESN'T HAVE A

18  CLUE AS TO WHY THE HOUNDS PICKED UP HIS SCENT.

19        IF HE IN FACT WENT NEAR THAT AREA

20  PREVIOUSLY, THAT COULD ACCOUNT FOR WHY THE HOUNDS

21  PICKED UP HIS SCENT IN THAT AREA.  AND HE COULD

22  HAVE SAID SO, AND HE DIDN'T.

23        YOUR HONOR, THE POINT IS THIS WOULD HAVE

24  BEEN A VIABLE SUSPECT -- AT LEAST TEMPORARILY IF HE

25  WAS INNOCENT.  BUT AT THE VERY LEAST TEMPORARILY,

1    IF HE HAD BEEN LOOKED INTO FURTHER.

2         AND THIS DOES MEET -- THE STATEMENT BY

3    MR. MARNER IS INCORRECT.  THIS IS ROCK-HARD

4    PHYSICAL EVIDENCE.  I'M NOT SAYING IT IS TOTALLY

5    INCULPATORY BY ITSELF, BUT IT IS AT LEAST EVIDENCE

6    THAT HE FITS THE PROFILE OF A SUSPECT.  NOTHING

7    ELSE EXCLUDES HIM AT ALL.

8         BUT BASICALLY I WANT TO UNDERSCORE THE FACT

9    THE BLOODHOUND REACTED POSITIVE, AND SECONDLY HE

10   HAD NO EXPLANATION.  AND ALL HE HAD TO DO IS SAY "I

11   WASN'T THERE."  OR EXCUSE ME, "I HAD GONE IN THAT

12   PARTICULAR AREA."

13        AND SO SOMETHING TOTALLY UNEXPLAINED

14   ACCOUNTS FOR WHY THE BLOODHOUND PICKED UP HIS SCENT

15   AT THE SCENE OF THE CRIME.  AND I TAKE IT YOU CAN

16   TAKE AN ALTERNATIVE ROUTE HERE.

17        AS THE COURT KNOWS, SO MUCH OF THIS CASE IS

18   IN 3.5, AND PART OF THE INQUIRY IN THE 3.5 IS HOW

19   THE LAW IS SUPPOSED TO BE TREATED WHEN JUVENILES

20   ARE INTERROGATED.

21        AND, THEREFORE, I AM IMPEACHING THE ENTIRE

22   QUALITY OF THE INVESTIGATION, TO A BROAD EXTENT

23   BECAUSE I WOULD HAVE TO MAKE THE JURY UNDERSTAND AT

24   TRIAL WHY, FRANKLY, A HOMICIDE DETECTIVE ON HIS

25   FIRST MURDER CASE MIGHT JUST JUMP THE GUN A LITTLE

1    TOO SOON, WHY HE DIDN'T PICK UP AND SEE PROBLEMS

2    WITH A KID CLAIMING HE KILLED 13 GANGSTERS, AND THE

3    KNIFE NOT MATCHING, AND THE WRONG DAY, ET CETERA,

4    ET CETERA.  AND, FURTHERMORE, OTHER OBSERVATIONS

5    FROM OTHER OFFICERS THAT THIS KID LIKES TO BRAG AND

6    MAKE UP STORIES.

7         THE GENERAL DEFENSE IS AN ATTACK ON THE

8    QUALITY OF THE INVESTIGATION AND THE LACK OF

9    EXPERIENCE OF DETECTIVE HOPKINS.  HE IS THE LEADER

10   OF THIS INVESTIGATION AND HE IS A RATHER YOUNG

11   DETECTIVE.

12        AND HE STRIKES ME AS A VERY NICE GUY AND MAY

13   BE GENERALLY COMPETENT, BUT I HAVE TO TAKE NOTE OF

14   THE FACT OF HIS LESS THAN STELLAR EXPERIENCE IN

15   THIS AREA.

16        AND TO THAT END THE RELEVANCE OF MR. BUTCHER

17   TAKES ON MORE THAN TRADITIONAL "OTHER SUSPECT"

18   AUTHORITY.  SURE, I THREW THAT IN BECAUSE I KNEW

19   WHAT I WOULD BE FACING -- I WOULD GET A BRIEF FROM

20   THE STATE.

21        AND I WANTED TO ADDRESS IT ON THAT SCORE

22   TOO.  BUT, YOUR HONOR, IT IS EXTREMELY PROBATIVE OF

23   THE LACK OF THOROUGH INVESTIGATION IN THIS CASE TO

24   MAKE THE JURY UNDERSTAND WHY THE INVESTIGATION

25   WOULD STOP DEAD COLD WHEN MR. SIMMERS WAS

1   IDENTIFIED AS BEING ON THE BURKE-GILMAN TRAIL.

2        IN THAT SENSE, IT IS PROBATIVE, TOTALLY

3   ASIDE FROM THE CONSIDERATION OF THERE BEING OTHER

4   SUSPECT EVIDENCE.

5        THANK YOU.

6        THE COURT:  ALL RIGHT.  THANK YOU.

7        MR. MARNER?

8        MR. MARNER:  ALL THROUGHOUT THESE MOTIONS,

9   MR. HICKS HAS POINTED TO THE UNIQUENESS OF THIS

10  CASE, SOMEHOW EXPECTING THAT TO CHANGE THE LAW OR

11  RELIEVE HIS BURDEN.  IT IS SIMPLY NOT THE CASE.

12        THE ISSUE ABOUT LACKING DEFENSE

13  INVESTIGATORS, BE THAT AS IT MAY, IT IS HIS BURDEN.

14  MR. HICKS TALKS ABOUT ROCK-HARD PROOF.  I THINK THE

15  EXPLANATION PROVIDED BY ME IN MY ORIGINAL ARGUMENT

16  ADDRESSES THAT DIRECTLY ON POINT AND VERY

17  COMPLETELY.

18        THERE ARE -- WE ARE NOT ROBBING MR. HICKS OF

19  ANYTHING IN HIS DEFENSE OF MR. SIMMERS BY ASKING

20  THE COURT TO FOLLOW CASE LAW.  AND I THINK SIMPLY

21  BECAUSE IT WOULDN'T FIT IN -- SIMPLY BECAUSE

22  IT WOULDN'T FIT IN TO MR. HICKS' PLAN OF DEFENSE,

23  THE COURT SHOULDN'T SOMEHOW GIVE HIM A BREAK.  AND

24  I THINK THAT'S WHAT HE IS ASKING FOR.

25        AGAIN, I WAS IMPRESSED, WHETHER OR NOT THE

1    SUPREME COURT WOULD EVEN CARE ABOUT A LOWLY DEPUTY

2    BEING IMPRESSED, BUT THE LANGUAGE AND THE

3    SUCCINCTNESS OF MAK, IT DOESN'T LEAVE ROOM FOR

4    DOUBT.  THE COURT WAS VERY CONCISE IN WHAT IT SAID,

5    AND IT JUST FITS IN LIKE A KEY TO THESE FACTS.

6         THE COURT:  ALL RIGHT.  THANK YOU.

7         MR. HICKS:  I BELIEVE I AM ALLOWED REBUTTAL,

8    YOUR HONOR.  I WILL BE BRIEF.

9         THE COURT:  EXCUSE ME?

10        MR. HICKS:  CAN I HAVE MY REBUTTAL?  I WILL

11   BE BRIEF.

12        THE COURT:  YES.

13        MR. HICKS:  MR. MARNER CLAIMS THERE IS NO

14   PHYSICAL EVIDENCE.  I BELIEVE THE BLOODHOUND

15   REACTION IS PHYSICAL EVIDENCE, FOR GOODNESS SAKES.

16        SECONDLY, HE SAYS THE BURDEN IS ON ME.  AND

17   THIS IS TRUE IN THE SENSE OF THE DEFENSE MOTION TO

18   ADMITT OTHER SUSPECT EVIDENCE, PER SE; HOWEVER, IN

19   ALL THESE CASES -- AND I INVITE YOUR INQUIRY, IF

20   YOU WANT TO MAKE IT, TRYING TO FIND AND ADDRESS THE

21   SITUATION WHERE THE LACK OF ADDITIONAL EVIDENCE

22   REGARDING THE SUSPECT IS CAUSED BY, I WOULD SUBMIT,

23   AN EXTRAORDINARY LACK OF DILIGENCE BY THE POLICE --

24        AND THAT IS THE SITUATION WE ARE REQUESTING

25   HERE, AND THAT IS NOT THE CASE IN MAK.  HERE, THEY

1    HAD A GUY THAT WAS OBVIOUSLY IDENTIFIED AS A

2    SUSPECT.  THE BLOODHOUND NAILED HIM, AND THEY TOOK

3    IT NO FURTHER.  THEY DIDN'T EVEN GIVE HIM A

4    POLYGRAPH.

5        AND THAT IS IN EVIDENCE.  DETECTIVE HOPKINS

6    TESTIFIED TO THAT.  IT IS NOT LIKE THE OTHER CASES.

7        AND, AGAIN, I PERHAPS TOOK A RISK IN TAKING

8    THE "OTHER SUSPECT" AVENUE, IN TERMS OF THE

9    CONTENTS OF MY BRIEFING.  BUT I DID SO IN

10    ANTICIPATION OF OUR POSITION, AND OTHER THINGS WE

11    HAVE BROUGHT OUT.  AND THAT IS IN CASES LIKE THIS,

12    THERE IS OBVIOUSLY A FLOOD OF POTENTIAL PERSONS OF

13    INTEREST, AND SUBSTANCES, ET CETERA.

14        THE STATE THEMSELF HAMMERED IN ON THE FACT

15    THAT THE VICTIM DID NOT LIVE A STELLAR LIFESTYLE,

16    AND RAN AROUND WITH FRIENDS AND ACQUAINTANCES THAT

17    DID DRUGS, AND THEY DRANK TOO MUCH -- A BIKER

18    CROWD, ET CETERA.

19        IN FACT, DETECTIVE HOPKINS, I BELIEVE,

20    TESTIFIED THERE WERE MANY POTENTIAL SUSPECTS IN

21    THIS CASE THAT WERE IDENTIFIED.  THERE IS A WHOLE

22    BUNCH OF NAMES IN DISCOVERY OF PEOPLE TO LOOK INTO,

23    BECAUSE OF HIS LIFESTYLE.

24        I HAVE NOT PURSUED ANY OF THOSE OTHER PEOPLE

25    BECAUSE I BELIEVE THE CASE IS LIKE MAK, AND

1  AUTHORITIES CITED BY THE STATE WOULD PRECLUDE IT.

2  AND I DON'T HAVE THE RESOURCES TO PROVE WHO DID IT.

3  IF MR. SIMMERS DIDN'T, THERE IS NO BURDEN ON THE

4  DEFENSE TO DO THAT.  AND I FOCUSED ON BUTCHER

5  BECAUSE IT IS SO PROBATIVE.

6          MR. MARNER:  YOUR HONOR, I THINK WE HAVE TO

7  HEAR FROM MR. SHERMAN IF WE HAVE A FACTUAL DISPUTE

8  HERE.  MS. MAHONEY SPOKE TO MS. SHERMAN AND THE

9  REPRESENTATIONS MADE BY MR. HICKS TO THE COURT

10  AREN'T THE SAME REPRESENTATIONS THAT MR. SHERMAN

11  MADE TO MS. MAHONEY.

12          I AM LOOKING AT A 27-PAGE INTERVIEW OF

13  MR. BUTCHER, AND IT IS TWICE AS LONG AS THE

14  INTERVIEW WITH MR. SIMMERS.

15          AND I AM LOOKING AT HOPKINS' REPORT THAT

16  INDICATES BUTCHER DID AGREE TO TAKE THE POLYGRAPH

17  EXAM AND THAT HE BACKED OFF.

18          THE COURT:  ALL RIGHT.  THANK YOU.

19          MR. MARNER:  AND SO THE COURT MAY WANT TO

20  INQUIRE OF MR. SHERMAN.

21          MR. HICKS:  YOUR HONOR, DID YOU HEAR THAT

22  LAST REMARK, THAT HE BACKED OFF?

23          THE COURT:  YES, I DID HEAR THAT.  I HEARD

24  HE AGREED AND THEN BACKED OFF FROM TAKING A

25  POLYGRAPH.  I DON'T BELIEVE I NEED TO HEAR FROM

1       MR. SHERMAN AT THIS POINT.

2             THE NEXT MOTION IS THE CHARACTER EVIDENCE

3       ISSUE AND/OR MOTION.  THIS WAS AN ISSUE THAT WAS

4       RAISED BY THE STATE IN THEIR TRIAL BRIEF AND

5       MOTIONS IN LIMINE, AND I'M LOOKING FOR IT.

6             MS. MAHONEY:  YOUR HONOR, --

7             THE COURT:  IT WAS PROVIDED, AND THERE WAS A

8       REQUEST YESTERDAY THAT WE CLARIFY.  WE HAVE HEARD

9       TESTIMONY TODAY OF THE TYPE THAT I THINK IS

10      PERTINENT TO THE FACTORS THAT THE COURT NEEDS TO

11      LOOK AT IN THE CONTEXT OF THE 3.5, BUT THAT'S A

12      SEPARATE ISSUE FROM TRIAL.

13            AND SO THE EVIDENCE RULES THAT I THINK

14      COUNSEL NEED TO FOCUS ON FOR PURPOSES OF ARGUMENT

15      RELATED TO THIS MOTION ARE EVIDENCE RULE 404(A),

16      AND EVIDENCE RULE 405, AND EVIDENCE RULE 406.

17            AS I UNDERSTAND IT AGAIN, MR. HICKS, ON

18      BEHALF OF THE DEFENDANT, WAS ARGUING HABIT OR MAY

19      ARGUE HABIT.  AND SO IT IS MY UNDERSTANDING THAT

20      THE STATE IS MOVING TO EXCLUDE TESTIMONY OF THIS

21      NATURE.

22            I WILL LET THE STATE GO FIRST, AND THEN HEAR

23      FROM MR. HICKS, AND THEN THE STATE WILL HAVE THE

24      OPPORTUNITY TO RESPOND FINALLY.

25            MS. MAHONEY:  YOUR HONOR, FIRST OF ALL, I

1    WILL GO TO THE STANDARD.  AND WHERE MY CONCERNS LIE

2    IS A LITTLE BIT DIFFICULT TO SPECIFICALLY ADDRESS

3    BECAUSE WE STILL DON'T HAVE SPECIFIC OFFERS OF

4    PROOF OF WHAT MR. HICKS INTENDS TO OFFER, AND WHY,

5    BUT I THINK THERE IS ACTUALLY A THREE-PART INQUIRY

6    SURROUNDING THOSE RULES THAT THE COURT HAS POINTED

7    OUT.

8         FIRST OF ALL, WE HAVE TO GET TO WHETHER OR

9    NOT THIS IS RELEVANT.  AND SHOULD YOU EVEN CONSIDER

10   CHARACTER EVIDENCE.

11        TEGLAND, AND NUMEROUS CASES POINT OUT THAT

12   NORMALLY WHAT WE ARE REALLY TALKING ABOUT HERE IS

13   MR. SIMMERS' TENDENCY TO EXAGGERATE.  AND

14   EXAGGERATION IS REALLY LYING.  AND SO WE ARE

15   TALKING ABOUT HIS REPUTATION FOR TRUTH AND

16   VERACITY.

17        TEGLAND AND CASE LAW TALK ABOUT THE FACT

18   THAT REALLY IN A MURDER CASE THAT'S NOT RELEVANT,

19   WHETHER OR NOT THEY LIE OR TELL THE TRUTH.  AND SO

20   I THINK THAT A VERY BIG HURDLE THAT WE HAVE TO LOOK

21   AT IS FIRST WHETHER OR NOT THIS TESTIMONY IS EVEN

22   RELEVANT TO THE CRIME CHARGED.

23        CHARACTER EVIDENCE IS NOT ADMISSIBLE UNDER

24   ANY STRETCH OF THE IMAGINATION, UNDER ANY

25   CIRCUMSTANCES, TO PROVE CONDUCT IN CONFORMITY

1  THEREWITH.

2          AND IT SEEMS EXACTLY WHAT MR. HICKS IS

3  OFFERING HERE IS TO SAY BECAUSE IAN HAS EXAGGERATED

4  SINCE HE WAS FIVE YEARS OLD, HE EXAGGERATED THIS

5  TIME.  AND THAT'S SPECIFICALLY PRECLUDED.  THAT IS

6  WHAT THE RULES SAY CANNOT HAPPEN.

7          AND SO I THINK ON THAT BASIS, NONE OF THIS

8  SHOULD BE COMING IN.

9          SECOND OF ALL, EVEN IF SOMEHOW MR. HICKS IS

10 ABLE TO OVERCOME THIS, BY SOME CASE LAW OR RULES

11 THAT I HAVE NOT FOUND, WE HAVE THE THRESHOLD OF

12 WHETHER OR NOT THEY ARE QUALIFIED TO TESTIFY AS TO

13 THE DEFENDANT'S REPUTATION IN THE COMMUNITY FOR

14 EXAGGERATING.  IT IS A VERY, VERY LIMITED INQUIRY,

15 BUT THE COURT MUST FIRST DETERMINE WHETHER OR NOT

16 THEY ARE EVEN QUALIFIED.

17         AND HOW "COMMUNITY" IS DEFINED WOULD BE MORE

18 THAN THEIR PERSONAL OPINION OR PERHAPS JUST

19 SPEAKING WITH HIS PARENTS AND IAN.  IT HAS GOT TO

20 BE A KNOWN IDENTIFIABLE COMMUNITY.

21         STATE V. LAND, 121 WN. 2D, GIVES SOME PRETTY

22 GOOD EXAMPLES OF THAT AS WELL AS, AGAIN, THE

23 DISCUSSIONS IN TEGLAND, WHICH IS PRETTY

24 AUTHORITATIVE ON THE SUBJECT OF THE RULES OF

25 EVIDENCE.

1        AND, FINALLY, IF THE COURT DOES FIND THAT

2   THE THRESHOLD HAS BEEN MET, THE INQUIRY IS LIMITED

3   TO "ARE YOU AWARE OF MR. SIMMERS' REPUTATION IN THE

4   COMMUNITY FOR EXAGGERATING"?   "IS IT GOOD OR BAD"?

5   END OF INQUIRY.

6        NO SPECIFIC INSTANCES SHOULD COME IN.

7   SPECIFIC INSTANCES ARE PRECLUDED UNDER ALL OF THE

8   REASONS I HAVE ARGUED, EVEN IF HE CAN GET TO THOSE

9   THRESHOLD SHOWINGS BECAUSE IT IS NOT AN ESSENTIAL

10  ELEMENT OR CLAIM OF DEFENSE.

11       AND I HAVE LOOKED THROUGH ALL THE CASE LAW,

12  AND REALLY THE ONLY TIME IN A CRIMINAL TRIAL THEY

13  HAVE EVER FOUND THAT SPECIFIC INSTANCES ARE AN

14  ESSENTIAL ELEMENT IS IN ENTRAPMENT CASES WHEN THE

15  STATE CAN INTRODUCE EVIDENCE OF PRIOR CRIMINAL ACTS

16  TO SHOW PREDISPOSITION.

17       IT HAS EVEN BEEN FOUND IN SELF-DEFENSE CASES

18  LIKE STATE V. ALEXANDER IT IS NOT ESSENTIAL.   AND

19  IF IT IS NOT THERE, IT ISN'T HERE.   AND FOR ALL

20  THOSE REASONS, I THINK THIS LINE OF INQUIRY IS

21  IMPROPER, AND I ASK THAT IT BE PRECLUDED.

22       THE COURT:  DID YOU WISH TO ADDRESS 406,

23  HABIT?

24       MS. MAHONEY:  THE HABIT EVIDENCE -- AGAIN,

25  HABIT EVIDENCE TALKS ABOUT -- I DIDN'T HAVE THAT

1    WRITTEN RIGHT IN FRONT OF ME.  I WAS LOOKING AT

2    THAT WHEN HE RAISED IT YESTERDAY, AND IT IS SUCH A

3    SPECIFIC SHOWING OF ABSOLUTE ROUTINE, LIKE IN A

4    CERTAIN SITUATION, RESPONSE TO THEIR ACTION.

5            AND THERE IS NO SHOWING HERE THAT UNDER A

6    SPECIFIC SET OF CIRCUMSTANCES, ON A REGULAR BASIS,

7    THAT CERTAIN STIMULUS MAKES THIS HABIT COME OUT OF

8    THE DEFENDANT.  AND CERTAINLY NONE OF THE EXAMPLES

9    CITED THUS FAR THAT THE COURT CAN BE AWARE OF FROM

10   THE WITNESSES ON THE 3.5 CAN MEET THAT.

11           HABIT IS LIKE I ALWAYS WEAR MY SEAT BELT

12   WHENEVER I GET IN A CAR.  IT IS NOT I EXAGGERATE TO

13   PEOPLE WHEN IT SUITS ME TO ACT LIKE A TOUGH GUY.

14           THE COURT:  ALL RIGHT, THANK YOU.  MR.

15   HICKS?

16           MR. HICKS:  THANK YOU.  WELL, LET'S SEE WHAT

17   MR. TEGLAND HAS TO SAY REGARDING HIS HANDBOOK ON

18   EVIDENCE.

19           THE COURT:  LET'S GET IT.  JUST A MINUTE,

20   I'VE GOT IT.  WHAT PAGE ARE YOU ON?

21           MR. HICKS:  INITIALLY, 181, 404(A,) AND I AM

22   READING THAT.  "EVIDENCE OF A PERSON'S CHARACTER OR

23   TRAIT OF CHARACTER IS NOT ADMISSIBLE FOR THE

24   PURPOSE OF PROVING ACTION AND CONFORMITY THEREWITH

25   ON A PARTICULAR OCCASION EXCEPT":

1    AND THEN PARAGRAPH 1 IS CHARACTER OF THE

2    ACCUSED; EVIDENCE OF A PERTINENT TRAIT OF CHARACTER

3    OFFERED BY AN ACCUSED OR BY THE PROSECUTION TO

4    REBUT SAME.

5    NOW, MY BASIC POSITION ON 404(A) IS THAT

6    BASICALLY I AM NOT POSITIVE, BUT AT THE SAME TIME I

7    DO CLAIM THAT IT SEEMS TO MEET THE BURDEN PUT ON BY

8    TEGLAND.  AND I WOULD ASK THE COURT TO LOOK AT THE

9    COMMENT ON PAGE 182, THE TOP OF PARAGRAPH 4.

10    NOW, THEY CHARACTERIZE THAT AS DEFENDANT'S

11    EVIDENCE OF GOOD CHARACTER.  BUT YOU WILL SEE THE

12    RULE SET OUT THERE IS NO QUALIFICATION THAT THE

13    EVIDENCE BE OF GOOD CHARACTER.  AND THIS IS CITED

14    AS DICTA BUT IT IS AN EXAMPLE.

15    RULE 404(A,) ONE PERMITS THE ACCUSED TO

16    INTRODUCE A CHARACTER, A PERTINENT TRAIT OF

17    CHARACTER.  THE ONLY LIMITATION IS THAT THE

18    EVIDENCE MUST BE PERTINENT TO REBUT THE NATURE OF

19    THE CHARGE.

20    AND THE NATURE OF THE EVIDENCE HERE IS THE

21    CONFESSION.  AND IT'S A PRETTY SPOTTY ONE, WITH

22    DETAILS PUNCHED IN THAT DON'T MAKE SENSE.  AND,

23    THEREFORE, THIS HELPS THE NATURE OF THE CHARGE

24    BECAUSE IT IS BASED ENTIRELY ON A CONFESSION THAT

25    HIS CHARACTER AND HIS PERTINENT TRAIT OF CHARACTER

```
 1    BROUGHT OUT WOULD TEND TO ELUCIDATE FOR A JURY'S
 2    PURPOSE TO DETERMINE WHETHER OR NOT IT WAS SINCERE.
 3         NOW, I WOULD LIKE TO MOVE ON TO HABIT
 4    ADDRESSED AT 197 TEGLAND.  AND IT IS CONTRARY TO
 5    THE SPECIFICITY ARGUED BY THE STATE.  THIS IS NOT
 6    TRUE, IT IS COMMENTED ON AS AN EXTREMELY BROAD
 7    RULE, AND I WOULD LIKE TO READ IT, AND I AM LOOKING
 8    AT AUTHOR'S COMMENTS UNDER SCOPE AND PURPOSE OF
 9    RULE 406, AND THAT IS RIGHT BELOW THE MAIN
10    PARAGRAPH.
11         MS. MAHONEY:  AUTHOR'S COMMENTS, PARAGRAPH
12    1, SCOPE AND PURPOSE, RULE 406.
13         MR. HICKS:  RULE 406 PROVIDES THAT THE HABIT
14    OF A PERSON OR THE ROUTINE PRACTICE OF AN
15    ORGANIZATION IS ADMISSIBLE TO PROVE THAT THE PERSON
16    OR ORGANIZATION ACTED IN CONFORMITY THEREWITH ON A
17    PARTICULAR OCCASION.  THE RULE ITSELF IS SIMPLE AND
18    STRAIGHTFORWARD AND HAS PRODUCED FEW INTERPRETIVE
19    DIFFICULTIES.
20         WELL, YOUR HONOR, IT FITS THIS CASE LIKE A
21    GLOVE.  CONTRARY TO THE STATE'S ASSERTION THAT SOME
22    MAGIC SITUATION HAS TO BE TRIGGERED BEFORE THIS
23    CHARACTER TRAIT OF MR. SIMMERS' MANIFESTS ITSELF,
24    THE EVIDENCE ESTABLISHES THAT IS NONSENSE.  THE
25    POLICE THEMSELVES STATED IN THE REPORTS THAT
```

1    MR. SIMMERS SEEMS TO BE BRAGGING ABOUT THIS, EAGER

2    TO IMPRESS.

3         AND IT ALL COMES DOWN TO ONE CHARACTERISTIC

4    OF MR. SIMMERS.  AND THAT IS WHEN HE WANTS TO

5    IMPRESS, WHEN HE WANTS TO OBTAIN A CERTAIN RESULT

6    OF IMPRESSING PEOPLE -- AND THE OVERALL TESTIMONY

7    BROUGHT OUT THUS FAR IS THAT, PARTICULARLY WHEN HE

8    DISCUSSES MATTERS INVOLVING A NUMBER, IT HAS TO BE

9    A BIG NUMBER.

10        AND WHEN IT INVOLVES A TYPE OF RECREATION,

11   IT HAS TO -- IF HE TALKS ABOUT SOMETHING LIKE GUN

12   RUNNING OR BUILDING A STILL, SOMETHING THAT AN

13   ADOLESCENT WOULD BE TYPICALLY SEEN TO IMPRESS

14   ADULTS, AND IT DOESN'T MATTER WHAT REASON HE DOES

15   IT, WHETHER IT IS TO GET POLICE OFF HIS BACK FOR

16   THE TIME BEING WHILE PROTECTING HIMSELF BY THROWING

17   IN BAD DETAILS, OR WHETHER OR NOT HE IS TRYING TO

18   SHOCK HIS PARENTS -- I MEAN, THERE IS A MOONSHINE

19   STILL HE IS WORKING ON WITH OTHERS, OR WHETHER OR

20   NOT HE TALKS WITH ANOTHER ADULT WHO APPARENTLY

21   LIKES HIM AND HE STATES HE IS RUNNING GUNS -- THE

22   BOTTOM LINE IS THAT THAT HABIT OF EXAGGERATING

23   DETAIL AND FABRICATING DETAIL IS SOMETHING THAT

24   PRESENTED ITSELF IN A STEADY PATTERN, THUS FAR

25   IDENTIFIED AT LEAST THROUGHOUT MR. SIMMERS'

1    CHILDHOOD, AS WELL AS HIS ADOLESCENCE.

2         IT MEETS THE DEFINITION OF HABIT, ROUTINE

3    AND PRACTICE ENVISIONED BY RULE 406.  AND THAT RULE

4    IS BROAD.  YOU CAN READ THE COMMENTS.

5         IT IS NOT SPECIFIC INVOLVING CERTAIN TRIGGER

6    MECHANISMS THE STATE SUGGESTS, AND, THEREFORE, I

7    WOULD SUBMIT AND RESERVE ARGUMENT FOR REBUTTAL THAT

8    UNDER 406 ALONE, IT IS ADMISSIBLE.  AND I MIGHT

9    MENTION, IT IS THE WHOLE DEFENSE CASE.

10         THE COURT:  ALL RIGHT.  THE STATE GETS TO

11    RESPOND LAST.

12         MR. HICKS:  I'M SORRY, THAT'S RIGHT.

13         THE COURT:  MS. MAHONEY?

14         MS. MAHONEY:  BASICALLY, YOUR HONOR, IF YOU

15    LOOK BACK TO PAGE 182 WHERE HE IS TALKING ABOUT

16    404(A,) IF HE JUST READ THE NEXT SENTENCE, IT TALKS

17    ABOUT -- WELL, THAT IN A TYPICAL ASSAULT OR

18    HOMICIDE CASE, THE DEFENDANT'S REPUTATION FOR BEING

19    PEACEFUL AND NONVIOLENT WOULD BE RELEVANT, BUT

20    REPUTATION FOR HONESTY AND TRUTHFULNESS WOULD NOT.

21         THAT WAS THE NEXT SENTENCE, AND THEN THERE

22    IS CASE EXAMPLES.

23         BACK ON THE HABIT EVIDENCE AGAIN, THE NEXT

24    PARAGRAPH DOWN TALKS ABOUT IN THE PRESENT INSTANCE

25    WE ARE TALKING ABOUT SPECIFIC -- THERE DO NEED TO

1    BE SPECIFIC SITUATIONS WHERE WE HAVE SPECIFIC

2    RESPONSES.

3         AND I DON'T THINK THE COURT HAS ENOUGH

4    EVIDENCE IN THIS CASE AT THIS POINT TO FIND THAT

5    THE DEFENDANT DOES ACT ON HABIT.  THERE IS NO

6    TESTIMONY THAT HE NEVER TELLS THE TRUTH OR THAT IN

7    EVERY GIVEN SITUATION THAT HE DOES EXAGGERATE.

8         DOES HE HAVE A TENDENCY?  SURE.  MOST KIDS

9    MAKE UP THINGS ABOUT THEIR PARENTS, AND MOST KIDS

10   EXAGGERATE HOW MANY TOYS THEY HAVE, AND IT IS

11   NOTHING UNIQUE IN THIS SITUATION.  IT IS NOT

12   UNUSUAL FOR A TEENAGE MALE TO WANT TO MAKE HIMSELF

13   SEEM STRONGER OR BIGGER THAN HE IS:  "I CAN LIFT

14   THAT ROLL OF CARPET BY MYSELF."  THAT'S THE TYPE OF

15   THING WE ARE TALKING ABOUT HERE, AND IT DOESN'T

16   MEET THE HABIT EVIDENCE.

17        AND I WAS LOOKING AT STATE V. PLATZ, WHICH

18   IS AN EXAMPLE GIVEN IN TEGLAND THAT DOES TALK ABOUT

19   THE FACT THAT IN HABIT --

20        MR. HICKS:  THE CASE PLEASE?

21        MS. MAHONEY:  P-L-A-T-Z, 33 WN. APP. 345,

22   WHERE IT TALKS ABOUT THE ADMISSION OF HABIT

23   EVIDENCE UNDER 406:  "HABIT IS A PERSON'S REGULAR

24   HABIT FOR THE PURPOSE OF MEETING A PARTICULAR TYPE

25   OF SITUATION WITH A PARTICULAR TYPE OF CONDUCT."

1    AND THAT SIMPLY IS NOT MET HERE.

2         THE COURT:  ALL RIGHT, THANK YOU.

3         WE WILL GET TOGETHER AGAIN AT APPROXIMATELY

4    1:50.

5         WE NEED TO PLAY A TAPE FOR THE JURY THAT IS

6    DELIBERATING, AND WE ARE HAVING EVERYBODY COME AT

7    1:30.  AND WHEN THAT IS DONE, WE WILL CALL FOR THE

8    DEFENDANT AND CONTINUE.

9         MS. FLIGELTAUB HAS PREPARED THE HARDSHIP

10   QUESTIONNAIRE, AND WE ARE GOING TO GIVE THAT TO THE

11   JURORS AFTER LUNCH.  AND YOU SHOULD ANTICIPATE THAT

12   WE WILL BE IN THE PROCESS OF AT LEAST BEGINNING

13   VOIR DIRE THIS AFTERNOON.

14        WHEN WE KNOW THAT WE HAVE THE JURORS, WE

15   WILL LOOK AT THE HARDSHIP QUESTIONNAIRE -- ALL OF

16   US WILL, AND THERE WILL BE COPIES MADE, AND WE WILL

17   DECIDE WHETHER AND WHO WE WANT TO BRING DOWN AND

18   QUESTION, OR WHO WE WANT TO EXCUSE BASED ON THE

19   RESPONSES WE GET.

20        AND SO YOU WILL SEE ALL THE QUESTIONNAIRES

21   OF PEOPLE WHO SAY THEY HAVE A HARDSHIP, AND WE WILL

22   LOOK AT THOSE.  THERE'S SOME WE WILL BE ABLE TO

23   EXCUSE WITHOUT TALKING TO THEM.

24        WE WILL BRING THEM DOWN IN A GROUP, AND I

25   WILL QUESTION THEM.  AND BEFORE WE BRING THEM DOWN

1    IN A GROUP, WE WILL ALL AGREE WE WANT TO TALK TO

2    THEM.  AND THERE ARE OTHERS WE MAY EXCUSE.

3         AND THEN, DEPENDING ON HOW BIG THE POOL IS,

4    WE MAY NEED TO SUPPLEMENT THE POOL.

5         AND SO THAT IS HOW I EXPECT WE WILL BE

6    SPENDING OUR TIME THIS AFTERNOON.  AND AT THE

7    CONCLUSION OF HAVING THE OFFER OF PROOF AND/OR

8    EVIDENCE FROM MS. JUDD, I WILL RULE ON THE 3.5.

9         AND I ALSO AM PREPARED TO RULE ON THE OTHER

10   TWO MOTIONS THAT WERE ARGUED THIS MORNING, AFTER

11   THE NOON RECESS, THE CHARACTER AND HABIT MOTION AND

12   THE OTHER SUSPECT MOTION.

13        MS. MAHONEY?

14        MS. MAHONEY:  YOUR HONOR, THERE IS ALSO

15   STILL THE OUTSTANDING MATTER OF THE LIMIT OF THE

16   SCOPE OF TESTIMONY REGARDING KEVIN OLSON, AND HIS

17   PRIOR HISTORY, THAT HAS BEEN RESERVED THAT WE

18   HAVEN'T ADDRESSED YET.  IT PROBABLY DOESN'T MAKE A

19   HUGE DIFFERENCE IN VOIR DIRE.

20        THE COURT:  IT DOESN'T MAKE ANY DIFFERENCE

21   FOR VOIR DIRE.

22        MS. MAHONEY:  I WOULD LIKE TO BE ABLE TO ASK

23   THE JURORS REGARDING THE FACT OF THE USE OF

24   INFORMANTS BECAUSE THAT IS KIND OF A PARTICULAR

25   THING THAT SOME PEOPLE DO HAVE VERY STRONG FEELINGS

1    ABOUT, NOT GETTING INTO THE SPECIFICS OF KEVIN

2    HIMSELF, BUT WITH THE POLICE USING PEOPLE LIKE

3    THAT.

4            THE COURT:  AND ALONG THAT VEIN, IF THERE

5    ARE QUESTIONS THAT COUNSEL WISHES TO POSE TO THE

6    JURY THAT THEY THINK NEED TO BE ADDRESSED BEFORE WE

7    START THAT PART OF THE JURY SELECTION PROCESS,

8    PLEASE THINK ABOUT IT AND LET'S RAISE IT ALL AT

9    ONCE.

10            IT CERTAINLY SEEMS APPROPRIATE, SINCE YOU

11    KNOW YOU ARE GOING TO HAVE AN INFORMANT TESTIFY,

12    THAT THAT INQUIRY WOULD BE MADE.

13            WE ALSO HAVE PROVIDED YOU WITH COMMON

14    GENERAL QUESTIONS THAT I ASK, AND I WILL GO THROUGH

15    THOSE WITH YOU BEFORE I EVER ASK THE JURY ABOUT

16    THEM.

17            I WILL NOT ASK ANYTHING OBVIOUSLY FROM NO.

18    17 ON.  IF THERE ARE ADDITIONAL GENERAL QUESTIONS,

19    PLEASE LET ME KNOW AND WE CAN DISCUSS THOSE.

20            I WILL NOT ASK QUESTION NO. 3 SINCE WE ARE

21    GOING TO HAVE A SEPARATE QUESTIONNAIRE THAT WILL

22    ADDRESS THE HARDSHIP ISSUE.

23            WE WILL BE IN THE FIRST INSTANCE, I HOPE,

24    GETTING APPROXIMATELY -- WELL, WE WILL TALK ABOUT

25    HOW MANY JURORS, BUT WE WILL TRY TO GET ENOUGH.

1          MS. MAHONEY:  YOUR HONOR, I AM HANDING

2     FORWARD THE STATE'S PROPOSED QUESTIONS, AND ONE OF

3     THE THINGS YOU TALKED ABOUT WAS HAVING THEM STAND

4     UP AND DO A BRIEF INTRODUCTION.

5          THE COURT:  WHAT YOU CAN DO IS YOU CAN TAKE

6     THE BOARD AND THE PAD AND WRITE THESE ON THEM SO

7     THAT THEY CAN ALL SEE THEM, PRINTED IN VERY BIG

8     BOLD LETTERS.

9          AND YOU CAN TELL THEM, OR I CAN TELL THEM

10    THAT THE ATTORNEYS WOULD LIKE THEM TO GO THROUGH

11    THAT INFORMATION, AT LEAST AS TO THE JURORS IN THE

12    BOX, BEFORE YOU START QUESTIONING THEM.

13         ALSO, I DO IDENTIFY ALTERNATES.  AND WE

14    SHOULD HAVE AT LEAST ONE, IF NOT TWO.  I WOULD

15    PROBABLY SAY TWO FOR PURPOSES OF SAFETY.

16         MS. MAHONEY:  THE SECOND QUESTION WAS JUST

17    ONE I WOULD PROPOSE THAT THE COURT ASK AS AN

18    ADDITIONAL GENERAL QUESTION.

19         THE COURT:  HAVE YOU EVER BEEN CHARGED WITH

20    A CRIME?

21         MS. MAHONEY:  MAYBE I MISSED IT.  I THOUGHT

22    I LOOKED A COUPLE OF TIMES, BUT I MIGHT HAVE MISSED

23    IT IN HERE.

24         THE COURT:  I DON'T THINK WE HAVE THAT.

25         MS. MAHONEY:  I AM INTERESTED IN FRIENDS AND

1    FAMILY MEMBERS AS WELL.

2             THE COURT:  MR. HICKS?

3             MR. HICKS:  I WANTED TO BRING SOME AUTHORITY

4    TO THE COURT'S ATTENTION.

5             THE COURT:  OKAY.

6             MR. HICKS:  197 TEGLAND, WHERE THEY

7    DESCRIBE --

8             THE COURT:  PAGE 197?

9             MR. HICKS:  -- DESCRIBING ADMISSIBLE

10   EXAMPLES.  PLEASE READ THE COMMENTS REGARDING

11   AUTHORITY CITED BY THE STATE -- USUALLY AS OPPOSED

12   TO ALWAYS, STATE V. PLATZ CITED BY THE STATE.

13            THE COURT:  ALL RIGHT.  ALSO BEFORE WE START

14   THE TRIAL, I WANT TO SIT DOWN WITH COUNSEL AND GO

15   THROUGH THE GENERAL PARAMETERS FOR TRIAL PROCEDURE.

16   WE WILL DO THAT, AND I'M SURE WE WILL HAVE TIME.

17            AND SO I THINK GETTING THE OTHER DEFENDANTS

18   DOWN AND PLAYING THE TAPE AND ALL -- I THINK

19   WHAT WE WILL DO IS WE WILL CALL FOR MR. SIMMERS

20   WHEN WE ARE DONE.

21            I CAN'T REMEMBER HOW LONG THE TAPE WAS, BUT

22   I THINK ABOUT 20 MINUTES.  I THINK THAT'S A FAIR

23   ESTIMATE.  AND I WILL SEE COUNSEL IN THIS CASE AT

24   20 MINUTES AFTER 2:00.

25                            (RECESS.)

1                  AFTERNOON SESSION

2                                    MARCH 12, 1996

3                          (THE FOLLOWING PROCEEDINGS WERE
                           HELD OUTSIDE THE PRESENCE OF
4                          THE JURY.)

5

6            THE COURT:  ALL RIGHT.  LET'S GO ON THE

7    RECORD.

8            MR. HICKS HAS PROVIDED A HANDWRITTEN OFFER

9    OF PROOF AS TO CHARLOTTE JUDD, J-U-D-D.  AND

10   MR. HICKS HAS TRIED, WITHOUT SUCCESS, TO GET AHOLD

11   OF HER.

12           THE STATE HAS ALSO PROVIDED AN OFFER OF

13   PROOF THAT MR. MARNER PREPARED, AND THESE ARE BOTH

14   GOING TO BE FILED.

15           AND IT IS MY UNDERSTANDING THE PARTIES HAVE

16   STIPULATED THAT THE COURT CAN CONSIDER THIS

17   INFORMATION THAT IS CONTAINED IN THERE FOR THE

18   PURPOSES OF THE 3.5 ONLY.  AND SO WE'LL FILE IT.

19           AND DO YOU WANT IT MARKED AS AN EXHIBIT?  WE

20   PROBABLY SHOULD.

21           MR. HICKS:  THAT'S FINE.

22           THE COURT:  WE WILL MARK THEM EACH AS AN

23   EXHIBIT OR TOGETHER, EITHER WAY.

24           MR. HICKS:  YOU CAN MARK THEM A AND B, AND

25   KEEP THEM TOGETHER.

1          THE COURT:  YES.

2          WHILE WE WERE WAITING FOR MR. SIMMERS TO

3    COME DOWN, WE ALSO HAD AN OPPORTUNITY TO GO THROUGH

4    THE GENERAL QUESTIONS THAT WILL BE ASKED OF THE

5    JURY.  THE WAY THE LOCATION OF THE EVENT WILL BE

6    DESCRIBED WILL BE THE NORTH LAKE AREA OF THE

7    BURKE-GILMAN TRAIL, WITHIN THE CITY OF BOTHELL NEAR

8    KENMORE.

9          WILL EVERYBODY BE ABLE TO FOLLOW THAT?

10          MS. MAHONEY:  IT IS NOT VERY CLEAR.

11          MR. HICKS:  YOU CAN CHANGE IT TO WHATEVER

12    YOU THINK IS APPROPRIATE, AS LONG AS THE

13    BURKE-GILMAN IS IN THERE.  I WOULD SUGGEST BOTHELL-

14    KENMORE AREA.

15          THE COURT:  I CAN SAY, "WITHIN THE CITY OF

16    BOTHELL, NEAR KENMORE," AND WE WILL LEAVE OUT THE

17    NORTH LAKE AREA, BECAUSE THAT MAY CONFUSE PEOPLE.

18          AND I WILL ADD A QUESTION WHICH IS:  HAVE

19    ANY PROSPECTIVE JURORS OR MEMBERS OR CLOSE FRIENDS

20    HAVE EVER BEEN CHARGED WITH A CRIME?  RIGHT AFTER

21    QUESTION NO. 14.

22          MR. HICKS, WERE THERE ANY ADDITIONAL

23    QUESTIONS THAT YOU WISHED THE COURT TO ADD, GENERAL

24    QUESTIONS?

25          MR. HICKS:  RIGHT.  I THINK I GOT THAT

1  COVERED ON THE ADDITION WE MADE TO THE POSTED

2  QUESTIONS ON THE BOARD.

3          THE COURT:  OKAY.

4          THE BAILIFF HAS GONE TO PROVIDE THE

5  POTENTIAL JURORS WITH A HARDSHIP QUESTIONNAIRE, AND

6  WE WILL BE GETTING THAT BACK.

7          REALISTICALLY, WE WILL PROBABLY NOT -- WELL,

8  WE MAY GET TO THE ENTIRE JURY TODAY, BUT THEN AGAIN

9  WE MAY NOT.  WE'LL HAVE TO SEE.

10         IN THE MEANTIME, DID COUNSEL WISH TO ARGUE,

11 NOW THAT THE OFFERS HAVE BEEN MADE IN THE FORM OF A

12 WRITTEN OFFER OF PROOF, THE 3.5 HEARING?

13         MR. HICKS:  THAT WILL BE FINE.

14         THE COURT:  ALL RIGHT.  WHY DON'T WE PROCEED

15 WITH THAT THEN.  WE HAVE HEARD ALL OF THE EVIDENCE

16 THAT HAS BEEN PRESENTED, AND THE STATE HAS THE

17 BURDEN, AND SO THE STATE WILL GO FIRST.

18         MS. MAHONEY:  YOUR HONOR, THE STATE HAS

19 PREPARED A BRIEF, WHICH I BELIEVE THE COURT HAS,

20 AND SO I'LL TRY NOT TO ELABORATE.  WE HAVE SET OUT

21 THE FACTS WHICH I THINK, TESTIMONYWISE, BEAR OUT --

22 FOR THE MOST PART SET OUT IN THE STATE'S OFFER OF

23 PROOF, IN THEIR BRIEF, ESSENTIALLY THE SOLE

24 QUESTION FOR THE COURT'S DETERMINATION HERE IS, NO.

25 1, WAS THE DEFENDANT PROPERLY ADVISED OF HIS

1    RIGHTS?

2        AND NO. 2, DID HE UNDERSTAND THOSE RIGHTS AS

3    THEY WERE GIVEN TO HIM, AND WAS HE ABLE TO MAKE A

4    KNOWING AND INTELLIGENT AND VOLUNTARY WAIVER?

5        WHAT IS NOT AT ISSUE HERE IS WHETHER OR NOT

6    THAT STATEMENT WAS TRUE.  THAT IS CLEARLY, BY CASE

7    LAW AS CITED BY THE COURT, BOTH IN THE CUSHING

8    CASE, 68 WN. APP. AND THE BRAUN CASE, 82 WN. 2D --

9    THESE ARE CASES THAT CITE BACK TO WELL-ESTABLISHED

10   LAW IN THIS STATE THAT THAT IS SIMPLY NOT THE

11   QUESTION.

12       FIRST OF ALL, THE FIRST QUESTION IS WHETHER

13   OR NOT HE WAS PROPERLY ADVISED.  CLEARLY,

14   MR. SIMMERS WAS PROPERLY ADVISED ON NUMEROUS

15   OCCASIONS, OF HIS RIGHTS.  THE COURT HAS BEFORE IT

16   THE FORMS THAT WERE READ TO MR. SIMMERS, AND THEY

17   ARE WHAT IS CONDONED AND ACCEPTED BY LAW AS BEING

18   PROPER WARNINGS.

19       THERE IS ABSOLUTELY NO DISPUTE BUT THAT

20   THESE RIGHTS WERE READ TO HIM, AND THEY WERE READ

21   AS PRINTED, AND THEY ARE PROPER.

22       SECOND OF ALL, THE QUESTION WAS WAS

23   MR. SIMMERS IN A POSITION TO UNDERSTAND THOSE

24   RIGHTS AS THEY WERE GIVEN TO HIM?

25       AND, AGAIN, I THINK AN INTERESTING NOTE HERE

1    FOR THE COURT -- THE QUESTION ISN'T WHETHER HE CAN

2    FORESEE ALL THE CONSEQUENCES OF TALKING, IT IS

3    WHETHER -- DOES HE UNDERSTAND THAT HE HAS THE RIGHT

4    TO REMAIN SILENT.  DOES HE UNDERSTAND THOSE WORDS

5    MEAN HE DOESN'T HAVE TO TALK?

6         DOES HE UNDERSTAND HE HAS A RIGHT TO A

7    LAWYER.  ARE THOSE THINGS PLAINLY EXPLAINED TO HIM.

8    WHETHER OR NOT HE CAN SEE THE CONSEQUENCES OF

9    TALKING IS NOT THE ISSUE FOR THE COURT.  AND THAT,

10   AGAIN, IS ILLUSTRATED IN STATE V. CUSHING, 68 WN.

11   APP. 388, WHEN THE COURT SPECIFICALLY POINTS OUT

12   THAT THAT IS NOT THE QUESTION.

13        BEFORE THE COURT, THERE IS ABSOLUTELY NO

14   EVIDENCE THAT MR. SIMMERS WAS NOT CAPABLE OF

15   UNDERSTANDING THE RIGHTS AS READ TO HIM.  TO ALL

16   PERSONS WHO CAME INTO CONTACT WITH HIM THAT DAY, HE

17   APPEARED COHERENT, NOT UNDER THE INFLUENCE OF ANY

18   ALCOHOL OR DRUGS.

19        HE COULD READ AND UNDERSTAND THE ENGLISH

20   LANGUAGE; HE WAS ABLE TO RESPOND APPROPRIATELY; HE

21   SEEMED QUITE FORTHCOMING WITH INFORMATION.  AND SO,

22   CLEARLY, HE WAS CAPABLE OF UNDERSTANDING WHAT WAS

23   GOING ON.

24        THE COURT ALSO KNOWS HE IS NOW 17 YEARS

25   OLD -- HE WAS 16 AT THE TIME -- AND THAT HE HAD

1    BEEN THROUGH SCHOOL, COMPLETED THE 10TH GRADE AND

2    WAS TAKING CLASSES IN THE 11TH GRADE, AND READS AND

3    UNDERSTANDS AND IS REALLY QUITE BRIGHT.

4          THIRD OF ALL, DID HE MAKE A VOLUNTARY AND

5    KNOWING AND INTELLIGENT WAIVER OF THOSE RIGHTS?

6    AGAIN, WE ARE TALKING ABOUT DID HE UNDERSTAND THOSE

7    RIGHTS AS THEY WERE GIVEN TO HIM AND ALL THE

8    CONSEQUENCES, BUT THE RIGHTS AS READ, AND DID HE

9    MAKE A DECISION TO TALK TO THE POLICE ON HIS OWN.

10          IT SEEMS THAT WHERE MR. HICKS IS FOCUSING

11   HERE IS THAT THAT WAS A COERCIVE SITUATION.  WELL,

12   FIRST OF ALL, DID THE POLICE USE DECEPTIVE TACTICS?

13   SOME.  YES, THEY DID.  AND THEY WERE CANDID ABOUT

14   THAT.

15          I HAVE GIVEN THE CASES TO THE COURT WHERE

16   THE COURTS HAVE REPEATEDLY SAID THAT'S OKAY.  THE

17   INQUIRY OF WHETHER A CONFESSION IS FREE AND

18   VOLUNTARY IS NOT DETERMINED BY WHETHER THE

19   OFFICERS' CONDUCT IS SHOCKING OR THE CONFESSION IS

20   CRUELLY EXTORTED BUT WHETHER EXTRACTED BY ANY SORT

21   OF THREATS, VIOLENCE, OR DIRECT OR IMPLIED PROMISE,

22   HOWEVER SLIGHT.  A CONFESSION THAT IS THE PRODUCT

23   OF COERCION, PHYSICAL OR PSYCHOLOGICAL, IS

24   INVOLUNTARY AND NOT ADMISSIBLE.

25          WE DON'T HAVE ANY OF THOSE THINGS HERE.  AND

1    ACTUALLY THE QUOTE I THOUGHT I WAS GOING FOR IS

2    BASICALLY DID THE POLICE DO ANYTHING SUCH AS TO

3    OVERCOME HIS FREE WILL.

4         THERE IS ABSOLUTELY NO EVIDENCE IN THE

5    RECORD THAT THEY DID ANYTHING TO OVERCOME HIS FREE

6    WILL.  THEY DID NOT THREATEN HIM; THEY DID NOT

7    PROMISE HIM ANYTHING; THEY DIDN'T COERCE HIM IN ANY

8    WAY.

9         AND THE LAST ISSUE IN THIS CASE WAS THAT HE

10   WAS IN CUSTODY FOR SOME TIME.  HE CLEARLY WAS IN

11   CUSTODY AT THE POLICE STATION FROM TEN TO ELEVEN

12   HOURS.  BUT THERE ARE EXPLANATIONS FOR THAT AS TO

13   WHAT IS GOING ON.

14        DURING THE TIME THAT HE IS THERE, HE IS KEPT

15   IN A HOLDING CELL VERY SIMILAR TO A JAIL CELL, AND

16   HE HAS GOT ACCESS TO RESTROOM FACILITIES.  AND HE

17   CAN LIE DOWN.  WHEN HE ASKED FOR A BLANKET, HE WAS

18   GIVEN A BLANKET.  AND HE WAS FED.  AND HE WAS NOT

19   UNDER CONSTANT INTERROGATION FOR THAT TIME.  THERE

20   ARE LARGE PERIODS OF TIME HE STAYS BY HIMSELF.

21        AND SO THERE IS NOTHING COERCIVE ABOUT WHAT

22   THEY WERE DOING, AND IT IS ALL EXPLAINED IN THEIR

23   ACTIONS THROUGHOUT THE DAY.  AND THE COURT HEARD

24   THE TESTIMONY AND SO I WON'T REITERATE WHAT THEY

25   WERE.

1    THERE WAS NOTHING IMPROPER ABOUT THE POLICE

2    PROCEDURES HERE, NOTHING TO OVERCOME THE

3    DEFENDANT'S WILL.

4        AND I WOULD POINT THE COURT TO STATE V.

5    FURMAN, WHICH SPECIFICALLY DEALS WITH A JUVENILE

6    CONFESSION, AT 122 WN. 2D 440, IN WHICH NOT ONLY

7    DID THEY TALK ABOUT THINGS TO LOOK AT IN A JUVENILE

8    CONFESSION BUT ALSO POINT OUT OTHER ADULT CASES

9    WHICH IS BRAUN, AND THE CASES THAT FOLLOWED THAT.

10    SO YOU HAVE TO LOOK AT THE WHOLE PICTURE:

11    DO THE ADULT AND THE JUVENILE CASES GO TOGETHER?

12    YOU ARE LOOKING AT THESE CONFESSIONS IN THE SAME

13    LIGHT AS YOU WOULD ANYONE ELSE'S CONFESSION.

14        AND BASED UPON THE FACTORS THAT THE STATE

15    MUST MEET, THERE IS ABSOLUTELY NOTHING TO SHOW IN

16    THIS CASE, AND AS A MATTER OF FACT, THERE IS

17    EVERYTHING TO SHOW THAT HE WAS PROPERLY ADVISED,

18    THAT HE KNEW AND HE UNDERSTOOD WHAT HE WAS DOING.

19    AND HE VOLUNTARILY AND FREELY GAVE A STATEMENT TO

20    THE POLICE -- SEVERAL STATEMENTS TO THE POLICE.

21        THE COURT:  THANK YOU.

22        MR. HICKS?

23        MR. HICKS:  YOUR HONOR, I WILL TRY AND FIRST

24    ADDRESS MS. MAHONEY'S ARGUMENT.  THE STATEMENT THAT

25    THERE WERE NO IMPLIED PROMISES IS SIMPLY NOT TRUE.

1      YOU WOULD HAVE TO UNDERSTAND THE PHRASE

2   "IMPLIED PROMISE" DOES NOT MEAN I PROMISE THIS, BUT

3   IMPLIED PROMISE -- THE POLICE OFFICERS IN EMPLOYING

4   THIS THEME NONSENSE IN THEIR INTERVIEW TACTICS DID

5   MAKE PROMISES, INFERRED PROMISES.  THEY INFERRED

6   THEY WOULD STAND BY MR. SIMMERS' VERSION THAT IT

7   WAS SELF-DEFENSE WHEN THEY SAID, "LOOK, WE HAVE

8   HEARD STORIES ABOUT THIS GUY ACCOSTING OTHER

9   PEOPLE."

10      WAS IT A SELF-DEFENSE SITUATION.  THEY

11   ADMITTED THEY WERE TRYING TO GET HIM.  AND THERE

12   WAS AN IMPLIED PROMISE BASICALLY WHEN THEY TAKE

13   OTHER THEMES, SUCH AS:  "YOU DON'T WANT TO GO DOWN

14   ON THIS ALONE," THEY ARE IMPLIEDLY PROMISING THEY

15   WILL HOLD SOMEONE ELSE RESPONSIBLE.

16      BOTH OF THESE WERE DECEPTIONS AND WERE NOT

17   TRUE.  THEY WERE IMPLIED PROMISES.  THERE IS AT

18   LEAST THE IMPLIED PROMISE THAT THEY WERE

19   INVESTIGATING THIS AND WOULD STAND BY A

20   SELF-DEFENSE POSITION BY MR. SIMMERS.  AND THAT IS

21   WHAT IMPLIED PROMISE CAN ADDRESS.

22      YOUR HONOR, YOU CANNOT LOOK AT THIS

23   PARTICULAR CASE IN A VACUUM.  IN LISTENING TO

24   MS. MAHONEY'S ARGUMENT, I DID NOT HEAR ONE

25   VARIATION TO ADDRESS PARTICULAR CIRCUMSTANCES THAT

1    YOU HAVE WITH A JUVENILE.  I BRIEFED THE MATTER AND

2    I AM JUST GOING TO INCORPORATE MY BRIEF BY

3    REFERENCE.  WHEN DEALING WITH JUVENILE CONFESSIONS,

4    IT IS TRUE THAT THE POLICE HAVE NO SPECIFIC

5    OBLIGATION, STANDING ALONE, TO CALL THE JUVENILE'S

6    PARENTS.  ALL OF THE SPECIFIC OBLIGATIONS THAT THE

7    STATE MAY CLAIM DO NOT EXIST INDIVIDUALLY MEAN JUST

8    THAT:  THEY DO NOT EXIST INDIVIDUALLY,

9    SPECIFICALLY.

10        THAT DOES NOT MEAN, LOOKING AT THE TOTALITY

11    OF CIRCUMSTANCES, THAT COMBINED, THOSE LAPSES AND

12    THINGS THAT WERE DONE WOULD PASS MUSTER.  HERE IS

13    WHAT WE HAVE IN THIS CASE:  THE ADMITTED USE OF

14    DECEPTION.  THEY CAME RIGHT OUT AND STATED, "WE

15    USED DECEPTION."

16        AND THIS IS EXACTLY THE KIND OF CASE WHERE

17    YOU DO NOT WANT TO USE THAT TACTIC; OTHERWISE, YOU

18    GET NOT ONLY A FALSE STATEMENT BUT ONE THAT

19    POSSIBLY COULD INCRIMINATE SOMEONE ELSE.

20        I WASN'T GOING TO SUBMIT THIS TO THE COURT,

21    BUT I AM NOW, DUE TO COUNSEL'S ARGUMENT.  SEVERAL

22    YEARS AGO, I ARGUED FOR SUPPRESSION OF A CONFESSION

23    IN A GANG RAPE CASE IN FRONT OF JUDGE FOX.  THE

24    TUKWILA POLICE IN MY CASE TOLD MY CLIENT EXACTLY

25    WHAT THE POLICE DID IN THIS CASE:  THEY TOLD HIM A

1    CO-DEFENDANT FINGERED HIM AS BEING PRINCIPALLY

2    RESPONSIBLE.  AND THEN MY CLIENT IN THAT CASE MADE

3    UP A WHOPPER OF A STORY BLAMING THE OTHER GUY.  AND

4    THAT WAS FALSE.  BASICALLY, YOU HAD TWO LIES.  AND

5    THE EXACT PURPOSE OF MIRANDA AND ITS PROGENY, TO

6    OBTAIN TRUTHFUL CONFESSIONS, WAS NOT MET.

7         YOUR HONOR, MIRANDA DOES STATE YOU CANNOT

8    USE DECEPTION, AND IT IS STILL LAW IN WASHINGTON.

9         THE CONFUSION IS, AS COUNSEL I'M SURE WILL

10   AGREE, THERE ARE A WIDE BODY OF WASHINGTON CASES

11   THAT SAY YOU CAN USE DECEPTION IN SERIOUS CASES.

12   AS JUDGE FOX POINTS OUT, IN OTHER CASES, THEY SAY

13   NO, THIS IS NOT GOOD.

14        THE BOTTOM LINE IS, AS A WHOLE, I FOUND

15   WASHINGTON'S BODY OF CASE LAW USELESS IN TRYING TO

16   DETERMINE WHETHER OR NOT WASHINGTON FOLLOWS THE

17   BRIGHT RED LETTER OF MIRANDA THAT SAYS YOU CAN'T

18   USE DECEPTION.

19        AND I WILL CONCEDE FOR PURPOSES OF ARGUMENT

20   THAT COUNSEL WOULD FIND AUTHORITY TO SAY, YES, YOU

21   CAN.  THAT DOES NOT END THE INQUIRY.  LOOKING AT

22   THE TOTALITY -- BY THE WAY JUDGE FOX SUPPRESSED

23   THAT CONFESSION.

24        OBVIOUSLY, IT IS NOT AUTHORITY, AND I AM NOT

25   GOING TO CITE IT, BUT IT IS AN EXAMPLE OF THE

1    DYNAMICS JUDGE FOX ANALYZED.  AND I SUBMIT IT TO

2    YOU FOR YOUR PERUSAL, BASICALLY IN THE TOTALITY OF

3    CIRCUMSTANCES TEST, YOU MUST CONSIDER THE USE OF

4    THIS EXCEPTION.

5         MR. SIMMERS AT THE TIME WAS LIVING ON THE

6    STREETS BASICALLY -- ON THE TRAIL IN THIS CASE

7    MAYBE.  DECEPTION WAS USED IN AT LEAST THREE

8    INSTANCES I CAN THINK OF.  BUT THROUGHOUT THE

9    ENTIRE ARGUMENT, THERE WERE THEMES PUT FORTH LIKE

10   THE SELF-DEFENSE THEME, THE YOU-DON'T-WANT-

11   TO-GO-DOWN-ALONE THEME.   YOU KNOW, IT IS ALL

12   NONSENSE.  AND THEY TRIED THREE DIFFERENT VERSIONS.

13        HOW IN THE WORLD CAN THEY EXPECT TO

14   ACCOMPLISH THE PURPOSE OF 3.5 CASE LAW AND MIRANDA

15   PROGENY, GETTING A TRUTHFUL STATEMENT, WHEN THEY

16   TAKE THESE OUT AND BASICALLY GIVE A GUY A DIRECTION

17   TO GO THAT WILL ULTIMATELY -- AND THEY KNOW WILL

18   RESULT IN A FALSE STATEMENT, BECAUSE THEY THEM-

19   SELVES DON'T BELIEVE THE FACTS THEY ARE STATING.

20        NONETHELESS THEY DID IT.

21        HE WAS NOT WASHED, THAT'S FOR SURE, AND HE

22   MUST HAVE BEEN TIRED, IF YOU LISTEN TO THE TAPE.

23   AND THAT'S THE REASON I WANTED YOU TO HEAR IT ON

24   THE RECORD.  HE IS SLURRING, AND THERE ARE SEVERAL

25   TIMES WHERE HIS VOICE TRAILS OFF, AND HE SLURS

1  SEVERAL WORDS.

2          MR. SIMMERS WAS NOT IN TOP FORM IN THAT

3  PARTICULAR CIRCUMSTANCE.  AND YOU CAN COME TO THE

4  CONCLUSION THAT HE NATURALLY SLURS THAT WAY, BUT

5  YOU HAVE TO DO THIS TO WEIGH THE CREDIBILITY OF

6  THESE OFFICERS.  THEY SAID HE DIDN'T SLUR AND THEY

7  SAW NO SIGNS OF INTOXICATION.

8          WELL, MY GOD!  ONE OF THE OFFICERS THAT

9  MERELY ACCOMPANIED SERGEANT RUSK STATED MORE

10  REFERENCES TO HUGE AMOUNTS OF ALCOHOL STOLEN IN HIS

11  REPORT THAN I THINK I HAVE EVER SEEN.  AND, YET,

12  THIS WASN'T EVEN ADDRESSED IN SERGEANT RUSK'S

13  REPORT.  HE SAYS THE GUY DIDN'T LOOK DRUNK AND

14  THAT'S IT; THAT'S THE END OF THE ANALYSIS.  WE

15  DIDN'T SMELL IT ON HIS BREATH.

16          NOTHING WAS DONE TO ASK, IN ANY WAY TO

17  VERIFY IAN'S CONDITION.  AND THE CONDITIONS I AM

18  TALKING ABOUT ARE THOSE PECULIAR TO A JUVENILE,

19  BEING FRIGHTENED, BEING OVERWORN BY THE ELEMENTS

20  AND SUDDENLY BROUGHT INTO CUSTODY.

21          THEY GOT HIM ALL HAPPY -- WELL, SPLENDID.

22  THAT DOESN'T ERASE THE OTHER FACTORS STANDING OUT

23  IN THIS PARTICULAR CASE.

24          THEY DIDN'T CALL HIS PARENTS.  THEY DID ASK

25  WHETHER OR NOT HE WANTS A LAWYER, BUT THAT'S AFTER

1    THEY BASICALLY CONCEDE USING THE "OFFICER FRIENDLY"

2    APPROACH, AND GOING TO MCDONALD'S, AND SO FORTH.

3          BEAR IN MIND ALSO, INITIALLY, MR. SIMMERS

4    DENIED ANY PARTICULAR INVOLVEMENT IN THE HOMICIDE.

5    ONLY WHEN ALL THESE THEMES WERE EXHAUSTED, AND THE

6    IMPLIED PROMISE HELD OUT LIKE A CARROT BY THE

7    OFFICERS DOES HE GIVE THIS STATEMENT.

8          NOW, LET'S DETERMINE WHETHER OR NOT, FOR

9    PURPOSES OF 3.5, MIRANDA, ET CETERA, HE GIVES A

10   STATEMENT:  IT'S THE WRONG KNIFE, THE WRONG DAY,

11   AND HE STATES THE KNIFE HAD A SERRATED EDGE AND

12   DRAWS IT, AND IT DOES NOT RESEMBLE IN ANY WAY,

13   SHAPE OR FORM THE KNIFE THAT THE OFFICERS ALLEGED

14   IS THE MURDER WEAPON.  THE BLADE IS TOO SHORT BY

15   MORE THAN HALF, AND THE SERRATIONS ARE COMPLETELY

16   DIFFERENT, AND IT IS A COMPLETELY DIFFERENT EDGE,

17   AND THE ACTUAL MURDER WEAPON IS ALLEGED BY THE

18   STATE TO BE A TWO-PRONGED KNIFE NOT A SINGLE.

19          HE STATES HE HAS KILLED 13 GANGSTERS.  THEY

20   SAY, "WE DON'T BELIEVE IT, THAT'S RIDICULOUS.  BUT

21   LET'S BELIEVE HIM WHEN HE SAYS HE KILLED THIS

22   INDIVIDUAL, EVEN THOUGH HE GIVES THE WRONG DAY AND

23   KNIFE AND OTHER DETAILS."

24          YOU HAVE GOT TO LOOK BEYOND -- COUNSEL IS

25   WRONG WHEN SHE SAYS ALL YOU LOOK AT IN A 3.5 IS

1    WHETHER OR NOT THIS KID UNDERSTOOD HIS RIGHTS AND

2    MADE A KNOWING AND INTELLIGENT WAIVER.

3         IF SHE IS REFERRING TO ADULT STANDARDS, YOU

4    DON'T.  YOU DO IT DIFFERENTLY WHEN IT IS A

5    JUVENILE.  THAT'S ADDITIONAL PROTECTION YOU GIVE A

6    MORE VULNERABLE DEFENDANT LIKE MR. SIMMERS.  AND IF

7    YOU LOOK AT THE TOTALITY OF THE CIRCUMSTANCES, THE

8    AMATEURISH METHODS USED, THE ADMITTED USE OF

9    DECEPTION IN MORE THAN THREE INSTANCES, AND

10   MR. SIMMERS' CONDITION AT THE TIME AS TO HOW HE

11   SOUNDS ON THAT TAPE, I DON'T THINK THE STATE HAS

12   MET THEIR BURDEN IN SHOWING MR. SIMMERS GAVE A

13   KNOWING AND INTELLIGENT AND VOLUNTARY STATEMENT, OR

14   THAT HIS FREE WILL WAS NOT OVERBORNE CONSIDERING

15   THE TOTALITY OF THE CIRCUMSTANCES.

16        AND, AGAIN, WHEN IT COMES TO JUVENILES, YOUR

17   HONOR, THIS DOESN'T GO TO WEIGHT.  THIS IS AN

18   ADDITIONAL SERIES OF ANALYSES THAT THE COURT MUST

19   TAKE NOTICE OF.

20        JUST TO COVER MYSELF, YOUR HONOR, I

21   INCORPORATE MY BRIEF AND AUTHORITY BY REFERENCE

22   WHEN YOU MAKE YOUR DECISION.

23        THE COURT:  ALL RIGHT.  THANK YOU.

24        MS. MAHONEY:  JUST BRIEFLY, YOUR HONOR, THE

25   STANDARD I AM CITING COMES DIRECTLY FROM THE CASE

1      LAW.

2            STATE V. FURMAN DOES DEAL DIRECTLY WITH A

3      JUVENILE CONFESSION.  AND THEY DO MAKE REFERENCE TO

4      THE FACT IN FURMAN, THEY TOLD THE DEFENDANT THAT

5      THEY HAD EVIDENCE THAT LINKED HIM TO THE SCENE THAT

6      WAS STRONGER THAN IT WAS -- JUST AS THEY DID

7      HERE -- AND THAT WAS FOUND PERMISSIBLE; THERE WAS

8      NOTHING WRONG WITH THAT.  THAT CONFESSION WAS

9      VOLUNTARY.

10            AND THE CASES THEY RELY ON IN MAKING THIS

11      DECISION -- THEY REFER BACK TO CASES SUCH AS BRAUN

12      AND ITS PROGENY, WHICH ARE ADULT SITUATIONS.

13            AND I'M NOT SAYING THAT THE COURT SHOULDN'T

14      ALSO TAKE INTO CONSIDERATION THE DEFENDANT'S AGE,

15      AND THAT HE WAS A JUVENILE, AND HIS PHYSICAL

16      CONDITION, BUT THAT'S JUST ONE OF THE MANY FACTORS.

17      YOU STILL LOOK AT THE ENTIRE PICTURE.

18            AND I THINK CUSHING IS ONE OF THE CASES I

19      ALSO SELECTED FOR THE COURT, BECAUSE THAT'S AN

20      INTERESTING QUESTION WITH THE MENTALLY-DISABLED

21      DEFENDANT WHO HAD POTENTIALLY THE EMOTIONAL LEVEL

22      OF ABOUT A NINE-YEAR-OLD.

23            AND THE COURT THERE SAID WHETHER THE

24      BEHAVIOR OF THE STATE'S LAW ENFORCEMENT OFFICIAL

25      WAS SUCH AS TO OVERBEAR HIS WILL TO RESIST AND

1    BRING ABOUT A CONFESSION NOT FREELY SELF-

2    DETERMINED, IS A QUESTION TO BE ANSWERED WITH

3    COMPLETE DISREGARD TO WHETHER OR NOT PETITIONER IN

4    FACT TOLD THE TRUTH.  AND THAT IS CITING BRAUN,

5    ALSO CITED BY THE JUVENILE CASE.

6        THERE IS NOTHING WRONG DONE BY THE POLICE

7    HERE; IT IS ALL CONDONED BY THE CASES.

8        BRAUN TALKS A GREAT DEAL ABOUT THE DECEPTIVE

9    PRACTICES THAT ARE OKAY, OR NOT OKAY.  THERE WERE

10   NO PROMISES MADE TO THIS DEFENDANT, NO THREATS, NO

11   COERCION -- THERE IS NOTHING IN THE RECORD TO

12   SUGGEST THAT MR. SIMMERS DIDN'T UNDERSTAND WHAT HE

13   WAS DOING, AND THAT HE DID ANYTHING BUT REALLY TALK

14   WITH THE POLICE AND VOLUNTEER INFORMATION.  HE

15   SAID, "I WILL TAKE YOU TO THE MARINA AND POINT OUT

16   THE BOATS I BROKE INTO."

17       THE POLICE HAD A LOT OF INFORMATION THAT DAY

18   TO CORROBORATE THE THINGS HE WAS TELLING THEM.  NOT

19   ONLY THE EARLIER CONFESSIONS, BUT THINGS SUCH AS

20   FOOTPRINTS, AND TIMES, AND DATES, AND BOATS -- NOT

21   ONLY WHAT HE DID IN POINTING OUT THE SPECIFIC ONES

22   BUT ALSO AS TO THE CONFESSION THEY TOOK REGARDING

23   THE MURDER.

24       DOES HE SAY HE KILLED 13 PEOPLE?  YES, HE

25   DOES.  DOES HE GIVE DETAILS?  NO.

1    HE DOES SAY HE STABBED RODNEY GOCHANOUR IN

2    THE BACK SIX TIMES. AND ED HOPKINS WHO ATTENDED

3    THE AUTOPSY KNOWS THAT.

4    HE DOES SAY THAT HE WAS SLASHED IN THE

5    FACE. AND ED HOPKINS WHO ATTENDED THE AUTOPSY

6    KNOWS THAT. AND HE TELLS THEM WHERE IT HAPPENED.

7    THERE ARE A LOT OF THINGS HERE THAT ACTUALLY

8    ARE CORROBORATED, AND SO THERE IS NOTHING TO FLAG

9    THE POLICE THAT THEY ARE SOMEHOW OVERBEARING HIS

10   WILL.

11   THE COURT HAS THE TRANSCRIPT, AND YOU HAVE

12   HEARD THE TAPE, AND THE TONE AND CONDUCT OF THE

13   INTERVIEW. THESE POLICE OFFICERS ARE NOT FEEDING

14   HIM INFORMATION; HE IS GIVING IT; HE IS ANSWERING

15   THE QUESTIONS.

16   AND BASED UPON THE EVIDENCE BEFORE THE

17   COURT, WE WOULD SUBMIT TO YOU THE STATE HAS MET

18   THEIR BURDEN BY A PREPONDERANCE OF THE EVIDENCE.

19   THE COURT: ALL RIGHT. THANK YOU.

20   MR. HICKS, YESTERDAY, YOU WERE CONCERNED

21   WHEN I WAS MOMENTARILY DIVERTED, ABOUT WHETHER I

22   WAS LISTENING TO THE TAPE. AND I LISTENED TO IT

23   LAST NIGHT.

24   BUT I KNOW NOW WHAT YOU WERE FOCUSING ON,

25   WHICH I DIDN'T KNOW, AND SO I WILL LISTEN TO THE

1    TAPE ONE MORE TIME.

2        MR. HICKS:  OH, GEE.  WELL, I DIDN'T MEAN

3    FOR YOU TO HAVE TO DO THAT.

4        THE COURT:  NO.  IT'S AN IMPORTANT DECISION,

5    AND I WILL LISTEN TO THE TAPE ONE MORE TIME, AND I

6    WILL RULE TOMORROW MORNING.  AND SO I NEED TO GET

7    THE TAPE FROM THE CLERK.

8        THE ORAL RULING, I KNOW, IS NOT AUTHORITY.

9    IT MAY OR MAY NOT BE USEFUL DEPENDING UPON HOW MUCH

10   ONE CAN TELL ABOUT THE FACTS.  I HAVEN'T LOOKED AT

11   IT.

12       MS. MAHONEY:  WITH REGARD TO THIS, FOR THE

13   RECORD, WE DON'T KNOW WHATEVER TRANSPIRED BEFORE

14   JUDGE FOX, AND IT IS NOT AUTHORITATIVE, AND IT IS

15   NOT CASE LAW.

16       THE COURT:  ALL RIGHT, THANK YOU.

17       MS. MAHONEY:  WE DON'T KNOW IF IT WAS EVER

18   TAKEN UP.

19       THE COURT:  I THINK WE SHOULD TAKE A BREAK

20   SO WE CAN FIND OUT WHAT IS TRANSPIRING IN THE

21   JURYROOM.  WE WILL HAVE THE DEFENDANT TAKE A BREAK

22   UNTIL WE FIGURE OUT WHETHER WE HAVE JURORS AND

23   WHETHER WE HAVE COPIES OF THE QUESTIONNAIRE.

24                              (RECESS.)

25

133

1              MORNING SESSION

2                                  MARCH 13, 1996

3                    (THE FOLLOWING PROCEEDINGS WERE
                     HELD OUTSIDE THE PRESENCE OF
4                    THE JURY.)

5

6          THE COURT:  GOOD MORNING.  LET'S TAKE UP THE

7     ISSUES THAT HAVE BEEN ADDRESSED CONCERNING THE

8     STATEMENT GIVEN BY MR. SIMMERS AND THE 3.5 HEARING,

9     AND THE OTHER SUSPECT MOTION, AND THE CHARACTER OR

10    HABIT MOTION.

11         AND IF YOU WILL GIVE ME JUST ONE MOMENT --

12         THE COURT:  BEFORE MR. SIMMERS' STATEMENTS

13    TO THE POLICE CAN BE ADMITTED INTO EVIDENCE, THE

14    COURT MUST FIRST DETERMINE WHETHER THE DEFENDANT

15    WAS PROPERLY ADVISED OF HIS RIGHTS, AND WHETHER HE

16    UNDERSTOOD THOSE RIGHTS, AND WHETHER HE MADE A

17    KNOWING, INTELLIGENT, AND VOLUNTARY WAIVER OF THOSE

18    RIGHTS.

19         THE 3.5 HEARING WAS HELD FOR THAT PURPOSE,

20    TO MAKE THAT DETERMINATION.  THE FIRST QUESTION IS

21    WHETHER THE DEFENDANT WAS PROPERLY ADVISED OF HIS

22    RIGHTS.

23         IN DETERMINING -- WELL, LET ME DIGRESS.  THE

24    DEFENDANT, I BELIEVE, WAS PROPERLY ADVISED OF HIS

25    RIGHTS MANY TIMES.  I MAY NOT BE ABLE TO ACCURATELY

1    ENUMERATE THEM, BUT HE WAS ADVISED OF HIS RIGHTS

2    FIRST BY OFFICER FULLER, AS I UNDERSTOOD IT.  I MAY

3    BE WRONG; IT MAY BE JANASZ WHO ACTUALLY READ

4    MR. SIMMERS HIS RIGHTS -- IT WAS OFFICER FULLER WHO

5    READ MR. WYATT HIS RIGHTS.

6         AND SO HE WAS FIRST ADVISED OF HIS RIGHTS BY

7    OFFICER JANASZ, AND THEN THERE WAS TESTIMONY FROM

8    DETECTIVE JARBOE WHO TALKED ABOUT -- I BELIEVE HE

9    ADVISED HIM OF HIS RIGHTS.

10         AND MR. SIMMERS WAS ALSO ADVISED OF HIS

11   RIGHTS BY DETECTIVE RUSK, AND AGAIN BY DETECTIVE

12   HOPKINS AT THE BEGINNING OF THE TAPE-RECORDING.  SO

13   THERE WERE NUMEROUS TIMES THAT MR. SIMMERS WAS

14   ADVISED OF HIS RIGHTS.

15         DETECTIVE JARBOE ALSO TESTIFIED THAT SHE HAD

16   ADVISED MR. SIMMERS OF HIS RIGHTS BEFORE, IN THE

17   CONTEXT OF ANOTHER MATTER RELATED TO HIS DETENTION

18   AT JUVENILE COURT.  AND I DON'T BELIEVE THERE IS

19   ANY DISPUTE, AND SO I BELIEVE IT IS UNDISPUTED THAT

20   MR. SIMMERS WAS IN FACT ADVISED OF HIS RIGHTS.

21         THE SECOND AND MOST CRITICAL QUESTION IS

22   WHETHER THE DEFENDANT UNDERSTOOD HIS RIGHTS AND WAS

23   ABLE TO VOLUNTARILY WAIVE HIS RIGHTS.  THERE IS

24   ABSOLUTELY NO INDICATION WHATSOEVER THAT

25   MR. SIMMERS DID NOT UNDERSTAND HIS RIGHTS.

1          I HAVE HAD THE OPPORTUNITY TO LISTEN TO THE

2     TAPE FOR THE THIRD TIME.  AND HE, EVEN IN THE TAPE,

3     IS VERY CLEAR THAT HE UNDERSTANDS HIS RIGHTS.  AND

4     SO THERE IS NO INDICATION FROM ANY OF THE TESTIMONY

5     FROM ANY OF THE WITNESSES THAT MR. SIMMERS MADE ANY

6     INDICATION THAT HE DID NOT UNDERSTAND HIS RIGHTS.

7          THERE WAS QUESTIONING ABOUT HIS DEMEANOR AND

8     WHETHER OR NOT THERE WAS ANY INDICATION THAT

9     MR. SIMMERS HAD TAKEN DRUGS OR ALCOHOL, AND THERE

10    WAS ABSOLUTELY NO INDICATION FROM ANY OF THE

11    WITNESSES THAT TESTIFIED TO THAT EFFECT.

12          NEXT IS WHETHER OR NOT MR. SIMMERS

13    VOLUNTARILY WAIVED HIS RIGHTS, HAVING DETERMINED

14    THAT HE WAS PROPERLY ADVISED OF HIS RIGHTS AND THAT

15    HE UNDERSTOOD HIS RIGHTS.

16          IN DETERMINING THE VOLUNTARINESS OF A

17    JUVENILE'S CONFESSION, THE COURT MUST CONSIDER THE

18    TOTALITY OF THE CIRCUMSTANCES, INCLUDING THE

19    JUVENILE'S AGE, EXPERIENCE, EDUCATION, BACKGROUND,

20    INTELLIGENCE, AND CAPACITY TO UNDERSTAND THE

21    WARNINGS GIVEN TO HIM.

22          THERE HAS BEEN ARGUMENT ALSO RELATED TO WHAT

23    I BELIEVE IN THE CASE LAW HAS BEEN CHARACTERIZED AS

24    DECEPTIVE PRACTICES ON THE PART OF THE LAW

25    ENFORCEMENT OFFICERS.

1    THE TEST RELATED TO DECEPTION IS WHETHER OR

2    NOT THE BEHAVIOR OF THE LAW ENFORCEMENT OFFICIALS

3    WAS SUCH AS TO OVERCOME MR. SIMMERS' WILL TO RESIST

4    AND BRING ABOUT A CONFESSION THAT WAS NOT FREELY

5    MADE.

6    THAT QUESTION IS ANSWERED, AND I CONCUR

7    BASED ON REVIEW OF THE CASE LAW, THAT THE COURT'S

8    FOCUS IS NOT ON WHETHER OR NOT THE DEFENDANT IN

9    FACT WAS TELLING THE TRUTH AT THE TIME OF THE

10   CONFESSION BUT WHETHER OR NOT THE CONDUCT OF THE

11   POLICE WAS SUCH TO OVERCOME MR. SIMMERS' ABILITY TO

12   MAKE A DETERMINATION AS TO WAIVING HIS MIRANDA

13   RIGHTS.

14   IN LOOKING AT THE TOTALITY OF THE

15   CIRCUMSTANCES, WHICH INCLUDE THE FACTORS THAT I

16   HAVE OUTLINED, MR. SIMMERS IS A JUVENILE WHO, AS I

17   UNDERSTAND IT, WAS IN THE 11TH GRADE OR 10TH GRADE

18   AND HAS SUCCESSFULLY COMPLETED HIS G.E.D.  HE HAS

19   BEEN ADVISED OF HIS RIGHTS BEFORE.  HE IS BY ALL

20   ACCOUNTS INTELLIGENT AND BRIGHT.

21   HE DOES APPARENTLY HAVE ATTENTION DEFICIT

22   DISORDER, AS TESTIFIED TO BY HIS MOTHER,

23   MRS. BERUBE, BUT THAT ATTENTION DEFICIT DISORDER IS

24   NOT IN THE NATURE OF A DISORDER AS DESCRIBED BY THE

25   WITNESSES.  AND I UNDERSTAND THAT THEY ARE NOT

1    MEDICAL WITNESSES AND DON'T HAVE THAT EXPERTISE,

2    BUT IT IS NOT OF THE KIND THAT WOULD IN ANY WAY

3    IMPACT MR. SIMMERS' ABILITY TO MAKE AN INTELLIGENT

4    DECISION AS TO WAIVING HIS WARNINGS AND THE

5    WARNINGS GIVEN TO HIM PURSUANT TO MIRANDA.

6         MS. BERUBE TESTIFIED THAT BASED ON HER

7    UNDERSTANDING OF THIS DISORDER, THAT THERE WAS A

8    CONCERN ABOUT HIS UNDERSTANDING THE CONSEQUENCES.

9         HOWEVER, IN LISTENING TO THE TAPE,

10   MR. SIMMERS, AT LEAST IN THIS CONTEXT, SEEMED TO

11   TAKE INTO ACCOUNT THE CONSEQUENCES AND TO HAVE

12   FACTORED THAT INTO WHAT HE WAS THINKING OF.

13        LOOKING AT THE CONDUCT OF THE LAW ENFORCE-

14   MENT OFFICIALS AND WHETHER OR NOT -- GIVEN THE

15   FACTORS THAT THE COURT MUST REVIEW, WHETHER OR NOT

16   THAT CONDUCT WAS OF THE TYPE THAT COULD OVERCOME

17   THE WILL OF MR. SIMMERS, THE DETECTIVES SPOKE TO

18   MR. SIMMERS IN A VERY NORMAL AND VERY NON-

19   THREATENING MANNER.  THEY RELIED PRIMARILY ON

20   OPEN-ENDED QUESTIONS.

21        MR. SIMMERS CLEARLY INDICATED ON THE

22   TAPE-RECORDING AND IN THE STATEMENT, THAT HE

23   UNDERSTOOD.

24        THERE WERE THEORIES AND LINES OF QUESTIONING

25   THAT WERE EMPLOYED BY THE LAW ENFORCEMENT OFFICERS,

1    WHICH WERE NOT ACCURATE, IMPLYING THAT SOMEONE ELSE

2    WAS INVOLVED, IMPLYING THAT THEY KNEW THAT

3    MR. SIMMERS WAS INVOLVED, AND THAT THERE WAS

4    EVIDENCE THAT WOULD LINK MR. SIMMERS PERHAPS TO THE

5    CRIME.

6         IN EXAMINING THE CASES AND THE EFFECT OF

7    DECEPTION ON THE VOLUNTARINESS OF THIS CONFESSION,

8    I DO NOT BELIEVE IT IS OF A TYPE WHICH AS A MATTER

9    OF LAW HAS BEEN HELD TO OVERBEAR HIS WILL AND HIS

10   DESIRE TO RESIST.

11        THEREFORE, I CONCLUDE THAT MR. SIMMERS DID

12   VOLUNTARILY, KNOWINGLY, AND INTELLIGENTLY

13   UNDERSTAND HIS RIGHTS AND WAIVED HIS RIGHTS AND

14   THAT THE ACTS OF THE LAW ENFORCEMENT OFFICIALS WERE

15   NOT OF THE TYPE THAT WERE IMPERMISSIBLE AS FAR AS

16   THE CONFESSION WAS CONCERNED.

17        I THINK THE CASE THAT APPEARS TO BE MOST

18   DIRECTLY ON POINT IS STATE V. FURMAN AT 122 WN. 2D

19   451.

20        MR. HICKS:  YOUR HONOR, JUST THE CITE ONE

21   MORE TIME.

22        THE COURT:  122 WN. 2D AT 451.

23        MR. HICKS:  THANK YOU.

24        THE COURT:  IN THAT CASE, IT WAS A JUVENILE

25   AND THE DETECTIVES BOTH FALSELY TOLD THAT JUVENILE

1    THE POLICE HAD FOUND EVIDENCE LINKING HIM TO THE

2    MURDER.

3          THE COURT DETERMINED THAT THE CONTENTION

4    THAT THIS DECEPTION WAS SUCH THAT THE CONFESSION

5    WAS NOT VALID WAS WITHOUT MERIT.  ACCORDING TO OUR

6    WASHINGTON STATE SUPREME COURT, MISLEADING

7    STATEMENTS ABOUT THE STRENGTH OF THE STATE'S

8    EVIDENCE DO NOT RENDER AN OTHERWISE VALID

9    CONFESSION INVOLUNTARY.

10         THERE WERE OTHER ARGUMENTS THAT WERE MADE

11    THAT I WILL ADDRESS FOR PURPOSES OF THE RECORD:

12    ONE WAS THE LENGTH OF TIME THAT MR. SIMMERS WAS

13    INCARCERATED.

14         HE WAS ARRESTED AT APPROXIMATELY 11:30, AND

15    THE QUESTIONING TOOK PLACE WITH DETECTIVES HOPKINS

16    AND RUSK AT APPROXIMATELY 9:30.  IT MAY HAVE BEEN A

17    LITTLE BIT LATER, OR A LITTLE BIT EARLIER.  I MAY

18    NOT BE TOTALLY ACCURATE ABOUT THAT, BUT THERE WAS A

19    CONCERN EXPRESSED ABOUT THE LENGTH OF TIME THAT

20    MR. SIMMERS WAS INCARCERATED.

21         THERE WAS TESTIMONY FROM DETECTIVE JARBOE --

22    NOT JARBOE, I'M SORRY, DETECTIVE RAFTIS -- ABOUT

23    THE FACT THAT HE WAS ASSIGNED TO BE STATIONED NEAR

24    WHERE MR. SIMMERS WAS BEING DETAINED IN THE CELL,

25    AND THAT MR. SIMMERS WAS PROVIDED WITH A BLANKET

1   WHEN HE REQUESTED THAT, SINCE HE WAS COLD, AND THAT

2   MR. SIMMERS DID TAKE A NAP, AND THAT AT SOME POINT

3   THAT EVENING, THAT MR. SIMMERS WAS PROVIDED WITH

4   FOOD.

5       THE INTERROGATION THAT WAS DONE WAS DONE

6   EARLY IN THE DAY WITH DETECTIVE RUSK, RELATED TO

7   THE BOAT PROWLS AND THE CAR PROWLS, BUT AT THE

8   CONCLUSION OF THAT INTERROGATION, THERE WAS NO

9   FURTHER INTERROGATION OF MR. SIMMERS UNTIL HE MET

10  WITH DETECTIVES RUSK AND HOPKINS.

11      AND SO THERE WAS NOT THE SORT OF ONGOING

12  INTERROGATION WHICH THE COURTS ARE CONCERNED ABOUT

13  TAKING PLACE IN THIS CASE, NOR WERE THERE ANY

14  THREATS OR COERCION.  AND THE COURT DOES NOT FIND

15  THAT THERE WERE ANY THREATS OR COERCION OF ANY

16  NATURE.

17      NOW, THE COURT OF APPEALS HAS BEEN QUITE

18  CONCERNED ABOUT FINDINGS BEING TIMELY DONE, AND SO

19  THE FINDINGS NEED TO BE DONE CERTAINLY BEFORE

20  SENTENCING, SO THAT THE COURT AND MR. HICKS WILL

21  HAVE AN OPPORTUNITY TO REVIEW THEM AND THEY CAN BE

22  ENTERED AT THE TIME OF SENTENCING AT THE LATEST.

23      MS. MAHONEY:  WE WILL GET THEM DONE OVER THE

24  WEEKEND, YOUR HONOR.

25      MR. HICKS:  NATURALLY, YOUR HONOR, WE

1    DISPUTE WHETHER OR NOT THERE IS GOING TO BE A

2    SENTENCING.

3         THE COURT:  I KNOW.  I AGREE.  AND I DID NOT

4    PRESUME BY THAT COMMENT TO IMPLY THERE WOULD BE,

5    BUT IN THE EVENT THAT COMES TO PASS, THAT WOULD BE

6    THE LATEST DATE --

7         MR. HICKS:  I UNDERSTOOD WHAT YOU MEANT

8    CERTAINLY IN A PROCEDURAL SENSE.

9         THE COURT:  LET ME TURN TO THE EVIDENCE

10   ABOUT OTHER SUSPECTS.  I AGREE THAT UNDER THE CASE

11   LAW AND THE TESTS THAT ARE ARTICULATED IN THE CASE

12   LAW, THERE HAS NOT BEEN AN OFFER OF PROOF OF THE

13   CONNECTION THAT IS REQUIRED IN ORDER TO ADMIT

14   EVIDENCE THAT SOMEONE ELSE COMMITTED THE CRIME AT

15   THIS POINT; HOWEVER, MR. HICKS HAS ARGUED THAT --

16   AND I THINK HE IS LEGITIMATELY ENTITLED TO -- ON

17   CROSS-EXAMINATION, WITH THE WITNESSES TO WHOM THIS

18   WOULD PERTAIN, QUESTION CAN BE ASKED ABOUT THE

19   ADEQUACY OR INADEQUACY OF THE INVESTIGATION.

20        AND SO I DO NOT MEAN BY THIS RULING TO

21   PRECLUDE MR. HICKS FROM BEING ABLE TO HAVE THE

22   ABILITY TO CROSS-EXAMINE ABOUT THE INVESTIGATION

23   THAT WAS DONE, AND WHY CERTAIN MATTERS WERE NOT

24   FOLLOWED UP, IF THEY SHOULD HAVE BEEN, AND WHY THE

25   INVESTIGATION PROCEEDED IN THE MANNER THAT IT DID.

1          NOW, I KNOW THAT THAT IS NOT A BRIGHT LINE,

2    AND I KNOW THE STATE'S CONCERN WILL BE THAT

3    MR. HICKS WILL IMPERMISSIBLY, PERHAPS NOT

4    INTENTIONALLY, BE ABLE TO INTERJECT THE SAME ISSUES

5    BEFORE THE JURY THROUGH CROSS-EXAMINATION -- BUT I

6    MEAN THE CROSS-EXAMINATION TO BE LIMITED TO THE

7    INVESTIGATION AND HOW IT WAS DONE.

8          MR. HICKS:  THANK YOU.

9          MS. MAHONEY:  SO I UNDERSTAND THEN, THERE

10   WOULD BE NO QUESTIONING ABOUT MR. BUTCHER IN

11   PARTICULAR, OR DID THEY INVESTIGATE OTHER

12   SUSPECTS -- THAT LINE OF QUESTIONING WOULD BE NOT

13   PROPER?

14         THE COURT:  WELL, NO, I WAS NOT SAYING THAT

15   AT ALL.  I WAS SAYING THAT HE COULD -- HE COULD ASK

16   WHETHER OR NOT THEY INVESTIGATED OTHER PEOPLE, AND

17   WHY, OR WHY NOT, BECAUSE THAT RELATES TO THE

18   ADEQUACY OF THE INVESTIGATION AND THE THEORY OF THE

19   DEFENSE.  I DO NOT BELIEVE THAT I CAN PROPERLY

20   PRECLUDE MR. HICKS FROM DOING THAT.

21         MR. HICKS CANNOT CALL THE TRACKER, THE

22   PERSON WHO HAD THE DOG, BUT I BELIEVE THAT

23   MR. HICKS CAN QUESTION THE DETECTIVES AND OTHER

24   POLICE OFFICIALS WHO WERE INVOLVED IN THE

25   INVESTIGATION ABOUT THE COURSE OF THE INVESTIGATION

1    AND THE ADEQUACY OF THE INVESTIGATION.

2         MR. HICKS:  YOUR HONOR, THE PROBLEM IS,

3    WITHOUT THE TRACKER OF THE DOG, THERE MAY NOT BE A

4    WAY FOR THE JURY TO HEAR THE FACT THAT, YOU KNOW,

5    THE DOG DID IN FACT I.D. MR. BUTCHER.  I CAN HEAR

6    THE OBJECTION NOW:  "HEARSAY, HEARSAY.  MR. HICKS

7    CAN'T ASK THAT QUESTION."

8         AND WE HAVE A SIDE-BAR, AND THE STATE WILL

9    BE RIGHT.  I HAVE TO INTRODUCE THAT TRACKER ON

10   DIRECT.

11        OR IF YOU WILL PERMIT, THE STATE CAN JUST

12   CONCEDE THIS, AND I CAN SAY LIKE TO DETECTIVE

13   SCHLAGEL, "WELL, DETECTIVE, YOU DID KNOW IN FACT

14   THERE WAS A TRACKER DOG GIVEN AN ARTICLE OF

15   CLOTHING, GIVEN BY A FELLOW NAMED BUTCHER, AND HE

16   WENT RIGHT TO THE BODY"?

17        AND THE STATE WILL HAVE TO WAIVE THAT IF I

18   AM GOING TO BRING IN THIS PARTICULAR TRACKER.  I

19   CAN'T SEE ANY WAY AROUND IT.

20        THE COURT:  WELL, I DON'T THINK YOU CAN

21   BRING IN THE TRACKER BECAUSE I DON'T THINK YOU HAVE

22   MADE THE SHOWING AND LAID A FOUNDATION UNDER THE

23   CASE LAW TO INDICATE THAT MR. BUTCHER IS A

24   PERSON -- WHERE THERE IS PROOF OF CONNECTION TO THE

25   CRIME, FACTS OR CIRCUMSTANCES THAT CLEARLY POINT TO

1    HIM AS BEING THE ONE WHO DID IT.

2          I DON'T THINK THAT YOU CAN PRESENT EVIDENCE

3    THAT SOMEBODY ELSE DID IT; I DO THINK THAT YOU CAN

4    QUESTION ABOUT THE PROCESS AND PROCEDURE OF THE

5    INVESTIGATION.

6          MR. HICKS:  ALL RIGHT.  LET ME ASK A

7    QUESTION, AND THIS MIGHT WRAP IT UP:  "DETECTIVE

8    HOPKINS, YOU ARE AWARE OF AN INDIVIDUAL AT THE

9    SCENE WHO WAS NOT SUPPOSED TO BE THERE, WHO HAD

10   CLOTHING BLOODHOUND-TESTED, AND THE BLOODHOUND

11   RESPONDED POSITIVELY AFTER SNIFFING CLOTHING

12   BELONGING TO AN INDIVIDUAL WHO HAD RESPONDED TO THE

13   SCENE OF THE HOMICIDE.  ARE YOU AWARE OF THAT"?

14         BY WHAT YOU HAVE JUST RULED, THAT SHOULD BE

15   ALLOWED.

16         THE COURT:  YES.

17         MR. MARNER:  WHAT ABOUT A HEARSAY OBJECTION?

18         THE COURT:  I AM NOT RULING ON THAT, AM I?

19   MR. HICKS IS INTERJECTING THAT ISSUE, AND SO WE ARE

20   SORT OF PRE-TRYING THIS.  I THINK MR. HICKS IS

21   ALLOWED TO ASK QUESTIONS OF THE DETECTIVES.  AND IF

22   HE HAS A GOOD FAITH BASIS, WHICH HE DOES, TO

23   FORMULATE A CROSS-EXAMINATION QUESTION THAT ASKS

24   ABOUT THE ADEQUACY OF THAT, HE CAN.

25         NOW, THE DETECTIVE -- IT IS NOT HEARSAY IF

1    THE DETECTIVE KNEW ABOUT IT, AND THERE IS A BASIS

2    FOR HIM TO KNOW ABOUT IT OTHER THAN THROUGH

3    HEARSAY.

4         MS. MAHONEY:  YOUR HONOR, WITH ALL DUE

5    RESPECT, MY CONCERN IS -- I MEAN, I AM TRYING TO

6    CLARIFY SO WE KNOW WHERE WE ARE GOING -- THAT

7    SPECIFICALLY EVIDENCE OF THIS NATURE HAS BEEN

8    PROPERLY EXCLUDED BY THE COURTS FOR THE VERY REASON

9    THAT WHAT MR. HICKS WISHES TO INTIMATE, WHICH IS

10   THAT THE DETECTIVES OVERLOOKED OTHER SUSPECTS AND

11   SOMEONE ELSE COULD HAVE COMMITTED THIS CRIME.  I

12   DON'T THINK THAT'S EXACTLY WHAT THE COURTS -- WHAT

13   THIS LINE OF CASE LAW IS SAYING, THAT THAT IS

14   PERMISSIBLE.

15        THE COURT:  IN THIS LINE OF CASE LAW, THERE

16   WAS NOT THE THEORY AS ARTICULATED BY THE DEFENSE,

17   THAT THERE WAS AN INADEQUATE POLICE INVESTIGATION

18   AND THAT THEY IMMEDIATELY FOCUSED ON MR. SIMMERS,

19   AND THERE IS THEREFORE AN INADEQUATE POLICE

20   INVESTIGATION THAT THEY WISH TO CROSS-EXAMINE

21   ABOUT.

22        I DO NOT BELIEVE THAT I CAN PRECLUDE THE

23   DEFENSE FROM CROSS-EXAMINING ON THAT.  THE DEFENSE

24   HAS AN ABSOLUTE RIGHT TO CROSS-EXAMINE ON THAT.

25        MS. MAHONEY:  I GUESS, WITH ALL DUE RESPECT,

1    LOOKING AT THESE CASES, THEY HAVE HAD THINGS SUCH

2    AS ACTUAL FORENSIC EVIDENCE AT THE SCENE THAT DOES

3    NOT MATCH THE DEFENDANT.

4         MR. HICKS:  COUNSEL, I OBJECT.  YOUR HONOR

5    THAT SHOULD NOT BE ALLOWED.  YOU HAVE RULED ON THAT

6    ISSUE.

7         THE COURT:  I HAVE RULED ON THE ISSUE AND

8    MS. MAHONEY IS TRYING TO, I THINK, GET CLARIFI-

9    CATION.

10         MR. HICKS:  NO, MA'AM, SHE IS ARGUING A

11    DIFFERENT BASIS.  BUT I WILL ADDRESS THAT.

12         MS. MAHONEY:  I AM TRYING TO GET

13    CLARIFICATION BECAUSE WHEN I LOOK AT THESE CASES,

14    THEY HAVE EXCLUDED SPECIFICALLY FORENSIC EVIDENCE,

15    AND THE FACT THEY DIDN'T FOLLOW UP ON THAT, AND

16    WHAT HAPPENED TO IT THAT IT WAS NOT LINKED, WHICH

17    WAS FAR MORE DAMAGING.

18         I KNOW THAT DETECTIVE HOPKINS HAS PERSONAL

19    KNOWLEDGE THAT SHERMAN WAS OUT THERE WITH THE

20    BLOODHOUND, AND THAT MR. BUTCHER WAS OUT THERE AT

21    THE SCENE, AND THAT HE DID NOT GO DIRECTLY TO WHERE

22    THE BODY WAS FOUND.  HE HIT ON MR. BUTCHER, BUT WE

23    KNOW THAT MR. BUTCHER WAS INSIDE THAT SCENE.

24         WHAT, I'M WONDERING, IF DETECTIVE HOPKINS

25    WAS ASKED:  "DID YOU FOLLOW UP ON MR. BUTCHER, AND

1   DID YOU FIND HIM A VIABLE SUSPECT"?  AND HE SAYS

2   "NO."

3        THE COURT:  THAT ENDS THAT.

4        MS. MAHONEY:  THAT SHOULD BE THE END OF THE

5   INQUIRY.

6        THE COURT:  BUT I THINK HE IS ENTITLED TO

7   GET UP TO THAT POINT.

8        MS. MAHONEY:  WITHOUT GOING INTO WHAT THEY

9   DID, BECAUSE THEN WE OPEN IT ALL UP.

10        MR. HICKS:  YOUR HONOR, IF I COULD ADDRESS

11   ANOTHER MATTER -- I THINK WE HAVE SETTLED THAT.

12        I WOULD LIKE TO ASK DETECTIVE HOPKINS --

13   HOW, DETECTIVE, DO YOU KNOW ABOUT MR. SHERMAN?

14   WERE YOU THERE AT THE TIME THIS OCCURRED?

15        DETECTIVE HOPKINS:  I WAS NOT.

16        MR. HICKS:  HOW DID YOU HEAR ABOUT IT?

17        THE COURT:  LET'S GO OFF THE RECORD.

18        (OFF THE RECORD.)

19        MR. HICKS:  YOUR HONOR, I HAVE NO WAY TO GET

20   BY WHAT THE COURT JUST RULED ON.  I CANNOT CALL

21   MR. SHERMAN UNLESS THE STATE WILL WAIVE THE HEARSAY

22   OBJECTION.

23        THE COURT:  WELL, THE STATE DOESN'T HAVE TO

24   WAIVE THE HEARSAY OBJECTION.  I AM GRANTING THE

25   STATE'S MOTION AS TO OTHER SUSPECTS, OTHER SUSPECT

1    EVIDENCE, PURSUANT TO THE CASE LAW, BUT I AM

2    ALLOWING LIMITED QUESTIONING.

3        WELL, I'M ALLOWING ALL QUESTIONING ABOUT THE

4    ADEQUACY OF THE INVESTIGATION, BUT LIMITED INQUIRY

5    RELATED TO MR. BUTCHER TO THE EXTENT IT RELATES TO

6    THE DEFENSE THEORY.

7        MR. HICKS:  I WOULD LIKE A RULING FROM THE

8    COURT NOW THAT I CAN -- THAT IT FALLS UNDER THE

9    HEARSAY OBJECTION, WHICH IT DOES, YOUR HONOR.  I

10   WAS ANTICIPATING THE STATE'S OBJECTION.

11       NOW, MY THEORY IS THAT YOU OUGHT TO RULE IT

12   IS A STATE OF MIND EXCEPTION WHEN I ASK THE

13   DETECTIVE IF HE WAS AWARE OF IT THROUGH HEARING

14   FROM OTHERS THAT THE BLOODHOUND TEST WAS PERFORMED,

15   AND THE REACTION OF THE BLOODHOUND, AND THE

16   IDENTITY OF THE INDIVIDUAL BEING MR. BUTCHER.

17       HE IS AWARE OF THAT AND THAT AFFECTS THE

18   STATE OF MIND EXCEPTION AND THE DECISIONS MADE

19   REGARDING THIS INVESTIGATION.

20       THE COURT:  WELL, I DON'T THINK I NEED TO

21   RULE ON A STATE OF MIND EXCEPTION, AND I DON'T

22   THINK THAT'S THE PROPER EVIDENTIARY BASIS.

23       BUT I DO THINK YOU MAY BE ABLE TO LAY A

24   FOUNDATION THROUGH THE DETECTIVE, AS THE LEAD

25   DETECTIVE ON THE CASE, IN ORDER TO ASK THE KINDS OF

1    QUESTIONS THAT YOU WISH TO PURSUE.

2         MR. HICKS:  YOU ARE STATING I CAN LAY THAT

3    FOUNDATION WITH DETECTIVE HOPKINS?

4         THE COURT:  WELL, I AM NOT DRAFTING IT, BUT

5    I BELIEVE THERE IS A WAY YOU CAN LAY A PROPER

6    FOUNDATION.

7         MR. HICKS:  ALL RIGHT, THANK YOU.

8         ON THE DEFENSE MOTION TO INTRODUCE EVIDENCE

9    OF MR. SIMMERS' HABIT OF EXAGGERATION OR HABIT OF

10   EXAGGERATING --

11        MR. HICKS:  -- AND FABRICATING.

12        THE COURT:  -- AND FABRICATING, THANK YOU --

13   THERE ARE THREE EVIDENCE RULES THAT WERE ADDRESSED

14   YESTERDAY, AND LET ME GO THROUGH THOSE:

15        FIRST IS EVIDENCE RULE 404(A,) WHICH CLEARLY

16   STATES CHARACTER EVIDENCE GENERALLY IS NOT

17   ADMISSIBLE EXCEPT -- AND THERE ARE EXCEPTIONS.

18        FIRST, IS THE CHARACTER OF THE ACCUSED,

19   WHICH WOULD BE MR. SIMMERS.  AND THE RULE OF

20   EVIDENCE IS CLEAR:  IT MUST BE EVIDENCE OF A

21   PERTINENT TRAIT OF CHARACTER OFFERED BY AN ACCUSED.

22        IN THE TYPICAL TYPES OF CASES WHERE THIS IS

23   ALLOWED, THE DEFENDANT MAY INTRODUCE EVIDENCE OF A

24   PERTINENT TRAIT OF HIS CHARACTER BECAUSE IT RELATES

25   TO THE CRIME CHARGED.

1          AND THE ANALYSIS THAT THE COURT MUST EMBARK

2     ON IS WHETHER OR NOT THE DEFENDANT'S CHARACTER

3     EVIDENCE RELATES TO A PERTINENT TRAIT, PERTINENT TO

4     THE CRIME CHARGED.  AND EXAGGERATION AND

5     TRUTHFULNESS, WHICH CLEARLY, IT SEEMS TO ME, FALL

6     WITHIN THE PARAMETERS OF EVIDENCE RULE 404(A) AND

7     CHARACTER EVIDENCE, ARE NOT RELEVANT TO OR

8     PERTINENT TO THE CRIME CHARGED.

9          AND, THEREFORE, UNDER EVIDENCE RULE 404(A)

10    AND 405, THE DEFENSE WOULD NOT BE ENTITLED TO

11    PRESENT CHARACTER EVIDENCE RELATING TO THE TRAIT OF

12    MR. SIMMERS' TO FABRICATE AND/OR EXAGGERATE.

13         EVIDENCE RULE 406 IS HABIT EVIDENCE, AND

14    PURSUANT TO THAT RULE AND THE CASE LAW THAT

15    INTERPRETS THAT RULE, A HABIT IS A PERSON'S REGULAR

16    PRACTICE OF MEETING A PARTICULAR KIND OF SITUATION

17    WITH A SPECIFIC KIND OF CONDUCT.

18         BASED ON THE ARGUMENTS THAT I HAVE HEARD AND

19    BASED ON THE TESTIMONY THAT WAS PROVIDED DURING THE

20    3.5 HEARING, I DO NOT BELIEVE THAT THE DEFENSE HAS

21    LAID THE FOUNDATION TO BE ABLE TO INTRODUCE

22    EVIDENCE OF MR. SIMMERS' FABRICATION OR FABRICATING

23    AND/OR EXAGGERATING BASED ON THE EVIDENCE RULES

24    RELATED TO HABIT.  THIS IS NOT A REGULAR PRACTICE

25    THAT IS ALWAYS DONE BY MR. SIMMERS IN A PARTICULAR

1    KIND OF SITUATION WITH A SPECIFIC KIND OF CONDUCT.

2         THE TESTIMONY WAS THAT MR. SIMMERS WOULD

3    EXAGGERATE OR FABRICATE ON OCCASION, BUT THERE WAS

4    NO FOUNDATION LAID THAT WOULD ALLOW THE COURT TO

5    GRANT THE DEFENSE MOTION TO INTRODUCE THIS

6    CHARACTER TRAIT UNDER THE EVIDENCE RULE.

7         MR. HICKS:  YOUR HONOR, COULD I NOTE AN

8    IMMEDIATE MOTION TO RECONSIDER, AND I'LL BRIEF IT?

9         THE COURT:  YOU'LL BRIEF IT?

10        MR. HICKS:  I'LL TRY TO BRIEF IT -- JUST

11   GIVING THE COURT NOTICE.

12        THE COURT:  ALL RIGHT.

13        NOW, THERE WAS A CONCERN EXPRESSED BY THE

14   STATE ABOUT NOT HAVING RESOLUTION TO THE CRIMINAL

15   HISTORY OF MR. OLSON --

16        MS. MAHONEY:  NOT ONLY MR. OLSON BUT WE

17   STILL NEED TO TALK ABOUT WHERE THE STATE CAN GO AS

18   FAR AS RES GESTAE ON SOME OF THESE OTHER INCIDENTS.

19   AND I HAVE ADDITIONAL CONCERNS I WOULD LIKE TO

20   BRING TO THE COURT'S ATTENTION AS FAR AS

21   MR. SIMMERS' CONDUCT AND PRIOR ACTS AS WELL.

22        THE COURT:  WHICH ONE DID YOU WANT TO

23   ADDRESS FIRST?

24        MS. MAHONEY:  WELL, MR. OLSON IS PROBABLY

25   EASIER.

1          THE COURT:  LET ME LOOK AT THAT.

2          MR. OLSON'S CRIMINAL HISTORY IS ON PAGE 15

3     OF THE STATE'S TRIAL BRIEF.  AND THE INFORMATION

4     THAT IS PROVIDED ON PAGE 15 -- ALL OF THOSE

5     CONVICTIONS ARE ADMISSIBLE FOR PURPOSES OF

6     IMPEACHMENT PURSUANT TO EVIDENCE RULE 609.  THEY

7     WOULD BE PER SE ADMISSIBLE UNDER STATE V. RAY.

8          MS. MAHONEY:  AND I AGREE WITH THAT.

9          THE COURT:  BUT AS I UNDERSTOOD IT, THERE

10    WERE OTHER CHARGES.  AND COULD YOU OUTLINE THOSE,

11    PLEASE, AGAIN?  OR CONVICTIONS?

12         MS. MAHONEY:  LET ME FIND THE FOLDER.

13         YOUR HONOR, IN ADDITION TO THE CONVICTIONS

14    WE HAVE LISTED THAT WE AGREE ARE CRIMES OF PER SE

15    DISHONESTY, MR. OLSON HAS A 1978 CONVICTION FOR

16    BURGLARY.  HE WAS PAROLED IN 1979, RETURNED IN '81,

17    AND PAROLED AGAIN IN '83.

18         AND THAT WAS THE LAST DATE HE WAS IN CUSTODY

19    ON THIS.  AND SINCE IT IS PAST TEN YEARS OLD, IT IS

20    EXCLUDED BY E.R. 69.  AND I'M ASKING, SINCE IT IS

21    SO REMOTE IN TIME, THAT NOT BE ADMITTED.  AND SINCE

22    WE HAVE SO MANY OTHERS, IT DOESN'T ADD TO ANYTHING.

23         ALSO ON 6-12-80, THERE WAS ANOTHER BURGLARY

24    IN THE SECOND DEGREE.  AND I'M NOT EVEN SURE IF

25    THESE WERE THEFT-RELATED.  I SUSPECT THAT THEY ARE

1    BUT WE DON'T KNOW THAT FOR SURE.  BURGLARY IN THE

2    SECOND DEGREE IN SNOHOMISH COUNTY, AND HE WAS --

3            MR. HICKS:  SORRY, THAT LAST DATE?

4            MS. MAHONEY:  6-12-80.  AND HE WAS AGAIN

5    RELEASED ON APRIL 7 OF '83.

6            THE COURT:  OKAY.

7            MS. MAHONEY:  AND SO AGAIN THAT'S PAST THE

8    TEN YEARS.  I AGREED TO THE 1984 BECAUSE HE WAS

9    RELEASED AND PAROLED IN '88, AND OBVIOUSLY HIS LAST

10   DATE OF RELEASE WAS MORE THAN TEN YEARS.

11           I MOVE TO EXCLUDE THE TWO BASED ON

12   REMOTENESS IN TIME, AND THE OTHER ONES I HAVE MOVED

13   TO EXCLUDE ARE ON 2-11-86, FAILURE TO RETURN TO

14   WORK RELEASE.  THAT IS NOT A CRIME.  THAT IS -- I

15   DON'T THINK WE NEED THE BALANCING FACTORS

16   PARTICULARLY WITH WHAT WE HAVE HERE, AND IT

17   CERTAINLY IS NOT A CRIME OF DISHONESTY PER SE.

18           AND ALONG THAT SAME LINE, THERE WAS ALSO A

19   VUCSA, 1-26-95, FOR THE SAME REASON.

20           MR. HICKS:  SHALL I RESPOND?

21           THE COURT:  WELL, ARE YOU DONE?

22           MS. MAHONEY:  THAT IS -- THERE ARE ALSO A

23   MISDEMEANOR CONVICTION FOR DRIVING ON A REVOKED

24   LICENSE.

25           MR. HICKS:  WE CAN SKIP THE MISDEMEANOR.

1    THE COURT:  MR. HICKS?

2    MR. HICKS:  THANK YOU, YOUR HONOR.  RAY DOES

3    NOT ADDRESS -- IT PRECLUDES OTHER CRIMES THAT CAN

4    BE A CRIME OF DISHONESTY.  WHAT IT STANDS FOR IS A

5    PROPOSITION THAT CERTAIN TYPES OF CRIMES THAT

6    TRADITIONALLY INVOLVE CRIMES OF DISHONESTY ARE

7    INDEED CRIMES OF DISHONESTY.

8    MR. OLSON WAS EXPECTED BACK TO WORK RELEASE,

9    AND HE FLEW THE COOP.  AND THAT IS, THEREFORE, A

10    CRIME OF DISHONESTY.

11    FIRST OF ALL, THAT WAS AN '86 CASE, AND THE

12    '95 VUCSA -- IF I'M NOT MISTAKEN, THAT IS PART OF

13    THE REASON HE WOUND UP BEING A SNITCH.  HE WAS

14    INCARCERATED, AND SOMEHOW NOT RELATED TO THIS

15    CHARGE, WHICH SEEMS FAIRLY RECENT, 1-26-95, HE WAS

16    IN CUSTODY FOR SOME REASON JUST RECENTLY WHEN HE

17    HAD HIS CONTACT WITH MR. SIMMERS.

18    AND, NOW, THIS IS A RATHER RECENT

19    CASE, 1-26-95, AND I DID NOT HEAR HOW IT WAS

20    RESOLVED.  AND IT IS STILL PENDING AND IT IS

21    OBVIOUSLY PROBATIVE AS TO HIS MOTIVES FOR SERVING

22    AS A SNITCH.

23    MS. MAHONEY:  IT HAS A RESOLUTION.  IT WAS A

24    VUCSA POSSESSION, AND IT IS NOT A CRIME OF

25    DISHONESTY PER SE.

1        HE WAS CONVICTED IN WHATCOM COUNTY, AND HE

2    WAS SENTENCED TO 17 MONTHS AND RELEASED ON

3    COMMUNITY SUPERVISION, AND IS CURRENTLY CONSIDERED

4    ON ESCAPE STATUS SIMPLY BECAUSE HE DIDN'T REPORT TO

5    HIS PAROLE OFFICER AFTER HE WAS P.R.'D IN DECEMBER.

6        BUT HE ACTUALLY WAS RELEASED TO COMMUNITY

7    SUPERVISION IN NOVEMBER ON THAT CASE, OR ACTUALLY

8    OCTOBER.  HE WAS IN THE KING COUNTY JAIL AT THE

9    TIME THAT HE MET MR. SIMMERS.

10       AND THAT IS THE BASIS FOR MY NEXT SERIES OF

11   MOTIONS IN RELATION TO HIM BASED ON FORGERY

12   INVESTIGATION -- OR EXCUSE ME, THAT WAS PSP.

13       AND SO THAT HAS NO RESOLUTION, AND THAT'S

14   THE NEXT AREA WHICH I WISH TO DISCUSS.  I WAS JUST

15   TRYING TO DEAL WITH HIS CONVICTIONS UNDER 609 AT

16   THIS POINT.  AND IF YOU WOULD LIKE ME TO MOVE ON, I

17   CAN, BUT POSSESSION WAS RESOLVED.

18       MR. HICKS:  IT WAS RESOLVED, APPARENTLY.

19   THEY FOUND OUT HE IS STILL TECHNICALLY A FUGITIVE

20   OUT OF WHATCOM COUNTY.

21       MS. MAHONEY:  NO, HE IS NOT.  THEY KNOW

22   WHERE HE IS, AND THAT IS BEING TAKEN CARE OF AS HE

23   IS IN CUSTODY.

24       THE COURT:  MR. HICKS, YOUR POSITION?

25       MR. HICKS:  YOUR HONOR, YOU CAN WELL IMAGINE

1    YOU WOULD NEVER HEAR SUCH AN ARGUMENT IF MR. OLSON

2    WAS, INDEED, A KING COUNTY DEFENDANT.  HE WOULD BE

3    -- THE PROSECUTOR WOULD BE JUMPING UP AND DOWN

4    SCREAMING HE WAS A FUGITIVE.

5         I DIDN'T PUT THAT TOGETHER; I MIGHT HAVE

6    MISSED IT IN THE PAPERWORK.  BUT IF HE IS

7    TECHNICALLY A FUGITIVE FOR FAILURE TO COMPLY WITH

8    WHATCOM COUNTY CONDITIONS, OBVIOUSLY THAT IS

9    PROBATIVE OF HIS GOOD FAITH ATTEMPTS TO BE HONEST,

10   IF NOT DISHONESTY ITSELF.

11        AND THE VUCSA -- EVEN THOUGH COUNSEL STATES

12   IT WAS RESOLVED, I DO NOT CALL BEING ON FUGITIVE

13   STATUS, WHATEVER THE TECHNICALITY, MIGHT BE CALLED

14   "RESOLVED" -- I'M SURE WHATCOM COUNTY WOULD NOT SEE

15   IT THAT WAY.  AND SO I DO SUGGEST I OUGHT TO BE

16   ABLE TO GO INTO THAT.

17        THE COURT:  WHAT ABOUT THE TWO OLDER

18   BURGLARIES?

19        MR. HICKS:  WELL, YEAH, CONCEDED.  I MAY

20   WANT TO REREAD 609, BUT I'M SURE COUNSEL IS RIGHT.

21        THE COURT:  THE EVIDENCE RULE SPECIFICALLY

22   SAYS TEN YEARS.

23        MR. HICKS:  I JUST DON'T GIVE UP EASY; I DO

24   WANT TO READ THE RULE AGAIN.

25        THE COURT:  I DON'T THINK I KNOW ENOUGH

1      ABOUT THE VUCSA --

2           MS. MAHONEY:  CAN I TELL YOU MORE?

3           THE COURT:  -- THE VUCSA AND THE PSP.  BUT

4      LET ME ASK, SO WE DON'T KEEP THESE JURORS WAITING,

5      THAT WE PERHAPS BREAK FROM THAT.

6           YOU NEED TO PROVIDE MORE INFORMATION ABOUT

7      THAT '95 VUCSA AND THE PSP BECAUSE IT SOUNDS AS

8      THOUGH MORE INFORMATION IS NECESSARY.

9           BUT WE HAVE JUROR QUESTIONNAIRES 51 TO 80,

10     AND I THINK WE NEED TO LOOK AT THE HARDSHIP

11     QUESTIONNAIRES AND FIGURE OUT WHO WE ARE GOING TO

12     QUESTION AS FAR AS HARDSHIP.  AND SO I ASK THAT WE

13     STOP NOW AND DO THAT.  AND THEN TO THE EXTENT THAT

14     WE HAVE TIME, THAT WE RETURN AND ADDRESS THE ISSUES

15     RELATED TO MR. OLSON.

16          MR. HICKS:  YOUR HONOR, YOU'D BETTER PREPARE

17     ME FOR MY RESEARCH AND REARGUING THE HABIT

18     EVIDENCE.

19          COULD I ASK THE COURT ONE QUESTION?  I TAKE

20     IT THE COURT REVIEWED THE AUTHORITY I POINTED TO IN

21     TEGLAND, SPECIFICALLY ON THE ISSUE OF THE HABIT NOT

22     HAVING TO BE SOMETHING AUTOMATICALLY DONE BUT

23     SOMETHING THAT WOULD REGULARLY OCCUR GIVEN A

24     CERTAIN FACT PATTERN.

25          THE COURT:  I READ THE PORTIONS OF TEGLAND

1      THAT YOU REFERENCED, AND I ALSO LOOKED AT CASE LAW.

2             MR. HICKS:  ALL RIGHT.  THANK YOU.

3             YOUR HONOR, YOU MENTIONED PSP, AND I WONDER

4      IF YOU DID THAT ACCIDENTALLY --

5             THE COURT:  NO.  MS. MAHONEY WAS TALKING

6      ABOUT, IN THE CONTEXT OF MR. OLSON, SOME PSP

7      INVESTIGATION.  AND I THOUGHT WE NEEDED TO HAVE --

8             MS. MAHONEY:  HE HAS ALL THE INFORMATION ON

9      THAT AS WELL.  MR. OLSON HAS BEEN CHARGED WITH

10     POSSESSION OF STOLEN PROPERTY IN THE SECOND DEGREE,

11     AND THAT'S WHY HE WAS IN THE KING COUNTY JAIL.

12            AND WE PROVIDED HIM WITH THE CERTIFICATION

13     OF PROBABLE CAUSE ON THAT AS WELL AS THE

14     INFORMATION.  AND THAT'S ONE OF THE ISSUES WE NEED

15     TO ADDRESS BECAUSE, CLEARLY, ALTHOUGH THAT HAS TO

16     COME UP TO EXPLAIN WHY HE WAS THERE, THERE CAN BE

17     NO INQUIRY INTO IT BECAUSE THEN HE HAS A FIFTH

18     AMENDMENT RIGHT.  AND IT REALLY ISN'T RELEVANT.

19     THAT'S ONE OF THE CONCERNS I WANT TO DEAL TO.

20            THE COURT:  WE WILL ADDRESS THAT LATER.

21     WHAT WE NEED TO DO NOW IS LOOK AT THE HARDSHIP

22     QUESTIONNAIRES.  WHEN YOU HAVE COMPLETED REVIEWING

23     THEM, LET ME KNOW.

24            (JURY VOIR DIRE NOT TRANSCRIBED.)

25

# Exhibit B

Sub 90B - Defense Brief Regarding CrR 3.5

FILED

MAR 11 1996

IN THE SUPERIOR COURT
KING COUNTY, STATE OF WASHINGTON

SUPERIOR COURT CLERK
BEVERLY ANN ENEBRAD
DEPUTY

---------------------------------------------------x
STATE OF WASHINGTON,                    )
                  Plaintiff,     )
                        )
                        )
        vs.               )   No. 95-1-02102-2
                        )   DEFENDANT'S 3.5
                        )   MEMORANDUM
                        )
IAN MONROE SIMMERS,                     )
                  Defendant.     )
---------------------------------------------------x

THE FOLLOWING IS SUBMITTED FOR GUIDANCE IN ANTICIPATION

OF ISSUES THAT MAY ARISE DURING DEFENDANT'S 3.5 HEARING.

I.     STATEMENTS MADE BY THE SIXTEEN YEAR OLD DEFENDANT
SHOULD BE SUPPRESSED BECAUSE, UNDER THE TOTALITY OF THE
CIRCUMSTANCES, DEFENDANT DID NOT KNOWINGLY AND
INTELLIGENTLY WAIVE HIS RIGHTS TO REMAIN SILENT AND TO HAVE AN
ATTORNEY, AND DEFENDANT DID NOT FREELY AND VOLUNTARILY MAKE
THESE STATEMENTS.

DATED this _____ day of March, 1996

Respectfully submitted,

JOHN TAYLOR HICKS, WSBA #13133
Attorney for Defendant

POSTED

JOHN TAYLOR HICKS
LAWYER
SUITE 300, HOWARD BUILDING
614 FIRST AVE.
SEATTLE, WASHINGTON 98104
TELEPHONE (206) 622 - 9055

i

51083084

## TABLE OF AUTHORITIES

| CASES | PAGES |
|---|---|
| Alston v. Redman, 34 F.3d 1237 (3rd Cir. 1994) | 4 |
| Ashcraft v. Tennessee, 322 U.S. 143, 64 S.Ct. 921, 88 L.Ed. 1192 (1943) | 2 |
| Berkemer v. McCarthy, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984) | 3 |
| Brooks v. Florida, 389 U.S. 413, 88 S.Ct. 541, 19 L.Ed. 2d 643 (1967) | 3 |
| Coleman v. Singletary, 30 F.3d 1420 (11th Cir. 1994) | 4 |
| Dutil v. State, 93 Wn.2d 84, 606 P.2d 269 (1980) | 2 |
| Fare v. Michael C., 442 U.S. 707, 99 S.Ct. 2560, 61 L.Ed. 2d 197 (1979) | 2 |
| Haley v. Ohio, 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224 (1948) | 2,3 |
| Haynes v. State of Wash.., 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed. 2d 513 (1963) | 1 |
| In re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed. 2d 527 (1967) | 1,2 |
| Johnson v. Trigg, 28 F.3d 639 (7th Cir. 1994) | 2,4 |
| Lord v. Duckworth, 29 F.3d 1216 (7th Cir. 1994) | 2 |
| Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed. 2d 694 (1966) | 2,3 |
| Moran v. Burbine, 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed. 2d 410 (1986) | 4 |
| Rogers v. Richmond, 21 Wn.App. 855, 587 P.2d 179 (1978) | 1 |
| State v. Barriault, 20 Wn. App. 419, 581 P.2d 1365 (1978) | 2 |
| State v. Braun, 82 Wn.2d 157, 509 P.2d 742 (1973) | 1,3 |
| State v. Burdick, 646 P.2d 91, 57 Or.App. 601 (1982) | 4 |
| State v. Forrester, 21 Wn.App. 855, 587 P.2d 179 (1978) | 1,2 |
| State v. Furman, 122 Wn.2d 440, 858 P.2d 1092 (1993) | 2,3 |
| State v. Jones, 95 Wn.2d 616, 628 P.2d 472 (1981) | 2 |
| State v. Prater, 77 Wn.2d 526, 463 P.2d 640 (1970) | 2 |
| State v. Rupe, 683 P.2d 571, 101 Wn.2d 664, appeal after remand 743 P.2d 210, | |

JOHN TAYLOR HICKS
LAWYER
SUITE 300, HOWARD BUILDING
614 FIRST AVE.
SEATTLE, WASHINGTON  98104
TELEPHONE (206) 622 - 9050

108 Wn.2d 734, reconsideration denied, certiorari denied 108 S.Ct. 2834,

100 L.Ed. 2d 934, rehearing denied 109 S.Ct. 25, 101 L.Ed.2d 976 (1987)    1,3

State v. Thompson, 38 Wn.2d 774, 232 P.2d 87    3

State v. Vickers, 24 Wn.App. 843, 604 P.2d 997 (1979)    3,4

State v. Wolfer, 39 Wn. App. 287, 693 P.2d 154, (1984)    1,3

U.S. v. Anderson, 929 F.2d 96 (2d. Cir. 1991)    4

U.S. v. Johnson, 42 F.3d 1312 (10th Cir. 1994)    4

U.S. v. Springs, 17 F.3d 192 (7th Cir. 1994)    4

U.S. v. Walton, 10 F.3d 1024 (3d Cir. 1993)    3,4

**STATUTES**

RCW 13.40.140 (8), (9)    2

JOHN TAYLOR HICKS
LAWYER
SUITE 300, HOWARD BUILDING
614 FIRST AVE.
SEATTLE, WASHINGTON  98104
TELEPHONE (206) 622 - 9050

## IN GENERAL

The test for admissibility of confessions is whether the confession was made freely, voluntarily, and without compulsion or inducement of any sort. Haynes v. State of Wash., 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963).

For due process purposes, the test to determine voluntariness is:

"[W]whether the behavior of the State's law enforcement officials was such as to overbear petitioner's will to resist and bring about confessions not freely self-determined –a question to be answered with complete disregard of whether or not petitioner in fact spoke the truth."

State v. Braun, 82 Wn.2d 157, 161-2, 509 P.2d 742 (1973) (quoting Rogers v. Richmond, 365 U.S. 534, 544 81 S.Ct. 735, 5 L.Ed.2d 760 (1961).

The voluntariness of a confession is determined by examining the totality of the circumstances in which the confession was made. State v. Rupe, 101 Wn.2d 664, 679, 683 P.2d 571 (1984). Factors a court may consider include the defendant's physical condition, age, experience, mental abilities, and the conduct of the police. Rupe, 101 Wn.2d at 679, 683 P.2d 571; State v. Forrester, 21 Wn.App. 855, 863, 587 P.2d 179 (1978), review denied, 92 Wn.2d 1006 (1979).

The state must prove voluntariness by a preponderance of the evidence and the trial court's determination that a confession was voluntary is binding on appeal when there is substantial evidence from which the trial court could find voluntariness by a preponderance of the evidence. State v. Wolfer, 39 Wn. App. 287, 693 P.2d 154, at 157 (1984).

## CATEGORY A; INTERROGATION STANDARDS WITH REGARD TO JUVENILES

The Fifth Amendment right against self-incrimination was made fully applicable to cases involving juveniles in the case: In re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed. 2d 527 (1967). With juveniles, special problems may arise with respect to waiver, and care must be taken to assure that the

JOHN TAYLOR HICKS
LAWYER
SUITE 300, HOWARD BUILDING
614 FIRST AVE.
SEATTLE, WASHINGTON  98104
TELEPHONE (206) 622 - 9050

1

admission was voluntary, not coerced, and "not the product of ignorance of rights or adolescent fantasy,

fright or despair". Id, 387 U.S. at 55, 87 S.Ct. at 1458.

The U.S. Supreme Court has indicated concern for the special problems of waiver that may arise

with juveniles. Fare v. Michael C., 442 U.S. 707, 729, 61 L.Ed. 2d 197, 215, 99 S.Ct. 2560, citing Haley

v. Ohio, 332 U.S. 596, 92 L.Ed. 224, 68 S.Ct. 302 (1947) (the voluntariness of a juvenile's confession

could not be judged by the more demanding standards of maturity). See also, Johnson v. Trigg, 28 F.3d

639, 642 (7th Cir. 1994) ("although there is no rule deeming teenagers, even slow ones, incapable of

rational choice... police tactics that might be unexceptionable when employed on an adult may cross the

line when employed against the less developed reason of a child."), and Lord v. Duckworth, 29 F3d, 1216,

1222 (7th Cir. 1994).

In Washington, the Legislature has specifically mandated that juveniles be accorded the same

privileges against self-incrimination as adults.  RCW 13.40.140 (8), (9).

Thus the Washington Supreme Court has held that the Constitution requires that a juvenile be

advised of his rights and warned of possible consequences of an admission.  State v. Prater, 77 Wn. 2d

526, 463 P.2d 640 (1970).  Police also must make sure the juvenile understands the Miranda warnings.  Id,

at 534.  See also State v. Barriault, 20 Wn. App. 419, 581 P.2d 1365 (1978), review denied, 91 Wash.2d

1002.

As with adults, a "totality of the circumstances" approach is used to determine whether a juvenile

has waived his Miranda rights.  State v. Jones, 95 Wn.2d 616, 628 P.2d 472 (1981).  Thus a court must

consider the juvenile's age, experience, education, background, intelligence, and capacity to effect a

voluntary waiver.  Id.  See also, State v. Barriault, 20 Wn.App. 419, 581 P.2d 1365 (1978), review denied,

91 Wash.2d 1002, Dutil v. State, 93 Wn.2d 84, 606 P.2d 269 (1980), State v. Prater, 77 Wn.2d 526, 463

P.2d 640 (1970), State v. Furman, 588 P.2d 1092, 122 Wn.2d 440 (1993), State v. Forrester, 587 P.2d

179, 21 Wn.App. 855 (1978).

The duration of questioning has, since even prior to Miranda v. Arizona, 384 U.S. 436, 86 S.Ct.

1602, 16 L.Ed. 2d 694 (1966), been a factor in determining whether a confession is made within the

requirements of due process.  Ashcraft v. Tennessee, 322 U.S. 143 (1943) (36 hour interrogation by police

JOHN TAYLOR HICKS
LAWYER
SUITE 300, HOWARD BUILDING
614 FIRST AVE.
SEATTLE, WASHINGTON  98104
TELEPHONE (206) 622 - 9050

in relays held a violation of due process).  See also, <u>Haley v. Ohio,</u> 332 U.S. 596 (1947) (violation where 15-year-old confessed after five hour interrogation by police in relays).

Offers or gifts of food, or the withholding of food, may also be a factor. <u>Brooks v. Florida,</u> 389 U.S. 413, 19 L.Ed. 2d 643, 88 S.Ct. 541 (1967).

The Third Circuit has found, in addition, that excessive friendliness on the part of an interrogator can be deceptive.  <u>United States v. Walton,</u> 10 F.3d 1024 (3rd Cir. 1993).

Here the police failed to contact the defendant's parents, employed deception in overstating their evidence and claiming defendant's friend implicated him.  In addition, the police fed the defendant and allowed him to sleep at his leisure, perhaps suggesting to the defendant, a runaway, that the situation was not adversarial in nature.

## CATEGORY B: DECEPTION

The voluntariness of a confession is determined by examining the totality of the circumstances in which the confession was made. <u>State v. Rupe,</u> 101 Wn.2d 664, 683 P.2d 571 (1984).  Deception may be a factor. <u>State v. Wolfer,</u> 39 Wn. App. 287, 693 P.2d 154 (1984), <u>State v. Vickers,</u> 24 Wn. App. 843, 604 P.2d 997 (1979).

Although not to be condoned, and in fact condemned, deception alone will not make confession inadmissible. <u>State v. Braun,</u> 82 Wn.2d 157, 509 P.2d 742 (1973), <u>State v. Thompson,</u> 38 Wn.2d 774, 232 P.2d 87.  If isolated, certain deceptions have been allowed. <u>State v. Furman,</u> 122 Wn.2d 440, 858 P.2d 1092 (1993) (misleading statements by police to a juvenile about strengths of state's evidence regarding murder will not render a confession involuntary).

Dictum in <u>Miranda</u> indicates that police are precluded from using trickery.  <u>Miranda v. Arizona,</u> 384 U.S. 436, at 476, 86 S.Ct. 1602, 16 L.Ed. 2d 694 (1966).  See also <u>Berkemer v. McCarthy,</u> 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984) (purpose of safeguards in <u>Miranda</u> to ensure police do not coerce or trick captive suspects into confessing to relieve inherently compelling pressures of custodial setting).  Lower federal courts have also indicated that waiver of the Fifth Amendment right against self-

JOHN TAYLOR HICKS
LAWYER
SUITE 300, HOWARD BUILDING
614 FIRST AVE.
SEATTLE, WASHINGTON  98104
TELEPHONE (206) 622 - 9050

3

incrimination must be voluntary in the sense that it is the product of a free and deliberate choice rather

than the product of deception.   Moran v. Burbine, 475 U.S. 412, 421 (1986), Alston v. Redman, 34 F.3d

1237 (3d 1994), United States v. Johnson, 42 F.3d 1312 (10th Cir. 1994), Johnson v. Trigg, 28 F.3d 639

(7th Cir. 1994), Coleman v. Singletary, 30 F.3d 1420 (11th Cir. 1994), United States v. Anderson, 929

F.2d 96 (2d. Cir. 1991). Cf. United States v. Walton, 10 F.3d 1024, 1030 (3d Cir. 1993) and United

States v. Springs, 17 F.3d 192, 194 (7th Cir. 1994) (in assessing whether totality of circumstances

indicates lack of voluntariness, courts must merely consider deception among other factors).

In determining voluntariness of confession, however, the crucial inquiry is whether the

confession is free and voluntary, and thus it must not be extracted exertion of *any improper influence*.

State v. Vickers, 604 P.2d 997, 24 Wn. App. 843 (1979) emphasis added. See also State v. Burdick, 646

P.2d 91, 57 Or.App. 601 (1982) (confession involuntary where made after police lies, a staged false

identification, implied suggestions that defendant would be charged with a lesser offense than murder if

he cooperated, and vulgar insults).

Here it is alleged that the police lied to the Mr. Simmers by telling him that his friend, Mr.

Wyatt, said the defendant was involved in the murder.  However, even according to the Certification for

Determination of Probable Cause, Mr. Wyatt never tells the police that.  In the Certification, Mr. Wyatt

tells police that Mr. Simmers has a knife and should not be released from custody.

To be fair, the Certification does allege that Mr. Wyatt "indicated" that he knew what the police

needed to know, was fearful of Mr. Simmers, and cried at various points while being interrogated.

Nevertheless, these actions can be interpreted in a number of ways, including an attempt by Mr.

Wyatt to deflect police scrutiny away from him.

Therefore, the police attempted to deceive Mr. Simmers, and that exertion of an improper

influence should be considered in determining the admissibility of Mr. Simmers' subsequent statements.

Respectfully submitted,

John T. Hicks, attorney
for defendant, 13133

JOHN TAYLOR HICKS
LAWYER
SUITE 300, HOWARD BUILDING
614 FIRST AVE.
SEATTLE, WASHINGTON  98104
TELEPHONE (206) 622 - 9050

4

# Exhibit C

Sub 116 - Findings of Fact and Conclusions of Law

51083084



**FILED**

KING COUNTY, WASHINGTON

MAY 16 1996

SUPERIOR COURT CLERK
BEVERLY ANN ENEBRAD
DEPUTY

SUPERIOR COURT OF WASHINGTON FOR KING COUNTY

STATE OF WASHINGTON, )
                                              )
                        Plaintiff,    )    NO. 95-1-02102-2
                                              )    CERTIFICATE PURSUANT TO CrR
            vs.                        )    3.5 OF THE CRIMINAL RULES
                                              )    FOR SUPERIOR COURT
IAN SIMMERS,                   )
                                              )
                        Defendant.  )
                                              )
                                              )
_____)

THIS MATTER having come on for a pretrial hearing pursuant to

CrR 3.5, before the Honorable Ann Schindler in the above-entitled

court; the defendant, Ian Simmers, having appeared in person and

represented by John Hicks, and the State of Washington, having

appeared by Norm Maleng, King County Prosecutor, through his

deputies, Susan Mahoney and James Marner, and the court having

considered the arguments of counsel, read the authorities cited,

and having considered the files and records herein, the court now

makes and enters the following Findings of Fact and Conclusions of

Law:

I.    **FINDINGS OF FACT**:

        1.    On March 15, 1995, at approximately 11:30 a.m., the

defendant, Ian Simmers was arrested by King County Police Officers

Janesz and Fuller for investigation of the unlawful discharge of

flare guns.  Jonathon Wyatt, age 14 years, was arrested with the

CrR 3.5 CERTIFICATE - 1

Norm Maleng
Prosecuting Attorney
W 554 King County Courthouse
Seattle, Washington 98104-2312
(206) 296-9000

51083084

1  defendant.  Officer Janesz verbally advised the defendant of his

2  Miranda rights which the defendant acknowledged he understood.

3      2.   The defendant was taken to King County Precinct #2 where

4  he was again advised of his rights by Officer Janesz.  Officer

5  Janesz used a preprinted police rights form to inform the

6  defendant of his Miranda rights (see pretrial exhibit #___).

7  Officer Janesz read the form verbatim including the special

8  warnings for a juvenile.  The defendant was 16 years old at the

9  time of his arrest.  Officer Janesz also read the waiver portion

10  of the form to the defendant.  The defendant acknowledged his

11  rights verbally and signed that he understood his rights.  The

12  defendant also signed the waiver portion of the form.  This was

13  done in Officer Janesz presence.  The defendant did not request an

14  attorney, to speak to his parents, or assert his right to remain

15  silent.  The defendant was then placed in a holding cell.  The

16  holding cell contained a place to sleep, a toilet, and a sink.

17  The defendant was the only occupant of the cell.

18      3.   A short time later, the defendant was contacted by King

19  County Police Detective Amy Jarboe, who was investigating arson

20  cases involving flare guns.  Detective Jarboe was familiar with

21  the defendant based on a prior contact with him in juvenile

22  detention and had advised him of his constitutional rights during

23  that contact.  Detective Jarboe informed the defendant of his

24  Miranda warnings which he again acknowledged he understood.  The

25  defendant was upset with Detective Jarboe and told her he would

CrR 3.5 CERTIFICATE - 2

**Norm Maleng**
Prosecuting Attorney
W 554 King County Courthouse
Seattle, Washington 98104-2312
(206) 296-9000

1   not speak talk to her.  He did not request an attorney.  Detective

2   Jarboe left the defendant in the holding cell.

3        4.   Shortly before 1:00 p.m., Detective Sgt. Clem Rusk was

4   informed that the defendant and Mr. Wyatt were in custody and

5   suspected of being involved in recent arsons on the Burke-Gilman

6   trail.  Detective Rusk instructed one detective to contact Mr.

7   Wyatt while Detective Rusk contacted the defendant.  Sgt. Rusk has

8   been a police officer for 21 years and has taken hundreds of

9   suspect statements.

10       5.   Detective Rusk took the defendant to an interview room.

11  The defendant was not in handcuffs.  Detective Rusk advised the

12  defendant of his constitutional rights verbatim from a police

13  rights form which included the special juvenile warnings (See

14  pretrial exhibit #___).  The defendant stated he understood his

15  rights and signed the form.  Sgt. Rusk also read the waiver

16  portion of the form to the defendant which he acknowledged and

17  signed.  The defendant admitted to being involved in the arson

18  case and agreed a written statement could be taken.  Sgt. Rusk

19  wrote out the statement on the rights form and asked the defendant

20  to review it.  He also tested the defendant's ability to read by

21  having him read a portion out loud.  The defendant agreed with the

22  contents of the statement, initialed each page, and signed at the

23  end.

24       7.   Sgt. Rusk then left the interview room for a few minutes

25  and consulted with other detectives.  Sgt. Rusk learned that the

CrR 3.5 CERTIFICATE - 3

**Norm Maleng**
Prosecuting Attorney
W 554 King County Courthouse
Seattle, Washington 98104-2312
(206) 296-9000

1  defendant may also be involved in a series of boat prowls.  Sgt.

2  Rusk then returned to the interview room and asked the defendant

3  if he would be willing to speak with him further; the defendant

4  agreed.  The defendant then admitted to prowling numerous boats in

5  a marina and eventually offered to accompany detectives to the

6  scene to point out the boats he had prowled.  This was added to

7  the previous statement with the defendant's permission; the

8  defendant signed at the bottom of the added portion.

9      8.  The defendant continued talking with Sgt. Rusk and

10  admitted involvement in additional crimes committed during the

11  past few days in the area of the Burke-Gilman trail.  Additional

12  items were added to the defendant's written statement with the

13  defendant's permission.  After each portion was added the

14  defendant reviewed the statement and signed it.  After Sgt. Rusk

15  and the defendant finished speaking the defendant was returned to

16  his holding cell to await transport to the marina to identify the

17  boats he had prowled.

18      9.  During Sgt. Rusk's contact with the defendant he noted

19  that the defendant appeared to understand, speak, and read the

20  english language.  The defendant was oriented to time and place

21  and gave appropriate responses to questions.  The defendant did

22  not appear to be under the influence of any drug or alcohol.  Sgt.

23  Rusk noted no signs of intoxicants including no odor, no slurred

24  speech, and no physical signs commonly associated with

25  intoxication.  The defendant never asked to speak with an attorney

CrR 3.5 CERTIFICATE - 4

**Norm Maleng**
Prosecuting Attorney
W 554 King County Courthouse
Seattle, Washington 98104-2312
(206) 296-9000

1    or to have his parents contacted.  The defendant never exercised

2    his right to remain silent.  The defendant was cooperative

3    throughout the interview session.

4        10.  Around 3:00 p.m. Sgt. Rusk and Detective Raftis drove

5    the defendant to the marina as the defendant had previously

6    offered.  Sgt. Rusk recalled reading something in the newspaper

7    about a stabbing in Bothell on the Burke-Gilman trail.  Sgt. Rusk

8    noted that the defendant had been in the same area during the same

9    time period.  While in route to the marina, Sgt. Rusk asked the

10   defendant if he knew anything about a guy named "Goocher" being

11   stabbed on the Burke-Gilman Trail.  The defendant responded, "I

12   didn't stab no bum."  Sgt. Rusk asked the defendant how he knew he

13   was a bum and the defendant responded that Sgt. Rusk had said he

14   was; Sgt. Rusk never used the word bum.  Sgt. Rusk asked no more

15   questions at that time regarding the homicide.

16       11.  Once at the marina, the defendant willingly pointed out

17   each boat he had been on and what he had taken and done on each.

18   The defendant was then returned to the precinct holding cell while

19   Sgt. Rusk returned to the marina with another detective and

20   Jonathon Wyatt, who also admitted involvement in the arsons and

21   boat prowls with the defendant. *While Sgt. Rusk was with Wyatt, ⚡

22   the defendant was left alone in the cell and not questioned *because he complained*

23   further. *According to Detective Raftis,* At some point he was given a blanket, and he may have *of being cold*

24   taken a nap.

25   → *Detective Raftis was assigned to watch the defendant in his holding cell after returning from the marina.*

*Detective Raftis testified that the defendant did not exhibit any signs of intoxication.*

Norm Maleng
Prosecuting Attorney
W 554 King County Courthouse
Seattle, Washington 98104-2312
(206) 296-9000

1    12.  During Sgt. Rusk's trip to the marina with Jonathon

2 Wyatt, Wyatt was also asked about the stabbing.  Wyatt started

3 crying and made several statements implicating the defendant in

4 the murder.  Wyatt then requested an attorney and his father;

5 Wyatt was immediately returned to the precinct and all questioning

6 ceased until his attorney could be contacted.  This occurred

7 around 5:00 p.m.

8    13.  Sgt. Rusk then instructed that Bothell Police Department

9 be contacted.  Detective Ed Hopkins was paged and notified King

10 County that he would come to the precinct immediately.

11    14.  Bothell Detective Ed Hopkins arrived at the precinct

12 around 6:00 p.m.  He was briefed on what had transpired during the

13 day.  Detectives were still attempting to contact an attorney for

14 Wyatt and had contacted Wyatt's father.  While waiting for an

15 attorney for Wyatt, Sgt. Rusk purchased a meal at McDonald's for

16 the defendant.  The meal was delivered to the defendant in the

17 holding cell where he was left alone to eat it.

18    15.  Following numerous difficulties, Wyatt's attorney

19 finally arrived at the precinct.  Detectives did not interview the

20 defendant during this time because they wanted to interview Wyatt

21 first, if possible.  Wyatt's attorney consulted with her client

22 and informed police that Wyatt would be making no further

23 statements.  Detective Hopkins and Sgt. Rusk ate dinner and then

24 recontacted the defendant sometime between 8:30 and 9:30 p.m.

25

**Norm Maleng**
Prosecuting Attorney
W 554 King County Courthouse
Seattle, Washington 98104-2312
(206) 296-9000

CrR 3.5 CERTIFICATE - 6

16.   The defendant was again brought to the interview room where he was introduced to Detective Hopkins by Sgt. Rusk. Detective Hopkins informed the defendant he was investigating a homicide.  Sgt. Rusk asked the defendant if he remembered his rights and the defendant stated that he did.  Sgt. Rusk then asked the defendant if he was willing to talk further and the defendant agreed.

17.   Detective Hopkins asked the defendant if he was involved in the stabbing and he denied any knowledge.  Sgt. Rusk and Detective Hopkins then told the defendant that Wyatt had implicated him in the murder stating to the defendant that he might as well tell them what happened so that the defendant did not "go down alone."  The defendant again denied any involvement or memory.  The defendant then asked for a cigarette and Sgt. Rusk left the room to supposedly look for a cigarette.

18.   Detective Hopkins and Sgt. Rusk spoke to the defendant in a normal, none-threatening manner.  The detectives asked open-ended questions.

19.   Detective Hopkins continued speaking with the defendant during Sgt. Rusk's brief absence.  Detective Hopkins stated that he did not believe the defendant had acted alone in an attempt to get the defendant to state what he knew.  The defendant still did not admit any wrongdoing.

20.   Sgt. Rusk then returned to the room and told the defendant that he had heard that the victim had been accosting

CrR 3.5 CERTIFICATE - 7

Norm Maleng
Prosecuting Attorney
W 554 King County Courthouse
Seattle, Washington 98104-2312
(206) 296-9000

1  people on the trail and maybe that is what had happened with the

2  defendant.  Sgt. Rusk had no such information and had stated such

3  as a ruse.  Following Sgt. Rusk's statement, the defendant stated

4  that was what had happened; the victim had socked him and he had

5  stabbed him.  The defendant then briefly described the entire

6  stabbing and gave a physical demonstration.  After the initial

7  questioning, Detective Hopkins asked the defendant if he would be

8  willing to give a taped statement; the defendant agreed.

9      21.  Detective Hopkins again formally advised the defendant

10  of his <u>Miranda</u> rights from a printed form (see exhibit # ___ ).

11  The defendant again acknowledged his rights and signed both the

12  acknowledgement and waiver portion of the form.  The defendant was

13  also verbally advised of his constitutional rights on tape which

14  he also acknowledged.  The defendant then gave a detailed

15  description of the stabbing.  Questioning concluded after 10:00

16  p.m. and the defendant was booked into the Youth Detention

17  facility.

18      22.  At no time during the interview with Detective Hopkins

19  and Sgt. Rusk did the defendant state he wished an attorney or

20  refuse to answer any questions. the defendant appeared alert,

21  aware, and able to comprehend what was going on.  None of the

22  officers who had contact with the defendant that day ever noted

23  any signs of intoxication or drug use.  The defendant never

24  requested to speak with a parent.  The defendant was not

25  threatened.  No promises or threats were made to the defendant.

*[handwritten]: According to the testimony of Detective Hopkins and Sgt. Rusk,*

CrR 3.5 CERTIFICATE - 8

**Norm Maleng**
Prosecuting Attorney
W 554 King County Courthouse
Seattle, Washington 98104-2312
(206) 296-9000

23.  At the time of his arrest, the defendant was 16 years old and had completed the 10th or 11th grade and a GED.  According to the testimony of the defendant's mother, he is bright and intelligent.  The mother testified that the defendant has Attention Deficit Disorder, but that the disorder would not impact the defendant's ability to make an intelligent decision.  The mother testified that the defendant is capable of thinking through his decisions even though he sometimes exercises bad judgment.

24.  Although the defendant was in custody for a long period of time, he was not subjected to lengthy sessions of on-going interrogation.

25.  The fact that the defendant was repeatedly advised of proper <u>Miranda</u> rights is undisputed.

26.  The trial court reviewed the taped confession three times and noted no indications that the defendant did not understand his rights.  The court also noted nothing in the defendant's demeanor to suggest that he was under the influence of drugs or alcohol.

27.  Although the trial court finds that the police did engage in some deceptive practices in their questioning, the practices used have been previously accepted by the courts.  The interview tactics employed by the police did not rise to the level of overcoming the defendant's ability to understand his rights or overbear the defendant's ability to freely determine whether he wished to make a statement.

CrR 3.5 CERTIFICATE - 9

**Norm Maleng**
Prosecuting Attorney
W 554 King County Courthouse
Seattle, Washington 98104-2312
(206) 296-9000

51083084

1

2   II.   **COURT'S CONCLUSIONS AS TO THE ADMISSIBILITY OF THE EVIDENCE**

3       1.   The defendant was properly advised of his constitutional

4   rights on numerous occasions.  The defendant acknowledged he

5   understood his rights verbally and in writing.

6       2.   Considering the totality of the circumstances as set

7   forth in cases such as <u>State v. Fuhrman</u>, 122 Wn.2d 453, the trial

8   court concludes that the defendant understood his rights and the

9   consequences of his decision to knowingly and voluntarily waive

10  his rights.  The defendant's statements to the police were freely

11  and voluntarily given and are therefore admissible at trial.

12      DONE IN OPEN COURT this 15 day of August, 1995  May 1996

13

14                                              _Ann Schindler_
                                                JUDGE ANN SCHINDLER

15

16  Presented by:          → The court incorporates by

17  NORM MALENG             reference its oral decision
    King County Prosecuting Attorney   setting forth its

18

19  By: _____   findings and
20      SUSAN MAHONEY, WSBA #21063 and   conclusions for
        JAMES MARNER, WSBA #
21      Deputy Prosecuting Attorneys   the 3.5 hearing.
        Attorneys for King County
22      Officer ID #91002                         AS

23  Copy received; approved as to form;

24

25  By: _____
        JOHN HICKS, WSBA #
        Attorney for Defendant

                                        **Norm Maleng**
                                        Prosecuting Attorney
                                        W 554 King County Courthouse
    CrR 3.5 CERTIFICATE - 10           Seattle, Washington 98104-2312
                                        (206) 296-9000

# Exhibit D

Sub 90J- Trial Court Minutes

51083084

CAUSE _951-02102-2 SEA_    DATE: _3/11/96_

CAPTION _STATE VS SIMMERS_

Evidentiary hearings, prior to trial date  (motions in limine, 3.5, 3.6, DNA, competency, child hearsay).

_____    EVIHRG

PTM    _____ hours    (Pre–trial motion time)

---

Trial

_____    NJTRIAL            _____ FFHRG        _____ ADJHRG
__✓__    JTRIAL  ✓ $JFA _12_  Person    _____ FFDHRG      _____ ADSNHRG

PTM    _9,25_    hours    (Pre–trial motion time)
VDT    _5,5_    hours    (Voir Dire time)
APT    _21,75_    hours    (Actual proceedings [trial] time)

---

Non–trial hearings, on trial date.

_____    GPOH – ANTRIAL
_____    GPSH – ANTRIAL
_____    MTHRG – ANTRIAL
_____    DSMHRG – ANTRIAL
_____         – ANTRIAL

PTM    _____ hours    (Pre–trial motion time)
VDT    _____ hours    (Voir Dire time)

---

Non–trial hearings, not on trial date.

_____ FNRHRG      _____ MTHRG      _____ CTPHRG      _____ ARRAIGN
_____ SCVHRG      _____ SMJHRG      _____ DSPHRG      _____ DECHRG
_____ DSMHRG      _____ STAHRG      _____ GRDHRG      _____ DETHRG
_____ GPOH        _____ STLCON      _____ SCCHRG      _____ RVWHRG
_____ GPSH        _____ HCNTU       _____ SCUHRG
_____ SNTHRG      _____ TCNTU

90J

51083084

Department No. **5**

Date: **3/11/96**

Page 1 of **3**

JUDGE: ANN SCHINDLER

BAILIFF: SHAUN FLIGELTAUB

COURT CLERK: BEVERLY ANN ENEBRAD

REPORTER: JANE LAMERLE

VICTORIA RACCAGNO

King County Cause No. **95-1-02102-2 SEA**

<u>Case Caption</u>

State of Washington

vs

IAN M. SIMMERS

<u>Litigants and Attorneys</u>

DPA - SUSAN MAHONEY AND JAMES MARNER

DEFT PRESENT WITH COUNSEL, JOHN HICKS

<u>Minute Entry</u>

| 4,5 | STATE'S MOTION TO AMEND INFORMATION TO ADD COUNT II - MURDER 2' - GRANTED. AMENDED INFORMATION FILED. |
| | DEFT WAIVES FORMAL ARRAIGNMENT. PLEA OF NOT GUILTY ENTERED. |
| | STATE'S MOTION TO EXCLUDE WITNESSES FROM COURTROOM EXCEPT GLORIA GOCHANOUR - GRANTED. |
| | STATE'S MOTION TO ADMIT CRIME SCENE AND AUTOPSY PHOTOS - RULING RESERVED. |

51083084

K.C. Cause No. _95·1·02102·25E4_     Date: _3/11/96_     Page _2_ of _3_

Caption: _ST vs SIMMERS_

### Minute Entry

**STATE'S MOTION IN LIMINE TO EXCLUDE :**

  1. DEFT'S SELF SERVING STATEMENTS~ RULING RESERVED
  2. VICTIM'S CRIMINAL HISTORY OR PRIOR BAD ACTS~ GRANTED
  3. BENZOYLECGONINE OR BARBITUATES IN VICTIM'S SYSTEM ~ DENIED .

**RESPECTIVE COUNSEL STIPULATE TO THE FOLLOWING :**

  1. TOXICOLOGIST'S REPORT
  2. RESULTS OF DNA TESTING ON KNIFE
  3. DNA TESTING ON PANTS ( DEFT'S )
  4. BLOOD ON VICTIM'S GLASSES
  5. TESTIMONY OF METRO SCHEDULE COORDINATOR

**STATE'S MOTION IN LIMINE TO EXCLUDE :**

  1. REFERENCE TO STATEMENTS OR REACTIONS OF JONATHAN WYATT,
    AN UNAVAILABLE WITNESS~ GRANTED
  2. OTHER SUSPECTS~ RULING RESERVED
  3. KEVIN OLSEN'S CRIMINAL HISTORY ~ RULING RESERVED;
    DRUG/ALCOHOL USE ~
  4. TESTIMONY OF KATE GARNAN~ RULING RESERVED.

**DEFT'S MOTION IN LIMINE TO EXCLUDE :**

  1. DEFT'S PRIOR CONVICTIONS~ GRANTED, IN CASE IN CHIEF.
  2. DEFT LISTED AS RUNAWAY WITH OUTSTANDING WARRANTS~ GRANTED.
  3. OBSERVATIONS BY OFFICERS THAT DEFT LIKES CRIME, BRAGS
    ABOUT DRUGS, BEING A GANG MEMBER~ RULING RESERVED
  4. MANIC DEPRESSION / PSYCHOLOGICAL CARE OF DEFT ~ GRANTED
    BY AGREEMENT
  5. SCENE/AUTOPSY PHOTOS ~ RULING RESERVED
  6. JONATHAN WYATT'S STATEMENT INFERRING GUILT ON PART OF
    DEFT ~ GRANTED

51083084

K.C. Cause No. 95-1-02102-2 SEA                Date: 3/11/96              Page 3 of 3

Caption: ST VS SIMMERS

## Minute Entry

| | |
|---|---|
| | 7. DEFT CARRYING KNIFE ~ RULING RESERVED |
| | 3.5 HEARING ~ |
| | FOLLOWING WITNESS SWORN AND EXAMINED FOR STATE : |
| | OFF. ORVILLE M. FULLER |
| | DEFT'S EX 1            ADMITTED/PRETRIAL |
| | FOLLOWING WITNESS SWORN AND EXAMINED FOR STATE : |
| | SGT. CLEMENT D. RUSK |
| | STATE'S EX 2-5            ADMITTED/PRETRIAL |
| | FOLLOWING WITNESSES SWORN AND EXAMINED FOR STATE : |
| | DET. PATRICK H. RAFTIS |
| | DET. AMY JARBOE |
| | DET. EDWARD HOPKINS |
| | FOLLOWING WITNESS SWORN AND EXAMINED FOR DEFT OUT OF ORDER : |
| | ROBERT WESLEY SETZER JR. |
| | EXAMINATION OF DET. EDWARD HOPKINS CONTINUES. |
| | COURT LISTENS TO STATE'S EX 4. |
| | CONTINUED TO 3/12/96 AT 9:00 AM. |

51083084

Department No. **5**

Date: **3/12/96**

Page 1 of **2**

JUDGE: ANN SCHINDLER

BAILIFF: SHAUN FLUGELTAUB

COURT CLERK: BEVERLY ANN ENEBRAD

REPORTER: JANE LA MERLE

King County Cause No. **95-1-02102-2 SEA**

Case Caption

State of Washington

vs

IAN M. SIMMERS

Continued from **3/11/96**

**Minute Entry**

| 3.5 PTM | DEFT AND RESPECTIVE COUNSEL PRESENT |
| | DEFT DISCUSSES UPDATED WITNESS LIST. |
| | 3.5 HEARING CONTINUED ~ |
| | EXAMINATION OF DET. EDWARD HOPKINS CONTINUES. |
| | DEFT EX 6          ADMITTED/PRETRIAL |
| | DEFT EX 7          ID ONLY / PRETRIAL |
| | FOLLOWING WITNESS SWORN AND EXAMINED FOR STATE: |
| | OFF. MICHAEL JANASZ |
| | STATE'S EX 8          ADMITTED/PRETRIAL |
| | STATE RESTS. |
| | FOLLOWING WITNESSES SWORN AND EXAMINED FOR DEFT: |
| | DONNA L. BERUBE |
| | BRIAN MICHAEL BERUBE |

51083084

K.C. Cause No. _95-1-02102-2 SEA_     Date: _3/12/96_     Page _1_ of _2_

Caption: _ST VS SIMMERS_

## Minute Entry

| | |
|---|---|
| | STATE'S EX 9        RULING RESERVED |
| | FOLLOWING WITNESS SWORN AND EXAMINED FOR DEFT : |
| | STEVEN JOHN CARRIER |
| | COURT ADVISES DEFT OF HIS RIGHT TO TESTIFY AT THIS HEARING. |
| | DEFT REQUESTS LETTER FROM INMATE KENNY WHITE REQUESTING TO TESTIFY AGAINST DEFT IN EXCHANGE FOR A DEAL ~ GRANTED. |
| | DEFT ADDRESSES COURT OF HIS INABILITY TO LOCATE HIS NEXT WITNESS FOR TELEPHONE CONFERENCE. |
| | FOLLOWING WITNESS SWORN AND EXAMINED FOR DEFT : |
| | DAVID ARTHUR BERUBE |
| | 3.5 HEARING TO BE CONTINUED TO 2:00 PM . DEFT TO LOCATE WITNESS        CHARLOTTE JUDD. |
| | STATE'S MOTION IN LIMINE TO EXCLUDE : |
| | 1. OTHER SUSPECTS ~  RULING RESERVED<br>2. CHARACTER EVIDENCE ~ RULING RESERVED |
| | 3.5 HEARING CONTINUED ~ |
| | RESPECTIVE COUNSEL MAKE OFFER OF PROOF RE TESTIMONY OF CHARLOTTE JUDD, MARKED AS STATE'S EX 10. |
| | ARGUMENTS PRESENTED. |
| | CONTINUED TO 3/13/96 AT 9:00 AM. |

51083084

Department No. **5**

Date: **3/13/96**

Page 1 of **2**

JUDGE: ANN SCHINDLER
BAILIFF: *SHAUN FLUGELTAUB*
COURT CLERK: *BEVERLY ANN ENEBRAD*
REPORTER: *JANE LAMERLE*

King County Cause No. **95·1·02102·2 SEA**

**Case Caption**

State of Washington

vs

**IAN M. SIMMERS**

Continued from **3/12/96**

**Minute Entry**

| | |
|---|---|
| **1,25 PTM**<br>**3,00 VDT** | DEFT AND RESPECTIVE COUNSEL PRESENT. |
| | COURT FINDS STATEMENT OF DEFT ADMISSIBLE AT TIME OF TRIAL. |
| | STATE'S MOTION IN LIMINE TO EXCLUDE OTHER SUSPECTS~ GRANTED, ALTHOUGH DEFT MAY CROSS EXAMINE OFFICERS AS TO COURSE OF INVESTIGATION OR ADEQUACY OF INVESTIGATION. |
| | DEFT'S MOTION TO ALLOW DEFT'S CHARACTER EVIDENCE~ DENIED. |
| | STATE'S MOTION IN LIMINE TO EXCLUDE KEVIN OLSEN'S CRIMINAL HISTORY ~ RULING RESERVED. |
| | JURORS #57, 58, 59, 69, 71, 73, 79 SWORN AND EXAMINED RE HARDSHIP. |
| | COURT EXCUSES #71, 59, 73 FROM FURTHER CONSIDERATION OF THIS CAUSE. |
| | JURY PANEL SWORN. |
| | JUROR #9 AND #57 EXAMINED INDIVIDUALLY OUT OF PRESENCE OF JURY RE PUBLICITY AND PERMANENTLY EXCUSED. |

51083084

K.C. Cause No. 95.1.02102.2 SEA          Date: 3/12/96          Page 2 of 2

Caption: ST VS SIMMERS

## Minute Entry

VOIR DIRE OF A PROSPECTIVE JURY PANEL COMMENCES.

PROSPECTIVE JURY ABSENT

JUROR # 30 EXAMINED RE DISCUSSING CASE WITH ANOTHER JUROR.

JUROR #63          EXAMINED AS TO WHY SHE LEFT MAIN JURY ROOM DURING BREAK. COURT EXCUSES JUROR FROM FURTHER CONSIDERATION OF THIS CAUSE.

VOIR DIRE CONTINUES.

CONTINUED TO 3/14/96 AT 9:00 A.M.

51083084

Department No. **5**

Date: **3/14/96**

Page 1 of **3**

JUDGE: ~~AT SCHINDLER~~

BAILIFF: **NANCY SODERLUND**

COURT CLERK: **BEVERLY ANN ENEBRAD**

REPORTER: **JANE LAMERLE**

King County Cause No. **95-1-02102-2 SEA**

**Case Caption**

State of Washington

vs

**IAN M. SIMMERS**

Continued from **3/13/96**

**Minute Entry**

| | |
|---|---|
| **2.5 VDT** | **DEFT AND RESPECTIVE COUNSEL PRESENT** |
| **2.5 AFT** | |
| | **VOIR DIRE OF A PROSPECTIVE JURY PANEL CONTINUES.** |
| | |
| | **PROSPECTIVE JURY ABSENT** |
| | **JUROR #14 SEATED IN SEAT 5 EXAMINED AS TO HER CONFUSION** |
| | **RE REPORTING INSTRUCTIONS.** |
| | **VOIR DIRE CONTINUES.** |
| | **PROSPECTIVE JURY ABSENT** |
| | **DEFT'S MOTION TO REDACT PORTION OF TRANSCRIBED STATEMENT** |
| | **RE BOAT ~** |
| | **RULING RESERVED.** |

51083084

K.C. Cause No. __95·1·02102·2__    Date: __3/14/96__    Page __2__ of ____

Caption: __ST VS SIMMERS__

## Minute Entry

FOLLOWING JURORS SWORN AND IMPANELED TO TRY THIS CAUSE:

| | |
|---|---|
| 1 ROGERS WEED | 7 MARY LANDRE |
| 2 RONALD RICE | 8 KATHLEEN DRUMMEY |
| 3 SARAH TODD | 9 ELLIOT CABUGON |
| 4 MARGARET SMITH | 10 FRANCES REES |
| 5 ALEXANDRO FILIPOWICZ | 11 MARVIN JACKSON |
| 6 PATRICIA MAGUIRE | 12 LORI PITZER |
| 13 DIXIE PEPE | |
| 14 ANTHONY TAMACCIO | |

JURY ABSENT

STATE'S MOTION IN LIMINE TO EXCLUDE:

1. KEVIN OLSEN'S CRIMINAL HISTORY ~ GRANTED AS TO 1979 AND 1980 BURGLARY, DENIED AS TO 1986 FAILING TO RETURN TO WORK RELEASE AND 1995 VUCSA POSSESSION.
2. KEVIN OLSEN'S DRUG/ALCOHOL USE AND ABUSE ~ GRANTED WITHOUT PREJUDICE.

STATE'S MOTION TO ALLOW IN OPENING STATEMENT THE FACT THAT DEPT AND WYATT WERE DETAINED AND QUESTIONED ON UNRELATED INCIDENTS OCCURRING BETWEEN 3/10-15/95 IN THE AREA OF THE BURKE GILMAN TRAIL ~ GRANTED.

STATE'S MOTION IN LIMINE TO EXCLUDE NAMES OF PEOPLE WHO OLSEN PROVIDED INFORMATION ABOUT ~ GRANTED.

STATE'S MOTION TO ALLOW JURORS TO TAKE NOTES ~ DENIED.

DEFT OBJECTS TO THREE WRITTEN CHARTS STATE INTENDS TO USE DURING OPENING STATEMENT ~ SUSTAINED.

51083084

K.C. Cause No. _95·1.02102·2 SEA_          Date: _3/14/96_          Page _3_ of ___

Caption: _ST VS SIMMERS_

## Minute Entry

| | |
|---|---|
| | STATE'S MOTION TO FILE 2ND AMENDED INFORMATION TO CORRECT DATE TO MARCH 11, 1995 ~ GRANTED. AMENDED INFORMATION FILED. |
| | JURY PRESENT |
| | STATE MAKES OPENING STATEMENT. DEFT RESERVES OPENING STATEMENT. |
| | FOLLOWING WITNESS SWORN AND EXAMINED FOR STATE : |
| | OFF. JOHN EDWARD VALENTINO, JR. |
| | STATE'S EX 1          ADMITTED |
| | FOLLOWING WITNESS SWORN AND EXAMINED FOR STATE : |
| | DIANA C. PATTERSON |
| | JURY ABSENT |
| | DEFT REQUESTS TO REDACT PORTIONS OF TRANSCRIBED STATEMENT OF DEFT SIMMERS ~ GRANTED IN PART AS TO PAGE 6 IN REFERENCE TO "HITTING THE BOATS," |
| | STATE'S EX 4, PREVIOUSLY MARKED AND ADMITTED FOR PRETRIAL ONLY, TO BE REDACTED. |
| | JURY PRESENT |
| | FOLLOWING WITNESS SWORN AND EXAMINED FOR STATE: |
| | DET. EDWARD JOHN HOPKINS |
| | CONTINUED TO 3/15/96 AT 9:00 AM. |

51083084

Department No. **5**

Date: **3/15/96**

Page 1 of **2**

JUDGE: ANN SCHINDLER

BAILIFF: **NANCY SODERLAND**

COURT CLERK: **BEVERLY ANN ENEBRAD**

REPORTER: **JANE LA MERLE**

King County Cause No. **95-1-02102-2 SEA**

Case Caption

State of Washington

vs

**IAN M. SIMMERS**

Continued from **3/14/96**

### Minute Entry

| 2.25 | DEFT AND RESPECTIVE COUNSEL PRESENT |
|------|--------------------------------------|
| | JURY ABSENT |
| | STATE'S MOTION TO CALL JEFF DAVIS OUT OF ORDER – GRANTED. |
| | STATE DISCUSSES PHOTO OF VICTIM TO BE OFFERED AND REDACTION OF STATE'S EX 4, ADMITTED FOR PRETRIAL ONLY. |
| | FURTHER DISCUSSION RE NEWSPAPER ARTICLE OF DEFT IN JOURNAL AMERICAN. |
| | JURY PRESENT |
| | COURT INQUIRES OF JURY AS TO NEWSPAPER ARTICLE. JURY ADMONISHED. |
| | FOLLOWING WITNESS SWORN AND EXAMINED FOR STATE OUT OF ORDER: |
| | JEFFREY CRAIG DAVIS |
| | STATE'S EX 2          ADMITTED |
| | EXAMINATION OF DET. EDWARD HOPKINS CONTINUES. |

51083084

K.C. Cause No. 95-1-02102-2 SEA        Date: 3/15/96        Page 2 of 2

Caption: ST vs SIMMERS

## Minute Entry

STATE'S EX 3            ADMITTED

JURY LISTENS TO STATE'S EX 3.

STATE REQUESTS DEMONSTRATION OF DEFT MIMICKING ACTIONS
OF INCIDENT AT INTERVIEW~

GRANTED, OVER OBJECTION.

STATE'S EX 4-5          ADMITTED
STATE'S EX 6-7          ID ONLY

JURY ABSENT

STATE REQUESTS CLARIFICATION RE 3RD PARTY PERPETRATOR~
GRANTED, DEFT MAY CROSS EXAMINE ONLY AS TO THOROUGHNESS
OF INVESTIGATION AND POLICE BIAS.

DEFT MAKES OFFER OF PROOF. OFFER OF PROOF NOTED.

JURY PRESENT

EXAMINATION OF DET. EDWARD HOPKINS CONTINUES.

JURY ABSENT
PHOTOS DISCUSSED.
CORRECTIONS OFFICER DISCUSSES WEAPON SAFETY AND REQUESTS PLACING
WEAPON IN BOX~ GRANTED.
CONTINUED TO 3/18/96 AT 9:00 AM.

51083084

Department No. **5**

Date: **3/18/96**

Page 1 of **2**

JUDGE: ANN SCHINDLER

BAILIFF: **SHAUN FLUGELTAUB**

COURT CLERK: **BEVERLY ANN ENEBRAD**

REPORTER: **VICTORIA RACCAGNO**

King County Cause No. **95-1-02102-2 SEA**

Case Caption

Gtate of Washington

**vs**

**IAN M. SIMMERS**

Continued from **3/15/96**

Minute Entry

| | |
|---|---|
| **3.15** | **DEFT AND RESPECTIVE COUNSEL PRESENT** |
| | **JURY ABSENT** |
| | **DEFT REQUESTS TO CROSS EXAMINE DET. HOPKINS QUESTIONING JOSEPH BUTCHER — DENIED.** |
| | **JURY PRESENT** |
| | **STATE'S EX 8-10      ID ONLY** |
| | **EXAMINATION OF DET. EDWARD HOPKINS CONTINUES.** |
| | **FOLLOWING WITNESS SWORN AND EXAMINED FOR STATE :** |
| | **REBECCA MINER** |
| | **STATE'S EX 14-15, 12, 17, 8-9, 16, 18-19, 11, 10  ADMITTED** |
| | **JURY ABSENT** |
| | **DEFT DISCUSSES ARRANGEMENT FOR TRANSFER OF DARYL CLOUD FOR INTERVIEW.** |

51083084

K.C. Cause No. _95-1-02102-2 SEA_     Date: _3/18/96_     Page _2_ of _2_

Caption: _ST VS SIMMERS_

## Minute Entry

JURY PRESENT

EXAMINATION OF REBECCA MINER CONTINUES.

   STATE'S EX 13   WITHDRAWN
   STATE'S EX 20·24  ID ONLY

FOLLOWING WITNESSES SWORN AND EXAMINED FOR STATE:

    LYNN DEAN
    NORMAN JOHN THIERSCH

   STATE'S EX 22·24, 21, 20  ADMITTED

JURY ABSENT

JUROR #6 PATRICIA MAGUIRE REQUESTS TO ATTEND FUNERAL
AT 11:00 AM — GRANTED.

CONTINUED TO 3/19/96 AT 1:30 PM.

Department No. **5**

Date: **3/19/96**

Page 1 of **2**

JUDGE: ~~ANN SCHINDLER~~

BAILIFF: **NANCY SODERLAND**

COURT CLERK: **BEVERLY ANN ENEBRAD**

REPORTER: **VICTORIA RACCAGNO**

King County Cause No. **95-1-02102-2 SEA**

**Case Caption**

~~State of Washington~~

vs

**IAN M. SIMMERS**

Continued from **3/18/96**

**Minute Entry**

| | |
|---|---|
| **2.25** | DEFT AND RESPECTIVE COUNSEL PRESENT |
| | JURY ABSENT |
| | STATE DISCUSSES DEFT'S WITNESS DARRYL CLOUD AND REQUESTS FOR INTERVIEW PRIOR TO TESTIMONY ~ |
| | JURY PRESENT |
| | FOLLOWING WITNESS SWORN AND EXAMINED FOR STATE : |
| | CAROLYN ALLYNE MILLER |

| | |
|---|---|
| STATE'S EX 25 | ADMITTED/ILLUSTRATIVE |
| STATE'S EX 26 | WITHDRAWN |

FOLLOWING WITNESS SWORN AND EXAMINED FOR STATE :

KEVIN SCOTT OLSEN

| | |
|---|---|
| STATE'S EX 27 | ADMITTED/ILLUSTRATIVE |
| STATE'S EX 28-29,30,31 | ADMITTED |
| DEFT'S EX 32 | ID ONLY |

51083084

K.C. Cause No. __95·1·02102·2 SEA__          Date: __3/19/96__          Page __2__ of __2__

Caption: __ST vs SIMMERS__

## Minute Entry

DEFT REQUESTS TO INQUIRE INTO KEVIN OLSEN'S DRUG/ALCOHOL USE.

EXAMINATION OF KEVIN OLSEN CONTINUES AS AN OFFER OF PROOF.

DEFT MAY INQUIRE AS TO WITHDRAWAL SYMPTOMS ON 11/12/95 AND 3/4/96 INTERVIEW.

CONTINUED TO 3/20/96 AT 9:00 A.M.

Department No. **5**

Date: **3/20/96**

Page 1 of **2**

JUDGE: ANN SCHINDLER

BAILIFF: **NANCY SODERLAND**

COURT CLERK: **BEVERLY ANN ENEBRAD**

REPORTER: **JANE LAMERLE**

King County Cause No. **95-1-02102-2SEA**

**Case Caption**

State of Washington

vs

**IAN M. SIMMERS**

Continued from **3/19/96**

**Minute Entry**

| | |
|---|---|
| **3.25** | **DEFT AND RESPECTIVE COUNSEL PRESENT** |
| | **JURY ABSENT** |
| | **STATE REQUESTS CLARIFICATION RE KEVIN OLSEN'S DRUG USE — GRANTED. DEFT MAY INQUIRE RE HEROIN WITHDRAWALS ON 11/12/95 AND 3/4/96.** |
| | **COURT DISCUSSES JURORS CONCERNS AS TO LENGTH OF TRIAL.** |
| | **JURY PRESENT** |
| | **EXAMINATION OF KEVIN OLSEN CONTINUES.** |
| | **STATE'S EX 33       WITHDRAWN** |
| | **DEFT'S EX 32       WITHDRAWN** |
| | **FOLLOWING WITNESS SWORN AND EXAMINED FOR STATE :** |
| | **OFF. MICHAEL B. JANASZ** |
| | **STATE'S EX 6       ADMITTED** |

51083084

K.C. Cause No. _95-1-02102-2 SEA_    Date: _3/20/96_    Page _2_ of _2_

Caption: _ST vs SIMMERS_

## Minute Entry

FOLLOWING WITNESSES SWORN AND EXAMINED FOR STATE:

      DET. SGT. CLEMENT RUSK

      TERRENCE McADAM

COURT READS STIPULATION RE BLOOD TEST RESULTS TO JURY.

FOLLOWING WITNESS SWORN AND EXAMINED FOR STATE:

      GLORIA YVONNE GOCHANOUR

STATE RESTS.

JURY ABSENT

DEFT'S MOTION TO DISMISS MURDER 1° ~ DENIED.

STATE'S MOTION TO EXCLUDE TESTIMONY OF KATE GARNAN RE
STATEMENT MADE BY DONNA BERUBE ~ GRANTED.

      STATE'S EX 34      ID ONLY

JURY PRESENT

FOLLOWING WITNESSES SWORN AND EXAMINED FOR DEFT:

      DET. ROGER RUSNESS

      SANDRA WYATT

JURY ABSENT

DISCUSSION RE INVESTIGATOR'S INTERVIEW WITH KEVIN OLSEN.

CONTINUED TO 3/21/96 AT 9:00 AM

51083084

Department No. **5**

Date: **3/21/96**

Page 1 of **3**

JUDGE: ANN SCHINDLER

BAILIFF: **NANCY SODERLAND**

COURT CLERK: **BEVERLY ANN ENEBRAD**

REPORTER: **JANE LAMERLE**

King County Cause No. **95-1-02102-2 SEA**

**Case Caption**

State of Washington

vs

**IAN M. SIMMERS**

Continued from **3/20/96**

**Minute Entry**

| | |
|---|---|
| **4, 5** | DEFT AND RESPECTIVE COUNSEL PRESENT |
| | JURY ABSENT |
| | DEFENSE WITNESSES DISCUSSED. |
| | JURY PRESENT |
| | FOLLOWING WITNESSES SWORN AND EXAMINED FOR DEFT: |
| | CHIEF ROBIN HICKOK |
| | DONNA L. BERUBE |
| | DEFT'S EX 35-40    ID ONLY |
| | DEFT'S EX 35-36, 30-39   ADMITTED |
| | JURY ABSENT |
| | DEFT'S MOTION FOR MISTRIAL BASED ON CROSS EXAMINATION RE PROBATION STATUS ~ DENIED, COURT WILL GIVE LIMITING INSTRUCTION. |
| | STATE REQUESTS TO INQUIRE AS TO RUNAWAY STATUS ~ DENIED, MAY INQUIRE AS TO NOT KNOWING WHEREABOUTS. |

K.C. Cause No. 95-1-02102-2 SEA    Date: 3/21/96    Page 2 of 3

Caption: ST vs SIMMERS

### Minute Entry

JURY PRESENT

COURT GIVES JURY LIMITING INSTRUCTION AS PROPOSED BY DEFT.

EXAMINATION OF DONNA BERUBE CONTINUES.

FOLLOWING WITNESS SWORN AND EXAMINED FOR DEFT:

DAVID BERUBE

DEFT'S EX 40          ADMITTED/ILLUSTRATIVE
STATE'S EX 41          ID ONLY

COURT READS STIPULATION RE CARNATION/KENMORE TRANSIT
SERVICE TO JURY.

FOLLOWING WITNESSES SWORN AND EXAMINED FOR DEFT:

KATHERINE GARMAN
HOPE MARSTON

IAN M. SIMMERS SWORN AND EXAMINED ON HIS OWN BEHALF.

FOLLOWING WITNESS SWORN AND EXAMINED FOR DEFT:

BRYAN MICHAEL BERUBE

STATE STIPULATES TO DEFT'S EX 37, LION KING VIDEO, IN ORDER FOR
ST TO BE WITHDRAWN AND RETURNED TO WITNESS.

STATE'S EX 42          ID ONLY

JAMES LOBSENZ, COUNSEL FOR DARRYL CLOUD, PRESENT.

K.C. Cause No. __95·1·02102·2__ __4__          Date: __3/21__ __9u__          Page __3__ of __3__

Caption: __ST VS SIMMERS__

<u>**Minute Entry**</u>

| | |
|---|---|
| | FOLLOWING WITNESS SWORN AND EXAMINED FOR DEFT: |
| | PARRYL ALLEN CLOUD |
| | WITNESS EXERCISES 5TH AMENDMENT RIGHTS RE DELUSIONS. |
| | DEFT RESTS. |
| | BRYAN BERUBE RECALLED TO WITNESS STAND IN REBUTTAL. |
| | JURY ABSENT |
| | JURY INSTRUCTIONS DISCUSSED |
| | DISCUSSION RE WHETHER DEFT WAIVED RIGHT TO REMAIN SILENT. |
| | CONTINUED TO 3/25/9u AT 9:00 AM. |

51083084

Department No. **5**

Date: March 26, 1996

Page 1 of **2**

JUDGE: ANN SCHINDLER

BAILIFF: Nancy Soderland

COURT CLERK: Carolyn Rhoads

REPORTER: Jane La Merle

King County Cause No. 95-1-0 2102-2

**Case Caption**

State of Washington vs Ivan M. Simmers

Continued from March 25, 1996

**Minute Entry**

Neither, def. nor counsel are present

Jury returns at 9:00 A. M. and resumes deliberations.

At 11:30 AM the jury submits written enquiries:

1. Do all inmates in administrative segregation have access to paper & pen the way Kevin Olson apparently did?

2. Does prosecution warrant that the taped statement in Ex 3 was one continual recording with the exception of the one noted pause to check batteries at the start of the tape?

3. Did counsel for both parties agree to remove any portion of the statement recorded in Ex 3.

At 1:30 P.M. the Court responds in writing that:

1) You have been provided with all evidence presented in this case.

2) The tapes provided in Ex 3 has been admitted by the Court and is evidence in this case.

At 3:30 P.M. the jury submits a written inquiry asking to hear the taped statement tomorrow morning.

51083084

K.C. Cause No. 95-1-0210⬤-2          Date: 3 - ⬤ 96          Page 2 of 2

Caption: State vs Simmers

Dept. 5                          **Minute Entry**

At 3:55 P.M. the court responds in
writing that the tape will be played
tomorrow at 9:00 A.M.

At 4:10 P.M. the bailiff admonishes and
excuses the jury for the evening to return
at 9:00 AM and resume deliberations

51083084

Department No. **5**

Date: **3/25/96**

Page 1 of **2**

JUDGE: ANN SCHINDLER

BAILIFF: **NANCY SODERLUND**

COURT CLERK: **BEVERLY ANN ENEBRAD**

REPORTER: **VICTORIA RACCAGNO**

King County Cause No. **95-1-02102-2 SEA**

**Case Caption**

Ciii i 31×0 Wiiii(i)

vs

**IAN M. SIMMERS**

Continued from **3/21/96**

**Minute Entry**

| | |
|---|---|
| 3.25 | DEFT AND RESPECTIVE COUNSEL PRESENT |
| | JURY ABSENT |
| | STATE REMOVES BELT AND SCARF FROM STATE'S EX 7 AS PREVIOUSLY AGREED. |
| | STATE'S EX 7 ADMITTED |
| | EXCEPTIONS TO COURT'S INSTRUCTIONS NOTED. |
| | STATE'S MOTION TO DISCUSS DEFT WAIVING RIGHT TO REMAIN SILENT ~ MUST BE EXTREMELY LIMITED. |
| | JURY PRESENT |
| | COURT INSTRUCTS THE JURY. |
| | RESPECTIVE COUNSEL MAKE FINAL ARGUMENTS. |
| | JURY RETIRES AT 2:07 PM TO DELIBERATE UPON A VERDICT. |

51083084

K.C. Cause No. ~~95-1-02102~~ EA          Date: 3/25          Page 2 of 2

Caption: ST VS SIMMERS

## Minute Entry

AT 3:00 PM JURY SUBMITS A WRITTEN INQUIRY REQUESTING A TAPE RECORDER.

DEFT AND RESPECTIVE COUNSEL PRESENT

AT 3:40 PM STATE'S EX 3 IS PLAYED TO THE JURY.

JURY EXCUSED AT 4:15 PM TO RETURN AT 9:00 AM ON 3/26/96 FOR FURTHER DELIBERATIONS.

Department No. __5__

Date: __3/27/96__

Page 1 of __1__

JUDGE: ANN SCHINDLER

BAILIFF: NANCY SODERLUND

COURT CLERK: BEVERLY ANN ENEBRAD

REPORTER: JANE LAMERLE

King County Cause No. __95-1-02102-2 SEA__

**Case Caption**

State of Washington

vs

IAN M. SIMMERS

Continued from __3/26/96__

**Minute Entry**

NEITHER DEFT NOR RESPECTIVE COUNSEL PRESENT

JURY RESUMES DELIBERATIONS AT 9:10 AM.

DEFT AND RESPECTIVE COUNSEL PRESENT

DEFT OBJECTS TO JURORS REQUEST TO RE-HEAR STATE'S EX 3 - OVERRULED.

AT 9:25 AM JURY LISTENS TO STATE'S EX 3.

JURY RESUMES DELIBERATIONS AT 9:50 AM.

AT 3:30 PM DEFT AND RESPECTIVE COUNSEL PRESENT

STATE'S MOTION FOR RECONSIDERATION OF COURT'S ANSWER TO JUROR QUESTIONNAIRE RE DELETION OF PORTION OF TAPED STATEMENT, STATE'S EX 3 -

CONTINUED TO 3/28/96 AT 8:45 AM.

JURY EXCUSED AT 4:20 PM TO RETURN AT 9:00 AM ON 3/28/96 FOR FURTHER DELIBERATIONS.

51083084

Department No. **5**

Date: **3/28/96**

Page 1 of **1**

JUDGE: ANN SCHINDLER

BAILIFF: **NANCY SODERLUND**

COURT CLERK: **BEVERLY ANN ENEBRAD**

REPORTER: **JANE LAMERLE**

King County Cause No. **95-1-02102-2 SEA**

**Case Caption**

State of Washington

vs

**IAN M. SIMMERS**

Continued from **3/27/96**

**Minute Entry**

JURY RESUMES DELIBERATIONS AT 9:02 AM.

DEFT AND RESPECTIVE COUNSEL PRESENT

STATE'S MOTION FOR RECONSIDERATION OF COURT'S ANSWER TO
JURY QUESTIONNAIRE AND TO GIVE SUPPLEMENTAL RESPONSE —

DENIED.

JURY RETURNS TO OPEN COURT AT 2:54 PM WITH THE FOLLOWING
VERDICT WHICH IS READ BY THE COURT IN THE PRESENCE OF
DEFT AND RESPECTIVE COUNSEL:

GUILTY - MURDER 1° DEADLY WEAPON

JURY POLLED. TWELVE JURORS ANSWER THIS IS THEIR INDIVIDUAL
VERDICT AND THE VERDICT OF THE JURY.

VERDICT RECEIVED AND FILED, JURORS EXCUSED FROM FURTHER
CONSIDERATION OF THIS CAUSE.

# Exhibit E

Sub 100F - Trial Witness List

51083084

# WITNESS TIME SHEET AND COST BILL
Criminal, Juvenile and Mental Illness

Page __1__ of __4__ Pages

F I L E D
KING COUNTY WASHINGTON

MAR 28 1996

SUPERIOR COURT CLERK
BEVERLY ANN ENEGRAD
DEPUTY

State of Washington
_____ Plaintiff,
        vs.

- IAN M. SIMMERS          1996
_____ Defendant.          No. 95-1-02102-2 SEA

| Witness For State | A-R | Name / Address (Include Zip Code) | 3/11 | 3/12 | 3/14 | 3/15 | 3/18 | Miles Per R.T. | Number Of Trips | Total Miles | Total Amount Due | Certificate Number |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ✓ | | OFF. ORVILLE M. FULLER / KING CO. POLICE | A | | | | | | 1 | | | |
| ✓ | | SGT. CLEMENT D. RUSK / KING CO. POLICE | F | | | | | | 1 | | | |
| ✓ | | DET. PATRICK H. RAFTIS / KING CO. POLICE | P | | | | | | 1 | | | |
| ✓ | | DET. AMY JAKBOE / KING CO. POLICE | P | | | | | | 1 | | | |
| ✓ | | DET. EDWARD HOPKINS / BOTHELL POLICE DEPT | P | A | F | A | F | | 5 | | | |
| | ✓ | ROBERT WESLEY SETZER JR * / 1111 W. 15TH / SPOKANE, WA. 99203 | P | | | | | 578 | 1 | 578 | 183 40 | MAR 29 1996 |
| ✓ | | OFF. MICHAEL JANASZ / KING CO. POLICE | | A | | | | | 1 | | | |
| | ✓ | DONNA L. BERUBE * / 6511 W. SNOQUALMIE VALLEY NE., CARNATION, WA. 98014 | | A | | | | 76 | 1 | 76 | 32 80 | MAR 29 1996 |
| | ✓ | BRIAN MICHAEL BERUBE * / 10509 71 AVE. CT. E. / PUYALLUP, WA. 98371 | | A | | | | 60 | 1 | 60 | 28 00 | MAR 29 1996 |

Page Total  (over)

POSTED 100F

DATED: 3/25/96 _____,19___.

Examined and Found Correct:

_____  91002/21063
                              D.P.A.

Approved and Allowed:

_____  5
                         JUDGE/Dept #

Witness Time Sheet and Cost Bill (WTTS) (JUV-WTSCB)          SC Form JO-107  1/86

# WITNESS TIME SHEET AND COST BILL
Criminal, Juvenile and Mental Illness



Page **2** of **4** Pages

State of Washington

vs.                    Plaintiff,

**IAN M. SIMMERS**   Defendant.   **1996**   No. **95-1-02102-2 SEA**

| Witness For | | Name / Address (Include Zip Code) | DATE(s) 3/12 | 3/14 | 3/15 | 3/18 | 3/19 | Miles Per R.T. | Number Of Trips | Total Miles | Total Amount Due | | Certificate Number |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| State | A-R | | | | | | | | | | | | |
| | ✓ | STEVEN JOHN LARRIER ✻ 31004 NE 132ND DUVALL, WA. 98019 | A | | | | | 58 | 1 | 58 | 27 | 40 | MAR 29 1996 |
| | ✓ | DAVID ARTHUR BERUBE ✻✓ 6511 W. SNOQUALMIE VALLEY RD. NE., CARNATION, WA 98014 | A | | | | | 76 | 1 | 76 | 32 | 80 | MAR 29 1996 |
| ✓ | | OFF. JOHN E. VALENTINO JR. BOTHELL POLICE DEPT | | P | | | | | 1 | | | | |
| ✓ | | DIANA C. PATTERSON ✻ 4114 FREMONT AVE. N. #6 SEATTLE WA 98103 | | P | | | | 10 | 1 | 10 | 13 | 00 | MAR 29 1996 |
| ✓ | | JEFFREY CRAIG DAVIS ✻ % KING CO. PROSECUTOR | | | A | | | 2 | 1 | 2 | 10 | 60 | MAR 29 1996 |
| ✓ | | REBECCA MINER ✻ P.O. BOX 1545 BRECKENRIDGE, CO. 80424 | | | | F | | | 1 | | 10 | 00 | MAR 29 1996 |
| ✓ | | LYNN DEAN KING CO. POLICE | | | | P | | | 1 | | | | |
| ✓ | | NORMAN JOHN THIERSCH KING CO. MEDICAL EXAMINER | | | | P | | | 1 | | | | |
| ✓ | | CAROLYN MILLER ✻ 11207 SE 235 PL. KENT WA 98031 | | | | | P | 36 | 1 | 36 | 20 | 80 | MAR 29 1996 |
| | | | | | | | | Page Total | | | (over) | | |

DATED: **3/25** ,19**96**.

Examined and Found Correct:

_Mahoney_     21063 / 91002
                       D.P.A.

Approved and Allowed:

_(signature)_ **5**
                       JUDGE/Dept #

# WITNESS TIME SHEET AND COST BILL
Criminal, Juvenile and Mental Illness

Page **3** of **4** Pages


State of Washington

vs.                    Plaintiff,

**IAN M. SIMMERS**    Defendant.  **1996**    No. **95-1-02102-2 SEA**

| Witness For State | A-R | Name / Address (Include Zip Code) | 3/19 | 3/20 | 3/21 | | | Miles Per R.T. | Number Of Trips | Total Miles | Total Amount Due | Certificate Number |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ✓ | | KEVIN SCOTT OLSEN ✻ ⁄₀ KING CO. PROSECUTOR ✓ | P | A | | | | 2 | 2 | 4 | 21 20 | MAR 29 1996 |
| ✓ | | OFF. MICHAEL B. JANASZ  KING CO. POLICE | | A | | | | | 1 | | | |
| ✓ | | DET. CLEMENT RUSK  KING CO. POLICE | | A | | | | | 1 | | | |
| ✓ | | TERRENCE McADAM  WA. ST. PATROL CRIME LAB | | A | | | | | 1 | | | |
| ✓ | | GLORIA GOCHANOUR ✻ ✓ 912 243RD. ST. SW, BOTHELL 98021 | | A | | | | 30 | 1 | 30 | 19 00 | MAR 29 1996 |
| ✓ | | DET. ROGER RUSNESS  SEATTLE POLICE DEPT | | P | | | | | 1 | | | |
| ✓ | | SANDRA WYATT ✻ 18305 SE NEWPORT WY. C201  ISSAQUAH WA. 98027 ✓ | | P | | | | 40 | 1 | 40 | 22 00 | MAR 29 1996 |
| ✓ | | CHIEF ROBIN HICKOK ✻ 250 5TH AVE. SO.  EDMONDS, WA 98020 ✓ | | | A | | | 34 | 1 | 34 | 20 20 | MAR 29 1996 |
| ✓ | | DONNA L. BERUBE ✻ 6511 W. SNOQUALMIE VALLEY/NE  CARNATION, WA 98014 ✓ | | | A | | | 76 | 1 | 76 | 32 80 | MAR 29 1996 |
| | | | | | | | | Page Total | | | (over) | |

DATED: **3/25** ,19**96**.

Examined and Found Correct:

_M. Mahoney_    9/002/2/06.3
                        D.P.A.

Approved and Allowed:

_A.M. Schindler_    **5**
                        JUDGE/Dept #

Witness Time Sheet and Cost Bill (WTTS) (JUV-WTSCB)    SC Form JO-107  1/86

51083084

# WITNESS TIME SHEET AND COST BILL
Criminal, Juvenile and Mental Illness

Page **2** of **4** Pages

State of Washington
vs.                              Plaintiff,

**IAN M. SIMMERS**     Defendant.  **1996**   No. **95·1·02102·2 SEA**

| Witness For State | A–R | Name / Address (Include Zip Code) | 3/12 | 3/14 | 3/15 | 3/18 | 3/19 | Miles Per R.T. | Number Of Trips | Total Miles | Total Amount Due | Certificate Number |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | ✓ | STEVEN JOHN CARRIER ✱ 31004 NE 132ND DUVALL, WA 98019 | A | | | | | 58 | 1 | 58 | 27 40 | MAR 29 1996 |
| | ✓ | DAVID ARTHUR BERUBE ✱✓ 6511 W. SNOQUALMIE VALLEY RD. NE., CARNATION, WA 98014 | A | | | | | 76 | 1 | 76 | 32 80 | MAR 29 1996 |
| ✓ | | OFF. JOHN E. VALENTINO JR. BOTHELL POLICE DEPT | | P | | | | | 1 | | | |
| ✓ | | DIANA C. PATTERSON ✱ 4114 FREMONT AVE. N. #6 SEATTLE WA 98103 | | P | | | | 10 | 1 | 10 | 13 00 | MAR 29 1996 |
| ✓ | | JEFFREY CRAIG DAVIS ✱ ℅ KING CO. PROSECUTOR | | | A | | | 2 | 1 | 2 | 10 60 | MAR 29 1996 |
| ✓ | | REBECCA MINER ✱ P.O. BOX 1545 BRECKENRIDGE, CO. 80424 | | | | F | | | 1 | | 10 00 | MAR 29 1996 |
| ✓ | | LYNN DEAN KING CO. POLICE | | | | P | | | 1 | | | |
| ✓ | | NORMAN JOHN THIERSCH KING CO. MEDICAL EXAMINER | | | | P | | | 1 | | | |
| ✓ | | CAROLYN MILLER ✱ 11207 SE 235 PL. KENT WA 98031 | | | | | P | 36 | 1 | 36 | 20 80 | MAR 29 1996 |
| | | | | | | | | | Page Total | | (over) | |

DATED: **3/25**                    ,19 **96**.

Examined and Found Correct:

Mahoney                    21063 / 91002
                                    D.P.A.

Approved and Allowed:

_[signature]_  **5**
                        JUDGE/Dept #

Witness Time Sheet and Cost Bill (WTTS) (JUV-WTSCB)          SC Form JO-107   1/86

51083084

# WITNESS TIME SHEET AND COST BILL
Criminal, Juvenile and Mental Illness

Page __4__ of __4__ Pages

_____ State of Washington _____
vs.                                    Plaintiff,

__IAN M. SIMMERS_____ Defendant.  1996   No. 95-1-02102-2 SEA



| Witness For | | Name | DATE(s) | | | | | Miles Per R.T. | Number Of Trips | Total Miles | Total Amount Due | | Certificate Number |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| State | A–R | Address (Include Zip Code) | 3/21 | | | | | | | | | | |
| | ✓ | DAVID BERUBE ✱ 6511 W. SNOQUALMIE VALLEY NE., CARNATION, WA. 98014 ✓ | A | | | | | 76 | 1 | 76 | 32 | 80 | MAR 29 1996 |
| | ✓ | KATHERINE GARMAN ✱ 23620 161 AVE. SE MONROE, WA 98272 ✓ | A | | | | | 58 | 1 | 58 | 27 | 40 | MAR 29 1996 |
| | ✓ | HOPE MARSTON 7540 15 SW SEATTLE, WA 98106 | A | | | | | | | | | | |
| | ✓ | BRYAN MICHAEL BERUBE ✱ 18505 71 AVE. CT. E. PUYALLUP, WA 98371 ✓ | F | | | | | 60 | 1 | 60 | 28 | 00 | MAR 29 1996 |
| | ✓ | DARRYL ALLEN CLOUD ✱ KING CO. JAIL ✓ | F | | | | | 2 | 1 | 2 | 10 | 60 | MAR 29 1996 |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | Page Total | | | | 572 | 80 | |

DATED: __3/25_____ ,19 96 .

Examined and Found Correct:                    Approved and Allowed:

_M. Mahoney_____          91002/31063          _A.M. Schindler_ 5
                                  D.P.A.                              JUDGE/Dept #

Witness Time Sheet and Cost Bill (WTTS) (JUV-WTSCB)        SC Form JO-107  1/86

# Exhibit F

Sub 100 A-C - Jury Verdict Forms

IN THE SUPERIOR COURT OF THE STATE OF
WASHINGTON FOR KING COUNTY



STATE OF WASHINGTON          )
                             )    No. 95-1-02102-2
            Plaintiff,       )
                             )    VERDICT FORM A
       vs.                   )
                             )
IAN MONROE SIMMERS           )
                             )
            Defendant.       )

    We, the jury, find the defendant IAN MONROE SIMMERS

_____Guilty_____ (write in not guilty or guilty) of the crime

of Murder in the First Degree as charged in count I.


_____
Presiding Juror

36

51083084

 



IN THE SUPERIOR COURT OF THE STATE OF
WASHINGTON FOR KING COUNTY

STATE OF WASHINGTON    )
                       )    No. 95-1-02102-2
              Plaintiff, )
                       )    VERDICT FORM B
       vs.             )
                       )
IAN MONROE SIMMERS     )
                       )
              Defendant. )
_____)

*not used*

We, the jury, find the defendant IAN MONROE SIMMERS

_____ (write in not guilty or guilty) of the crime

of Murder in the Second Degree (intentional murder) as charged in

count II.



_____
Presiding Juror


    We, the jury, find the defendant IAN MONROE SIMMERS

_____ (write in not guilty or guilty) of the crime

of Murder in the Second Degree (felony murder) as charged in

count II.



_____
Presiding Juror

  

IN THE SUPERIOR COURT OF THE STATE OF
WASHINGTON FOR KING COUNTY

FILED
KING COUNTY, WASHINGTON

MAR 28 1996

SUPERIOR COURT CLERK
BEVERLY ANN ENEBRAD
DEPUTY

| | |
|---|---|
| STATE OF WASHINGTON | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| IAN MONROE SIMMERS | ) |
| | ) |
| Defendant. | ) |

No. 95-1-02102-2

SPECIAL VERDICT FORM C

We, the jury, return a special verdict by answering as
follows:

Was the defendant Ian Simmers armed with a deadly weapon at
the time of the commission of murder in the first degree as
charged in count I?

ANSWER: __Yes__ (Yes or No)

_Ss Ween_
Presiding Juror

We, the jury, return a special verdict by answering as
follows:

Was the defendant Ian Simmers armed with a deadly weapon at
the time of the commission of murder in the second degree
(intentional murder) as charged in count II?

ANSWER: _____ (Yes of No)

_____
Presiding Juror

We, the jury, return a special verdict by answering as
follows:

Was the defendant Ian Simmers armed with a deadly weapon at
the time of the commission of murder in the second degree (felony
murder) as charged in count II?

ANSWER: _____ (Yes or No)

_____
Presiding Juror

37

# Exhibit G

Sub 113 - Judgment and Sentence

51083084

# SUPERIOR COURT OF WASHINGTON FOR KING COUNTY

**FILED**

STATE OF WASHINGTON )
                   Plaintiff, )
      v. )
IAN MONROE SIMMERS )
             Defendant. )

No. 95-1-02102-2

**JUDGMENT AND SENTENCE**

96 MAY 13  AM 7: 40

KING COUNTY
SUPERIOR COURT CLERK
SEATTLE, WA.

## I. HEARING

1.1 The defendant, the defendant's lawyer, ~~BECK LEIBAL~~ JOHN HICKS, and the deputy prosecuting attorney were present at the sentencing hearing conducted today.  Others present were:  _KATHLEEN JOHNSON, CCO_ _FAMILY & FRIENDS OF RODNEY GOCHANOUR & DEFENDANT ; ED HOPKINS, BOTHELL_

1.2 The state has moved for dismissal of count(s) _____

## II. FINDINGS

Based on the testimony heard, statements by defendant and/or victims, argument of counsel, the presentence report(s) and case record to date, and there being no reason why judgment should not be pronounced, the court finds:

2.1 CURRENT OFFENSE(S): The defendant was found guilty on (date): _3-25-96_____ by jury of:

Count No.: I           Crime: _MURDER 1ST DEGREE_
RCW _9A 32 030 1 A_      Crime Code _00124_
Date of Crime _3-10-95_      Incident No. _____

Count No.: _____      Crime: _____
RCW _____      Crime Code _____
Date of Crime _____      Incident No. _____

Count No.: _____      Crime: _____
RCW _____      Crime Code _____
Date of Crime _____      Incident No. _____
☐ Additional current offenses are attached in Appendix A.

SPECIAL VERDICT/FINDING(S):

(a) ☐ A special verdict/finding for being armed with a **Firearm** was rendered on Count(s): _____
(b) ☒ A special verdict/finding for being armed with a **Deadly Weapon** other than a **Firearm** was rendered on Count(s): _I_
(c) ☐ A special verdict/finding was rendered that the defendant committed the crimes(s) with a **sexual motivation** in Count(s): _____
(d) ☐ A special verdict/finding was rendered for Violation of the Uniform Controlled Substances Act offense taking place ☐ in a school zone ☐ in a school ☐ on a school bus ☐ in a school bus route stop zone ☐ in a public park ☐ in public transit vehicle ☐ in a public transit stop shelter in Count(s): _____
(e) ☒ **Vehicular Homicide** ☐ Violent Offense (D.W.I. and/or reckless) or ☐ Nonviolent (disregard safety of others)
(f) ☐ Current offenses **encompassing the same criminal conduct** and counting as one crime in determining the offender score (RCW 9.94A.400(1)(a)) are: _____

2.2 OTHER CURRENT CONVICTION(S):  Other current convictions listed under different cause numbers used in calculating the offender score are (list offense and cause number): _951058333 CT I-II ARSON 2 CT III-XII VEHICLE PROWL 1ST DEGREE_

C/PROC
CUST
CASH
JUDGE
DISG
CRIM
ACC
EXH

Rev 11/95 - JCC                     1     **40**

96 9 11965 8 JUDGMENT NUMBER

MAY 13 1996

COPY TO SENTENCING GUIDELINES COMMISSION   MAY 13 1996

CERTIFIED COPY TO COUNTY JAIL

POSTED

51083084

**2.3  CRIMINAL HISTORY:** Prior convictions constituting criminal history for purposes of calculating the offender score are (RCW 9.94A.360):

|     | Crime | Sentencing Date | Adult or Juv. Crime | Cause Number | Location |
|-----|-------|-----------------|---------------------|--------------|----------|
| (a) |       |                 |                     |              |          |
| (b) |       |                 |                     |              |          |
| (c) |       |                 |                     |              |          |
| (d) |       |                 |                     |              |          |

☐ Additional criminal history is attached in **Appendix B.**
☐ Prior convictions (offenses committed before July 1, 1986) served concurrently and counted as one offense in determining the offender score are (RCW 9.94A.360(6)(c)): _____
☐ One point added for offense(s) committed while under community placement for count(s) _____

**2.4  SENTENCING DATA:**

| SENTENCING DATA | OFFENDER SCORE | SERIOUSNESS LEVEL | STANDARD RANGE | ENHANCEMENT | TOTAL STANDARD RANGE | MAXIMUM TERM |
|-----------------|----------------|-------------------|----------------|-------------|----------------------|--------------|
| Count I | 12 | XIV | 411 TO 548 M | +12 MONTHS DW | 423 TO 560 MONTHS | LIFE AND/OR $50,000 |
| Count |  |  |  |  |  |  |
| Count |  |  |  |  |  |  |

☐ Additional current offense sentencing data is attached in **Appendix C.**

**2.5  EXCEPTIONAL SENTENCE:**
☐ Substantial and compelling reasons exist which justify a sentence above/below the standard range for Count(s) ____ _____. Findings of Fact and Conclusions of Law are attached in **Appendix D.** The State ☐ did ☐ did not recommend a similar sentence.

### III. JUDGMENT

IT IS ADJUDGED that defendant is guilty of the current offenses set forth in Section 2.1 above and Appendix A.
☐ The Court DISMISSES Count(s) _____

### IV. ORDER

IT IS ORDERED that the defendant serve the determinate sentence and abide by the other terms set forth below.

**4.1  RESTITUTION AND VICTIM ASSESSMENT:**
☐ Defendant shall pay restitution to the Clerk of this Court as set forth in attached **Appendix E.**
☐ Defendant shall **not** pay restitution because the Court finds that extraordinary circumstances exist, and the court, pursuant to RCW 9.94A.142(2), sets forth those circumstances in attached **Appendix E.**
☐ Restitution to be determined at future hearing on (Date) _June 25, '96_ at _8:30_ a.m. ☐ Date to be set.
  ☒ Defendant waives presence at future restitution hearing(s).

✓ *Defendant shall pay $100 Victim Assessment, pursuant to RCW 7.68.035.*

**4.2  OTHER FINANCIAL OBLIGATIONS:** Having considered the defendant's present and likely future financial resources, the Court concludes that the defendant has the present or likely future ability to pay the financial obligations imposed. The Court waives financial obligation(s) that are checked below because the defendant lacks the present and future ability to pay them.  Defendant shall pay the following to the Clerk of this Court:
(a)  ☐ $_____, Court costs; ☒ Court costs are waived;
(b)  ☐ $_____, Recoupment for attorney's fees to King County Public Defense Programs, 2015 Smith Tower, Seattle, WA 98104; ☒ Recoupment is waived (RCW 10.01.160);
(c)  ☐ $_____, Fine; ☐ $1,000, Fine for VUCSA; ☐ $2,000, Fine for subsequent VUCSA; ☐ VUCSA fine waived (RCW 69.50.430);
(d)  ☐ $_____, King County Interlocal Drug Fund; ☐ Drug Fund payment is waived;
(e)  ☐ $_____, State Crime Laboratory Fee; ☐ Laboratory fee waived (RCW 43.43.690);
(f)  ☐ $_____, Incarceration costs; ☐ Incarceration costs waived (9.94A.145(2));
(g)  ☐ $_____, Other cost for: _____

**4.3  PAYMENT SCHEDULE:** Defendant's **TOTAL FINANCIAL OBLIGATION** is: $ _100.00 + restitution if any_. The payments shall be made to the King County Superior Court Clerk according to the rules of the Clerk and the following terms:
☐ Not less than $_____ per month; ☒ On a schedule established by the defendant's Community Corrections Officer. ☐ : _____ The
Defendant shall remain under the Court's jurisdiction and the supervision of the Department of Corrections for up

51083084

4.4 **CONFINEMENT OVER ONE YEAR:** Defendant is sentenced to a term of total confinement in the custody of the Department of Corrections as follows, commencing: ☒ Immediately; ☐ (Date):_____ by _____ __.m.

_560_ months on Count _I_ _____ months on Count _____ _____ months on Count _____

_____ months on Count ___ _____ months on Count _____ _____ months on Count _____

**ENHANCEMENT** time due to special deadly weapon/firearm finding of _12_ months is included for Counts _I_ _____.

The terms in Count(s) No._____ are concurrent/consecutive
The sentence herein shall run concurrently/consecutively with the sentence in cause number(s) _____
_____ but consecutive to any other cause not referred to in this Judgment.

Credit is given for ☒ _____ days served ☒ days as determined by the King County Jail solely for conviction under this cause number pursuant to RCW 9.94A.120(15). — TO INCLUDE TIME IN JUVENILE DET. FROM 3/95+

4.5 ☒ **NO CONTACT:** For the maximum term of _Life_ _____ years, defendant shall have no contact with _____
Violation of this no contact order is a criminal offense under chapter 10.99 RCW and will subject a violator to arrest; any assault or reckless endangerment that is a violation of this order is a felony.

4.6 **BLOOD TESTING:** (sex offense, violent offense, prostitution offense, drug offense associated with the use of hypodermic needles) **Appendix G** is a blood testing and counseling order that is part of and incorporated by reference into this Judgment and Sentence.

4.7 **COMMUNITY PLACEMENT, RCW 9.94A.120(9):** Community Placement is ordered for any of the following eligible offenses: any "sex offense", any "serious violent offense", second degree assault, any offense with a deadly weapon finding, any CH. 69.50 or 69.52 RCW offense, for the maximum period of time authorized by law. All standard and mandatory statutory conditions of community placement are ordered.
☒ **Appendix H** (for additional nonmandatory conditions) is attached and incorporated herein.

4.8 ☐ **WORK ETHIC CAMP:** The court finds that the defendant is eligible for work ethic camp and is likely to qualify under RCW 9.94A.137 and recommends that the defendant serve the sentence at a work ethic camp. Upon successful completion of this program, the Department shall convert the period of work ethic camp confinement at a rate of one day of work ethic camp to three days of total standard confinement and the defendant shall be released to community custody for any remaining time of total confinement. The defendant shall comply with all mandatory statutory requirements of community custody set forth in RCW 9.94A.120(9)(b).
☐ **Appendix K** (for additional special conditions, RCW 9.94A.120(9)(c), is attached and incorporated herein.

4.9 ☐ **SEX OFFENDER REGISTRATION** (sex offender crime conviction): **Appendix J** is attached and incorporated by reference into this Judgment and Sentence.

4.10 ☐ **ARMED CRIME COMPLIANCE, CH. 129, Sec. 6, 1995 Laws.** The state's plea/sentencing agreement is [ ] attached [ ] as follows:_____

**The defendant shall report to an assigned Community Corrections Officer upon release from confinement for monitoring of the remaining terms of this sentence.**

Date:__6/10/96__                          Judge _Ann Schindler_
                                          Print Name: _ANN SCHINDLER_

Presented by:                             Approved as to form:
_O Mahoney 91006_                         _M. T. Hicks_
Deputy Prosecuting Attorney, Office WSBA ID #91002    Attorney for Defendant, WSBA # 13133
Print Name: _SUSAN MAHONEY_               Print Name: _John T. Hicks_

Rev 11/95 - BAS                    3                    42

F I N G E R P R I N T S



RIGHT HAND
FINGERPRINTS OF:

DEFENDANT'S SIGNATURE: _____
DEFENDANT'S ADDRESS: _K C JAIL_

IAN MONROE SIMMERS

DATED: _5/10/96_

JUDGE, KING COUNTY SUPERIOR COURT

ATTESTED BY:
M. JANICE MICHELS, SUPERIOR COURT CLERK
BY: _____
        DEPUTY CLERK

---

CERTIFICATE

I, _____,
CLERK OF THIS COURT, CERTIFY THAT
THE ABOVE IS A TRUE COPY OF THE
JUDGEMENT AND SENTENCE IN THIS
ACTION ON RECORD IN MY OFFICE.
DATED: _____

_____
            CLERK

BY: _____
        DEPUTY CLERK

PAGE 4 - FINGERPRINTS

OFFENDER IDENTIFICATION

S.I.D. NO.

DATE OF BIRTH: AUGUST 11, 1978

SEX: M

RACE: WHITE

43

# SUPERIOR COURT OF WASHINGTON FOR KING COUNTY

STATE OF WASHINGTON, )

              Plaintiff, )    NO. *95 · 1 · 02102 · 2*

           vs. )    APPENDIX G

*Ian Monroe / Simmers* )    ORDER FOR BLOOD TESTING
        Defendant. )    AND COUNSELING

(1) ☐ 4.4 **HIV TESTING AND COUNSELING**. (Required for defendants convicted of sexual offenses, drug offenses associated with the use of hypodermic needles, or prostitution related offenses committed after March 23, 1988):

    The Court orders the defendant contact the Seattle-King County Health Department and participate in human immunodeficiency virus (HIV) testing and counseling in accordance with Chapter 70.24 RCW. The defendant, if out of custody, shall promptly call Seattle-King County Health Department at 296-4848 to make arrangements for the test to be conducted within 30 days.

(2) ☒ 4.4 **DNA IDENTIFICATION TESTING**. (Required for defendants convicted of sexual offenses or violent offenses):

    The Court orders the defendant to cooperate with the King County Department of Adult Detention and/or the State Department of Corrections in providing a blood sample for DNA identification analysis. The defendant, if out of custody, shall promptly call the King County Jail at 296-1226 between 8:00 a.m. and 1:00 p.m., to make arrangement for the test to be conducted within 15 days.

If both (1) and (2) are checked, two independent blood samples shall be taken.

Date: _5 10 96_

Presented by:

_____
Deputy Prosecuting Attorney

_____
JUDGE, King County Superior Court

_____
Attorney for Defendant

_____
Defendant

1    **46**

# SUPERIOR COURT OF WASHINGTON FOR KING COUNTY

STATE OF WASHINGTON,                )
        Plaintiff,                          )   NO. *95·1·02102·2*
                           )
    vs.                                 )   APPENDIX G
                           )   ORDER FOR BLOOD TESTING
*Jan Monroe / Simmers*          )   AND COUNSELING
          Defendant.                  )

(1) ☐ 4.4  **HIV TESTING AND COUNSELING**.  (Required for defendants convicted of sexual offenses, drug offenses associated with the use of hypodermic needles, or prostitution related offenses committed after March 23, 1988):

    The Court orders the defendant contact the Seattle-King County Health Department and participate in human immunodeficiency virus (HIV) testing and counseling in accordance with Chapter 70.24 RCW.  The defendant, if out of custody, shall promptly call Seattle-King County Health Department at 296-4848 to make arrangements for the test to be conducted **within 30 days**.

(2) ☒ 4.4  **DNA IDENTIFICATION TESTING**.  (Required for defendants convicted of sexual offenses or violent offenses):

    The Court orders the defendant to cooperate with the King County Department of Adult Detention and/or the State Department of Corrections in providing a blood sample for DNA identification analysis.  The defendant, if out of custody, shall promptly call the King County Jail at 296-1226 between 8:00 a.m. and 1:00 p.m., to make arrangement for the test to be conducted **within 15 days**.

If both (1) and (2) are checked, two independent blood samples shall be taken.

Date: _5|10|96_

Presented by:

_____
Deputy Prosecuting Attorney

_____
JUDGE, King County Superior Court

_____
Attorney for Defendant

_____
Defendant

# Exhibit H

Post-Trial Hearing Transcripts
(VRP 11/4- 12/9/1997; 11/6/1997)

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

IN AND FOR KING COUNTY AT KENT

STATE OF WASHINGTON,               )
                                   )
                  Plaintiff,       )
                                   )   COA No. 38620-4-I
          vs.                      )   No. 95-1-02102-2
                                   )
IAN SIMMERS,                       )
                                   )   ▭  © Ⓞ ℗ 𝕐  ▭
                  Defendant.       )
                                   )

Verbatim Report of Proceedings
from Electronic (Videotape) Record

CRIMINAL MOTION HEARING - 11/4 - 12/9/97
Before The Honorable ANN SCHINDLER, Judge

COUNSEL OF RECORD ON APPEAL:

        For the Appellee:   KING COUNTY PROSECUTING ATTORNEY
                            Juvenile Division
                            1211 East Alder
                            Seattle, Washington  98122


        For the Appellant:  SUZANNE LEE ELLIOTT
                            1300 Hoge Building
                            705 Second Avenue
                            Seattle, Washington  98104


TRANSCRIPTIONIST:  Laurie K. Snell

**F**inal **D**raft
SUPPORT SERVICES
Lynnwood, Washington • (425) 775-1064

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

IN AND FOR KING COUNTY AT KENT

| | |
|---|---|
| STATE OF WASHINGTON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 95-1-02102-2 |
| vs. ) | |
| ) | |
| IAN SIMMERS, ) | |
| ) | |
| Defendant. ) | |

Verbatim Report of Proceedings
from Electronic (Videotape) Record

CRIMINAL MOTION HEARING

Before The Honorable ANN SCHINDLER, Judge

November 4 - December 9, 1997

--oOo--

APPEARANCES OF COUNSEL:

        For the Plaintiff:   SUSAN MAHONEY, D.P.A.
                             King County Prosecuting Attorney
                             W554 King County Courthouse
                             516 Third Avenue
                             Seattle, Washington  98104


        For the Respondent:  SUZANNE LEE ELLIOTT
                             1300 Hoge Building
                             705 Second Avenue
                             Seattle, Washington  98104


            For Witness
            Kevin Olson:     COUNSEL MS. RAMEY

1           KING COUNTY SUPERIOR COURT TUESDAY, NOVEMBER 4, 1997

2                              9:58 A.M.

3                              --o0o--

4

5                         (Defendant and respective

6                          counsel present.)

7                         (Defendant's Exhibits 1, 2 and

8                          3 marked for identification.)

9                MS. MAHONEY:  Your Honor, this is State of

10   Washington versus Ian Simmers, 95-1-07832-6; Susan

11   Mahoney for the State of Washington.  Ms. Suzanne Elliott

12   is here on behalf of Mr. Simmers, who is present in

13   court.

14                Your Honor, we are here today for a

15   Defense motion for a new trial.  We do have testimony

16   available, and the State has potential witnesses,

17   depending on how the evidence develops and what

18   Ms. Elliott puts before the Court to respond to.

19                I would like the Court to know that

20   Mr. Olsen is in the courthouse.  He is with two

21   plainclothes Bellevue detectives.  Detective Hopkins is

22   also here.  We have apprised the jail officers of the

23   situation.  He is changing his clothes right now and will

24   be here shortly.

25                Ms. Nave is here to testify.  Ms. Elliott

1    would like to call her.  The State would also have

2    questions for her.  Ms. Nave, so that the Court is aware,

3    was the early plea unit deputy who handled Mr. Olsen's

4    plea agreement on his PSP charge.  And as we did discuss

5    last spring, it had looked, and the State did concede,

6    that Ms. Elliott had made enough of a showing to at least

7    deal with that aspect.

8                    Ms. Nave has interviews back in Seattle at

9    1:15.  I know that Ms. Elliott still needs to interview

10   Mr. Olsen, because she didn't know where he was; as the

11   Court is well aware, he is in protective custody.  And

12   Mr. Ernsdorff is also here to be interviewed but needs a

13   waiver [from] Mr. Olsen.

14                    I am telling the Court this because what I

15   would ask is, could we please take testimony from

16   Ms. Nave first -- I believe this is okay with Ms. Elliott

17   -- and then deal with the Olsen-Ernsdorff aspects, so

18   that we can get Ms. Nave out of here.

19                    THE COURT:  Is that agreeable?

20                    MS. ELLIOTT:  That's agreeable, Your

21   Honor.  I was not necessarily going to call Ms. Nave.  If

22   the State wants to put her on, that's fine at this point.

23   I do have one question, depending upon what she testifies

24   to.

25                    The other problem I have is that Mr. Hicks

1    was to be a witness for -- my first witness, quite

2    frankly -- for the motion for new trial.  And I called --

3    I stopped by his office, actually, yesterday to drop off

4    the latest motions and materials.  And I was informed by

5    his receptionist that he was at his mother's funeral,

6    which --

7                    So, I asked him to call me at home last

8    night; I didn't get a call.  I left a voice message and

9    a written message, and I haven't heard from him.  I think

10   he lives in Seattle, but I don't know where his mother's

11   funeral was, quite frankly.  So, it may be that we will

12   have to come back briefly later in the week for his

13   testimony.  I guess I was certain that you wouldn't order

14   him to come in today if he is at proceedings for his

15   mother's funeral.  Thank you.

16                    THE COURT:  I would not.

17                    So, as I understand it, there is no

18   objection to calling Ms. Nave out of order, and this

19   would be the State's witness?

20                    MS. MAHONEY:  May I ask for a -- this is

21   Ms. Elliott's motion.

22                    THE COURT:  It is.

23                    MS. MAHONEY:  I know that she is putting

24   forth a plea agreement and a plea.  I think that, as I

25   argued last spring under the Bandura (phonetic) case, the

CRIMINAL DEFENSE MOTION                              -5-
    Preliminary Comments

1  burden is on Ms. Elliott to put forth --

2              THE COURT:  It is.

3              MS. MAHONEY:  -- competent evidence;

4  however, I think that, based on this, I would just as

5  soon call her and clear it up, so.

6              THE COURT:  That was the sense I got.

7              MS. MAHONEY:  Okay.  So, yes, I guess she

8  is my witness, then.  But this is what I am responding

9  to --

10             THE COURT:  Right.

11             MS. MAHONEY:  -- were those allegations.

12             THE COURT:  Right.  Had Ms. Elliott gone

13 first and had she not called Ms. Nave, you would have, if

14 she had put these into evidence somehow?

15             MS. MAHONEY:  Yes.  And I have no

16 objection to these being in evidence.

17             THE COURT:  All right.

18             MS. ELLIOTT:  Thank you, Your Honor.

19             THE COURT:  All right.  Ms. Nave.

20

21                 MARGARET NAVE,

22 called as a witness for the State, being first duly sworn

23 or affirmed to tell the truth, was examined and testified

24 as follows:

25

1          THE COURT:  Before you begin, for

2     purposes of the record, so that we are clear for any

3     appellate record:  Ms. Elliott, why don't you outline the

4     basis for the motion for new trial, so that we can put

5     the --

6          MS. ELLIOTT:  Certainly, Your Honor.

7          THE COURT:  -- the evidence in the

8     context of that.

9          MS. ELLIOTT:  Well, as you know, and as

10    you -- we did receive a letter back saying that we were

11    present today for Mr. Simmers' motion to withdraw his

12    guilty plea.  I --

13         THE COURT:  And that is --

14         MS. ELLIOTT:  -- know the --

15         THE COURT:  -- incorrect.

16         MS. ELLIOTT:  -- Court knows that is

17    incorrect.

18         THE COURT:  It's a motion for new trial.

19         MS. ELLIOTT:  And you listed in that

20    letter the materials that had been submitted by me.  I

21    have both the motion for new trial filed in the spring,

22    as well as some supplemental facts and authorities in my

23    motion.

24          I believe I have made a showing, absent

25    any testimony at all, that in this case the State

1   withheld from Mr. Hicks evidence that, between the period

2   of time of December 7, 1995, and the time that he

3   testified, Mr. Olsen -- now Carpenter -- had an

4   additional five criminal investigations which were filed

5   with the Prosecutor's Office, one of which he was clearly

6   arrested for on February 28, 1996, and which were not

7   disclosed to Defense Counsel.

8           Those are important in this case.  That

9   Brady violation alone is sufficient to order a new trial

10  here, because the State moved and you granted the motion

11  at the original trial, which is contained in the March 20

12  and 21 transcripts, to prohibit Mr. Hicks from

13  questioning Mr. Olsen about the intervening period.

14          It is relevant because, when he was

15  released on December 7, 1995, there was an in-camera

16  release hearing, and Mr. Olsen was released on his

17  personal recognizance, despite the fact that he had

18  fifteen or so prior felonies and he had agreed to obey

19  all laws and order of the court and made a promise to

20  appear -- two relevant broken promises on the part of

21  Mr. Olsen in terms of his credibility and bias in

22  testifying in this case.

23          And because the State knew about those and

24  in addition moved to prohibit him from testifying about

25  that intervening period at the time of this trial, the

State v. SIMMERS/95-1-02102-2.SEA          11/4/97

1    jury was not informed about those broken promises.

2    Mr. Olsen was permitted to lie on the stand and state

3    that he was being held only on the possession of stolen

4    property charge, when in fact he had been arrested on the

5    2/28 bad check charge.

6              And he was permitted to testify -- and

7    Mr. Hicks, of course, not having the intervening facts,

8    couldn't cross-examine him -- but he was permitted to

9    testify that -- and I think I have a quote here from the

10   transcript -- that in this case, in November 1995, he

11   informed on Mr. Simmers because he felt "compelled as

12   kind of a token for things I have done in the past, and I

13   thought for myself this might make a difference to

14   myself." And having informed for that reason, he then

15   proceeded into the community and committed at least five

16   further violations of the law.

17             Finally, there was a considerable debate

18   about whether or not Mr. Olsen was withdrawing from

19   heroin at the time that he was interviewed on March 4.

20   And the State insisted that that was not a fact, and

21   there was a good deal of question about a foundation to

22   be laid for whether or not he was withdrawing from heroin

23   at that time.

24             Had Mr. Hicks been informed about

25   Mr. Olsen's crime spree, I guess you might say, during

1   the intervening period of time, there would have been a

2   foundation to examine him as to why he needed to steal

3   and burglarize and cash checks and use credit cards that

4   belonged to others in order to get cash.  And I think

5   that would have been at least some supporting evidence

6   that he still had a raging heroin habit at the time and

7   probably would have substantiated the notion that he was

8   high or was using at the time that he was arrested on

9   February 28, 1996, and likely suffering from withdrawal

10   at the time of the interview on March 4.

11          There are additional matters that I

12   believe that I need to examine Mr. Olsen about, but in

13   particular is Mr. Olsen's continued assertion that he

14   received nothing for his testimony in this case.  The

15   notes of the Prosecutor's Office now indicate that

16   Ms. Nave agreed to recommend low end.  Mr. Olsen lied

17   about that on the stand; he said there had never been

18   any agreement in the PSP case about any recommendation.

19   That's the 1995 PSP case.

20          He continued to insist that he never

21   received anything for testifying in Thompson.  The DOC

22   records, which were later provided to me by the

23   Prosecutor's Office, indicate that shortly after

24   testifying against Mr. Thompson, the DOC noted that there

25   was a large sum of money placed on his books at the

1  institution, which he frittered away.  I think I should

2  be allowed to inquire about that, since it is

3  contradictory to what he testified in this trial.

4              I can get to the law later in terms of the

5  State's protestations about this, but those are the basic

6  -- I have a <u>Brady</u> issue and a <u>Naypu</u> (phonetic) issue.  On

7  <u>Brady</u>, I do have a bit of a burden of proof, not a very

8  high one.  On <u>Naypu</u>, I think the case is clear.  If he

9  lied, Mr. Simmers is entitled to a new trial,

10 particularly if he lied and the State did not

11 immediately take steps to clarify his untruths.  Thank

12 you.

13              THE COURT:  Ms. Mahoney.

14

15                    DIRECT EXAMINATION

16 BY MS. MAHONEY:

17     Q.   Ms. Nave, could you please state your full name

18 and your occupation for the record.

19     A.   My name is Margaret Elsie Nave.  I work at the

20 King County Prosecutor's Office, where I am a senior

21 deputy prosecuting attorney.

22     Q.   And back in November of 1995 what was your

23 position at the office?

24     A.   In November of 1995 I was a deputy working on

25 the early plea unit of our office.

1    Q.   How long have you been a prosecutor?

2    A.   Since 1991.

3    Q.   And your duties with the early plea unit --

4  what are they, or what were they?

5    A.   The early plea unit of the Prosecutor's Office

6  is a unit that is specifically set up to negotiate cases

7  prior to case setting, after a trial date -- before a

8  trial date is picked in a case or taken in a case, there

9  is a case-setting hearing, at which point the defendant

10  is supposed to indicate that he is willing to plead

11  guilty or go to trial.  Prior to case setting, the early

12  plea unit reviews all of the cases to -- if appropriate,

13  to negotiate them.

14    Q.   And how are the tasks broken up in the office?

15  How many plea negotiators were there in that unit?

16    A.   I think there were three at that time.

17    Q.   And how did you break them up?

18    A.   By alphabet.

19    Q.   Okay.  Mr. Kevin Olsen -- were you responsible

20  for the part of the alphabet at that time that contained

21  the letter "O"?

22    A.   I was.

23    Q.   Okay.  Is that how you came into contact with

24  the case against Mr. Kevin Olsen?

25    A.   Yes.  The way we get the cases for early plea

1    is that all of the cases that are set for case setting

2    for the next day arrive in our office the afternoon

3    before case setting.  That's before the first case

4    setting.  That's the first time that we have any contact

5    with any case.  Mr. Olsen's case was just one of the

6    cases that was in my stack for the first case setting.

7         Q.   All right.  And this case -- I am referring to

8    Cause No. 95-1-07832-6 -- is that a cause number for a

9    charge on possession of stolen property in the second

10   degree?

11        A.   It is.

12        Q.   And what is the alleged offense date in that

13   case?

14        A.   I have to look at the cert.  It should be; I

15   don't know why it's not.  And it may be that I am just

16   not seeing it here.  The 11th of November 1995.

17        Q.   The 11th of November?

18        A.   Yeah.

19        Q.   And when was his first case setting date set?

20        A.   His first case setting, according to the front

21   of the file -- the way case settings are kept track of,

22   are they are indicated on the front of the file.  And

23   apparently the first case setting was on the -- let me

24   just double-check -- it was set for the 27th of November.

25        Q.    All right.  Prior to that first case-setting

CRIMINAL DEFENSE MOTION
  NAVE - Direct                                          -13-

1    hearing -- or, actually, ever throughout this case, did

2    you ever have any personal contact with a Mr. Kevin

3    Olsen?

4          A.    No.

5          Q.    Who did you discuss his case with?

6          A.    With his attorney.

7          Q.    And who was that at the time?

8          A.    I should clarify that.  I actually didn't talk

9    to anybody on the 27th of November.  Apparently, case

10   setting was continued, and I got the case for the first

11   time on the 18th of December.

12         Q.    On the 18th of December.

13         A.    Right.  Well, that was for case setting on

14   the 18th of December, and I talked with his attorney,

15   Mr. Gary Ernsdorff.

16         Q.    All right.  And do you have any notes that

17   reflect what the first date that you talked with

18   Mr. Ernsdorff was?

19         A.    Well, I wrote in my notes the content of the

20   conversation.  I didn't actually talk -- I didn't say

21   that I spoke with him, but I clearly remember speaking to

22   him on the day that I wrote these notes.  And my notes

23   indicate it was the 18th of December.

24         Q.    All right.  Now, prior to speaking with

25   Mr. Ernsdorff on the 18th of December, did you ever have

1    any conversations with me about Mr. Olsen's case?

2        A.    No.

3        Q.    Would you have had any indications, in that

4    file or from any other information, that I would at all

5    be interested -- and I am speaking of myself, Susan

6    Mahoney -- in Mr. Olsen's case?

7        A.    No.  On the 18th of December, the only thing

8    that I had indicating anybody being involved with this

9    case in terms of prosecutors, was Michael DiJulio, who

10   signed the original recommendation, and then the filing

11   deputy, whose initials I recognize, and that's David

12   Ryan (phonetic).

13       Q.    All right.  Now, when you spoke with

14   Mr. Ernsdorff on that day, did he give you any

15   information that involved myself?

16       A.    Yes.

17       Q.    And what did he tell you, to the best of your

18   recollection?

19       A.    Mr. Ernsdorff came into my office.  The way

20   negotiations work in EPU is the defense attorneys come

21   and negotiate just whenever they show up.  And he came

22   sometime during the day -- I don't have any memory of

23   that -- and told me that he -- that Mr. Olsen was

24   apparently a witness in a case that you had; that it was

25   a murder case, and that he had been discussing with you

1    the possibility of dismissing this case for testimony

2    [unintelligible].

3        Q.    And what did you do in response to the

4    information that Mr. Ernsdorff gave you?

5        A.    Well, when a defense attorney comes into my

6    office at EPU, or when they did at EPU, part of the

7    policies -- well, first off, we hear a lot of things, and

8    especially when someone says, "I have talked to another

9    prosecutor; she is interested in dismissing this case

10   for testimony," the first thing I needed to do is verify

11   if that was true.  And --

12       Q.    And how did you do that?

13       A.    I called you up.  You were not there that day;

14   you were at home.  I found that out -- I probably talked

15   to my secretary about that; I don't remember how I found

16   that out -- and called you at home.  I kicked

17   Mr. Ernsdorff out of my office and closed the door,

18   because I wanted to find out, number one, if this was

19   true.  That was just really the first step.  If in fact

20   there had been some sort of discussions about that, I

21   wouldn't have had any authority to do anything with this

22   case in exchange for testimony.  It would have gone up

23   the chain, certainly to my boss, Marilyn Nowogroski and

24   then further on up to someone in trial teams, clear up to

25   the front office, if such an arrangement actually

1    existed.  But I called you up on the phone.

2         Q.   All right.  And do you recall our conversation?

3         A.   I definitely recall our --

4         Q.   And why --

5         A.   -- conversation.

6         Q.   -- do you definitely recall our conversation?

7         A.   Because you were very upset.

8         Q.   To the best of your recollection, would you

9    please tell the Court what our conversation was.

10        A.   I called you and talked to you on the phone,

11   and I told you that Gary had come into the office on this

12   guy, Kevin Olsen, and said that you and he had worked out

13   a deal.  I don't remember the exact words that I said to

14   you, but the information I got from Gary gave me the

15   clear impression that he and you -- or, he was telling me

16   that he and you had been working out some sort of deal in

17   exchange for testimony, and I wanted to verify if this

18   was true and what should be the next step if in fact it

19   was true.

20             And you -- your reaction was very, very

21   negative.  You were pretty angry and said something to

22   the effect of "Why on earth would I ever do that?  That's

23   absolutely not true."  You were very emphatic and made it

24   very clear to me that that was not the case at all and

25   that I should not make any -- not take the fact that

1    Mr. Olsen was going to testify in any case that you had

2    into consideration in anything that I did with this case.

3           You also said, "Don't agree" -- "Should he plea

4    to this case, don't agree to release him pending

5    sentencing," and you were very emphatic about that as

6    well.  You were pretty angry.

7        Q.   Okay.  And so, at that point in time did you

8    in any way give or make any deal with Mr. Ernsdorff

9    regarding Mr. Olsen's case, based on the fact that he

10   would be testifying?

11       A.   No.  The original recommendation -- as I said,

12   what happens to these cases is, they go -- I think I said

13   -- they go through Michael DiJulio in our office for a

14   preliminary review before they come to EPU.  And he,

15   Mr. DiJulio, had --

16              MS. ELLIOTT:  I'll object to anything

17   Mr. DiJulio said as hearsay.

18              THE COURT:  Sustained; it's hearsay.

19              MS. MAHONEY:  Your Honor, since this is a

20   post-trial fact-finding hearing, I would submit that

21   there is a relaxed rule of evidence here regarding

22   hearsay.  And in addition, I am not necessarily offering

23   it for the truth of the matter asserted, but why Ms. Nave

24   would do what she did next.  I think it's important --

25              THE COURT:  She can testify why she did

1    what she did next without [unintelligible].

2                 MS. MAHONEY:  Okay.

3                 THE WITNESS:  Okay.  May I?

4                 MS. MAHONEY:  Yes.

5         A.   All I did next was leave the recommendation

6    that was in the file, which was for a 22-month

7    recommendation, the way it was.  I did not make that

8    original recommendation.  There was a plea form -- there

9    was a prosecutor's plea recommendation in my file that

10   was there when I got the case that said 22 months of

11   confinement.

12                Mr. Olsen's standard range -- he had an

13   offender score of ten; he was maxed out on this charge --

14   he was looking at 22 to 29 months.  So, there was a

15   low-end rec in the file.  I told Mr. Ernsdorff, "I will

16   leave this rec where it is; that's all I am doing.  I am

17   not doing anything.  I don't even want to know anything

18   about that murder trial."  And in fact I didn't get any

19   more information about it.

20        Q.   Okay.  Now, on the 18th of December, in

21   addition to leaving the low-end rec --

22                Let me ask you, Ms. Nave:  How long had you

23   been working in EPU at that point?

24        A.   I think I started in April.  I started

25   certainly before summer of 1995.  I was afraid you would

1    ask me that, and I can't really remember.

2         Q.   And how many files do you think that you review

3    typically during a week?

4         A.   During a week?  It would not be uncommon to

5    review 30 cases a day.  So, what's thirty -- 150.

6         Q.   So, hundreds of cases in the time that you had

7    been there previously -- prior to December 18, you had

8    reviewed hundreds of cases?

9         A.   Right.

10        Q.   And as a matter of policy in our office and

11   standard procedure, does Mr. DiJulio make all the

12   initial recommendations?

13        A.   Yes, unless it's a preassigned case.

14        Q.   Okay.  Was this a preassigned case?

15        A.   No; I wouldn't get a preassigned case.

16        Q.   All right.  And was the low-end rec -- based on

17   your experience and your review of those hundreds of

18   files, was that out of the norm?

19        A.   No; that's sort of the purpose of EPU.

20        Q.   What's that?

21        A.   The point of EPU is to negotiate and get pleas

22   at case setting, rather than have cases be set for trial.

23   It's an attempt to clear at least some of these cases

24   that should be pleas out.

25        Q.   So, even with someone with an offender score of

1    10 on a PSP, was it surprising to you to see a low-end

2    rec?

3        A.    No.

4        Q.    Is that typical?

5        A.    Yes.  It was pretty typical to give a low-end

6    rec off of EPU.

7        Q.    All right.  Now, following that December 18

8    conversation with Mr. Ernsdorff, when did you next see

9    this file?

10       A.    Can I look at the file.

11            The next time I saw the file was on the 7th of

12   March.

13       Q.    Okay.  Do you know why?

14       A.    Because it came to me for case setting in my

15   stack of files for that day, for case setting on the 7th

16   of March.  I may have looked at it on the 6th, but my

17   note in here is the 7th.

18       Q.    Do you have any indication of what happened to

19   this case-setting date in December?

20       A.    Yes.  He failed to appear on the 18th of

21   December, and a bench warrant was issued.

22       Q.    Okay.  Now, on the 7th of March, who did you

23   speak with again?  I'm not sure I --

24       A.    Yeah; I spoke with Mr. Ernsdorff again.

25       Q.    Okay.  And at that point, during your contacts

1    with him in March, did you ever speak with me about this

2    case again?

3         A.   No.

4         Q.   Other than that December 18 date, did

5    Mr. Olsen's testimony in Mr. Simmers' case ever come up

6    again, from myself, Mr. Ernsdorff or anybody else?

7         A.   Certainly not from you.  I have -- no.  I do

8    not remember ever discussing it again.  After the initial

9    conversation with you on the phone, when I brought Gary

10   back into the office, I said, "No way.  This is not going

11   to be" -- "We're not going to dismiss this case for any

12   kind of deals for testimony.  Susan says it's not what

13   she and you were discussing."  And I made it pretty clear

14   to Gary that I wasn't interested in talking about that

15   anymore.  If in March -- I have no memory whatsoever of

16   Gary mentioning it to me again.  I don't know whether he

17   said something in passing.  We definitely did not discuss

18   the case.

19        Q.   Okay.  And when you say "discussed the case,"

20   are you referring to Mr. Simmers' case?

21        A.   I'm referring to the case that you had.  I

22   didn't even know the name of the case --

23        Q.   Okay.

24        A.   -- the murder case.

25        Q.   Would you at any point have had any authority

CRIMINAL DEFENSE MOTION
     NAVE - Direct                                    -22-

1    whatsoever to give Mr. Olsen a deal based on his

2    willingness to testify in my case?

3        A.    No.

4        Q.    And did anyone ever give you that authority?

5        A.    No.

6        Q.    Did you ever give Mr. Olsen a deal?

7        A.    Did I give him a deal in exchange for

8    testifying?

9        Q.    In exchange for testimony; I'm sorry --

10       A.    No.

11       Q.    -- I should have been more clear.

12            Now, if you could, you started dealing with

13   this case on the 7th of March.  And isn't it true that

14   there are a few entries after that time in that file

15   regarding Mr. Olsen's '95 PSP case?

16       A.    Regarding the case that he was charged with --

17       Q.    Right.

18       A.    -- the original charge?  Yeah; there was

19   actually -- I did --

20       Q.    Could you please just --

21       A.    -- did work on the case.

22       Q.    -- for saving time, go through the dates that

23   you had contact with that file and summarize for the

24   Court what you did with that file and why.

25       A.    Yeah.  Well, on the 7th of March, after it got

CRIMINAL DEFENSE MOTION
  NAVE - Direct                                    -23-

1    back on for case setting -- and I don't really know why

2    it was back on for case setting on the 7th of March; I

3    can guess that he got picked up on the warrant, but I

4    don't know -- Mr. Ernsdorff came in and told me that he

5    had -- that Mr. Olsen had another case out there. And

6    that's very typical; defense attorneys often find out

7    from their clients things about pending charges before

8    the prosecutor does. And usually it's typical in EPU for

9    the defense attorney to want to consolidate cases at the

10   time of negotiating, so that they don't catch up at some

11   point later.

12           So, Gary came in and said, "He's got another

13   charge out there." And I said, "Well, let me see what I

14   can find out." And I gave the file to my paralegal,

15   Lori Bridgewater. I did that on -- he came in on

16   the 7th. I don't know when I gave it to Lori, but

17   there's a note from Lori in the file saying that she did

18   check to see what was out there on the 11th, and I got

19   the case back in on the 14th. And by the 14th --

20       Q.   And we're talking March of '96 --

21       A.   March --

22       Q.   -- is that correct?

23       A.   -- of '96, right. On the 14th, all I knew was

24   notes from Lori. Lori had said that she had checked to

25   see if there were any cases that were LODI'ed in, which

1    means filed with our office, other than the charge --

2    this current charge, the PSP that I was working on, the

3    95-1-07832 case.

4        Q.    Uh-huh.

5        A.    And the note from Lori indicated no; that he

6    was picked up on an FTA on a PSP-2 charge from this

7    case.  Booking history does not indicate anything

8    pending.

9        Q.    Okay.  But also did she make a note that he had

10   been arrested on certain things, though, in addition;

11   that the investigation should have said something

12   different?

13       A.    No; not in this note from her.

14       Q.    Okay.  Can I -- you are referring to the file;

15   is that correct?

16       A.    Right.

17       Q.    (Indicating)

18       A.    Oh, yeah; I beg your pardon.  There is a

19   little note off to the side from her.  It says with the

20   FTA on a PSP, and it was booked on three counts of

21   investigation of fraud.

22       Q.    Okay.  Now, after you saw that note from Lori

23   on the 14th of March, what did you do?

24       A.    Well, Mr. Ernsdorff came in, and I said to him

25   that I needed to check out these other cases.  He wanted

1   to work out some sort of deal consolidating these two

2   cases.

3       Q.   Is that unusual?

4       A.   Very, very typical; not unusual at all.  In

5   fact, I think that that was sort of the point of

6   negotiating.  It was very common for defense attorneys

7   wanting to clear up everything at once.  I heard it three

8   times a week.  A defense attorney would come in, have

9   found some information from his client, saying, "I know I

10  got arrested on something else three months ago.  That

11  case is probably going to show up."  And the defense

12  attorney would come in and say, "Can we just deal with

13  these all at once?"

14          That usually caused continuances of case

15  settings, so that we could try and find these other

16  cases.  But Lori had already checked, and there was

17  nothing LODI'ed in, nothing that had been sent in to our

18  office --

19      Q.   So, as of --

20      A.   -- but I did talk to him.

21      Q.   -- March 14, 1995 (sic), what was actually

22  pending against Mr. Olsen in our office?

23      A.   Just this charge.

24      Q.   All right.

25      A.   And it was --

1        Q.   PSP --

2        A.   -- 1996.

3        Q.   -- '95.  The '95 PSP --

4        A.   Right.

5        Q.   -- was all that was pending against Mr. Olsen?

6        A.   Right.

7        Q.   All right.  Now, after that -- after the 14th

8    of March, did you contact the detective?

9        A.   Yes.  What I did was try and figure out what

10   these other pending charges might be.  And I found out

11   from my paralegal what he had been booked on -- what

12   Mr. Olsen had been booked on.  And so, I called the

13   police and tried to get copies of those cases.

14       Q.   And did you receive copies?

15       A.   I did.  I did receive copies.

16            MS. MAHONEY:  All right.  I am going to

17   ask that this be marked as an exhibit.

18                              (State's Exhibit 4 marked

19                               for identification.)

20       Q.   I'm showing you what has been marked as State's

21   Exhibit 4.  Are these the reports that you received?

22       A.   Yes.

23       Q.   And there's a fax date up there.  What day did

24   you receive those?

25       A.   The 19th of March 1996.

1    Q.   And who did you receive those from?

2    A.   [It's missing.]

3              MS. ELLIOTT:  Excuse me, Your Honor.

4              MS. MAHONEY:   It's this group right here.

5              MS. ELLIOTT:  Are these all of the police

6    reports stapled together?

7              MS. MAHONEY:  Just these.

8              THE COURT:  I don't know.  Would you like

9    to look at the exhibit?  I don't know if --

10             MS. ELLIOTT:  I don't know.  I have five

11   different numbers, but they could have all been stapled

12   together.

13             THE COURT:  Ms. Mahoney, if you could

14   provide that to [Counsel].

15             MS. ELLIOTT:  Okay.  I have got it now,

16   Your Honor.  Thank you.

17   A.   I don't know exactly who I received these

18   from.  I actually -- in looking at the notes, I think I

19   may have gotten them from Lori, the paralegal.  I think

20   she called SPD and asked for the incident numbers that

21   he had been booked on, and they were faxed, and she gave

22   them to me.  I don't remember talking to a detective on

23   the 14th of March regarding these cases.

24   Q.   Okay.  When you received those on the 19th of

25   March 1996, were those LODI'ed cases into our office, or

1    did you just receive those copies from Seattle Police at

2    your request?

3         A.    I just received them from Seattle Police at our

4    request.  They had not been LODI'ed into our office.

5         Q.    Okay.  Were those cases ever filed?

6         A.    You mean filed as a charge from our office?

7         Q.    Yes.

8         A.    No.

9         Q.    Okay.  And was there sufficient information

10   contained in those cases to file them at that time?

11        A.    Well, the cases were not very well worked up.

12   I could have probably filed another -- the -- in this

13   second case, the defendant apparently tried to pass --

14   Olsen tried to pass a bad check and then, when he was

15   arrested, he had other credit cards on him -- or,

16   actually, did he have credit cards?  He had checks --

17   checks and Social Security cards and drivers' licenses on

18   him.  I could have filed another -- maybe an attempted

19   forgery for the check that he tried to pass.  It would

20   have taken some more investigation to file the possession

21   -- any of the possession of the checks, which would have

22   been PSP-3's.

23        Q.    Okay.  And the attempted forgery -- that would

24   have been a misdemeanor as well?

25        A.    Right.

1      Q.   Okay.  And based on those reports, what did you

2   then do?

3      A.   Based on these reports, I talked to the police.

4   I called and talked to Detective McNaughton (phonetic).

5      Q.   And what day did you do that?

6      A.   I did that -- I think I actually talked to him

7   on the 25th of March.  I started trying to talk to him on

8   the 20th -- the 21st of March.

9      Q.   Now, during this time, did you have any contact

10  with me?

11     A.   No.

12     Q.   During this time did you have any contact with

13  Jim Marner (phonetic) or anyone in connection with the

14  Simmers case?

15     A.   No; I was treating this case just like a

16  typical EPU case.

17     Q.   Did you even know that there was another trial

18  going on --

19     A.   No.

20     Q.   -- that Mr. Olsen was testifying on during this

21  time period?

22     A.   I do not -- no.  I don't remember Mr. Ernsdorff

23  -- the only person who would have told me about it was

24  Gary Ernsdorff, and I don't remember talking to him about

25  your trial after the original conversation that I had

CRIMINAL DEFENSE MOTION
    NAVE - Direct                                      -30-

1    with him.  He may --

2         Q.    In November of '95 --

3         A.    -- have mentioned something to me.

4         Q.    -- or December of '95?

5         A.    Right.

6         Q.    And during this time, would any of these cases

7    that you now had in your possession, that you had

8    received from Seattle Police -- would there have been any

9    indication in the Prosecutor's records that those were

10   out there?  I mean, were they ever LODI'ed in?

11        A.    No.  I mean, this is a common -- this is kind

12   of a problem, especially for fraud cases.  Property crime

13   cases, frequently the person gets booked on them, gets

14   released on it, and they never get LODI'ed into our

15   office, or they very slowly get LODI'ed in.  They take a

16   while to work up.  Lots of them can't be proved.  It's

17   not uncommon at all for us to call them and say, "We've

18   got the defense attorney saying there might be something

19   else out there.  Let me look it over, see if it's worth

20   using as part of our negotiation."

21        Q.    Okay.  After you got that information and when

22   you talked to Detective -- then you talked to Detective

23   McNaughton?

24        A.    Right.

25        Q.    Would you please relate to the Court your

CRIMINAL DEFENSE MOTION                              -31-
        NAVE - Direct

1    discussion with Detective McNaughton.

2        A.    All right.  And I also talked to Sergeant Hume

3    (phonetic) at the North Precinct.  They -- both Detective

4    McNaughton and Sergeant Hume -- I told them -- well,

5    here -- my plan.  What I wanted to do with this case was

6    what I would usually do with defendants who were

7    completely maxed out.

8            At this point there is some evidence that

9    Mr. Olsen had committed more crimes.  He didn't, in my

10   opinion, deserve a low-end recommendation.  His offender

11   score was 10.  He tried to pass a bad check and had a

12   couple of other checks and a Social Security card on him.

13   I didn't think that, following our standards -- number

14   one, if we could have proved the cases, which certainly

15   from the information that I had, I don't think there was

16   enough to do that.  And even if we had been able to prove

17   them, I don't think it would have been grounds for an

18   exceptional sentence.

19           So, based on the fact that he was maxed out,

20   what I was heading towards doing was recommending a

21   high-end rec for an agreement not to file the charge that

22   he was arrested on -- he was arrested on this one on

23   the 28th of February.  That was my original plan.

24       Q.    And did you eventually follow that plan?

25       A.    Yes.  I talked to --

1      MS. ELLIOTT:  I will object to anything

2   the police officers say.  I think we are headed there.

3      THE COURT:  I think she was going to

4   testify about her own --

5      MS. ELLIOTT:  Oh.  That's fine.

6      THE COURT:  -- what she did.  Did you

7   follow the plan?

8      A.  Right.  I talked to the police, and then I

9   followed the plan.

10     Q.  All right.  And as part of the office's policy,

11  aren't you required to talk with police officers before

12  we enter into any sort of agreement to not file charges?

13     A.  Right.  And I also wanted to do this because,

14  from the police reports that I got, I could tell that the

15  check that he had -- the checks that he had on him, that

16  Olsen had on him at the time that he was arrested -- had

17  most likely been taken from burglaries.  And I was not

18  willing to agree to not file burglary charges if there

19  was any possible way we could prove them.

20     Q.  Okay.

21     A.  And that's why I talked to the police about it.

22  I wanted information on the burglaries; where these

23  charges -- where these checks and the things that he had

24  in his pocket had come from.

25     Q.  And after talking with the police, was there

CRIMINAL DEFENSE MOTION                           -33-
       NAVE - Direct

1    any indication that we would ever be able to charge and

2    prove those burglary cases?

3              MS. ELLIOTT:  I will object to that if

4    it's based upon the conversation she had with the police.

5              THE COURT:  Sustained.

6              MS. MAHONEY:  Your Honor, again I would

7    object that --

8              THE COURT:  You can rephrase the question

9    so she can testify based on her own knowledge

10   [unintelligible].

11        Q.   Based upon the information that you received

12   from the police, was it your belief that you would be

13   able to ever file or that the office could ever prove

14   these charges?

15        A.   No.

16        Q.   And based upon the fact that you did not

17   believe we would ever be able to pursue these, what did

18   you do?

19        A.   Well, I didn't do anything with them.  I told

20   -- well, that's not quite true.  I told Mr. Ernsdorff

21   that I was changing the rec from 22 months to 29 months,

22   which is the high end, and that I wanted an agreement as

23   to real facts on the possession of the -- possession

24   charges for the items that he had on him at the time that

25   he was arrested.

1        Regarding the burglaries, in my opinion, there

2   wasn't enough information to prove -- there were two

3   burglaries; there wasn't enough information to prove that

4   he committed those burglaries at all.  One of them was a

5   -- both of them were without witnesses; no usable prints,

6   no way to show who had committed the burglary.  I didn't

7   ask for real facts on the burglaries.

8        Q.   Okay.  And did you also ask to an agreement for

9   restitution [unintelligible]?

10       A.   I think I did.  Yes.  I didn't know what -- I

11  asked for restitution for some checks that he had -- at

12  the time that he was arrested, there was some information

13  that he had tried to pass a check the day before, and I

14  asked for restitution for those.  I asked for restitution

15  -- there was a check from one of the burglaries that had

16  been passed by somebody at a place called the Earwax,

17  that I asked for restitution on.  I didn't know, really,

18  if Mr. Olsen -- there was no way to prove that he was

19  actually even the person who had passed the check.  We

20  just knew that one of those checks stolen from her

21  burglary had been used.

22       Q.   And what day did you make this offer to

23  Mr. Ernsdorff?

24       A.   After the 25th.

25       Q.   [Of March?]

State v. SIMMERS/95-1-02102-2.SEA                    11/4/97

1        A.    He pled -- his next case setting was -- well,

2   he had a case setting on the 21st, and that's when I

3   first started -- I tried to get a hold of Detective

4   McNaughton and Sergeant Hume.

5            It's typical in EPU or at case setting that, if

6   you are trying to get some information and you think you

7   can get this resolved by the next day, rather than asking

8   for a waiver of speedy trial for one day, you just agree

9   to hold the case and case setting till the next day.

10  That happened and continued to happen until the 25th,

11  when I had heard back from the police and decided to go

12  ahead and make a high-end recommendation on real facts

13  and restitution.  So, I think I made that on the 25th.

14       Q.    Okay.  And did he plead guilty to that

15  recommendation, to your knowledge?

16       A.    To my knowledge.  I can look at the plea

17  agreement -- I mean, the plea form.

18            MS. MAHONEY:  Previously, for the record,

19  Ms. Elliott had asked that Defendant's 1, 2 and 3 be

20  marked.  I would take Defendant's 2 and 3 at this time.

21  And do you mind if I offer these?  I have no --

22            MS. ELLIOTT:  No; I intended on doing so.

23            MS. MAHONEY:  Right.

24            I would offer, then, Defendant's 2 and 3.

25  I would show them to Ms. Nave.  That's the plea form for

State v. SIMMERS/95-1-02102-2.SEA                    11/4/97

1    Mr. Olsen for identification, for the record, and the

2    judgment sentence.

3         A.    And I believe you asked me if he did plead

4    guilty to our high-end recommendation.

5         Q.    Yes.

6         A.    And he did.

7              MS. MAHONEY:  Sorry.  So, I have offered

8    -- I guess we have agreed that we have offered 2 and 3 --

9    has been handed to the Court.  I think this normally

10   would have come in in a little different order, but -- .

11        Q.    Ms. Nave, let me ask you:  Did you treat

12   Mr. Olsen any differently than you did a typical

13   defendant in his situation with the type of charge that

14   he had and with the type of criminal history that he had?

15             MS. ELLIOTT:  Your Honor, I'm going to

16   object.  I don't think that is relevant to the inquiry.

17             THE COURT:  Overruled.

18        A.    I didn't treat him any differently.  It's very

19   -- it was very common in EPU to agree not to file charges

20   where we didn't have really enough proof to file them

21   anyway.  And in fact I gave him a high-end rec.

22             MS. MAHONEY:  Thank you.  I have no

23   further questions.

24             THE COURT:  Ms. Elliott.

25             MS. ELLIOTT:  Thank you, Your Honor.

CRIMINAL DEFENSE MOTION
NAVE - Direct                                        -37-

                         CROSS-EXAMINATION

1    BY MS. ELLIOTT:

2         Q.   Ms. Nave, I'm going to -- first of all, just to

3    kind of clarify the dates for me:   There was an

4    arraignment, was there not, on the -- could you give me

5    the name of the victim on the '95 cause number, so that I

6    can just refer to it by, say, for instance, "the Smith

7    case."

8         A.   There was only one charged case that I was

9    dealing with.

10        Q.   Yes.   And that PSP, what is the name of the

11   victim in that case?

12        A.   Okay.   Let me see if I can -- .   Crook; Carol

13   A. Crook.

14        Q.   In the Crook case, which we have now identified

15   as the 1995 case, there was an arraignment, was there

16   not?

17        A.   Yes.

18        Q.   And what was the date of that?

19        A.   The 17th of November 1995.

20        Q.   And there was -- I am going to show you

21   Defendant's Exhibit No. 1.   And can you state for the

22   record what that is.

23        A.   It's a conditions of release for the Defendant.

24        Q.   What is the name of the form?

1        A.    (No audible response.)

2        Q.    And what is the date of that?  What is that

3    dated?

4        A.    12/7/95.

5        Q.    And does that bear the Crook cause number at

6    the top?

7        A.    Yes.

8        Q.    So, does that indicate that Mr. Olsen was

9    released on that cause number?

10        A.    It does.

11        Q.    And was that on his personal recognizance?

12        A.    Yes.

13        Q.    And what are the conditions of release?

14        A.    Just to obey all laws, appear at all court

15    hearings, appear at next hearing, December 18, 1995, at

16    1 o'clock in [unintelligible].

17        Q.    And do your notes reflect whether or not you

18    were present at that hearing?

19        A.    I know I was not present.  Wait a minute.  What

20    hearing; you mean the arraignment hearing?

21        Q.    No; the --

22        A.    [Unintelligible]

23        Q.    -- release hearing of December 7.

24        A.    I know I was not present.

25        Q.    Okay.  And does your file reflect that release?

CRIMINAL DEFENSE MOTION
   NAVE - Cross                                    -39-

1          A.    Yes.   In the front of the file is a note

2    written by the deputy who was present and what happened.

3          Q.    And who was present at that hearing?

4          A.    Gina Sierra was the deputy present; Judge Gain

5    was the judge, and all it says on the front of the file

6    is "Defendant PR'ed."

7          Q.    Okay.   And did you discuss that with

8    Ms. Sierra?

9          A.    No; never.

10         Q.    Did you discuss that with Mr. Ernsdorff?

11         A.    Discuss what; the --

12         Q.    The release on personal recognizance.

13         A.    No.   I'm not sure I even knew.   Well, I mean,

14   if I had looked at the file, I could have told that he

15   was PR'ed, but I don't think that Olsen's custody status

16   came up between me and Mr. Ernsdorff.

17         Q.    Okay.   And so, when --

18         A.    It might have.

19         Q.    --   you were speaking with Mr. Ernsdorff on

20   December 18, you did or did not know whether or not he

21   was in custody at that time?

22         A.    I don't know whether I had looked at the file

23   and noticed or whether Mr. Ernsdorff had said he was out

24   of custody.   It wasn't really -- it didn't have much to

25   do with our negotiation.   I can't remember.

1      Q.   Okay.  And could you read your full note as to

2   12/18.

3      A.   Uh-huh.  It says, "Case looks okay.  Defendant

4   is apparently a witness in a murder case of Susan

5   Mahoney's.  I have made no deals here other than low

6   end.  Per Susan, do not release pending sentencing."

7      Q.   So, you considered to be low end a deal?

8      A.   Well, I was referring to the fact that that is

9   what the recommendation form was.

10     Q.   Okay.  So, you used the word "deal," however,

11  in your notes --

12     A.   Well --

13     Q.   -- in the file?

14     A.   -- that's the word.

15     Q.   When did you first become aware again that

16  Mr. Olsen was rearrested?

17     A.   On the 7th of March.

18     Q.   On the 7th of March did you review the blue-

19  sheet notes before you made that note?

20     A.   Before I made the note about -- what note?

21     Q.   The March 7 note.

22     A.   Did I look at the other notes?

23     Q.   Yes.

24     A.   I don't remember, but I probably did.

25     Q.   Okay.  So, you refreshed your memory that there

1    had been another case out there with Ms. Mahoney --

2        A.    Yeah.

3        Q.    -- that Mr. Olsen was going to testify in?

4        A.    I'm pretty sure that I did.

5        Q.    Okay.  And how long have you worked for the

6    Prosecutor's Office?

7        A.    Since 1991.

8        Q.    And have you always worked for the Prosecutor's

9    Office?

10       A.    No; I have worked for them since 1991.

11       Q.    Okay.  Have you previously worked at any other

12   -- other than the King County Prosecutor's Office, have

13   you ever worked --

14       A.    No.

15       Q.    Okay.  So, you have 16 years' experience as a

16   prosecutor; is that correct?

17       A.    No; I have seven years' experience as a

18   prosecutor.

19       Q.    Oh, '91; I'm sorry.  I thought you said '81.

20   And you are aware of your duty --

21            And you have been a trial deputy, have you not?

22       A.    I have.

23       Q.    In both the district and felony courts?

24       A.    Yes.

25       Q.    Okay.  And you are aware, are you not, of your

1    duties in regard to providing discovery to defense

2    counsel?

3         A.    I hope so.

4         Q.    And you understand that that is an ongoing duty

5    on the part of a trial deputy, do you not?

6         A.    Sure.

7         Q.    And knowing that, you did nothing to inform

8    Ms. Mahoney about the new cases that had been acquired by

9    Mr. Olsen?  You made no mention to her of any of these

10   new problems regarding Mr. Olsen?

11        A.    Are you asking me if I did that?

12        Q.    Yes.  Did you?

13        A.    I don't remember doing that.  I --

14        Q.    Did it ever cross your mind to --

15        A.    -- [unintelligible]

16        Q.    Did it ever occur to you to do that?

17        A.    I don't think it did.

18        Q.    Did Ms. Mahoney ever contact you?

19        A.    No.

20        Q.    Now, on 3/11/96, when it says "Defendant

21   actually booked on," what does it say in regard to that

22   note?

23        A.    Well, that's not my note.  That's a note --

24        Q.    Oh, no.  Right.

25        A.    -- that was made by the paralegal.

CRIMINAL DEFENSE MOTION                                    -43-
     NAVE - Cross

1          Q.   And you asked your paralegal to go find that

2    information --

3          A.   Right.

4          Q.   -- for you, did you not?

5          A.   Yeah.  I [didn't] --

6          Q.   And you have no reason --

7          A.   -- [check] her work.

8          Q.   -- to believe -- you have no reason to believe

9    she would have put down something there that wasn't true,

10   do you?

11         A.   No.

12         Q.   Okay.  And what was Mr. Olsen booked on?

13         A.   Well, it says here that the Defendant was

14   booked on 2/28/96 for an FTA on PSP-2 charge, this case.

15   "Booking history does not indicate anything pending.  As

16   of today no new cases on this Defendant have been filed

17   in our office."  And then, in parens to the side, she

18   wrote, "Defendant actually booked on FTA PSP-3 counts,

19   investigation of fraud, investigation of stolen property

20   FTA burg," and then something I can't read, something

21   about "arraignment."

22         Q.   All right.  So --

23         A.   "Community placement," I think that says.

24   Community placement.

25         Q.   I'm going to -- do you still have State's

1    Exhibit 4 there?

2         A.    I don't think I have any.

3              MS. MAHONEY:  Did I take it back?

4              MS. ELLIOTT:  I thought this -- this is

5    State's Exhibit 4.  It's marked on the back.

6              [THE CLERK]:  Oh, thank you.

7         Q.    Did you review that before you talked to

8    Mr. Ernsdorff in regard to this case in March of 1996?

9         A.    I reviewed it when I got it on the 19th of

10   March.

11        Q.    Okay.  And does that reflect a new arrest date

12   for Mr. Olsen on No. 96-090770?

13        A.    Yes.

14        Q.    Okay.  And what was Mr. Olsen arrested for on

15   that day?

16             MS. MAHONEY:  I'm sorry.  What cause

17   number are you referring to?

18             MS. ELLIOTT:  This is State's Exhibit

19   No. 4, which is 96-090770.

20             MS. MAHONEY:  Oh; incident number.

21             MS. ELLIOTT:  Incident number; excuse me.

22        A.    It says, "Investigation of fraud and

23   investigation of stolen property."

24        Q.    Okay.  And was Mr. Olsen arrested at the scene

25   or nearby the scene of that fraud?

1        A.    Well, I obviously wasn't present.  I --

2        Q.    Does the police report reflect that?

3        A.    Yes; it appears that what happened was he was

4    trying to -- wait a minute; I'm getting it confused with

5    the other case.  Apparently, he was arrested a half a

6    block away.

7        Q.    Okay.  And that this was when he attempted to

8    pass a bad check at Mary Martha's Cafe; is that correct?

9        A.    Right.

10       Q.    That report also contains reference to passing

11   a bad check at the Erotic Bakery, does it not?

12       A.    Right.  Apparently, what happened from here --

13   it's kind of hard to figure out, but apparently someone

14   came -- when they arrested him, someone said, "Oh, that's

15   the same guy who passed a bad check at the Erotic

16   Bakery."

17       Q.    Well, doesn't it say, "While officer was

18   interviewing suspect, Ms. Whitaker identified suspect as

19   the one who tried to pass the bad checks today and two

20   weeks ago"?

21       A.    Well, that's at Mary Martha's.

22       Q.    So he had two -- he tried to pass bad checks

23   twice at Mary Martha's?

24       A.    According to what this witness said.  We didn't

25   have any copies of the checks or any real information

1    about it.

2        Q.    Okay.  And does it also say that it came to the

3    officer's attention that there was a copy of a check

4    written to the Erotic Bakery, or at the --

5        A.    [Yeah.]

6        Q.    Okay.

7              MS. MAHONEY:  Your Honor, at this point

8    I'm going to object.  The exhibit speaks for itself and,

9    quite frankly, what the allegations there are don't

10   really have anything to do with this matter.

11             THE COURT:  To the extent that the witness

12   does not have any personal knowledge about this and what

13   we're doing is [unintelligible].

14             MS. ELLIOTT:  All right, Your Honor.  I

15   will move on.

16       Q.    You received --

17             MS. ELLIOTT:  Could I have the Clerk mark

18   these.

19       Q.    -- at least three other incident reports, did

20   you not?

21       A.    I received incident reports for all of the

22   cases listed in the plea agreement.

23       Q.    And what are those numbers?  If you could read

24   those for the record.

25       A.    96-90770.  That's actually, I think, the

1    incident number -- huh; I think that's the incident

2    number hooked up with the original charge -- and then

3    96-89088, 96-020262, 96-84648, 96-88897.

4                              (Defendant's Exhibits 5, 6 and

5                               7 marked for identification.)

6        Q.    Okay.  I'm going to show you Defendant's

7    Exhibits 9 -- 7, 6 and 5.  And if you could identify

8    those for the record and state whether or not those are

9    the incident reports you received.

10       A.    You want me to read the case numbers again?

11       Q.    Yeah, just -- and relate them to the exhibit

12   number.

13       A.    Defendant's Exhibit No. 5 is Incident 96-89088;

14   Defense Exhibit No. 6 is 95-088897, and Defense Exhibit

15   No. 7 is 96 -- is a King County police report, 96-020262.

16       Q.    And do those appear to be the copies of the

17   reports that you have in your file?

18       A.    They do.  I haven't looked at each page, but

19   I'm sure that they [comply].

20       Q.    When you talked to Detective -- well, when

21   made the decision -- let me step back a minute.  Were you

22   present at sentencing?

23       A.    No.

24       Q.    Does it show anywhere in your file on March 21

25   -- March 20 or 21, that on those days Mr. Olsen was

CRIMINAL DEFENSE MOTION                                    -48-
    NAVE - Cross

1  actually testifying in the Simmers case?

2      A.   No, it doesn't.  In fact, I thought, when I got

3  this case in March, that the murder case in December was

4  concluded.

5      Q.   Did you ever have any discussions with

6  Mr. Ernsdorff about what he told his client about the

7  pending charges, including those that were LODI'ed, as

8  you say?

9      A.   The only ones that were LODI'ed were the ones

10  that were charged.  These cases that you're -- these

11  exhibits were never LODI'ed.  I got them from --

12      Q.   Did you ever have any discussion with

13  Mr. Ernsdorff about what he told his client about

14  Defendant's Exhibits 4, 5, 6 and 7?

15      A.   No.

16      Q.   Did you have any personal discussion with

17  Mr. Olsen about what he thought about Defendant's

18  Exhibits 4, 5, 6 and 7?

19      A.   [No.]

20      Q.   Did you ever have any discussion with him about

21  why he thought those cases were being dismissed?

22      A.   No.

23      Q.   Okay.

24          MS. MAHONEY:  I'm going to object to the

25  word "dismissed."  Those were cases --

1          MS. ELLIOTT:  Or, not filed --

2          MS. MAHONEY:  -- were never dismissed.

3          MS. ELLIOTT:  -- excuse me;  I'll correct

4     myself --

5     A.   Not -- not filed.

6     Q.   -- not filed.

7          THE COURT:  Exactly.

8     A.   Did I ever discuss with Mr. Olsen --

9     Q.   Personally.

10    A.   No.  I have never seen Mr. Olsen.

11    Q.   And let me ask you one last question:  The term

12    "LODI" -- could you tell us what that stands for?

13    A.   No; I can't.

14    Q.   Well --

15    A.   It means when -- I can tell you what it is.

16    Q.   What does LODI do?  What is it?

17    A.   When a police officer completes a charge, he

18    then brings it to our office, submits it to the filing

19    unit of our office, and it gets entered into a book and

20    stamped and then hooked up with the appropriate paperwork

21    we need to then be submitted to a filing deputy to review

22    for possible filing of charges.

23    Q.   Okay.  And is there any defense counsel in

24    Seattle who has access to that book and that information

25    before the charge is actually filed?

1      A.   I have no idea.

2      Q.   Okay.  And is it something maintained by the

3  Prosecutor's Office?

4      A.   I merely -- not -- I don't -- I have never -- I

5  don't think I've ever even seen the LODI book.

6      Q.   Okay.

7      A.   I'm not sure who maintains it.  I can guess who

8  maintains it, but --

9      Q.   All right.

10     A.   -- but I don't know.

11     Q.   In your experience as a prosecutor -- have you

12  served in the filing unit?

13     A.   I have.

14     Q.   Okay.  In your experience, is it common for a

15  police officer to submit a police report that neglects to

16  contain facts sufficient for charging?

17     A.   It is unfortunately extremely common.

18     Q.   Okay.  And commonly, is it not true that the

19  filing unit, or whoever actually first sees the police

20  report, sends it back to the officer to do additional

21  investigation?

22     A.   Commonly.

23     Q.   And it would not have been inappropriate to do

24  that in the five cases, or the other pending cases out

25  there that you received on Mr. Olsen, would it?

1      A.    There -- from looking at the cases that I got,

2   there wasn't any additional information that could be

3   done on that.  He was arrested; he had them in his

4   pocket; we had the police reports of when those crimes

5   had been committed, and there wasn't any way to prove

6   that he had actually taken the car.

7      Q.    Well, if one of the police reports reflected

8   that he had been cut and bled at the scene of the

9   burglary, would that have been something that could have

10  been followed up on?

11     A.    It could have been, except that in that case

12  there wasn't any -- I thought about that.  One of the

13  victims of the burglaries that we couldn't prove said,

14  "Well, gee, the guy seems to have been cut."  None of the

15  glass -- none of that blood had been retained.

16     Q.    Okay.  So, when the police officers did a

17  search of the scene of the burglary, it had not been

18  preserved?

19     A.    Right.

20     Q.    But that's not necessarily true as to all the

21  passing bad checks charges, is it?  You had eyewitnesses

22  in those cases, did you not?

23     A.    And we had statements from them.

24     Q.    And you could have sent the checks out for

25  handwriting exemplars, could you not?

1      A.   We had two blank checks.  I think there were

2    two blank checks in his pocket.  So, there wouldn't have

3    been any --

4      Q.   No; on the ones that --

5      A.   -- need for handwriting.

6      Q.   -- any of the other ones that were passed.

7      A.   He attempted to pass one.  That was the arrest.

8    The other one, where the person said, "Oh, this is the

9    guy who tried to pass a check two weeks ago" -- we didn't

10   have that check --

11     Q.   Okay.

12     A.   -- or anything about that, except that the

13   witness saying that had occurred.  And then the one where

14   -- the Erotic Bakery one, we had a witness that said this

15   is the guy who did it.

16     Q.   So, you had two charges that could actually

17   have been proved, correct?

18     A.   The attempted -- which is a misdemeanor --

19     Q.   Well, it doesn't -- drawing upon your

20   experience as a prosecutor, isn't mere presentation of a

21   forged instrument forgery?

22     A.   But I don't think that he did it.  I think what

23   happened is --

24     Q.   Do you know whether or not he did it?

25     A.   Well, I can read the police report, if you want

1    me to sit here and do that.

2                MS. MAHONEY:   I'm going to object at this

3    point to the relevance of this.

4                THE COURT:   Overruled on relevance

5    grounds.

6                MS. MAHONEY:   I'm going to object on the

7    fact she had no personal knowledge, because she wasn't

8    there.

9                THE COURT:   Sustained as to that

10   objection related to the police reports.  You may

11   inquire as to Ms. Nave and what she did or didn't do or

12   why she did or didn't do whatever she did.

13       Q.   Did you make any further investigation as to

14   whether or not you could have gotten handwriting

15   exemplars and charged forgery as to either of the two

16   cases?

17       A.   I talked with the police about the cases.  In

18   EPU, my purpose was to try and resolve this.  After

19   discussing it with the police and looking at the reports

20   that we had, which basically consisted of him just

21   having things on his possession, it seemed like the best

22   thing would -- to not attempt to try and put more of a

23   case together.

24               MS. ELLIOTT:   Thank you.  I have no

25   further questions.

CRIMINAL DEFENSE MOTION                              -54-
    NAVE - Cross

1          THE COURT:  Ms. Mahoney.

2          MS. MAHONEY:  I just want to clarify a

3    couple things.

4

5                  REDIRECT EXAMINATION

6    BY MS. MAHONEY:

7      Q.    Exhibit 4 -- you received those on the 19th of

8    March, according to the fax date; is --

9      A.    Yes.

10     Q.    -- that correct?

11          Now, I want to clarify:  Exhibits 5, 6 and 7

12   that you have identified, what day did you actually

13   receive these?

14     A.    In April of '97, some -- I don't know the exact

15   date.

16     Q.    Okay.  And why did you actually ask for those

17   reports?

18     A.    Because you came to my office -- I was long

19   since out of EPU and was in the Special Assault Unit --

20   and told me that this hearing was likely to be pending,

21   so I ordered the file and ordered the police report.

22     Q.    Okay.  And so, at the time that you made the

23   decision about the inability to file the burglaries, it

24   was based on your discussion with the detective; is that

25   correct?

State v. SIMMERS/95-1-02102-2.SEA          11/4/97

A.   Right.

Q.   All right.  And again, Ms. Nave, at any time did you handle this case in any way any differently than you would any defendant with the same criminal history and types of charges and information that you had with Mr. Olsen?

A.   No.  This was very -- a very typical case.  As I said, it's very common for a defendant when he gets arrested to have evidence of other crimes or even evidence of a crime that we might be able to charge. Part of EPU is we package them all together and attempt to resolve it --

Q.   And did you ever give this --

A.   -- and I thought the high-end rec was the best way to do that.

Q.   I'm sorry, Ms. Nave.  Did you ever give him any consideration in your negotiations or your plea deal with Mr. Olsen, based on the fact that he provided testimony in another State case?

A.   No.

Q.   Okay.  And I just want to go back to -- Ms. Elliott had asked you about the word "deal."  What does that mean?  I mean, why did you write that down?

A.   Well, probably because Gary -- Mr. Ernsdorff had come in and asked for a deal in exchange for

CRIMINAL DEFENSE MOTION                        -56-
NAVE - Redirect

1    testifying, and what he intimated to me was certainly at

2    the time far more than -- what he wanted was to get rid

3    of the charged case.

4         Q.   Was any deal given?

5         A.   No; the original recommendation stood.

6              MS. MAHONEY:  Thank you.  No further

7    questions.

8

9                    RECROSS EXAMINATION

10   BY MS. ELLIOTT:

11        Q.   Ms. Nave, based upon your experience as a

12   prosecutor, if you had known that, during March 1996,

13   Mr. Olsen was testifying for the State in a trial, would

14   you have done anything different?

15        A.   No.  I tried very hard to just treat this case

16   like just any other EPU case that came across my desk.

17        Q.   So, you would never have informed Ms. Mahoney

18   about the crimes that Mr. Olsen was suspected to have

19   committed while he was released?

20        A.   If I had known that he was testifying right

21   then, I think I probably would have done that, but I

22   don't know for sure.  I can only guess what I would have

23   done.

24             MS. ELLIOTT:  Thank you.

25             MS. MAHONEY:  I have nothing further.

1          THE COURT:  All right.  May the witness be

2    excused?

3          MS. ELLIOTT:  I have no further questions,

4    Your Honor.

5          THE COURT:  Ms. Mahoney?

6          MS. MAHONEY:  Yes.  I would just ask to

7    reserve the ability to re-call her, depending on what

8    Ms. Elliott may bring up, since this is her motion, and

9    I'm kind of --

10          THE COURT:  All right.

11          MS. MAHONEY:  -- responding.

12          Your Honor, Mr. Olsen is available.  And

13    we need to call, if Madame Clerk wouldn't mind,

14    Mr. Ernsdorff.  He had left his direct line.

15          MS. ELLIOTT:  Mr. Hicks is also available

16    now.

17          MS. MAHONEY:  Oh.  Do you want to call him

18    first, before you talk to Mr. Olsen, or do you want to

19    talk to Mr. Olsen?

20          MS. ELLIOTT:  I will talk -- may I speak

21    briefly with Mr. Hicks, since I -- he just arrived; I

22    just saw him come in.

23          THE COURT:  You may.  How much time do you

24    want to talk to him?  Should we take a break, is the

25    question.

State v. SIMMERS/95-1-02102-2.SEA           11/4/97

1          MS. ELLIOTT:  Oh.  Five minutes, ten

2   minutes, Your Honor, is max.  I just want to let him know

3   where we are in the hearing and --

4          THE COURT:  We will take a ten-minute

5   recess, and you can talk to Mr. Hicks.  And then it is my

6   understanding that he will not be called until

7   Ms. Elliott has the opportunity to interview him.

8          MS. ELLIOTT:  Well, we also need to check

9   to make sure what he and Mr. Ernsdorff have had worked

10  out in terms of a waiver or whether he is seeking counsel

11  or anything like that.  So, now would be a good time to

12  make that determination.

13         THE COURT:  You want to do that off the

14  record or on the record?

15         MS. MAHONEY:  I know that he is not

16  asserting his need for counsel.  And I know that he is

17  willing to waive.

18         THE COURT:  You can discuss --

19         MS. ELLIOTT:  I wish that -- I mean, I

20  think that you -- I am going to ask him about certain

21  things, Your Honor, and I don't care whether he has

22  counsel or not.  I imagine the Court may.

23         THE COURT:  Who is "he" --

24         MS. ELLIOTT:  Mr. Olsen.

25         THE COURT:  -- Mr. Olsen?

1              MS. MAHONEY:  Your Honor, I guess what my

2    concern would be here is that maybe what we need is an

3    offer of proof.  Ms. Elliott doesn't get to just go on a,

4    you know, exploratory mission here.  She has to have

5    certain allegations that she has already set forth, and

6    she has to have a good-faith basis that she has certain

7    evidence to put on before we begin just, you know,

8    questioning at will.

9              I don't know what she intends to ask him

10   that he could have a Fifth-Amendment privilege about, but

11   -- I mean, I'm getting a little concerned here.  The only

12   thing that seems relevant is, "Mr. Olsen, did you get a

13   deal?"

14              THE COURT:  Well, no --

15              MS. MAHONEY:  That seems that --

16              MS. ELLIOTT:  No.

17              MS. MAHONEY:  -- she's only --

18              THE COURT:  I don't think that's true,

19   Ms. Mahoney.  I think that Ms. Elliott has articulated

20   and argued that she believes and, I think, has the basis

21   to inquire as to testimony that was given and whether or

22   not it was accurate.

23              MS. MAHONEY:  Right.

24              THE COURT:  To the extent that Ms. Elliott

25   has that ability -- which she does -- and she has made a

State v. SIMMERS/95-1-02102-2.SEA          11/4/97

1   sufficient showing to be able to ask that line of

2   questioning, Mr. Olsen may need an attorney, because if

3   in fact there is any concern about his testimony in that

4   regard.

5           So, I certainly understand that there are

6   questions related to a deal, but I also understand there

7   are questions and issues related to whether or not he

8   testified truthfully.

9           MS. MAHONEY:  All right.  I don't have any

10  concerns about -- and I guess I didn't mean to -- I

11  thought that everything that she has talked about so far

12  that she is concerned about is whether or not -- in what

13  he testified to.  I don't think that there is -- I mean,

14  obviously, it's up to Mr. Olsen, and he would have to

15  assert it at that time if it is limited to the testimony

16  that he gave also.

17          I guess I'm just concerned -- is she going

18  off to ask questions about his other charges that he had

19  or things like that.  I don't see where that is relevant.

20  I think that, first of all, Ms. Elliott would need to put

21  forth some basis that, number one, that he -- I don't

22  think that there will be any basis to be shown that,

23  number one, Mr. Hicks did not know that Mr. Olsen was

24  arrested for other things, because I think Mr. Ernsdorff

25  will testify differently.  If need be, I may have to

1   withdraw and testify.  Detective Hopkins was present at

2   an interview where those things were discussed with

3   Mr. Olsen and his current potential liability.

4                    THE COURT:  Well, that may be, but --

5                    MS. MAHONEY:  Second, there's no showing

6   otherwise.  And I guess --

7                    THE COURT:  It seems to me that we are

8   trying to argue this ahead of time.  Clearly,

9   Ms. Elliott can inquire as to what Mr. Ernsdorff knew or

10  didn't know related to whether he was getting a deal or

11  not --

12                   MS. MAHONEY:  Right.

13                   THE COURT:  -- and what he communicated

14  to Mr. Olsen.  To that extent, of course, the three

15  charges can be inquired into.  And --

16                   MS. MAHONEY:  Right.  I'm just saying, you

17  know --

18                   THE COURT:  -- that's true --

19                   MS. MAHONEY:  "Did you do this?  Did you

20  do this?  Did you do that?  Were you using heroin?"  None

21  of those things -- well, first of all, we know that there

22  was extensive discussion about Mr. Olsen's heroin use.

23  I'm sure the Court can recall that, but --

24                   THE COURT:  I don't think this is

25  particularly fruitful at this point.  I think there's --

1          MS. MAHONEY:  All right.  I'm sorry.  I

2   just -- I'm concerned that, you know, where she is

3   going.  I don't have --

4          THE COURT:  That may be, but I think we

5   are going to have to take it up as we get there.  And I

6   do believe that Mr. Olsen potentially could require

7   having an attorney if in fact there are questions that

8   are going to expose him to perjury charges or other

9   charges --

10          MS. MAHONEY:  Right.

11          THE COURT:  -- related to the truthfulness

12   of his testimony, which is different than what he knew or

13   didn't know related to the --

14          MS. MAHONEY:  Right.

15          THE COURT:  -- alleged deal.

16          MS. MAHONEY:  Right.

17          THE COURT:  So --

18          MS. MAHONEY:  And I agree with that.  I

19   don't anticipate there will be a problem there, but --

20          THE COURT:  I don't know, but Mr. Olsen

21   certainly needs to --

22          MS. MAHONEY:  He's the only one who does.

23          THE COURT:  -- have advice of an attorney

24   in order to make a decision related to that before he

25   testifies today.

State v. SIMMERS/95-1-02102-2.SEA                 11/4/97

1          MS. MAHONEY:  We are going to have a

2    little problem, then, because I had discussed with him

3    that he would be questioned about what he testified to,

4    about whether he received anything from us, and regarding

5    his testimony.  He doesn't have an attorney here now.

6    Mr. Ernsdorff now works for my office, so he can't be

7    appointed.

8          MS. ELLIOTT:  A fact I think Mr. Olsen

9    might want to know.

10          MS. MAHONEY:  Mr. Olsen knows.

11          THE COURT:  Well, that's fine.

12          Well, it seems to me that there certainly

13    is -- given the appropriate line of questioning related

14    to the truthfulness of the testimony given by Mr. Olsen,

15    it seems to me that it is appropriate to ask that an

16    attorney be appointed for purposes of that line of

17    questioning.

18          MS. MAHONEY:  Okay.  Mr. Olsen did not

19    indicate a need for -- his desire to have an attorney,

20    so, as I'm telling the Court, there isn't one here.  It's

21    not easy to get him here, as the Court is aware.

22          THE COURT:  No; I know that, but he --

23    if --

24          MS. MAHONEY:  So, what I'm asking is:  Can

25    we maybe try and do this, and if at some point he feels

CRIMINAL DEFENSE MOTION                              -64-
NAVE - Recross

1   the need to discuss something with attorney, he could let

2   us know.

3                THE COURT:  Well, I think he needs to have

4   legal advice as to what the potential -- he needs legal

5   advice before he takes the stand, I believe.  So, why

6   don't we take a break.  I will see if there is an

7   attorney who is available to meet with him.

8                MS. MAHONEY:  Thank you.  I guess that's

9   what I --

10               THE COURT:  I do believe that there

11  certainly are areas that are appropriate for

12  questioning --

13               MS. MAHONEY:  Uh-huh.

14               THE COURT:  -- where he may need the

15  advice of counsel.  So, I will certainly do what I can,

16  Ms. Mahoney, but I believe that Ms. Elliott has been

17  quite clear that part of what the basis for this motion

18  is, is that Mr. Olsen was untruthful, so.

19               MS. MAHONEY:  Oh, I understand that.  I'm

20  just wondering about how much she wants to get into

21  trying the other matters that were never filed.

22               THE COURT:  Well, I think trying to

23  anticipate that is, again, not at this point fruitful.

24  If it appears that Ms. Elliott is not questioning

25  relevant to the issues, then an objection is

CRIMINAL DEFENSE MOTION
NAVE - Recross                                    -65-

State v. SIMMERS/95-1-02102-2.SEA                    11/4/97

1   appropriate.

2                   MS. MAHONEY:  That was my whole concern.

3   I don't care about -- I understand that she would be

4   questioning him regarding his testimony.

5                   THE COURT:  Well, I don't know where we

6   have gotten in this discussion, except I need to call

7   OPD --

8                   MS. MAHONEY:  Right.

9                   THE COURT:  -- to see if there is an

10  attorney available who can be appointed.  If not, I

11  don't believe that that line of inquiry should be

12  embarked on until there is an attorney who is

13  available to advise Mr. Olsen, even if he doesn't want

14  one.  Given the significance of the issues raised, I

15  don't believe it would be appropriate to proceed

16  without one.

17                  MS. MAHONEY:  Okay.

18                  THE COURT:  All right.  So, we will be in

19  recess for probably now about fifteen minutes, and we

20  will call.

21                          (Recess, 11:08 to 11:20 a.m.)

22                  MS. ELLIOTT:  Mr. Hicks is present, Your

23  Honor.  The Defense would call Mr. Hicks.  Thank you.

24

State v. SIMMERS/95-1-02102-2.SEA                11/4/97

1                          JOHN HICKS,

2    called as a witness for the Defendant, being first duly

3    sworn or affirmed to tell the truth, was examined and

4    testified as follows:

5

6                      THE COURT:  You may want to move the chair

7    over.  No; I meant [unintelligible].

8                      MS. ELLIOTT:  Is Your Honor going to

9    remain standing?

10                     THE COURT:  Yes.  I'm sorry.

11                     MS. ELLIOTT:  That's okay.

12                     THE COURT:  I'm sorry.

13                     MS. ELLIOTT:  I didn't want to interrupt.

14                     THE COURT:  No.  No.

15

16                      DIRECT EXAMINATION

17   BY MS. ELLIOTT:

18       Q.   Mr. Hicks, you represented Mr. Ian Simmers

19   before this Court, did you not?

20       A.   Yeah.  Should I put my name on the record?

21       Q.   Yes.  Could you state your name and spell it

22   and give your business address.

23       A.   John Hicks, H-i-c-k-s attorney; Howard

24   Building, Suite 300, 614 First Avenue, Seattle,

25   Washington, 98104.

CRIMINAL DEFENSE MOTION                          -67-
  HICKS - Direct

1          And, yes; I represented Mr. Simmers at his

2   trial.

3          Q.   Okay.  And in front of this very judge; is that

4   correct?

5          A.   That is correct.

6          Q.   Okay.  And do you recall the period of March

7   1996?

8          A.   Well, phrased that way, no.  If you mean --

9          Q.   In regard to this trial.

10         A.   When was the trial?

11         Q.   March 1996.

12         A.   Yes, I do.

13         Q.   Have you reviewed any portions of your file

14   before coming to court here today?

15         A.   No.  I reviewed some materials you gave me.

16         Q.   Okay.  And where is your file now?

17         A.   Well, somewhere in my office, in storage.

18         Q.   Okay.

19         A.   I have no idea where.

20         Q.   Okay.

21         A.   Possibly I gave it to you; I forget.

22         Q.   Are you aware of what the inquiry is here

23   today?

24         A.   The general nature, yes.

25         Q.   Okay.  Do you recall seeking as -- well, how

1    many years have you been a defense attorney?

2         A.    Oh, about fourteen.

3         Q.    And how many cases have you tried?

4         A.    I have no idea.

5         Q.    An estimate.

6         A.    I have no idea of what an estimate would be.

7    It might be hundreds; it might be thousands.  Well, not

8    thousands tried.  I have done -- I have probably handled

9    thousands -- tried a couple hundred, but I'm not even

10   sure of that.

11        Q.    And in those cases, you make discovery

12   requests, do you not?

13        A.    Yes.

14        Q.    And tell me a little bit about what you request

15   from the Prosecutor's Office when you make a discovery

16   request.

17        A.    Well, in addition to whatever requests I made

18   in this case, there is an ongoing obligation, obviously,

19   to provide exculpatory materials.  In this particular

20   case I was interested in the subject matter I believe

21   you are inquiring about, the -- about the --

22        Q.    Well, did you make specific requests about

23   criminal history in regard to a State's witness, Kevin

24   Olsen?

25        A.    Yes.  Yes, I did.

1        Q.   Okay.  And did you receive any materials from

2    the State in regard to Mr. Olsen?

3        A.   Yes.

4        Q.   What did you receive, if you recall?

5        A.   A printout -- and I say that because it was in

6    the materials you showed me -- showing a record, a record

7    of arrests as well as convictions; some certified copies,

8    I believe, of convictions.  I do not recall whether I got

9    them from my investigator, Len Greenwood, which would be

10   more appropriately the case, or from the State.

11       Q.   Okay.  Did you --

12       A.   And, of course, I interviewed Mr. Olsen, and

13   he --

14       Q.   And -- okay.  Did you rely solely upon the

15   State's representations as to his criminal history in

16   this case?

17       A.   Well, that and what Mr. Olsen said in our

18   interview with him.

19       Q.   Did you ask Mr. Greenwood to do any independent

20   review of Mr. Olsen's criminal history?

21       A.   I would not have to, but I probably did anyway.

22   But Mr. Greenwood, as a matter of course, does that, and

23   I cannot detail what his measures are, but it's whatever

24   measures he takes.  I do not know whether he did it in

25   this case from personal knowledge myself.

1      Q.   Do you recall whether or not he came back with

2   any indications about Mr. Olsen's criminal history?

3      A.   Well, he came back with nothing in addition to

4   what we got already; I know that.

5      Q.   Okay.  And when you say "in addition to what

6   you got already," who had you received that previous

7   material from?

8      A.   The State.

9      Q.   Now, was there a period of time in which

10  Mr. Olsen was out on a material-witness warrant, prior to

11  this trial, if you recall?

12     A.   I really don't.  For some reason, I believe he

13  was inappropriately out and then gotten again, but it's

14  just real vague.

15     Q.   Okay.  Do you recall a March 4 interview with

16  Mr. Olsen?

17     A.   Well, if that's the date; I remember the

18  interview.

19     Q.   Okay.  If I show you some notes from an

20  interview, do you think that might refresh your memory?

21     A.   Well, if it has the date on it, I am willing to

22  assume it's the date.  I'm just saying I have no personal

23  knowledge as to the exact date.

24                        (Defendant's Exhibit 8 marked

25                         for identification.)

CRIMINAL DEFENSE MOTION                        -71-
    HICKS - Direct

1          Q.    Showing you what has been marked as Defense

2     Exhibit 8:  Do you recognize that?

3          A.    Yes.

4          Q.    Okay.  And what is that?

5          A.    It's a work product of Mr. Greenwood.  It is a

6     report of our interview with Mr. Olsen.  It is dated

7     March 4, 1996, and I would assume that date to be

8     correct; Mr. Greenwood is a very fine investigator.

9          Q.    And does it reflect who was present at that

10    interview?

11         A.    Detective Hopkins, Jim Marner, Susan Mahoney

12    and Hope Marsden (phonetic).  Now, Hope Marsden may have

13    been the investigator, rather than Mr. Greenwood, who was

14    working for her at the time.  So, it might have been her

15    rather than Mr. Greenwood.

16         Q.    Does that refresh your recollection as to an

17    interview you had with Mr. Olsen prior to trial?

18         A.    Yes.

19         Q.    Do you recall Ms. Mahoney being present at that

20    interview?

21         A.    I don't independently recall.  I'm sure she --

22    no, I'm not sure she was, because Mr. Marner was

23    co-counsel.  No, I'm not.  I'm not sure.

24         Q.    Okay.  Do you recall whether or not there was

25    any discussion about Mr. Olsen's drug use at that

1    interview?

2        A.    Yes.

3        Q.    Okay.  And why did you have that discussion?

4        A.    He was an addict -- [a bad one].

5        Q.    Okay.  Were you aware at that time whether or

6    not he had had access to drugs shortly before the

7    interview?

8        A.    I did not know.  I recall the first time I went

9    to interview him, he was apparently suffering some

10   withdrawal symptoms.

11       Q.    Okay.  During that interview, did you --

12       A.    The second interview.

13       Q.    Oh.  And the first interview took place where?

14       A.    The first interview really didn't take place,

15   if I recall correctly, because he was sick -- Mr. Olsen.

16       Q.    Okay.  Do you recall whether or not, prior to

17   that interview, the State gave you any new or additional

18   criminal history?

19       A.    I don't recall.

20       Q.    Okay.  I'm going to show you some -- after the

21   March 4 interview with Mr. Olsen, do you recall whether

22   you ever interviewed Mr. Olsen again prior to his taking

23   the stand in this case?

24       A.    I don't recall.  I don't think I did, but I'm

25   not sure.

CRIMINAL DEFENSE MOTION                                      -73-
     HICKS - Direct

1      Q.   Do you recall whether or not, during that

2  interview, Mr. Olsen revealed any additional arrests or

3  criminal history?

4      A.   I don't know what you mean by "additional."

5  Additional to what?

6      Q.   Additional to what you already knew about.  Did

7  you talk --

8      A.   I do not know.

9      Q.   -- to him about that?  Okay.

10     A.   It would be reflected in my notes if he did.

11     Q.   Okay.

12     A.   I proceeded on my investigator's notes.

13     Q.   Okay.  Do you want to review those quickly to

14  see if that did come up?

15     A.   Well, I can --

16     Q.   Could you refresh --

17     A.   -- but it still wouldn't tell me right now if

18  it added anything to what I knew then.

19     Q.   Okay.  All right.  Thank you.  I'm going to

20  show you what has been marked as State's Exhibit No. 4.

21  Can you take a moment to look through that.

22            MS. MAHONEY:  For the purpose of time, I

23  will stipulate that Mr. Hicks was never provided with

24  State's Exhibits 4, 5, 6 or 7.

25            THE WITNESS:  Beautiful.

1          THE COURT:  Mr. Hicks, [unintelligible].

2          MS. MAHONEY:  I will also stipulate for

3     the record that those particular reports were never

4     discussed, as those reports are reflected, with

5     Mr. Hicks.

6          THE COURT:  All right.  Never provided to

7     Mr. Hicks, and they were never --

8          MS. MAHONEY:  And the reports themselves

9     were never discussed.

10          THE COURT:  -- and the reports themselves

11     were never discussed.

12          MS. MAHONEY:  That's correct.

13          THE COURT:  That's the stipulation.

14          Ms. Elliott, does that facilitate --

15          MS. ELLIOTT:  I think that relieves me of

16     any further discussion with Mr. Hicks this morning.  I

17     will reserve any further questions I have for rebuttal.

18          THE COURT:  Okay.  Thank you.

19          Ms. Mahoney.  [Unintelligible]

20          MS. ELLIOTT:  I forgot to leave the

21     exhibits with the Clerk.

22

23                    CROSS-EXAMINATION

24     BY MS. MAHONEY:

25          Q.  Mr. Hicks, in addition to being provided with

1    Mr. Olsen's criminal history -- actually, let me back up

2    a little further.  Do you recall the reason why you were

3    appointed into this case?

4        A.    No.  I think I was to replace John Austin

5    about something.  I --

6        Q.    Would it be to replace Ken Scearce because

7    Mr. Olsen became a witness, and Mr. Scearce had to

8    conflict out because of Mr. Olsen?  Do you recall that?

9        A.    It could very well be, yes.  And I think you

10   are -- yes, you are correct; I'm sorry.

11       Q.    And do you recall that Mr. Scearce actually

12   kept all of Mr. Simmers' other cases that were pending

13   because Mr. Olsen wasn't involved in those cases?

14       A.    I do not recall.  And I do not recall it being

15   the specific reason that he previously represented

16   Mr. Olsen.  I do not independently recall.

17       Q.    Okay.  So, you came into this case about

18   November or December of '95; is that correct?

19       A.    I have no idea.

20       Q.    Okay.  Did you receive materials from

21   Mr. Scearce?

22       A.    I'm sure I did.

23       Q.    Okay.  And do you recall him saying to you,

24   "We have had so many attorneys.  Do you want to come by

25   and look at my notebook and compare it to yours"?

CRIMINAL DEFENSE MOTION
   HICKS - Cross                                        -76-

State v. SIMMERS/95-1-02102-2.SEA            11/4/97

1     A.   No.

2     Q.   Do you recall sending your investigator to do

3   that?

4     A.   No.

5     Q.   Is that possible?

6     A.   It's possible.  It is unlikely I would send an

7   investigator to review discovery.

8     Q.   Do you recall -- Is it possible you yourself

9   came by my office?

10    A.   Yes.

11    Q.   Okay.  And Mr. Greenwood actually did quite a

12  bit of work on this case; isn't that correct?

13    A.   Mr. Greenwood and Ms. Marsden.

14    Q.   And do you recall that Mr. Greenwood actually

15  knew Mr. Olsen from before and provided some additional

16  information to both of us?

17    A.   If you say he did, I'm sure he did.  I do not

18  independently remember.

19    Q.   Okay.  Do you recall that you were told about

20  Mr. Olsen's testimony previously for the State in the

21  Thompson case?

22    A.   I believe his previous testimony came up.

23    Q.   And do you recall that you interviewed

24  Mr. Nacht and Mr. Maguire with SCRAP, who were Drew

25  Thompson's attorneys, regarding Mr. Olsen?

CRIMINAL DEFENSE MOTION                         -77-
    HICKS - Cross

1      A.    Well, if I interviewed him, I believe I
2  discussed it with at least Mr. Nacht.
3      Q.    Okay.
4      A.    But I'm not positive.
5      Q.    And do you recall endorsing them as potential
6  witnesses, as well as Mr. Tod Bergstrom, who was the
7  prosecutor in that case?
8      A.    It rings a bell.
9      Q.    And so, you were aware that there had been a
10  previous trial and there were transcripts, et cetera?
11      A.    Yes, I guess.
12      Q.    And in regard to Mr. Olsen, you were provided
13  his criminal history; is that correct?
14      A.    Mr. Olsen?
15      Q.    Yes.
16      A.    Yes; I was at least provided a printout.
17      Q.    And do you recall being provided the
18  certification for probable cause and the charging sheet
19  for a '95 PSP case?
20      A.    No.  And, Ms. Mahoney, I warned you about this
21  before:  I don't remember specifics on something that was
22  two and a half years ago.  No one has talked to me
23  previous to this hearing on these details.
24      Q.    Is this possible?
25      A.    It's possible.

CRIMINAL DEFENSE MOTION                              -78-
   HICKS - Cross

1   Q.   Do you recall that Mr. Olsen was missing during

2   most of your time in preparation of his case?

3   A.   No, I don't.  I am not denying it; I am just

4   saying I don't remember.

5   Q.   Do you remember the Friday before Mr. Simmers'

6   trial was due to begin, having the omnibus hearing and

7   reserving a motion to continue should Mr. Olsen appear

8   in time to testify for trial?

9   A.   I don't recall it, no.  Something like that --

10  Q.   Is it possible?

11  A.   Yes.

12  Q.   Okay.  Do you recall being present when

13  Mr. Ernsdorff came into the courtroom to tell you and

14  myself that he had been arrested?

15  A.   I do not recall the incident.

16  Q.   Could it have happened?

17  A.   It could have happened.

18  Q.   And so, it could have happened that

19  Mr. Ernsdorff actually told us --

20          MS. ELLIOTT:  I'm going to object --

21  Q.   -- he had been arrested and [unintelligible]--

22          MS. ELLIOTT:  -- to what could have

23  happened as to --

24          THE COURT:  Sustained.

25          MS. ELLIOTT:  -- Mr. Ernsdorff saying

CRIMINAL DEFENSE MOTION                              -79-
    HICKS - Cross

1    something.

2        Q.    So, I guess, Mr. Hicks, what I am trying to

3    convey to the Court here is that your memory, because it

4    was two and a half years ago, is faulty as to all that

5    you knew or didn't know; is that true?

6        A.    Not as to what I knew back then, no.

7        Q.    Okay.  But you just -- okay.  I thought that

8    you just said that you couldn't remember whether you did

9    certain things in the Thompson case or whether

10   Mr. Greenwood gave you certain information.

11       A.    I did.  But it sounded from the way you phrased

12   your question you were attacking my memory at the time --

13   my memories at the time.

14       Q.    Oh, I'm sorry, Mr. Hicks.  That makes it clear.

15   Today, as you sit here today, is your memory clear as to

16   everything that you knew two and a half years ago?

17       A.    No.

18       Q.    And so, is it possible that you knew more than

19   may be reflected in some of the written materials that

20   you possess in this case?

21       A.    Extremely likely.

22       Q.    Is it possible, Mr. Hicks?

23       A.    It is possible.

24       Q.    Do you recall that you had actually two

25   -- we met at the jail two different times with

CRIMINAL DEFENSE MOTION                                    -80-
   HICKS - Cross

1   Mr. Olsen?

2        A.   I believe that is true.

3        Q.   And the first time was with Mr. Greenwood; is

4   that right?

5        A.   I don't -- I believe it was Len, but I'm not

6   positive.

7        Q.   And you don't remember whether or not I was

8   present?

9        A.   I believe you were present, either that or

10  Mr. Marner, but I think you were there the first time.

11  I'm not sure.

12       Q.   Do you remember -- would it be possible both of

13  us were present?

14       A.   Very possible.

15       Q.   Do you remember if Detective Hopkins came

16  back?

17       A.   Sorry; no.

18       Q.   Is it possible?

19       A.   Certainly.

20       Q.   Mr. Hicks, do you remember calling as a defense

21  witness a Captain Hickok from Edmonds Police?

22       A.   Yes.

23       Q.   And didn't in fact you learn about that witness

24  through your own investigation?

25       A.   I called Hickok and talked to him.  I believe

1   the initial information I got was from Mr. Olsen.   And

2   that's the reason I contacted the detective.

3        Q.   And do you remember also receiving additional

4   information from Mr. Greenwood about Mr. Olsen's

5   activities?

6        A.   I may well have.

7        Q.   Are you able at this time to specifically tell

8   the Court everything you knew about Mr. Olsen at that

9   time?

10       A.   No.

11       Q.   Do you know where Mr. Greenwood is now?

12       A.   I have -- I may have a phone number for him.

13  It's out of state; it's either Florida or South

14  Carolina; I believe South Carolina.

15       Q.   Would you be willing to help us contact him if

16  need be?

17       A.   Certainly.

18            MS. MAHONEY:   Thank you.   I have nothing

19  further.

20            THE WITNESS:   I should mention Hope

21  Marsden is still in the area and working.

22            MS. MAHONEY:   Okay.

23       Q.   Who was your primary investigator in that case?

24       A.   Greenwood.

25

CRIMINAL DEFENSE MOTION                                    -82-
   HICKS - Cross

```
 1                    REDIRECT EXAMINATION

 2   BY MS. ELLIOTT:

 3        Q.   Mr. Hicks, do you recall whether or not either

 4   you -- that you had any knowledge of a February 28, 1996,

 5   incident involving Mr. Olsen at the Mary Martha Cafe?

 6        A.   Where?

 7        Q.   In Seattle.

 8        A.   No.

 9        Q.   Did anyone -- Mr. Greenwood, Ms. Mahoney, or

10   Mr. Olsen -- tell you that he had been arrested on that

11   date trying to pass a bad check at that cafe?

12        A.   Not to my memory.  As I recall, he only had

13   about one pending charge at the time.

14        Q.   Okay.  Did he ever mention to you in your

15   interview, did Ms. Mahoney ever tell you, or did

16   Mr. Greenwood ever tell you, that he had passed a bad

17   check at the Erotic Bakery?

18        A.   I think I would remember that, and the answer

19   is no.

20        Q.   Do you recall Ms. Mahoney, Mr. Greenwood or

21   Mr. Olsen or any other person ever telling you that, at

22   the time that Mr. Olsen was arrested in March of 1996,

23   that he had in his possession stolen credit cards?

24        A.   I do not recall that, no.

25        Q.   -- that he was a suspect in a purse theft at
```

1    Evergreen Washelli Cemetery?

2         A.   No.

3         Q.   -- that he was a suspect in a purse theft from

4    a commercial sewing store on Roosevelt Way?

5         A.   No.

6         Q.   -- that he was a suspect in the burglary of

7    Kristin Okerlund's (phonetic) home?

8         A.   No; no memory of that.

9         Q.   -- in North Seattle.

10        A.   No.

11        Q.   In your experience as a defense attorney, would

12   those have been matters that you would have considered

13   material to your preparation of the case against

14   Mr. Simmers?

15                 MS. MAHONEY:   I'm going to object at this

16   point.

17                 THE COURT:   Basis?

18                 MS. MAHONEY:   I don't see what --

19   speculation.

20                 THE COURT:   Overruled on that ground.

21        A.   Yes, particularly if they resulted in

22   convictions.  But the fact that they were still in

23   investigation is still worth looking into.

24                 MS. ELLIOTT:   Thank you, Mr. Hicks.

25

RECROSS EXAMINATION

1

2    BY MS. MAHONEY:

3        Q.    You knew that Mr. Olsen was gone -- I mean,

4    that he was not in custody at the time that this trial

5    was set; is that correct?

6        A.    I don't recall, Ms. Mahoney.

7        Q.    Okay.  Wouldn't it seem that, if you knew that

8    the State would be calling him as a witness -- okay.  You

9    don't recall whether he was in custody or out of

10   custody; is that what you are saying?

11       A.    During what time period?  At --

12       Q.    Just prior --

13       A.    -- the time of the trial, he was in custody.

14       Q.    -- prior to Mr. Simmers' trial.

15       A.    I remember him being in custody at the time of

16   the trial.

17       Q.    Do you remember why you couldn't interview him

18   until the week before the trial and needed a continuance

19   for a week at the trial?

20       A.    I do not remember the specifics.  I believe he

21   was out.  Your office was having difficulty locating him.

22   I was concerned you were going to get him at the last

23   minute, and I -- put him on the stand.  So, I am sure I

24   had some concerns along those lines.

25       Q.    Okay.  So, it is possible, then, that indeed

CRIMINAL DEFENSE MOTION                                    -85-
    HICKS - Recross

1    you did know he had been arrested on February 28?

2         A.   I'm sorry.  Say that again.

3         Q.   It's possible, then, that you did know and were

4    informed that he was arrested on February 28 and was now

5    in custody and available to testify?

6         A.   Yes.

7         Q.   And it's possible that Mr. Ernsdorff was there

8    during that conversation and told us both what he was

9    arrested for; isn't that right?

10        A.   When and where was this? -- if you --

11        Q.   Up on the --

12        A.   -- can [refresh my mind].

13        Q.   -- 12th floor, on the Friday morning that --

14             MS. ELLIOTT:  Your Honor, I'm going to

15   object.

16        Q.   -- [unintelligible] continue.

17             MS. ELLIOTT:  I think Mr. Hicks has

18   testified he does not remember this conversation.

19             THE COURT:  Well, Ms. Mahoney is entitled

20   to test his memory, but I agree that at this point, the

21   way the question is being phrased, it's not --

22             MS. MAHONEY:  Well, he is asking where and

23   when this would be, and so I'm trying --

24             THE COURT:  You can't --

25             MS. MAHONEY:  -- to say, "Do you remember

CRIMINAL DEFENSE MOTION                              -86-
    HICKS - Recross

1  that?"

2              THE COURT:  You can't testify.  So, you

3  can rephrase your question without interjecting your own

4  testimony.

5      Q.   Is it possible that that occurred; that

6  Mr. Ernsdorff did tell you at the time you were up on 12

7  -- or, excuse me.  Is it possible that Mr. Ernsdorff did

8  tell you he was arrested and briefly why?

9      A.   It's possible.  I don't think it's likely he

10  told me why if it involved any of these things

11  Ms. Elliott has brought up, because I certainly would

12  have taken note of it and followed up.

13      Q.   What would you have done differently,

14  Mr. Hicks?

15      A.   Looked into it and see what was out there in

16  terms of additional charges.  For one thing, it was

17  obvious that Mr. Olsen wasn't honest during our

18  interview, if there were these other uncharged matters

19  out there.  I always ask broad, open-ended questions to

20  make sure we cover everything, and if I didn't have it,

21  he must have lied to us.

22      Q.   Did you ask him -- Do you recall asking him

23  what he was arrested for?

24      A.   Well, obviously not, because at the time of the

25  interview I would not have known what he was arrested

1    for.

2        Q.   But if you knew he was out of custody and then

3    he got arrested --

4            MS. ELLIOTT:  I'm going to object.

5        Q.   -- wouldn't it make sense --

6            MS. ELLIOTT:  That assumes a fact not in

7    evidence.

8        A.   I could --

9            MS. MAHONEY:  But he is saying that he

10   thinks he may --

11           THE COURT:  Well, this is -- A, it is

12   becoming argumentative; B, Mr. Hicks is a witness, so

13   you need to ask him questions; and C, you will be able

14   to call other witnesses.

15           MS. MAHONEY:  Right.  I guess what I'm

16   asking is -- Mr. Hicks has testified that it would have

17   been material for him to know that.  But if it would be

18   -- I guess I am trying to get at, then, based on what he

19   did know, why he didn't do any more.

20           THE COURT:  Well, you could ask him --

21           THE WITNESS:  Based on what I knew of

22   what?

23           THE COURT:  Well, ask questions,

24   Ms. Mahoney.

25       Q.   Do you -- I guess I want to be clear on your

State v. SIMMERS/95-1-02102-2.SEA          11/4/97

1    answer here, then:  Do you have a clear memory today

2    about what the sequence of events were that led to

3    Mr. Olsen being available for testimony in the Simmers

4    trial?

5          A.   No.

6                    MS. MAHONEY:  No further questions.

7

8                    REDIRECT EXAMINATION

9    BY MS. ELLIOTT:

10         Q.   But are you clear as to whether or not you knew

11   about the other possession of stolen property charges,

12   thefts?

13         A.   We jumped on everything we had --

14                   MS. MAHONEY:  Okay.  I'm going to object

15   at this point.  If he is not clear, then he can't

16   speculate to what he would have done.

17                   THE COURT:  That goes to the weight.  He

18   has answered the question.  Could you ask your question

19   again.

20                   THE WITNESS:  I heard the question, Your

21   Honor.

22                   THE COURT:  Why don't you repeat it.

23                   MS. ELLIOTT:  Okay.

24         Q.   Are you clear as to whether or not you knew

25   about the theft -- or, the attempt to pass a bad check at

1    the Erotic Bakery, an attempt to pass a bad check at Mary

2    Martha's Cafe, the stolen checks, the stolen purse and

3    the potential burglary charge that were being

4    investigated against Mr. Olsen?

5         A.   Well, again, those ring no bell whatsoever.   I

6    don't remember anything about them, so I -- my answer is

7    no.

8              But I will say this:  At the time, we jumped on

9    everything we could find on Mr. Olsen because, for

10   tactical reasons, I wanted to get this trial over with.

11   I had my own reasons.  And we jumped on everything we had

12   at the time, so I am confident I did not have these other

13   pending charges at my disposal.

14             MS. ELLIOTT:  Thank you.  No further

15   questions.

16             MS. MAHONEY:  Nothing further.

17             THE COURT:  So, may this witness be

18   excused?

19             MS. ELLIOTT:  He may.

20             THE COURT:  Ms. Mahoney, did you think

21   there was a need to re-call him?

22             MS. MAHONEY:  (Shakes head.)

23             THE COURT:  Oh, all right.  Thank you,

24   Mr. Hicks.

25             THE COURT:

```
1                    MS. MAHONEY:  I may want to try and obtain
2     an affidavit from Mr. Greenwood.
3                    THE COURT:  To that extent, Mr. Hicks,
4     could you remain just a moment, so you can coordinate
5     with Ms. Mahoney about how to get a hold of
6     Mr. Greenwood.
7                    THE WITNESS:  [I wrote it down.]
8                    THE COURT:  Okay.  We will stop this
9     morning.
10                    Now, what is the order of presentation
11    this afternoon, Ms. Elliott?
12                    MS. ELLIOTT:  Well, it's my understanding
13    that -- well, Mr. Ernsdorff has told me that Mr. Olsen
14    has refused to waive the attorney-client privilege, so I
15    do not know if Ms. Mahoney will still be calling him, and
16    I do not know the status of the attorney for Mr. Olsen.
17    You know --
18                    THE COURT:  So, we have --
19                    MS. ELLIOTT:  I am confident there is a
20    basis to grant a new trial at this point, but I believe
21    that the State wishes to call those two people.
22                    THE COURT:  All right.  Ms. Mahoney.
23                    MS. MAHONEY:  Is Ms. Elliott saying that
24    she would like to stop with the testimony as it is before
25    the Court now and --
```

CRIMINAL DEFENSE MOTION                                        -91-
    HICKS - Redirect

1          MS. ELLIOTT:  Oh, no.  I want to examine

2   Mr. Olsen.  I want to get Mr. Ernsdorff's file.  I don't

3   know if that is possible.

4          THE COURT:  Okay.  Ms. Mahoney.

5          MS. MAHONEY:  I don't know that I can

6   respond at this point.  It's her motion.

7          THE COURT:  All right.  Ms. Elliott wishes

8   to call Mr. Olsen.  What was the result of an attorney

9   being appointed for Mr. Olsen?

10          MS. MAHONEY:  Have we heard back from

11   Mr. Alexander?  This was the phone number we left.

12          THE COURT:  I would ask Counsel to remain.

13   I will call OPD about the status of that and determine

14   how to proceed after that.  Ms. Elliott is entitled to

15   call Mr. Olsen to the stand, and as far as I am being

16   told now, Mr. Olsen is not waiving the attorney-client

17   privilege, and maybe Mr. Ernsdorff at this stage [will

18   not be available].

19          MS. MAHONEY:  Mr. Ernsdorff can -- I would

20   call him for one brief matter.  There are some things he

21   can testify to that don't have anything to do with his

22   attorney-client privilege.

23          THE COURT:  All right.  So, the potential

24   witnesses this afternoon are Mr. Olsen and Mr. Ernsdorff.

25   Is there any way --

State v. SIMMERS/95-1-02102-2.SEA                    11/4/97

1                    MS. MAHONEY:  And Detective Hopkins.

2                    THE COURT:  -- and Detective Hopkins.

3        Anybody else?

4                    MS. ELLIOTT:  Not that I know of.

5                    THE COURT:  All right.  We will be in

6        recess, and we will call OPD.

7                              (Noon recess; 12:12 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    KING COUNTY SUPERIOR COURT; TUESDAY, NOVEMBER 4, 1997

2                          1:47 P.M.

3                          --oOo--

4

5                          (Court reconvenes following

6                          noon recess.)

7              THE COURT:  All right.  We are on the

8    record.

9              MS. ELLIOTT:  Thank you, Your Honor.

10             MS. MAHONEY:  Your Honor, back on the

11   record on the Simmers case.  I have had an opportunity to

12   talk with Ms. Elliott and, although I would like to

13   reserve the opportunity to file an affidavit of a

14   declaration of my own, if necessary, following today's

15   case, Ms. Elliott has agreed that I may offer the

16   following stipulation to the Court, which may help the

17   Court put some information in a framework.

18             THE COURT:  Okay.  And then just do me a

19   favor:  Go slowly.

20             MS. MAHONEY:  Okay.  As I agreed and as I

21   stipulated during Mr. Hicks' testimony, he was never

22   provided with Exhibit 4, 5, 6 or 7, and that was because

23   I did not have those.  I never sought to get those.

24             THE COURT:  Okay.

25             MS. MAHONEY:  I knew that Mr. Olsen was

1   arrested for investigation of fraud or forgery on

2   the 28th of February.  I believe that information was

3   passed on to Mr. Hicks; obviously, the Court will have to

4   determine that.

5               THE COURT:  Okay.  Just a minute.  Again,

6   since I don't write as fast as you speak -- you knew

7   that Mr. Olsen was arrested on February 28.  Was there

8   anything else?  Didn't you say something else?

9               MS. MAHONEY:  For investigation of fraud

10  or forgery; I don't recall which.

11              THE COURT:  Okay.

12              MS. MAHONEY:  I knew that from

13  Mr. Ernsdorff.  I knew he had been booked under a

14  different name.

15              THE COURT:  Knew from Mr. Ernsdorff --

16  just a minute.

17              MS. MAHONEY:  I learned that on the Friday

18  morning, whatever the following -- the 28th was, which

19  may have been the very next day.  I believe it was

20  March 1.  And I learned that with Mr. Hicks present.  I

21  never again checked into any of those matters.

22              THE COURT:  Uh-huh.

23              MS. MAHONEY:  And I know that during the

24  interviews with Mr. Olsen that those matters were never

25  discussed with Mr. Hicks and Mr. Olsen.  Mr. Ernsdorff

CRIMINAL DEFENSE MOTION                                   -95-
   Colloquy

1    was not present at the interview of Mr. Olsen by

2    Mr. Hicks --

3                    THE COURT:  Uh-huh.

4                    MS. MAHONEY:  -- because there was the

5    understanding --

6                    THE COURT:  Uh-huh.

7                    MS. MAHONEY:  -- with Mr. Ernsdorff,

8    myself, and Mr. Hicks, that his pending matters would not

9    be discussed.  Obviously, then, Mr. Olsen would have

10   needed counsel.

11                   Does that cover what I told you? -- what

12   your concerns were?

13                   MS. ELLIOTT:  (No audible response.)

14                   MS. MAHONEY:  So, I just wanted to make

15   it, you know, clear for the record that, other than being

16   told of an investigation of fraud or forgery, none of the

17   other things were ever discussed with Mr. Hicks, so he

18   wouldn't have any knowledge of that, whether he remembers

19   or not -- from me or from Mr. Olsen.

20                   THE COURT:  Ms. Elliott.

21                   MS. ELLIOTT:  With that, Your Honor --

22                   MS. MAHONEY:  I don't know what he looked

23   into on his own.

24                   MS. ELLIOTT:  With that, Your Honor, I

25   would offer -- I don't think we offered any, 1, 2, 3, 4,

1    5, 6 or 7, and I would offer all of those as exhibits in

2    this case.

3              MS. MAHONEY:  I have no objection.  I also

4    have no objection to No. 8, now that I have had the

5    opportunity to review it, if Ms. Elliott cares to offer

6    it.  I would like to note for the record that two of

7    those pages from those notes are missing.

8              MS. ELLIOTT:  I only used it to refresh

9    Mr. Hicks' memory as to the dates.  I think, given his

10   testimony and Ms. Mahoney's stipulation, we don't need to

11   offer it, Your Honor.

12             THE COURT:  Then Exhibits 1 through 7 are

13   admitted.  Exhibit 8 can be admitted for purposes of the

14   record only.

15             MS. MAHONEY:  I would just like to say

16   that there are two pages missing from it, even when it

17   was used to refresh his recollection.

18             THE COURT:  That's fine.  That's fine.

19                        (Conference at counsel table

20                         for the prosecution.)

21             MS. MAHONEY:  I would like to point out

22   that the pages that are missing --

23             THE COURT:  Uh-huh.

24             MS. MAHONEY:  -- were when they were

25   discussing Kevin's past work, what he had going on, any

1    potential remuneration, those sorts of things.  So, those

2    are the two pages missing, so that's kind of key, since

3    that is what is at issue here.  When you were asking

4    Mr. Hicks if this helped refresh his recollection, there

5    wasn't anything there to help refresh.  I mean, essential

6    portions of that were missing.

7                    THE COURT:  Okay.  So, if I understand the

8    stipulation -- and let me go through it, so that I am

9    clear -- Mr. Hicks was never provided Exhibits 4, 5, 6

10    or 7.

11                    MS. MAHONEY:  Because I didn't have them.

12                    THE COURT:  Ms. Mahoney never had or

13    sought to obtain these.  Ms. Mahoney knew that Mr. Olsen

14    was arrested on February 28 for investigation of fraud or

15    forgery.  Ms. Mahoney knew from Mr. Ernsdorff that

16    Mr. Olsen was booked under a different name.

17                    MS. MAHONEY:  I knew from Mr. Ernsdorff

18    that he was booked under a different name on

19    investigation of fraud or forgery.

20                    THE COURT:  Okay.

21                    MS. MAHONEY:  All the information I knew

22    was from Mr. Ernsdorff.

23                    THE COURT:  Okay.  On March 1, with

24    Mr. Hicks present, you learned this information from

25    Mr. Ernsdorff.

1          MS. MAHONEY:  Right.

2          THE COURT:  Ms. Mahoney never checked into

3     those matters.  You indicated that --

4          MS. MAHONEY:  I'm sorry.  I never checked

5     into them with the police.  I knew nothing was filed in

6     our office.

7          THE COURT:  During the interviews,

8     Mr. Ernsdorff was not present -- the interviews with

9     Mr. Olsen, Ms. Mahoney and Mr. Hicks.  There was an

10    agreement with Mr. Ernsdorff, Mr. Hicks and Ms. Mahoney

11    that the pending matters would not be discussed;

12    otherwise, Mr. Olsen would have needed counsel.

13         Is there anything else?

14         MS. MAHONEY:  No.

15         THE COURT:  Okay.

16         Now, Ms. Ramey is here.  And is Mr. Olsen

17    prepared to testify?

18         MS. RAMEY:  Your Honor, I would like to

19    see, if possible, the plea statement from the PSP.

20         MS. ELLIOTT:  I have that.

21         MS. MAHONEY:  It's probably in one of the

22    exhibits.

23         MS. ELLIOTT:  Here is a copy.

24         MS. RAMEY:  And if possible --

25         MS. ELLIOTT:  Here is a copy.

 1          MS. RAMEY:  Okay.

 2          THE COURT:  Is there anything else you

 3  would like to see, Ms. Ramey, and did you want additional

 4  time with Mr. Olsen before we proceed with his testimony?

 5          MS. RAMEY:  Are the police reports from

 6  the five pending charges that were ultimately just never

 7  filed --

 8          THE COURT:  Ms. Elliott has all of those.

 9          MS. ELLIOTT:  I have copies.

10          Your Honor, is it all right if I hand

11  Ms. Ramey the official exhibits? because I stapled mine.

12          THE COURT:  Only if she promises to give

13  them back.

14          Ms. Ramey, how much time -- just tell us,

15  because we will be in recess while you --

16          MS. RAMEY:  Oh, I just need about ten

17  minutes.

18          THE COURT:  All right.  We will be in

19  recess for ten minutes.

20                    (Recess; 1:55 to 2:15 p.m.)

21          MS. MAHONEY:  I should get Mr. Olsen, I

22  suppose.

23          MS. RAMEY:  Mr. Olsen is going to testify,

24  Your Honor.

25          THE COURT:  And who is calling him?

1          MS. ELLIOTT:  I am.

2

3                KEVIN OLSEN,

4    called as a witness for the Defendant, being first duly

5    sworn or affirmed to tell the truth, was examined and

6    testified as follows:

7

8                MS. RAMEY:  Your Honor, do you want me to

9    sit next to him, or --

10               THE COURT:  If it's easier for you.  You

11   can sit wherever you think it Is easiest.

12               MS. RAMEY:  Well, if he has any questions,

13   then --

14               THE COURT:  That's fine.  That's fine.

15               MS. RAMEY:  -- please signal me, and I

16   will come up there.

17               THE WITNESS:  Okay.

18               THE COURT:  Okay.

19

20               DIRECT EXAMINATION

21   BY MS. ELLIOTT:

22       Q.   Would you state your name and spell your last

23   name for the record, Mr. Olsen.

24       A.   Kevin Scott Olsen, O-l-s-e-n.

25       Q.   And are you presently in the custody of the

1    Department of Corrections?

2         A.   Yes, I am.

3         Q.   You are not wearing jail clothes today.

4         A.   No, I'm not.

5         Q.   Who got you the street clothes?

6         A.   Who got these?

7         Q.   Uh-huh.

8         A.   I got them myself.

9         Q.   Who allowed you to change today?  Where did you

10   change?

11              MS. MAHONEY:  Objection:  What is the

12   relevance of this, Your Honor?

13              THE COURT:  It has marginal relevance, and

14   the objection is sustained.  You may have some inquiry as

15   to particular privileges related to his status.

16              MS. MAHONEY:  Your Honor, could --

17              THE COURT:  Thank you.

18              MS. MAHONEY:  -- I stipulate for the

19   record -- to maybe get us through this, so that we don't

20   wander into bad areas, since he is in protective custody

21   -- the State arranged for Bothell detectives to pick up

22   Mr. Olsen from his undisclosed location.  The transport

23   order was under seal, and he had his own clothes at that

24   facility, and the Bothell detectives allowed him to

25   change in the Prosecutor's office prior to coming to

CRIMINAL DEFENSE MOTION                              -102-
     OLSEN - Direct

1  court today.

2          THE COURT:  All right.  Thanks.

3          MS. ELLIOTT:  May I inquire further?

4          THE COURT:  You may.

5          MS. ELLIOTT:  Okay.

6     Q.   Did you have any conversation with Ms. Mahoney

7  before you came to court here today?

8     A.   Some.

9     Q.   When?

10    A.   I think I talked to her on the phone one time a

11 week ago and just basically a little while ago.

12    Q.   Did she call you, or did you call her?

13    A.   Oh, I called her.

14    Q.   Why did you call her?

15    A.   To make sure that there was not going to be any

16 security difficulties and what the issue was about.

17    Q.   How did you find out about the issue?  How did

18 you find out that you were coming to court here today?

19    A.   I was given that information by the

20 Prosecutor's Office.

21    Q.   Who at the Prosecutor's Office gave you that

22 information?

23    A.   Oh, Sue Mahoney.

24    Q.   And how did she give that information to you,

25 by letter or by telephone?

1      A.   Neither.

2      Q.   Pardon me?

3      A.   Oh.  By -- okay.  When I called her, I inquired

4  about what I was coming to court for; what the --

5      Q.   Okay.  How did --

6      A.   -- issue was about.

7      Q.   -- you get notified that you were coming to

8  court today?

9      A.   I had contacted the -- somebody in the

10  Prosecutor's Office about another issue.

11      Q.   What issue did you contact the prosecutors

12  about?

13      A.   A letter that I had sent.

14      Q.   Who did you send the letter to?

15      A.   Who did I send the letter to?

16      Q.   Yeah.

17      A.   I sent it to Antonio Terry's wife --

18      Q.   And --

19      A.   -- her family.  It was not a letter; it was

20  actually a card.

21      Q.   Okay.  And who did you talk to in the

22  Prosecutor's Office when you sent that card?

23      A.   Scott O'Toole.

24      Q.   And what did Scott O'Toole tell you about this

25  hearing?

CRIMINAL DEFENSE MOTION                                      -104-
     OLSEN - Direct

1     A.   Nothing, other than the fact that I should

2  probably get a hold of Sue Mahoney, and I did that.

3     Q.   Well, did he tell you why you should get a hold

4  of Sue Mahoney?

5     A.   No; I just got a hold of Sue Mahoney.

6     Q.   Okay.  Does Mr. O'Toole take all of your

7  calls?

8     A.   No, he does not.

9     Q.   How many times do you think you call him in a

10  month or week? -- month.  How many times do you call

11  Mr. O'Toole in a month?

12     A.   I don't know; not very many at all.

13     Q.   More than once?

14          MS. MAHONEY:  I am going to object at this

15  point and ask for a relevant time period.

16          THE COURT:  Sustained.

17     Q.   How many times have you called Mr. O'Toole

18  since the trial in the Simmers case?

19     A.   Just a couple of times, concerning security

20  issues.

21     Q.   And what do you mean by "concerning security"

22  -- were you asking Mr. O'Toole to do something for you

23  when you made those calls?

24     A.   No.

25     Q.   Okay.  Were you expressing your concerns about

1     your personal safety?

2           A.   I was.

3           Q.   Okay.  Did Mr. O'Toole take your call both

4     times?

5           A.   It took a little doing to get through to him.

6           Q.   But you finally got through to him?

7           A.   Yes, ma'am.

8           Q.   And he talked to you?

9           A.   Yes, he did.

10          Q.   Okay.  So, do you ever correspond with

11    Mr. O'Toole?

12          A.   What do you mean?

13          Q.   Do you send him letters?

14          A.   I sent a card, a condolence card, to the

15    Antonio family through him.

16          Q.   Okay.  What day did you call Ms. Mahoney?

17          A.   I don't recall exactly what day it was or what

18    time it was exactly or --

19          Q.   Was it --

20          A.   -- the date itself.

21          Q.   -- more than a month ago?

22          A.   It was just a week or two ago, just a couple

23    weeks ago.

24          Q.   And that is the first you heard about this

25    court date?

1          A.    Yes, it is.

2          Q.    Okay.  And what did Ms. Mahoney tell you about

3    this court date?

4          A.    That I would be being called down to court.

5          Q.    And did she tell you what the subject of your

6    testimony was going to be?

7          A.    I don't recall that she did.  I think it was

8    -- that issue was going to be taken up when I got here,

9    [just here] in court today.

10         Q.    So, she never discussed with you what the

11   concerns are today?

12         A.    I don't believe -- I don't recall.

13         Q.    You don't recall that conversation you had with

14   her two weeks ago?

15         A.    It was real quick and to the point, that I

16   would be called to court, probably on the 4th of

17   November.

18         Q.    Do you recall November 1995?

19         A.    Yes, I do.

20         Q.    And where were you on or about November 11,

21   1995?

22         A.    On the 11th, I was in the King County Jail, I

23   believe.

24         Q.    Okay.  And what had you been arrested for?

25         A.    Possession of stolen property.

1      Q.   Okay.  How many times had you been previously

2   convicted of felonies in the state of Washington?

3      A.   From this day; from that day?

4      Q.   From that day.

5      A.   I'd say about thirteen.

6      Q.   So, you don't really recall how many felony

7   convictions you have, do you?

8      A.   I could go through them one by one with you,

9   and we could count them up.  I know them all [verbatim].

10      Q.   Okay.  And do you recall December 7, 1995?

11      A.   That general time period, yeah.

12      Q.   Yeah.  Do you recall being released on

13   conditions pursuant to that possession of stolen property

14   charge?

15      A.   Yes, I do.

16      Q.   Okay.  I'm showing you Defendant's Exhibit

17   No. 1.  Do you recognize that piece of paper?

18      A.   Yes, I do.

19      Q.   Okay.  Is that your signature at the bottom of

20   that piece of paper?

21      A.   Yes, it is.

22      Q.   Okay.  Do you recall the hearing that led up to

23   -- what is the title of that document?

24      A.   This is conditions of release.

25      Q.   Do you remember the hearing that led up to that

```
 1    release?
 2         A.   Do I remember the hearing?
 3         Q.   Yes.
 4         A.   I refused to go to the hearing.
 5         Q.   Why?
 6              THE COURT:  I didn't hear the last part.
 7              THE WITNESS:  I didn't -- I --
 8              THE COURT:  You refused to go to where?
 9              THE WITNESS:  I refused to go to the
10    hearing.
11         Q.   Why did you refuse to go to the hearing?
12         A.   For security issues.
13         Q.   Okay.  And do you recall discussing the hearing
14    with Mr. Ernsdorff?
15         A.   What was said, no, I don't recall exactly.
16         Q.   So, you had no idea that, on December 7, 1995,
17    that Mr. Ernsdorff was going to go to court and ask for
18    your release?
19         A.   Oh, yeah; I do remember that.
20         Q.   So, you did discuss the bond hearing --
21         A.   Oh, yeah.  Yeah.
22         Q.   -- with Mr. Ernsdorff?  Okay.
23              Did you ask Mr. Ernsdorff to set a bond hearing
24    for you?
25         A.   Yes, I did.
```

1     Q.   Okay.  Did you tell him who to call as
2  witnesses?
3     A.   I believe I told him to call my probation
4  officer in Bellingham.
5     Q.   What about Mr. Bergstrom?  Did you tell him to
6  call Mr. Bergstrom?
7     A.   I don't know that I did or not.
8     Q.   Okay.  How would Mr. Ernsdorff find out --
9  well, let me ask you this:  Did you know Mr. Bergstrom,
10  Tod Bergstrom?
11     A.   I know who he is, yes.
12     Q.   And why do you know who he is?
13     A.   I was involved with a trial with him in
14  'ninety- -- the early '90s.
15              THE COURT:  In when?
16              THE WITNESS:  Early '90s.
17     Q.   And you continued to correspond with him after
18  that trial, did you not?
19     A.   I had on occasion, yeah.
20     Q.   Okay.  And if there was someone who you would
21  want to have tell the judge about your previous
22  cooperation, it would be someone like Mr. Bergstrom,
23  correct?
24     A.   I wouldn't mind that at all.
25     Q.   Okay.  And would you have informed

CRIMINAL DEFENSE MOTION
  OLSEN - Direct                                    -110-

```
 1    Mr. Ernsdorff that Mr. Bergstrom could provide that kind
 2    of information to Judge Gain?
 3         A.   I don't recall.
 4         Q.   Okay.  What made you think you would qualify
 5    for bond on the PSP case?
 6         A.   Actually, I had an active probation and a
 7    parole officer in the community; I had a residence --
 8    established residence; my willingness to go into alcohol
 9    treatment; and I had a job waiting, all those side
10    issues --
11         Q.   Did you mention to Mr. Ernsdorff that you had
12    informed against Mr. Simmers before he went to the
13    hearing?
14         A.   Um --
15         Q.   Is that an item of information you would have
16    wanted him to have?
17         A.   I don't believe I did.  I don't know.  I don't
18    recall.
19         Q.   Okay.  So, you don't know if Mr. Ernsdorff
20    addressed that with the judge or not?
21         A.   No, I'm -- I wouldn't know that at all.
22         Q.   Okay.  How many times previously had you been
23    released on your personal recognizance before trial with
24    no bond set?
25         A.   Gees, several times.
```

CRIMINAL DEFENSE MOTION
  OLSEN - Direct               -111-

1    Q.   Okay.  How many?

2    A.   I don't recall exactly how many.

3    Q.   Okay.  But on other times you hadn't been

4  released, had you, pending trial?

5    A.   Oh, no.

6    Q.   Okay.  You are generally held, wouldn't you

7  say, pending trial?

8    A.   Generally I am, yeah.

9    Q.   And you had a poor history for showing up for

10  court dates, didn't you?

11    A.   I would say so.

12    Q.   You had a poor history of remaining in custody,

13  didn't you?

14    A.   I've got a poor history of everything, ma'am.

15    Q.   Okay.  Could you read halfway down the page

16  what the conditions you were released on?

17    A.   Marked with the "X"?

18    Q.   Yes.

19    A.   It says, "On the condition to obey all laws,

20  appear at all court hearings, appear at next hearing on

21  December 18, 1995, at 1 p.m., East 1201."

22    Q.   And did you sign below that condition?

23    A.   Yes, I did.

24    Q.   Did anyone review that condition with you

25  before you were released from the King County Jail?

```
1          A.   Oh, yes, they did.
2          Q.   Okay.  Did you appear for your court date on
3     December 18, 1995?
4          A.   No, I didn't.
5          Q.   Did you obey all laws?
6          A.   No, I didn't.
7          Q.   Okay.  Do you recall a burglary at Kristin
8     Okelund's house?  Maybe you don't remember the name.
9               MS. MAHONEY:  I'm going to object at this
10    point, because what is the -- there is no showing that
11    this would be relevant at this point to the Simmers case.
12              THE COURT:  Ms. Elliott.
13              MS. ELLIOTT:  It's relevant, Your Honor,
14    because -- in this way:  No one told Mr. Hicks about
15    these police reports.
16              THE COURT:  All right.
17              MS. ELLIOTT:  No one told Mr. Hicks that
18    Mr. Olsen had been released on his promise to obey all
19    the laws.  Mr. Olsen was released, committed -- violated
20    the court order, which is evidence of how he views his
21    promises to the court, which would be relevant to his
22    promise to tell the truth.
23              And he proceeded to, not only fail to
24    appear, but if he -- I don't know whether he is going to
25    admit to these police reports, but at least one of them
```

CRIMINAL DEFENSE MOTION                              -113-
    OLSEN - Direct

```
1    he was arrested on, and the knowledge about whether or

2    not he committed these offenses is relevant, and if he

3    admits to them, relevant to the inquiry that Mr. Hicks

4    should have been able to make at the time of trial in the

5    Simmers case.

6              THE COURT:  Ms. Mahoney.

7              MS. MAHONEY:  I think, Your Honor, first

8    of all, he has already admitted that he didn't appear,

9    and he has already admitted that he broke laws during

10   that time period.  There is already before the Court that

11   Mr. Hicks did not know about those police reports.  It is

12   clear from the testimony thus far that those police

13   reports weren't even received by anyone in my office

14   until the 19th of March.  There is -- so, the Court

15   is -- So, whether or not all of these police reports are

16   true doesn't matter.

17             THE COURT:  All right.  Ms. Elliott, they

18   are exhibits?

19             MS. ELLIOTT:  They are.

20             THE COURT:  And they have been admitted --

21             MS. ELLIOTT:  They are.

22             THE COURT:  -- without objection, and

23   Mr. Hicks has testified.  If you want to ask relevant

24   questions to Mr. Olsen, you can, but because they have

25   been admitted without objection [and] because they are
```

1    part of this record --

2              MS. ELLIOTT:  I'm not going to go over the

3    facts, Your Honor.  I was just leading up to some further

4    questions.

5              THE COURT:  Maybe you could put them

6    together as a foundation and then indicate what your next

7    line of inquiry would be.

8         Q.   Okay.  Mr. Olsen, you committed crimes when

9    you had absconded from your supervised release, correct?

10   -- or your promise to appear.

11        A.   Yes, I did.

12        Q.   Okay.  And you were arrested on February 28,

13   1996, were you not?

14        A.   Yes, I was.

15        Q.   Okay.  What were you arrested for?

16        A.   I believe investigation of forgery or

17   possession of stolen property.

18        Q.   Okay.  And you were taken directly to the King

19   County Jail, were you not?

20        A.   No, I wasn't.

21        Q.   Where were you taken?

22        A.   I was taken to a precinct on the North End.

23        Q.   Okay.  And you lied about your name?

24        A.   Yes, I did.

25        Q.   And where were you taken from there?

1        A.    To King County Jail.

2        Q.    Okay.  And were you ever released again from

3   the King County Jail pending your testimony in the

4   Simmers case?

5        A.    I don't believe so.

6        Q.    Okay.  And did you -- you in fact told

7   Mr. Ernsdorff that there was more than one problem

8   pending out there, didn't you?

9              MS. MAHONEY:  Your Honor, at this point,

10   I'm going to object, because I think Mr. Olsen should be

11   advised that he had already indicated he didn't wish to

12   waive his privilege with Mr. Ernsdorff.

13              THE COURT:  And it's his privilege, and

14   he --

15              MS. MAHONEY:  But I think he needs to know

16   that if he talks about it --

17              THE COURT:  Well, Ms. Mahoney --

18              MS. MAHONEY:  -- that the privilege is

19   waived.

20              THE COURT:  -- I was going to indicate he

21   has his own attorney.

22              MS. MAHONEY:  I'm sorry.

23              THE COURT:  So, it is Mr. Olsen's

24   privilege.  Ms. Mahoney informed us earlier that

25   Mr. Olsen did not wish to waive the attorney-client

1    privilege as it related to conversations he had with

2    Mr. Ernsdorff related to the representation during him.

3    Mr. Olsen, did you want to consult with Ms. Ramey?

4                    THE WITNESS:  Yes, I think.  Thank you.

5                    MS. RAMEY:  [Unintelligible]

6                    THE COURT:  No.

7                            (Conference between the Witness

8                             and his counsel.)

9         Q.   Did you discuss with Mr. Ernsdorff the pending

10   charges?

11        A.   I want to assert my attorney-client privilege.

12   Thank you.

13        Q.   Okay.  Did you know that there were other bad

14   checks out there that you had written?

15        A.   That I had written?

16        Q.   Participated in the writing of.

17        A.   Potentially.

18        Q.   And you knew that there were other crimes out

19   there that may eventually land in the Prosecutor's

20   Office, didn't you -- as either police reports, bad

21   checks, theft allegations, didn't you?

22        A.   Potentially.

23        Q.   And you knew that, if some of those police

24   reports, some or all of those police reports landed in

25   the Prosecutor's Office, that there was a likelihood that

1   additional charges, not just the ones you had been

2   arrested on, but others would be filed?

3       A.   That's always a possibility, yeah.

4       Q.   Okay.  And wouldn't you agree that -- in

5   February or March 1996, did you still have an unresolved

6   1995 possession of stolen property charge pending?

7       A.   From November?  Or, yeah -- from November 2?

8       Q.   Yeah.

9       A.   Yes, I did.

10      Q.   Okay.

11               THE COURT:  Of what year?

12               THE WITNESS:  '95.

13      Q.   And --

14               [THE COURT]:  What kind of charge was

15   that?

16               MS. ELLIOTT:  Possession of stolen

17   property.

18      Q.   I'm going to hand you Defendant's Exhibit

19   No. 2.  Do you recognize that document?

20      A.   (Examines document) The reason it's taking so

21   long is it's hard to read.

22               (Examines document) Yes, I do.

23      Q.   What is that document?

24      A.   This is a plea agreement.

25      Q.   And is it signed by you?

```
 1        A.   Oh, yeah.

 2        Q.   And is it in regard to the 1995 possession of

 3   stolen property case?

 4        A.   Yes, it is.

 5        Q.   And can you read aloud Section F?

 6        A.   Barely.  "The prosecuting" -- I am going to

 7   assume that says "attorney" -- "will make the following

 8   recommendation to the judge:  29 months' confinement,

 9   court costs, $100 victim's" -- "victim's recoupment of

10   attorneys fees," I think, "restitution to the victims in

11   this case, and SPD Incident No. 96-90770, 96-88897,

12   96-84, 96-84648.  State agrees not to file any charges

13   arising out of 96-90770" -- which is the original number,

14   original reading there -- "96-8897," which was already

15   read, "96-84648" was already read, "96-020262 and

16   96-89088; will file other charges out of those" --

17   "arising out of that."  I guess the incident number, my

18   understanding, was 96-90770.  That charge and all those

19   others were stemming from the same.

20        Q.   Okay.  And who do you suppose notified the

21   Prosecutor's Office about those outstanding charges?

22                  MS. MAHONEY:  Objection --

23                  THE COURT:  Sustained.

24                  MS. MAHONEY:  -- calls for speculation.

25                  THE COURT:  Lack of foundation.
```

1     Q.  Did you tell your lawyer about those pending

2  charges out there, or your suspicions about pending

3  charges out there?

4     A.  I don't know exactly what I had told him

5  specifically about the -- the plea agreement.  He came

6  back to me with the agreement, and that was what it was.

7     Q.  So, you never gave Mr. Ernsdorff any

8  instructions as to negotiating the plea in this case?

9          MS. MAHONEY:  I'm going to object at this

10  point in asking if Mr. Olsen is determining to waive his

11  privilege.

12          THE COURT:  I had thought that was why we

13  had Ms. Ramey here, but --

14          MS. MAHONEY:  I know, but I'm concerned

15  that Mr. Olsen doesn't understand --

16          THE WITNESS:  I didn't understand exactly.

17          THE COURT:  Ms. Ramey, maybe you should

18  sit next to --

19          MS. RAMEY:  -- Mr. Olsen, so it's not so

20  difficult for you to communicate with him.  It is my

21  understanding at this point Mr. Olsen wishes to maintain

22  his attorney-client privilege as to conversations he had

23  with Mr. Ernsdorff related to the cases that

24  Mr. Ernsdorff represented him on.

25     Q.  When did you first become aware that there were

1    other Seattle police reports out there pending against
2    you?
3         A.   When did I become aware?  I was never exactly
4    aware of anything.
5         Q.   Well, you knew you had committed other crimes,
6    correct?
7         A.   Well, sure.
8         Q.   And you had been negotiating cases for years
9    with prosecutors, had you not?
10        A.   I have never personally negotiated
11   [unintelligible] --
12        Q.   Well, you have been dealing with lawyers and
13   prosecutors for years, have you not?
14        A.   I have.
15        Q.   Okay.  And you know that it is to your
16   advantage to have a number of charges considered
17   together, because sometimes some are dismissed, do you
18   not?
19        A.   That would be a definite advantage, yeah,
20   obviously.
21        Q.   So, it would have been -- wouldn't you agree it
22   would have been to your advantage to have all the charges
23   come into the Prosecutor's Office at the same time?
24        A.   I would agree with that scenario.
25        Q.   Okay.  And you would agree, would you not, that

1    it is to your advantage to cooperate with the

2    Prosecutor's Office when it comes to plea negotiations?

3         A.    Would you ask that again.

4         Q.    In your experience, it has been to your

5    advantage to cooperate with the Prosecutor's Office when

6    it comes to plea negotiations, hasn't it?

7         A.    Not all the time.

8         Q.    Well, sometimes you get charges dismissed,

9    don't you?

10        A.    The key word was "sometimes."

11        Q.    Okay.  And sometimes you get charges not filed

12   when you cooperate; isn't that true?

13        A.    Yeah.

14        Q.    And sometimes you get prosecutors who come up

15   and tell the judge you should be released on your

16   personal recognizance, don't you?

17        A.    [Unintelligible]

18        Q.    Okay.  Sometimes you get a different

19   recommendation as to sentence if you cooperate with the

20   Prosecutor's Office; isn't that true?

21             MS. MAHONEY:  I'm going to object at this

22   point to cooperating on what basis.  What does she mean

23   by "cooperate"?

24             THE COURT:  Sustained.  There's --

25             MS. ELLIOTT:  Okay.

1          THE COURT:  -- ambiguity as to
2     [unintelligible] --
3          Q.  By testifying against other defendants.
4          A.  Oh.  Please restart your questioning over
5     again, cause I didn't understand where you were coming
6     from from the start, by "cooperation."  I thought you
7     meant by --
8          Q.  You don't understand --
9          A.  -- pleading --
10         Q.  -- what the word "cooperation" means?
11         A.  I thought you meant like pleading -- by me
12    pleading guilty, that's what I thought your "cooperation"
13    meant.
14         Q.  Have you ever gone to trial before --
15         A.  No, I haven't.
16         Q.  -- Mr. Olsen?  You've never gone to trial
17    before?
18         A.  Oh.  Yes, I have.
19         Q.  Okay.  And you have pled guilty before?
20         A.  I have.
21         Q.  Okay.  And when you plead guilty, you get
22    deals, don't you?
23         A.  Yes, I have.
24         Q.  Okay.  And when you testify against other
25    defendants, you get consideration, don't you?

1      A.    I never have gotten anything --

2      Q.    Well, in this --

3      A.    -- consideration or otherwise.

4      Q.    In this case were you ever charged with any of

5   the crimes resulting from those five other Seattle police

6   report incidents?  Any new burglary charges come out of

7   those?

8      A.    Those are totally separate from -- your

9   interpretation of cooperation and my interpretation of

10  cooperation by pleading guilty.

11     Q.    In this case, when did you testify against

12  Mr. Simmers, before or after those cases were not filed?

13     A.    I testified against Ian in March; I think it

14  was the 18th or so, around there.

15     Q.    Okay.  And when did you plead guilty and have

16  -- to the Prosecutor's agreement?

17     A.    It was sometime after that.

18     Q.    Pardon me?

19     A.    Sometime after that.

20     Q.    Okay.  So, those cases were out there and

21  pending until after you testified, weren't they?

22     A.    It had nothing to do with when I testified.

23     Q.    Okay.  And how do you know that?  Did you

24  discuss that with Mr. Ernsdorff?

25     A.    I'll reserve my privilege.

1     Q.  Okay; I thought so.

2        Do you recall testifying on another occasion

3 against a defendant by the name of Mr. Smiley?

4     A.  Yes, I do.

5     Q.  Okay.  Do you recall his attorney,

6 Ms. Gustafson (phonetic), asking you about the five

7 different SPD incident numbers in this case?

8     A.  I don't recall it verbatim.  I imagine [it was

9 asked, though].

10     Q.  Okay.  If I showed you a copy of your testimony

11 in that case, would that refresh your recollection about

12 what you testified to?

13     A.  Sure.

14        MS. MAHONEY:  I would also like to see a

15 copy of that.

16        MS. ELLIOTT:  I only have one copy.  I

17 will show it to Mr. Olsen first and then --

18        MS. MAHONEY:  Before the questioning

19 continues, I would like to see it.

20        MS. ELLIOTT:  I will, before the

21 questioning continues.

22            (Pause in proceedings.)

23     Q.  Now, that was -- do you recall when you

24 testified against Mr. Smiley?

25     A.  Yes, I do.

1       Q.   Okay.  When did you testify against Mr. Smiley?

2       A.   You want exact dates?

3       Q.   Well, yes.

4       A.   Oh, the exact date I don't remember.

5       Q.   If I show you a transcript, do you think that

6  would refresh your recollection?

7            MS. MAHONEY:  At this point I am going to

8  object to the relevance of the Smiley testimony, absent

9  any foundation laid or offer of proof as to why it would

10  be relevant to the Simmers case, since it happened

11  several months after the Simmers case and Mr. Olsen was

12  not even a witness at the time or known witness.

13            MS. ELLIOTT:  Well, the testimony I am

14  about to offer has nothing to do with Mr. Smiley, except

15  to the extent that Mr. Olsen was testifying about his

16  perception of the benefits accorded him in this case.

17            MS. MAHONEY:  Again, Your Honor, I would

18  object, because he never said that he got it as a benefit

19  for testifying in the Simmers case.  That has never been

20  the assertion.  So, there is no inconsistency, so I would

21  object on relevance.

22            THE COURT:  Well, I think, Ms. Elliott,

23  you need to simply ask Mr. Olsen questions.  If in fact

24  he has given inconsistent testimony, you can use it to

25  impeach him.

CRIMINAL DEFENSE MOTION
OLSEN - Direct

1        MS. ELLIOTT:  Okay.

2        THE COURT:  But your questioning needs to

3   relate only to the Simmers case.

4        MS. ELLIOTT:  Okay.

5        THE COURT:  I agree wholeheartedly that

6   there is no basis to inquire as to the testimony into the

7   Smiley case, except to the extent that you wish to lay a

8   foundation as to your arguments in this case.

9        Q.   Mr. Olsen, do you perceive it as a benefit to

10  you that those five SPD incident charges were not filed?

11       MS. MAHONEY:  And I am going to object at

12  this point.  Benefit relevant to what?  If it is not a

13  benefit relevant to Simmers, it is not relevant.

14       THE COURT:  Sustained.

15       Q.   Did it reduce the amount of time that you were

16  looking at in terms of going to jail?

17       MS. MAHONEY:  Again, objection, unless it

18  is tied up to the Simmers case.

19       THE COURT:  Sustained.

20       Q.   Did you perceive that, if you didn't testify --

21  or, that if you did testify in this case, things would go

22  better for you on your pending charges?

23       A.   I didn't have no perception of that whatsoever.

24       Q.   What was your perception?

25       A.   Totally different situations.

1      Q.   So, you felt that there was absolutely no

2   relevance between the five pending charges that you had

3   acquired while you were released on your personal

4   recognizance and your testimony in Mr. Simmers' case?

5      A.   I see none whatsoever.

6      Q.   Okay.  Did you perceive any relationship

7   between your release on personal recognizance and your

8   informing on Mr. Simmers on November 15 or so in 1995?

9      A.   No, there wasn't.

10      Q.   So, you do not believe that that had any

11   influence on Judge Gain's decision to release you on

12   your personal recognizance?

13      A.   Not to my knowledge.

14           MS. ELLIOTT:  Okay.  I have no further

15   questions, Your Honor.

16           THE COURT:  Ms. Mahoney?

17

18                   CROSS-EXAMINATION

19   BY MS. MAHONEY:

20      Q.   Mr. Olsen, back in November of 1995, when you

21   first contacted the Prosecutor's Office, after you spoke

22   with Mr. Simmers, who did you first contact there?

23      A.   I believe it was the secretary.

24      Q.   Were you then put in touch eventually with

25   Detective Hopkins?

CRIMINAL DEFENSE MOTION
   OLSEN - Cross

1      A.   Yes, I was.

2      Q.   The day after you met with Detective Hopkins,

3   did you meet with myself and Detective Hopkins?

4      A.   Yes, I did.

5      Q.   And we are talking in mid-November of 1995?

6      A.   Right.

7      Q.   I believe around -- it was around November 16,

8   17; does that sound right?

9      A.   Somewhere in that area, yes.

10     Q.   You met with Detective Hopkins one day first

11  and then myself and Detective Hopkins the following day?

12     A.   Right.

13     Q.   And that very first day, with our very first

14  meeting, was it made clear to you that you would receive

15  absolutely nothing if you chose to testify in this case?

16     A.   That's exactly what was told to me, yes, almost

17  verbatim.

18     Q.   How was it told to you?

19     A.   Just like that.

20     Q.   Was there ever anything discussed otherwise?

21     A.   No.  Not that I know of, no.

22     Q.   Did you ever receive any form of compensation

23  whatsoever, from myself, from Mr. Marner or anyone else

24  in the Prosecutor's Office, in exchange for your

25  testimony for Mr. Simmers?

```
 1          A.   None whatsoever.

 2          Q.   Did you ever receive anything from the Bothell

 3    or King County Police Departments?

 4          A.   Nothing at all.

 5          Q.   Or any other state or police agency in [return]

 6    for your testimony in the Simmers case?

 7          A.   I received absolutely nothing from no one.

 8          Q.   Did anyone ever lead you to believe otherwise?

 9          A.   No.

10          Q.   At the time that you testified in the Drew

11    Thompson case with Mr. Bergstrom, back in the early 90's,

12    did you receive anything at all for your cooperation in

13    that case, from the State or from the police or from any

14    agency connected with your testimony in that case?

15          A.   No.  I think I got a nice letter, I believe.

16          Q.   From who?

17          A.   From Tod Bergstrom's office.

18          Q.   Did you receive any consideration on your jail

19    sentences at all, ever, for your cooperation in the

20    Thompson or the Simmers case?

21          A.   No.

22          Q.   Were you aware at the time that you requested a

23    bond hearing that the State would be objecting to your

24    release?

25          A.   I didn't go to the hearing, so I don't know
```

1  what took place.

2      Q.   Between the time that you testified in the

3  Simmers trial in March of '95 and the time that we talked

4  within a week or two ago, have you and I ever spoken

5  again?

6      A.   Just about a week ago, two weeks ago, when I

7  called, inquiring about security issues of coming into

8  this court hearing.

9      Q.   So, between the time that you actually appeared

10  in the courtroom and testified in Simmers and a week or

11  two ago --

12     A.   Okay.

13     Q.   -- was there any contact between you and I

14  whatsoever?

15     A.   Not at all.

16     Q.   Was it ever your understanding that your plea

17  agreement on the '95 PSP case had anything to do with

18  your testimony in the Simmers case?

19     A.   It didn't at all.

20     Q.   Did you and I ever discuss your PSP case or

21  your plea bargain?

22     A.   No.

23     Q.   As a matter of fact, would you agree that it

24  was made clear to you that we should not discuss that

25  case?

1    A.   Yes, it was, I believe.

2    Q.   At the time that you testified in the Simmers

3    case, other than knowing that the PSP charge was filed,

4    did you have any knowledge that anything else had been

5    filed against you in the Prosecutor's Office at the time

6    that you testified?

7    A.   No; I had no idea at all anything was filed.

8    Q.   And following your plea in the PSP case, were

9    additional King County charges filed on you?  Did you

10   have a '96 cause number filed?

11   A.   Yeah; a burglary, second-degree burglary.

12   Q.   Okay.  And is that a number that was not

13   contained in your plea bargain before?

14   A.   I don't think so.  I don't believe it was.  It

15   was separate --

16   Q.   Were you actually sentenced on another case in

17   which you actually got it consecutive to your PSP charge?

18   A.   Right.

19   Q.   And wasn't that a case that actually occurred

20   out of the time period that you absconded on your PR?

21   A.   Yes, it was.

22   Q.   Okay.  So, to be clear then, you had a '96

23   charge that was filed that had actually occurred during

24   your FTA period on your PSP '95 case?

25   A.   That's -- that's correct; yeah.

1      Q.   And you were sentenced on that case consecutive

2   to your PSP charge; is that correct?

3      A.   Right.

4      Q.   And that was a King County '96 case?

5      A.   Yeah.   King County 'ninety -- yes, it was.

6      Q.   That technically could have been dealt with at

7   the same time as the '95 case, but was not; is that

8   correct?

9      A.   That's correct.

10     Q.   So, you actually suffered additional

11  consequences --

12          MS. ELLIOTT:   I will object, Your Honor.

13  I think that's been covered.

14          THE COURT:   Sustained to the form of the

15  question.

16     Q.   How long are you in custody for now?

17     A.   Till February 14, 2001.

18     Q.   At the time after you were arrested on

19  February 28 of 1996, just prior to your testimony in the

20  Simmers case, do you recall -- or did you ever tell

21  myself, Mr. Marner, or Detective Hopkins yourself about

22  any other pending matters you may have out there?

23     A.   No, I did not.

24     Q.   Did we ever discuss what you had been up to

25  between December of '95 and March -- or, February 28 of

CRIMINAL DEFENSE MOTION
    OLSEN - Cross                                      -133-

1    1996?

2         A.    I don't recall anything like that.

3              MS. MAHONEY:  I have nothing further.

4

5                    REDIRECT EXAMINATION

6    BY MS. ELLIOTT:

7         Q.    Mr. Olsen, did you ever tell Mr. Hicks about

8    what you had been up to in that three-month period?

9         A.    I may have.

10        Q.    When would you have told him that?

11        A.    We had an interview in the King County Jail.

12        Q.    And when did you have that interview?

13        A.    The exact date and time I don't recall.

14        Q.    All right.  Did you ever tell him about the

15   check passing at the Erotic Bakery?

16        A.    I don't know if I did.

17        Q.    Did you ever tell him about the Mary Martha

18   Cafe?

19        A.    I don't know if I did.

20        Q.    Did you ever tell him about two or three

21   burglaries and a purse theft from Evergreen Washelli?

22        A.    I don't know if I ever -- that was even asked

23   or answered or not.  I don't know.

24        Q.    Okay.  Ever tell him about a purse theft from a

25   commercial sewing concern out in North Seattle?

CRIMINAL DEFENSE MOTION                              -134-
    OLSEN - Redirect

```
 1        A.    I don't recall.

 2        Q.    Did you ever tell him about the 1996 burglary

 3   that you were eventually filed on and convicted of in

 4   King County?  Did you ever tell him you did that in those

 5   three months that you were out there? -- Mr. Hicks.

 6        A.    I don't recall.

 7        Q.    Did you ever tell him about -- there's actually

 8   another burglary out there, too, isn't there, from

 9   Snohomish County from 1996?

10        A.    Is that a question?

11        Q.    Yeah.  Isn't there another 1996 Snohomish

12   County burglary out there that ran concurrent with the

13   King County time?

14        A.    I believe so; yeah.

15        Q.    Yeah.  So, really, your release date, if that

16   time hadn't been run concurrent, would be something

17   beyond 2001?

18        A.    Yeah; I believe so.

19        Q.    Okay.  So, there were two burglaries that you

20   don't recall whether or not you told Mr. Hicks about?

21        A.    I --

22        Q.    At least two?

23        A.    Probably about a hundred thousand things I

24   didn't tell Mr. Hicks.

25        Q.    Okay.  All right.
```

1    A.    He asked certain questions, and I answered
2    them.
3    Q.    Did you tell him about -- Any other convictions
4    you forgot to tell him about?
5    A.    I don't recall.
6    Q.    You don't recall telling him, or you don't
7    recall all your convictions?
8    A.    I recall all my convictions.
9    Q.    Okay.  Do you recall whether or not you told
10   Mr. Hicks about all of your convictions?
11   A.    To the best of my knowledge, yeah.
12   Q.    And he certainly asked you about all of those
13   convictions, didn't he?
14   A.    I don't recall his exact questioning.
15   Q.    You don't recall whether or not that was an
16   important issue to Mr. Hicks?
17              MS. MAHONEY:  I'm going to object at this
18   point.  How does he know what's important to Mr. Hicks?
19              THE COURT:  Sustained.
20   Q.    Do you recall being cross-examined about your
21   prior convictions by Mr. Hicks during Mr. Simmers' trial?
22   A.    During the interview or --
23   Q.    During trial.
24   A.    -- or when I was -- okay.  I believe so; yeah.
25   Q.    Do you recall Ms. Mahoney asking you about your

1    prior convictions in direct examination during trial?

2        A.   Yes, I do.

3        Q.   Did it ever cross your mind that the matters

4    that you had been up to during that release period might

5    be important to Ms. Mahoney or Mr. Hicks?

6        A.   I don't know.

7             THE COURT:   What was the response?

8        Q.   Did it ever cross your mind to tell them about

9    those additional crimes that you had committed between

10   December 1995 and February 28, 1996?

11       A.   I don't think I wanted anybody to know about

12   them.

13       Q.   Well, did you tell Mr. Ernsdorff about them?

14       A.   I will assert my privilege.

15       Q.   At some point the Prosecutor's Office knew

16   about them, though, as far as you know?

17       A.   As far as I know.  I guess; yeah.

18       Q.   Was there a question at trial that you were

19   examined on regarding your use of heroin prior to being

20   booked on February 28, 1996?

21       A.   There were some questions about my drug

22   activity, yeah.

23       Q.   Okay.  And do you recall there being a colloquy

24   about whether or not you were high at the time or

25   withdrawing at the time that you were interviewed? -- by

1    Mr. Hicks or Ms. Mahoney.

2        A.    I think there was a question something to that

3    effect, yeah.

4                THE COURT:  I'm going to object at this

5    point on the relevance of that to a motion for new trial.

6    There is no dispute; that was known to everybody and

7    discussed at length during the trial.

8                THE COURT:  Sustained.

9                MS. ELLIOTT:  I will withdraw the

10   question.

11       Q.    Mr. Olsen, were you ever incarcerated in 1991?

12       A.    Yes, I was.

13       Q.    Okay.  Where were you incarcerated?

14                MS. MAHONEY:  I will object at this point

15   to the relevance.

16                THE COURT:  Ms. Elliott --

17                MS. ELLIOTT:  It goes to the issue that

18   she asked regarding his compensation in the Thompson

19   case.

20                THE COURT:  Oh.  To the extent it relates

21   to the question Ms. Mahoney asked concerning

22   Mr. Thompson --

23                MS. MAHONEY:  That's fine; I withdraw the

24   objection.  I didn't know -- it was vague.

25       A.    Where was I located?

1          Q.    Yeah.

2          A.    I believe Walla Walla.

3          Q.    Do you recall a Roger Benson, classifications

4     counselor three?

5          A.    Yes, I do.

6          Q.    Okay.  Do you recall receiving a large sum of

7     money prior to October 31, 1991, placed on your books at

8     Walla Walla?

9          A.    I believe so.

10         Q.    Okay.  And was that for services rendered?

11                    MS. MAHONEY:  Objection --

12         A.    No, it was not.

13                    MS. MAHONEY:  -- that it's too vague.

14    Services rendered for what?

15         Q.    What was the large sum of money placed on your

16    books for?

17         A.    [Unintelligible]

18                    MS. MAHONEY:  I would again object.

19    Unless she can tie it to the relevance of if he received

20    compensation in the Thompson case or the Simmers case,

21    it's not relevant.

22                    THE COURT:  I think she is trying to ask

23    that question.

24                    MS. ELLIOTT:  I'm trying to ask that.

25         Q.    Were you employed by anyone --

```
 1                    THE COURT:  And the objection is
 2   overruled.
 3        Q.   -- in 1991?
 4        A.   No.  I was employed by the Department of
 5   Corrections; yeah.
 6        Q.   Okay.  How much did you make an hour?
 7        A.   About 40 cents.
 8        Q.   That wouldn't qualify as a large sum of money,
 9   would it, Mr. Olsen?
10        A.   I don't believe so, no.
11        Q.   Okay.  What did you receive the large sum of
12   money for in October 1991 -- sometime before October 31,
13   1991?
14                    THE WITNESS:  Can I ask a question of my
15   lawyer?
16                    MS. ELLIOTT:  Uh-huh.
17                         (Conference between the
18                          Witness and his counsel.)
19        Q.   What did you receive the large sum of money for
20   on October 31, 1991?
21        A.   I received a cash award from Crime Stoppers.
22        Q.   And what did you receive the cash award for?
23        A.   Information.
24        Q.   Okay.  So, your testimony in every trial that
25   you have testified in, that you have never received
```

1    compensation is untrue, isn't it?

2        A.    No, it's not.

3        Q.    Okay.  What -- explain to me, then, what this

4    large cash sum is for.

5        A.    It has nothing to do with my testimony --

6    giving testimony.  It was not for --

7        Q.    Who was --

8        A.    -- me testifying.

9        Q.    -- the information against, Mr. Olsen?

10       A.    It was against these people, but I was not

11   given the cash as exchange for my testimony.

12       Q.    Well, what was it for?

13       A.    It was for the information that I gave to them.

14       Q.    So, you informed on someone and received

15   payment?

16       A.    That's what -- that's how it works; yeah.

17       Q.    How much money did you receive?

18       A.    $500.

19       Q.    Okay.  And who did you receive that from?

20       A.    Crime Stoppers.

21       Q.    Who is Crime Stoppers?

22       A.    A privately funded outfit.

23       Q.    How many times have you called Crime Stoppers

24   in your life?

25       A.    A couple times, a few times.

1          Q.   What does "a couple times" mean to you,

2     Mr. Olsen?

3          A.   Several.

4          Q.   What does "several" mean to you, Mr. Olsen?

5          A.   I can't give you an exact --

6          Q.   More than ten?

7          A.   I may have.

8          Q.   What does "I may have" mean?

9          A.   It means more than ten.

10         Q.   More than a hundred?

11         A.   No.

12         Q.   Okay.  In fact, you knew that number by heart

13    when you testified in this case, did you not? -- or,

14    maybe it was the Smiley case.

15         A.   Yeah.

16         Q.   Okay.  And who did you negotiate with for the

17    $500?

18         A.   I didn't negotiate with anybody.

19         Q.   Did --

20              MS. MAHONEY:  Are we back to the 1991

21    payment?

22              MS. ELLIOTT:  Yes, Your Honor.

23              THE COURT:  That's how I took it.

24              MS. MAHONEY:  I just want to make sure.

25         Q.   Who did you inform against, Mr. Olsen?

1    A.    For the $500?

2    Q.    Yes.

3    A.    It was Drew Thompson.

4    Q.    So, you did receive payment in Drew Thompson's

5    case of $500?

6    A.    But not in exchange for my testimony; no.

7    Q.    So, your -- you received 500 -- who did you

8    provide that information to?

9    A.    Who did I provide it to?  Crime Stoppers.

10   Q.    Yeah.  And what -- are they a police agency?

11   A.    It's a private-funded [organization].

12   Q.    Who did they give the information to,

13   Mr. Olsen?

14   A.    To the police.

15   Q.    What kind of documentation did you have to give

16   to them to get the $500?

17   A.    [Unintelligible]

18   Q.    Did you just walk in there and say "Hi; I'm

19   Kevin Olsen.  Give me $500"?

20   A.    No, I didn't.

21   Q.    Okay.  How did you prove to them that you had

22   earned the $500?

23   A.    What do you mean, how did I prove to them?

24   They set up a -- they have a board that goes to -- they

25   decide on their own.  They don't have any -- it has

CRIMINAL DEFENSE MOTION                          -143-
    OLSEN - Redirect

```
 1    nothing to do with the --
 2         Q.   What do you tell the board?
 3         A.   I don't tell them anything.  It was nothing to
 4    do with me.
 5         Q.   Well, you got the 500 -- what do you perceive
 6    you received the $500 for, Mr. Olsen?
 7         A.   For the information that I gave --
 8         Q.   What information --
 9         A.   -- Crime Stoppers.
10         Q.   -- did you give to Crime Stoppers?
11         A.   I told them what Drew Thompson had told me, the
12    information.
13         Q.   Okay.  Did you tell Crime Stoppers that before
14    you told the police, or did they tell the police that you
15    had told them that?
16         A.   I'm not sure exactly how it worked out.
17         Q.   Did you receive it before or after your
18    testimony in the Thompson case?
19         A.   Um --
20         Q.   Well, it must have been after, right, because
21    it was October of 1991?
22         A.   I suppose so.
23         Q.   Okay.  How did you receive that money?  Did it
24    just get put on your books?
25         A.   Yes, it did.
```

1        Q.   Okay.  Did they receive a tape of -- Did Crime

2   Stoppers receive a tape of the phone call that you had

3   made and then, based upon that, determine that your

4   information was good?

5        A.   I don't know how they determined it.

6        Q.   Did they wait --

7        A.   I wasn't a part of the process.

8        Q.   -- until after you testified against

9   Mr. Thompson to pay you the $500?

10       A.   I don't know how they determined it.  I wasn't

11   a part of the process, ma'am.

12       Q.   So, $500 just appeared on your books?

13       A.   Yeah.

14       Q.   Who handled it for you on the outside?

15       A.   What do you mean; who handled it for me on the

16   outside?

17       Q.   Well, did you write to Crime Stoppers saying,

18   "Where is my money"?

19       A.   It's done through a process.

20       Q.   What is that process?  Let's start -- okay.

21   You make the call.  Let's start right there.

22            MS. MAHONEY:  Your Honor, at this point,

23   again I am going to object on the relevance of whether or

24   not he received something from Crime Stoppers.  That's

25   not inconsistent with any of the testimony provided in

CRIMINAL DEFENSE MOTION
   OLSEN - Redirect                              -145-

1   Simmers.  It's not inconsistent -- I don't see where it's

2   relevant to this case.  He has testified Crime Stoppers

3   isn't a police agency; it's not the Prosecutor's Office.

4   He didn't --

5              THE COURT:  It is relevant for purposes of

6   impeachment pursuant to the questions you asked him, and

7   for that reason, Ms. Elliott may inquire.

8              MS. MAHONEY:  Okay.  I was just going to

9   say, though, at trial he wasn't -- he was asked about if

10  he received anything from our office.

11             THE COURT:  That's fine.  But you asked a

12  question on cross-examination which I believe Ms. Elliott

13  now is entitled to impeach him on.

14             MS. MAHONEY:  Okay.  I'm sorry; I was --

15             THE COURT:  Not at trial.  Here --

16             MS. MAHONEY:  All right.  I was like --

17             THE COURT:  -- today.

18             MS. MAHONEY:  I don't see it.

19             THE COURT:  I have not had an opportunity

20  to look at the trial transcript, so.

21             MS. MAHONEY:  All right.  Thank you.

22             MS. ELLIOTT:  I would have to go through

23  and look again, Your Honor, but I do believe

24  [unintelligible].

25       Q.  Okay.  Tell me about the process of going

1    through Crime Stoppers, Mr. Olsen.

2         A.   You place a call to them --

3         Q.   Is the call recorded?

4         A.   I don't know.

5         Q.   Okay.  There is no warning that it's being

6    recorded, is there?

7         A.   I don't know.

8         Q.   Well, how many times have you called them

9    again?

10        A.   Several; more than ten.

11        Q.   And you don't recall from any of those ten

12   times whether or not the telephone call is recorded?

13        A.   I don't know.

14        Q.   Well, okay.  Go ahead.  What happens next?

15        A.   You give them an i.d. number, or --

16        Q.   What's -- where do you get --

17        A.   You pick --

18        Q.   -- the i.d. number?

19        A.   You pick it.

20        Q.   So, it's secret?

21        A.   Yeah.

22        Q.   Okay.  How do you pick the i.d. number?

23        A.   I'm not going to tell you.

24        Q.   Why not?

25        A.   Because it's secret; that's why.

1      Q.   You don't have to tell me what the number is.

2   Tell me how you pick it.

3      A.   A number that you would be familiar with, just

4   like your PIN number, ma'am.

5      Q.   Okay.  And do you use that to punch into the

6   phone?

7      A.   No, you don't.

8      Q.   How do you use it?

9      A.   For further contact with them.

10      Q.   Do you talk to a real person?

11      A.   Yes, you do.

12      Q.   Okay.  When you give them that number, do you

13   tell -- first, do you tell them your real name?

14      A.   Yeah, as a matter of fact.

15      Q.   Did you use the name Kevin Olsen?

16      A.   I think I used "Mister."

17      Q.   Okay.  Did you ever use any other names with

18   them?

19      A.   No.

20      Q.   Okay.  Have you always used the same PIN

21   number?  You don't have to tell me what it is.

22      A.   I believe I only have one number.

23      Q.   But you have had more than one?

24      A.   No.

25      Q.   And do they ask you questions about where you

1    are located?

2        A.    No.

3        Q.    Do they ask you your address?

4        A.    No.

5        Q.    Well, how are they going to know where to send

6    the money if you don't give them your address?

7        A.    It's part of the process.  You have your i.d.

8    number; that's what it's for.

9        Q.    Who do you give your address to?

10       A.    You don't give it to anybody there.

11       Q.    Well, then, if they have an i.d. number, how do

12   they know where to reach you with the money, Mr. Olsen?

13       A.    The money is taken to a bank, ma'am --

14   deposited in a bank account.

15       Q.    This sounds kind of complex.  So, you must have

16   had someone on the outside to help you?

17       A.    Yeah.

18       Q.    Okay.  Who was that?

19       A.    Who was that?

20       Q.    Yeah.  Do you have an attorney, a friend?  You

21   don't have to give me their name.

22       A.    A friend.

23       Q.    And how does that person get the money out of

24   the bank?  Well, let me ask you this next:  After you

25   give them your name, what kind of information do you have

1    to give them?

2         A.    What kind of information?

3         Q.    Yeah.

4         A.    Well, the information that you have, ma'am.

5         Q.    Well, do you have to tell them you're in the

6    joint?

7         A.    No, you don't have to tell them.

8         Q.    So, you don't have to tell them where you are

9    located?

10        A.    No.

11        Q.    Do you have to tell them how you got the

12   information?

13        A.    I don't know if that's -- I don't recall.

14        Q.    You don't have to tell them anything about the

15   reliability of the information that you have got?

16        A.    I don't know if you do or not.

17        Q.    To the best of your recollection, tell me

18   exactly what you told them about Mr. Thompson.

19        A.    I can't recall exactly what I told them.

20        Q.    All right.  So, what happened -- Then what did

21   they tell you at the end of the phone call, after you

22   gave them that information?

23        A.    That I would probably be -- I may be contacted.

24        Q.    So, they had to have some way of contacting

25   you, didn't they?

1        A.   Uh-huh.

2        Q.   Did you give them your friend's name, or did

3   you give them your phone number at the joint?

4        A.   I think you kind of misled me there on -- are

5   we talking about the funds?

6        Q.   How they would get back to you -- no; how they

7   would get back to you for more information.

8        A.   Okay.  Well, they knew where I was at.  I told

9   them where I was at.

10       Q.   Okay.  You told them you were in the

11  institution?

12       A.   Yeah.

13       Q.   The jail or the --

14       A.   Right.  Whether that's required or not, to your

15  question, I don't know.  But I did tell them.

16       Q.   Okay.  Did the person who was taking this

17  information give you a name?

18       A.   Yeah, they did.

19       Q.   What was their name; Officer something?

20       A.   No; I don't believe there was any officer in

21  it.  It's a private organization.  I believe it was just

22  a "mister."  I can't recall his name.

23       Q.   Why didn't they just pay over right then?

24       A.   Ma'am, I don't know what the process is.

25       Q.   All right.  Well, you must have some idea of

1    what the process is.  You got paid, didn't you?

2          A.   Yes, I did.

3          Q.   Okay.  So, what happened next, to the best of

4    your knowledge, Mr. Olsen?

5          A.   Next after what?

6          Q.   After you hung up off the telephone call to

7    Crime Stoppers.

8          A.   I was contacted by the Seattle Police

9    Department.

10         Q.   Okay.  And where did they learn to contact you?

11         A.   From Crime Stoppers.

12         Q.   Okay.  So, somebody at Crime Stoppers must have

13   called SPD?

14         A.   Yes, they did.

15         Q.   Okay.  And after you talked to SPD, what

16   happened then?

17         A.   Nothing.

18         Q.   You never testified against Mr. Thompson; is

19   that what --

20         A.   Oh, yeah.

21         Q.   -- you're saying?

22         A.   I did.

23         Q.   Okay.  What happened after -- what happened

24   next?

25         A.   About a year later, I went to court and --

1      Q.   Did you get paid the $500 in that intervening

2   year?

3      A.   No, I didn't.

4      Q.   Okay.  Did you testify against Mr. Thompson?

5      A.   Yes, I did.

6      Q.   Did you testify that to the best of your

7   knowledge he'd killed Rita Barchot (phonetic) or knew

8   where the body was, one of the two?

9      A.   Could you say that again.

10      Q.   Did you testify that to the best of your

11   knowledge Mr. Thompson had killed Ms. Barchot, or at

12   least knew where the body was or admitted that to you?

13      A.   I testified that he did tell me that.

14      Q.   Okay.  And was Mr. Thompson subsequently

15   convicted?

16      A.   Oh, yes, he was.

17      Q.   And you didn't receive the money until after he

18   was convicted, did you?

19      A.   I don't believe so, no.

20      Q.   Okay.  How did Crime Stoppers know that your

21   testimony had successfully put Mr. Thompson behind bars?

22      A.   I don't know.

23      Q.   You never called them again about the Thompson

24   case?

25      A.   I believe I had.

1    Q.   So, you bugged them a little bit about the

2    money, didn't you?

3    A.   I didn't bug them a little bit, no.

4    Q.   You bugged them a lot?

5    A.   No.

6    Q.   Did you call up and ask, "Where is my $500"?

7    A.   I didn't know that I was getting anything,

8    ma'am.

9    Q.   Okay.  Did you call up and say, "Am I getting

10   anything?"

11   A.   I inquired about it after a while, yeah.

12   Q.   Okay.  And they didn't pay until after you made

13   the inquiry again, did they?

14   A.   I don't remember if that was the case or not;

15   I don't recall.

16   Q.   Okay.  Did you call them again after you

17   received the money?

18   A.   Yes, I have.

19   Q.   Okay.  Did you call them between the time of

20   the trial and before you received the money -- after

21   Mr. Thompson was convicted but before you received the

22   money?

23   A.   I don't recall when I called.

24   Q.   How did you get the process going again to get

25   the $500?

1          A.    I believe I did -- I did contact them again,

2    yeah.  I inquired, but I don't know the time.

3          Q.    What did you say?

4          A.    I gave them my i.d. number and -- verbatim I

5    don't know exactly what was said.

6          Q.    Did you ask where your money was?

7          A.    I didn't know that I was getting any money,

8    ma'am.

9          Q.    What did you say?

10         A.    I inquired about the status.

11         Q.    Did you, just as a public service, let them

12   know that Mr. Thompson had been convicted?

13         A.    I inquired and asked the status of my original

14   information, and I was told to get back to them.

15         Q.    Okay.  When did you get back to them, then?

16   How long did you wait?

17         A.    I don't know exactly.

18         Q.    A week?

19         A.    Don't know.

20         Q.    A day?

21         A.    I don't know.

22         Q.    Did you call collect or did you use three-way?

23         A.    I believe I called collect.

24         Q.    And they accepted your collect call?

25         A.    They took everybody's.

CRIMINAL DEFENSE MOTION                              -155-
   OLSEN - Redirect

1    Q.   And how did you get the money moved from this

2    secret bank location to your books at the joint?

3         A.   A friend.

4         Q.   So, who told you that the money had been

5    placed in this bank?

6         A.   Crime Stoppers did.

7         Q.   So, you got a letter?

8         A.   No.

9         Q.   What did you get?

10        A.   They had told me to re-contact them again, and

11   they would let me know the status of my original

12   information.  And when that was I don't know.  And when I

13   did re-contact them again, they told me they had an

14   outcome and that they would ask me for a bank nearest

15   somebody that I could have pick it up.  And that's what I

16   did.

17        Q.   Okay.  So, you gave them information about

18   where to go to the bank?

19        A.   I did, yeah.

20        Q.   Okay.  Did you ever receive any other money

21   from Crime Stoppers?

22        A.   Uh-huh; I have.

23        Q.   Okay.  For what?

24        A.   Information that I provided.

25        Q.   Okay.  On who?

CRIMINAL DEFENSE MOTION                                    -156-
     OLSEN - Redirect

1       A.   I received information -- I gave information on

2    Ian Simmers.  I gave --

3       Q.   And you received money from Crime Stoppers for

4    telling about Ian?

5       A.   For information that I gave them.

6       Q.   Okay.  When did you give that information?

7       A.   I gave the information to them -- actually, I

8    had called them before I actually called the Prosecutor's

9    Office.

10      Q.   Okay.  Did you tell Ms. Mahoney that you had

11   money coming from Crime Stoppers in this case?

12      A.   No.  Why should I?

13      Q.   How about Detective -- excuse me -- Hopkins --

14           MS. ELLIOTT:  Is it Hopkins?  I'm sorry.

15           DET. HOPKINS:  Hopkins.

16      Q.   -- Hopkins here?  Did you ever tell him you got

17   money for the services you performed here?

18      A.   No.  Why would I?

19      Q.   Well, why wouldn't you, Mr. Olsen?

20      A.   I don't know; I --

21      Q.   In your mind, that's completely

22   compartmentalized from what you did here in testifying,

23   isn't it?

24      A.   What do you mean?

25      Q.   It's completely different.  Giving information

1    to Crime Stoppers is completely different from giving

2    information to Mr. Hopkins; isn't that true?

3        A.   No.  Well, I don't know.  He's a police agency,

4    and Crime Stoppers isn't.

5        Q.   Okay.  And he didn't pay you, did he?

6        A.   No.

7        Q.   But Crime Stoppers did, didn't they?

8        A.   For the information that I gave them, yes.

9        Q.   How much money did you get for snitching on

10   Mr. Simmers?

11       A.   I wouldn't use the word "snitch," but --

12       Q.   I know you wouldn't.

13       A.   -- for the information that I gave them.

14       Q.   Yes.  How much money did you make?

15       A.   I didn't make any money.

16       Q.   How much money did you receive?

17       A.   There you go.

18       Q.   Thank you.

19       A.   A couple hundred bucks, and I donated it.

20       Q.   Oh, yeah.  Where did you donate it to?

21       A.   To a worthy cause, and I won't --

22       Q.   Okay.  Do you have any receipts?

23            MS. MAHONEY:  I'm going to object at this

24   point.  This is argumentative, and it's getting --

25            THE COURT:  Sustained.  The questioning is

1    becoming very argumentative, Ms. Elliott.  You may ask
2    questions only.
3         Q.   You received two hundred bucks.  What day did
4    you receive $200 --
5         A.   I don't know.
6         Q.   -- for providing information?
7         A.   Ma'am, I don't know what that date was.
8         Q.   Was it before you testified or after you
9    testified?
10        A.   I don't recall.
11        Q.   All right.  Did it get placed on your books at
12   the DOC?
13        A.   No, ma'am.
14        Q.   Where did it go?
15        A.   It went to a bank account.
16        Q.   And how did you get the money?
17             MS. MAHONEY:  Again, I'm going to object.
18   He has testified he got the money.  I think that's really
19   the only relevant point here.
20             MS. ELLIOTT:  I think the timing issue is
21   very important.
22             THE COURT:  Well, you can ask about time,
23   but I don't think we need to go through the details
24   about --
25             MS. ELLIOTT:  Okay.

CRIMINAL DEFENSE MOTION
   OLSEN - Redirect                                -159-

1              THE COURT:  -- the bank and the friend.

2        Q.   You don't recall whether -- did you have to

3   give Crime Stoppers a result before you got the money?

4        A.   What do you mean, a result?

5        Q.   Well, do Crime Stoppers require a conviction?

6        A.   I'm not sure exactly what they require.

7        Q.   Did you call them up after the verdict came in

8   in Ian's case, if you recall?

9        A.   I don't know; I don't recall.

10       Q.   Did they pay over after your first call in

11  November of 1995?

12       A.   After that?

13       Q.   Did they pay over -- yeah, like within the next

14  two weeks after you gave them the information about Ian?

15       A.   I don't think so.

16       Q.   Before the 15th of December 1995?

17       A.   I don't think so.

18       Q.   Okay.  Did you get any of that money while you

19  were out on the streets?

20       A.   No.

21       Q.   Okay.  Did it come when you were in jail

22  between February 28 and March 20 of 1996?

23       A.   I imagine so, sometime between there.

24       Q.   Does Crime Stoppers keep a record of when they

25  pay over the money?

1        A.   I don't know, ma'am.

2        Q.   Okay.  What's your PIN number at Crime

3   Stoppers, so that we can verify this, Mr. Olsen?

4             MS. MAHONEY:  I am going to object at this

5   point.  I don't see what the relevance of that is, if he

6   has testified he received money in the Simmers case.

7             THE COURT:  Overruled, to the extent that

8   Ms. Elliott is going to pursue additional information

9   related to this --

10            MS. MAHONEY:  I have no problem with that.

11  I just understand that Crime Stoppers is confidential.

12  And so if we --

13            THE COURT:  If he says that --

14            MS. MAHONEY:  -- could do that outside of

15  open court --

16            THE COURT:  Right.

17            MS. MAHONEY:  -- with an order, I have no

18  objection.

19            THE COURT:  No.  If he says that, then I

20  know that Ms. Elliott has the means to obtain it through

21  a subpoena and elsewise, but --

22            Mr. Olsen, the question is pending.

23       A.   I need the question again.  I forgot what [it

24  was].

25            THE COURT:  What is your PIN number, or

1    what is your number with Crime Stoppers?

2         Q.   What is your PIN number with Crime Stoppers,

3    Mr. Olsen?

4         A.   Oh.  It's confidential.

5         Q.   Are you willing to give that to me here today?

6         A.   No.

7              MS. ELLIOTT:  Okay.  Your Honor, could you

8    ask Mr. Olsen to answer that question.

9              THE COURT:  No, I will not, not without

10   individuals from Crime Stoppers being here.  So, if you

11   would move into another topic.  We will have to take it

12   up later, in --

13             MS. ELLIOTT:  Okay.

14             THE COURT:  -- a different context.

15        Q.   Did you ever receive any other money from

16   Crime Stoppers, Mr. Olsen?

17        A.   I believe I have, yeah.

18        Q.   And how many times have you received money from

19   Crime Stoppers?

20        A.   Several times.

21        Q.   Apart from Mr. Thompson and Mr. Simmers?

22        A.   Several times.

23        Q.   Okay.  Let's start with Mr. Terry's case,

24   Mr. Smiley's case.  Did you receive money in the Terry-

25   Smiley case?

1     A.   Yes, I did.

2     Q.   And how much money did you receive in Terry-

3   Smiley?

4     A.   A couple hundred bucks.

5     Q.   Did you ever reveal that to Mr. O'Toole?

6     A.   Not that I remember.

7     Q.   Did you ever reveal it to the Court, this very

8   same Court, when you were testifying in that case?

9     A.   I don't recall.

10     Q.   When did you receive the money in the Terry

11   case?

12     A.   I don't recall.

13     Q.   Before or after the verdict in the Terry case?

14     A.   I don't recall.

15     Q.   To the best of your knowledge, would Crime

16   Stoppers have information about that with your PIN

17   number?

18     A.   I don't know.

19     Q.   Did you use the same PIN number in Terry-Smiley

20   and Thompson?

21     A.   Yes, I did.

22     Q.   Okay.  Who else did you get money from Crime

23   Stoppers on?

24     A.   I believe some information I had given them

25   years before that.

CRIMINAL DEFENSE MOTION                              -163-
    OLSEN - Redirect

1     Q.   Who did you give information on?

2     A.   No; I can't answer that.

3     Q.   Why can't you answer that?

4     A.   Safety issues.

5     Q.   Okay.  How many individuals, Mr. Olsen?

6     A.   A couple.

7     Q.   Were you ever questioned by Mr. Hicks regarding

8  money received for informing?

9     A.   I don't recall.

10     Q.   Okay.  Do you ever recall Ms. Mahoney asking

11  you about money that you have received for informing?

12     A.   I don't recall.

13     Q.   Were you ever questioned by Mr. O'Toole or

14  Mr. Matthews before the Terry trial regarding money you

15  might have received or might subsequently receive for

16  informing against Mr. Smiley?

17     A.   I don't recall anything like that.

18     Q.   Okay.  Did you ever tell any defense lawyers,

19  the lawyers in the Thompson case or Ms. Gustafson in the

20  Terry case, or Mr. Bradley, about the money that you

21  expected to receive for testifying in the Terry case?

22     A.   I don't believe I recall anything like that.

23     Q.   To the best of your information, Mr. Olsen, if

24  no verdict is rendered, would you have been paid in any

25  of those cases?

1        A.    I don't think that's an issue at all.

2        Q.    You don't think that they require that there be

3   a closure to the case before they pay you?

4        A.    I don't think that was an issue; no.

5        Q.    Okay.  If that's the case, why didn't they pay

6   you right after your first phone call?

7        A.    I don't know what their procedure is, ma'am.

8        Q.    Did this detective here, Detective Hopkins --

9   did he ever ask you about money you were being paid for

10  the case?

11       A.    I don't recall anything like that.

12       Q.    So, over the years, how much money have you

13  actually received -- I want to be real clear -- for any

14  case, whether it is informing; whether it is doing

15  controlled buys; whether it is testifying -- how much

16  money over the years have you received in your work as an

17  informant?

18       A.    As my work as an informant?

19       Q.    Well, have you ever held a job other than

20  informing?

21       A.    Oh, yeah.

22       Q.    Okay.

23       A.    How much money have I received in my whole

24  life?

25       Q.    For informing.

1     A.   For giving information?

2     Q.   Yes.

3     A.   Gees, I don't know.

4     Q.   Did you ever file a tax return, Mr. Olsen, on

5  which that might be reflected?

6     A.   I have never filed taxes in my life.

7     Q.   Okay.  But you have had jobs?

8              MS. MAHONEY:  Your Honor, at this point I

9  am going to object to the relevance of this.

10            THE COURT:  Sustained.  The objection is

11  sustained as to that last --

12            MS. ELLIOTT:  Thank you, Your Honor.

13            THE COURT:  -- question.

14            MS. ELLIOTT:  I'm just -- I guess at this

15  point --

16            THE COURT:  Do you have any further

17  questions, because we are going to take up the issue as

18  to Crime Stoppers --

19            MS. ELLIOTT:  Okay.  As to --

20            THE COURT:  -- separately.

21            MS. ELLIOTT:  Yeah.  Without that

22  information, I think it's somewhat difficult to get any

23  further information about Mr. Olsen.  So, I would like to

24  suspend my examination now and resume it when we get

25  that information.

1            THE COURT:  Well, you need to conclude

2     your examination as to all other topics except Crime

3     Stoppers.

4            MS. ELLIOTT:  This only came up in

5     rebuttal, Your Honor.

6            THE COURT:  I know.  So --

7            MS. ELLIOTT:  So, that's it.

8            THE COURT:  -- have you concluded?

9            MS. ELLIOTT:  I have concluded --

10           THE COURT:  -- except --

11           MS. ELLIOTT:  -- as to all other topics

12    except the money he has received --

13           THE COURT:  -- Crime Stoppers; from Crime

14    Stoppers.

15       Q.  Well, let me ask you this:  Have you ever

16    received money from anyone other than Crime Stoppers?

17       A.  What do you mean?

18       Q.  Money for informing, doing controlled buys,

19    testifying --

20       A.  Oh, no.

21       Q.  -- rewards?

22       A.  No.  I think that -- I believe some flowers

23    were bought for my daughter.

24       Q.  By who?

25       A.  A police officer.

```
1          Q.   What police officer?

2          A.   In Mount -- in Edmonds.

3          Q.   For what case?

4          A.   Oh, it wasn't for a case.

5          Q.   Okay.

6          A.   For the kindness of his heart.

7          Q.   So, the only organization who has ever paid you

8     money is Crime Stoppers; is that correct?

9          A.   Yes, it is.

10              MS. ELLIOTT:  Okay.  Thank you.

11              THE COURT:  Ms. Mahoney.

12

13                    RECROSS EXAMINATION

14    BY MS. ELLIOTT:

15         Q.   Mr. Olsen, did you ever tell anyone connected

16    with the Simmers case, as far as myself, Detective

17    Hopkins, or anyone else from my office or any other

18    police agency, that you received money from Crime

19    Stoppers in the Simmers case?

20         A.   No, I haven't.

21         Q.   Okay.  And did we ever discuss that in regard

22    to the Thompson case?

23         A.   Nope.

24         Q.   And to your knowledge, is Crime Stoppers in any

25    way affiliated with my office?
```

CRIMINAL DEFENSE MOTION                          -168-
   OLSEN - Recross

```
 1        A.   They are not.
 2        Q.   Is it in any way affiliated with the police?
 3        A.   No, they are not.
 4        Q.   Was there any agreement that you would testify
 5   with Crime Stoppers?
 6        A.   As a matter of fact, I believe it was made
 7   clear that it would have nothing to do with that, by
 8   Crime Stoppers.  They had told me that, "This was for the
 9   information that you have given us.  This has nothing to
10   do with you going to court."  And they made that very
11   clear to me.
12        Q.   Oh, and Ms. Elliott also asked you some
13   questions about your Snohomish County burglary.
14        A.   Yes.
15        Q.   As a matter of fact, had you not been actually
16   PR'ed on that case with the same criminal history that
17   you were PR'ed in this PSP case?
18        A.   Yes, I was.
19        Q.   Also, as far as that goes, was there any type
20   of deal struck with the Snohomish County prosecutor
21   regarding your testimony in the Simmers trial?
22        A.   Not at all.
23        Q.   Okay.  Was that ever discussed or brought up?
24        A.   No, it was not.
25        Q.   Were you given any sort of deal by Snohomish
```

CRIMINAL DEFENSE MOTION
OLSEN - Recross

1    County in exchange for your cooperation with the State in

2    King County?

3        A.   No, I was not.

4             MS. MAHONEY:  Nothing further.

5

6                 REDIRECT EXAMINATION

7    BY MS. ELLIOTT:

8        Q.   Who was your lawyer in Snohomish County,

9    Mr. Olsen?

10       A.   My lawyer was Stephen Garvey.

11       Q.   May I speak to Mr. Stephen Garvey about your

12    assertions that there was no deal?

13       A.   I will assert my attorney-client privilege,

14    ma'am.

15       Q.   Okay.  So, let me get this straight about

16    Crime Stoppers:  If you called them up and told them that

17    someone was in the cell next to you, such as myself, and

18    I had confessed to a crime, they would pay you simply for

19    offering up that information?  That's all you would have

20    to give them?

21       A.   I don't know how they determine it, ma'am.  It

22    goes to a committee of some sort.

23       Q.   Well, you know that they don't take testimony

24    into consideration, don't you?  Didn't you just testify

25    to that?

1          A.    Right.  They will not pay you for testifying.

2          Q.    Okay.  Will they pay you simply for an

3    allegation?

4          A.    I don't know how they evaluate the information,

5    ma'am; I really don't -- for the third time.

6                MS. ELLIOTT:  I don't have any further

7    questions, Your Honor.

8                THE COURT:  All right.  What I need to do

9    is to -- outside the presence of the attorneys and

10   Mr. Simmers, and I will have sealed -- ask Mr. Olsen what

11   the PIN number, in the event that that comes to pass,

12   that that is relevant.  So, I think that's the most

13   efficient way to handle it.  I know that you have issues

14   related to --

15               MS. MAHONEY:  Can he maybe --

16               THE COURT:  -- obtaining that information.

17               MS. MAHONEY:  -- write it on a piece of

18   paper and hand it up to you?

19               THE COURT:  That would be fine.  And then

20   we could seal it in the record.  That's good.  Thank

21   you.

22               Also, Ms. Elliott, just because I'm

23   concerned that the --

24               THE WITNESS:  It's six pages long.  No,

25   I'm just kidding.

CRIMINAL DEFENSE MOTION
  OLSEN - Redirect                              -171-

1                 THE COURT:  Well, just a minute.

2                 -- because I'm concerned the record is not

3    clear.  You asked whether Mr. Olsen had used the same PIN

4    number for all of the cases except Mr. Simmers.

5         Q.   Oh.  Did you use the same PIN number --

6                 MS. ELLIOTT:  May I ask him another

7    question, Your Honor?

8                 THE COURT:  Well, let's get this --

9                 MS. ELLIOTT:  Okay.

10                THE COURT:  -- issue cleared up.  And that

11   is:  Mr. Olsen, did you use the same PIN number for all

12   of the individuals that you have testified about,

13   including Mr. Simmers?

14                THE WITNESS:  Yes.

15                THE COURT:  Okay.  And you are going to

16   write that down, and it will be sealed.

17                MS. ELLIOTT:  I would like to know the

18   total, so I want to know if he has ever used any other

19   PIN number, ever.  I want all the PIN numbers he has ever

20   used --

21                THE COURT:  With Crime Stoppers.

22                MS. ELLIOTT:  -- with Crime Stoppers.

23                THE COURT:  Okay.

24                THE WITNESS:  Just the one.

25                MS. ELLIOTT:  That was my understanding.

CRIMINAL DEFENSE MOTION                          -172-
    OLSEN - Redirect

1  I just wanted to make that clear.

2              THE COURT:  Now we are all clear, and he

3  is writing it down.  And he will be excused at this

4  point, and we will conclude at this point.

5              Counsel, could I see about -- or, we can

6  take up what other issues need to be resolved.  I

7  don't --

8              MS. MAHONEY:  Right.  I think our

9  testimony with Mr. Olsen is completed.

10             THE COURT:  Well, Ms. Elliott may want to

11 re-call him.  I will hear argument about it later, but at

12 this point, it is concluded.

13             You remember, Ms. Elliott said that she

14 wanted to ask more questions about Crime Stoppers but

15 didn't have the information.  So, we'll take it one step

16 at a time.

17             MS. RAMEY:  Handing to the Court the

18 piece of paper --

19             THE COURT:  Well --

20             MS. RAMEY:  -- with the PIN number.

21             THE COURT:  -- hand it to the Clerk to

22 file and seal.

23             All right.  Thank you.  You are excused

24 now.  And --

25             MR. RAMEY:  For good?

CRIMINAL DEFENSE MOTION
   OLSEN - Redirect                          -173-

```
 1                    THE COURT:  Well, I think not for good
 2       with Mr. Olsen, but for good for now and for this week
 3       and --
 4                    MS. RAMEY:  The Court will notify him?
 5                    THE COURT:  Yes -- until you are notified
 6       next.  And we need to conclude today.
 7                    Ms. Elliott, I don't know what steps you
 8       wish to take, but I will let you look into that.  Consult
 9       with Ms. Mahoney.  I am available for purposes of any
10       motions or issues related to that.
11                    Counsel, I do not have any transcripts
12       from the trial, except what was given to me today.  So,
13       if there are portions of the trial record that you
14       believe the Court should review in the context of this
15       motion, I need it.  One of the things that I know that I
16       need, that I at one point had, was the statement given by
17       Mr. Simmers.  It was transcribed.
18                    MS. MAHONEY:  The confession?
19                    THE COURT:  And I did have a transcript of
20       it, and I think I need to review it again in the context
21       of this motion.
22                    MS. MAHONEY:  Okay.  We are not done with
23       the motion, are we, other --
24                    THE COURT:  No.
25                    MS. MAHONEY:  -- than Crime Stoppers?
```

```
 1   Because I'm not done.
 2                   THE COURT:  That's fine, but I need to
 3   conclude today, so we need to talk about scheduling --
 4                   MS. ELLIOTT:  Oh.  Oh, cause --
 5                   THE COURT:  I was trying to be clear that
 6   we were done today.
 7                   MS. ELLIOTT:  I'm not done talking, Your
 8   Honor.
 9                   MS. MAHONEY:  Well, can I ask just a
10   couple of questions?  Is Ms. Elliott done with her
11   portion of evidence?
12                   THE COURT:  Ms. Elliott?
13                   I think the assumption has been
14   Ms. Elliott is going to try to pursue getting information
15   from Crime Stoppers --
16                   MS. MAHONEY:  Can we briefly --
17                   THE COURT:  -- but other than that --
18                   MS. MAHONEY:  -- discuss that?
19                   THE COURT:  Very briefly.
20                   MS. MAHONEY:  I guess my --
21                   THE COURT:  But Ms. Mahoney -- slow down,
22   please; just one sec -- you asked a question.  Let's ask
23   Ms. Elliott.
24                   MS. ELLIOTT:  Well, if Ms. Mahoney can
25   expedite getting all of that information from Crime
```

1  Stoppers, I have no objection to her doing so.  I will be
2  starting -- I don't know anything about the organization
3  -- I will be starting from square one.

4         I think it's clear Mr. Olsen was not
5  truthful with the jury in this case, and I think that's a
6  sin of -- maybe perhaps omission, not commission, but --

7         THE COURT:  Well, I don't know whether you
8  need to pursue Crime Stoppers.  What needs to happen is,
9  we need to reschedule a time for you either to present
10  additional testimony, if it's necessary --

11         MS. ELLIOTT:  Yeah.

12         THE COURT:  -- and Ms. Mahoney to present
13  additional testimony, if necessary, and for you to make
14  your argument.  I know that, before the argument, I need
15  to see a copy of the statement made by Mr. Simmers.  I
16  also need any portions of the trial transcript that the
17  Prosecutor would like to refer to or have the Court
18  review.

19         So, at this point, I think the testimony
20  has been given, and it is relatively complete, related to
21  Crime Stoppers.  To the extent you think you wish to
22  pursue it beyond that, I was not going to put you on the
23  spot today, but let you contemplate that, because I knew
24  we needed to conclude today and schedule another time to
25  resume.

CRIMINAL DEFENSE MOTION
   OLSEN - Redirect                              -176-

1              MS. ELLIOTT:  I guess -- and I know Your

2     Honor is not prepared to make a ruling.  But really what

3     I am interested in is issues of timing in terms of the

4     payment.  And if Your Honor thinks that that is relevant,

5     as I do -- it may or may not be; it may be more relevant

6     if it's after the trial and just a little bit less if

7     it's before the trial.

8              But issues of timing are important to me,

9     and how that information was conveyed to and from Crime

10    Stoppers, I guess, is also important to me.  And if I can

11    find those things out relatively expeditiously, I will

12    present that testimony.  But I will keep the Court

13    informed.

14             THE COURT:  All right.  So, Ms. Mahoney --

15             Let me be clear, though, with Ms. Elliott.

16    So, other than that, have you concluded presenting your

17    evidence?

18             MS. ELLIOTT:  I have no interest in

19    calling Mr. Ernsdorff, since Mr. Olsen has refused to let

20    him talk about anything relevant --

21             THE COURT:  Okay.  And --

22             MS. ELLIOTT:  -- at this point.

23             THE COURT:  -- Ms. Mahoney, was there any

24    testimony that you wished to present?

25             MS. MAHONEY:  Yes; briefly Detective

CRIMINAL DEFENSE MOTION
    OLSEN - Redirect                                        -177-

1    Hopkins and Mr. Ernsdorff.  Mr. Ernsdorff can discuss his

2    plea bargainings, and so can Mr. Garvey, for that matter,

3    if she wants to call Sno County.

4              My concern with the Crime Stoppers is that

5    we are going to unnecessarily delay this motion.  I

6    think, for purposes of the Court's determination, you

7    have the information needed.  You know, quite frankly,

8    yes, he received money from Crime Stoppers.  He said he

9    didn't tell us about it.  We know he didn't testify to

10   it.  And so, therefore, how was that material?  And

11   that's really where we are.  It doesn't really matter at

12   this point the specifics of it so much, because we know

13   it happened, and there's no dispute that it happened.

14             MS. ELLIOTT:  Well --

15             MS. MAHONEY:  So, I don't know what good

16   is the going through all the subpoena process and

17   fighting it, and they will argue their privacy, and going

18   off on a sideshow where she really hasn't -- if the Court

19   is going to be persuaded there is enough there for the

20   purposes of new trial in order to make her arguments

21   before the Court.

22             THE COURT:  Well, I can assume, for

23   purposes of the new trial, that the timing is whatever

24   Ms. Elliott would like to present.  And if you would like

25   to stipulate to that, then that's fine.  I --

```
 1                    MS. MAHONEY:  I don't know that we can say
 2    in Simmers, because we don't have any information, but
 3    she has got -- the money was put on the books in October
 4    of '91 in the Thompson case; is that correct?
 5                    MS. ELLIOTT:  That's correct; it was
 6    after his testimony.  And I need to call someone from
 7    Crime Stoppers to find out if it --
 8                    THE COURT:  Well, that --
 9                    MS. ELLIOTT:  -- requires a conviction.
10                    THE COURT:  Counsel, we need to stop
11    today.  I have a calendar that I need --
12                    MS. ELLIOTT:  Sorry.
13                    THE COURT:  -- am responsible for calling
14    at 3:30.  I need to talk to you about when we are going
15    to reschedule.  I think that Ms. Elliott needs the
16    opportunity to review the testimony given today, as do
17    you, Ms. Mahoney, to determine whether or not pursuing
18    information from Crime Stoppers is necessary or relevant.
19                    One way to address this would be to
20    assume, for purposes of the argument, that the timing was
21    such that monies were received from Crime Stoppers after
22    testifying.
23                    So, even without getting the specifics --
24    I share the same concern that Ms. Mahoney has expressed,
25    that this is going to be a tremendously time-consuming
```

CRIMINAL DEFENSE MOTION
   OLSEN - Redirect                                     -179-

1    effort that is going to consume significant amounts of

2    time.  And if the State wants to, for purposes of this

3    motion only, agree with whatever timing that you wish to

4    suggest, Ms. Elliott, in the context of --

5                MS. ELLIOTT:  Well, one very simple thing

6    I would like to do is call and see if their protocols are

7    -- apart from the confidential aspects of it, which may

8    or may not be relevant -- to get their protocols, to find

9    out if they have any published protocols about what is

10   required to recover.  And we may be able to make certain

11   assumptions from that as well.  But I will contact

12   Ms. Mahoney to see if there is some way we can expedite

13   that this week.

14               I don't want to set this out very far

15   either, because the Court of Appeals is breathing down my

16   neck on this, so --

17               MS. MAHONEY:  After my conversations with

18   Mr. Hopkins, if Ms. Elliott wishes to argue that he

19   received this money after, that is a likely outcome.

20               THE COURT:  Okay.  Well, then why --

21               MS. MAHONEY:  And not because he has

22   personal knowledge of him --

23               THE COURT:  Right.

24               MS. MAHONEY:  -- getting this.  He just

25   knows how Crime Stoppers works.  It doesn't matter --

```
 1                    THE COURT:  He --
 2                    MS. MAHONEY:  We are not agreeing that the
 3       testimony matters --
 4                    THE COURT:  Right.
 5                    MS. MAHONEY:  -- because that's actually
 6       not the case.  Testimony doesn't matter.
 7                    THE COURT:  Right.  Well, that's -- and
 8       Detective Hopkins knows more than the three of us.
 9                    MS. MAHONEY:  That's right.
10                    THE COURT:  So, I suggest that we conclude
11       today; that we schedule a time for you to come back; that
12       Ms. Mahoney be allowed to present her two witnesses.  If
13       you would like to come back Thursday morning, I can
14       accommodate that.
15                    MS. ELLIOTT:  I'm free Thursday morning.
16                    THE COURT:  We can do it then.  Between
17       now and then, you can talk to Detective Hopkins, who
18       knows much more than certainly any of us about Crime
19       Stoppers.  You can talk to Crime Stoppers, if you want.
20       But at least then we would conclude the testimony and you
21       could make your argument, and then I can review the case
22       law and make a determination.
23                    That wouldn't preclude you, Ms. Elliott,
24       from subsequently, if you think it's really necessary --
25                    MS. ELLIOTT:  Oh, I would come back.
```

 1              THE COURT:  -- going down the Crime
 2   Stopper road.  But between now and then, I think that the
 3   State is agreeing that, for purposes of your motion, you
 4   could assume payment afterward, which I understood from
 5   your presentation was the most relevant timing --
 6              MS. ELLIOTT:  Seems to me to be the
 7   most --
 8              THE COURT:  -- [is that fair]?
 9              MS. ELLIOTT:  -- I would say the most
10   incriminating timing, but relevant might be --
11              THE COURT:  All right.  That way
12   Mr. Simmers could remain, and we would schedule back on
13   Thursday morning.
14              MS. MAHONEY:  9 o'clock?
15              MS. ELLIOTT:  Do you need a written order
16   in that regard?
17              MR. (UNIDENTIFIED):  I think so
18   [unintelligible].
19              THE COURT:  Well, if you think so, that's
20   fine, but I will call, because the last time that this
21   happened, I was told I didn't need an order; that it was
22   sufficient that, until we were done, the person stays.
23   But I will call.  I will call.
24              All right.  I will see you all Thursday
25   at 9.

1               (Cause continued to 9:00 a.m.

2               on November 6, 1997,

3               adjourning at 3:42 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CRIMINAL DEFENSE MOTION
  OLSEN - Redirect

1          KING COUNTY SUPERIOR COURT; THURSDAY, NOVEMBER 6, 1997

2                           9:27 A.M.

3                           --oOo--

4

5                           (Defendant and respective

6                            counsel present.)

7                           (Hearing continued from

8                            November 4, 1997.)

9                           (Proceedings not transcribed

10                           for purposes of this report.)

11          * * * * *

12                          (Court adjourns, 11:20 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25


CRIMINAL DEFENSE MOTION

```
 1        KING COUNTY SUPERIOR COURT; MONDAY, NOVEMBER 17, 1997

 2                          10:06 A.M.

 3                           --o0o--

 4

 5                          (Counsel for defendant present;

 6                           counsel for the

 7                           plaintiff not present.)

 8                THE COURT:  Okay.  Let's take up the

 9        subpoena for Crime Stoppers.  I'm sorry you went to the

10        wrong place, Detective.

11                DET. HOWE:  Well, it's a cacophony of

12        errors, I'm sure.

13                THE COURT:  You received the subpoena.

14        For purposes of the record, this is State of Washington

15        versus Ian Simmers, Cause No. 95-1-02102-2.

16                Based on a hearing that was held in the

17        context of a motion for a new trial -- testimony was

18        given by Kevin Olsen related to payment that he received

19        for information he provided in that case; he was a

20        witness in that case -- I filed under seal what we have

21        called the PIN number; I don't know what Crime Stoppers

22        calls it, but whatever that number is, [it] is filed

23        under seal.  The only place that that number actually

24        appears is in the subpoena that went to you, Detective.

25        It does not appear anyplace else.  Defense Counsel does
```

CRIMINAL DEFENSE MOTION
  Colloquy

1   not have it; the Prosecutor does not have it.  For

2   purposes of the record, it is filed and available for

3   purposes of review.

4            I did sign the subpoena.  I indicated

5   that, in the event there were no documents that the

6   entity could certify to the Court, and there was a

7   request made to the City of Bothell -- excuse me; they

8   did certify they have no records.  But in the event --

9   there was an expression of concern related to providing

10  these documents without having the Court first review

11  them; that they could be produced for an in-camera

12  review.  We did receive a request from you and/or your

13  office to reschedule this for today.  It was to be

14  returned on Friday, but we accommodated that request,

15  given the short time frame for the notice.

16            So, today we have with us Ms. Suzanne

17  Elliott, who represents Mr. Simmers.  Deputy Prosecuting

18  Attorney Susan Mahoney is not here and has indicated she

19  will not be.

20            So, with that introduction, Detective,

21  what, if anything, is Crime Stoppers' position, or what,

22  if anything, have you brought?

23            DET. HOWE:  Your Honor, what we have is

24  very little, actually.  And I'm not sure, having never

25  done this before, what it is that I am allowed to divulge

CRIMINAL DEFENSE MOTION
    Colloquy                                    -186-

1  in front of --

2              THE COURT:  And that was why I --

3              DET. HOWE:  -- the attorney.

4              THE COURT:  -- put in the provision for

5  in-camera review.  I mean, if you've got some concerns

6  about divulging information that you don't think relates

7  to anything concerning this request, then you can so

8  indicate, and I can review it and make a determination as

9  to whether or not Defense Counsel should receive a

10  version that perhaps has certain information redacted or

11  removed.

12              DET. HOWE:  I would request that.

13              THE COURT:  Okay.  Now, why don't you come

14  forward and show me -- and we will keep Ms. Elliott

15  here --

16              DET. HOWE:  Okay.

17              THE COURT:  -- and show me what it is that

18  you are concerned about turning over to Ms. Elliott or

19  anybody else.

20              DET. HOWE:  The one log sheet that we

21  have, the only single piece of identification regarding

22  that PIN number that you gave us is highlighted in the

23  yellow there.

24              THE COURT:  So you are worried about all

25  the other ones, and I understand that.

```
 1                    DET. HOWE:  Yes.  And we are also worried
 2   about that one as well, because we guarantee anonymity
 3   for our callers.
 4                    THE COURT:  Although this caller
 5   testified.
 6                    DET. HOWE:  Right.
 7                    THE COURT:  So, I think, to that extent,
 8   this caller has waived his concerns about anonymity.
 9                    What is the PIN number?  This is the date?
10   Is this --
11                    DET. HOWE:  Actually, this is the PIN
12   number here.
13                    THE COURT:  This is the PIN number, okay.
14                    DET. HOWE:  Right.
15                    THE COURT:  So, what I would propose
16   doing, Detective, so that you know what I am doing -- and
17   Ms. Elliott will know what I am doing, too -- is that I
18   will make a copy of this.
19                    I will redact, Ms. Elliott, information as
20   to all these other people that you didn't ask about.
21                    MS. ELLIOTT:  I don't care about all those
22   other people.
23                    THE COURT:  And I am also going to redact
24   the PIN number, to be consistent.
25                    MS. ELLIOTT:  That's perfectly all right
```

1   with me.

2               THE COURT:  So, you will have only the

3   information related to the person who has testified in

4   our proceeding, a Mr. Kevin Olsen.

5               MS. ELLIOTT:  That's fine.

6               THE COURT:  Okay.

7               MS. ELLIOTT:  I do have a couple of

8   questions for the Detective, however.

9               THE COURT:  Well, now, we are not -- I

10  don't know if we are done.

11              MS. ELLIOTT:  Oh.

12              THE COURT:  I was going to finish asking

13  if he had any more --

14              MS. ELLIOTT:  Any further information?

15              THE COURT:  Yeah; anything else.  Is this

16  all you have?

17              DET. HOWE:  That's all, Your Honor.

18              THE COURT:  Okey-doke.  Thanks.  All

19  right.  Now --

20              DET. HOWE:  The only way that I knew the

21  name of the person was through Detective Hopkins.

22              THE COURT:  And that is because he came

23  and sat here and testified.

24              DET. HOWE:  Right.  We don't know the

25  names of our people unless they freely give that to us,

CRIMINAL DEFENSE MOTION
  Colloquy                                        -189-

1    and I have no knowledge of that occurring with this

2    particular person.

3              THE COURT: Okay. Thank you. I'm sorry

4    you had to drive everywhere.

5              DET. HOWE: Oh, no problem.

6              MS. ELLIOTT: Could I ask you a couple

7    questions, Detective.

8              How long do you keep your records?

9              DET. HOWE: One year.

10             MS. ELLIOTT: So, these would only be --

11   you may have had other records that were subsequently

12   destroyed?

13             DET. HOWE: Yes, perhaps. In fact, this

14   particular document that I have given the Judge sort of

15   slipped through the cracks, because the information is

16   actually almost a year and a half old now.

17             MS. ELLIOTT: Okay. Could the Seattle

18   Police Department themselves have other information about

19   this person?

20             DET. HOWE: They could, but it wouldn't be

21   -- it would be totally a hit-and-miss situation. For

22   instance, if he is in our Seattle-King County crime

23   records system, then, yes, there's probably some

24   information about him there.

25             MS. ELLIOTT: Would your payment records

1   have ever been entered into the Seattle Police Department
2   records in any way?
3              DET. HOWE:  No; we keep our own records.
4              MS. ELLIOTT:  And then I just have one
5   kind of question, for my own information:  How do you
6   determine the validity of the information and that the
7   matter should be paid over on, so to speak?
8              DET. HOWE:  We don't determine validity
9   unless, of course, it's so preposterous -- but what we do
10  is, we take the information given us, and we pass it on
11  to the applicable jurisdiction.
12             MS. ELLIOTT:  And how do you -- so, you
13  just pay over on everything, without question?
14             DET. HOWE:  No; the -- no.  Actually, what
15  happens is, if we give it to Bothell Police Department, a
16  particular unit within that department, depending upon
17  the crime, handles that information.  And what they do
18  with it is totally up to them.  We just provide them the
19  information given us by the anonymous caller.
20             If they do make an arrest or seize
21  property, felony type, then they get back with us and
22  say, "Okay, the information that you gave us was valid.
23  We made an arrest on so-and-so" or, "We recovered such-
24  and-such a property that your tip that was given --
25  provided for us."

CRIMINAL DEFENSE MOTION                      -191-
    Colloquy

1              And if that's true -- we verify all of

2    that -- then we take that information; we give it to our

3    civilian board, who determines -- they recommend on a

4    scale, whatever their scale is, on a reward amount, and

5    then that reward amount is paid.

6                   MS. ELLIOTT:  Where are the records of

7    verification kept?

8                   DET. HOWE:  In our office.

9                   MS. ELLIOTT:  Do you have any in

10   relationship to that call?

11                  DET. HOWE:  No.

12                  MS. ELLIOTT:  You --

13                  DET. HOWE:  That's the only piece of paper

14   -- that's the only documentation we have on the entire

15   thing.

16                  MS. ELLIOTT:  Are those only kept for one

17   year, too, the records of verification?

18                  DET. HOWE:  Yes.

19                  MS. ELLIOTT:  But someone had to call you

20   back and give you the OK to pay over on that tip?

21                  DET. HOWE:  Correct.

22                  MS. ELLIOTT:  Thanks.

23                  THE COURT:  Thank you.  All right.

24                  MS. ELLIOTT:  I don't have any other

25   questions.

CRIMINAL DEFENSE MOTION
  Colloquy                                              -192-

```
 1                    THE COURT:  No?  You can go back to work.
 2                    DET. HOWE:  Great.  Thank you.
 3                    MS. ELLIOTT:  Thank you, Your Honor.
 4                    THE COURT:  Now, I will -- Do we have --
 5       you should give me your address, because I will mail back
 6       a copy, and then I will file for the record the
 7       unredacted version, together with the redacted version.
 8                    MS. ELLIOTT:  Under seal, the unredacted
 9       version.  That's fine.  I do have a question about
10       further proceedings in this matter.
11                    THE COURT:  The motion to compel?
12                    MS. ELLIOTT:  The motion to compel, which
13       -- I thought Ms. Mahoney was going to be here, so -- I
14       haven't even served on her.
15                    THE COURT:  Well, and the 19th won't work,
16       because I'm not here.
17                    MS. ELLIOTT:  Okay.
18                    DET. HOWE:  Good day, Your Honor, and --
19                    THE COURT:  Thanks.
20                    DET. HOWE:  -- sorry for the delay.  Good
21       bye.  (Takes leave of proceedings).
22                    THE COURT:  That's okay.
23                    [You made it] a lot faster than I thought.
24                    MS. ELLIOTT:  So, I need to pick another
25       date.  I think I need to notify Ms. Mahoney.  Maybe --
```

CRIMINAL DEFENSE MOTION
     Colloquy                                            -193-

```
 1                    THE COURT:  I do.

 2                    MS. ELLIOTT:  -- she can persuade them to

 3      do this without a hearing.

 4                    THE COURT:  Well, I think that might be

 5      true.  You know, let me give you some names of -- Carol

 6      Pidduck -- I don't know to whom this went.  It always

 7      makes me a little nervous, the subpoenas.  So --

 8                    MS. ELLIOTT:  Right.

 9                    THE COURT:  So, anyway, Carol Pidduck,

10      P-i-d-d-u-c-k --

11                    MS. ELLIOTT:  P-i-d-d-u-c-k; got it.

12                    THE COURT:  -- is with the -- now I can't

13      remember their exact title, but she is -- there are two

14      lawyers who are legal advisors to the Seattle Police

15      Department.

16                    MS. ELLIOTT:  Okay.

17                    THE COURT:  And if I were you, I would

18      talk to Ms. Mahoney, and you and Ms. Mahoney should call

19      Ms. Pidduck -- you can say I gave you Ms. Pidduck's name.

20      I've had a lot of dealings with her --

21                    MS. ELLIOTT:  Okay.

22                    THE COURT:  -- in the Terry case.  And --

23      just to make sure that she is aware --

24                    MS. ELLIOTT:  I agree.  I only had it

25      served by LMI because I wanted to have the affidavit --
```

CRIMINAL DEFENSE MOTION
    Colloquy                                          -194-

1              THE COURT:  Right.

2              MS. ELLIOTT:  -- of service.  Usually I

3    would walk it over myself, so everybody understood.

4              THE COURT:  But, you know, I am never

5    really confident, when you do those records custodian,

6    who gets it or where it goes after the person or entity

7    is served.

8              MS. ELLIOTT:  I think it goes into a big

9    in-basket, probably.

10             THE COURT:  So, anyway --

11             MS. ELLIOTT:  I will.  I will do that.

12             THE COURT:  -- call Carol Pidduck.  It's

13   -- you know, there's a number.  She's the SPD legal

14   advisor.  Somebody there can tell you how to get a hold

15   of her.  And talk to Ms. Mahoney.  And then, if you need

16   a return date and want to go forward with this motion,

17   let me know.

18             MS. ELLIOTT:  Okay.  And then I will pick

19   a date when you will be here.

20             THE COURT:  That would be good.

21             MS. ELLIOTT:  And I hate to ask this, but

22   do you have a ballpark as to when you might have a

23   decision?  Because I have to call the court -- or do a

24   motion to the Court of Appeals today.

25             THE COURT:  And I know they have been

```
 1   anxious.  I have another -- ironically, another motion

 2   for a new trial that I was going to rule on, and then

 3   this one.  This one is longer and more complex.  So, I

 4   would be happy to do it right after Thanksgiving.

 5            MS. ELLIOTT:  All right.  I will ask the

 6   Court to continue this --

 7            THE COURT:  But we should set a date

 8   certain.  So why don't you also, in your conversation

 9   with --

10            MS. ELLIOTT:  Okay.

11            THE COURT:  -- Ms. Mahoney, figure out

12   when you all want to come back.  And what I would suggest

13   is we set it that first week in December -- we are going

14   to have to do that, because I am going into another trial

15   starting the 8th.  We need to set it the week of

16   December 1.

17            MS. ELLIOTT:  And 8:30, 4 o'clock?  Which

18   -- what time?

19            THE COURT:  Both are bad because I hear

20   other [calendars] --

21            MS. ELLIOTT:  Oh, yeah.

22            THE COURT:  -- in both.  I would say

23   at 9 --

24            MS. ELLIOTT:  Nine --

25            THE COURT:  -- or 3, because I call the
```

CRIMINAL DEFENSE MOTION
  Colloquy

1    calendar at 3:30.  So, basically, I'm on other calendars

2    between 8:30 and 9 --

3                    MS. ELLIOTT:  Okay.

4                    THE COURT:  -- and 3:30 and 5.

5                    MS. ELLIOTT:  All right.

6                    THE COURT:  So it's a little bit of a

7    reverse.

8                    MS. ELLIOTT:  Oh, lookit; I think that

9    week is very good for me.  So, I will just call

10   Ms. Mahoney, and we will figure out a mutually agreeable

11   time.

12                   THE COURT:  Okay.

13                   MS. ELLIOTT:  Every day but the 5th I am

14   okay.

15                   THE COURT:  Now, do you want to wait so

16   you can get this --

17                   MS. ELLIOTT:  Yeah.  I'll just hang around

18   while --

19                   THE COURT:  -- piece of paper?

20                   MS. ELLIOTT:  -- you redact it.

21                   THE COURT:  Yes.  Because I'll go make a

22   copy and start marking it up.

23                   MS. ELLIOTT:  Thank you.

24                             (Hearing adjourned, 10:20 a.m.)

25

```
 1        KING COUNTY SUPERIOR COURT; TUESDAY, DECEMBER 9, 1997
 2                         3:16 P.M.
 3                         --o0o--
 4
 5                    (Defendant and respective
 6                    counsel present.)
 7             THE COURT:  Good afternoon.  Please be
 8   seated.
 9             Counsel:  You have provided me with, on
10   behalf of Mr. Simmers, a motion regarding State v.
11   Berlin (phonetic), Ms. Elliott, along with two additional
12   cases from the Ninth Circuit concerning Brady (phonetic)
13   violations.
14             And, Ms. Mahoney, you have provided me
15   with a two-page letter concerning the State v. Berlin
16   case.
17             This is, for purposes of the record, State
18   of Washington versus Ian Simmers, Cause No. 95-1-02102-2.
19             I called Counsel -- I can't remember now
20   when.
21             MS. ELLIOTT:  December 1, Your Honor.
22             THE COURT:  Thank you.
23             MS. MAHONEY:  Second.
24             MS. ELLIOTT:  -- or 2nd.
25             THE COURT:  I called Counsel to indicate
```

CRIMINAL DEFENSE MOTION
       Colloquy                                        -198-

1   that, in my reviewing the record, which I felt an

2   obligation to do in light of the motion pending before

3   me for a new trial, I was aware of the fact that

4   Mr. Hicks, Mr. Simmers' attorney, had taken exception to

5   the Court's not giving manslaughter jury instructions and

6   that the Court -- I -- did not give manslaughter

7   instructions on two grounds:  one, as a matter of law,

8   because of the state of the case law then, which, as I

9   think [I] described during the colloquy, was a bright-

10   line test as set forth in State v. Lucky (phonetic), and,

11   secondly, based on the second prong of State v. Workman

12   (phonetic) that there was not an evidentiary basis to

13   give the manslaughter instructions.

14         I was aware that the State Supreme Court

15   had reversed State v. Lucky.  I did not know the citation

16   for the case but raised this concern about State v.

17   Lucky with Counsel.  Counsel then provided to me, which I

18   received yesterday, a motion concerning that, and the

19   State has articulated a position related to that issue.

20         I did not know whether either of you

21   wished to add anything to what you had submitted.

22   Ms. Elliott.

23         MS. ELLIOTT:  Well, Your Honor, just

24   briefly, I wrote my -- you know, they were kind of blind

25   -- they crossed, basically, over the weekend,

CRIMINAL DEFENSE MOTION
  Colloquy

1   Ms. Mahoney's two-page letter to me and my brief.

2          The only issue that I have, really, is the

3   difference between the idea of lesser-included

4   instructions and alternative means.

5          In this case, Ms. Mahoney argues there was

6   no error in the failure to give the manslaughter

7   instructions because the jury was instructed on second-

8   degree felony murder by assault.

9          THE COURT:  Uh-huh.

10         MS. ELLIOTT:  That's a fundamentally

11  different concept than giving lesser-included

12  instructions.

13         THE COURT:  Uh-huh.

14         MS. ELLIOTT:  So, I don't believe that the

15  harmlessness can be established by the case she cites,

16  which truly was a lesser-included instruction situation,

17  where the jury rejected the lesser includeds.

18         So, I think the only issue left is whether

19  or not, factually, the lesser-included instruction

20  should have been given.

21         I think it's clear legally now, if the

22  factual basis was there, the Court was in error, not

23  because -- I mean, the Court wasn't in error at the time,

24  but is now in error --

25         THE COURT:  Uh-huh.  Uh-huh.

1          MS. ELLIOTT:  -- thanks to the belated

2    correction of that problem by the State Supreme Court.

3          And I think that the evidence taken --

4    that there is an inference that the murder in this case

5    was not premeditated.  As I point out, the State relied

6    heavily both on Mr. Simmers' questioned confession in

7    this case as well as the testimony of Mr. Olsen.  And

8    Mr. Simmers' confession does not give rise to

9    premeditation.

10         That evidence, taken in a light most

11   favorable to the State, does not conclusively establish

12   that this was a premeditated murder.  It does give an

13   inference of an unintentional murder, perhaps a failed --

14   something like a failed self-defense theory, which would

15   be manslaughter one or two.

16         It also impacts -- the Court's resolution

17   of the Brady issue or the problems inherent in

18   Mr. Olsen's perjured testimony go directly to this issue

19   because, absent Mr. Olsen's testimony, the factual

20   inferences would have been different, and I think this

21   Court would have decided the factual prong of the

22   Workman test differently.

23         THE COURT:  Okay.  Ms. Mahoney.

24         MS. MAHONEY:  Your Honor, just briefly, I

25   believe that the Court was right in the fact that there

1  was no factual basis; I won't go back to those facts.

2              Second of all, I think that, under Hanson

3  (phonetic), there is also -- even if there had been a

4  problem under Workman, that this would be harmless error.

5  I had given the Court my copy of the entire transcript,

6  if you recall, so I was not able to look at it.  But it

7  is my recollection, since I was the trial lawyer, that we

8  charged Mr. Simmers murder one and, alternatively,

9  intentional murder and felony murder.

10             THE COURT:  You did.

11             MS. MAHONEY:  And that, in addition -- so,

12  the jury was instructed on murder one and murder two, and

13  that's kind of --

14             THE COURT:  They were.

15             MS. MAHONEY:  -- obvious in itself that

16  one was more serious than the other.

17             And second of all, I also have a specific

18  memory of arguing against this, and now I'm glad that the

19  Court's wisdom prevailed, which is that you had me change

20  the alternative instruction to inform the jury that it

21  was a lesser included as well.  It said the lesser charge

22  is also -- the lesser charge of murder in the second

23  degree has also been charged, so --

24             THE COURT:  Right.

25             MS. MAHONEY:  -- the jury was informed

1     specifically that that was a lesser charge.

2               THE COURT: I think they were. I mean, I

3     don't have the jury instructions in front of me. They

4     are in my office.

5               MS. MAHONEY: I remember having to go back

6     and rewrite that after the Court having fashioned such an

7     instruction, which was different than I had initially

8     submitted. So, in any case, although I don't really

9     think that that is pertinent under the case law, I just

10     wanted to make that clear for the record.

11               I will not argue further. I would just

12     like to make sure that this is made part of the record,

13     because I am relying on the cases in here, State v.

14     Brown (phonetic), State v. Fowler (phonetic) and Workman

15     and Hanson.

16               THE COURT: Oh, and yours says original?

17               MS. ELLIOTT: I gave you both an original

18     and a copy, Your Honor.

19               THE COURT: Ah. Do you want the

20     attachments?

21               MS. ELLIOTT: The cases, Your Honor?

22     Those don't necessarily need to be part of the --

23               THE COURT: File? All right.

24               MS. ELLIOTT: -- the file.

25               THE COURT: Let me cite them for the

1   record so, in the event that --

2             MS. ELLIOTT:  Yes.  If you want to --

3             THE COURT:  -- [unintelligible] to know

4   what you attached.  You attached Henry Grisby v. James

5   Blodgett (phonetic), a Ninth Circuit 1997 case, and

6   Donald Pradis, P-r-a-d-i-s, v. A-j-a-r-a-b-e.  That's

7   also a Ninth Circuit case, 1997.  All right.

8

9               RULING ON DEFENSE MOTION

10  BY THE COURT:

11            Mr. Ian Simmers, through his attorney,

12  Ms. Elliott, is seeking a new trial pursuant to Criminal

13  Rule 7.7, and --

14            MS. MAHONEY:  I'm sorry, Your Honor.  Is

15  that 7.8?

16            THE COURT:  I'm sorry -- 7.8, but recently

17  under 7.7, based on State v. Berlin.

18            The grounds that are argued by the

19  Defendant for new trial have, I believe it's fair to

20  say, evolved.  But in order to be clear for purposes for

21  the record, it is my understanding that the Defendant has

22  moved for a new trial on the grounds that there was a

23  failure to reveal all of the benefits to witness Kevin

24  Olsen, because of alleged promises of a reduced sentence

25  in exchange for testimony; negotiations on unresolved

1    burglary charges; failure to disclose the fact that

2    Mr. Olsen had received benefits for providing information

3    from Crime Stoppers; an allegation that there was a

4    failure to reveal unresolved charges, and a failure to

5    reveal other state law enforcement officials -- this

6    specifically refers to Assistant Chief Hickok, who

7    determined and testified that Mr. Olsen was

8    untrustworthy.

9              There also was an articulation of a ground

10   which I believe is no longer pending, but that's why I am

11   clarifying -- which is failure to reveal all of Kevin

12   Olsen's criminal history.  As I understood it, the

13   Defense was no longer taking that position.

14              MS. ELLIOTT:  No, Your Honor.

15              THE COURT:  "No," meaning --

16              MS. ELLIOTT:  No; we no longer allege

17   that.

18              THE COURT:  Okay.  Have I left anything

19   out?

20              MS. ELLIOTT:  Well, perjury.

21              THE COURT:  Well, I think that's --

22              MS. ELLIOTT:  -- which is kind of subsumed

23   into the others.

24              THE COURT:  I think it is.  And I will

25   state it separately, so I can address it separately.

CRIMINAL DEFENSE MOTION
   Court's Ruling                              -205-

1          MS. ELLIOTT:  Okay.

2          THE COURT:  The Defendant has set forth

3     and I think articulated that he did not get a fair trial,

4     in violation of the constitutional rights afforded by due

5     process and the 14th Amendment because of perjured

6     testimony of Kevin Olsen, which the State knew or should

7     have known was perjured.

8               And the perjured testimony is in two

9     contexts:  one, that Kevin Olsen testified that he had

10    received no compensation of any nature whatsoever and,

11    number two, that he did not accurately testify related to

12    his criminal history.

13              Let me start with the legal analysis and

14    then turn to the facts, because a review of the entire

15    record frankly was necessary in order to make the

16    determination that needed to be made, based on the case

17    law that has been provided.  And the case law is

18    extensive.

19              Under the case law, there are different

20    standards depending on the violation, and so, let me set

21    those out.  For situations and factual cases where the

22    prosecutor knowingly uses perjured testimony, the

23    conviction, according to the case law, must be set aside

24    if there is any reasonable likelihood that the false

25    testimony could have affected the judgment of the jury.

1    The cases that are cited and the case law -- that is

2    discussed, I think, in some detail in the Bagley

3    (phonetic) case, United States v. Bagley -- sets out the

4    different situations and how the standards are

5    different.

6                    If there are other instances where the

7    State has failed to disclose evidence favorable to the

8    Defendant, then the test is whether or not that evidence

9    is material.  Evidence is material under that analysis if

10   there is a reasonable probability that the outcome of the

11   trial would have been different had the evidence been

12   disclosed to the Defendant.

13                   There are two, therefore, I think,

14   distinct tests that need to be applied, depending on the

15   determination as to whether or not there was a knowing

16   use of perjured testimony, since that is a different test

17   than the State's failure to disclose evidence under

18   Brady.  So, let me resolve these issues separately,

19   because there are a number of different grounds that the

20   Defendant has articulated.

21                   Let me turn first to the testimony that

22   has been given in the context of a hearing recently

23   conducted with Mr. Olsen.  And I will also need to, I

24   think, probably refer to the testimony given by Ms. Nave.

25   And I will start with the testimony of Ms. Nave, because

1    there are two grounds that are articulated for Mr. Olsen

2    giving perjured testimony.  And the first is that there

3    was a misrepresentation of his prior criminal history, as

4    I understand it.

5                There are also allegations concerning

6    whether or not the Defense was made aware of the

7    investigations that were pending for fraud and forgery at

8    the time that Mr. Olsen was incarcerated for possession

9    of stolen property.

10                Ms. Nave testified that the recommendation

11    that was made by the Prosecuting Attorney's Office, in

12    the context of the possession of stolen property charge

13    for which Mr. Olsen was being held, was a recommendation

14    that was made in the normal course of plea negotiations,

15    and the Court finds that the testimony of Ms. Nave sets

16    forth a course that was typical for the course of action

17    followed by the Prosecutor's Office in the context of

18    resolving the charges against Mr. Olsen.

19                In addition to that, however, Ms. Nave

20    very specifically testified that she was directed and had

21    in mind that she could not and would not in any way treat

22    Mr. Olsen differently because of his participation in

23    this case.  She specifically recalled a conversation with

24    Ms. Mahoney.

25                Mr. Hicks cross-examined Mr. Olsen as to

1    the pending charges.  He very specifically, in cross-

2    examination of Mr. Olsen, questioned him, not only about

3    his criminal history, but also about the fact that he was

4    under investigation for fraud and forgery.  There is an

5    allegation that, because the specifics of those charges

6    were not made known to Mr. Hicks, he could not get into

7    the specifics.

8              And the argument contrary to that is that

9    it wouldn't be admissible because they were pending and,

10   therefore, Mr. Olsen would have had the opportunity to

11   exercise his Fifth Amendment rights.  Some of this,

12   frankly, is speculative.

13             The State has stipulated that, for

14   purposes of Exhibits 4, 5, 6 and 7, they were not

15   provided to the Defense.  So, for purposes of that

16   ground, I will assume that the State had an obligation to

17   and did not provide the information contained in

18   Exhibits 4, 5, 6 and 7.

19             And although Mr. Olsen's responses, upon

20   close scrutiny, can be characterized as literal, if one

21   assumes a level of intelligence and sophistication that

22   he may or may not possess, there are certainly instances

23   in his testimony where Mr. Olsen misrepresents and, as

24   far as the compensation, in fact, lies as to whether or

25   not he has received any compensation of any nature or

CRIMINAL DEFENSE MOTION
   Court's Ruling

1    anything for the testimony given.

2              I think that the issue concerning which

3    standard and whether or not the Prosecutor should or did

4    or should have known about the payments by Crime Stoppers

5    to Mr. Olsen has to be resolved in favor of the State.

6    The testimony of Mr. Olsen is clear that he never told,

7    not only Ms. Mahoney, but -- I was the judge who presided

8    over the State v. Smiley case -- he never told

9    Mr. O'Toole or Mr. Matthews or any of the other

10   attorneys.  And he has had many interactions with many

11   attorneys; he has never told any of the attorneys that

12   he received payment for information that he provided.

13             I think the case law that is cited by

14   Ms. Elliott as to Crime Stoppers is correct in setting

15   forth the general principle that, if it is known that an

16   individual has made contact with Crime Stoppers and is

17   looking for compensation from Crime Stoppers, or if there

18   is a specific request concerning discovery from Crime

19   Stoppers, that that information certainly could, should

20   and would be used as impeachment.  It goes to motive; it

21   goes to bias.

22             The question is, in this particular case,

23   one, whether or not the more stringent standard should

24   apply because the prosecutors knew that they were

25   putting on perjured testimony when Mr. Olsen testified as

1    he did about receiving any compensation or not.

2              I think the record is clear from the

3    questions that were asked and from the hearing that has

4    recently been held, that neither Ms. Mahoney nor

5    Mr. Marner knew or should have known that Mr. Olsen was

6    in any way going to be compensated for the information he

7    provided.  In looking at the opening statement, in

8    looking at the representations that were made, it makes

9    no sense that the prosecutors were proffering the

10   argument or statements that they were making or

11   questioning that they were doing if they knew or should

12   have known.

13             The test, therefore, I do not believe is

14   the more restrictive test.  And I think the test, then,

15   is whether or not there is a reasonable probability, had

16   the evidence been disclosed, the result would have been

17   different.

18             A reasonable probability is a probability

19   that is sufficient enough to undermine the confidence in

20   the outcome.  And that is the test that is not only set

21   forth by the United States Supreme Court in a number of

22   cases, United States v. Bagley and other cases provided,

23   but also State v. Knudson (phonetic) sets forth that

24   standard.  So, that is the standard that I have in mind

25   in going through the record in this case.

CRIMINAL DEFENSE MOTION                                       -211-
     Court's Ruling

1              The other allegations that were made:

2    Based on the testimony that has been provided and

3    presented, there is no evidence to support a conclusion

4    that there was any promise for a reduced sentence in

5    exchange for testimony or any other benefits from the

6    State.

7              In reviewing the transcript and record in

8    this case, I focused on the testimony of Kevin Olsen.  I

9    also focused on the entire defense case, including the

10   testimony from Darrel Cloud (phonetic) and Assistant

11   Chief Hickok and on the testimony that was given

12   concerning the physical evidence, concerning the

13   statement given by Mr. Simmers and concerning the

14   circumstantial evidence.

15             Mr. Olsen was examined at length by the

16   State as to, not only prior criminal history, but also

17   pending charges.  On cross-examination, Mr. Hicks

18   explored before the jury and cross-examined Mr. Olsen

19   about what he was being held for, possession of stolen

20   property and burglary.  Discrepancies in his testimony

21   [are] discrepancies related to the notes that he had

22   taken, significant discrepancies as in the description of

23   the size of the knife, aliases that Mr. Olsen had used.

24             Mr. Hicks laid a foundation for subsequent

25   testimony from Assistant Chief Hickok concerning

1   Mr. Olsen's participation as an informant and a witness
2   with Snohomish County.  Mr. Hicks was able to cross-
3   examine and examine Mr. Olsen as to his drug addiction,
4   as to his heroin withdrawal, as to his drug prior
5   convictions, as to the new charges that were filed, the
6   investigations that were being done for additional
7   charges for fraud and forgery, and matters related to his
8   reliability.

9         Assistant Chief Hickok was a witness
10  called by the defense who was a very honest,
11  straightforward and, I believe, effective witness.  An
12  assistant for the -- assistant chief for the Edmonds
13  Police Department, he had been in law enforcement for
14  22 years.  He testified he knew Kevin Olsen for 20 years;
15  he had used him as an informant.

16        Assistant Chief Hickok gave a detailed
17  recitation of his concerns as to the reliability and
18  truthfulness of Mr. Olsen, and he testified that
19  Mr. Olsen was not reliable; that he would not use Kevin
20  Olsen as an informant unless information had been
21  completely corroborated.  And Assistant Chief Hickok
22  testified that, in fact, Mr. Olsen had received money
23  from their department for legal financial obligations
24  that had been paid to Mr. Olsen.  Mr. Olsen's testimony
25  was also impeached by Hope Marsden and by Darrel Cloud.

1          The defense in this case was that
2    Mr. Simmers did not commit the crime and that he was not
3    there.  There was testimony that was presented by the
4    Defense concerning an alibi and the fact that Mr. Simmers
5    was not there.  The argument was also made there was no
6    physical evidence to connect the crime to Mr. Simmers.
7    And there was no argument made, there was no evidence
8    proffered, there was no defense articulated for self-
9    defense or some sort of failed self-defense.

10          The State in its closing argument referred
11   only once to Mr. Olsen, and it was in the context of "if
12   you choose to believe Mr. Olsen."  There was an argument
13   made that Mr. Simmers' statement provided to the jury
14   the factual and evidentiary basis to find premeditation,
15   but if they chose to believe Mr. Olsen, there were
16   different reasons that had been articulated by him.

17          It was the Defense, in their closing, that
18   clearly had the opportunity and did, because of the
19   evidence that they had presented in their case, show how
20   Mr. Olsen should not be in any way relied on.  And the
21   State did not in any way rebut that.  In rebuttal, the
22   State indicated that Mr. Olsen could be accepted or not,
23   but the thrust of the State's case, by the evidence
24   produced and the arguments made, was that the statement
25   of Mr. Simmers and the evidence produced, the physical

1   evidence produced and the circumstantial evidence

2   produced, the circumstantial physical evidence produced,

3   the crime scene, and the physical evidence corroborated

4   and, together with the statement, was the basis for

5   charging and arguing that it was Mr. Simmers who had

6   committed the crime.

7              Mr. Simmers identified where the stabbing

8   occurred; he gave a general description of the victim.

9   He gave a number of details related to the stabbing on

10  the chin and the cheek and a description of the stab

11  wounds, such that those were corroborated by the physical

12  evidence.

13             And it is this Court's determination that,

14  even if the State had properly disclosed the information

15  provided in Exhibits 4, 5, 6 and 7, and even if the

16  information had been known concerning Mr. Olsen, given

17  the fact that he was impeached and his reliability was

18  challenged on this record in the way it was, and the fact

19  that the case, as presented to the jury, was based on the

20  statement made and the physical evidence, it is my

21  conclusion that there is not a reasonable probability the

22  outcome of the trial would have been different had this

23  evidence been disclosed.

24             There was evidence in the record -- the

25  record is replete with evidence of Mr. Olsen's being

1    impeached, his lack of being truthful, his not being

2    reliable and contradictions of his testimony to the

3    witnesses that I have identified.  For those reasons, the

4    Defense motion for a new trial is denied.

5              Now, as to the Criminal Rule 7.7 ground

6    that is articulated under State v. Lucky -- which is

7    reversed now and has been reversed by our State Supreme

8    Court under State v. Berlin:  Because of the fact that

9    the jury was instructed to consider murder in the second

10   degree as a lesser included and they rejected murder in

11   the second degree, I do not believe that State v. Berlin

12   would require that this case be reversed and a new trial

13   be granted on that ground.

14             There were two grounds, again, as I

15   articulated at the time of giving the instruction, a

16   legal basis and a factual basis.  The legal basis has

17   obviously changed, but given the fact that murder in the

18   second degree was given, I don't believe that reversal

19   would be required.

20             I certainly may be wrong.  These cases are

21   extremely recent, and the Court of Appeals will have the

22   opportunity to more carefully and fully analyze that

23   issue.  As to the factual prong, I did not believe then

24   and do not believe now that there is a factual basis to

25   give manslaughter.

 1                    And Ms. Mahoney, you have the obligation,

 2    I think, and requirement to provide --

 3                    MS. MAHONEY:  Can I ask --

 4                    THE COURT:  -- the findings.

 5                    MS. MAHONEY:  I know that you are pressed

 6    for time.  What I am understanding is that the Court is

 7    finding that Kevin Olsen lied in regard to receiving

 8    compensation.  Can I clarify as to what compensation:

 9    Would that be the Crime Stoppers regarding --

10                    THE COURT:  It was as to one --

11                    MS. MAHONEY:  He received money --

12                    THE COURT:  If you look at his testimony,

13    he is very literal, and --

14                    MS. MAHONEY:  Right.

15                    THE COURT:  -- he equivocates often.  But

16    there was one place, and if you give me just a moment --

17    I'm not sure I put the exact citation down, but there was

18    one place where he testified that he was not getting

19    anything at all for his testimony.

20                    MS. ELLIOTT:  He also lied as to the

21    compensation he received in State v. Thompson; that is

22    quite clear.

23                    MS. MAHONEY:  Well, if I could have a

24    moment, that is what I was trying to clarify.  At the

25    point that he testified in this trial, I think that the

1    evidence in the hearing has clearly established that he

2    had not received anything from Crime Stoppers.  I think

3    he certainly had the expectation --

4                    MS. ELLIOTT:  Right.

5                    MS. MAHONEY:  -- he might, based on a past

6    record.

7                    THE COURT:  Right.

8                    MS. MAHONEY:  But he had no promise of

9    receiving anything and didn't know for sure he would.

10                   THE COURT:  Right.  That's right.

11                   MS. MAHONEY:  But the compensation he knew

12   about at the time was Thompson.  Would that be a fair

13   statement for the findings of fact?

14                   THE COURT:  I think it is, and I do know

15   that -- and I did rely on the fact that Detective Hopkins

16   testified -- and I had to rely on this for purposes of

17   the Crime Stoppers information -- that individuals were

18   not paid until the information was determined to be

19   reliable, which was subsequent to whenever the

20   information was given.  Now, of course, Detective Hopkins

21   did not have specific information as to when Kevin Olsen

22   was paid.  But the payments that were made were also not

23   tied to testimony or the outcome of the case.

24                   But it is clear that Ms. Elliott has

25   indicated in her brief, and I think the record supports,

CRIMINAL DEFENSE MOTION
  Court's Ruling                                    -218-

1    that he was in fact paid for testimony in other cases.

2    And he very, I think, specifically, although I don't have

3    that page in front of me, indicated that he had not been.

4    So --

5              MS. MAHONEY:  I agree with that.  I just

6    wanted to clarify that at the time --

7              THE COURT:  There --

8              MS. MAHONEY:  -- that the record would

9    support that he had only received money in Thompson, and

10   he hadn't received money in Simmers at the time that he

11   testified.

12             MS. ELLIOTT:  Well, I think that is his

13   testimony now.  I don't think we know that conclusively.

14             MS. MAHONEY:  I think --

15             THE COURT:  We don't know it completely,

16   but based on the evidence before me now, I think that

17   is --

18             MS. MAHONEY:  Didn't the crime --

19             THE COURT:  -- the conclusion I would need

20   to reach.

21             MS. MAHONEY:  The Crime Stopper -- okay.

22             And also in regard to that, I guess I

23   asked a couple different times about the compensations

24   that stood out to me.

25             THE COURT:  You did.  And you asked it a

1    number of different times and in a number of different
2    ways.

3                    MS. MAHONEY:  No; I understand that.  But
4    also I am looking at my own notes as you were going
5    through the findings, so I'm trying to see if that
6    clarifies what I needed.

7                    MS. ELLIOTT:  Is Your Honor making a
8    finding that Mr. Hicks was not provided with the five
9    outstanding SPD incident reports?

10                   THE COURT:  It was my understanding that
11   was stipulated to.

12                   MS. MAHONEY:  That was stipulated to.
13   That was my next question.

14                   THE COURT:  And that was therefore my
15   finding, since it was stipulated to, and that was the
16   basis upon which I moved to the analysis of whether the
17   information that was not disclosed would have required a
18   new trial.

19                   MS. MAHONEY:  The stipulation was based on
20   the fact that I had checked; they were not in our
21   office.  And also the dates of the reports as are
22   submitted show that they were not received by my office
23   for quite some time.

24                   Can I include that in the facts?  I think
25   that's pretty clear.  I do not dispute that they were

1    never given to Mr. Hicks, but they were not in possession
2    of my office at the time that this occurred and did not
3    come into possession for some time.  And part of the
4    stipulation was that I agreed that I had checked, but no
5    cases had been LODI'ed in.
6             THE COURT:  Well, if that's part of the
7    stipulation, the latter part can go in.  I think the
8    first part of what you said is certainly far more
9    specific than anything I remember.
10            MS. MAHONEY:  Well, the reports
11   themselves, I asked Ms. Nave about the dates that she
12   received them --
13            THE COURT:  Right.
14            MS. MAHONEY:  -- and how she received
15   them.  And --
16            THE COURT:  Right.  And --
17            MS. MAHONEY:  -- she went to a lot of
18   trouble; they were not easy to come by.  And the only
19   reason why we had the information is because we were told
20   by the Defendant.  We don't get to know --
21            THE COURT:  Right.
22            MS. MAHONEY:  -- everything in his head.
23            THE COURT:  Well, based on the evidence
24   provided by Ms. Nave, which was not contradicted, you can
25   put that --

1          MS. MAHONEY:  Okay.

2          THE COURT:  -- into the findings.

3          MS. MAHONEY:  And there was also dates

4     when they are received on the reports, and the exhibits

5     themselves, there's fax dates on there.

6          THE COURT:  I also didn't address DOC.  I

7     do not believe that the State had an obligation to obtain

8     the information from DOC that was obtained by the defense

9     in the State v. Smiley case, which was at some point a

10    basis for arguing that there should be a motion for a new

11    trial.  That was just a part of that argument, but there

12    was no obligation, under 4.7, for the State to disclose

13    it.

14         MS. MAHONEY:  All right.  That's all I

15    have for now.  I'm sure that we will probably need to

16    come back.  I will do a proposed findings of fact and

17    conclusions.

18         MS. ELLIOTT:  Your Honor --

19         THE COURT:  Also, you know, I didn't

20    address the failure to reveal Assistant Chief Hickok.  I

21    think there's a concession that --

22         MS. ELLIOTT:  There was a concession to

23    that early on.

24         THE COURT:  There is a concession in the

25    -- early on by the State that they should have provided

CRIMINAL DEFENSE MOTION                              -222-
     Court's Ruling

1    -- and it's in a footnote in a brief that I don't have in

2    front of me -- that they should have provided --

3              MS. MAHONEY:  I didn't know about

4    Mr. Hickok until he was endorsed after the State had

5    rested.  So, I agree that, had I known, that information

6    should have been turned over, but my argument has always

7    been that clearly Defense knew more than I did and used

8    it effectively.

9              THE COURT:  And I will look at that

10   footnote and see specifically what the concession was,

11   but it is the Court's finding that there was no

12   prejudice, since the Defense was given the information

13   related to State v. Thompson that allowed them to contact

14   and call Detective Hickok as their own witness.

15              Are there any other --

16              MS. MAHONEY:  I don't think so.

17              MS. ELLIOTT:  Your Honor -- I have a

18   question, Your Honor:  Have the Smiley files been

19   unsealed?

20              THE COURT:  No.  I mean, I don't know what

21   their -- the whole file is not sealed.  There are just

22   certain portions of it --

23              MS. ELLIOTT:  -- in regard to Mr. Olsen's

24   name.

25              THE COURT:  I don't think so, no.  I would

1  be happy to sign an order that allows you to have access

2  to -- and I thought I made this clear before -- any and

3  all information relating to Mr. Olsen under the name of

4  Carpenter.

5                 MS. ELLIOTT:  What if they are inquiries

6  to me regarding Mr. Olsen?

7                 MS. MAHONEY:  I guess I don't understand

8  what you mean.

9                 MS. ELLIOTT:  Well, it's -- other

10  attorneys are interested in what I have found out about

11  Mr. Olsen.

12                 THE COURT:  It's part --

13                 MS. ELLIOTT:  Public knowledge.

14                 THE COURT:  Everything that has happened

15  here has --

16                 MS. ELLIOTT:  Thank you.

17                 THE COURT:  -- has happened in open court,

18  Ms. Elliott.

19                 MS. ELLIOTT:  Thank you.

20                 THE COURT:  -- and I think that you can

21  and clearly have an obligation to represent truthfully

22  whatever you found out here.

23                 MS. ELLIOTT:  Thank you.

24                 THE COURT:  And there was no secret as to

25  who Mr. Olsen was --

```
 1                MS. ELLIOTT:  -- in Mr. Simmers' trial.
 2                THE COURT:  Nope -- none.
 3                MS. ELLIOTT:  Mr. Simmers would like to
 4     waive his presence at any presentation of the ultimate
 5     findings of fact and conclusions of law.  And I would ask
 6     the Court to permit me to simply submit a supplemental
 7     order of indigency, rather than requiring that
 8     Mr. Simmers fill out a new affidavit.
 9                THE COURT:  That's fine.
10                MS. ELLIOTT:  I think it's clear he
11     remains indigent --
12                THE COURT:  That's fine.
13                MS. ELLIOTT:  -- in this matter.
14                THE COURT:  Any other questions?
15                MS. MAHONEY:  No.  I anticipate getting
16     those done within the next two weeks, because I know that
17     we need the appeal to begin.
18                THE COURT:  Yes.  All right.  And I'm
19     sorry, Ms. Mahoney; I didn't realize I had your copy of
20     the transcript.
21                MS. MAHONEY:  Oh, that's fine; I had left
22     it here on purpose, but, I mean, I --
23                THE COURT:  I treated it as my copy, which
24     may be --
25                MS. MAHONEY:  That's fine.
```

CRIMINAL DEFENSE MOTION
   Court's Ruling

-225-

C E R T I F I C A T E

STATE OF WASHINGTON )
                    ) ss.
COUNTY OF KING      )


     I, the undersigned Notary Public in and for the
State of Washington, do hereby certify that the foregoing
verbatim report of proceedings was prepared by me from
certified copies of videotape recordings of the
proceedings, monitored by me and reduced to typewriting
to the best of my ability;

     That the report is, to the best of my ability, a
full, true and correct record of the proceedings,
including the testimony of witnesses, questions and
answers and all objections, motions and exceptions of
counsel made and taken at the time of the proceedings.

     That portions of the electronic record not clearly
intelligible to me on monitoring are represented in this
report within brackets [as exemplified here], and
portions entirely inaudible or unintelligible to me by
the word "inaudible" or "unintelligible" within brackets;

     I further certify that I am neither attorney for,
nor a relative or employee of any of the parties to the
action; that I am not a relative or employee of any
attorney or counsel employed by the parties hereto, nor
financially interested in its outcome.


     IN WITNESS WHEREOF, I have hereunto set my hand and
affixed my seal this _16th_ day of _June_, 1998.




                    **LAURIE K. SNELL**, Notary Public
                    in and for the State of
                    Washington, residing at Lynnwood
                    (Commission expires July 17, 2000).

1          THE COURT:  -- a problem.

2          MS. MAHONEY:  We had actually made it

3   clear, and we asked Ms. Elliott that, when the appeal

4   happens, that she treat it as if we had never had a

5   copy --

6          MS. ELLIOTT:  I will forward another copy

7          MS. MAHONEY:  -- because I had also --

8          THE COURT:  Oh, okay.  All right.

9          MS. MAHONEY:  -- possessed it as my own,

10  not for an appellate attorney, and I will not likely

11  handle the appeal, being on trial teams.

12          THE COURT:  I couldn't understand.  What

13          MS. [CLERK]:  [Unintelligible]

14          THE COURT:  Okay.  Thanks.

15          MS. ELLIOTT:  There's a file to copy?

16          THE COURT:  Oh, that's right.  You were

17  here, and you did it.

18          All right.  Thank you.

19                      (Hearing adjourns 4:00 p.m.)

20

21

22

23

24

25

THE COURT: -- a problem.

MS. MAHONEY: We had actually made it clear, and we asked Ms. Elliott that, when the appeal happens, that she treat it as if we had never had a copy --

MS. ELLIOTT: I will forward another copy

MS. MAHONEY: -- because I had also --

THE COURT: Oh, okay. All right.

MS. MAHONEY: -- possessed it as my own, not for an appellate attorney, and I will not likely handle the appeal, being on trial teams.

THE COURT: I couldn't understand. Wh

MS. [CLERK]: [Unintelligible]

THE COURT: Okay. Thanks.

MS. ELLIOTT: There's a file to copy?

THE COURT: Oh, that's right. You we

here, and you did it.

All right. Thank you.

(Hearing adjourns 4:00 p.

```
1                    THE COURT:  -- a problem.
2                    MS. MAHONEY:  We had actually made it
3      clear, and we asked Ms. Elliott that, when the appeal
4      happens, that she treat it as if we had never had a
5      copy --
6                    MS. ELLIOTT:  I will forward another copy.
7                    MS. MAHONEY:  -- because I had also --
8                    THE COURT:  Oh, okay.  All right.
9                    MS. MAHONEY:  -- possessed it as my own,
10     not for an appellate attorney, and I will not likely
11     handle the appeal, being on trial teams.
12                   THE COURT:  I couldn't understand.  What?
13                   MS. [CLERK]:  [Unintelligible]
14                   THE COURT:  Okay.  Thanks.
15                   MS. ELLIOTT:  There's a file to copy?
16                   THE COURT:  Oh, that's right.  You were
17     here, and you did it.
18                   All right.  Thank you.
19                        (Hearing adjourns 4:00 p.m.)
20
21
22
23
24
25
```

CRIMINAL DEFENSE MOTION
  Court's Ruling                                    -226-

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

IN AND FOR KING COUNTY AT KENT

| | |
|---|---|
| STATE OF WASHINGTON, ) | |
| ) | |
| Plaintiff, ) | COA No. 38620-4-I |
| ) | No. 95-1-02102-2 |
| vs. ) | |
| ) | |
| IAN SIMMERS, ) | |
| ) | ▫ C O P Y ▫ |
| Defendant. ) | |

Supplemental Verbatim Report of Proceedings
from Electronic (Videotape) Record

CRIMINAL MOTION HEARING - 11/6/97
Before The Honorable ANN SCHINDLER, Judge

COUNSEL OF RECORD ON APPEAL:

     For the Appellee:  KING COUNTY PROSECUTING ATTORNEY
                             Juvenile Division
                             1211 East Alder
                             Seattle, Washington  98122

     For the Appellant:  SUZANNE LEE ELLIOTT
                             1300 Hoge Building
                             705 Second Avenue
                             Seattle, Washington  98104

TRANSCRIPTIONIST:  Laurie K. Snell

1    KING COUNTY JUVENILE COURT; THURSDAY, NOVEMBER 6, 1997

2                         9:27 A.M.

3                         --o0o--

4

5                              (Cause continued from Tuesday,

6                              November 4, 1997.)

7                              (Defendant and respective

8                              counsel present.)

9              THE COURT:  Ms. Elliott.

10             MS. ELLIOTT:  Yes, Your Honor.  Good

11   morning.  I filed two additional briefs in this matter.

12   I faxed them, but I think I brought in bench copies this

13   morning, in case Your Honor didn't get them.

14             THE COURT:  I have received them.  I have

15   not had an opportunity to read --

16             MS. ELLIOTT:  Okay.

17             THE COURT:  -- them.

18             MS. ELLIOTT:  I have served a copy on

19   Ms. Mahoney as well.  I have no further evidence.  I

20   believe Ms. Mahoney wishes to call a witness.

21             THE COURT:  All right.  Ms. Mahoney.

22             MS. MAHONEY:  Your Honor, in regard to the

23   declaration of Ms. Elliott, I have no objection, as long

24   as there is no objection to Detective Hopkins testifying

25   regarding the information he received about Crime

CRIMINAL DEFENSE MOTION                    -184.3-
   Preliminary remarks

1    Stoppers yesterday.

2              THE COURT:  Well, Ms. Elliott may want an

3    opportunity to talk to him before hearing it for the

4    first time on the stand, but with that in mind --

5              MS. MAHONEY:  Oh, I have no problem with

6    that.  I told her that he talked to him yesterday, so --

7              MS. ELLIOTT:  Well, Your Honor, as long as

8    I am not foreclosed from presenting other evidence.  I am

9    interested in hearing what Detective Hopkins found out

10   from Crime Stoppers, because they would not talk to me.

11   I don't believe the issue that I have about Crime

12   Stoppers has anything to do with what Detective Hopkins

13   is going to testify to.  I think it's staffed by the

14   police.

15             THE COURT:  I have no idea --

16             MS. ELLIOTT:  Yeah.

17             THE COURT:  -- Ms. Elliott.  And so, do

18   you need an --

19             MS. ELLIOTT:  I will speak briefly to

20   Detective Hopkins about what he found out from Crime

21   Stoppers.

22             THE COURT:  Would you like to talk to him

23   before Ms. Mahoney calls him to the stand?

24             MS. ELLIOTT:  Yes.

25             THE COURT:  Okay.  Now, Ms. Mahoney, did

```
 1    you have any other witnesses you needed to --
 2              MS. MAHONEY:  No.  I just --
 3              THE COURT:  -- call?
 4              MS. MAHONEY:  -- wanted to deal with that
 5    and submit transcripts to the Court.  And that -- I would
 6    be --
 7              THE COURT:  I do --
 8              MS. MAHONEY:  -- resting.
 9              THE COURT:  I do need transcripts.  All
10    right.  Well, I will get off the bench, allow Ms. Elliott
11    to talk to Detective Hopkins, and then will you tell me
12    when we are ready for that very brief testimony.
13              MS. MAHONEY:  All the information he knows
14    can be covered in about two minutes.
15              THE COURT:  That may be.
16              MR. HOPKINS:  We could just step outside.
17              THE COURT:  So, we will be in recess
18    for --
19              MS. MAHONEY:  Five.
20              THE COURT:  -- five.
21              MS. MAHONEY:  We really . . .
22                        (Recess, 9:29 to 9:42 a.m.)
23              THE COURT:  . . . had the opportunity to
24    talk to the Detective, Ms. Elliott?
25              MS. ELLIOTT:  Yes, I have.
```

```
 1              THE COURT:  And this is your only witness;
 2    is that correct?  All right.
 3              MS. MAHONEY:  I thought that would make
 4    you happy.
 5              THE COURT:  Well, if -- whatever you want.
 6    It doesn't [need to] make me happy.  This is whatever you
 7    need for the record.
 8              MS. MAHONEY:  No.  I understand.
 9
10              DETECTIVE EDWARD HOPKINS,
11    called as a witness for the State, being first duly sworn
12    or affirmed to tell the truth, was examined and testified
13    as follows:
14
15              DIRECT EXAMINATION
16    BY MS. MAHONEY:
17        Q.   Detective, could you please state your full
18    name and your occupation for the record.
19        A.   Edward Hopkins.  I am a detective for the City
20    of Bothell Police Department.
21        Q.   All right.  How long have you been so
22    employed?
23        A.   I have been with the police department for
24    almost ten years.
25        Q.   Were you the main investigator on the State v.
```

CRIMINAL DEFENSE MOTION
DET. HOPKINS - Direct                              -184.6-

1  Ian Simmers homicide case?

2      A.   Yes.

3      Q.   And during the time that you worked as a

4  detective on that case, did you meet a Kevin Olsen?

5      A.   Yes, I did.

6      Q.   And at any time when Mr. Olsen contacted you

7  and provided you with any information regarding this

8  case, did you ever make any promises to Mr. Olsen or

9  offer him any type of compensation in any form in

10 exchange for his cooperation?

11     A.   No, I did not.

12     Q.   And in fact, did you tell him the opposite?

13     A.   I told him he would get absolutely nothing.

14     Q.   And were you present during conversations with

15 myself and Mr. Olsen?

16     A.   I was.

17     Q.   And were you present at an interview,

18 specifically the first time I met him, when I told him he

19 would get absolutely nothing?

20     A.   Correct.

21              MS. ELLIOTT:  I will object, Your Honor,

22 to the --

23              THE COURT:  Sustained; it's hearsay.

24     Q.   Did you ever have any knowledge of him getting

25 any type of compensation from the State or any police

CRIMINAL DEFENSE MOTION
DET. HOPKINS - Direct                            -184.7-

```
 1    agency for his cooperation in the Simmers case?

 2         A.    No, I did not.

 3         Q.    Detective Hopkins, are you familiar with an

 4    organization called Crime Stoppers?

 5         A.    Yes.

 6         Q.    And as a matter of fact, yesterday did you

 7    have an opportunity to speak with someone from that

 8    organization?

 9         A.    Yes, I did.

10         Q.    And based upon your research -- have you worked

11    with Crime Stoppers before?

12         A.    Yes, I have.

13         Q.    Okay.  And based upon your prior experience

14    with them and in addition to the research you did

15    yesterday, could you tell the Court just basically a

16    little bit how Crime Stoppers works.

17         A.    I can.  I spoke to an individual, Chris --

18    Detective Chris -- and I don't know if it's pronounced

19    "Goff" (phonetic) or "Go" (phonetic) -- G-o-u-g-h.  And

20    he is a -- I believe the director of operations for Crime

21    Stoppers.  He's a Seattle Police detective.  And my

22    conversation with him -- I asked him how the system

23    worked, how the program worked, and how informants were

24    paid any reward and so forth, and I can sort of give you

25    a summary, if that would be --
```

CRIMINAL DEFENSE MOTION
DET. HOPKINS - Direct                              -184.8-

1       Q.    Yeah.  That's [what I would like you to do].

2       A.    Okay.  He told me that, when an individual

3    calls Crime Stoppers, the individual is assigned a number

4    at -- the individual chooses a number and is put into the

5    computer by number; that there is not a name or address

6    associated with the individual at any time.  He said that

7    some people like to give their name, but they choose not

8    to associate it with the number.

9            After they provide the information, it is

10   dispersed to the appropriate police agency.  There are

11   detectives that take the calls, because they are familiar

12   with law enforcement procedures and who to contact and

13   what to do with the information.  They take and send

14   either a fax or a letter to the agency or sometimes a

15   phone call.

16           They provide the information, and they tell the

17   informant to call back within about two weeks and check

18   the status.  That way it has time to be disseminated and

19   something possibly done.  The informant then is, like I

20   say, instructed to call back.  The information is

21   dispersed to the police agency, and Crime Stoppers then

22   would follow up on that.  How they do that is unknown to

23   me -- Usually by phone call, I would imagine, or

24   requesting some sort of written confirmation.  I don't

25   know.

1          The -- the information, like I say, is worked

2     by the agency.  The individual may not have results

3     within that two-week period.  They are told, if they call

4     back, to call again in two weeks, and they are just

5     continually put off until information is retrieved.

6          Detective Go (phonetic), or Goff (phonetic),

7     told me that, after information is confirmed to be

8     reliable -- he used an example that, if a drug house in,

9     let's say, an apartment was to be reported by an

10    individual --

11    Q.   Uh-huh.

12    A.   -- and the police go out and either make an

13    arrest or recover drugs or do anything that would be able

14    to substantiate the information, then the individual

15    providing that information would be eligible for some

16    form of compensation.  But how that is decided is, once

17    the information is verified in whatever fashion, Crime

18    Stoppers, the officers that staff the office, send the

19    information to a civilian board, who makes a

20    determination as to if money is paid out and how much.

21         Once that is determined, the informant, when

22    they call in, after that has been determined, they are

23    told to go to a Seafirst Bank location --

24    Q.   Uh-huh.

25    A.   -- on a predetermined day -- apparently there

1    are pay-outs once per month --

2         Q.   Uh-huh.

3         A.   -- and they can either go to the bank or they

4    can send someone on their behalf.  Anyone who has that

5    identification number --

6         Q.   Uh-huh.

7         A.   -- goes into the bank, obtains the money, and

8    it's the end of it.  I asked him how long they stored

9    their records, and he said that they stored their records

10   for one year; they were purged after one year, and that

11   they were not ever associated with name or specific

12   information other than if that number had been reliable

13   in the past.

14        Q.   Detective Hopkins, prior to yesterday's

15   testimony, when you were here in the courtroom, when

16   Mr. Olsen testified, were you ever aware that Mr. Olsen

17   had received any money from Crime Stoppers in the Simmers

18   case?

19        A.   No, I wasn't.

20        Q.   Were you ever involved in any way with him

21   receiving money from Crime Stoppers in the Simmers case?

22        A.   No.  There was a message on my machine from

23   Crime Stoppers at some point that I didn't return, on my

24   voice mail [system].

25        Q.   Okay.  Also, when you talked to Crime Stoppers,

1    was there any discussion about whether or not it is in

2    any way associated with their -- a witness' willingness

3    to testify?

4         A.   I asked that as well from the detective I spoke

5    to.  He said that the money was paid out by determination

6    of the civilian board, if the information is

7    substantiated, and that it is in no way tied to testimony

8    or outcome of the trial or case --

9         Q.   Okay.

10        A.   -- or if there's even -- a charge is filed, for

11   that matter.

12        Q.   And --

13             THE COURT:  Say that again.

14        A.   The money that is paid out isn't necessarily

15   tied to charges being filed or an arrest being made.  For

16   instance, if they were to take drugs from this apartment,

17   this hypothetical apartment --

18             THE COURT:  Uh-huh.

19        A.   -- and that was information provided by an

20   informant, that would then -- information was verified

21   that the informant provided.  So, if charges weren't

22   filed, that doesn't necessarily mean that the informant

23   wouldn't get a reward of some type.  He told me that

24   specifically that the reward money was not tied to

25   testimony or outcome of the case.

1    Q.   Okay.  And would people in a situation like

2    Kevin's be paid before or after the testimony?

3    A.   I would have no way of knowing that.  He told

4    me that the money wasn't tied to testimony or outcome; it

5    was tied to whether the information was verified.

6    Q.   All right.  And you personally never dealt with

7    Crime Stoppers in regard to Mr. Olsen; is that correct?

8    A.   Right.

9         MS. MAHONEY:  All right.  I have nothing

10   further of this witness.

11        THE COURT:  Ms. Elliott.

12        MS. ELLIOTT:  Thank you.

13

14            CROSS-EXAMINATION

15   BY MS. ELLIOTT:

16   Q.   Detective Hopkins, did you know how Crime

17   Stoppers worked before the Simmers case?

18   A.   I didn't know the specifics as I just told them

19   here, but I had a working knowledge of the fact that they

20   received tips through confidential informants and that

21   they provided that information to police agencies.

22   Q.   Okay.  Did Detective Gough tell you how

23   verification is made?

24   A.   He didn't say specifically how it was made.  He

25   just said once verification of the information is

CRIMINAL DEFENSE MOTION
DET. HOPKINS - Cross                    -184.13-

1    accomplished.

2        Q.   So, he made it clear to you that they would not

3    just take the informant's word --

4        A.   Well --

5        Q.   -- on the tip?

6        A.   Right.  Obviously, they would have to find some

7    way other than the word of the informant.  But since I

8    have never actually worked in the Crime Stoppers office,

9    I couldn't tell you specifically if --

10       Q.   So, based upon your knowledge of Crime

11   Stoppers, if Mr. Olsen did in fact receive $200 in this

12   case, someone must have verified something?

13       A.   That's correct.

14       Q.   Okay.

15       A.   That could have been through --

16       Q.   Well, I just asked:  Someone must have verified

17   something?

18       A.   Somehow; correct.

19       Q.   Okay.  Has it been more than a year since they

20   paid something to Mr. Olsen?

21       A.   I don't know when they paid something to

22   Mr. Olsen.

23       Q.   Okay.

24       A.   The first I knew was the other day, when he

25   said that.

CRIMINAL DEFENSE MOTION                        -184.14-
   DET. HOPKINS - Cross

```
 1          Q.   All right.  Could Mr. Olsen have been paid
 2    before he testified in this case?
 3          A.   I wouldn't know that.
 4          Q.   Okay.  Did Mr. Olsen make any calls to you
 5    during the period of between December 7, 1995, and
 6    February 28, 1996?
 7                    MS. MAHONEY:  I am going to object.
 8          Q.   He was on the street.
 9                    MS. MAHONEY:  This is outside the scope,
10    unless it's tied up to Crime Stoppers or --
11                    MS. ELLIOTT:  I will tie it up.
12                    MS. MAHONEY:  -- whether or not he
13    received something.
14                    THE COURT:  Based on Ms. Elliott's
15    representation that it's going to be tied up, I will
16    allow the inquiry.
17          Q.   Did he ever make any calls to you?
18          A.   I'm sorry.  Could you please --
19                    THE COURT:  Would you tell me -- yeah.
20    Tell us again.
21          Q.   Between December 7, 1995, when he was released
22    on his personal recognizance, and February 28, 1996, when
23    he was rearrested.
24          A.   Just before we came up here or began court
25    today, I was reminded that, when he was released, he was
```

CRIMINAL DEFENSE MOTION
DET. HOPKINS - Cross                                    -184.15-

1   apparently released at 1 or 2 in the morning, and I was

2   contacted through my department.  I had allowed my

3   department to receive collect calls from him, should he

4   have the need to reach me during this proceeding.  And he

5   needed a ride; I think it was to the Edmonds area.  So,

6   fortunate as I was, I got to pick him up and give him a

7   ride.

8          Q.    Okay.  So, your --

9          A.    And I think --

10         Q.    -- your department had been receiving collect

11  calls from Mr. --

12         A.    When we first --

13         Q.    -- Olsen?

14         A.    -- talked with him -- I believe it was the 16th

15  of November '96 or '95 -- I'm not certain on the year --

16  whichever; I have had a lot of cases since then.  But the

17  first time I met with him was on the 16th of November, I

18  believe, and on that date, I told him that, if he needed

19  to reach me, he could contact the police department.

20  They are allowed to only make collect calls from jail.

21  And then I met with him and Ms. Mahoney the next day,

22  the 17th.  And while we were in the process of learning

23  what information he had and so forth, I did -- he

24  continued to make calls to the department, trying to

25  reach me, but I didn't --

CRIMINAL DEFENSE MOTION
DET. HOPKINS - Cross                           -184.16-

1     Q.   Okay.

2     A.   -- speak with him or have --

3     Q.   Would those calls have been recorded?

4     A.   They may have been.  I'm --

5     Q.   Okay.

6     A.   -- not familiar with how --

7     Q.   Who would he have spoken to when he called the

8 Bothell Police Department, if he didn't speak to you?

9     A.   He would contact the dispatch office and

10 probably -- and would have, and I know he did, ask for me

11 on several occasions.  However, because I was in the

12 middle of many other things, they would just take

13 messages.

14     Q.   But he could have had a conversation with the

15 dispatch office --

16     A.   He could have had --

17     Q.   -- briefly?

18     A.   -- a conversation.  It's possible.

19     Q.   Okay.  And are those calls to the dispatch

20 office normally recorded?

21     A.   I believe so.

22     Q.   Okay.

23     A.   I'm not familiar with --

24     Q.   Would those records still exist in the Bothell

25 Police Department?

CRIMINAL DEFENSE MOTION
  DET. HOPKINS - Cross             -184.17-

```
 1        A.   I believe that the records that we keep are
 2   purged after a year, but I'm not certain on that.
 3        Q.   Were there ever any written messages taken
 4   regarding Mr. Olsen's calls to you?
 5        A.   I don't believe so.
 6        Q.   Okay.
 7             MS. MAHONEY:  I am going to object at this
 8   point and ask:  Are we still talking a specific time
 9   period?  I would like to know for the record the specific
10   time period that Detective Hopkins was receiving these
11   calls.
12             MS. ELLIOTT:  Well, right now, I am
13   talking about between November 16 and the time of his
14   testimony, Your Honor.
15             MS. MAHONEY:  All right.
16             THE COURT:  All right.
17        A.   I can tell you that, had there been something
18   that I felt relevant, I would have noted it or remembered
19   it, and --
20        Q.   Okay.  So, that would have been your judgment
21   call?
22        A.   If there was some -- if I had some contact with
23   Mr. Olsen or was advised of some contact that someone
24   else in my department had with Mr. Olsen that I deemed to
25   be important to this case in one fashion or another, I
```

```
1    would have documented that someplace.  Mr. Olsen and I

2    did not have any meaningful conversation or -- there -- I

3    have no notes of any phone calls from him to the station

4    [unintelligible] --

5        Q.    And you didn't discuss any of this on your ride

6    with him out to Lynnwood, any of his testimony?

7        A.    No.  He hadn't testified.

8        Q.    Any of his potential testimony?

9        A.    No.  We talked in organized meetings, obtaining

10   this information and whatnot.  Quite frankly, I was not

11   real happy that I got woke up at 2 in the morning to

12   go --

13       Q.    But you had --

14       A.    -- [unintelligible].

15       Q.    -- no conversation in the car on the way from

16   there to Lynnwood?

17       A.    If we did, it was casual conversation.

18       Q.    Did you talk --

19       A.    All the content --

20       Q.    -- about any of his other informant work at

21   that time?

22       A.    No.

23       Q.    Okay.

24       A.    I wasn't aware of his past, other than what we

25   had learned in our meetings.
```

1          Q.    Okay.  You never made any independent

2    investigation of his informant work, then?

3          A.    I had no desire to learn about his past.

4          Q.    Okay.  What about after Mr. Olsen testified in

5    this case?  Did you have any contact with, for instance,

6    Mr. Ernsdorff, his attorney, on his pending matters?

7          A.    No.  I don't recall ever speaking to

8    Mr. Ernsdorff until Tuesday, when we [unintelligible] --

9          Q.    Did you have any contact with Crime Stoppers

10   about the payment?

11         A.    No.  I don't remember ever speaking with Crime

12   Stoppers, either.

13         Q.    Who at Bothell, if not you, would have talked

14   to Crime Stoppers to verify the information?

15         A.    I don't know.  There's about fifty people at

16   the department, so I have no idea.

17         Q.    Would there be a written record made of who

18   spoke --

19              MS. MAHONEY:  I am going to object at this

20   point, because there is nothing to show that Crime

21   Stoppers ever was confirmed -- that the information was

22   ever confirmed through the Bothell Police Department.

23   There is only testimony they don't know how it was

24   confirmed.

25              THE COURT:  Sustained as to the form of

1   the question.

2      Q.   In your experience, when there is a call made

3   regarding a case in the Bothell Police Department, is

4   some notation made of that?

5      A.   When a call is made regarding a case, the call

6   would be referred to the individual handling that

7   particular case.  We have a voice mail system for each

8   officer in the department.

9      Q.   And do you save your voice mails?

10      A.   Sometimes I save them.  From the time I listen

11   to them --

12      Q.   Is there any --

13      A.   -- until I --

14      Q.   -- master tape of your voice mails?

15      A.   No, there is not.

16      Q.   Do you recall getting a call, a fax or any

17   substantiation of Mr. Olsen's phone call to Crime

18   Stoppers about this case?

19      A.   I'm sorry.  Could you rephrase that.

20      Q.   Do you recall getting a fax or a phone call

21   about Mr. Olsen's call to Crime Stoppers in this case in

22   November of 1995?

23      A.   No.  I was informed of this information through

24   the Prosecutor's Office, that Mr. Olsen wanted to speak

25   with someone.

1   MS. ELLIOTT:  I have no further questions,
2   Your Honor.

3

4                   REDIRECT EXAMINATION

5   BY MS. MAHONEY:
6       Q.  I just want to clarify that, when you were
7   informed of this information through the Prosecutor's
8   Office, what are you referring to?  You are not talking
9   about Crime Stoppers, are you?
10      A.  No.  No; I was -- I was advised that there was
11  an individual in the King County Jail that wanted to
12  speak to someone about this incident, about the homicide
13  that I had investigated.  And that information, that
14  there was an individual that wanted to speak to me or to
15  someone at the department, came through the King County
16  Prosecutor's Office, and then I proceeded to the jail to
17  begin the investigation there.
18      Q.  Okay.  And between the time that you dropped
19  Kevin off, in Lynnwood or wherever it was, the day he was
20  PR'ed and the time of the interview with Mr. Hicks and
21  myself at the King County Jail, or the first attempt at
22  an interview at the beginning of March, did you have any
23  contact with Mr. Olsen?
24      A.  No.  No --
25      Q.  As a matter of fact --

```
 1         A.    -- in fact, I didn't know Mr. Olsen's
 2    whereabouts, and that later came up, because we were
 3    trying to find him, but no.  And I was pretty unhappy
 4    with Mr. Olsen for waking me up in the middle of the
 5    night, so I had no desire to speak with him.
 6              MS. MAHONEY:  Okay.  Thank you.  No
 7    further questions.
 8              MS. ELLIOTT:  No further questions, Your
 9    Honor.
10              THE COURT:  Thank you.
11              MS. MAHONEY:  Your Honor, I have portions
12    of the transcript from Mr. Olsen's testimony from
13    March 19 of 1996 and March 20 and 21, and I would ask
14    that these be marked as exhibits.  Specifically, in these
15    transcripts, it is very clear, contrary to Mr. Hicks'
16    recollection -- or, actually, he said he didn't recall --
17    but what it does show is that Mr. Hicks did indeed --
18              MS. ELLIOTT:  Your Honor, I am going to
19    object to this.  I think they are part of the record and
20    that they speak for themselves.
21              THE COURT:  Sustained.
22              MS. ELLIOTT:  And she can -- Ms. Mahoney
23    can argue after I am finished arguing my motion.
24              THE COURT:  That's fine.
25              MS. MAHONEY:  I just wanted to point out
```

CRIMINAL DEFENSE MOTION
    Colloquy                                    -184.23-

```
 1    certain portions to you --
 2              THE COURT:  You can in your argument.
 3              MS. MAHONEY:  All right.
 4              THE COURT:  And I did request, since I
 5    have no transcripts except what Counsel has given me,
 6    that, if there are parts of the trial record that either
 7    Counsel were going to cite to or rely on, that you
 8    provide me with copies.
 9              MS. MAHONEY:  I would move for those to be
10    admitted.  And based upon that, I would rest.
11                        (State's Exhibits 9 and 10
12                         marked for identification.)
13              THE COURT:  Ms. Elliott, is there anything
14    else?
15              MS. ELLIOTT:  I have no further testimony;
16    only argument, Your Honor.
17              THE COURT:  All right.  Now, if there are
18    other parts of the trial transcript you think are
19    important, then you should please feel free to provide
20    those to me also.
21              MS. ELLIOTT:  Actually, I do have one
22    further issue regarding Tuesday's testimony.  I have
23    prepared a subpoena duces tecum for Crime Stoppers, for
24    Seattle Police Department, for King County Police, and
25    for the Bothell Police.  I sent a fax to you, a proposed
```

1   copy.  I don't know whether or not Ms. Mahoney had the

2   opportunity to see the fax that I sent her late yesterday

3   afternoon.  I will show her.

4          THE COURT:  First of all, I was not here

5   yesterday.

6          MS. ELLIOTT:  Ah.  I'm sorry.

7          THE COURT:  And secondly, I have copies of

8   these but have not had time to [review them].

9          MS. ELLIOTT:  Okay.  Do you want to --

10   perhaps I could blend my argument as to why these are

11   appropriate at this point with my argument regarding the

12   motion.  Would that be --

13          THE COURT:  I think they should be

14   separate.

15          MS. ELLIOTT:  Okay.  The reason I am

16   asking for these now, Your Honor, is that it is

17   absolutely clear to me that Mr. Olsen lied in the trial

18   of this case; that he continued to lie to this Court on

19   Tuesday until confronted with actual documentation of his

20   payment in the Thompson case.  So, we know that nothing

21   that Mr. Olsen says can be trusted unless verified.

22          We now learn that he has given information

23   to Seattle-King County Crime Stoppers and in fact had a

24   financial interest in this case, as well as the Thompson

25   case, a matter in which he blatantly lied from the first

CRIMINAL DEFENSE MOTION
   Colloquy                         -184.25-

1    trial.

2              All the evidence is, even from Detective

3    Hopkins, that the Seattle-King County Crime Stoppers is

4    an arm of the police.  I found no Washington cases

5    regarding Crime Stoppers; however, in the supplemental

6    materials that I provided to the Court today, there are

7    cases out of other jurisdictions.  If you read the facts,

8    you will find that the Crime Stoppers in those

9    jurisdictions operate on exactly the same principle as

10   Crime Stoppers in Seattle-King County.  It appears to be

11   a national model to me, after getting it on the Internet.

12   And what those cases have said is that Crime Stoppers

13   cannot be used as an elaborate Chinese wall to avoid the

14   State's <u>Brady</u> obligations.

15              THE COURT:  Have you cited these cases?

16              MS. ELLIOTT:  They are cited right here.

17              THE COURT:  Okay.  "Right here" being -- ?

18   Again, I have --

19              MS. ELLIOTT:  The second --

20              THE COURT:  -- not had --

21              MS. ELLIOTT:  -- supplemental authorities

22   in support of the motion for new trial that I filed

23   today.

24              THE COURT:  All right.

25              MS. ELLIOTT:  That is the title of it,

1  "second supplemental."  They are <u>Ballantine</u> (phonetic) <u>v.</u>

2  <u>Alaska</u>, <u>Crawford</u> (phonetic) <u>v. Texas</u>, and <u>Illinois v.</u>

3  <u>Richmond</u> (phonetic).

4                 MS. MAHONEY:  I don't disagree that the

5  Crime Stoppers information would be discoverable.

6                 THE COURT:  All right.  So, let's try --

7                 MS. MAHONEY:  Not the subpoena stuff, but

8  I'm saying that he had --

9                 THE COURT:  Well, let's --

10                MS. MAHONEY:  -- reported to Crime

11 Stoppers.

12                THE COURT:  [I am] trying to address the

13 subpoena.

14                MS. MAHONEY:  Oh, I'm sorry.

15                THE COURT:  I have in front of me a

16 subpoena that Ms. Elliott has requested; that is all I

17 want to address now --

18                MS. MAHONEY:  Oh, okay.

19                THE COURT:  -- is just the subpoena and

20 whether or not such subpoena should issue.

21                Ms. Elliott, that is what you need to

22 limit your argument to --

23                MS. ELLIOTT:  Okay.

24                THE COURT:  -- and it is my understanding

25 that you are asking the Court to issue this subpoena.

```
 1                    MS. ELLIOTT:  Yes.  And I believe that
 2          they are important for this Court to be able to verify
 3          the testimony of Mr. Olsen here in court today.  I
 4          prepared one to Crime Stoppers --
 5                    THE COURT:  Verify what about the
 6          testimony?
 7                    MS. ELLIOTT:  That it is limited to a $200
 8          payment in this case and that he -- and that -- the
 9          timing by which he received the payment and the manner in
10          which the payment was verified.
11                    THE COURT:  So, say again what -- because
12          your subpoena is much broader than that.  And so --
13                    MS. ELLIOTT:  Well, it's --
14                    THE COURT:  -- to say -- why don't you
15          tell me again exactly what it is that you are looking
16          for.
17                    MS. ELLIOTT:  I am looking for all records
18          of contact that Mr. Olsen had with Crime Stoppers and, in
19          particular, I am looking for tapes of telephone
20          conversations, because if he called Crime Stoppers before
21          he called the Prosecutor's Office and Detective Hopkins
22          and gave a --
23                    THE COURT:  We probably need a time frame
24          by --
25                    MS. ELLIOTT:  November 16, 19 -- no; I
```

1    don't believe we need a time frame.  I think we need any

2    contact Mr. Olsen has ever had with Crime Stoppers.  In

3    this case there is a particular time frame, but in -- he

4    was asked --

5                    THE COURT:  What else do you think you

6    need?

7                    MS. ELLIOTT:  Okay.  Any taped

8    conversations --

9                    THE COURT:  Uh-huh.

10                   MS. ELLIOTT:  -- because he may have given

11   different information to Crime Stoppers than he gave to

12   the prosecutors.

13                   THE COURT:  About this case?

14                   MS. ELLIOTT:  About this case.  I need any

15   records in any other cases, to see if he has been deemed

16   unreliable; that his tips have not paid off.

17                   THE COURT:  Uh-huh.

18                   MS. ELLIOTT:  I need records of payment

19   and the timing of payment --

20                   THE COURT:  Uh-huh.

21                   MS. ELLIOTT:  -- because that becomes

22   relevant.  I need to know if Crime Stoppers took

23   information about matters other than payment, such as

24   search-warrant affidavits, because that goes to his

25   reliability.  I need to know if they maintain an

CRIMINAL DEFENSE MOTION
   Colloquy                                          -184.29-

```
 1    informant file on Mr. Olsen that contains other
 2    information about him, because that might contain
 3    reliability.
 4              I need records of their contact back to
 5    Mr. Olsen, because he has represented in this case that
 6    he donated the money to charity, which I believe to be
 7    untrue.  I need a record of who contacted Crime Stoppers
 8    from the Prosecutor's Office or the police departments
 9    about Kevin Olsen, to see if they did, before this trial,
10    contact them and attempt to comply with their Brady
11    obligations.  And that is why it's written so broadly.
12              My experience with subpoena duces tecums
13    is that the agencies will read them literally, so they
14    must be as broad as possible in order to gain all of the
15    information that the police agencies have and that, if
16    you simply say "payments," they will give you a printout
17    of the payments, and that is not the relevant information
18    here.
19              THE COURT:  Okay.
20              MS. ELLIOTT:  Oh -- and the reason I asked
21    for all four agencies is because I want to avoid the
22    situation where Crime Stoppers say, "We don't keep that
23    information; the Seattle-King County Police officer" --
24    or "the Seattle Police officer keeps that information, so
25    you will have to subpoena them," or "The King County
```

```
 1    Police officer keeps that information; you will have to

 2    subpoena him," or, you know, Bothell.  I --

 3                  THE COURT:  Your subpoena is directed to

 4    the custodian of record of Crime Stoppers.

 5                  MS. ELLIOTT:  Yes.

 6                  THE COURT:  And I do not see any direction

 7    to any other --

 8                  MS. ELLIOTT:  I have --

 9                  THE COURT:  -- branch of --

10                  MS. ELLIOTT:  -- prepared three more --

11    I'm sorry -- because last night it occurred to me that,

12    if Crime Stoppers maintains that someone else maintains

13    these records, that those are the most likely agencies;

14    that --

15                  THE COURT:  Well, then your argument makes

16    sense, in light of what you --

17                  MS. ELLIOTT:  I'm sorry.

18                  THE COURT:  -- have before you that I do

19    not have before me.

20                  MS. ELLIOTT:  I'm sorry.

21                  THE COURT:  Ms. Mahoney, did you have any

22    position on the proposed subpoena?  The only one I have

23    before me at this point is the subpoena to the records

24    custodian for Crime Stoppers.

25                  MS. ELLIOTT:  The others are all identical
```

1    in scope.

2                    THE COURT:  Well, let's take this one up

3    first.

4                    MS. MAHONEY:  Your Honor, I certainly

5    don't have standing in order to argue on behalf of Crime

6    Stoppers whether or not they would honor this subpoena.

7    However, I don't -- I would submit to the Court that, in

8    order to determine this motion, this information is not

9    necessary; that the Court has before it that Mr. Olsen --

10   the competent evidence placed before this Court for

11   consideration is that Mr. Olsen did call Crime Stoppers;

12   that Mr. Olsen did receive money from Crime Stoppers in

13   regard to the Simmers case --

14                   THE COURT:  Uh-huh.

15                   MS. MAHONEY:  -- that he did receive it in

16   regard to the Thompson case, and that at some point in

17   time that money was paid to him; he believes it was

18   after the testimony.  We have credible evidence in

19   Thompson that clearly shows that it was paid after his

20   testimony, and he says it is likely in Simmers.

21                   Mr. Olsen says he never told my office or

22   myself about it; that he never told Detective Hopkins.

23   Detective Hopkins has testified before the Court that he

24   didn't have anything to do with it and didn't know of it.

25   That is the competent evidence before the Court --

```
 1                    THE COURT:  Right.  And I'm --
 2                    MS. MAHONEY:  -- at this point.
 3                    THE COURT:  And I know that you are going
 4      to argue your motion in just a minute, so --
 5                    MS. MAHONEY:  I am not going to argue my
 6      motion.  What I am saying is that I think that there is
 7      sufficient evidence at this point in order for the Court
 8      to make a determination as to the materiality, without
 9      knowing all of the particular details --
10                    THE COURT:  That aside --
11                    MS. MAHONEY:  -- and there is no
12      showing --
13                    THE COURT:  That aside -- that aside,
14      Ms. Elliott is asking for a subpoena.  So, I understand
15      you don't have --
16                    MS. MAHONEY:  I am objecting --
17                    THE COURT:  -- standing.
18                    MS. MAHONEY:  -- because it's not
19      necessary.
20                    THE COURT:  Okay.  All right.  For
21      purposes of the motion, you are objecting because it's
22      not necessary.
23                    I will hear argument today; I will not
24      decide today, because I need to review the case law that
25      has been cited by both sides.  I will sign a subpoena,
```

CRIMINAL DEFENSE MOTION
     Colloquy                                        -184.33-

1    but I am going to delete certain paragraphs, because I

2    think it is too broadly written.  I think the information

3    in paragraph (b) and (c) and (e), (f), (g), and (h) is

4    relevant, but not (a) and not (c); I am going to delete

5    those sections.

6              MS. MAHONEY:  I would ask, Your Honor, if

7    we could, that if they do return those -- I suspect they

8    will put up a fight --

9              THE COURT:  Well, it says --

10             MS. MAHONEY:  -- but if they do return

11   those --

12             THE COURT:  -- to return under seal to me.

13             MS. MAHONEY:  Thank you.  I don't have --

14   I haven't had a chance to review these documents.  That

15   was my next question:  Could that please happen.

16             THE COURT:  I think -- and although it's

17   not clear until you get to the last paragraph, I would

18   assume they will be sophisticated enough to understand

19   that under seal back to me would be in camera.  I guess

20   we should add that, "for in-camera review."

21             MS. ELLIOTT:  Well, for your in-camera

22   review is what I intended; that's what the case law

23   supports.

24             THE COURT:  And that's fine.  But "under

25   seal" may not --

1          MS. ELLIOTT:  It may not mean anything to
2     a records custodian; that's true, Your Honor.
3          THE COURT:  "Under seal for in-camera
4     review."  I will say, "for" --
5          MS. ELLIOTT:  I have the original.  That's
6     probably a faxed copy of --
7          THE COURT:  Oh, it is.  No.  But I didn't
8     -- it would be bad if I marked it.  I will just mark this
9     up and then mark up the original consistently.
10          MS. ELLIOTT:  Okay.  I did propose them
11     for your signature and leave a blank for the PIN number,
12     because I did not believe that --
13          THE COURT:  I have filed that under seal,
14     and I haven't looked at it yet, but I will.
15          MS. ELLIOTT:  Okay.  I will put the
16     originals in here for the --
17          MS. MAHONEY:  What will the return date
18     be?
19          THE COURT:  It was within ten days.
20          MS. MAHONEY:  Because I know that they
21     will fight it.
22          THE COURT:  Maybe we should make it
23     sooner.  No.  I don't think that's fair, but we should
24     probably put a date certain.
25          MS. ELLIOTT:  That's probably a good idea.

1    Then I could tell the Court of Appeals why I won't be

2    getting back to them immediately, so --

3                    THE COURT:  So, instead of saying "within

4    ten days of service," because I have no means of serving,

5    I will say "by" -- and I will try to send these out

6    today, so a week from Friday.

7                    MS. ELLIOTT:  I was thinking Monday,

8    November 17, but --

9                    THE COURT:  No.  I think I will try

10   the 14th.

11                   MS. ELLIOTT:  Okay.

12                   THE COURT:  By Friday, November 14.  Now,

13   Counsel, if they object, they will appear that day, and

14   so I will set a certain time.  Do you want me to insert

15   in here that, if there is an objection, that each of you

16   should be contacted, so you have the opportunity to be

17   here if you would like?

18                   MS. MAHONEY:  That would be great -- or at

19   least the Court to know that they are coming with

20   counsel.  Detective Hopkins had asked them how they would

21   respond to a subpoena, and they said, "First of all, we

22   only keep records for one year, and second of all, we

23   will fight it."

24                   THE COURT:  Well, that's fine, but it's a

25   subpoena asking for in-camera review, so --

CRIMINAL DEFENSE MOTION
   Colloquy                                        -184.36-

1                   MS. MAHONEY:  Right.  I understand --

2                   THE COURT:  -- fight --

3                   MS. MAHONEY:  -- but I'm just saying that,

4  given that --

5                   THE COURT:  -- fight as they will, there

6  is a certain amount of authority to require that they

7  produce the documents for in-camera review.

8                   MS. MAHONEY:  Oh, I understand.  I was

9  just telling the Court that I do anticipate that they

10  will show up with counsel.

11                  THE COURT:  And that's fine, as long as

12  they show up with the documents, and --

13                  MS. MAHONEY:  Yeah.  Like I said, I

14  obviously don't represent them.  I don't have anything to

15  do with it.  We just wondered what it would be like, in

16  case this request was made.

17                  THE COURT:  And I will try to make that

18  clear, that they are to produce the records for purposes

19  of in-camera review, to determine materiality as to this

20  particular case.  And the reason I will keep the

21  originals and do it today is so that no one else has

22  access to the PIN.

23                  MS. MAHONEY:  And Your Honor --

24                  MS. ELLIOTT:  That was my idea, Your

25  Honor.

1          THE COURT:  I will probably do a cover --
2    I will probably do a cover letter, too.
3          MS. ELLIOTT:  I have no objection to that.
4    Whatever it takes to get the records here and make --
5          THE COURT:  Well, not that I will be
6    successful, but I will make the attempt.
7          MS. MAHONEY:  Prior to beginning argument
8    -- if we are done with this, can I ask one other thing?
9          THE COURT:  We are done with this.
10         MS. MAHONEY:  Okay.
11         THE COURT:  Although let me -- before we
12   do this:  In addition to Crime Stoppers, you are
13   directing this to Seattle Police Department and Bothell.
14         MS. ELLIOTT:  And the King County Police,
15   only because it is staffed by officers of those two
16   organizations, and I have had experience with the literal
17   nature by which these are read.
18         THE COURT:  Well, I don't see why the King
19   -- I think it's fair to say the Seattle Police, based on
20   Detective Hopkins' testimony, and I think it's fair to
21   ask Detective Hopkins to whom to forward this in Bothell,
22   but I don't think we need the King County Police in here.
23         MS. ELLIOTT:  All I know is that I was
24   informed that my representative to Seattle-King County
25   Crime Stoppers was a King County police officer.  I don't

CRIMINAL DEFENSE MOTION
   Colloquy                                    -184.38-

1    know why that is, but off the Internet, that's who my
2    representative is.
3                 THE COURT:  I will take that one out.  I
4    think, with three police organizations and Crime
5    Stoppers, if there is anything, we can get it, and King
6    County Police can wait until later.
7                 Now, to whom should I forward my letter,
8    so that Bothell would have an opportunity to respond to
9    this by next Friday?
10                MR. HOPKINS:  To the manager of
11    communications and records, Jan O'Neal (phonetic).
12                THE COURT:  Okay.  So, Bothell -- is the
13    manager --
14                MR. HOPKINS:  Manager of communications
15    and records.  If it will be done here --
16                THE COURT:  You can just take it?
17                MR. HOPKINS:  Sure; I could take it.
18                THE COURT:  That would be great; that
19    will help me on Bothell.  Then I will just have to worry
20    about Crime Stoppers and Seattle Police Department.
21                MS. ELLIOTT:  Thank you.
22                THE COURT:  Okay.
23                MS. MAHONEY:  If they have nothing, is a
24    letter from her sufficient?
25                THE COURT:  Yes.  They just need to write

CRIMINAL DEFENSE MOTION
   Colloquy                                    -184.39-

1    a letter and say they have nothing, which is why I was

2    going to do a cover letter.  I will say, "After reviewing

3    your files and doing your search, if you have nothing,

4    please so indicate by" --

5                    MR. HOPKINS:  I --

6                    THE COURT:  -- "letter or declaration or

7    otherwise."

8                    MR. HOPKINS:  And, Your Honor, if you

9    would like, you could just fax it to the department

10   even, to Manager O'Neal; I can call and tell her to

11   expect a fax --

12                   THE COURT:  Okay.

13                   MR. HOPKINS:  Would that --

14                   THE COURT:  But before you leave, perhaps

15   you could leave me fax numbers and such --

16                   MR. HOPKINS:  Yes, ma'am.

17                   THE COURT:  -- okay, because -- I will

18   need to mark it up [like that].

19                   Now, this is your motion.

20                   MS. ELLIOTT:  Yes, Your Honor.

21                   MS. MAHONEY:  But prior to beginning to

22   the argument, can I ask something?

23                   THE COURT:  Sure.

24                   MS. MAHONEY:  I think that it's crucial

25   that -- we have had a number of briefs and a number of

CRIMINAL DEFENSE MOTION                        -184.40-
    Colloquy

1    allegations made, and I would ask -- I think that, for

2    the findings of fact that this Court needs to make, that

3    Ms. Elliott be required to state specifically under what

4    sections of the rules she is seeking a new trial.

5                I would like to point out that, although

6    we have dealt with 7.6, that this is outside of the time

7    rule, and clearly the State in this particular case is

8    aware of it but agreed to let this -- you know, not to

9    contest the timeliness.  I just wanted to put that on the

10   record.

11               THE COURT:  Okay.

12               MS. MAHONEY:  But I do think that it is

13   very important, for me to be able to respond and the

14   Court to make appropriate findings, that we have the

15   specific sections and allegations stated.

16               MS. ELLIOTT:  Could I see your rules.

17               MS. MAHONEY:  (Hands document to counsel)

18               THE COURT:  All right.

19               MS. ELLIOTT:  Your Honor, I believe my

20   motion for new trial was filed within a year.

21               MS. MAHONEY:  But this is ten days --

22               THE COURT:  Well, whether it was or

23   whether it wasn't, I think Ms. Elliott's (sic) request is

24   appropriate, that, Counsel, you be clear about which

25   sections you are relying on and what the specific

CRIMINAL DEFENSE MOTION
     Colloquy                                    -184.41-

1    allegations are.

2              MS. ELLIOTT:  All right.  My allegations

3    are brought pursuant to relief from judgment or order,

4    CrR 7.8.  And I am relying on Section (b), which states,

5    "On motion from final judgment must be made within a

6    year"; under subsection 1, "mistakes, inadvertent,

7    surprise, excusable, neglect, irregularity in obtaining

8    the judgment or order";

9              Subsection 2, "newly discovered evidence

10   which by due diligence could not have been discovered in

11   time to move for a new trial" -- fraud, which is

12   number 3 -- and 5, any other reason justifying relief,

13   which is the unconstitutional nature of the -- or the

14   constitutional implications of the Brady violations and

15   the discovery violations in this case.

16             THE COURT:  Okay.

17             MS. MAHONEY:  All right.  So, you are not

18   -- I just want to make it clear, then, even though in

19   your opening brief you cite to Rule 7.6, and although we

20   have pretty much treated this like a 7.6 motion, you are

21   not moving under 7.6; is that correct?

22             MS. ELLIOTT:  In my motion for new trial

23   and preparation of a transcript, I cited to CrR 7.8, Your

24   Honor, relief from judgment.

25             MS. MAHONEY:  Right.  Well, I also saw it

1    just 7.6; that's why I am asking.

2                    THE COURT:  Well, so we are clear -- I

3    think Ms. Elliott has been absolutely clear -- it's 7.8.

4                    MS. MAHONEY:  Because it makes a big

5    difference --

6                    THE COURT:  Well --

7                    MS. MAHONEY:  -- in the review.

8                    THE COURT:  -- it's 7.8, and --

9                    MS. MAHONEY:  All right.

10                   THE COURT:  -- that's how we are

11   proceeding.

12                   MS. ELLIOTT:  Thank you, Your Honor.

13                   THE COURT:  Okay.

14

15           CLOSING ARGUMENT FOR THE DEFENSE

16   BY MS. ELLIOTT:

17                   For my argument today, Your Honor, I would

18   like to rely on two portions of my motion, which I admit

19   has been developing over time as more information has

20   become available to me.  But there are two bases on

21   which this Court should find that Mr. Simmers was not

22   afforded a fair trial in this matter.

23                   The first basis is the perjured testimony

24   given by Mr. Kevin Olsen in this matter.  In my second

25   supplemental motion filed today, I reviewed the testimony

1    given by Mr. Olsen, which has been given to the Court,

2    and he made this testimony in March of 1996. At that

3    time Ms. Mahoney asked him, "Now, for your cooperation in

4    either the drug cases or the Rita Barchot case, did you

5    receive anything from the State?" Mr. Olsen: "Nothing."

6    That's a lie.

7           Second lie: Ms. Mahoney: "What was your

8    reward in prison for testifying in that case?" --

9    referring again to the Barchot case. Olsen -- and again,

10   this is not confined to Mr. Olsen's quibbling about

11   whether we are talking about a reward, payment for

12   testimony, informant fees -- "Did you receive a reward?"

13   -- very broad word. Mr. Olsen: "I didn't receive any

14   reward." Another lie.

15          Third lie: "After your conversation with

16   Mr. Simmers on November 12, what did you do?" Olsen says

17   he thought about it for a while, and then he contacted

18   the authorities and the Prosecutor's Office -- a lie; he

19   first contacted Crime Stoppers.

20          Lie four: "What motivated you to call the

21   Prosecutor's Office?" Mr. Olsen goes into a -- I would

22   characterize -- pathetic lie that it was because of the

23   callous way that Ian talked about the crime and his

24   remorse, et cetera, et cetera. Another lie; Mr. Simmers

25   (sic) contacted the Prosecutor's Office in this case

CRIMINAL DEFENSE MOTION
  Defense Closing                              -184.44-

1    because he had contacted Crime Stoppers and had a

2    financial interest in verifying the story that he had

3    made up about Mr. Simmers.

4              Lie number five -- now, Mr. Olsen, I

5    think, also participates in very literal constructions of

6    questions put to him.  But Ms. Mahoney says, "And what

7    were you led to understand about your cooperation in this

8    case?"  And Mr. Olsen says, "It was very clear I would

9    get nothing" -- another lie; he was expecting a payment

10   from Crime Stoppers.

11             And then lie number six -- and this is a

12   very broad question, Your Honor -- "Have you ever

13   received any monetary compensation for your cooperation

14   with the police at any time?"  Mr. Olsen:  "No" -- a

15   lie.

16             Then, when Mr. Hicks asks him a question

17   about that, he says, "Well, I have never received any

18   money for being a witness."  He again on cross-

19   examination tells Mr. Hicks that the reason that he is

20   testifying in this case is because he is appalled by

21   Mr. Simmers' crime, never revealing that he had contacted

22   Crime Stoppers; that he was a frequent caller to Crime

23   Stoppers; that he had received money in the past in the

24   Thompson case and knew how to manipulate Crime Stoppers

25   into making payments to him.

1          A final lie is that he lied here in court

2     on Tuesday.  When Ms. Mahoney again asked him, "Did you

3     ever receive anything for testifying in Thompson, for

4     cooperating in Thompson?" he said no.  And only when he

5     was faced with documentation from the Department of

6     Corrections that would have exposed that lie did he, on

7     redirect, finally admit that, yes, he had received

8     payments, not only in this case, but in the Smiley case

9     as well as the Thompson case.  So, he had an unrevealed

10    financial interest in the outcome of this trial, the

11    Thompson trial, and the Smiley case.

12          When a witness commits perjury in a

13    criminal trial, the showing that the Defendant has to

14    make -- particularly a State's witness -- is very low --

15    very low.  If there is any reasonable likelihood that the

16    false testimony could have affected the judgment of the

17    jury; that is the test here.

18          The court has imposed a strict standard in

19    terms of reversing -- strict against the State, I might

20    add -- because perjured testimony involves both

21    prosecutorial misconduct and the corruption of the truth-

22    seeking function of the trial process.

23          THE COURT:  Now, what cases are you

24    relying on?  And is this cited in the supplemental

25    brief --

1          MS. ELLIOTT:  It is cited; it's United

2    State v. Augers (phonetic), 427 U.S. 97.

3          THE COURT:  All right.

4          MS. ELLIOTT:  In this case, the State

5    knew or should have known about Mr. Olsen's payments.

6    The payments were made by an arm of the police agency.

7    Brady v. Maryland and all of its progeny make it clear

8    that the prosecutor is responsible for making an

9    extensive investigation of an informant's background in

10   terms of cooperating with the police.  The prosecutor

11   cannot say, "I just didn't know."

12          And in this case, it appears as though

13   there is an institutionalized effort to make sure that

14   persons charged with a crime won't know about the

15   cooperation of paid informants.  It looks like the

16   Seattle-King County Police Department -- Seattle-King

17   County Police agencies have set up an elaborate Chinese

18   wall in which they purge their records every year, in

19   which they fight every effort to get records; they don't

20   make them available, when in fact, under Brady v.

21   Maryland as well as the State of Washington court rules,

22   they are required to come forward with that information

23   before trial and provide it to defendants.

24          Ms. Mahoney and her office cannot hide

25   behind the notion that they didn't know about these

1    payments to Mr. Olsen.  And in fact they can't make
2    themselves deliberately blind, either.  They can't say,
3    "Well, I didn't want to know," as Detective Hopkins here
4    said -- "I didn't want to know about Mr. Olsen's past."
5    Well, the reason they don't want to know about
6    Mr. Olsen's past is then they have to reveal it to the
7    court and defense counsel, and it can be used as
8    exculpatory evidence in the defendant's case.  It can be
9    used to impeach someone of the caliber of Mr. Olsen.
10            As I stated, I haven't located any
11   Washington cases in the last 24 hours dealing with Crime
12   Stoppers, but cases from two other jurisdictions say
13   that, actually, the Prosecutor would likely be required
14   to provide Crime Stoppers reports in discovery.
15            And so, Ms. Mahoney knew or should have
16   known about Mr. Olsen's activities with Crime Stoppers,
17   not just in this case, but also in the Thompson case.
18   Particularly when she put him on the stand and asked him
19   questions about that, she had a duty to confirm or deny
20   that.  And in Crawford v. Texas, the court -- or in
21   Illinois v. Richmond, the court said it could be
22   reversible error to prohibit inquiry into whether or not
23   a witness was or would have been paid.
24            So, timing -- actually, I think timing, in
25   both situations, cuts against the Prosecutor here.  If

1    he is paid before he has testified, then he didn't reveal

2    a payment when he was on the stand and when he was asked

3    "Did you receive any compensation?"  So, that goes to the

4    perjury.

5             If he doesn't receive it until after the

6    trial, then he has got a financial interest, an

7    unrevealed financial interest in the outcome of trial,

8    and Mr. Hicks was entitled to put him on the stand and

9    ask him in front of the jury, "Well, you know,

10   Mr. Simmers" -- "is it your understanding that

11   Mr. Simmers has to be convicted before you can collect

12   your $200 here?"

13            So, the timing, while it is of some

14   interest to me, I don't think is of any benefit to the

15   State.  It only goes to whether or not Mr. Olsen was

16   actually perjuring himself or just failing to reveal all

17   of the information that he had about his cooperation in

18   this case.

19            The manner in which the Prosecutor

20   examined Mr. Olsen resulted in testimony that -- well, I

21   think there are some actual lies in there, but there are

22   some other questions which, I suppose, could simply be

23   characterized as misleading.  But the manner in which

24   they were presented was so misleading that it amounted to

25   falsity in this case.

CRIMINAL DEFENSE MOTION                          -184.49-
    Defense Closing

1          Mr. Olsen protested that he had never

2   received financial compensation for any case that he had

3   ever been involved with as an informant and that his sole

4   motivation in testifying before this Court was his

5   notions regarding public service and service to himself

6   and -- or, his goodwill. And that just is a remarkably

7   inaccurate picture of Mr. Olsen.

8          I would also like to concentrate on the

9   unrevealed pending charges, as well as Mr. Olsen's

10   behavior on the street in December 1995, January 1996,

11   and February 1996 which, again, Ms. Mahoney knew or

12   should have known about. And clearly, that information

13   was within the confines of her office.

14          And before she put Mr. Olsen on the stand,

15   she had a duty to investigate what Mr. Olsen was being

16   held on, whether or not he had any pending charges. And

17   had she done so, she would have found that, while he was

18   on the street, he had committed somewhere between five

19   and seven additional crimes; that there were police

20   reports out there regarding that; and that, at the point

21   of his arrest, he once again actually lied and gave a

22   false name. All of those facts were material to

23   Mr. Olsen's reliability in this case.

24          Once again, I think the Prosecutor's

25   Office's attitude is "Well, I didn't know. I didn't

CRIMINAL DEFENSE MOTION
  Defense Closing

-184.50-

1    know.  I didn't know."  That's all -- that has been the

2    testimony here, and that is a complete and total

3    misunderstanding of the prosecutor's obligations under

4    _Brady_.  They are charged with making a full and careful

5    investigation of the potentially exculpatory evidence for

6    the defense.

7              In _Giglio_ (phonetic) _v. United States_,

8    the U.S. Supreme Court has stated that "The prosecutor's

9    obligation is far-reaching, and it has to manage its case

10   meticulously.  Failure to disclose evidence due to

11   negligence is not excusable."  "Good-faith, bad-faith

12   intentions on the part of the prosecutor's office are

13   irrelevant" -- _Kyles v. Whitley_ (phonetic).

14             The government is held to a disclosure

15   standard that is based on what all of its officers acting

16   on its behalf know about the case -- not just the

17   prosecutors, but Mr. Hopkins, the police who are working

18   for Crime Stoppers, all of those persons involved in law

19   enforcement who have had contact with Mr. Olsen and know

20   about his reliability.  She has a duty to learn about

21   favorable or unfavorable evidence, particularly in the

22   case of someone like Mr. Olsen, where she knows that he

23   has acted as an informant on a number of occasions in

24   the past and that his lifestyle indicates that what he

25   tells her or the Court should not be taken at face value.

1          In <u>Kyles v. Whitley</u>, the Supreme Court

2     said, "There is no serious doubt that procedures and

3     regulations can be established to carry the prosecutor's

4     burden and ensure communication of all relevant

5     information in each case to every lawyer who deals with

6     it."  And the Supreme Court said, "To require anything

7     less than full joint responsibility to disclose all of

8     this information, and to excuse the prosecutor from

9     disclosing what he does not happen to know, boils down to

10    a plea to substitute the police for the prosecutor and to

11    permit relevant and exculpatory information to be hidden

12    from the Defense."

13         I have seen no authority contrary to mine

14    cited by the State.  The State, I think, is conceding

15    that failure to reveal the unresolved charges against

16    Mr. Olsen before he took the stand is a <u>Brady</u> violation.

17    But again, just like the payment, as to the unresolved

18    charges, the State's failure to make an adequate -- an

19    acceptable investigation of Mr. Olsen in this case

20    permitted the State to put him on and allowed Mr. Olsen

21    to perjure himself [in] the jury, when, if they had made

22    that rational explanation, they knew or should have known

23    that he was lying.

24         When he got on the stand and said "I am

25    only being held on possession of stolen property; I was

```
 1    arrested on the warrant," Ms. Mahoney asked him, "And you
 2    were actually rearrested because you were on a warrant
 3    for possession of stolen property; is that correct?"
 4    Olsen says, "That's correct."  That's not correct; that's
 5    a lie.  He was rearrested trying to pass a bad check at
 6    Mary Martha Cafe, and he gave a false name to the officer
 7    who arrested him.  She should have known that.
 8                    And the perjured testimony was presented
 9    without her informing the Court that it was perjured
10    because she didn't discharge her duty, and we have a
11    very, very low burden in that situation to motivate a new
12    trial.
13                    THE COURT:  And the case you are relying
14    on for the very, very low burden is -- the cases --
15                    MS. ELLIOTT:  Augers, Giglio, Naypu --
16    there's a whole line of U.S. Supreme Court cases, every
17    single one of them placing the burden on the prosecutor
18    and requiring full and fair disclosure to avoid precisely
19    this situation.
20                    THE COURT:  Well, I don't disagree with
21    the burdens on the prosecutor, but what case are you
22    relying on for your argument that there is a very, very
23    low burden?
24                    MS. ELLIOTT:  Naypu and Augers.
25                    THE COURT:  Okay.
```

MS. ELLIOTT:  There have not been many
Washington State cases on the issue of perjured
testimony, but the U.S. Supreme Court cases are clear,
and they apply to the prosecutor in this state because
it's a due-process violation as well as a -- it goes
directly to the issue of fair trial.

But even if we have the moderate burden
that Brady imposes, the Brady violations here were
material, and this Court cannot be confident in the
verdict of the jury based upon those Brady violations.
And I say that for two reasons:

If Your Honor will recall, in this case,
the only other evidence, competent evidence, was a
questioned confession given by Mr. Simmers.  There were
no forensics; there was no eyewitness.  The issue -- and
there was an alibi, a complete alibi.  That was heavily
litigated.

When it came down to the time that the
jury was considering this case, they had two questions;
jury inquiries are in the file.  The first one has to do
with Mr. Olsen, so it's not as if they completely ignored
Mr. Olsen's testimony in this case.  They came out and
said -- and they wanted some evidence going directly to
his reliability and his credibility.  What they asked
was, "Do they always give people in protective custody a

1    pen and a piece of paper?"  Because, as you recall, he

2    said he wrote it down.  And then they came out, and they

3    wanted to re-hear the confession on tape.

4                    So, I suspect that the Prosecutor's

5    argument will be, "There was plenty of evidence in this

6    case, Your Honor.  Ignore our negligence.  Ignore the

7    fact that we put Mr. Olsen on the stand, sponsored him as

8    our witness without making a full and complete review of

9    his background, and just say there was plenty of

10   evidence.  No error here."

11                   And that's simply not the case.  Your

12   Honor sat and heard the evidence here.  The jury had a

13   difficult time deciding this case, and they had a

14   difficult time based upon the testimony given by

15   Mr. Olsen and because of the questioned confession, which

16   was the only other evidence.  I quite honestly cannot

17   imagine a clearer case for reversing or granting a new

18   trial on the basis of perjured testimony, as well as far-

19   reaching failures to comply with Brady.

20                   And finally, I would like to point out

21   that, although it doesn't fit neatly within either

22   category of Brady or Naypu and Giglio, that during the

23   trial Mr. Hicks did attempt to question Mr. Olsen on

24   what he had been up to between the time he was released

25   from jail and the time that he was picked up on

1    February 28, and there was a colloquy.  It's cited --

2    that part of the record is cited in my second

3    supplemental brief.  And --

4                    THE COURT:  What page?

5                    MS. ELLIOTT:  Page 8 -- I will give you

6    the transcript pages; it's on March 19, 1996, at

7    page 79, where Mr. Hicks starts to ask Mr. Olsen if he

8    was aware, during the time of the prosecutor's -- during

9    the time that he was on the street, the prosecutors were

10   trying get in touch with him.  And there was a lot of

11   discussion, and you broke for the day.

12                   Ms. Mahoney objected to any inquiry about

13   what he was doing.  She comes back the next morning, and

14   she wants to confirm that you are going to prohibit

15   Mr. Hicks from questioning Mr. Olsen on, and I quote,

16   "what he was doing in that intervening time as far as his

17   drug use, et cetera."  And this Court granted that motion

18   and prohibited Mr. Hicks from inquiring.

19                   Now, had Ms. Mahoney discharged her

20   obligations under the discovery rules in <u>Brady v.</u>

21   <u>Maryland</u>, she would have known that that evidence was

22   highly relevant.  And by objecting here without full

23   knowledge of the facts, she permitted or allowed or

24   facilitated the failure of Mr. Olsen to disclose those

25   facts under cross-examination by Mr. Hicks.

1          So, again, Ms. Mahoney knew or should have

2   known that that was relevant information; that, without

3   inquiry into that, a false picture -- not just a false

4   testimony, but a false picture of Mr. Olsen was

5   presented to the jury. And for those reasons, a new

6   trial in this case is clearly warranted, even without yet

7   the payment records from Crime Stoppers. I will save

8   whatever other time I have for rebuttal.

9          THE COURT: Page 8 and 9, the reference

10  has just been made to that portion of the trial

11  transcript. Although it's synopsized here, I believe

12  there was more to it, and it was focused on the drug use.

13  Have those portions of the transcript been provided to

14  the Court?

15          MS. MAHONEY: (Nods head)

16          MS. ELLIOTT: Oh, yeah.

17          MS. MAHONEY: They --

18          MS. ELLIOTT: The whole --

19          THE COURT: The whole colloquy and ruling?

20          MS. ELLIOTT: Yes.

21          THE COURT: I recall there being a very

22  specific ruling related to drug use and that that came up

23  more than once. So, I would be interested to see the

24  entire context and ruling.

25          Ms. Mahoney.

1          MS. MAHONEY:  And to that end, I think

2     what I will also hand up is marked 12 and 13, because we

3     kept going back and at different [fill-in] points in the

4     trial talking about Mr. Olsen and his history.

5          THE COURT:  Do you want that marked --

6          MS. MAHONEY:  I would like --

7          THE COURT:  -- as an exhibit?

8          MS. MAHONEY:  -- that marked and admitted

9     also.  I think that that may be --

10          THE COURT:  That would be --

11          MS. MAHONEY:  -- helpful --

12          THE COURT:  -- Exhibit 11, then.

13          MS. MAHONEY:  -- to the Court.

14                    (State's Exhibits 11 and 12

15                     marked for identification.)

16          THE COURT:  All right.  Ms. Mahoney.

17          MS. MAHONEY:  Okay.  I am assuming, for

18     purposes of this argument, based on the representation of

19     Ms. Elliott and her argument just now, that she is

20     centering her claims for a new trial based on what she

21     has just argued.  And if that is correct, I would like to

22     respond only to those areas, rather than all the other

23     things that have been asserted over the course of these

24     motions.

25          MS. ELLIOTT:  Well, I am centering it on

1    all of my motions, but I am focusing on those which the

2    evidence now establishes as clearly --

3            THE COURT:  As I understand it, so that

4    we are all clear and there are no misconceptions about

5    what the Court is going to look at and what Counsel --

6            MS. ELLIOTT:  No.

7            THE COURT:  -- needs to address, there are

8    Brady violations; there are arguments that are being made

9    relating to perjured testimony and Naypu --

10           MS. ELLIOTT:  Right.

11           THE COURT:  -- and Crime Stoppers and the

12   obligations of the prosecutor.  So, there are due-process

13   arguments that are being made, and Ms. Elliott has

14   concluded with an argument related to, again, the

15   Prosecutor not providing information concerning the

16   pending charges in the period of time that Mr. Olsen was

17   out and therefore precluding testimony and intelligent

18   argument from the Defense and an intelligent ruling from

19   the Court.  The argument, as I understand it, is grounded

20   on 7.8, the subsection cited, and constitutional

21   requirements of due process and of fair trial.

22           Ms. Elliott, is there anything else?

23           MS. ELLIOTT:  No.  I will withdraw my

24   allegation made in the very first motion that the State

25   did not make Mr. Hicks aware of all of Mr. Olsen's prior

```
 1    convictions.
 2                  THE COURT:  Okay.
 3                  MS. ELLIOTT:  I think that --
 4                  THE COURT:  It's just --
 5                  MS. ELLIOTT:  -- there has been no
 6    evidence regarding that.
 7                  THE COURT:  It's just the uncharged
 8    crimes --
 9                  MS. ELLIOTT:  Yes.
10                  THE COURT:  -- that you are concerned
11    with?
12                  MS. MAHONEY:  Okay.  I am also concerned,
13    if I may ask -- and initially, there was an allegation
14    that Mr. Olsen received -- that the plea bargain he
15    received on the PSP was a direct result of negotiations
16    for his testimony in the Simmers case.  Is that now
17    withdrawn?
18                  MS. ELLIOTT:  No.  We don't know that or
19    not, because --
20                  MS. MAHONEY:  Okay.
21                  MS. ELLIOTT:  -- Mr. Olsen will not let us
22    inquire.
23                  THE COURT:  Okay.
24                  MS. MAHONEY:  I need to also ask -- there
25    was also an allegation that we agreed to a PR.  I would
```

1    submit at this point there is no competent evidence for

2    that.  I would ask that the Court make such a finding.

3                    THE COURT:  Well, first, let's just

4    clarify whether that is a ground that the Defense is

5    proceeding, before you articulate what you believe the

6    Court should do.

7                    MS. ELLIOTT:  Well, I guess we don't know,

8    because Mr. Olsen will not let us inquire of

9    Mr. Ernsdorff.

10                   THE COURT:  I --

11                   MS. ELLIOTT:  My only allegation is that

12   he received benefits that were not revealed to Mr. Hicks.

13                   THE COURT:  All right.  So --

14                   MS. ELLIOTT:  And one of those benefits

15   was release, whether it was the judge or the prosecutor.

16   The real issue is what Mr. Olsen thought.

17                   THE COURT:  All right.  So, the

18   allegation, as I understand it, is Mr. Olsen received

19   favorable benefits because he was going to testify as a

20   witness in this case.  The favorable benefits were

21   twofold:  one, he was released on PR; two, there was a

22   plea agreement entered into.

23                   MS. ELLIOTT:  And I guess my argument is

24   that, absent his waiving his right to counsel, we should

25   assume that my allegation is true, because his

1    invocation of the right to counsel prohibits us from

2    cross-examining him about those.

3                    THE COURT:  All right.  Is there anything

4    else before Ms. Mahoney has her opportunity to address --

5                    MS. MAHONEY:  Well, there are still --

6                    THE COURT:  -- the motion?

7                    MS. MAHONEY:  -- some other allegations

8    also in her first motion.  So, the criminal history is

9    withdrawn.  The failure to reveal all benefits to Olsen I

10   think she has clarified.  Failure to reveal unsolved

11   charges is clarified.  She has a section 4 in her initial

12   motion for new trial, page 9:  "Failure to reveal that

13   other state law enforcement official found Olsen to be

14   untrustworthy" -- talking about Robin Hickok, who indeed

15   actually testified.

16                   THE COURT:  Well, let's just ask for

17   clarification.  Is that --

18                   MS. ELLIOTT:  Okay.

19                   THE COURT:  -- a grounds that you are

20   proceeding on?

21                   MS. ELLIOTT:  I will withdraw the

22   allegation regarding Mr. Hickok but reserve, pending the

23   subpoena duces tecums, as to any other agency.

24                   THE COURT:  Okay.  On Crime Stoppers.

25                   MS. MAHONEY:  Okay.  So, at this point,

1    then, I would ask that the Court -- and I don't want to

2    have to go back over that -- I would ask specifically

3    that the Court make a finding at this point that there is

4    no competent evidence in the record on which this Court

5    could rule or has been presented, as is the Defendant's

6    burden.  This is just -- I am just --

7                    THE COURT:  What I --

8                    MS. MAHONEY:  -- so that I don't have to

9    spend --

10                   THE COURT:  -- will do, Ms. Mahoney, is

11   articulate for the record that the Defense is withdrawing

12   any allegation concerning prior convictions and the

13   assertion that failure to provide information about

14   Detective Hickok was in any way improper.  And the Court

15   will make no determinations based on those two

16   allegations.  I understood that Mr. Hickok, or Detective

17   Hickok testified at trial, and I --

18                   MS. MAHONEY:  My other concern is she

19   actually specifically lists him as an informant in any

20   case and a DEA agent.  And so, right now the only

21   thing --

22                   THE COURT:  I understand --

23                   MS. MAHONEY:  -- that could possibly come

24   up --

25                   THE COURT:  -- there is no evidence in

CRIMINAL DEFENSE MOTION
  Defense Closing                              -184.63-

 1    this --

 2                    MS. MAHONEY:  Right.

 3                    THE COURT:  -- in this [person] --

 4                    MS. MAHONEY:  I just want to make sure

 5    before I spend a lot of time dealing with it.  I wanted

 6    to know exactly what I am responding to.  I think I am

 7    entitled to be able to do that.

 8                    THE COURT:  You are, and I was trying to

 9    clarify --

10                    MS. MAHONEY:  I'm sorry.

11                    THE COURT:  -- for you.  And so, in order

12    to do that, why don't you begin your argument by simply

13    indicating the position of the Prosecutor on those two

14    allegations and then move into the rest.  And it will be

15    up to Ms. Elliott to respond.

16                    MS. MAHONEY:  All right.

17

18                    CLOSING ARGUMENT FOR THE STATE

19    BY MS. MAHONEY:

20                    Your Honor, first of all, Ms. Elliott is

21    moving under 7.8.  I would submit to the Court that,

22    under the sections that she outlines, number one, (b),

23    that there was --

24                    Well, I will just make my argument:  I

25    would submit that there is no reason to arrest the

1    judgment, either to reverse or grant a new trial, on

2    either 1, 2, 3 or 5.  In regard -- and specifically to

3    the allegations that she brings up with Mr. Olsen's

4    perjured testimony.

5            Number one, in regard to his motivation, I

6    think certainly that there is nothing raised, even with

7    the Crime Stoppers information, to suggest that he says

8    that he testified because he was appalled.  That can also

9    be true.  There is no evidence before the Court that he

10   only testified to receive money from Crime Stoppers.  As

11   a matter of fact, that would be contrary, because

12   testimony is not required.  So, the fact that he says

13   that his motivation would be because he was appalled

14   certainly could be realistic, particularly given the type

15   of crime that we have here.

16           So, I think that Ms. Elliott states

17   something extremely accurately:  Kevin takes a very

18   literal view of how he decides to answer questions.  He

19   answers the question put to him as it is put to him, in

20   the context it is put to him.  I think that, when you

21   review the entire transcript, as I am sure was very clear

22   for the jury, that is exactly how Mr. Olsen operates.

23           He has a lengthy shady history.  None of

24   that was hidden from the jury.  The jury knew that he had

25   criminal history dating back a very long time.  The jury

1    knew that he had provided information in other cases; the

2    jury knew that he received different treatment in prison

3    and jail as a result of it.  The jury knew that another

4    inmate was called to dispute everything that he said;

5    that he would not have been able to hear it; that none of

6    that was ever said because, had it been said, that that

7    particular inmate would have heard it also.  The jury had

8    ample evidence on which to question Mr. Olsen's

9    credibility and his motives, aside from what he said.

10                In addition, the fact of the matter is

11    that the State did reveal to Mr. Hicks that, at the time

12    that Mr. Olsen was arrested on February 28, that he was

13    investigated -- arrested for investigation of fraud and

14    forgery and that he was held on burglary charges.  The

15    reason why that is clear that that is revealed is that,

16    if you read the entire transcript of the testimony of

17    Mr. Olsen, Mr. Hicks asks Mr. Olsen about that.  And

18    Mr. Olsen candidly testifies correctly to that.

19                In particular, I have handed up my copies

20    of the transcript, you know, just to highlight certain

21    portions.  On page 12 of March 20, Mr. Hicks asks

22    Mr. Olsen:  "Did you also told us (sic) that your arrest"

23    -- and I'm referring to this interview, again, where he

24    is referring back to the interview of March 4, where we

25    have some of the missing pages -- "was also for fraud and

1    forgery?"  Kevin answers, "I was under investigation for

2    that, yes."

3              And then later, "You are in custody now;

4    is that correct?"  "I am."  "You are being escorted by

5    the officers from the Bothell Police Department?"  "I

6    am."  "At the time I interviewed you on the 4th, as we

7    discussed before, were you in custody then?"  I objected:

8    "He has already testified he was being held on a PSP."

9    Mr. Hicks says, "Why was it" -- or, mister -- you

10   overruled my objection.  Mr. Olsen asks, "Why was I being

11   held at that time?"  Mr. Hicks says, "Yes."  Mr. Olsen

12   again says, "For possession of stolen property and

13   investigation of fraud."

14             Question from Mr. Hicks:  "And so, after

15   you agreed to testify for the State, you still managed to

16   rack up some new charges?"  Answer by Mr. Olsen:  "I was

17   under investigation for new charges; yes."  Prior to this

18   time, also on my redirect, I asked him if he failed to

19   appear for a court date; he said yes.

20             THE COURT:  Now, what page is that, again?

21             MS. MAHONEY:  I'm sorry; that's on 13, on

22   my redirect.  I asked him, "And you were actually

23   rearrested because you were on a warrant for possession

24   of stolen property; is that correct?"  And that's

25   actually true; he wasn't being held on any other charges

CRIMINAL DEFENSE MOTION                              -184.67-
    State's Closing

1    at that time.  No other charges had been filed in my

2    office, as the testimony was clear before this Court.

3              "And you failed to appear for a court

4    date?"  Mr. Olsen says, "I did."  Also, prior to this,

5    during his testimony, if you read through the entire

6    thing -- I don't want to go through all of it, because I

7    have submitted it to the Court, and it will be part of

8    the record -- he says that he was being held on PSP and

9    burglary charges also.  We talk about his drug history,

10   his drug use, the fact that Mr. Hicks tries to ask if he

11   knew I was trying to get a hold of him during the time

12   he was out of custody.

13             So, Mr. Hicks was aware during the trial

14   that he was out of custody.  Mr. Hicks was aware of a lot

15   of things at that time that he cannot recall now, and

16   that's very, very evident when you review the

17   transcripts.

18             Mr. Olsen is a difficult character to get

19   all the information on.  He is extremely shady, and he

20   spends more time doing illegal things than not.  When you

21   review the transcripts in totality, that is extremely

22   clear and was extremely clear for the jury.

23             Second of all, even if -- there is no

24   question that those police reports from the additional

25   incidents were not turned over to Mr. Hicks.  I didn't

1   have them in my possession.  They weren't in the

2   possession of the State until after Kevin testified.

3   There were no new charges filed at the time.  I did check

4   LODI.

5             But even had those specific reports been

6   given to Mr. Hicks, there is no showing they would be

7   admissible.  Mr. Olsen still had a Fifth Amendment

8   privilege.  Under the case law, he is not permitted to

9   take his Fifth Amendment privilege in front of the jury.

10  Part of the discussions that we had were in regard to

11  that.

12            We don't get to ask him specifically about

13  what he did with his PSP; there is no case law to say

14  that that is relevant.  We don't get to specifically ask

15  him about his illegal activities; there is no case law

16  that would permit such cross-examination.  As a matter of

17  fact, in the very next trial in which Mr. Olsen

18  testified, as this Court is well aware, those issues were

19  not allowed to be inquired into, even when the additional

20  reports were known and Mr. Olsen had pled guilty, because

21  those things simply are not relevant.  What is relevant

22  to the jury -- and those would be issues of extrinsic

23  evidence.

24            What is important to the jury in this

25  particular case is for them to be able to evaluate what

CRIMINAL DEFENSE MOTION
   State's Closing                          -184.69-

1    Mr. Olsen tells them; what things attack whether or not

2    Mr. Olsen could really know what he says he knows, and is

3    he the kind of person who would make this up.

4              In front of the jury, mountains of

5    evidence were put on about what a shady character

6    Mr. Olsen had been; how he had lied in the past; how he

7    had repeated criminal violations.  And so, the jury had

8    the ability to evaluate his credibility.

9              At some point, the Court has to say -- and

10   there is ample case law on this also, as the Court is

11   aware, as far as cross-examination goes -- when does it

12   become more prejudicial than probative?  When does it

13   become cumulative?  And one of the very things that

14   Ms. Elliott would have to show to get a new trial under

15   new evidence is that it isn't just impeaching, and it

16   isn't just cumulative.

17              And at this point, I would say that, not

18   only was it, but it also wasn't admissible.  And as the

19   Washington courts discuss, in following the standards set

20   out in U.S. v. Bagley (phonetic) and U.S. v. Kyles

21   (phonetic) -- the Knudsen (phonetic) case that I have

22   cited for the Court, the Mach (phonetic) case that I have

23   cited in my brief for the Court -- that, wrapped up in

24   the standard of materiality that the Courts needs to

25   review, are issues of admissibility.  If evidence is

1    neither admissible nor likely to lead to admissible

2    evidence, it is unlikely that disclosure of evidence

3    could affect the outcome of the proceeding.

4                  Now, Mr. Hicks did not have the advantage

5    of having those reports in his hands to go look to see if

6    the evidence was admissible.  But what the Court does

7    have the advantage of knowing, and that you typically

8    wouldn't know, is that you have a situation -- and

9    Ms. Elliott has been able to put nothing to the contrary,

10   which is her burden to do so -- how that information

11   would have been exculpatory.  As a matter of fact, it was

12   explored by another set of investigations and defense

13   attorneys, and nothing exculpatory or admissible was ever

14   found there.

15                  THE COURT:  Well now, just a minute --

16                  MS. ELLIOTT:  Well --

17                  THE COURT:  -- Ms. Mahoney, please.  I do

18   believe there was 608 evidence in the State v. Smiley

19   case related to some of this.  So, before --

20                  MS. MAHONEY:  There --

21                  THE COURT:  -- continuing, I think, in

22   fairness, I need to tell you that.

23                  MS. MAHONEY:  Okay.  And I agree that

24   there was, and I am aware of that, and there was

25   questioning about whether or not he had those cases

State v. SIMMERS/95-1-02102-2 SEA                    11/6/97

1   dismissed.  But what I am saying is that the burden is on

2   Ms. Elliott, on behalf of Mr. Simmers, to come forward

3   and show to the Court how this trial outcome would have

4   been different --

5                  THE COURT:  Right.

6                  MS. MAHONEY:  -- would likely have been

7   different -- and the fact of the matter here is, it would

8   not be -- and that this evidence, "material" means

9   material to guilt or innocence of the defendant -- and

10  the fact of the matter is that nothing Mr. Olsen had to

11  say changes the fact that Mr. Simmers, only days after

12  this murder, long before he ever met Mr. Olsen, was able

13  to tell a police officer how he stabbed Rodney Gochanour

14  (phonetic); what Rodney Gochanour looked like; where

15  exactly on his body that he stabbed him, how he slashed

16  him in the face first and he spun around.

17                  How would he know these things if he

18  hadn't seen him?  He was exactly accurate with the

19  testimony of the medical examiner.  He is exactly

20  accurate in where he stabs him, how the knife was bent,

21  where the knife was thrown.  None of this has anything to

22  do with Mr. Olsen whatsoever.

23                  The fact of the matter is that the

24  evidence of premeditation came largely from the medical

25  examiner, who said, "After this man was stabbed in the

1    back, he was paralyzed; he could not have run." And you

2    had a tracker that came in and presented evidence to the

3    jury of the run for Mr. Gochanour's life, and how he ran

4    and how there was blood, and where his glasses were

5    found, and that those glasses had blood on them, and

6    there was blood in the leaves that certainly suggests

7    that, between the slashing of his face and those stabs in

8    the back, that there was a fight and a flight for his

9    life, where Mr. Simmers waited to stab him again. That

10   evidence has absolutely nothing to do with Mr. Olsen, and

11   that evidence is certainly material to his guilt.

12           But the evidence about whether or not

13   Mr. Olsen had, you know, three pending burglaries or one

14   pending burglary is not -- has nothing to do with whether

15   or not Mr. Simmers stabbed Mr. Gochanour. It's

16   extrinsic.

17           So, I would submit to the Court that,

18   number one, even if you were to accept absolutely

19   everything Ms. Elliott said to be true -- which I am not

20   conceding, but even if that were the case -- the main

21   crux, the last prong that this Court has to get to is:

22   Is it material? And even if everything she said were

23   accepted, it is not material. It just simply would not

24   have probably changed the outcome of this trial,

25   particularly taken in light of everything that the jury

1    did know about Mr. Olsen.

2              And I have started backwards from the end.

3    I agree with Ms. Olsen (sic) in the standard set out by

4    Bagley and Kyles and the cases that she cites.  But they

5    all talk about how it has to be material.  I have cited

6    for the Court in my brief where Washington cases have

7    even dealt with situations where a defendant did receive

8    a benefit -- which I think that there is evidence in this

9    case to show that Mr. Olsen never received a benefit from

10   the State or police agencies -- Crime Stoppers is not

11   part of that -- and he certainly never received anything

12   from my office.  He never received anything from Bothell.

13              THE COURT:  What cases are you citing --

14              MS. MAHONEY:  Even in a case -- I am just

15   looking for those right now, as I was talking.  If you

16   look in my brief, there is State v. Chavez (phonetic).  I

17   believe that's 76 Wn.Ap.  They are in a footnote.  And

18   State v. -- I pulled this out ahead of time, so I could

19   tell you.  State v. Chavez, "The State's failure to

20   disclose a cooperation agreement, not reversible error

21   because the evidence was not material."  State v. Garcia

22   (phonetic):  "Prosecutor's failure to comply with 4.7 and

23   the trial court's error in handling defense discovery

24   requests, not reversible error because evidence withheld

25   not material."

```
 1              I would ask the Court to go ahead and take
 2      a look at those cases, because they deal with similar
 3      allegations to what are made here that were in fact true
 4      but still didn't require reversal of the judgment or a
 5      new trial.  The case of Knudsen, the case of Mach, all
 6      the cases cited here and the line of cases that follow
 7      Kyles and Bagley all talk about materiality; that, even
 8      if there is misconduct -- even if there is recklessness,
 9      like in the Kyles case, there was no question that the
10      prosecutor didn't have the information that became really
11      crucial to them in that case.
12              The difference between like Kyles and what
13      we have here is that the police had withheld what could
14      potentially be an exculpatory statement, an eyewitness
15      statement that directly disputed how the crime occurred,
16      and that was the only evidence they had in that case.
17              I mean, here we have something entirely
18      different, which is where the Defendant confesses.  It
19      has to be material to the guilt or innocence of the
20      defendant, not extrinsic impeachment evidence.  That has
21      not been held to be material.
22              The only time that I found a case -- and I
23      don't know; it actually could be this -- I think it's
24      cited in the Chavez case.  There was a case that was
25      reversed and a new trial was given because there was a
```

1    cooperation agreement given with the main witness that

2    was not disclosed.  But the reason why they reversed in

3    that case, again, is because that was the only witness

4    against the defendant.  That was the only evidence

5    against the defendant's guilt.  And that is clearly where

6    the courts make the difference.  And here you simply

7    don't have that.

8              I would like to just -- I will try and

9    make it brief -- go through and state that, first of all,

10   I don't believe that there is evidence in the record to

11   find prosecutorial misconduct.  I did my best throughout

12   the trial to inform Mr. Hicks of everything that I knew.

13   I would ask the Court to note that, from the time that

14   Kevin Olsen was arrested, we were -- the day that we

15   found out, we were up on the final omnibus hearing.  I

16   mean, all of this happened -- it was very quickly, and we

17   were in this murder trial.  So, it's not like we had days

18   and days to sit around and check out things, and we did

19   the best that we could within the time limits.

20             Also, a lot of this knowledge is in Kevin

21   Olsen's head and in his attorney's, and he has a Fifth-

22   Amendment privilege not to incriminate himself.  The

23   reports that Ms. Nave had come after his testimony --

24   that there was no misconduct whatsoever; that best

25   efforts were made to turn over information.

1          In regard to the Crime Stoppers, I agree

2    that that information should have been turned over to the

3    Defense, had it been known.  Crime Stoppers is a

4    confidential organization.  I don't believe that it would

5    be a reasonable burden to say that every single time that

6    the State has any case, that they need to try and

7    subpoena confidential information from Crime Stoppers to

8    see if anyone they have dealt with has dealt with that.

9    Never had it come up.  I have never dealt with it.

10          And yesterday I think it was pretty clear

11   -- or, Tuesday was the first time I learned that Kevin

12   had anything to do with Crime Stoppers.  I agree; that

13   information should have been told to the Defense, but I

14   don't agree that it was prosecutorial misconduct; that

15   it was not.

16          And regardless, even if it was

17   recklessness or negligence or what have you, it's not

18   material.  Again, it doesn't affect the evidence that was

19   there that showed this Defendant's guilt.  It was

20   extrinsic impeachment evidence.

21          As a matter of fact, had they said -- I

22   mean, there's an argument to be made -- "Have you ever

23   received any compensation on any of your cases or

24   rewards?" and he said no, then, in order to go into

25   whether or not he had ever received, you know, money from

CRIMINAL DEFENSE MOTION
   State's Closing                           -184.77-

1    -- on other cases would be extrinsic and not allowed.

2    It's extrinsic impeachment.  I think there certainly

3    would have been that discretion of the Court as it was.

4                    So, I would argue that there has been no

5    misconduct; that they have not met the standard of newly

6    discovered evidence as is set out in my brief, so I won't

7    go all through that standard again.  That is clearly

8    stated out in case law;

9                    That they have not met all five of the

10   required factors; that there has been no fraud.  If

11   Mr. Olsen chose not to tell them things, there was no

12   fraud by the State or the government.  And again,

13   certainly there was nothing material.

14                   There is nothing here to show that this

15   Defendant's right to a fair trial is any way

16   substantially prejudiced -- nothing.  There was, as I

17   said, mountains of impeachment evidence against

18   Mr. Olsen.  There was ample evidence for the jury to find

19   him reliable or unreliable.  And that, you know, whether

20   or not he had, you know, three pending matters or ten

21   pending matters or fifteen pending matters doesn't

22   really matter taken in the big context of this trial.

23                   And I am not trying to make light of my

24   obligations; I hope that the Court doesn't take it that

25   way.  What I am saying is that there was no prosecutorial

1   misconduct here; there was no attempt to mislead the

2   jury; there is no evidence that I knowingly put on

3   perjured testimony; and that, again, even if everything

4   Ms. Elliott said were true, there is no showing that this

5   was material; that the outcome of this trial probably

6   would have been different, when taken against all of the

7   other evidence in this case, most importantly his

8   confession.

9              THE COURT:  Ms. Elliott, before hearing

10  from you, I now have in front of me the first motion for

11  new trial --

12             MS. ELLIOTT:  Yes.

13             THE COURT:  -- that you filed.

14             MS. ELLIOTT:  Yes.

15             THE COURT:  And I think that it does need

16  to be clear, because I am on page 4, and you are saying

17  that Mr. Simmers is entitled to a new trial pursuant to

18  Criminal Rule 7.6, -5 and -8.

19             MS. ELLIOTT:  Okay.  I withdraw that.

20  This was not brought within ten days.  There is probably

21  a good basis to reopen.  I would say that the 7.6 and 7.8

22  factors blend somewhat, but I am proceeding under the

23  rule which I comply with in every regard, which is 7.8

24             THE COURT:  All right.  Then you

25  specifically delineate certain grounds.  Number one is

1    failure to reveal all of Olsen's criminal history.  Are

2    you still proceeding on that ground?

3                    MS. ELLIOTT:  I am, but I exclude

4    convictions.  I used that -- I'm sorry.  I used that

5    phrase probably differently than the SRA.  I agree that

6    there was disclosure of a rap sheet that had all of his

7    convictions.

8                    THE COURT:  [Just a moment.]

9                    Number two is failure to reveal all

10   benefits to Olsen.  You are still proceeding on that --

11                   MS. ELLIOTT:  I am still --

12                   THE COURT:  -- ground.

13                   MS. ELLIOTT:  -- proceeding on that

14   ground.

15                   THE COURT:  I know; I am just clarifying

16   for the record.  Number three is failure to reveal the

17   extent of Olsen's exposure to additional prosecutions.

18   You are still proceeding on that ground.

19                   But number four is failure to reveal that

20   other state law enforcement official found Olsen to be

21   trustworthy (sic).  This is a specific reference,

22   apparently, to Detective Hicks --

23                   MS. ELLIOTT:  I withdraw as to Hickok

24   or --

25                   THE COURT:  -- Hickok.

1          MS. ELLIOTT:  -- but I reserve the right

2    to raise that again if anything comes out of the

3    informant files at Crime Stoppers, something I was

4    unaware of.

5          THE COURT:  Well, I don't think that that

6    fits within your argument.  This is failure to reveal

7    that other state law enforcement official found Olsen --

8          MS. ELLIOTT:  Okay.

9          THE COURT:  -- untrustworthy.

10          MS. ELLIOTT:  Well, other law enforcement

11    agencies or their adjuncts, would be what I am reserving

12    on.  If there is information at Crime Stoppers that he

13    gave false information, it is a basis to reverse.

14          THE COURT:  Okay.  So, is that clear now?

15          MS. MAHONEY:  Yeah.

16          THE COURT:  As I understand it,

17    Ms. Elliott is not proceeding on Criminal Rule 7.6;

18    Ms. Elliott is not taking the position that the

19    Prosecutor did not fully reveal prior criminal

20    convictions; and there is no allegation as to Detective

21    or Officer Hickok -- or Chief Hickok.

22          MS. MAHONEY:  Well, or at this point,

23    there is no -- what I am understanding her to say is

24    there isn't any evidence in this record at this time for

25    the Court to review that claim with regard to anyone, and

1     she is reserving with regard --

2               THE COURT:  I know, but --

3               MS. MAHONEY:  -- to Crime Stoppers.

4               THE COURT:  -- I am being specific as to

5     Chief Hickok, so that that is clear --

6               MS. MAHONEY:  Well --

7               THE COURT:  -- and I understand that --

8               MS. MAHONEY:  Okay.

9               THE COURT:  -- there is a subpoena and

10    that there may be an argument made later.  But as to

11    Chief Hickok, to whom this applied, that is withdrawn.

12    She may raise it later, if there is information from

13    Crime Stoppers --

14              MS. MAHONEY:  Okay.

15              THE COURT:  -- but that's all.

16              MS. MAHONEY:  All right.

17              THE COURT:  All right.  Ms. Elliott.

18              MS. ELLIOTT:  Yes.  Thank you.

19

20              REBUTTAL ARGUMENT FOR THE DEFENSE

21    BY MS. ELLIOTT:

22              Briefly, in rebuttal:  What I hear

23    Ms. Mahoney saying is that partial truths in this case

24    were enough; that the fact that they partially revealed

25    Mr. Olsen's exposure to prosecution; that they partially

CRIMINAL DEFENSE MOTION                           -184.82-
  Defense Rebuttal

1    revealed his unreliability; that he partially revealed

2    his previous informant activity, are good enough.  And

3    that is simply not true.

4            It is apparent to me that Ms. Mahoney has

5    not read all the cases cited in my three briefs, because

6    the courts are clear.  Payments to informants are never

7    extrinsic.  A financial interest in how the case goes is

8    never extrinsic.  In this case, Mr. Olsen apparently had

9    figured out -- this is a man who makes 40 cents an hour,

10   so $200 or $500 is a fortune -- had figured out how to

11   manipulate the system into getting paid for informing.

12   And the jury is entitled to know that perhaps what he

13   says is not accurate, because it's not motivated by his

14   public interest but rather by his efforts to get $200 in

15   this case, just as he did in Thompson.

16           Not only that; by failing to reveal that,

17   how was Mr. Hicks to know to go talk to Crime Stoppers?

18   If the State keeps themselves deliberately blind, then no

19   one will ever know the full truth.  They are the people

20   who called this man, who deemed him essential to their

21   case about a year ago -- a little more than a year ago --

22   and now saying his testimony didn't really matter.

23           You are right; it was a quick time between

24   when Mr. Olsen was rearrested and when he got on the

25   stand to testify.  But if Ms. Mahoney didn't have the

CRIMINAL DEFENSE MOTION
  Defense Rebuttal                          -184.83-

1    ability to go ahead and discharge her duties under <u>Brady</u>,

2    then she shouldn't have called him.  She has an

3    obligation under all the cases to find out what there is

4    to know about Mr. Olsen.

5              And in this case, it is -- it's almost

6    beyond my comprehension that it wouldn't have occurred to

7    Ms. Mahoney that, during that period of time that

8    Mr. Olsen was on the street, given the fact that -- she

9    calls him a shady character; I think he's a seventeen-

10   time loser who lies with impunity -- but when he has been

11   on the street, not to go and make some inquiry about what

12   he had been up to.  She knows he's a heroin addict on

13   March 4.  Well, what does a heroin addict do when he's on

14   the street?  He steals, to get money to do heroin.

15             She has been practicing long enough to

16   know that, Your Honor, and to make herself deliberately

17   blind to that permitted her to put a man on the stand

18   who then lied.  It was perjury.  And what the cases say,

19   when a witness perjures themselves, is -- the Ninth

20   Circuit says, "A prosecutor's presentation of tainted

21   evidence is viewed seriously, and its effects are

22   exceedingly carefully scrutinized."  That's <u>Palizzi</u>

23   (phonetic), 801 F.2d 1543.  "A new trial is required if

24   there is any reasonable likelihood that the false

25   evidence could have affected the judgment of the jury."

1    Same case.

2                The jury came back with a question about

3    Mr. Olsen.  They considered his testimony.  His testimony

4    probably is the only key to the premeditation here.  The

5    other is speculation on the part of the forensic

6    examiner, because there was no eyewitness.  What it does

7    is create an eyewitness, if you believe Mr. Olsen's

8    testimony about what Mr. Simmers said, which is

9    Mr. Simmers' own statement about what happened, if you

10   believe what he says.

11               THE COURT:  Believe what who says?

12               MS. ELLIOTT:  Olsen -- about what

13   Mr. Simmers said on November 16 or 15 in the King County

14   Jail.

15               There is lower burden than required in

16   any other kind of evidentiary cases, because it involves

17   a corruption of the truth-seeking function.  What I hear

18   Ms. Mahoney arguing is, "We don't have to do background

19   checks of these people, and it doesn't affect the truth-

20   seeking function.  It doesn't reflect on this court when

21   we put someone on who blatantly lies, when I could have

22   gone out and found out that he was perjuring himself."

23               When he says, "No, I wasn't" -- this is

24   just beyond belief.  When he says, "Were you arrested on

25   the warrant for possession of stolen property?" he

1    agrees with her, that's wrong, and it's a lie.  That is

2    not a matter of literalness or not.  He was arrested for

3    passing a bad check, and he didn't even give the name

4    Kevin Olsen, so he could not have been arrested on the

5    possession of stolen property warrant.

6            In Naypu -- in my second brief in this

7    case, I believe I cited Naypu v. Illinois, and that's the

8    case that says, when perjured testimony is presented,

9    reversal is virtually automatic.  And I don't hear

10   Ms. Mahoney saying that Mr. Olsen didn't lie -- didn't

11   lie in the trial here; didn't lie Tuesday morning.  You

12   know, here is a man who is brought down here, taken out

13   to lunch, gets to change into street clothes in her

14   office, and takes the stand.  I don't think he is afraid

15   that Ms. Mahoney is going to charge him with perjury

16   after his testimony on Tuesday.

17           So, the attitude which he takes as to the

18   oath, it is very difficult for me to accept that he only

19   received $500 in Thompson or that the $500 he received in

20   Thompson, the $200 he received in Simmers, and the $200

21   he received in Smiley were the only payments he ever

22   received from Crime Stoppers.

23           I don't think he cares what the truth is,

24   Your Honor, and I don't believe that this Court can

25   uphold a verdict that is based in any part on his

CRIMINAL DEFENSE MOTION
  Defense Rebuttal                              -184.86-

```
 1   testimony.  For that reason, we would ask the Court to
 2   grant a new trial in this case.
 3                THE COURT:  All right; two things:
 4   Number one, I have not had the opportunity to look at the
 5   portions of the transcript that you have put into
 6   evidence, but quite frankly, I believe I am going to need
 7   to read the transcript from beginning to end.  So,
 8   Ms. Mahoney, I would ask that I have -- not right this
 9   minute, but -- a working copy of the trial transcript.
10                MS. ELLIOTT:  Entire trial; oh, okay --
11   because we did give all of Olsen's, but --
12                THE COURT:  Well, I think --
13                MS. ELLIOTT:  Yeah.
14                THE COURT:  -- based on the argument that
15   has been made, I need to read the trial transcript from
16   beginning to end.  We can skip the 3.5 hearing, but from
17   the beginning of the trial --
18                MS. MAHONEY:  I think you have most of it,
19   though.
20                THE COURT:  -- till the end.
21                MS. MAHONEY:  I don't know that I have all
22   of it here.
23                THE COURT:  Not here, but at some point --
24   I would assume both sides have it, but if you don't,
25   Ms. Elliott --
```

1          MS. ELLIOTT:  Well --

2          THE COURT:  -- and Ms. Mahoney:  I would

3   make it a joint request that I be provided with a copy, a

4   working copy of the trial transcript as soon as you

5   could --

6          MS. ELLIOTT:  I would volunteer, but --

7          THE COURT:  -- from beginning to end.

8          MS. ELLIOTT:  -- the State Supreme Court

9   will not reimburse me for making you a copy, so --

10          THE COURT:  Well, if you give me your

11   copy, we can make a copy.

12          MS. ELLIOTT:  Okay.

13          MS. MAHONEY:  Well, I will give you my

14   copy, because I have already told her that, if and when

15   this goes to the appeal, she should assume the State

16   doesn't have a copy.

17          THE COURT:  Well, I can make a copy of

18   your copy.

19          MS. ELLIOTT:  Ms. Mahoney has it here, and

20   that would require me sending my messenger with --

21          THE COURT:  Well, I don't want you to do

22   that.

23          MS. ELLIOTT:  He would object.

24          THE COURT:  All right.

25          MS. MAHONEY:  Your Honor, I do have the

1    whole thing.

2              THE COURT:  Okay.  If you could put that

3    together.  I will need --

4              MS. ELLIOTT:  I don't mind.  I know she's

5    marked it up.  I have no objection.

6              THE COURT:  Okay.  And you can look at it

7    beforehand.

8              MS. MAHONEY:  I am just going to give you

9    the whole thing, but it's pretty clearly marked as to

10   what's the 3.5, et cetera.

11             THE COURT:  Okay.  And I will have it --

12             MS. MAHONEY:  But just so you can tell

13   that you have the whole thing.

14             THE COURT:  I will have Ms. Elliott look

15   at it before I look at it.

16             MS. ELLIOTT:  Yeah.

17             THE COURT:  I need to have Counsel remain,

18   and also the Detective, so that we can finalize these

19   subpoenas.  And I will need to read the entire trial

20   transcript, and I will also need to read the case law.  I

21   will set the return date for next Friday on the

22   subpoenas.

23             MS. ELLIOTT:  Your Honor, may I request

24   that Mr. Simmers remain in King County until at least

25   after the return on the warrants, in case this

1    requires --

2                 THE COURT:  You mean the subpoenas?

3                 MS. ELLIOTT:  I mean, the subpoenas --

4                 Sorry, Ian.

5                 -- in case this necessitates further

6    hearing or testimony.  I have concerns about him going

7    back to Walla Walla and then us needing him or being

8    reluctant to go forward.

9                 THE COURT:  That's one more week.  And for

10   the next week, yes.

11                MS. ELLIOTT:  Thank you.

12                THE COURT:  And then I will have a better

13   idea after that of the timing of the Court's decision

14   also.

15                MS. ELLIOTT:  Okay.  If at any time you

16   think it is not going to be necessary, you can let me

17   know, but I think there were some problems getting him

18   here, or it was an extensive effort to get him here for

19   this hearing, so I hate to send him --

20                THE COURT:  All right.

21                MS. MAHONEY:  The only thing I appear to

22   be missing is -- and I don't know what day these are --

23   is 1 through 36 that leads up to Detective Rusk's

24   (phonetic) testimony.  So I don't think that that is

25   probably a huge --

State v. SIMMERS/95-1-02102-2 SEA                    13/6/97

1          THE COURT:  No.

2          MS. ELLIOTT:  I don't recall that being

3   particularly relevant to the other issues that are before

4   the Court.

5          THE COURT:  It's not.  I recall there were

6   a number of detectives in the --

7          MS. MAHONEY:  I don't know who testified

8   before him.  That's 1 through 36.  But I don't think it

9   was Kevin, unless that's the part I took out.

10          THE COURT:  All right.  And we will be in

11   recess now.

12          MS. ELLIOTT:  Okay.

13                        (State's Exhibits 10, 11 and 12

14                         withdrawn and incorporated

15                         into State's Exhibit 9.)

16                        (Cause recessed, court

17                         adjourning at 11:20 a.m.)

18

19

20

21

22

23

24

CRIMINAL DEFENSE MOTION
    Colloquy                                    -184.91-

C E R T I F I C A T E

STATE OF WASHINGTON )
                    ) ss.
COUNTY OF KING      )


I, the undersigned Notary Public in and for the State of Washington, do hereby certify that the foregoing verbatim report of proceedings was prepared by me from certified copies of videotape recordings of the proceedings, monitored by me and reduced to typewriting to the best of my ability;

That the report is, to the best of my ability, a full, true and correct record of the proceedings, including the testimony of witnesses, questions and answers and all objections, motions and exceptions of counsel made and taken at the time of the proceedings.

That portions of the electronic record not clearly intelligible to me on monitoring are represented in this report within brackets [as exemplified here], and portions entirely inaudible or unintelligible to me by the word "inaudible" or "unintelligible" within brackets;

I further certify that I am neither attorney for, nor a relative or employee of any of the parties to the action; that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially interested in its outcome.


IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal this  19th  day of  June , 1998.


_____
LAURIE K. SNELL, Notary Public
in and for the State of
Washington, residing at Lynnwood
(Commission expires July 17, 2000).

# Exhibit I

Sub 149 - Findings of Fact and Conclusions of Law

51083084



**FILED**
KING COUNTY, WASHINGTON

OCT 01 1998

SUPERIOR COURT CLERK
**BY RHONDA M. CLOSSUM**
DEPUTY

 

## SUPERIOR COURT OF WASHINGTON FOR KING COUNTY

| | |
|---|---|
| STATE OF WASHINGTON, | No. 95-1-02102-2 SEA |
| Plaintiff | |
| v. | FINDINGS OF FACT AND CONCLUSIONS OF LAW ON MOTION FOR NEW TRIAL |
| IAN MONROE SIMMERS, | |
| Defendant | |

Pursuant to Criminal Rule 7.8, defendant Ian Simmers by and through his attorney, Suzanne Elliott. made a motion for a new trial based on the State's alleged failure to fulfill its discovery obligations, newly discovered evidence, and presentation of testimony the State knew or should have known was perjured. Deputy Prosecuting Attorney Susan Mahoney represented the State.

The court having presided over Simmers' trial on murder charges and having heard sworn testimony on the motion for a new trial and having considered the memoranda, affidavits, exhibits and stipulations submitted in support and in opposition to the motion for a new trial, the transcript from the trial, the arguments in support of and opposition to the motion for a new trial and the files and records herein, now, therefore enters the following findings of fact and conclusions of law:

### FINDINGS OF FACT

1.  On March 20, 1995 Ian Monroe Simmers was charged by information with Murder in the First Degree.  The information alleged that on March 11, 1995 on the Burke-Gilman trail, the defendant Ian Simmers with premeditated intent stabbed thirty-five year old Rodney Gochanaur to death.

2.  Trial began March 11, 1996.  The State was allowed to amend the information to charge in addition to Murder in the First Degree, the alternative crimes of Murder in the Second Degree and/or Felony Murder in the Second Degree.  The essence of the State's case was the defendant's confession.  On March 15, 1995 he described in detail the stabbing and the specific injuries inflicted.  He drew a diagram and demonstrated what had occurred.

3.  The defendant's confession, with some redactions, was introduced into evidence during the trial.  The State presented physical and medical testimony and evidence that corroborated the defendant's description of the events and injuries.  The State also called Kevin Olsen, an inmate at the King County jail, who testified about conversations with the defendant and statements he made.

POSTED

51083084

 

4. The defense was general denial and alibi. No evidence or argument was ever presented related to self-defense. Witnesses were presented by the defense. In addition, the defense presented the testimony of Edmonds Assistant Chief Hickock, Darryl Cloud, an inmate in the King County jail, and Hope Marston, a defense investigator, to contradict and impeach the testimony of Kevin Olsen.

5. The jury was instructed on Murder in the First Degree, Intentional Murder in the Second Degree and/or Felony Murder in the Second Degree.

6. On March 28, 1996, the jury found the defendant guilty of Murder in the First Degree. On May 16, 1996, judgment and sentence was entered. The defendant was sentenced within the standard sentence range.

7. The defendant, Ian Simmers, filed a motion for a new trial in April 1997. At a hearing in June, 1997, appellate counsel was authorized to obtain the pertinent portions of the trial transcript and documents obtained in State v. Smiley, an unrelated subsequent case in which Kevin Olsen testified.

8. Defendant's motion for a new trial alleged that:
    (A) The State did not fulfill its discovery obligations. The State failed to reveal all impeachment evidence of Kevin Olsen including:
        (1) all his criminal history;
        (2) information regarding favorable treatment by the prosecutor's office of Kevin Olsen in exchange for his testimony in State v. Simmers;
        (3) the full extent of unresolved charges pending when Kevin Olsen testified in the trial;
        (4) other state officials who found Mr. Olsen untrustworthy.

    (B) Newly discovered evidence required a new trial based on the following:
        (1) information from Department of Corrections documents related to Mr. Olsen;
        (2) the testimony of Kevin Olsen on November 4, 1997 during the hearing on defendant's motion for a new trial that revealed he had obtained money from Crime Stoppers for information he provided in State v. Simmers; State v. Thompson; and State v. Smiley.

    C) Witness Kevin Olsen's testimony was false on two grounds:
        (1) receipt of benefits; and
        (2) his arrest and pending charges

9. A hearing on defendant's motion for a new trial was held in November 1997.

2

10.  Detective Ed Hopkins, Bothell Police Department, testified he was advised by the King County Prosecutor's Office that there was an individual in the King County jail who wanted to speak to someone about the homicide he had investigated.  Detective Hopkins met with and interviewed Kevin Olsen.  The State endorsed Kevin Olsen as a witness in State v. Simmers in November 1995.  The prosecutor's office provided defense counsel Ken Scearce with a copy of Olsen's interview with Detective Hopkins, Mr. Olsen's criminal history, Olsen's aliases, charging documents related to Olsen's pending second degree possession of stolen property charge (PSP) and information concerning Olsen's prior testimony in another case, State v. Thompson.

11.  After reviewing this information, Ken Scearce withdrew because he had previously represented Olsen.  On November 28, 1995, new counsel, John Hicks, was appointed.

12.  In November 1995, Gary Ernsdorf represented Kevin Olsen on the pending PSP charge, King County Cause No. 95-1-07832-6.

13.  Senior Deputy Prosecuting Attorney (DPA) Margaret Nave, who was then assigned to the Early Plea Unit of the Prosecuting Attorney's Office (PAO), negotiated Olsen's PSP charge with his attorney Gary Ernsdorf.  Negotiations were first initiated by Ernsdorf in late November/early December of 1995.  DPA Nave testified she was unaware that Olsen was to be a state's witness in the Simmers case until Ernsdorf informed her.  Ernsdorf requested that the PSP case be dismissed in return for Olsen's testimony in the Simmers case.

14.  DPA Nave testified she immediately called the Simmers DPA Susan Mahoney and was specifically told by Ms. Mahoney that Olsen should not be given any special consideration or benefits because he was a potential witness in State v. Simmers.  According to Ms. Nave, Ms. Mahoney unequivocally indicated that the processing of Mr. Olsen's case by the Prosecuting Attorney's Office should in no way take into consideration Mr. Olsen's endorsement as a witness in his testimony.  Ms. Nave provided this response to Mr. Ernsdorf.

15.  Mr. Olsen had an Offender Score of 10 with a standard sentence range of 22-29 months.  The original recommendation of the PAO for the PSP charge was for the low end, 22 months.  This recommendation is typical of what other defendants would receive if their case was resolved through the Early Plea Unit with the same charge and criminal history as Olsen's.

16.  On December 7, 1995 at the request of his attorney, Kevin Olsen was released from jail pending trial on the PSP charge.  The hearing to release was conducted by Judge Brian Gain in camera.  The conditions of release pending trial were that he obey all laws, appear at all court hearings, and appear at the case setting hearing scheduled for December 18, 1995.

51083084

17.  Mr. Olsen failed to appear at his case setting hearing on December 18, 1995 and a bench warrant was issued.

18.  On January 26, 1996 John Hicks requested approval of the expenditure of public funds for an investigator to further investigate and do a background check on Kevin Olsen.  This request was approved in early February, 1996.

19.  Olsen's whereabouts were unknown during the time period between his December 1995 release and his arrest on February 28, 1996 for investigation of fraud and forgery.  Olsen was booked into King County Jail under an alias.  After he was booked, his true identity was learned and he was then held on his original PSP charge.  On March 1, 1995 DPA Mahoney requested and was granted a material witness warrant.  On that same day John Hicks was informed of Olsen's arrest for investigation of fraud and forgery.  DPA Mahoney verified no new case reports were received by the Prosecuting Attorney's Office regarding Olsen.

20.  Trial in State v. Simmers was scheduled to begin March 4, 1996.  The trial was continued for one week to allow Mr. Hicks and his investigator to interview Olsen.  Hicks and his investigator interviewed Kevin Olsen twice.  Hicks, Mahoney and Ernsdorf discussed Olsen's interview with Hicks and the pending charged and uncharged cases.  There was an agreement between Mr. Hicks, DPA Mahoney and Kevin Olsen's attorney, Gary Ernsdorf, that the pending matters under investigation wouldn't be discussed in the interviews.  Mr. Ernsdorf, therefore, was not present during these interviews.

21.  Olsen's PSP case was still pending when he testified in the Simmers' trial.  Olsen testified during direct and cross-examination that he had pending charges for possession of stolen property, that he was being held on that charge and burglary and that he had been arrested and was under investigation for fraud and forgery.  Mr. Hicks knew Olsen had charges pending with potential new additional charges and had not been sentenced yet.  Olsen was examined at length regarding his extensive criminal history, potential new charges, his absconding and arrest, his release and the motivation he had to cooperate in his pending cases.  He was also questioned on cross-examination about discrepancies between his original statements and trial testimony, his prior use of aliases, his drug convictions and addiction, his recent heroin withdrawal and his prior informant role.  Olsen's testimony and credibility were also effectively impeached by Assistant Chief of Police Hickock, Daryl Cloud, Hope Marsten, witnesses called by the defense.  Assistant Chief Hickock testified he had been in law enforcement for more than twenty years and had known Olsen for approximately 20 years.  Chief Hickock testified he had used Olsen as an informant and that Olsen was unreliable.  Daryl Cloud testified he could hear conversations between Olsen and defendant Simmers, and recalled two

4

51083084

conversations.  He testified Olsen initiated both conversations and the defendant always denied guilt.  Ms. Marsten's testimony impeached Olsen's account of the interview with attorney Hicks.

22.  The State's case was based on the defendant's confession and the physical and circumstantial evidence that corroborated it.  The defendant provided a very detailed description of the murder to police, including what the victim looked like, exactly how many times and where the victim was stabbed, how and where the victim was slashed on his face, the type of murder weapon, the condition of the weapon, and where it was thrown.  The defendant also demonstrated to the detectives how he grabbed the knife and slashed the victim across the face; how the victim turned; and how he stabbed him down the back.  The medical examiner and other physical evidence corroborated his confession.  The description given by the defendant was consistent with the testimony of the medical examiner.

23.  On March 27, 1996, after testifying in <u>State v. Simmers</u>, Olsen pled guilty to possession of stolen property in the second degree.  Olsen's attorney sought to include potential unfiled charges in the plea agreement.  DPA Margaret Nave testified that she agreed to resolve the unfiled charges after discussing it with Seattle Police Department Detectives who agreed the unfiled charges would be difficult to prove and were not very well presented.  In addition, Olsen's offender score of 10 exceeded the maximum for purposes of determining sentence range.  Olsen agreed to pay restitution in full to the victims on the charged and uncharged cases, to a recommendation for sentencing to the high end of the standard range and a recommendation against Work Ethic Camp.  Olsen and the State entered into the plea agreement on those terms.

24.  The agreement recited in Finding 23 is a standard practice and approach of the prosecutor's office.  Olsen's testimony in the <u>Simmers</u> case was not in any way taken into consideration by DPA Nave in negotiating his plea agreement.

25.  Olsen received no special treatment, compensation, or benefit from the State in negotiating and entering into the plea agreement for possession of stolen property in the second degree.  Kevin Olsen was treated no differently by the State than any other defendant with a similar criminal history and charges.

26.  The State did not request or obtain copies of the police incident reports listed in the PSP plea agreement from the Seattle Police Department until April 1997 when they were requested in conjunction with the Motion for New Trial.

27.  DPA Mahoney entered into a stipulation concerning the police reports for the unfiled charges at the hearing on defendant's Motion for a New Trial.  She stipulated that John Hicks, defendant's attorney, was never provided with

5

Exhibits 4, 5, 6 or 7 (the police reports for the unfiled charges). She did not have them nor did she seek to obtain them. DPA Mahoney did check records in the PAO to see if any charges had been filed but never checked with the Seattle Police Department. According to the stipulation, John Hicks was told there were pending charges and that Mr. Olsen was under investigation for fraud and forgery. John Hicks also discussed the charges with Olsen's attorney, Ernsdorf.

28. Several months after the State v. Simmers case, Mr. Olsen testified on behalf of the state in State v. Smiley, King County Cause No. 94-1-03702-8 SEA. Mr. Olsen testified about a conversation he had with Mr. Smiley in the King County jail. In preparation for cross-examination of Olsen, defense counsel for Mr. Smiley had obtained through discovery extensive information about Mr. Olsen including information about his past criminal conduct and documents from the Washington State Department of Corrections.

29. After the conclusion of State v. Smiley, appellate counsel for Mr. Simmers filed a CR 7.8 motion for a new trial in State v. Simmers based on the different and additional information obtained and used by defense counsel in cross-examination and impeachment of Olsen in State v. Smiley. Appellate counsel for Mr. Simmers requested the portion of the State v. Smiley transcript related to Mr. Olsen's testimony concerning his criminal history and copies of the documents produced by the Department of Corrections. This court granted appellate counsel's request for these documents and portions of the State v. Smiley trial transcript.

30. In the November, 1997 hearing on defendant's motion for a new trial, the State presented the testimony of Kevin Olsen concerning his testimony and plea agreement. In the State v. Simmers trial Olsen testified that he had never received any monetary compensation with the police. During the motion for a new trial hearing, Olsen again testified that he had never received any form of compensation for his past cooperation with police and prosecutors. On cross-examination by appellate counsel, Olsen testified that he had in fact received money from Crime Stoppers for information he had provided to police in State v. Thompson, State v. Simmers, and State v. Smiley. Olsen had not previously revealed this information to the State, the police or the defense.

31. Detectives Hopkins and Howe testified about Crime Stoppers. Appellate Counsel presented evidence through an affidavit. Seattle King County Crime Stoppers is comprised of citizens, law enforcement agencies and news media that pays cash rewards for information leading to an arrest and charge on all serious cases. Information received is provided to police agencies. Anonymity is guaranteed to the callers. Crime Stoppers verifies the reliability of the information. If it is reliable, the anonymous caller is eligible for some form of compensation. The civilian board of Crime Stoppers determines the amount, if

any, to be paid.  Compensation is not tied to testifying or the outcome of the case but whether the information is verified as reliable.

## CONCLUSIONS OF LAW

1.  The allegation that the State did not provide all of Olsen's criminal history to defense counsel in State v. Simmers was withdrawn by appellate counsel.  The State provided all of Olsen's criminal and conviction history.

2.  The allegation that the State did not reveal other state officials who found Olsen untrustworthy was withdrawn by appellate counsel.  Based on the information disclosed to the defense by the State, the defense through its own investigation identified Chief Hickock and called him as a witness.

3.  The State stipulated that the defense was not provided with the police reports of the charges under investigation when Olsen was arrested in February, 1996.  The State had an obligation to request and provide the police incident reports to the defense prior to trial.  The State did not request these or have them until the motion for a new trial.  However, information concerning Olsen's pending possession of stolen property charge and unfiled charges was available to defense counsel.  He knew Gary Ernsdorf was Olsen's attorney and could have followed up on this information.  Based on the arguments made outside the presence of the jury and the cross-examination conducted of Olsen, Simmer's attorney knew Olsen had potential new charges pending and had not been sentenced yet.  As described in the findings of fact, Olsen was cross-examined at length about his criminal history, arrest and pending charges.

4.  Olsen did not receive special consideration or any kind of benefit from the State in exchange for his testimony in the defendant's case.  There is no evidence of any agreement between the State and Olsen in exchange for testimony.

5.  Pursuant to Criminal Rule 4.7 (d) the Simmers defense could have subpoenaed the Department of Corrections documents as did defense counsel in State v. Smiley.

6.  There is no evidence that the State knew or should have known that Olsen had received money from Crime Stoppers or any other source for providing information.  There is no evidence that the State knew or should have known Olsen testified falsely that he had never received any benefit for his past cooperation with police and prosecutors.  If the prosecutor had knowledge of this information, they would have had an obligation to disclose.  If the defense had

7

sought information from Crime Stoppers under Criminal Rule 4.7 (d), a subpoena would have been issued.

7.  There is no reasonable likelihood Olsen's false testimony could have effected the jury's verdict.  The State neither focused its case nor relied heavily on Olsen's testimony.  Olsen was effectively cross-examined and impeached.  The State acknowledged his lack of reliability.  The State's case was based almost entirely on the defendant's confession and the physical and circumstantial evidence that corroborated his confession.  That evidence was overwhelming.  Olsen's testimony was not material.

8.  The evidence discovered since the trial could have been discovered before trial by exercising due diligence.  This information would be cumulative impeachment evidence.

9.  There is no reasonable possibility that the cumulative impeachment evidence would have changed the outcome of Simmers' trial.

10.  Defense counsel John Hicks took exception on behalf of Mr. Simmers to the court's decision to not include jury instructions on manslaughter.  But under State v. Lucky, the prevailing law at the time of trial, manslaughter was not a lesser included offense of murder.  Even if State v. Berlin, overruling State v. Lucky, had been decided when the Court instructed the jury in State v. Simmers, there was no evidentiary basis to give manslaughter instructions.  The second (factual) prong of the State v. Workman test was not met under the evidence presented at trial.  The jury was instructed on Murder in the First Degree and the alternative crimes of Murder in the Second Degree and/or Felony Murder in the Second Degree.  The jury was also instructed that the defendant should only be convicted of the lowest crime if there was a reasonable doubt as to which of two or more crimes that person is guilty.

11.  After the case had concluded the Washington Supreme Court overruled State v. Lucky in State v. Warden and State v. Berlin.  Because of the instructions given, and the absence of proof that the defendant did not commit murder and did not commit the lesser crime of manslaughter, the defendant's conviction for Murder in the First Degree remains valid.

Based on the foregoing findings of fact and conclusions of law, the defendant's motion for a new trial is denied.

DONE IN OPEN COURT this ___ day of _____ 199_

_____
JUDGE                    ANN SCHINDLER

# Exhibit J

Sub 153 - Mandate and Opinion of COA

51083084

DOC

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION I    00 JAN 26 PM 1: 44

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | KING COUNTY SUPERIOR COURT CLERK |
| Respondent, | ) | No. 38620-4-I SEATTLE, WA. |
| | ) | |
| v. | ) | MANDATE |
| | ) | |
| IAN MONROE SIMMERS, | ) | KING County |
| | ) | |
| Appellant. | ) | Superior Court No. 95-1-02102-2.SEA |
| | ) | |

**THE STATE OF WASHINGTON TO:**  The Superior Court of the State of Washington in

and for KING County.

.  This is to certify that the opinion of the Court of Appeals of the State of

Washington, Division I, filed on May 24, 1999, became the decision terminating review of

this court in the above entitled case on January 21, 2000.  An order denying a motion for

reconsideration was entered on July 1, 1999.· An order denying a petition for review was

entered in the Supreme Court on January 5, 2000.  This case is mandated to the Superior

Court from which the appeal was taken for further proceedings in accordance with the

attached true copy of the opinion.

c:    Kristin Sweeney  kcpa
      Suzanne Elliott
      Hon. Ann Schindler
      Indeterminate Sentencing Review Board



**IN TESTIMONY WHEREOF,** I have hereunto set my
hand and affixed the seal of said Court at Seattle, this
21st of January, 2000.

RICHARD D. JOHNSON
Court Administrator/Clerk of the Court of Appeals, State
of Washington, Division I.

153

51083084

A majority of the panel has
determined that this opinion will not be
printed in the Washington Appellate
reports but will be filed for public record
pursuant to RCW 2.06.040 IT IS SO
ORDERED.

F I L E

IN CLERK'S OFFICE
COURT OF APPEALS
STATE OF WASHINGTON-DIVISION I
DATE......MAY 2 4 1999........

CHIEF JUDGE

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

DIVISION I

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | NO. 38620-4-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| IAN MONROE SIMMERS, | ) | |
| | ) | |
| Appellant. | ) | FILED   MAY 2 4 1999 |

BECKER, J. -- Convicted of premeditated murder, Ian Simmers appeals

from an order denying his motion for a new trial. His motion was based on the

State's failure to disclose information undermining the credibility of one of the

State's witnesses. The witness had testified that Simmers admitted to lying in wait

for a victim. Simmers contends the jury may not have found premeditation if he

had been able to impeach the witness with the undisclosed information.

We affirm, holding there was no reasonable probability of a different

outcome even if the information had been disclosed. We further hold that

Simmers' admission that he made a decision to kill defeats the factual prong for a

lesser included offense instruction on manslaughter.

No. 38620-4-I\2

The victim was found dead on a jogging trail in Bothell, in March, 1995. He had been stabbed several times. Suspicion focused on Simmers, then 16 years old. After questioning by police, Simmers confessed. The State charged Simmers with one count of first degree premeditated murder with a deadly weapon or, alternatively, one count of second degree felony murder predicated on second degree assault with a deadly weapon.

Simmers was tried as an adult in March 1996. The State played the tape of Simmers' confession for the jury. The State also presented the testimony of Kevin Olsen, who had become acquainted with Simmers in jail. According to Olsen, Simmers told him "he was laying and waiting for anybody to come by to rob and kill", then spotted the victim and stabbed him to death. Simmers countered with an alibi defense, that he was at home on the night of the crime.

The jury convicted Simmers of premeditated murder. The court entered judgment and a sentence of 46 1\2 years and later denied a motion for a new trial.

## LESSER INCLUDED OFFENSE

Simmers assigns error to the trial court's decision not to include his proposed jury instructions on first degree manslaughter.

A defendant is entitled to a lesser included offense instruction if each of the elements of the lesser included offense is a necessary element of the offense as charged (the "legal prong"), and the evidence supports an inference that only the

51083084

No. 38620-4-I\3

lesser crime was committed (the "factual prong").[1]  Here, because the legal prong is satisfied,[2] the only issue is whether Simmers' conduct satisfies the factual prong. To satisfy the factual prong, it is not enough to argue that the jury may disbelieve the evidence of the greater crime; there must be affirmative evidence introduced by either party supporting a conclusion that only the lesser crime was committed.[3]

A defendant is guilty of first degree manslaughter when he "recklessly causes the death of another person".[4]  "A person is reckless or acts recklessly when he knows of and disregards a substantial risk that a wrongful act may occur and his disregard of such substantial risk is a gross deviation from conduct that a reasonable man would exercise in the same situation."[5]

Simmers contends the jury could have found that he committed only manslaughter from the statement he gave to police explaining that he got out his knife and cut the victim's face in reaction to being accosted and "socked" by the victim.  He relies on State v. Schaffer,[6] a case in which there was evidence that Schaffer reached for his gun and fatally shot the victim after the victim shook his fist and threatened to kill Schaffer.  The Supreme Court held it was error for the

---

[1] State v. Gostol, 92 Wn. App. 832, 835, 965 P.2d 1121 (1998), following State v. Berlin, 133 Wn.2d 541, 545-46, 947, P.2d 700 (1997).
[2] State v. Pettus, 89 Wn. App. 688, 700, 951 P.2d 284, review denied 136 Wn.2d 1010 (1998).
[3] State v. Brown, 127 Wn.2d 749, 754-55, 903 P.2d 459 (1995); see also State v. Gostol, 92 Wn. App. at 838.
[4] RCW 9A.32.060(1)(a).
[5] RCW 9A.08.010(1)(c).
[6] State v. Schaffer, 135 Wn.2d 355, 358, 957 P.2d 214 (1998).

51083084

No. 38620-4-I\4

trial court to refuse to instruct the jury on manslaughter because the jury could have found that Schaffer acted in the reasonable belief that he was in danger but "recklessly or negligently used excessive force to repel the danger he perceived."[7]

We distinguish this case from Schaffer in that the statement on which Simmers relies to prove manslaughter does not end with cutting the victim's face. If Simmers had done no more than cut the victim's face in response to being "socked", an instruction allowing the jury to find a mental state of recklessness may have been appropriate. But Simmers went on to say that after he cut the victim's face he made a decision to kill his victim in order to keep him from being a witness. When he "realized that the individual would likely go to the police", he knew he "had to finish the job," and he "decided to kill the individual." The victim died from the stab wounds inflicted after Simmers decided to kill him, not from the initial cuts to his face. From Simmers' description of the killing as a deliberate act, a jury could not find that he caused the victim's death with only a reckless state of mind.

Because the factual prong is not satisfied, the trial court properly refused to instruct on manslaughter.

### MOTION FOR NEW TRIAL

In November 1995, Kevin Olsen resided in a cell in the King County Jail next to Simmers. Olsen testified at Simmers' trial that Simmers described to him the murder he was charged with and admitted to committing it. Olsen further said his sole motivation for reporting Simmers to the police was the callous way

---

[7] State v. Schaffer, 135 Wn.2d at 358.

51083084

No. 38620-4-l\5

Simmers talked about the crime.  He expressly denied that he ever received any monetary compensation or otherwise benefited from his report to the police.

Simmers rigorously cross-examined Olsen about discrepancies between his original statements and trial testimony, his use of aliases in past criminal proceedings, and his prior convictions for drug offenses.  Simmers also elicited the testimony of the assistant chief of police of Edmonds, Washington, who said he had used Olsen as a police informant in the past and found him to be unreliable.  Finally, Olsen admitted there were pending charges against him for possession of stolen property, that he was being held both on those charges and on burglary, and that he had also been arrested and was under investigation for fraud and forgery.

Months later, after Simmers was convicted, Olsen testified as an informant for the State in an unrelated criminal case.  In preparation for cross-examination of Olsen in that case, the defendant's counsel obtained extensive information about Olsen's past criminal conduct from the State Department of Corrections.  This information revealed at least five additional instances of Olsen's criminal conduct that the State had not disclosed to Simmers.  Simmers, upon learning this, moved for a new trial.

At a hearing on the motion, the State stipulated that in the month before Simmers' trial, police reports existed showing that Olsen was under investigation for crimes involving fraud, stolen property, and passing a bad check.  Olsen unexpectedly revealed at the hearing that he had received about $200 from Seattle \ King County Crime Stoppers for providing information about Simmers.

-5-

No. 38620-4-I\6

Simmers argued a new trial was necessary because of the State's failure to disclose the pending investigations and because the Crime Stoppers evidence could have been used to impeach Olsen's testimony that he had received nothing of value in exchange for his cooperation with the police.

Due process under Brady v. Maryland[8] requires the State to disclose evidence that is both favorable to the accused and material to either guilt or punishment. The State must disclose any favorable evidence known to others acting on the government's behalf in the case, including the police.[9] While the State cannot avoid Brady by keeping itself ignorant of matters known to other state agents, it has no duty to search for exculpatory evidence.[10] There is no Brady violation if the defendant, using reasonable diligence, could have obtained the information at issue.[11] Evidence is "material" with respect to a Brady violation only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceedings would have been different.[12] In applying this reasonable probability standard, the "question is not whether the defendant would more likely than not have received a different verdict with the evidence, but

---

[8] Brady v. Maryland, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).
[9] Kyles v. Whitley, 514 U.S. 419, 437, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995).
[10] State v. Judge, 100 Wn.2d 706, 717, 675 P.2d 219 (1984).
[11] In re Personal Restraint Petition of Gentry, 137 Wn.2d 378, 972 P.2d 1250 (1999).
[12] In re Personal Restraint Petition of Gentry, 137 Wn.2d at 396.

No. 38620-4-I\7

whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence."[13]

Even when the State has no duty under Brady to disclose favorable evidence, a defendant may still obtain a new trial under CrR 7.8 on the basis that the evidence was newly discovered. To establish the right to a new trial as a result of newly discovered evidence, the defendant must prove that the evidence (1) will probably change the result of the trial; (2) was discovered after the trial; (3) could not have been discovered before trial by the exercise of due diligence; (4) is material; and (5) is not merely cumulative or impeaching.[14] A new trial may be denied if any one factor is absent.[15]

Simmers claims that the trial court erred in concluding the State had no obligation to request and provide the police reports concerning Olsen. The court in fact concluded the opposite, but decided that Simmers could have obtained the reports himself using reasonable diligence; the reports were cumulative; and they were not material.

We need not review the finding that Simmers could have found out about the new police reports through due diligence. It is clear the trial court did not err in concluding they were not material to the case. The police reports were merely cumulative of other information the jury heard about Olsen's recent criminal

---

[13] Kyles v. Whitely, 514 U.S. at 434; In re Personal Restraint Petition of Gentry, 137 Wn.2d at 396.
[14] State v. Ieng, 87 Wn. App. 873, 878, 942 P.2d 1091 (1997), review denied, 134 Wn.2d 1014 (1998).

-7-

51083084

No. 38620-4-I\8

conduct.  As impeachment evidence, they were far less compelling than the testimony of the assistant police chief that Simmers was an unreliable informant.

In <u>United States v. Agurs</u>,[16] the State did not disclose before trial that the victim, Sewall, had a criminal record, including guilty pleas for assault and carrying a deadly weapon.  This information would have supported a theory of self-defense for the defendant.  But the United States Supreme Court concluded the evidence of Sewall's prior record was not material because it was "largely cumulative of the evidence that Sewall was wearing a bowie knife in a sheath and carrying a second knife in his pocket".[17]  Similarly, there is no reasonable probability here that had the State disclosed the additional police reports to Simmers before trial, the result of his trial would have been different.

Simmers also claims that the trial court erred in concluding there was no evidence that the State knew or should have known that Olsen received payment for providing information.  Crime Stoppers, the court found, is an organization "comprised of citizens, law enforcement agencies and news media that pays cash rewards for information leading to an arrest and charge on all serious cases. Information received is provided to police agencies.  Anonymity is guaranteed to the callers."

---

[15] <u>State v. Ieng</u>, 87 Wn. App. at 878.
[16] <u>United States v. Agurs</u>, 427 U.S. 97, 100-01, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976).
[17] <u>United States v. Agurs</u>, 427 U.S. at 114.

No. 38620-4-I\9

Simmers contends that because Crime Stoppers is a "police" agency, the State had access to the knowledge that Crime Stoppers paid Olsen for his information. The record does not require a finding that Crime Stoppers is a police agency. A police detective testified at the hearing that when an individual calls Crime Stoppers, the individual is assigned a number which is not associated with a name. He said informants, even when they receive an award, are "not ever associated with name or specific information other than if that number had been reliable in the past." This testimony supports the court's finding and effectively rebuts Simmers' argument that the prosecutor could have found out from Crime Stoppers about the payment to Olsen.

Simmers relies on several cases from other states holding that Crime Stoppers information is discoverable and can be used for impeachment: Balentine v. State,[18] People v. Richmond,[19] and Crawford v. State.[20] These cases are not on point because they involve situations in which the existence of potentially useful Crime Stoppers information was known to the defendant at the time of trial. In this case, the information was discovered after the trial was over. The question here is not whether such information is discoverable or admissible, but whether its discovery after trial makes a new trial necessary. We hold both that the State had

---

[18] Balentine v. State, 707 P.2d 922, 929 (Alaska Ct. App. 1985).
[19] People v. Richmond, 201 Ill. App. 3d 130, 138, 559 N.E.2d 302, 147 Ill. Dec. 302 (1990).
[20] Crawford v. State, 892 S.W.2d 1, 4 (Tex. Crim. App. 1994).

51083084

No. 38620-4-I\10

no <u>Brady</u> obligation to seek out and disclose the Crime Stoppers information; and

that even if it had such an obligation, the omission does not undermine confidence

in the verdict.

Affirmed.

WE CONCUR:

# Exhibit K

Sub 158 - Defense Motion

FILED
2019 FEB 14 09:00 AM
KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE #: 95-1-02102-2 SEA

IN THE SUPERIOR COURT FOR THE STATE OF WASHINGTON
KING COUNTY

STATE OF WASHINGTON,

                       Plaintiff,

    vs.

IAN MONROE SIMMERS,

                      Defendant.

No. 95-1-02102-2

DEFENDANT IAN SIMMERS'S MOTION FOR RELIEF PURSUANT TO CRIMINAL RULE 7.8

## I.    MOTION

Defendant Ian Monroe Simmers, by and through his attorney, Maureen Devlin, hereby moves for an order of relief pursuant to CrR 7.8 in King County Superior Court No. 95-1-02102-2.

This motion is based on Washington Rules of Criminal Procedure 7.8, RCW 10.73.100, the attached affidavit of counsel, and the attached Exhibits.

A.    PROCEDURAL HISTORY

In March 1996, Mr. Simmers was convicted by a jury of First-Degree Murder for the March 1995 death of Rodney Gochanour.  Exhibit A.  At the time of Mr. Gochanour's death and Mr. Simmers's arrest, Mr. Simmers was 16 years old. He was sentenced to 560 months in prison. Exhibit A.  Mr. Simmers's appealed his conviction on the grounds of failure to include a lesser-included offense in the jury instructions.  Mr. Simmers had previously moved for a new trial on

MAUREEN T. DEVLIN
LAW OFFICE OF DAVID B. ZUCKERMAN
705 Second Avenue, Suite 1300
Seattle, Washington 98104
(206) 538-5302

the basis of newly discovered evidence; specifically, that a jailhouse informant had failed to disclose receiving payment from Crime Stoppers for his assistance in Mr. Simmers's case. The trial judge denied the motion for new trial.  The appeal of the denial for motion for new trial was reviewed by the Court of Appeals along with the direct appeal, and Mr. Simmers's conviction was upheld.  *State v. Simmers*, 95 Wn. App. 1049 (1999), *rev. denied*, 139 Wn.2d 1017, 994 P.2d 849 (2000).  Mr. Simmers has filed no additional legal challenges to his conviction.  In January 2016, the Indeterminate Sentence Review Board (ISRB) conducted a hearing in Mr. Simmers's case pursuant to RCW 10.95.030.  Following the hearing, the ISRB issued a decision denying release.  The denial appears to have been based in large measure on Mr. Simmers's inability to answer questions about the details of the murder and of Mr. Simmers's state of mind during the murder. Exhibit B.

B.      EVIDENCE AT TRIAL AND CONCERNS OVER VALIDITY OF CONFESSION

         The specific evidence relied upon for this motion is evidence now available calling into question the validity of the statement Mr. Simmers made while in police custody, in which he confessed to the murder of Mr. Gochanour. There are additional circumstances, which makes reliance on this questionable statement especially significant.

         Evidence presented against Mr. Simmers at trial was remarkably scant. In fact, while there were hours of testimony concerning the crime scene, the investigation, and the condition of the body, the sum total of the evidence presented connecting Mr. Simmers to this murder consisted of: 1) the statement of a jailhouse informant, who testified that Mr. Simmers had made incriminating statements to him; and 2) Mr. Simmers's statement to the police.  The credibility of the jailhouse informant has been called into serious question following the revelation that the informant lied under oath about receiving compensation for his assistance in the case against Mr. Simmers.  *See State v. Simmers,* supra. Defense counsel called the Edmonds Chief of Police as a

DEFENDANT SIMMERS'S MOTION FOR
RELIEF PURSUANT TO CRR 7.8 - 2

MAUREEN T. DEVLIN
LAW OFFICE OF DAVID B. ZUCKERMAN
705 Second Avenue, Suite 1300
Seattle, Washington 98104
(206) 538-5302

witness at trial who testified that this informant was not reliable. 3/20/96 RP 130.[1] It is

extremely unlikely that the State would present this informant as a witness at a subsequent trial.

There was absolutely no forensic evidence of any kind presented linking Mr. Simmers to

the crime. At the time of trial, no fingerprints were found on the knife. 3/18/96 RP 84-87. A

stipulation was entered into that Mr. Simmers could not have been the source of blood on the

knife. 3/20/96 RP 81-82. DNA evidence was presented but did not implicate Mr. Simmers. There

was no testimony that any physical evidence was found on Mr. Simmers's person or at his home.

There was no evidence presented that anything of Mr. Gochanour's was found on Mr. Simmers

or at his home. Mr. Gochanour's body was found in a wooded area off the Burke

Gilman/Sammamish trail, in an area full of foliage, brambles, and mud. *Id.* at 18, 26. Mr.

Gochanour's body had vines wrapped up between his legs. *Id.* at 32. There was no evidence

presented that Mr. Simmers's clothing or body showed signs of having been in such an area.

Likewise, there was no evidence presented indicating that Mr. Simmers's body showed signs of a

recent physical altercation. Boots were found near the body - in the river. *Id.* at 59. A tracking

expert testified at trial that the only footprints near the body were boot prints. *Id.* at 76. The

boot prints were "something like" the boots found near the body. *Id.* at 29, 37. There was no

evidence presented that Mr. Simmers owned or ever wore boots like those that made the tracks.

Mr. Simmers presented an alibi at trial: three family members testified at trial that Mr. Simmers

was home on the night of the murder. *Id.* at 140, 183-184, 216, 218. The murder location was in

the Bothell section of the trail; trial testimony from Mr. Simmers' mother was that Bothell was

approximately 20 miles from Mr. Simmers's home. *Id.* at 138. Family members testified that

Mr. Simmers did not have a key to a family car (*Id.* at 146, 186), that no one heard a car that

night (*Id.* at 146), and that Mr. Simmers did not have access to a working bicycle (*Id.* at 198).

Mr. Simmers's mother testified that it was "absolutely impossible" that Mr. Simmers could have

---

[1] Citations to Superior Court transcripts are referred to as "Date RP Page."

MAUREEN T. DEVLIN
LAW OFFICE OF DAVID B. ZUCKERMAN
705 Second Avenue, Suite 1300
Seattle, Washington 98104
(206) 538-5302

left the house late Friday night and then returned without her knowing. 3/20/96 RP 169. Mr.
Simmers's step-father testified that Mr. Simmers could perhaps have left the home without him
hearing, but Mr. Simmers's could not have returned home without him hearing, in part due to
family dogs that routinely barked when anyone entered the home. *Id.* at 199-200. A stipulation
was entered into that there was no bus service between Mr. Simmers's home and the murder
location during the relevant time period. *Id.* at 207.

Given the lack of physical or forensic evidence against Mr. Simmers and the lack of
credibility of the jailhouse informant, the only evidence left against Mr. Simmers is his own
statement made in police custody. Because the validity of that statement has become so critical
to the integrity of this conviction, undersigned counsel sought expert advice about the
circumstances under which the statement was obtained by a recognized expert in the science of
false confessions, Professor Steven A. Drizin of Northwestern University's Pitzker School of
Law. Professor Drizin and his team reviewed Mr. Simmers's statement, as well as the entire trial
transcript, and all discovery provided to defense counsel, and considered these materials in
conjunction with his research into the reality of false juvenile confessions. Based on that review
and analysis, Professor Drizin concluded that there are serious concerns about the reliability of
Mr. Simmers's statement. He would testify accordingly at any new trial. Professor Drizin
provided a preliminary report to undersigned counsel, which could be made available to this
Court if the Court wishes. A transcript of the custodial statement made by Mr. Simmers is
attached as Exhibit C. Defense counsel provided Professor Drizin's report to the King County
Prosecutor's Office, beginning a dialogue about the integrity of this conviction and a reopening
of the investigation.

The advances in scientific understanding of the reality of false confessions will be
addressed in greater detail below. Even without those advances, a careful review of Mr.
Simmers's statement shows the statement to be suspect. To begin with, Mr. Simmers's

DEFENDANT SIMMERS'S MOTION FOR
RELIEF PURSUANT TO CRR 7.8 - 4

MAUREEN T. DEVLIN
LAW OFFICE OF DAVID B. ZUCKERMAN
705 Second Avenue, Suite 1300
Seattle, Washington 98104
(206) 538-5302

statement was rife with factual errors. For instance, the murder was committed in the very early morning hours of Saturday, March 11, 1995 (sometime after midnight of Friday, March 10). Exhibit A; 3/18/96 RP 94, 128; Exhibit D. At the time of the custodial interview, Mr. Simmers was facing pending charges for arsons and boat prowls that occurred on Sunday, March 12, 1995, in the early morning hours. Exhibit E. In Mr. Simmers's statement, he insisted that the murder occurred on a Saturday night and that it occurred on the same night as the arsons.  The officers appear to brush off this significant inconsistency as Mr. Simmers being "confused."  In Mr. Simmers's statement to the police, he also stated that he did not get together with his co-defendant for the boat prowls and arsons until Saturday evening.

In his custodial statement, Mr. Simmers was also flat-out wrong about where the murder took place.  After initially saying it was near Woodinville, one of the officers twice told him it took place near Bothell.

Additionally, in pre-recording conversations, Mr. Simmers also confessed to previously killing 13 other people.  3/15/96 RP 108.  There was absolutely no follow up on this, suggesting that the officers did not find Mr. Simmers credible in his admissions to any murder other than that of Mr. Gochanour.

Mr. Simmers made statements that could be immediately proven false during the actual interrogation. For example, he said he had a bruise on his ribs from where the victim hit him; the notes from the pre-recording conversation state that the officers saw no signs of bruising or injury to Mr. Simmers.  As another example, during his interview, Mr. Simmers stated unequivocally that he was still wearing he same clothes that he was wearing during the murder. These clothing items were sent to the crime lab for analysis. The forensic report, attached as Exhibit F, does not appear to have been introduced at trial but would be introduced at a new trial; the report found that blood was indeed found on the pant leg of Mr. Simmers, but Mr. Gochanour was eliminated at the source of that blood.  Additionally, Mr. Simmers stated that he had the

DEFENDANT SIMMERS'S MOTION FOR
RELIEF PURSUANT TO CRR 7.8 - 5

MAUREEN T. DEVLIN
LAW OFFICE OF DAVID B. ZUCKERMAN
705 Second Avenue, Suite 1300
Seattle, Washington 98104
(206) 538-5302

1    knife tucked into his clothing or pocket, in the back of his pants while walking and took the knife

2    from that location.  Interestingly, there was no testimony or evidence of a sheath being used or

3    found near the crime scene or in a search of Mr. Simmers's home. During Mr. Simmers's

4    custodial interview, there was no follow-up questioning of Mr. Simmers regarding how exactly

5    he managed to walk along the trail while carrying a long, unsheathed knife next to his body.

6         Significantly, Mr. Simmers's description of the knife used in the murder did not match

7    the description of the actual knife.  During his interview, Mr. Simmers drew a picture of the

8    knife he allegedly used in the murder; undersigned counsel expects that the State will concede

9    that the knife drawn did not look like the knife actually used. Testimony of one of the officers

10   agreed that the drawing did not match the knife.  3/15/96 RP 157-58. Mr. Simmers was also

11   wrong in the "reenactment" portion of his statement about the number of stabbing motions he

12   made during the attack on Mr. Gochanour.  In his statement, Mr. Simmers said that he stabbed

13   the victim six times.  While it is true that the victim suffered six stab wounds, there were eight

14   knife holes in the victim's shirt, indicating that the murderer had made contact with the victim's

15   person eight times. 3/20/96 RP 78-79. Mr. Simmers did not state in his interview that two of his

16   stabbing attempts only made contact with the victim's clothing.

17        Mr. Simmers was also wrong in his physical description of the victim. The investigation

18   notes prior to the tape recorder being turned on indicate that Mr. Simmers volunteered he would

19   not have murdered a "bum."  This was noted as an indication that Mr. Simmers must have some

20   inside information about the victim.  In fact, though, the victim was not a transient person;

21   testimony indicated that he lived with family. 3/18/96 RP 12.  Mr. Gochanour was described in

22   trial testimony as looking perhaps a bit disheveled or rumpled, but not like a "bum" or

23   "transient."  3/20/96 RP 87; 3/15/96 RP 10.

24        In his custodial statement, Mr. Simmers also inexplicably left out bits of information that

25   were unique to the facts of the murder that would have been known by the actual murderer.  For

DEFENDANT SIMMERS'S MOTION FOR
RELIEF PURSUANT TO CRR 7.8 - 6

MAUREEN T. DEVLIN
LAW OFFICE OF DAVID B. ZUCKERMAN
705 Second Avenue, Suite 1300
Seattle, Washington 98104
(206) 538-5302

1  instance, the victim's construction-type boots had been removed and discarded.  Despite

2  prodding by the interviewing officer, Mr. Simmers said he did not remove any shoes or clothing

3  from the victim.

4        The circumstances surrounding Mr. Simmers's interview create additional concerns over

5  the validity of the statement.  Discovery materials provided to undersigned counsel, which would

6  be presented at new trial, show that this 16-year-old child had a serious inhalant abuse problem

7  and had abused alcohol and other drugs.  Moreover, the discovery and pre-trial testimony

8  indicated Mr. Simmers was enrolled in special education classes due to emotional and behavioral

9  issues, including attention deficit disorder. 3/12/96 RP 20. Mr. Simmers was interviewed alone

10  in an interrogation room with no parent, lawyer, or other support person present, and after having

11  already spent nearly 10 hours in police custody.  Mr. Simmers would testify that he recalls being

12  very tired, sleeping in a cell, and initially saying he did not wish to make a statement. The

13  recorded portion of the interview lasted a mere 27 minutes.  Clearly, there were extensive

14  discussions that took place in advance of the tape recorder being turned on, for which there are

15  scant notes. There was also plenty of opportunity for such pre-recorded discussion to take place.

16  For example, during his time in police custody, Mr. Simmers traveled via patrol car to the site of

17  the boat prowls and arsons.  3/20/96 RP 40, 42-45.  At trial, one of the officers acknowledged

18  that there was some "back and forth" and asking Mr. Simmers "whether he had been involved,

19  that we believed he was." *Id.* at 54.  We can surmise that there were in fact discussions

20  conducted off tape by some of the discussion after the tape was turned on. For instance, one of

21  the first things the officer says is that he would ask questions about "when the knife came into

22  play…."  This would have been an odd thing to say if it had not been discussed previously.

23  However, there are no notes indicating that this particular discussion took place.

24        The custodial interview demonstrates a heavy reliance on the so-called Reid techniques

25  for interrogation.  One of the interviewing officers testified at trial that he was trained in the Reid

DEFENDANT SIMMERS'S MOTION FOR
RELIEF PURSUANT TO CRR 7.8 - 7

method. 3/14/96 RP 74. An interviewing officer admitted to using "ruses;" for example, falsely telling Mr. Simmers that his co-defendant had confessed and had told the officers where to find the knife. 3/20/96 RP 55-59. As discussed in Professor Drizin's report and below, those techniques have now been shown to be particularly dangerous when used with juvenile interviewees because of the susceptibility of juveniles to false confessions. The specific Reid techniques used in Mr. Simmers's interview include the interrogating officer falsely telling Mr. Simmers that he had evidence linking Mr. Simmers to the murder, that a co-defendant had implicated Mr. Simmers, and that the co-defendant had shown the officers the location of the knife. The officer appealed to Mr. Simmers's ego (another Reid technique) by suggesting that he needed to tell him what happened so that others would not think he was the sort of person who killed for no reason. In classic Reid form, the officer gave Mr. Simmers an "out" of sorts by encouraging Mr. Simmers to believe he had "blanked out." The officer also provided Mr. Simmers a suggested way of minimizing his guilt. The officer, on his own and prior to any such suggestion from Mr. Simmers, said he had "heard rumors" that the victim had "accosted" people on the trail and asked if Mr. Simmers was "only trying to defend himself." Mr. Simmers then agreed that this was indeed what happened. The officer made comments rather than asking questions at several points. For instance, the officer told Mr. Simmers that "later that evening you had cause to be on the Burke-Gilman Trail." Another example is when Mr. Simmers says he knew exactly what time the murder took place, but then admitted he had no watch on. The officer corrects Mr. Simmers, saying "so all you know necessarily is that it was dark." (This is significant because Mr. Simmers said in his statement that the time of the murder was around 9:15 p.m. Subsequent investigation and trial testimony confirmed that the victim was alive until after midnight. The State actually amended the charging document to reflect that the date of the offense was Saturday, March 11th rather than the originally charged Friday, March 10th. Exhibit G.

MAUREEN T. DEVLIN
LAW OFFICE OF DAVID B. ZUCKERMAN
705 Second Avenue, Suite 1300
Seattle, Washington 98104
(206) 538-5302

C.    NEWLY DISCOVERED SCIENTIFIC UNDERSTANDING OF ADOLESCENT
BRAIN DEVELOPMENT AND NEW RESEARCH RELATING TO THE
PHENOMENON OF FALSE CONFESSIONS AND THE INCREASED RISK THAT
JUVENILES ARE SUSCEPTIBLE TO FALSELY CONFESSING CASTS
SUBSTANTIAL DOUBT ON THE VALIDITY OF MR. SIMMERS'S CUSTODIAL
STATEMENTS AND THUS ON THE INTEGRITY OF THE CONVICTION

Criminal Rule 7.8 states, in pertinent, part as follows:

(b) Mistakes; Inadvertence; Excusable Neglect; Newly Discovered Evidence;
Fraud; etc. On motion and upon such terms as are just, the court may relieve a
party from a final judgment, order, or proceeding for the following reasons:

(2) Newly discovered evidence which by due diligence could not have been
discovered in time to move for a new trial under rule 7.5.

Since Mr. Simmers's trial, there have been an abundance of scholarly studies on the

phenomenon of false juvenile confessions. The data and scholarly research show a disturbing

truth: juveniles can and do make false confessions at an alarmingly high rate. Since Mr.

Simmers's trial, there has been increased scholarly study of juvenile brain development and the

psychological and social reasons for these false juvenile confessions.  Professor Drizin's report

details the increased understanding of juvenile cognition we now have that makes juveniles

particularly susceptible to falsely confessing.

At the time of Mr. Simmers's 1996 trial, the legal community did not understand juvenile

brain development or the reality of false confessions the way we now do.  It was hard to imagine

a young person would admit to a violent crime that he had in fact not committed. The adolescent

brain was not considered to be wired much differently from an adult brain in any way that would

significantly affect the criminal justice process.  Neuro-imaging and neuro-scientific research

have demonstrated that, far from being fixed, the adolescent brain is in a state of flux, and is still

growing, changing, and maturing well past the teenage years. This is especially true for the pre-

frontal cortex area of the brain, which is associated with executive functioning.  Executive

functions are those that help us make reasoned rather than impulsive or emotional decisions; to

plan, to organize our thoughts, and to connect actions to consequences. Attached as Exhibit H is

MAUREEN T. DEVLIN
LAW OFFICE OF DAVID B. ZUCKERMAN
705 Second Avenue, Suite 1300
Seattle, Washington 98104
(206) 538-5302

an excellent article succinctly discussing the science of the adolescent brain, *The Adolescent Brain,* by B.J. Casey, Rebecca M. Jones, and Todd A. Hare Sackler Institute, Weill Medical College of Cornell University, New York, New York (2008).

We now know that the young brain is simply not equipped, on a sheer physical level, to work like an adult brain.  Legal standards are catching up with developments in brain science. The United States Supreme Court in *Miller v. Alabama*, 567 U.S. 460, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012), in finding mandatory life without parole unconstitutional noted that that "hallmark features" of the adolescent brain include, "immaturity, impetuosity, and failure to appreciate risks and consequences." *Id.* at 477.

These "hallmark features" of the adolescent brain make youthful suspects particularly ill-suited to engage in the high-stakes risk-benefit analysis inherent in any psychological interrogation.  When today's sophisticated psychological interrogation tactics are deployed, the pressure brought to bear can produce a "frighteningly high percentage" of people to confess to crimes they did not commit.  *See Corley v. United States*, 556 U.S. 303, 321, 129 S.Ct. 1558, 173 L.Ed.2d 443 (2009), citing, Drizin & Leo, *The Problem of False Confessions in the Post-DNA World,* 82 N. C. L. Rev. 891, 906-907 (2004).  When they are deployed against softer targets like children and teenagers, the risk of false confessions is "all the more acute." *J.D.B. v. North Carolina*, 564 U.S. 261, 269, 131 S.Ct. 2394, 180 L.Ed.2d 310 (2011).

At the time of Mr. Simmers's interrogation, few if any police officers contemplated that standard psychological interrogation tactics, especially when used on youthful suspects, could produce false confessions.  Today, there is widespread recognition that young people are particularly at risk of false confessions when questioned by police. The International Association of Chiefs of Police (IACP), the world's largest police executive membership association, has embraced this principle: "Over the past decade, numerous studies have demonstrated that juveniles are particularly likely to give false information – and even falsely confess – when

DEFENDANT SIMMERS'S MOTION FOR
RELIEF PURSUANT TO CRR 7.8 - 10

MAUREEN T. DEVLIN
LAW OFFICE OF DAVID B. ZUCKERMAN
705 Second Avenue, Suite 1300
Seattle, Washington 98104
(206) 538-5302

questioned by law enforcement." *See* Int'l Ass'n of Chiefs of Police, *Reducing Risks: An Executive's Guide to Effective Juvenile Interview and Interrogation* (2012) (IACP Guide), available at: http://www.theiacp.org/portals/0/pdfs/ReducingRisksAnExecutiveGuidetoEffectiveJuvenileInterviewandInterrogation.pdf at 1. Even John E. Reid & Associates, Inc., the industry leaders in interrogation training, similarly explains that "[i]t is well accepted that juvenile suspects are more susceptible to falsely confess than adults," John E. Reid & Assoc., Inc., Investigator Tips, March-April 2014,[2] and warns: "[E]very interrogator must exercise extreme caution and care when interviewing or interrogating a juvenile." John E. Reid & Associates, Inc., *Take Special Precautions When Interviewing Juveniles or Individuals With Significant Mental or Psychological Impairments.*[3]

Empirical and laboratory research studies reinforce and corroborate these conclusions. The leading study of 125 proven false confessions, cited by the U.S. Supreme Court in *Corley*, 556 U.S. at 320-21, and *J.D.B.*, 564 U.S. at 268-70, found that 63% of false confessors were under the age of twenty-five and 32% were under eighteen. Drizin & Leo, *The Problem of False Confessions in the Post-DNA World*, 82 N.C. L. REV. at 945. Professor Brandon Garrett's study of the first sixty-six false confessions in the Innocence Project's DNA Exoneration database, found that "over one-third" of those who falsely confessed were juveniles. Brandon Garrett, *Contaminated Confessions Revisited*, 101 VIRGINIA L. REV. 395, 400 (2015). Another respected study of 340 exonerations found that individuals under the age of eighteen were much more likely to falsely confess as adults. Samuel R. Gross, et al., *Exonerations in the United States, 1989 Through 2003*, 95 J. Crim. L. & Criminology 523, (2005). A more recent study found that a false confession contributed to almost twice as many wrongful conviction cases when the

---

[2] *See* http://www.reid.com/educational_info/r_tips.html?serial=20140301&print=[print]

[3] *See* http://www.reid.com/pdfs/20120929d.pdf

DEFENDANT SIMMERS'S MOTION FOR
RELIEF PURSUANT TO CRR 7.8 - 11

MAUREEN T. DEVLIN
LAW OFFICE OF DAVID B. ZUCKERMAN
705 Second Avenue, Suite 1300
Seattle, Washington 98104
(206) 538-5302

accused was a youth, rather than an adult. Joshua A. Tepfer, Laura H. Nirider, & Lynda Tricarico, *Arresting Development: Convictions of Innocent Youth*, 62 Rutgers L. Rev. 887, 904 (2010). And a laboratory study astonishingly found that a *majority* of young participants complied with a request to sign a false confession without uttering a word of protest. Allison D. Redlich & Gail S. Goodman, *Taking Responsibility For an Act Not Committed: Influence of Age and Suggestibility*, 27 L. & Hum. Behav. 141, 150-51 (2003).

In the more than two decades since Mr. Simmers was arrested, there has been a sea change in understanding about adolescent brain development and the causes and consequences of false confessions. Little or none of this information was available at the time to police, prosecutors, defense attorneys, judges or juries in confession cases. This new corpus of research provides a new lens with which to analyze Mr. Simmers's confession and to re-evaluate the integrity of his conviction. It is "newly discovered evidence" and when it is applied to Mr. Simmers's case, it reveals a lack of integrity to his conviction.

Washington courts employ a five-factor test for determining when to provide a new trial on the basis of newly discovered evidence. *See State v. Statler*, 160 Wn. App. 622, 632, 248 P.3d 165, 170-71, *rev. denied*, 172 Wn.2d 1002, 257 P.3d 666 (2011).

A trial court will not grant a new trial on the basis of newly discovered evidence unless the moving party demonstrates that the evidence "(1) will probably change the result of the trial; (2) was discovered since the trial; (3) could not have been discovered before trial by the exercise of due diligence; (4) is material; and (5) is not merely cumulative or impeaching." *State v. Williams*, 96 Wn.2d 215, 223, 634 P.2d 868 (1981) (emphasis omitted).

The newly discovered evidence invokes the constitutional rights of Mr. Simmers to due process and a fair trial under Article One, sections 3 and 22 of the Washington Constitution and the Sixth Amendment to the United States Constitution. This newly discovered evidence meets the requirements for granting a new trial under the five-factor analysis of *Williams*. As to the

DEFENDANT SIMMERS'S MOTION FOR
RELIEF PURSUANT TO CRR 7.8 - 12

MAUREEN T. DEVLIN
Law Office of David B. Zuckerman
705 Second Avenue, Suite 1300
Seattle, Washington 98104
(206) 538-5302

first *Williams* factor, the evidence would certainly change the result of the trial. At trial, as noted above, no forensic or physical evidence of any kind whatsoever linked Mr. Simmers to this murder, and the only other piece of evidence presented against Mr. Simmers, the testimony of the jailhouse informant, has been called into serious question. In a new trial, the defense would present expert testimony regarding the new scientific understanding of the reality of false juvenile confessions, the particular susceptibility of juveniles to falsely confessing after certain interrogation techniques are employed, the nature of the adolescent brain, and the specific factors in Mr. Simmers's interview that raise concerns over the validity of his statements.

Taken together, this would cast significant doubt on the only remaining bit of evidence against Mr. Simmers: the custodial statement. A jury hearing this new evidence would be unlikely to find Mr. Simmers statement to be a valid "confession" and would be likely to acquit.

As to the second and third *Williams* factors, the evidence regarding false juvenile confessions was discovered since trial and could not have been known to Mr. Simmers by his exercise of due diligence because such scientific research and data analysis methods simply did exist at the time of trial. As to the fourth *Williams* factor, the evidence is clearly material in that it casts doubt on the only piece of evidence remaining against Mr. Simmers. Finally, regarding the fifth factor, this evidence is not merely cumulative or impeaching. No evidence regarding the trustworthiness of juvenile confessions or the nature of the adolescent brain was presented at trial.

D.    THIS MOTION IS TIMELY UNDER RCW 10.73.100

While RCW 10.73.090 generally sets a one-year time limit for collateral attacks on convictions, the one-year limit is inapplicable when the collateral motion is based on newly discovered evidence.

RCW 10.73.100 states in relevant part:

The time limit specified in RCW 10.73.090 does not apply to a petition or motion that is based solely on one or more of the following grounds:

(1)    Newly discovered evidence, if the defendant acted with reasonable diligence in discovering the evidence and filing the petition or motion.

Mr. Simmers's undersigned counsel, who has been working pro bono on this investigation and motion, received Professor Drizin's preliminary report on May 5, 2017. The report was then promptly attached to a letter from defense counsel and sent to the King County Prosecutor on May 8, 2017. Since receiving defense counsel's letter and Professor Drizin's report, the King County Prosecutor and defense counsel have been working diligently and cooperatively to determine what steps should be taken next. As will no doubt be set forth in detail in the State's response to this motion, the prosecutor's office has taken extraordinary steps to further investigate this matter, including conducting additional DNA testing, interviewing witnesses and police officers, interviewing Mr. Simmers, and consulting with Mr. Simmers's trial lawyers. Mr. Simmers, through undersigned counsel, has welcomed and helped facilitate some of these interviews.

Within the last several weeks, the last of the advanced, sophisticated DNA testing results have come back. The results are attached as Exhibit I. This new testing was conducted using newly developed, cutting edge technology called STR-MIX, which allows for testing of complex and mixed DNA samples, which previously could not be tested accurately. The results found that Mr. Simmers is excluded as being a possible donor of the mixture of DNA found on the knife and on the fingernail clippings of the victim. After further discussions with the prosecuting attorney's office, we have now reached the point where this motion for new trial has become necessary.

MAUREEN T. DEVLIN
LAW OFFICE OF DAVID B. ZUCKERMAN
705 Second Avenue, Suite 1300
Seattle, Washington 98104
(206) 538-5302

## II.    CONCLUSION

For the above reasons, this Court should grant Mr. Simmers's motion pursuant to CrR 7.8 to vacate this conviction.

DATED this 13th day of February, 2019.

Respectfully submitted:

s/Maureen T. Devlin
WSBA 23911
Law Office of David B. Zuckerman
705 Second Avenue, Suite 1300
Seattle, WA 98104
Phone (206) 538-5302
Fax (206) 623-2186
Email: maureen@davidzuckermanlaw.com

DEFENDANT SIMMERS'S MOTION FOR
RELIEF PURSUANT TO CRR 7.8 - 15

MAUREEN T. DEVLIN
LAW OFFICE OF DAVID B. ZUCKERMAN
705 Second Avenue, Suite 1300
Seattle, Washington 98104
(206) 538-5302

1

## CERTIFICATE OF SERVICE

2
I hereby certify that on the date listed below, I served one copy of the foregoing

3
document by email on the following:

4
**VIA EMAIL ONLY**
5
Ms. Carla Carlstrom
Deputy King County Prosecuting Attorney
6
Email: Carla.carlstrom@kingcounty.gov

7
DATED this 13th day of February, 2019.

8

9
s/Maureen T. Devlin

WSBA 23911
10
Law Office of David B. Zuckerman
705 Second Avenue, Suite 1300
11
Seattle, WA 98104
Phone (206) 538-5302
12
Fax (206) 623-2186
Email: maureen@davidzuckermanlaw.com
13

14

15

16

17

18

19

20

21

22

23

24

25

DEFENDANT SIMMERS'S MOTION FOR
RELIEF PURSUANT TO CRR 7.8 - 16

# SUPERIOR COURT OF WASHINGTON FOR KING COUNTY

FILED
96 MAY 13 AM 7:40
KING COUNTY
SUPERIOR COURT CLERK
SEATTLE, WA.

| | |
|---|---|
| STATE OF WASHINGTON | ) No. 95-1-02102-2 |
| Plaintiff, | ) |
| | ) JUDGMENT AND SENTENCE |
| v. | ) |
| | ) |
| IAN MONROE SIMMERS | ) |
| Defendant. | ) |

## I. HEARING

1.1 The defendant, the defendant's lawyer, ~~BECKY NEAL~~ JOHN HICKS , and the deputy prosecuting attorney were present at the sentencing hearing conducted today. Others present were: KATHLEEN JOHNSON, CCO FAMILY & FRIENDS OF RODNEY GOCHANOUR & DEFENDANT ; ED HOPKINS, BOTHELL

1.2 The state has moved for dismissal of count(s) _____

## II. FINDINGS

Based on the testimony heard, statements by defendant and/or victims, argument of counsel, the presentence report(s) and case record to date, and there being no reason why judgment should not be pronounced, the court finds:

2.1 CURRENT OFFENSE(S): The defendant was found guilty on (date): 3-25-96 _____ by jury of:

Count No.: I _____ Crime: MURDER 1ST DEGREE _____
RCW 9A 32 030 1 A _____ Crime Code 00124 _____
Date of Crime 3-10-95 _____ Incident No. _____

Count No.: _____ Crime: _____
RCW _____ Crime Code _____
Date of Crime _____ Incident No. _____

Count No.: _____ Crime: _____
RCW _____ Crime Code _____
Date of Crime _____ Incident No. _____
☐ Additional current offenses are attached in Appendix A.

SPECIAL VERDICT/FINDING(S):

(a) ☐ A special verdict/finding for being armed with a Firearm was rendered on Count(s): _____
(b) ☒ A special verdict/finding for being armed with a Deadly Weapon other than a Firearm was rendered on Count(s): I
(c) ☐ A special verdict/finding was rendered that the defendant committed the crimes(s) with a sexual motivation in Count(s): _____
(d) ☐ A special verdict/finding was rendered for Violation of the Uniform Controlled Substances Act offense taking place ☐ in a school zone ☐ in a school ☐ on a school bus ☐ in a school bus route stop zone ☐ in a public park ☐ in public transit vehicle ☐ in a public transit stop shelter in Count(s): _____
(e) ☐ Vehicular Homicide ☐ Violent Offense (D.W.I. and/or reckless) or ☐ Nonviolent (disregard safety of others)
(f) ☐ Current offenses encompassing the same criminal conduct and counting as one crime in determining the offender score (RCW 9.94A.400(1)(a)) are: _____

2.2 OTHER CURRENT CONVICTION(S): Other current convictions listed under different cause numbers used in calculating the offender score are (list offense and cause number): 951058333 CTI,II ARSON 2 CT III-XII VEHICLE PROWL 1ST DEGREE

Rev 11/95 - JCC                    1        40

**Exhibit A**

2.3  **CRIMINAL HISTORY:** Prior convictions constituting criminal history for purposes of calculating the offender score are (RCW 9.94A.360):

| | Crime | Sentencing Date | Adult or Juv. Crime | Cause Number | Location |
|---|---|---|---|---|---|
| (a) | | | | | |
| (b) | | | | | |
| (c) | | | | | |
| (d) | | | | | |

☐ Additional criminal history is attached in Appendix B.
☐ Prior convictions (offenses committed before July 1, 1986) served concurrently and counted as one offense in determining the offender score are (RCW 9.94A.360(6)(c)): _____
☐ One point added for offense(s) committed while under community placement for count(s) _____

2.4  **SENTENCING DATA:**

| SENTENCING DATA | OFFENDER SCORE | SERIOUSNESS LEVEL | STANDARD RANGE | ENHANCEMENT | TOTAL STANDARD RANGE | MAXIMUM TERM |
|---|---|---|---|---|---|---|
| Count I | 12 | XIV | 411 TO 548 M | +12 MONTHS DW | 423 TO 560 MONTHS | LIFE AND/OR $50,000 |
| Count | | | | | | |
| Count | | | | | | |

☐ Additional current offense sentencing data is attached in Appendix C.

2.5  **EXCEPTIONAL SENTENCE:**
☐ Substantial and compelling reasons exist which justify a sentence above/below the standard range for Count(s) ____ _____. Findings of Fact and Conclusions of Law are attached in Appendix D. The State ☐ did ☐ did not recommend a similiar sentence.

### III. JUDGMENT

IT IS ADJUDGED that defendant is guilty of the current offenses set forth in Section 2.1 above and Appendix A.
☐ The Court DISMISSES Count(s) _____

### IV. ORDER

IT IS ORDERED that the defendant serve the determinate sentence and abide by the other terms set forth below.

4.1  **RESTITUTION AND VICTIM ASSESSMENT:**
☐ Defendant shall pay restitution to the Clerk of this Court as set forth in attached **Appendix E.**
☐ Defendant shall **not** pay restitution because the Court finds that extraordinary circumstances exist, and the court, pursuant to RCW 9.94A.142(2), sets forth those circumstances in attached **Appendix E.**
☐ Restitution to be determined at future hearing on (Date) *June 25.96* at *8:30* a.m. ☐ Date to be set.
   ☒ Defendant waives presence at future restitution hearing(s).

✓ *Defendant shall pay $100 Victim Assessment, pursuant to RCW 7.68.035.*

4.2  **OTHER FINANCIAL OBLIGATIONS:** Having considered the defendant's present and likely future financial resources, the Court concludes that the defendant has the present or likely future ability to pay the financial obligations imposed. The Court waives financial obligation(s) that are checked below because the defendant lacks the present and future ability to pay them. Defendant shall pay the following to the Clerk of this Court:
(a)  ☐ $_____, Court costs; ☒ Court costs are waived;
(b)  ☐ $_____, Recoupment for attorney's fees to King County Public Defense Programs, 2015 Smith Tower, Seattle, WA 98104; ☒ Recoupment is waived (RCW 10.01.160);
(c)  ☐ $_____, Fine; ☐ $1,000, Fine for VUCSA; ☐ $2,000, Fine for subsequent VUCSA; ☐ VUCSA fine waived (RCW 69.50.430);
(d)  ☐ $_____, King County Interlocal Drug Fund; ☐ Drug Fund payment is waived;
(e)  ☐ $_____, State Crime Laboratory Fee; ☐ Laboratory fee waived (RCW 43.43.690);
(f)  ☐ $_____, Incarceration costs; ☐ Incarceration costs waived (9.94A.145(2));
(g)  ☐ $_____, Other cost for:_____

4.3  **PAYMENT SCHEDULE:** Defendant's TOTAL FINANCIAL OBLIGATION is: $ *100.00 + restitution if any* shall be made to the King County Superior Court Clerk according to the rules of the Clerk and the following terms: ☐ Not less than $_____ per month; ☒ On a schedule established by the defendant's Community Corrections Officer. ☐ : _____ The Defendant shall remain under the Court's jurisdiction and the supervision of the Department of Corrections for up

4.4  **CONFINEMENT OVER ONE YEAR:** Defendant is sentenced to a term of total confinement in the custody of the Department of Corrections as follows, commencing: ☒ Immediately; ☐ (Date):_____ by _____ .m.

__560__ months on Count __I__    _____ months on Count _____    _____ months on Count _____

_____ months on Count _____    _____ months on Count _____    _____ months on Count _____

**ENHANCEMENT** time due to special deadly weapon/firearm finding of __12__ months is included for Counts __I__
_____

The terms in Count(s) No._____ are concurrent/consecutive
The sentence herein shall run concurrently/consecutively with the sentence in cause number(s) _____
_____ but consecutive to any other cause not referred to in this Judgment.

Credit is given for ☒ _____ days served ☒ days as determined by the King County Jail solely for conviction under this cause number pursuant to RCW 9.94A.120(15). — TO INCLUDE TIME IN JUVENILE DET. FROM 3/95+

4.5  ☒ **NO CONTACT:** For the maximum term of _Life_ _____ years, defendant shall have no contact with _____

Violation of this no contact order is a criminal offense under chapter 10.99 RCW and will subject a violator to arrest; any assault or reckless endangerment that is a violation of this order is a felony.

4.6  **BLOOD TESTING:** (sex offense, violent offense, prostitution offense, drug offense associated with the use of hypodermic needles)  Appendix G is a blood testing and counseling order that is part of and incorporated by reference into this Judgment and Sentence.

4.7  **COMMUNITY PLACEMENT, RCW 9.94A.120(9):** Community Placement is ordered for any of the following eligible offenses: any "sex offense", any "serious violent offense", second degree assault, any offense with a deadly weapon finding, any CH. 69.50 or 69.52 RCW offense, for the maximum period of time authorized by law. All standard and mandatory statutory conditions of community placement are ordered.
☒ **Appendix H** (for additional nonmandatory conditions) is attached and incorporated herein.

4.8  ☐ **WORK ETHIC CAMP:** The court finds that the defendant is eligible for work ethic camp and is likely to qualify under RCW 9.94A.137 and recommends that the defendant serve the sentence at a work ethic camp. Upon successful completion of this program, the Department shall convert the period of work ethic camp confinement at a rate of one day of work ethic camp to three days of total standard confinement and the defendant shall be released to community custody for any remaining time of total confinement. The defendant shall comply with all mandatory statutory requirements of community custody set forth in RCW 9.94A.120(9)(b).
☐ Appendix K (for additional special conditions, RCW 9.94A.120(9)(c), is attached and incorporated herein.

4.9  ☐ **SEX OFFENDER REGISTRATION** (sex offender crime conviction): Appendix J is attached and incorporated by reference into this Judgment and Sentence.

4.10 ☐ **ARMED CRIME COMPLIANCE, CH. 129, Sec. 6, 1995 Laws.** The state's plea/sentencing agreement is [ ] attached [ ] as follows:

The defendant shall report to an assigned Community Corrections Officer upon release from confinement for monitoring of the remaining terms of this sentence.

Date: __15/10/96__

Judge: _Ann Schindler_
Print Name: _ANN SCHINDLER_

Presented by:
_O. Mahoney #91002_
Deputy Prosecuting Attorney, Office WSBA ID #91002
Print Name: _SUSAN MAHONEY_

Approved as to form:
_J. T. Hicks_
Attorney for Defendant, WSBA # 13733
Print Name: _John T. Hicks_

Rev 11/95 - BAS                    3

42

F I N G E R P R I N T S



RIGHT HAND
FINGERPRINTS OF:

IAN MONROE SIMMERS

DATED: 5|10|96

JUDGE, KING COUNTY SUPERIOR COURT

DEFENDANT'S SIGNATURE: _____
DEFENDANT'S ADDRESS: K.C. JAIL

ATTESTED BY:
M. JANICE MICHELS, SUPERIOR COURT CLERK
BY: _____
DEPUTY CLERK

CERTIFICATE

I, _____,
CLERK OF THIS COURT, CERTIFY THAT
THE ABOVE IS A TRUE COPY OF THE
JUDGEMENT AND SENTENCE IN THIS
ACTION ON RECORD IN MY OFFICE.
DATED: _____

_____
          CLERK

BY: _____
    DEPUTY CLERK

PAGE 4 - FINGERPRINTS

OFFENDER IDENTIFICATION

S.I.D. NO.

DATE OF BIRTH: ███████, 1978

SEX: M

RACE: WHITE

43

# SUPERIOR COURT OF WASHINGTON FOR KING COUNTY

STATE OF WASHINGTON,

        Plaintiff,

    vs.

    *Ian Monroe Simmers*

        Defendant.

NO. 95-1-02102-2

APPENDIX G
ORDER FOR BLOOD TESTING
AND COUNSELING

(1) ☐ 4.4  **HIV TESTING AND COUNSELING.** (Required for defendants convicted of sexual offenses, drug offenses associated with the use of hypodermic needles, or prostitution related offenses committed after March 23, 1988):

    The Court orders the defendant contact the Seattle-King County Health Department and participate in human immunodeficiency virus (HIV) testing and counseling in accordance with Chapter 70.24 RCW. The defendant, if out of custody, shall promptly call Seattle-King County Health Department at 296-4848 to make arrangements for the test to be conducted within 30 days.

(2) ☒ 4.4  **DNA IDENTIFICATION TESTING.** (Required for defendants convicted of sexual offenses or violent offenses):

    The Court orders the defendant to cooperate with the King County Department of Adult Detention and/or the State Department of Corrections in providing a blood sample for DNA identification analysis. The defendant, if out of custody, shall promptly call the King County Jail at 296-1226 between 8:00 a.m. and 1:00 p.m., to make arrangement for the test to be conducted within 15 days.

If both (1) and (2) are checked, two independent blood samples shall be taken.

Date: 5/10/96

Presented by:

_____
Deputy Prosecuting Attorney  81066 / 91002

_____
JUDGE, King County Superior Court

_____
Attorney for Defendant  18123

_____
Defendant

Ord-Bld-Tst

1

**46**

# SUPERIOR COURT OF WASHINGTON FOR KING COUNTY

STATE OF WASHINGTON,

        Plaintiff,

        vs.

Ian Monroe Simmers

        Defendant.

NO. 95·1·02102·2

APPENDIX G
ORDER FOR BLOOD TESTING
AND COUNSELING

(1) ☐ 4.4  **HIV TESTING AND COUNSELING.** (Required for defendants convicted of sexual offenses, drug offenses associated with the use of hypodermic needles, or prostitution related offenses committed after March 23, 1988):

        The Court orders the defendant contact the Seattle-King County Health Department and participate in human immunodeficiency virus (HIV) testing and counseling in accordance with Chapter 70.24 RCW. The defendant, if out of custody, shall promptly call Seattle-King County Health Department at 296-4848 to make arrangements for the test to be conducted within 30 days.

(2) ☒ 4.4  **DNA IDENTIFICATION TESTING.** (Required for defendants convicted of sexual offenses or violent offenses):

        The Court orders the defendant to cooperate with the King County Department of Adult Detention and/or the State Department of Corrections in providing a blood sample for DNA identification analysis. The defendant, if out of custody, shall promptly call the King County Jail at 296-1226 between 8:00 a.m. and 1:00 p.m., to make arrangement for the test to be conducted within 15 days.

If both (1) and (2) are checked, two independent blood samples shall be taken.

Date: 5/10/96

Presented by:

_____
Deputy Prosecuting Attorney  2106b/91002

_____
JUDGE, King County Superior Court

_____
Attorney for Defendant 12123

_____
Defendant



STATE OF WASHINGTON
# DEPARTMENT OF CORRECTIONS
## INDETERMINATE SENTENCE REVIEW BOARD
P.O. BOX 40907, OLYMPIA, WA 98504-0907

### DECISION AND REASONS

| | |
|---|---|
| NAME: | SIMMERS, IAN |
| DOC #: | 745079 |
| FACILITY: | Airway Heights Correctional Center |
| TYPE OF HEARING: | LTJUVBRD Hearing |
| HEARING DATE: | January 26, 2016 |
| PANEL MEMBERS: | TS & LR-G |
| FINAL DECISION DATE: | February 29, 2016 |

This matter came before Tom Sahlberg and Lori Ramsdell-Gilkey, who are members of the Indeterminate Sentence Review Board (ISRB or the Board) on the above date for a release hearing in accordance with the provisions of RCW 9.94A.730.   Mr. Simmers appeared in person and was represented by Attorney Maureen Devlin.   Additional testimony was provided by Department of Corrections (DOC) Classification Counselor Craig Johnson.

**BOARD DECISION:**

This was a Deferred Decision.  Based on the burden of proof set out in RCW 9.94A.730(3) and the totality of evidence and information provided, the Board does find by a preponderance of the evidence that Mr. Simmers is more likely than not to commit any new criminal law violations if released on conditions at this time.  Consequently, the Board finds Mr. Simmers not releasable.

**NEXT ACTION:**

Mr. Simmers may re-petition the Board for another hearing in January of 2018.

**JURISDICTION:**

RCW 9.94A.730, enacted in 2014, allows offenders who were under the age of 18 when they

# Exhibit B

SIMMERS #745079
Page 2 of 5

committed their crime(s) and were sentenced as adults to petition the Board for consideration of early release after serving no less than 20 years of total confinement. Ian Simmers' petition was accepted, which resulted in his hearing on this date.

Ian Simmers is currently incarcerated on a 1996 conviction in King County; Cause #95-1-02102-2 for Murder in the First Degree. The time start is May 21, 1996. The Court set the original confinement term at 560 months from a Sentencing Reform Act range of 411 to 548 months. The maximum confinement term, if released, would expire on November 26, 2041. He has served approximately 236 months plus 419 days of jail time credit.

**NATURE OF INDEX OFFENSE(S):**
File materials describe the offense as Mr. Simmers (age 16) stabbing a 35 year old male to death on the Burke-Gilman Trail in Bothell. Reports indicate that Simmers and a 14 year old male were on a crime spree that involved stealing items from several boats and setting fires in a boat and marina along Lake Washington. On the date of the murder, Simmers and his friend had a run-in encounter with the victim, that resulted in Simmers taking out a knife he carried and slashing the victim across the face, then stabbing him multiple times in the back.

**PRIOR CRIMINAL CONDUCT:**
Mr. Simmers has 1995 convictions for two Counts of Second Degree Arson and ten Counts of First Degree Vehicle Prowling; King County Cause #95-1-05833-3. As noted above he and an accomplice broke into approximately 35 boats, stealing many items, eating, drinking and sleeping in them; and using flare guns to set a boat and a marina bathroom on fire. He has 1994 convictions for two Counts of Second Degree Burglary and Second Degree Escape as well as multiple misdemeanor convictions for Minor in Possession of Alcohol, Theft and Assault.

**HISTORY/COMMENTS:**
This was Mr. Simmers' first Board hearing. He has incurred 43 serious infractions, the last of which was in 2013. He has earned his GED and completed Stress Anger Management, Thinking

for a Change, Life Skills Computing and I-Best composites. He is participating in Cognitive Behavior classes and is employed as a Unit Porter.

## EVIDENCE CONSIDERED:

In preparation for Mr. Simmers' hearing and its decision in this case, the Board completed a review of his DOC and ISRB files. The Board considered all information contained in those files, including but not limited to: Information provided by the sentencing court/prosecutor; the most recent DOC facility plan; information regarding institutional behavior and programming; any letters of support and/or concerns sent to the Board; Psychological Evaluations and the Pre-Sentence Investigation. The Board also considered the testimony of witnesses.

## REASONS:

Mr. Simmers' counselor testified that he was "unusual, in a positive way" with his efforts "to reshape his life ... hats off to Mr. Simmers for his positive and appropriate behavior". Mr. Johnson said that he had known Mr. Simmers for a long time and that "most of his infractions were as a young inmate". He has had multiple extended family visits from his mother and hopes to release to her home in Seattle.

Mr. Simmers' attorney noted his "transformation" and change into a different person while in prison and that he was a "safe bet" to release. She also noted the positive support of his mother who is willing to help her son and is financially secure.

Mr. Simmers said "I was out of control and didn't care" during the time before and leading up to the murder. He reported that his father "abandoned" the family and that he began associating with a group called "the Northwest Gangsters" with whom he "got along and did thefts, drugs and anything... so they would like me more". At the time, he "had unfocused anger" and abused alcohol and drugs, often to "blackout". In 1995 he was released from Juvenile and went to a friend, doing "a road trip of crime to my area ...wanted people to think I was destructive". They "looted marina boats, set a boat on fire" and consumed "lots of alcohol". He said that he does

not remember what happened, but the details of the official account "could have happened. I accepted the fact that it happened and I'm here. It is hard for me to take direct responsibility for something I don't remember 100%", the details of which he described as "ambiguous".

After about 10 years in prison he "didn't like who I was and let others dictate my behavior". He knew he could "show how strong I could and wanted to be and became a solo person". He "found new associates" and that "getting into trouble was no longer worth the consequences I had to pay". He decided, "I don't want to be a follower any more" and began to exercise and find hobbies and programs to occupy his time. His mother has been the constant positive in his life and she told him about the change in law that prompted him to petition the Board. He said that he now chooses to be clean and sober and that he is willing to participate in whatever treatment and programming he needs.

A Psychological Evaluation completed by Dr. Wentworth on November 8, 2015 assesses Mr. Simmers' risk to violence to be Moderate to High. With additional protective factors present in his life, his overall risk level is Moderate. It is recommended that, "Mr. Simmers may be a reasonable candidate for transitioning to a less restrictive setting when all recommended programming is completed" and that "additional programming and employment opportunities would be available at lower custody levels and Mr. Simmers would be exposed to more of the challenges of life in a community as he progresses while under supervision".

Mr. Simmers' lack of memory of the specifics of the murder in concerning, especially given a more detailed account that he gave to police immediately following his arrest. He contends that the police made him aware of the details and that he agreed to them. In this hearing, the panel pressed him for more detail, to no avail which is consistent with his first statement to police when he "could not remember stabbing anyone and that it wasn't in his memory". Dr. Wentworth also expressed concern over this memory lapse and noted, "His memory deficit is only for the murder". The Board is familiar with research that indicates that neither admission of a crime, nor remorse has a correlation to reoffending, however it is troubling that the memory deficit is

SIMMERS #745079
Page 5 of 5

specific to details of the murder only. His completion of offender change and vocational programming, combined with appropriate behavior and willingness to continue to participate in additional programming and treatment is commendable.

As a result of this decision, Mr. Simmers may submit a petition to the Board in January of 2018, at which time the Board expects Mr. Simmers to demonstrate infraction free behavior, complete chemical dependency treatment/classes and continue to engage in available offender change and vocational programming.

TS: ch
February 5, 2016


cc:     Ian Simmers
        Maureen Devlin, attorney
        Institution
        File

BOTHELL POLICE DEPARTMENT
CASE 95-1570 TAPED INTERVIEW
IAN M. SIMMERS

DATE: 3/15/95    TIME: 10:40 PM

The following is a taped interview conducted by Detective E. J. Hopkins of the Bothell Police
Department with Sergeant Rusk at the King County Police North Precinct also present. The
interview is with suspect:

Ian Monroe Simmers  DOB: ██-78

Hopkins: OK, this is Detective Hopkins with the Bothell Police Department present with Sgt.
Rusk and Ian would you go a head and state your full name for me?

Simmers: Ian Monroe Simmer.

Hopkins: And Ian how do you spell your last name?

Simmers: S-I-M-M-E-R-S.

Hopkins: OK, what's your birth date Ian?

Simmers: ██-78.

Hopkins: OK Ian, this is a taped interview at the King County North Precinct. I would like to
know if we have your permission to tape this interview at this time. It's 2240 hours, which is
10:40 PM, and today's date is March 15, 1995, Wednesday evening.

Simmers: Yeah.

Hopkins: So we have your full knowledge and consent?

Simmers: Yes.

Hopkins: Sgt. Rusk, is this being recorded with your knowledge and consent?

Rusk:    It is.

Hopkins: And I have stated I'm Detective Hopkins and this will be Ian's statement with an issue
we just finished talking about. The first thing I would like to do Ian, I'd like to read you your
rights again as we did before.

Simmers: Alright.

1

**Exhibit C**

Simmers_I 0184

BOTHELL POLICE DEPARTMENT
CASE 95-1570 TAPED INTERVIEW
IAN M. SIMMERS

Hopkins: Before questioning and the making of any statement I, Ian Simmers, have been advised by Detective Hopkins the following rights:

> I have the right to remain silent.
> Anything that I say or sign can be used against me in a court of law.
> I understand that if I am a juvenile, anything that I say or sign can be used against me in criminal prosecution in the event that juvenile court declines jurisdiction in my case.
> I have the right at this time to an attorney of my own choosing and to have him present, before and during questioning or the making of any statement.
> If I cannot afford an attorney, I'm entitled to have one appointed for me by a court without cost to me and to have him present before and during questioning and the making of or signing of any statement.

I further understand that I have the right to exercise any of the above rights at any time before or during questioning or the making of.... or signing of any statement.

Do you understand each of those?

Simmers: Yes.

Hopkins: Any questions about any of those?

Simmers: No.

Hopkins: OK, will you sign on the X there to indicate you understand those?

Simmers: (sound of writing)

Hopkins: Let me read you that part first, OK?

Simmers: Oh, OK.

Hopkins: This is the Waiver of Constitutional Rights and it says:

I have read the above explanation of my Constitutional Rights and I understand them. I have decided not to exercise these rights at this time and the following statement is made by me freely and voluntarily without threats or promises of any kind.

OK, do you understand that?

2

BOTHELL POLICE DEPARTMENT
CASE 95-1570 TAPED INTERVIEW
IAN M. SIMMERS

Simmers: Yep.

Hopkins: OK. Sign on the X for that also. Shall we pause the the tape and check to make sure it is recording.

Rusk: Oh we could. Ian, just one more thing, is there anything you don't understand about any of your rights?

Simmers: No.

Rusk: OK. If you want, I can go a head and check the tape. This is Sgt. Rusk and it's about two minutes after we started. After a pause of about 15 seconds, this is Sgt. Rusk and I have restarted the taping again and this is still being taped with your permission?

Simmers: Yes.

Rusk: And Ed this is being taped with your permission?

Hopkins: Yes it is.

Rusk: OK, that will be the last interruption. Go ahead it seems to be running and functioning well.

Hopkins: OK, Ian as we just finished talking a little bit ago, or I should say, started talking a few minutes ago about the incident that occurred with the man walking on the trail and you and your friend John. John's last name again was?

Simmers: Wyatt.

Hopkins: John Wyatt and you were together that evening. What I would like to do is first start out by talking about earlier that afternoon or that day when you guys got together and when the knife came into play and where it came from. Can you tell me a bit about that.

Simmers: Ah...he, I was at home around like 7:30 or 8 on Saturday evening. I was bored so I called John up and he was thinking about trying to call me but he didn't have my number. And so we were chatting for a while. He had his mom come and pick me up and so we were down in Redmond for a while just kicking it. Went to the store, got some munchies, went back up to the cabana which has a work-out and all that. And upstairs there was a fat chunky knife.

Hopkins: Can you describe it for me as best you can?

3

BOTHELL POLICE DEPARTMENT
CASE 95-1570 TAPED INTERVIEW
IAN M. SIMMERS

Simmers: It's like almost....it's a bit bigger than a paring knife, like almost ah.....four or five inch blade. Ah.......four or three inch black handle, ah....like a little stopper thing at the very end.

Hopkins: Do you remember what the blade looked like specifically?

Simmers: Ah........

Rusk: On the back of this form maybe you can draw me a little picture.

Simmers: Ah...I'm master at drawing blades.

Rusk: OK, as best you can recall.

Hopkins: And during the silence here, Ian is going to go ahead a draw a picture of the knife the way he recalls it. (long pause) Shall we pause the tape during the drawing, no? (long pause) The little lines that you are drawing at the edge of the blade.... .

Simmers: They're the serrations and

Hopkins: Partially serrated.

Simmers: Yeah.

Hopkins: Mildly or what ever. Do you recall on the tip of this blade having one or two points, thin back.

Simmers: It had one.

Hopkins: Do you remember ah....

Rusk: Can I clarify something. When you mean a serration, what do you mean by a serration?

Simmers: It had groves in it.

Rusk: Like grooves like...what is a groove to you?

Simmers: It...you know how steak knives, you look at them sideways and they have those dips in them?

Rusk? Yeah, why don't you draw the blade sideways or what ever so you can show the dips in it? ·

4

BOTHELL POLICE DEPARTMENT
CASE 95-1570 TAPED INTERVIEW
IAN M. SIMMERS

You mean like, I'm not sure if I understand what you mean serrations.

Hopkins: Or would it be sufficient to say the blade was not a flat standard sharp blade...

Simmers: Yeah, if you put your fingers on it and went along side the blade you would feel bumps.

Rusk: OK, OK, that's sufficient, that's sufficient.

Hopkins: Alright...OK

Rusk: Ed one thing, we've got to be real careful, it drives the typist crazy if one or two, or actually two or three of us are talking at the same time so we just need to be a little bit careful about that. I'm sorry.

Hopkins: OK, ah..... with......so the knife you received out of the cabana from John's apartment complex.

Simmers: Yeah

Hopkins: Later that evening you had cause to be on the Burke Gilman Trail.

Simmers: Yeah.

Hopkins: OK, tell me about that, what was the weather conditions, what was the light conditions, do you recall any of that?

Simmers: Ah...it was around like 9:30 or 10:00 o'clock, yeah a quarter after nine, we were over at the Burke Gilman Trail, just sitting there chatting underneath the bridge.

Hopkins: OK, and you...backing up. You spent...did you have a watch on that night.

Simmers: No.

Hopkins: So all you know is necessarily that it was dark.

Simmers: Uh-huh.

Hopkins: And was it raining or was it dry that night.

5

BOTHELL POLICE DEPARTMENT
CASE 95-1570 TAPED INTERVIEW
IAN M. SIMMERS

Simmers:  It was...it had rained a little bit and it was just a little bit and then it stopped.

Hopkins:  OK, but it was dark when you were out there?

Simmers:  Yeah.

Hopkins:  Had you had anything to drink or any dope that night?

Simmers:  No.

Hopkins:  So you were sober and everything was cool, OK

Simmers:  Surprising enough.

Rusk:  Go a head, what happened then?

Simmers:  And we were chatting and since we both been thinking about hitting the boats up here in Kenmore already, we were thinking about it again and just thought, hummm.  We can get there if we wanted to.  And we both just said, the hell with it let's go.

Rusk:  Then what happened?

Simmers:  And so we started walking towards Woodinville because you can get to here from there.  And, so we was walking on the road.......on the trail, talking all sorts of craziness and I could figure he was high, it's like dude's tweeked and dude socked me up in my rib and I took and I reached back grabbed up on the knife where I normally keep it or normally keep mine.

Hopkins:  Where do you keep it at?

Simmers:  Right on my ah.....right in between my pocket and my belt and put it in my waist there. I normally have a fat throwing knife.  And I grabbed for it and I knew that I didn't have my knife but subconsciously I knew that there was a knife there so I thought OK.  I grabbed it and when dude came at me again I just pulled it out, went up towards his face, caught him like in his chin and a little bit on his cheek.  He looked surprised and stupid, it was like, oh shit.  He turned on his right heel and I just jumped forward and I shanked him about six times, shoulder blade to mid back and then back up.  Bent the blade when I stabbed him in the shoulder.

Hopkins:  Did he try to run at some point after he started to get hit?

Simmers:  Yeah, he turned on his heel.  He got like maybe three steps.  Because what I do was I

6

BOTHELL POLICE DEPARTMENT
CASE 95-1570 TAPED INTERVIEW
IAN M. SIMMERS

hit...grabbed shoulder when I knife somebody, because I've done it before. Is grab the shoulder to keep it going.

Hopkins: Do you remember what happened, did he have a coat on then? Do you remember what happened when you grabbed?

Simmers: I don't remember. I don't pay attention to well to what I'm doing.

Rusk: OK, when you said you shanked him, I think you used the word shanked him six times. What does that mean?

Simmers: It's another word for a knife, it's a juvenile knife.

Rusk: So you like you stabbed him six......

Simmers: Yeah.

Rusk: That's what you mean by shanked?

Simmers: Yes.

Rusk: OK, and when you said you did this, was that on the back (

Simmers: It was on the back.

Rusk: You hit him on the back?

Simmers: Yeah, what he did was, when he realized that I had cut him on his face, he swiveled on his right foot so he turned his left side and like he was going to take off and then I thought OK, I just went and stabbed this fool already. I can get in deep shit, might just as well finish it off and I just jumped forward.

Hopkins: So you just went a head and finished him off then?

Simmers: Yeah, cause once I do something and I get the ah.....I'll see the consequences way a head of what even the incident might have. And it's like OK, I stabbed this guy. I can have....he can come at me again because what it looked like he was doing was....turn, run back a little bit, then maybe turn. And I thought, I ain't having that or just go straight to the police and it's like OK this guy tried to stab me.

7

BOTHELL POLICE DEPARTMENT
CASE 95-1570 TAPED INTERVIEW
IAN M. SIMMERS

Rusk: So you were worried about him going to the police?

Simmers: Yeah.

Rusk: OK, what happened then?

Simmers: I just like, me , I'm not really sure where John was because when that kind of feeling runs through my body of, OK, you need to attack or be caught or do something like that. Then everything blanks out of my mind. I see one thing and that's it. And that's my target.

Rusk: You just saw the dude then.

Simmers: Yeah.

Rusk: What did he look like.

Simmers: I want to say he was dark haired, but it wasn't really.

Rusk: Medium hair?

Simmers: Yeah, almost like mine but not really.

Rusk: OK, was he a white guy or a black guy?

Simmers: White.

Rusk: And how old do you think he was?

Simmers: I'd ..........ah.....I'd say like mid thirties.

Rusk: Do you remember what he was wearing at all? What color of clothes?

Simmers: Uh-uh, I don't even pay attention to those.

Rusk: OK.

Hopkins: Light colors or dark colors?

Simmers: Ah........dark.

8

**BOTHELL POLICE DEPARTMENT**
**CASE 95-1570 TAPED INTERVIEW**
**IAN M. SIMMERS**

Hopkins:  Do you remember specifically when he turned on his heel and you grabbed for him, could his jacket have come off?  Do you recall?

Simmers:  It could have.  All I felt was just like a shirt or something.

Hopkins:  OK, after when you finished him, did you finish him up by the trail or did you finish him down by the slough more or do you recall?

Simmers:  It was....he'd tried to move in that direction and I just kept on going with him.

Hopkins:  In what direction?

Simmers:  Towards the slough.

Hopkins:  Towards the slough.

Simmers:  And then when I was shanking  I just (phoosh sound).

Hopkins:  Do you remember running through any particular types of brush or anything like that?

Simmers:  Uh-uh.

Hopkins:  When he got to that spot, did he fall or did you knock him down or.....

Simmers:  He kind of stumbled to the ground and that's when we both left.  But he could have gotten up again and moved because I don't think there were any vital shots.

Hopkins:  OK, did you take anything off of his body or anything?

Simmers:  No.

Hopkins:  Do you remember doing anything with his coat.  Afterwards do you remember, oh shit there's his coat we've got to put it some place.

Simmers:  No.

Hopkins:  Anything like that?

Simmers:  No.

9

BOTHELL POLICE DEPARTMENT
CASE 95-1570 TAPED INTERVIEW
IAN M. SIMMERS

Hopkins:  Do you remember anything about his shoes at all?

Simmers:  No.  You asked me about that earlier and it's like I've been trying to remember..

Hopkins:  OK, when you left there, which direction did you head?

Simmers?  Towards Woodinville.  So that's from Redmond, which direction is that?

Hopkins:  Think, think back real clearly.

Rusk:  You came from Redmond

Simmers:  Yeah, I was...we were coming from Redmond.

Hopkins:  OK, you were coming like towards here?

Simmers:  Yeah. Here's  Woodinville here.

Hopkins:  So do you remember,  after you left, OK after you left do you remember your path?
How the trail went?  Can you like describe the trail after you ran out, where it went?

Simmers:  Uhmmmmmmm

Hopkins:  Did you stay on the same side of the slough or did you cross the slough.

Simmers:  Stayed on the same side.

Hopkins:  OK, then did you follow the trail across the bridge?  Do you recall that?

Simmers:  Uh-uh.

Hopkins:  Do you remember the bridge.  OK, it was dark.  At what point.....did you keep the
knife initially in case you ran into some other problem?  Maybe he wasn't alone or something like
that?

Simmers:  No, I was just

Hopkins:  As you were running or, you recall when you tossed it.

Simmers:  Yeah, when I realized that I had the knife still in my hand it was like, I don't want it

10

BOTHELL POLICE DEPARTMENT
CASE 95-1570 TAPED INTERVIEW
IAN M. SIMMERS

now.

Hopkins: So you chucked it while you were running?

Simmers: Yeah.

Hopkins: OK, were you a little ways a way from him after you had started to take off.

Rusk: I'm sorry I don't think that came across. When you answered...when he asked you if you chucked the knife, did you chuck it when you were running away from the guy.

Simmers: Yeah.

Rusk: Do you remember how far away?

Simmers: It wasn't too far. It was pretty close but.....

Rusk: Like what's pretty close, 100 yards, 200 yards, a mile, I mean I know what close is to me but what's close to you?

Simmers: Like fifty feet.

Rusk: OK.

Hopkins: You ran from the area and it's a little way away from him. OK, and then where did you go afterwards?

Simmers: To Woodinville.

Hopkins: OK, did you tell anybody afterwards what happened?

Simmers: (can't hear)

Hopkins: Did you discuss it with John?

Simmers: No, I totally blanked it out of my memory. And so when you guys questioned me about it earlier today, I was just like I don't know what your talking about.

Hopkins: OK. Then to recap that then, the reason you finished him off was because....

11

BOTHELL POLICE DEPARTMENT
CASE 95-1570 TAPED INTERVIEW
IAN M. SIMMERS

Simmers: He presented a physical threat to me and that's why I made the first one.

Hopkins: And then after you made the first one....

Simmers: Because I was in a position to be threatened by police, and it was like no, I can't have the police, I have too many things to do.

Hopkins: OK, up to this point you do understand that you have been recorded and this is a taped statement.

Simmers: Yes.

Hopkins: There have not been any threats or promises made to you at this point by myself or Sgt. Rusk?

Simmers: No.

Hopkins: OK. Can you think of anything else Sarge?

Rusk: Just a couple of quick questions. This was the same night as that stuff we talked about earlier that you gave me the statement about?

Simmers: Yes.

Rusk: The boat fire and everything else.

Simmers: Yes.

Rusk: Same night?

Simmers: Yeah.

Rusk: OK, this Saturday night. Where did you spend the rest of the night at that night?

Simmers: Just going down the trail.

Rusk: OK, did you end up in Kenmore or did you end up in Woodinville?

Simmers: Woodinville.

12

BOTHELL POLICE DEPARTMENT
CASE 95-1570 TAPED INTERVIEW
IAN M. SIMMERS

Rusk: OK, and was this before or after the boat fire?

Simmers: Ah....after.

Rusk: This would have been after the boat fire then.

Simmers: Yeah.

Rusk: OK, and then what part of the slough were you and Mike in, were you like in downtown Bothell, or downtown Kenmore, or downtown Woodinville? Did you see any lights, anything familiar?

Simmers: No, when I go into that kind of a daze when somebody hits me, I don't see anything but them.

Rusk: You mentioned earlier that you were under a bridge I think. I think you said that you and John ......

Simmers: Yeah but that was way over in Redmond.

Rusk: OK, so that was a long ways away. And you walked from Redmond down to where this happened.

Simmers: Yeah.

Rusk: And is this where this happended more or less downtown Woodinville ro downtown Bothell or downtown Kenmore.

Simmers: I'd say it would be more the Bothell area.

Rusk: More the Bothell area.

Simmers: Yeah.

Rusk: And go back to this guy. Stand up here for a minute Ed will you? And why don't you go ahead and stand up too Ian. Was this guy about the same height of Ed.

Simmers: I'd say like right about there.

Hopkins: A couple inches shorter?

13

BOTHELL POLICE DEPARTMENT
CASE 95-1570 TAPED INTERVIEW
IAN M. SIMMERS

Simmers: Yeah. Because when I grabbed for his shoulder I had to reach up a little bit.

Hopkins: I'm 6/3 so maybe this guy would have been .........

Simmers: 6/2 or 6/1, because I'm 5/10.

Hopkins: OK and can you show me again how the first cut went?

Simmers: This dude hit me like that and I went back like that, grabbed at the knife

Hopkins: Back handed.....

Simmers: Yeah, and came up like that and then he swiveled like that and I just grabbed his shoulder and went whack, flipped it over and just started sticking him in the back.

Hopkins: OK, what you showed me is you started like mid-back and worked your way up to the shoulder.

Simmers: Yeah.

Hopkins: When you hit the shoulder what happened

Simmers: That...the blade bent like that a bit...

Hopkins: The blade bent kind of in an arc?

Simmers: It was still at an arc any way so it was hitting straight.

Rusk: A couple more questions brought up, were you wearing the same clothes you're wearing now.

Simmers: Yeah.

Rusk: OK, same clothes?

Simmers: Uh-huh.

Rusk: OK did the dude bleed alot.

Simmers: Not really.

14

BOTHELL POLICE DEPARTMENT
CASE 95-1570 TAPED INTERVIEW
IAN M. SIMMERS

Rusk:  OK, and what did he say or do before he nailed you in the ribs.

Simmers:  He was just oh.....(blah type noise) talking nonsense.  It was like HUH....

Rusk:  What kind of nonsense?

Simmers:  It didn't make any sense and that's why I can't like really repeat it because it was like gibberish.  We were looking at him like, what the hell is this?

Rusk:  And I think talked about him being kind of tweeked.

Simmers:  Yeah.

Rusk:  OK, I don't know, I think you used the word tweeked, I'm not positive.  What does tweeked mean to you?

Simmers:  Well, when you are on cocaine, like if you look at somebody and like their eye will twitch or something, it's like a threatening remark to you is like (cough sound) dude, what are you doing that for?  It's like what?  Your eye is twitching.  It's like, no.  The smallest thing will set you off.

Hopkins:  Did he give you any warning before he nailed you in the ribs?

Simmers:  No.

Rusk:  How close was he when he hit you.

Simmers:  About like....

Rusk:  I've got to you the tape recorder can't record hands....OK, when you are saying that, your saying like a foot, two feet, three feet?

Simmers:  Two, three feet away.

Rusk:  And what hand did he hit you with?

Simmers:  His right.

Rusk:  And what side did he hit you on?

15

BOTHELL POLICE DEPARTMENT
CASE 95-1570 TAPED INTERVIEW
IAN M. SIMMERS

Simmers:  My left.

Rusk:  OK, and you kind of pointed to.........

Simmers:  About mid-side in the middle.

Rusk:  Like underneath your arm pit.

Simmers:  Yeah, there's a bruise too.

Rusk:  OK,  the area you're pointing to.....go a head and tell me what area you're pointing  at because again the tape recorder isn't going.....

Simmers:  That's what I was saying.  It's between my hip and my arm pit, like right dead in the middle.

Rusk:  Ok, on which side of your body.

Simmers:  On my left side.

Rusk:  And you carry the knife .......

Simmers:  On my right side  up on the back of my hip.

Rusk:  And you used your......

Simmers:  My right hand to grab it real quick.

Hopkins:  Do we have your permission to come back and talk to you some more if we have any more questions in a few minutes.

Simmers:  Yeah.

Hopkins:  OK, the date is still the 15th and it's 11:03 or 2303 hrs., twenty-four hour time. Detective Hopkins, Sgt. Rusk and Ian.  And Ian again this was voluntarily and freely given with your knowledge and consent.

Simmers:  Yes.

Hopkins:  OK, we will stop the tape at this time and if  we have more questions we'll come back.

16

BOTHELL POLICE DEPARTMENT
CASE 95-1570 TAPED INTERVIEW
IAN M. SIMMERS

Rusk:  And Ian, just once more, this is recorded with your permission correct?

Simmers:  Yes.

Rusk:  OK, I'm going to go ahead an end the tape.

17

Simmers_I  0200

FILED
KING CO.

MAR 14 1996

SUPERIOR COURT CLERK
BEVERLY ANN ENEBRAD
DEPUTY

SUPERIOR COURT OF WASHINGTON FOR KING COUNTY

THE STATE OF WASHINGTON,        )
                                )
                Plaintiff,      )  No.  95-1-02102-2
                                )  SECOND
        v.                      )  AMENDED INFORMATION
IAN MONROE SIMMERS              )
                                )
                                )
                                )
                                )
                Defendant.      )
_____)

COUNT I

I, Norm Maleng, Prosecuting Attorney for King County in the name and by the authority of the State of Washington, do accuse IAN MONROE SIMMERS of the crime of **Murder in the First Degree**, committed as follows:

That the defendant IAN MONROE SIMMERS in King County, Washington on or about March 11, 1995, with premeditated intent to cause the death of another person did cause the death of Rodney Wayne Gochanour, a human being, who died on or about March 11, 1995;

Contrary to RCW 9A.32.030(1)(a), and against the peace and dignity of the State of Washington.

And I, Norm Maleng, Prosecuting Attorney for King County in the name and by the authority of the State of Washington further do accuse the defendant IAN MONROE SIMMERS at said time of being armed with a deadly weapon, to-wit: a knife, under the authority of RCW 9.94A.125.

COUNT II

And I, Norm Maleng, Prosecuting Attorney aforesaid further do accuse IAN MONROE SIMMERS of the crime of **Murder in the Second Degree**, a crime of the same or similar character as another crime charged herein, and committed as follows:

That the defendant IAN MONROE SIMMERS in King County, Washington on or about March 11, 1995, while committing and

Norm Maleng
Prosecuting Attorney
W 554 King County Courthouse
Seattle, Washington 98104-2312
(206) 296-9000

AMENDED INFORMATION- 1

5

**Exhibit D**

 

1    attempting to commit the crime of Assault in the Second Degree, and
    in the course of and in furtherance of said crime and in the
2    immediate flight therefrom, and with intent to cause the death of
    another person, did cause the death of Rodney Wayne Gochanour, a
3    human being, who was not a participant in said crime, and who died
    on or about March 14, 1995;
4

5        Contrary to RCW 9A.32.050(1)(a) and (b), and against the peace
    and dignity of the State of Washington.

6        And I, Norm Maleng, Prosecuting Attorney for King County in the
    name and by the authority of the State of Washington further do
7    accuse the defendant IAN MONROE SIMMERS at said time of being armed
    with a deadly weapon, to-wit:  a knife, under the authority of RCW
8    9.94A.125.

9

10                  NORM MALENG
                    Prosecuting Attorney
11

12                  By:
                  Jim Marner, WSBA #91002
13                  Deputy Prosecuting Attorney

14

15

16

17

18

19

20

21

22

23

24

25

AMENDED INFORMATION- 2

6

**Norm Maleng**
Prosecuting Attorney
W 554 King County Courthouse
Seattle, Washington 98104-2312
(206) 296-9000

FILED

95 DEC 20 PM 2: 27

KING COUNTY
SUPERIOR COURT CLERK
SEATTLE, WA.

SUPERIOR COURT OF WASHINGTON FOR KING COUNTY

THE STATE OF WASHINGTON,       )
                               )
                 Plaintiff,    )    No.  95-1-05833-3
                               )
       v.                      )    SECOND AMENDED INFORMATION
IAN M. SIMMERS                 )
                               )
                               )
                               )
                               )
                 Defendant.    )
-------------------------------

COUNT I

    I, Norm Maleng, Prosecuting Attorney for King County in the
name and by the authority of the State of Washington, do accuse IAN
M. SIMMERS of the crime of **Arson in the Second Degree**, committed as
follows:

    That the defendant IAN M. SIMMERS, together with another, in
King County, Washington on or about March 12, 1995, did knowingly
and maliciously cause a fire and explosion which damaged a boat,
property located in the 14000 block of Northeast 145th Street,
Seattle, in said county and state;

    Contrary to RCW 9A.48.030, and against the peace and dignity of
the State of Washington.

COUNT II

    And I, Norm Maleng, Prosecuting Attorney aforesaid further do
accuse IAN M. SIMMERS of the crime of **Arson in the Second Degree**,
based on the same conduct as another crime charged herein, which
crimes were so closely connected in respect to time, place and
occasion that it would be difficult to separate proof of one charge
from proof of the other, committed as follows:

    That the defendant IAN M. SIMMERS, together with another, in
King County, Washington on or about March 12, 1995, did knowingly
and maliciously cause a fire and explosion which damaged a restroom,

Norm Maleng
Prosecuting Attorney
W 554 King County Courthouse
Seattle, Washington 98104-2312
(206) 296-9000

POSTED

SECOND AMENDED INFORMATION- 1

**Exhibit E**

1  property located at Northeast 145th and Sammamish River Trail in
   said county and state;

2

3  Contrary to RCW 9A.48.030, and against the peace and dignity of
   the State of Washington.

4                              COUNT III

5      And I, Norm Maleng, Prosecuting Attorney aforesaid further do
   accuse IAN M. SIMMERS of the crime of **Vehicle Prowl in the First**
6  **Degree**, based on the same conduct as another crime charged herein,
   which crimes were so closely connected in respect to time, place and
7  occasion that it would be difficult to separate proof of one charge
   from proof of the other, committed as follows:

8

9      That the defendant IAN M. SIMMERS, together with another, in
   King County, Washington during a period of time intervening between
10 March 11, 1995 through March 15, 1995, did enter or remain
   unlawfully in a vessel belonging to Harvy Noble and Randy Gehrke,
11 equipped for propulsion by mechanical means or by sail, which has a
   cabin equipped with permanently installed sleeping quarters and
12 cooking facilities, located at 6201 Northeast 175th, Seattle, in
   said county and state, with intent to commit a crime against a
13 person or property therein;

14 Contrary to RCW 9A.52.095, and against the peace and dignity of
   the State of Washington.

15                              COUNT IV

16     And I, Norm Maleng, Prosecuting Attorney aforesaid further do
   accuse IAN M. SIMMERS of the crime of **Vehicle Prowl in the First**
17 **Degree**, based on the same conduct as another crime charged herein,
   which crimes were so closely connected in respect to time, place and
18 occasion that it would be difficult to separate proof of one charge
   from proof of the other, committed as follows:

19

20     That the defendant IAN M. SIMMERS, together with another, in
   King County, Washington during a period of time intervening between
21 March 11, 1995 through March 15, 1995, did enter or remain
   unlawfully in a vessel belonging to Jeffrey McClure, equipped for
22 propulsion by mechanical means or by sail, which has a cabin
   equipped with permanently installed sleeping quarters and cooking
23 facilities, located at 6155 Northeast 175th, Seattle, in said county
   and state, with intent to commit a crime against a person or
24 property therein;

25 Contrary to RCW 9A.52.095, and against the peace and dignity of
   the State of Washington.

Norm Maleng
Prosecuting Attorney
W 554 King County Courthouse
Seattle, Washington 98104-2312
(206) 296-9000

SECOND AMENDED INFORMATION- 2

COUNT V

And I, Norm Maleng, Prosecuting Attorney aforesaid further do accuse IAN M. SIMMERS of the crime of **Vehicle Prowl in the First Degree**, based on the same conduct as another crime charged herein, which crimes were so closely connected in respect to time, place and occasion that it would be difficult to separate proof of one charge from proof of the other, committed as follows:

That the defendant IAN M. SIMMERS, together with another, in King County, Washington during a period of time intervening between March 11, 1995 through March 15, 1995, did enter or remain unlawfully in a vessel belonging to Tony Simonelli, equipped for propulsion by mechanical means or by sail, which has a cabin equipped with permanently installed sleeping quarters and cooking facilities, located at 6155 Northeast 175th, Seattle, in said county and state, with intent to commit a crime against a person or property therein;

Contrary to RCW 9A.52.095, and against the peace and dignity of the State of Washington.

COUNT VI

And I, Norm Maleng, Prosecuting Attorney aforesaid further do accuse IAN M. SIMMERS of the crime of **Vehicle Prowl in the First Degree**, based on the same conduct as another crime charged herein, which crimes were so closely connected in respect to time, place and occasion that it would be difficult to separate proof of one charge from proof of the other, committed as follows:

That the defendant IAN M. SIMMERS, together with another, in King County, Washington during a period of time intervening between March 11, 1995 through March 15, 1995, did enter or remain unlawfully in a vessel belonging to Fred Romvari, equipped for propulsion by mechanical means or by sail, which has a cabin equipped with permanently installed sleeping quarters and cooking facilities, located at 6155 Northeast 175th, Seattle, in said county and state, with intent to commit a crime against a person or property therein;

Contrary to RCW 9A.52.095, and against the peace and dignity of the State of Washington.

COUNT VII

And I, Norm Maleng, Prosecuting Attorney aforesaid further do accuse IAN M. SIMMERS of the crime of **Vehicle Prowl in the First Degree**, based on the same conduct as another crime charged herein,

Norm Maleng
Prosecuting Attorney
W 554 King County Courthouse
Seattle, Washington 98104-2312
(206) 296-9000

1  which crimes were so closely connected in respect to time, place and
   occasion that it would be difficult to separate proof of one charge
2  from proof of the other, committed as follows:

3      That the defendant IAN M. SIMMERS, together with another, in
   King County, Washington during a period of time intervening between
4  March 11, 1995 through March 15, 1995, did enter or remain
   unlawfully in a vessel belonging to Thomas Paine, equipped for
5  propulsion by mechanical means or by sail, which has a cabin
   equipped with permanently installed sleeping quarters and cooking
6  facilities, located at 6155 Northeast 175th, Seattle, in said county
   and state, with intent to commit a crime against a person or
7  property therein;

8      Contrary to RCW 9A.52.095, and against the peace and dignity of
   the State of Washington.
9

10                              COUNT VIII

11     And I, Norm Maleng, Prosecuting Attorney aforesaid further do
   accuse IAN M. SIMMERS of the crime of **Vehicle Prowl in the First**
12 **Degree**, based on the same conduct as another crime charged herein,
   which crimes were so closely connected in respect to time, place and
13 occasion that it would be difficult to separate proof of one charge
   from proof of the other, committed as follows:

14     That the defendant IAN M. SIMMERS, together with another, in
   King County, Washington during a period of time intervening between
15 March 11, 1995 through March 15, 1995, did enter or remain
   unlawfully in a vessel belonging to Allen Wells, equipped for
16 propulsion by mechanical means or by sail, which has a cabin
   equipped with permanently installed sleeping quarters and cooking
17 facilities, located at 6201 Northeast 175th, Seattle, in said county
   and state, with intent to commit a crime against a person or
18 property therein;

19     Contrary to RCW 9A.52.095, and against the peace and dignity of
   the State of Washington.
20

21                              COUNT IX

22     And I, Norm Maleng, Prosecuting Attorney aforesaid further do
   accuse IAN M. SIMMERS of the crime of **Vehicle Prowl in the First**
   **Degree**, based on the same conduct as another crime charged herein,
23 which crimes were so closely connected in respect to time, place and
   occasion that it would be difficult to separate proof of one charge
24 from proof of the other, committed as follows:

25

Norm Maleng
Prosecuting Attorney
W 554 King County Courthouse
Seattle, Washington 98104-2312
(206) 296-9000

SECOND AMENDED INFORMATION- 4

1    That the defendant IAN M. SIMMERS, together with another, in
2 King County, Washington during a period of time intervening between
March 11, 1995 through March 15, 1995, did enter or remain
3 unlawfully in a vessel belonging to Diane Pratt, equipped for
propulsion by mechanical means or by sail, which has a cabin
4 equipped with permanently installed sleeping quarters and cooking
facilities, located at 6201 Northeast 175th, Seattle, in said county
5 and state, with intent to commit a crime against a person or
property therein;

6    Contrary to RCW 9A.52.095, and against the peace and dignity of
the State of Washington.
7

8                            COUNT X

9    And I, Norm Maleng, Prosecuting Attorney aforesaid further do
accuse IAN M. SIMMERS of the crime of **Vehicle Prowl in the First**
10 **Degree**, based on the same conduct as another crime charged herein,
which crimes were so closely connected in respect to time, place and
11 occasion that it would be difficult to separate proof of one charge
from proof of the other, committed as follows:

12    That the defendant IAN M. SIMMERS, together with another, in
King County, Washington during a period of time intervening between
13 March 11, 1995 through March 15, 1995, did enter or remain
unlawfully in a vessel belonging to Howard Plimpton, equipped for
14 propulsion by mechanical means or by sail, which has a cabin
equipped with permanently installed sleeping quarters and cooking
15 facilities, located at 6155 Northeast 175th, Seattle, in said county
and state, with intent to commit a crime against a person or
16 property therein;

17    Contrary to RCW 9A.52.095, and against the peace and dignity of
the State of Washington.
18

19                           COUNT XI

20    And I, Norm Maleng, Prosecuting Attorney aforesaid further do
accuse IAN M. SIMMERS of the crime of **Vehicle Prowl in the First**
21 **Degree**, based on the same conduct as another crime charged herein,
which crimes were so closely connected in respect to time, place and
22 occasion that it would be difficult to separate proof of one charge
from proof of the other, committed as follows:

23    That the defendant IAN M. SIMMERS, together with another, in
King County, Washington during a period of time intervening between
24 March 11, 1995 through March 15, 1995, did enter or remain
unlawfully in a vessel belonging to Lee Lannoye, equipped for
25 propulsion by mechanical means or by sail, which has a cabin

Norm Maleng
Prosecuting Attorney
W 554 King County Courthouse
Seattle, Washington 98104-2312
(206) 296-9000

SECOND AMENDED INFORMATION- 5

1  equipped with permanently installed sleeping quarters and cooking
   facilities, located at 6155 Northeast 175th, Seattle, in said county
2  and state, with intent to commit a crime against a person or
   property therein;
3

4  Contrary to RCW 9A.52.095, and against the peace and dignity of
   the State of Washington.

5  COUNT XII

6  And I, Norm Maleng, Prosecuting Attorney aforesaid further do
   accuse IAN M. SIMMERS of the crime of Vehicle Prowl in the First
7  Degree, based on the same conduct as another crime charged herein,
   which crimes were so closely connected in respect to time, place and
8  occasion that it would be difficult to separate proof of one charge
   from proof of the other, committed as follows:
9

10 That the defendant IAN M. SIMMERS, together with another, in
   King County, Washington during a period of time intervening between
   March 11, 1995 through March 15, 1995, did enter or remain
11 unlawfully in a vessel belonging to Ralph Dreitzler, equipped for
   propulsion by mechanical means or by sail, which has a cabin
12 equipped with permanently installed sleeping quarters and cooking
   facilities, located at 6155 Northeast 175th, Seattle, in said county
13 and state, with intent to commit a crime against a person or
   property therein;
14

   Contrary to RCW 9A.52.095, and against the peace and dignity of
15 the State of Washington.

16                         NORM MALENG
                          Prosecuting Attorney
17

18                        By: _____
                          Jim Macner, WSBA #91002
19                        Deputy Prosecuting Attorney

20

21

22

23

24

25

Norm Maleng
Prosecuting Attorney
W 554 King County Courthouse
Seattle, Washington 98104-2312
(206) 296-9000

1

CAUSE NO. 95-1-05833-3

2

SECOND SUPPLEMENTAL CERTIFICATION FOR DETERMINATION
3                        OF PROBABLE CAUSE

4          That Jim Marner is a Deputy Prosecuting Attorney for King
County and is familiar with the police report and investigation
5   conducted in King County Department of Public Safety case No. 95-
060415, 95-079427, 95-079471, 95-082173, 95-083878, and 95-084257;
6
           That this case contains the following upon which this motion
7   for the determination of probable cause is made;

8          On Saturday, March 11, 1995, the defendant, Ian M. Simmers,
walked along the Burke-Gilman trail, located in Bothell, King
9   County, Washington, with his fourteen-year-old friend, Jonathan
Wyatt.  They came upon a 35-year-old man, whom the defendant is
10  currently charged with murdering.  On Wednesday, March 15, 1995, the
defendant and Wyatt were arrested after they were found setting off
11  flares in a residential neighborhood.  Wyatt and the defendant were
both advised of their Miranda warnings, which they acknowledged and
12  waived.   Besides confessing to the murder, the defendant showed
police several boats he entered and places he had set on fire.  The
13  defendant also confessed to stealing a boat.

14                              COUNT I

15         William Buchanan owns a twenty-one foot 1987 Campion boat which
he keeps on a trailer near his house in King County, Washington.
16  The boat is valued at $15,000.

17         Early in the morning on March 12, 1995, a neighbor of Mr.
Buchanan's saw heavy smoke coming from the direction of the boat.
18  A newspaper deliverer also noticed the fire and 911 was called.  An
examination  of  the  fire  revealed  Mr.  Buchanan's  boat  was
19  deliberately set on fire with hand held flares and an accelerant.
When Mr. Buchanan thoroughly examined his boat after the fire was
20  out, he discovered a burnt flare wedged under a seat cushion.  The
two fire extinguishers he kept on board were missing; one was found
21  floating in the Sammamish River later in the day.  A flare gun was
also missing.  The defendant confessed to breaking into the boat and
22  to taking a flare gun from it.

23         The defendant and Wyatt broke into the boat and found flare
guns and various types of flares.  The defendant set the boat on
24  fire with the flares.  Wyatt described the defendant as laughing
throughout the incident.  The boat was destroyed; the estimated
25  damage is $15,000.

Second Supplemental Certification                    **Norm Maleng**
for Determination of Probable Cause - 1              Prosecuting Attorney
                                                     W 554 King County Courthouse
                                                     Seattle, Washington 98104-2312
                                                     (206) 296-9000

1      The defendant and Wyatt continued down the trail. They came to
2  an apartment complex parking lot. The defendant broke into about
   twenty cars looking for money.

3  COUNT II

4      The defendant continued down the trail until he came upon a
   King County Parks Department restroom located in King County,
5  Washington. The defendant started firing flares into the restroom.
   Three separate fires were started in the women's restroom, and two
6  fires were started in the adjoining men's restroom. Investigators
   found numerous aerial and hand held flares and caps on the floors.
7  Damage was estimated at over $5,000. Again, Wyatt described the
   defendant as being quite pleased with himself and his destruction.
8  The defendant confessed to shooting flares off and to starting the
   fire in the restroom.
9

10 COUNTS III through XII

11     Between March 11, 1995, and March 15, 1995, the defendant
   climbed over a fence and entered two different marinas. He
12 proceeded to break into at least thirteen yachts in Harbour Village
   Marina, located at 6155 Northeast 175th, Seattle, King County,
13 Washington. The defendant also broke into at least nineteen yachts
   at Davidson's Marina, located at 6201 Northeast 175th, in Seattle,
14 King County, Washington. All of the boats entered are equipped with
   permanently installed sleeping quarters and cooking facilities.
15 Each of the boats entered suffered varying degrees of damage. Many
   boats had items stolen or ruined. Some of the stolen items included
16 flares or flare guns which were used in the arsons. The defendant
   took alcohol from any of the boats that had alcohol. The defendant
17 ate, drank, and slept on these boats. Thousands and thousands of
   dollars in damage occurred.

18     Randy Gehrke and Harvy Noble own a 26-foot boat which was
   moored at Davidson's Marina. The boat is equipped with permanent
19 sleeping quarters and cooking facilities. They examined their boat
   and discovered that door lock had been broken and a window had been
20 smashed. Upon entering the boat, Mr. Gehrke and Mr. Noble
   discovered that the door to the refrigerator had been broken and the
21 carpet had been burnt. They also noticed a flare gun and flares
   were missing. They did not give anyone permission to enter the
22 boat.

23     Jeffrey McClure owns a 48-foot motor boat that he keeps moored
   at the Harbour Village Marina. The boat is equipped with permanent
24 sleeping facilities and a galley. Mr. McClure examined his boat and
   discovered a door pried open, cabinets open, and several bottles of
25 alcohol missing, as well as a marine band radio. A flare gun had

Second Supplemental Certification
for Determination of Probable Cause - 2

Norm Maleng
Prosecuting Attorney
W 554 King County Courthouse
Seattle, Washington 98104-2312
(206) 296-9000

1   been fired and other flares were missing.  No one had permission to
    enter or remain on Mr. McClure's boat.
2
        Tony Simonelli owns a boat that he keeps moored at the Harbour
3   Village Marina.  The boat has permanent sleeping quarters and a
    galley.  Mr. Simonelli examined his boat and discovered cabinets
4   opened, a flare gun and flares missing, and window frames broken.
    No one had permission to enter or remain on Mr. Simonelli's boat.
5
        Fred Romvari owns a boat that he keeps moored at Harbour
6   Village Marina.  The boat is equipped with permanent sleeping
    quarters and a galley.  Mr. Romvari examined his boat and discovered
7   the entry hatch damaged, and flares were missing.  No one had
    permission to be on Mr. Romvari's boat.  Latent prints taken from
8   the boat's interior were found to belong to the defendant.
9
        Thomas Paine owns a boat which was moored at the Harbour
    Village Marina.  The boat is equipped with permanent sleeping
10  quarters and cooking facilities.  Mr. Paine examined the boat and
    found that the latch securing the door had been pried off.  Inside
11  he found marine equipment, including a flare gun kit, spread on a
    bed.  He also noticed that a marine radio he had just purchased for
12  $250 was missing.  Mr. Paine did not give anyone permission to enter
    the boat.
13
        Allen Wells owns a 28-foot boat which was moored at Davidson's
14  Marina.  The boat is equipped with permanent sleeping quarters and
    cooking facilities.  He examined his boat and found that the door
15  lock had been broken.  Inside his boat he found cigarette butts and
    open cans of beer and soda which had not been in the boat when he
16  had last been aboard.  He also found two sleeping bags, a heater,
    and an alarm clock which did not belong to him.  Mr. Wells did not
17  give anyone permission to enter his boat.
18      Diane Pruitt owns a 24-foot boat which is moored at Davidson's
    Marina.  The boat is equipped with permanent sleeping quarters and
19  cooking facilities.  When Ms. Pruitt examined the boat, she found
    that the hinge to the entry door had been broken and the interior
20  had been ransacked.  Ms. Pruitt did not give anyone permission to
    board her boat.
21
        Howard Plimpton owns a boat moored at the Harbour Village
22  Marina.  The boat is equipped with permanent sleeping quarters and
    cooking facilities.  Mr. Plimpton examined the boat and discovered
23  that the rear entry hatch lock had been broken.  When he inspected
    the interior of the boat, Mr. Plimpton discovered that a bottle of
24  scotch and a bottle of vodka were missing from the liquor cabinet.
    Mr. Plimpton also noticed that many knives were on the galley floor.
25

Second Supplemental Certification
for Determination of Probable Cause - 3

Norm Maleng
Prosecuting Attorney
W 554 King County Courthouse
Seattle, Washington 98104-2312
(206) 296-9000

Lee Lannoye owns a boat which is moored at the Harbour Village Marina. The boat is equipped with permanent sleeping quarters and cooking facilities. When Mr. Lannoye inspected his boat after the reported break-ins, he discovered that his boat had been broken into and ransacked. Liquor and various personal items were missing. Mr. Lannoye did not give anyone permission to enter his boat.

Ralph Dreitzler owns a boat moored at Harbour Village Marina. The boat is equipped with permanent sleeping quarters and cooking facilities. When Mr. Dreitzler inspected his boat after the break-ins were reported, he discovered that the lock on the pilot door had been broken and the interior had been ransacked. Beer and wine were missing. Mr. Dreitzler did not give anyone permission to enter his boat.

Later on Wednesday, at approximately 12 p.m., King County Police were called on a report of juveniles firing flare guns. The defendant was arrested. A flare gun was found in the defendant's waistband. The defendant admitted to committing all of the above offenses. He led police to the marinas and tried to remember which boats he had entered. The ones he remembered, he pointed out to police.

Under penalty of perjury under the laws of the State of Washington, I certify that the foregoing is true and correct. Signed and dated by me this _____ day of November, 1995, at Seattle, Washington.

_____
Jim Marner, WSBA #91002

Second Supplemental Certification
for Determination of Probable Cause - 4

Norm Maleng
Prosecuting Attorney
W 554 King County Courthouse
Seattle, Washington 98104-2312
(206) 296-9000



*Forensic Science Associates*

3053 Research Drive, Richmond, CA 94806
FAX (510) 222-8887
(510) 222-8883

November 14, 1995

Susan Mahoney, Attorney
King County Prosecuting Attorney's Office
W554 King County Courthouse
516 Third Avenue
Seattle, WA, 98104

Re: Washington v. Ian Simmers
Cause No. 95-1-02102-2
Our File No. 95-907
<u>Report</u>

<u>Background</u>

 The following information was communicated to us by Susan Mahoney of the King County Prosecuting Attorney's Office: The Gochanour case involves a homicide in which the victim is Rodney Wayne Gochanour and a potential suspect is Ian Simmers. On or about March 11, 1995, the stabbed body of Gochanour was discovered near the Burke-Gilman Trail in Bothel, Washington. A kitchen type serrated knife was found near the murder scene. Pursuant to the investigation of this case clothing including pants were collected from Simmers. These pants were examined by Mike Croteau of the Seattle State Patrol Forensic Science Laboratory. Croteau discovered blood stains in the pocket area of the Simmers pants. It was requested the PCR based DNA typing be conducted to determine whether or not Simmers and/or Gochanour can be eliminated as potential sources of blood from the murder scene knife and the Simmers pants.

**Exhibit F**

Our File No. 95-907

<u>Items of Physical Evidence</u>

The following items of physical evidence were received from Detective E. J. Hopkins of the Bethell Police Department on June 20, 1995 via Federal Express mail:

<u>Item</u>

1. Tape sealed envelope labeled "I95-1665 blood control Rodney Gochanour" containing tape sealed plastic bag labeled "I95-1665 Rodney Gochanour" containing blood stained filter paper labeled "I95-1665 Rodney Gochanour".

2. Tape sealed envelope labeled "I95-1665 Blood control Ian Simmers" containing tape sealed plastic bag labeled "I95-1665 Ian Simmers" containing blood stained filter paper labeled "Ian Simmers I95-1665".

3. Tape sealed paper bag labeled "Simmers Pants EJH-11 I95-1665" containing a pair of black pants.

4. Tape sealed box labeled "95-1570 homicide Knife RM13 I95-1665" containing tape sealed plastic bag labeled "95-1570 homicide RM13" containing one knife.

<u>Examination of the Simmers Pants [Item 3]</u>

A pair of black denim pants [Item 3] was submitted for examination. An overview of the pants front and back is illustrated in figures 1 and 2. Several stained areas were observed on the inside surface of the left pant leg front. These areas [A, B, C, and D] are illustrated in figure 3. Blood was detected in areas A, B, C, and D using a sensitive presumptive test [o-tolidine and hydrogen peroxide]. These areas are illustrated in detail in figures 4 and 5. Approximately half of each stain area was removed for DNA extraction and analysis as described below.

2

 Simmers_I 0202

Our File No. 95-907

A small amount of stain material was observed on the outside surface of the front left pocket in three areas [E, F, and G]. These stained areas are illustrated in figures 6 and 7. Blood was detected in each of these stains using a sensitive presumptive test. Approximately half of the stain from area E and all of the stain from areas F and G were removed for DNA extraction and analysis as described below.

A long narrow dirt encrusted stain was observed at the bottom front of the right pant leg. This stain [H] is illustrated in figure 8. Blood may be present in this stain based on a sensitive presumptive test. Approximately one fourth of this stain was removed for DNA extraction and analysis as described below.

## Examination of the Serrated Kitchen Knife [Item 4]

A serrated kitchen type knife [Item 4] was submitted for examination. This knife is illustrated in figure 9. Blood was detected on the surface of the knife blade using a sensitive presumptive test [o-tolidine and hydrogen peroxide]. The material on each side of the knife [A and B] as well as material from the serrated edge [C] was collected using separate cotton swabs and sterile deionized water. DNA was extracted from these specimens as described below.

## Genetic Analysis of DNA

Several genes were amplified using the polymerase chain reaction [PCR] and subsequently typed. These genes include DQ$\alpha$ and the polymarker genes LDLR, GYPA, HBGG, D7S8, and GC.

The DQ$\alpha$ DNA region can be considered a genetic marker system in its own right in a similar manner to the ABO genetic marker system. Within the DQ$\alpha$ marker system there are 6 alleles (or traits) designated 1.1,1.2,1.3, 2, 3, and 4. Since each individual has two alleles, this genetic marker gives rise to 21 possible types as follows: [1.1,1.1], [1.1,1.2], [1.1,1.3], etc. Each allele is associated with a specific and known DNA sequence. The DNA associated with the conventional HLA genetic markers (A, B, and C loci) is in the Class I

3

Our File No. 95-907

group. All of these genetic markers are associated with the short arm of chromosome 6.

The Polymarker system consists of six genetic markers [DQα is included in the Polymarker system and is typed separately from the other five genes] each located on a different chromosome. These PCR amplifiable genes include the low density lipoprotein receptor [LDLR] located on chromosome 19, glycophorin A [GYPA] located on chromosome 4, hemoglobin gamma globin [HBGG] located on chromosome 11, D7S8 located on chromosome 7, and Group Specific Component [GC] located on chromosome 4 and distantly removed from GYPA. The Polymarker genes are amplified simultaneously and typed using sequence specific probes immobilized on typing strips. Each of these genes possesses two or three alleles. Two of the gene systems described above have been widely employed in forensic practice where typing was conducted at the protein level. Glycophorin A is responsible for the MN blood group system, commonly used in paternity testing; and group specific component [GC] is a blood serum protein responsible for vitamin D transport.

Genetic analysis of the specimens in this case involved the following essential steps:

1. Blood was digested with SDS and proteinase K.

2. DNA was extracted from sample digests with chloroform/phenol and concentrated using Centricon molecular filters.

3. The various genes described above were amplified using the Polymerase Chain Reaction [PCR].

4. DQα and the polymarker genes were typed by hybridizing the amplified sample DNA with Allele Specific Oligonucleotides (ASO's) using a Dot Blot Assay.

The results of this analysis are summarized in Table 1. These findings revealed the following observed facts:

4

Our File No. 95-907

1. The genes described above were successfully amplified and typed from the blood stains recovered from the Simmers left pant leg in areas A, B, C, and D as well as the left pant pocket in areas E, F, and G. These blood stains were determined to be DQα type **1.2,1.3**; LDLR type **A,A**; GypA type **A,A**; HBGG type **A,B**; D7S8 type **A,A** and GC type **C,C**. This array of genotypes occurs in approximately 0.01% [one out of 9,500] of the Caucasian population and less frequently in other major population groups such as the Black and Mexican American populations. The frequencies associated with individual genotypes are summarized in Appendix 1 below.

2. No result was obtained from stain area H at the bottom of Simmers right pant leg.

3. A small amount of DNA was recovered from the pocket outside the blood stained areas. DNA from these non blood cells produced the same genetic array as the DNA recovered from the pocket blood stain areas. Since larger quantities of DNA were recovered from the blood stain areas, it is likely that these typing determinations reflect the genetic properties of the blood stain source.

4. The DNA recovered from the serrated knife blade in areas A, B, and C was determined to be DQα type **1.1**,4; LDLR type **B,B**; GypA type **A,A**; HBGG type **A,A**; D7S8 type **A,B** and GC type **C,C**. This array of genotypes occurs in approximately 0.03% [one out of 3,300] of the Caucasian population and less frequently in other major population groups such as the Black and Mexican American populations. The frequencies associated with individual genotypes are summarized in Appendix 1 below.

95-1-02102-2 SEA

Simmers_I  0205

Our File No. 95-907

5. Ian Simmers was determined to be DQα type **1.2,1.3**; LDLR type **A,A**; GypA type **A,A**; HBGG type **A,B**; D7S8 type **A,A** and GC type **C,C**. Therefore, he can not be eliminated as a potential source of the blood stains [Areas A, B, C, D, E, F, and G] on his pants [Item 3].  He is eliminated as a potential source of the blood on the serrated knife blade [Item 4].

6. Rodney Gochanour was determined to be DQα type **1.1,4**; LDLR type **B,B**; GypA type **A,A**; HBGG type **A,A**; D7S8 type **A,B** and GC type **C,C**. Therefore, he is eliminated as a potential source of the blood stains from the Simmers pants [Item 3].  He can not be eliminated as a potential source of biological material on the serrated knife blade [Item 4].

Should you have any questions concerning this work, please contact us.

Sincerely,

*Jennifer A. Mihalovich*

Jennifer S. Mihalovich
Criminalist

*Edward T. Blake*

Edward T. Blake, D.Crim

6

Our File No. 95-907

# Appendix 1:
## Cumulative Frequency Data for the
## DQα and Polymarker Genotypes

Item 3.  Blood Stains from Simmers Pants in Areas A, B, C, D, D, F, & G.

| Marker | Type | Frequency in Caucasians | Frequency in Blacks | Frequency in Mexican Americans |
|---|---|---|---|---|
| DQα | 1.2,1.3 | 0.03 | 0.02 | 0.01 |
| LDLR | A,A | 0.19 | 0.06 | 0.24 |
| GYPA | A,A | 0.30 | 0.26 | 0.40 |
| HBGG | A,B | 0.49 | 0.21 | 0.43 |
| D7S8 | A,A | 0.39 | 0.40 | 0.43 |
| GC | C,C | 0.32 | 0.04 | 0.25 |
| Cumulative Frequency | | 0.0001 | 0.000001 | 0.000044 |
| Cumulative % | | 0.01% | 0.0001% | 0.0044% |
| Reciprocal Frequency | | 1/9,500 | 1/950,000 | 1/20,000 |

Item 4.  Blood Stains from Knife [areas A, B, & C].

| Marker | Type | Frequency in Caucasians | Frequency in Blacks | Frequency in Mexican Americans |
|---|---|---|---|---|
| DQα | 1.1,4 | 0.08 | 0.09 | 0.09 |
| LDLR | B,B | 0.32 | 0.58 | 0.26 |
| GYPA | A,A | 0.30 | 0.26 | 0.40 |
| HBGG | A,A | 0.26 | 0.23 | 0.14 |
| D7S8 | A,B | 0.47 | 0.47 | 0.45 |
| GC | C,C | 0.32 | 0.04 | 0.25 |
| Cumulative Frequency | | 0.0003 | 0.00006 | 0.00015 |
| Cumulative % | | 0.03% | 0.006% | 0.015% |
| Reciprocal Frequency | | 1/3,300 | 1/17,000 | 1/6,800 |

1.  DQα frequency estimates are based on a compilation of seven studies involving 2390 Caucasians, eight studies involving 2004 Blacks, and four studies involving 464 Mexican Americans.  Polymarker frequency estimates are based on genotype counts provided by Roche Molecular Systems, Forensic Science Associates, the FBI, and the Serological Research Institute [SERI].  These frequencies are based on a random survey of 420 Caucasians, 337 Blacks, and 268 Mexican-Americans.  The frequencies for GYPA and GC are similar to those frequencies in the serology literature.

7

95-1-02102-2 SEA

Simmers_J 0208

## PCR AMPLIFIED DNA AND TYPING: 95-907
### TABLE 1

| ITEM NO. | DESCRIPTION | EST. DNA CONC. [ng/ul] | DQα Type | Polymarker Genes | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | LDLR Type | GYPA Type | HBGG Type | D7S8 Type | GC Type |
| 1 | RODNEY GOCHANOUR, REF. BLOOD | 20 | 1.1,4.1 | B,B | A,A | A,A | A,B | C,C |
| 2 | IAN SIMMERS, REF. BLOOD | 5 | 1.2,1.3 | A,A | A,A | A,B | A,A | C,C |
| 3A | BLOOD STAIN FROM SIMMERS PANTS, AREA A | | 1.2,1.3 | A,A | A,A | A,B | A,A | C,C |
| 3B | BLOOD STAIN FROM SIMMERS PANTS, AREA B | | 1.2,1.3 | A,A | A,A | A,B | A,A | C,C |
| 3C | BLOOD STAIN FROM SIMMERS PANTS, AREA C | | 1.2,1.3 | A,A | A,A | A,B | A,A | C,C |
| 3D | BLOOD STAIN FROM SIMMERS PANTS, AREA D | 0.25 | 1.2,1.3 | A,A | A,A | A,B | A,A | C,C |
| 3E | BLOOD STAIN FROM SIMMERS PANTS, AREA E | 0.5 | 1.2,1.3 | A,A | A,A | A,B | A,A | C,C |
| 3F | BLOOD STAIN FROM SIMMERS PANTS, AREA F | 0.125 | 1.2,1.3 | A,A | A,A | A,B | A,A | C,C |
| 3G | BLOOD STAIN FROM SIMMERS PANTS, AREA G | 0.1 | 1.2,1.3 | A,A | A,A | A,B | A,A | C,C |

NA: No Activity
NAI: No Activity Due to Inhibition
D: Degraded

H: High
M: Medium
L: Low

1

## PCR AMPLIFIED DNA AND TYPING: 95-907
### TABLE 1

95-1-02102-2 SEA

Simmers_I 0209

| ITEM NO. | DESCRIPTION | EST. DNA CONC. [ng/μl] | DQα Type | Polymarker Genes | | | | |
| | | | | LDLR Type | GYPA Type | HBGG Type | D7S8 Type | GC Type |
|---|---|---|---|---|---|---|---|---|
| 3H | BLOOD STAIN FROM SIMMERS PANTS, AREA H | | NA | NA | NA | NA | NA | NA |
| 3C1 | CONTROL AREA 1 FROM SIMMERS PANTS | | NA | NA | NA | NA | NA | NA |
| 3C2 | CONTROL AREA 2 FROM SIMMERS PANTS [Pocket] | 0.031 | 1.2,1.3 | A,A | A,A | A,B | A,A | C,C |
| 4A | BLOOD STAIN FROM KNIFE, AREA A | 0.063 | 1.1,4.1 | B,B | A,A | A,A | A,B | C,C |
| 4B | BLOOD STAIN FROM KNIFE, AREA B | 0.016 | 1.1,4.1 | B,B | A,A | A,A | A,B | C,C |
| 4C | BLOOD STAIN FROM KNIFE, AREA C | 0.1 | 1.1,4.1 | B,B | A,A | A,A | A,B | C,C |
| | EXTRACTION BLANK | 0 | NA | NA | NA | NA | NA | NA |

NA: No Activity
NAI: No Activity Due to Inhibition
  D: Degraded

2

H: High
M: Medium
L: Low

F I L E D
KING COUNTY, WASHINGTON

MAR 11 1996

SUPERIOR COURT CLERK
BEVERLY ANN ENEBRAD
DEPUTY

SUPERIOR COURT OF WASHINGTON FOR KING COUNTY

THE STATE OF WASHINGTON,        )
                                )
                    Plaintiff,  )   No.  95-1-02102-2
                                )
        v.                      )   AMENDED INFORMATION
IAN MONROE SIMMERS              )
                                )
                                )
                                )
                                )
                    Defendant.  )
_____)

COUNT I

I, Norm Maleng, Prosecuting Attorney for King County in the name and by the authority of the State of Washington, do accuse IAN MONROE SIMMERS of the crime of **Murder in the First Degree**, committed as follows:

That the defendant IAN MONROE SIMMERS in King County, Washington on or about March 10, 1995, with premeditated intent to cause the death of another person did cause the death of Rodney Wayne Gochanour, a human being, who died on or about March 10, 1995;

Contrary to RCW 9A.32.030(1)(a), and against the peace and dignity of the State of Washington.

And I, Norm Maleng, Prosecuting Attorney for King County in the name and by the authority of the State of Washington further do accuse the defendant IAN MONROE SIMMERS at said time of being armed with a deadly weapon, to-wit:  a knife, under the authority of RCW 9.94A.125.

COUNT II

And I, Norm Maleng, Prosecuting Attorney aforesaid further do accuse IAN MONROE SIMMERS of the crime of **Murder in the Second Degree**, a crime of the same or similar character as another crime charged herein, and committed as follows:

That the defendant IAN MONROE SIMMERS in King County, Washington on or about March 10, 1995, while committing and

Norm Maleng
Prosecuting Attorney
W 554 King County Courthouse
Seattle, Washington 98104-2312
(206) 296-9000

AMENDED INFORMATION- 1

**Exhibit G**

1  attempting to commit the crime of Assault in the Second Degree, and
   in the course of and in furtherance of said crime and in the
2  immediate flight therefrom, and with intent to cause the death of
   another person, did cause the death of Rodney Wayne Gochanour, a
3  human being, who was not a participant in said crime, and who died
   on or about March 10, 1995;
4
       Contrary to RCW 9A.32.050(1)(a) and (b), and against the peace
5  and dignity of the State of Washington.

6      And I, Norm Maleng, Prosecuting Attorney for King County in the
   name and by the authority of the State of Washington further do
7  accuse the defendant IAN MONROE SIMMERS at said time of being armed
   with a deadly weapon, to-wit: a knife, under the authority of RCW
8  9.94A.125.

9

10                        NORM MALENG
                          Prosecuting Attorney
11
12                        By: _____
                          Jim Marher, WSBA #91002
13                        Deputy Prosecuting Attorney

14

15

16

17

18

19

20

21

22

23

24

25

AMENDED INFORMATION- 2

Norm Maleng
Prosecuting Attorney
W 554 King County Courthouse
Seattle, Washington 98104-2312
(206) 296-9000

# *The Adolescent Brain*

## B.J. Casey,[a] Rebecca M. Jones,[a] and Todd A. Hare[b]

[a]*Sackler Institute, Weill Medical College of Cornell University, New York, New York, USA*

[b]*California Institute of Technology, Pasadena, California, USA*

Adolescence is a developmental period characterized by suboptimal decisions and actions that are associated with an increased incidence of unintentional injuries, violence, substance abuse, unintended pregnancy, and sexually transmitted diseases. Traditional neurobiological and cognitive explanations for adolescent behavior have failed to account for the nonlinear changes in behavior observed during adolescence, relative to both childhood and adulthood. This review provides a biologically plausible model of the neural mechanisms underlying these nonlinear changes in behavior. We provide evidence from recent human brain imaging and animal studies that there is a heightened responsiveness to incentives and socioemotional contexts during this time, when impulse control is still relatively immature. These findings suggest differential development of bottom-up limbic systems, implicated in incentive and emotional processing, to top-down control systems during adolescence as compared to childhood and adulthood. This developmental pattern may be exacerbated in those adolescents prone to emotional reactivity, increasing the likelihood of poor outcomes.

*Key words:* adolescence; prefrontal cortex; nucleus accumbens; amygdala; limbic; impulsivity; reward; development; risk taking; emotion

## Introduction

Adolescence is the period between childhood and adulthood encompassed by changes in physical, psychological, and social development (Ernst et al. 2006). These alterations make this period a time of vulnerability and adjustment (Steinberg 2005). According to the National Center for Health Statistics, there are over 13,000 adolescent deaths in the United States each year. Approximately 70% of these deaths result from motor vehicle crashes, unintentional injuries, homicide, and suicide (Eaton et al. 2006). Results from the 2005 National Youth Risk Behavior Survey (YRBS) show that adolescents engage in behaviors that increase their likelihood of death or illness by driving a vehicle after drinking or without a seat belt, carrying weapons, using illegal substances, and engaging in unprotected sex resulting in unintended pregnancies and STDs, including HIV infection (Eaton et al. 2006). These statistics underscore the importance of understanding risky choices and behavior in adolescents.

Adolescence is also a time of increased emotional reactivity. During this period, the social environment is changing such that more time is spent with peers versus adults, and more conflicts arise between the adolescent and his/her parents (Csikszentmihalyi et al. 1977; Steinberg 1989). These changes in social interactions may influence the rise of emotional reactivity. In addition, given the increase in risky choices and behavior during adolescence, it appears the value of positive and negative information may be exaggerated. Greater emotional reactivity and sensitivity during adolescence may play a role in the higher incidence of affective disorder onset and addiction during this developmental period (Pine et al. 2001; Silveri et al. 2004; Steinberg 2005).

A number of cognitive and neurobiological hypotheses have been postulated to explain why adolescents engage in suboptimal choice behavior. In a recent review of the literature on human adolescent brain development, Yurgelun-Todd (2007) suggests that cognitive development during adolescence is associated with progressively greater efficiency of cognitive control and affective modulation. An increase in activity in the prefrontal regions as an indication of maturation (Rubia et al. 2000; Rubia et al. 2006; Tamm et al. 2002) and diminished activity in irrelevant brain regions (Brown et al. 2005; Durston et al. 2006; Monk

Address for correspondence: BJ Casey, Sackler Institute, Weill Cornell Medical College, 1300 York Avenue, Box 140, New York, NY 10021. Voice: +212-746-5832 fax: 212-746-5755 USA.

bjc2002@med.cornell.edu

Ann. N.Y. Acad. Sci. 1124: 111–126 (2008). © 2008 New York Academy of Sciences.
doi: 10.1196/annals.1440.010

**Exhibit H**

et al. 2003) are described as the neurobiological explanation for the behavioral changes associated with adolescence. This general pattern, of improved cognitive control and emotion regulation with maturation of the prefrontal cortex, suggests a linear increase in development from childhood to adulthood.

As evidenced by the National Center for Health Statistics on adolescent behavior and mortality, suboptimal choices and actions observed during adolescence represent a nonlinear change in behavior, distinct from childhood and adulthood. If immaturity of prefrontal cortex were the basis for suboptimal choice behavior and heightened emotional reactivity in adolescence, then children who have less developed prefrontal cortex and cognitive abilities should look remarkably similar or even worse than adolescents. Thus, immature prefrontal function alone cannot account for adolescent behavior.

This review will provide evidence from developmental animal and human neuroimaging studies that may account for nonlinear changes in behavior and development during adolescence. A model of adolescent brain development is presented in the context of risk factors including suboptimal decision making and heightened emotional reactivity.

## Development of Goal-directed Behavior: Risk versus Impulse

An accurate conceptualization of cognitive and neurobiological changes during adolescence must treat adolescence as a transitional developmental period (Spear 2000), rather than a single snapshot in time (Casey et al. 2005). In other words, to understand this developmental period, transitions into and out of adolescence are necessary for distinguishing distinct attributes of this stage of development. Adolescent behavior has been described as impulsive and risky, almost synonymously, yet these behaviors rely on different cognitive and neural processes (Casey et al. in press), which suggest distinct constructs with different developmental trajectories.

A cornerstone of cognitive development is the ability to suppress inappropriate thoughts and actions in favor of goal-directed ones, especially in the presence of compelling incentives (Casey et al. 2005; Casey et al. 2000; Casey et al. 2002). A number of classic developmental studies have shown that this ability develops throughout childhood and adolescence (Case 1972; Flavell et al. 1966; Keating & Bobbitt 1978; Pascual-Leone 1970). Several theorists (e.g., Bjorkland 1985, 1987; Case 1985) have argued that cognitive devel-

opment is due to increases in processing speed and efficiency and not due to an increase in mental capacity. Other theorists have included the construct of "inhibitory" processes in their account of cognitive development (Harnishfeger & Bjorkland 1993). According to this account, immature cognition is characterized by susceptibility to interference from competing sources that must be suppressed (e.g., Brainerd & Reyna 1993; Dempster 1993) (Casey et al. 2002; Diamond 1985; Munakata & Yerys 2001). Thus goal-directed behavior requires the control of impulses or delay of gratification for optimization of outcomes, and this ability appears to mature across childhood and adolescence.

On a cognitive or behavioral level, the immature cognition of adolescence is characterized as impulsive (i.e., lacking cognitive control) and risk taking, with these constructs used synonymously and without appreciation for distinct developmental trajectories for each. Human imaging and animal studies suggest distinct neurobiological and developmental trajectories for the neural systems that underlie these separate constructs of impulse control and risky decisions. Specifically, a review of the literature suggests that impulsivity diminishes with age across childhood and adolescence (Casey et al. 2005; Casey et al. 2002; Galvan et al. 2007) and is associated with protracted development of the prefrontal cortex (Casey et al. 2005; Casey et al. 2002; Galvan et al. 2007) and is associated with protracted development of the prefrontal cortex (Casey et al. 2005). However, there are individual differences in the degree of impulsivity, regardless of age.

In contrast to the linear increase with age associated with impulse control, risk taking appears greater during adolescence relative to childhood and adulthood and is associated with subcortical systems known to be involved in evaluation of incentives and affective information. Human imaging studies that are reviewed here suggest an increase in subcortical activation (accumbens and amygdala) when making risky choices and processing emotional information (Ernst et al. 2005; Monk et al. 2003; Montague & Berns 2002) (Kuhnen & Knutson 2005; Matthews et al. 2004) that is exaggerated in adolescents, relative to children and adults (Ernst et al. 2005; Galvan et al. 2006).

These findings suggest distinct neurobiological trajectories for impulse versus risk taking behavior. The limbic subcortical systems appear to be developed by adolescence in contrast to control systems that show a protracted and linear developmental course into young adulthood. The prefrontal cortical control systems are necessary for overriding inappropriate choices and actions in favor of goal-directed ones.



**FIGURE 1.** Illustrations of the most common magnetic resonance methods used in the study of human development. **(A)** Structural magnetic resonance imaging (MRI) to produce structural images of the brain useful for anatomical and morphometric studies, **(B)** diffusion tensor imaging (DTI) measures myelination and directionality of fiber tracts between anatomical structures, and **(C)** functional MRI (fMRI) measures patterns of brain activity within those structures (from Casey et al. 2005).

## Animal Studies of Adolescent Brain Development

Until recently, much of our understanding of the adolescent brain has come from animal studies. These experiments have been critical for obtaining information about the neurochemical and cellular changes that occur as a function of age. The validity of animal models to study adolescence has been questioned, since it is argued that only humans undergo the psychological stress of adolescence (e.g., Bogin 1994). However, animals including rodents and nonhuman primates exhibit increased social interactions during adolescence (Primus & Kellogg 1989) as well as novelty-seeking and risk-taking behaviors (Adriani et al. 1998; Spear 2000). These behavioral findings suggest that animal models are appropriate for studying neurobiological changes during adolescence.

Studies in rodents have shown at the cellular level that there are distinct changes in limbic and prefrontal regions during adolescence. During early puberty, there is an overproduction of axons and synapses, followed by rapid pruning in later adolescence (Crews et al. 2007). Specifically, there is dendritic pruning in the amygdala (Zehr et al. 2006), nucleus accumbens (Teicher et al. 1995), and prefrontal cortex (Andersen & Teicher 2004; Andersen et al. 2000) and continual growth in the density of the fibers connecting the amygdala and prefrontal cortex into early adulthood (Cunningham et al. 2002). There is more prolonged pruning throughout adolescence in the prefrontal cortex versus the accumbens (Andersen et al. 2000; Teicher et al. 1995). These differences in pruning in rodents are consistent with our model suggesting that the accumbens matures earlier than the prefrontal cortex.

Consistent with the cellular changes in animals, there are alterations in neurotransmission in these sub-cortical and cortical areas. Animal studies have shown that dopamine is crucial for communication between the accumbens, amygdala, and prefrontal cortex and that signaling between these regions relies upon the fine balance between excitatory and inhibitory dopamine transmission (Floresco & Tse 2007; Grace et al. 2007; Jackson et al. 2001). There are significant peaks in dopamine expression during adolescence. Dopamine projections to the prefrontal cortex continue to develop into early adulthood, with dopamine levels peaking in the prefrontal cortex during adolescence versus earlier or later in life in nonhuman primates (Rosenberg & Lewis 1994, 1995) and in rats (Kalsbeek et al. 1988). Dopamine receptor expression is highest in the accumbens during early adolescence (Tarazi et al. 1998). These findings in rodents suggest that there are specific regions undergoing structural changes, and therefore, connections and communication between subcortical and cortical regions are in transition and in flux during adolescence. Significant evidence suggests that the neuroanatomical changes described above are also occurring during adolescence in humans, but our methods for studying humans only provide an approximate index of such changes.

## Neuroimaging Studies of Human Brain Development

Our current understanding of the human adolescent brain has come from advances in neuroimaging methodologies that can be used with developing human populations. These methods depend on magnetic resonance imaging (MRI) methods (see FIG. 1) and include structural MRI, which is used to measure the size and shape of structures; diffusion tensor imaging (DTI), which is used to index connectivity of white matter fiber tracts; and functional MRI which is used to



**FIGURE 2.** Illustration of gray matter volume maturation over the cortical surface from 5 to 20 years of age (from Lenroot & Giedd 2006).

measure patterns of brain activity. These methods have furthered our understanding of the neurobiological basis and development of reward or incentive behavior relative to goal-directed behavior.

### MRI Studies of Human Brain Development

Several studies have used structural MRI to map the developmental course of the normal brain (for review, see Durston et al. 2001). Although the brain reaches approximately 90% of its adult size by age six, the gray and white matter subcomponents of the brain continue to undergo dynamic changes throughout adolescence. Data from recent longitudinal MRI studies indicate that the change in gray matter volume over time has an inverted U-shape pattern and has greater regional variation than white matter (Giedd 2004; Gogtay et al. 2004, Sowell et al. 2003, 2004). In general, regions that involve primary functions, such as motor and sensory systems, mature earliest compared to the higher-order association areas that integrate these primary functions (Gogtay et al. 2004; Sowell et al. 2004). MRI studies show loss of cortical gray matter first in primary sensorimotor areas, followed by that in the dorsolateral prefrontal and lateral temporal cortices (Gogtay et al. 2004) (see Fig. 2). This pattern of change is consistent with nonhuman primate (Bourgeois et al. 1994) and human postmortem studies (Huttenlocher 1979) indicating that the prefrontal cortex is one of the last brain regions to mature. In contrast to gray matter, white matter volume increases in a roughly linear pattern throughout development and into adulthood (Gogtay et al. 2004). These changes most likely reflect ongoing myelination of axons by oligodendrocytes enhancing neuronal conduction and communication.

When examining neuroanatomical changes across development, the subcortical regions are often overlooked, however, it is important to note that these areas have some of the largest changes during development in the brain, particularly in the basal ganglia (Sowell et al. 1999) and specifically in males (Caviness et al. 1996; Giedd et al. 1996; Reiss et al. 1996). Developmental changes in structural volume within basal ganglia and prefrontal regions are interesting in light of the previously mentioned animal work showing pruning in these regions during adolescence. These processes allow for the fine tuning and strengthening of connections between prefrontal and subcortical regions during development and learning that may correspond to greater

cognitive control.

How do these changes in structure relate to differences in cognition? A number of studies have related frontal lobe structural maturation and cognitive function using neuropsychological and cognitive measures (e.g., Sowell et al. 2003). Specifically, these studies showed associations between MRI-based regional volumes of the prefrontal cortex and basal ganglia with measures of cognitive control (i.e., ability to override an inappropriate response in favor of another or to suppress attention toward irrelevant stimulus attribute in favor of relevant stimulus attribute) (Casey et al. 1997, 1997). These findings suggest that cognitive changes are reflected in structural brain changes and underscore the importance of subcortical (basal ganglia) as well as cortical (e.g., prefrontal cortex) development. While these findings showed associations between structure and function, a more in-depth discussion of functional imaging evidence for changes in activity that more directly coincide with behavior across development is presented in the fMRI section.

### DTI Studies of Human Brain Development

The MRI-based morphometry studies previously reviewed suggest that during development, cortical connections are fine tuned via elimination of an overabundance of synapses and by strengthening of relevant connections, although these measures do not have the resolution to visualize or measure synapses. Recent advances in MRI technology, like DTI, provide a potential tool for examining the role of specific white matter tracts in the development of the brain and behavior (for review, see Cascio et al. 2007). Examining white matter tracts can provide knowledge about pathways of connectivity in the brain, and presumably it is via these pathways that information is able to travel from one region of the brain to another (Cascio et al. 2007). Relevant to this paper are the neuroimaging studies that have linked the development of white matter fiber tracts with improvements in cognitive ability with age.

Recently, associations have been shown between DTI-based measures of prefrontal white matter development and cognition in children. Nagy and colleagues showed a positive correlation between maturation of prefrontal–parietal fiber tracts and working memory in children (Nagy et al. 2004), which is consistent with functional neuroimaging studies showing differential recruitment of these regions in children relative to adults. Using a similar approach, Liston and colleagues (2006) have shown that white matter tracts between prefrontal–basal ganglia and posterior fiber tracts continue to develop across childhood into adulthood, but only tracts between the prefrontal cortex

and basal ganglia are correlated with impulse control, as measured by performance on a go/no-go task. The prefrontal fiber tracts were defined by regions of interests, which were identified in an fMRI study using the go/no-go task. In developmental DTI studies, fiber tract measures were correlated with age, but specificity of particular fiber tracts with cognitive performance were shown by dissociating the particular tract (Liston et al. 2006) or cognitive ability (Nagy et al. 2004). These findings highlight the importance of examining not only regional, but also related circuitry changes, when making inferences about neural changes in cognition across development.

### Functional MRI Studies of Human Brain Development

Compared to MRI and DTI, fMRI is a more direct approach for examining behavior changes during development and for establishing structure–function relationships. Using fMRI to measure functional changes in the developing brain has significant potential for the field of developmental science and provides a means for constraining interpretations of adolescent behavior.

As stated previously, the development of the prefrontal cortex is believed to play an important role in the maturation of higher cognitive abilities such as decision making and cognitive control (Casey et al. 2002; Casey et al. 1997; Hare & Casey 2005). Many behavioral paradigms, together with fMRI, have assessed the neurobiological basis of these abilities, including flanker, Stroop, and go/no-go tasks (Casey et al. 1997; Casey et al. 2000; Durston et al. 2003). Collectively, these studies show that children recruit distinct but often larger and more diffuse prefrontal regions when performing these tasks than do adults. The patterns of brain activity that are important for task performance, such as those regions that correlate with cognitive performance, become more fine tuned with age. Regions that are not correlated with task performance diminish in activity with age. This pattern has been observed across both cross-sectional (Brown et al. 2005) and longitudinal studies (Durston et al. 2006) and across a variety of paradigms. Neuroimaging studies cannot definitively characterize the mechanism of such developmental changes as dendritic arborization or synaptic pruning. However, these studies suggest that change over a period of time results in both refinement within brain regions as well as fine tuning of projections from these regions (Brown et al. 2005; Bunge et al. 2002; Casey et al. 1997; Casey et al. 2002; Luna et al. 2001; Moses et al. 2002; Schlaggar et al. 2002; Tamm et al. 2002; Thomas et al. 2004; Turkeltaub et al. 2003).

*Functional MRI Studies of Behavior
during Adolescence*

The question remains how can fMRI studies help



# Exhibit L

Sub 159 - State's Motion

57555882

FILED
2019 FEB 19 01:33 PM
KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE #: 95-1-02102-2 SEA

SUPERIOR COURT OF WASHINGTON FOR KING COUNTY

STATE OF WASHINGTON,

Plaintiff,

vs.

IAN MONROE SIMMERS,

Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)

No. 95-1-02102-2 SEA

MOTION TO VACATE
CONVICTION

## MOTION

Defendant Ian Simmers continues to challenge his 1996 conviction for First-Degree Murder, claiming that he was wrongly convicted based upon a false confession. The State has spent over one year reviewing the case, interviewing witnesses and re-examining the evidence.  The State has not and does not agree that the defendant is innocent of the crime or that he was wrongly convicted.  However, the State has concluded that a defense motion for a new trial would likely be granted.  Moreover, given the difficulty in retrying this case decades after the crime, the fact that the defendant was 16 years old at the time of the murder, and that the defendant has

MOTION TO VACATE CONVICTION - 1

**Daniel T. Satterberg**, Prosecuting Attorney
W554 King County Courthouse
516 Third Avenue
Seattle, Washington 98104
(206) 296-9000, FAX (206) 296-0955

57555882

1  served over 23 years in confinement, the State has determined that a new trial would

2  not be in the interests of justice.

3      Accordingly, by this motion, the State now moves the Court for an order vacating

4  the defendant's conviction of Murder in the First Degree.

6  CERTIFICATION

7      That Carla B. Carlstrom is a Senior Deputy Prosecuting Attorney in and for King

8  County, Washington, and is familiar with the records and files herein and that the State

9  moves to vacate the conviction based upon the following:

10  1. I have been a Senior Deputy Prosecuting Attorney for over 21 years. I have

11      extensive experience handling homicide cases; I was assigned to the

12      homicide unit for over 8 years. In 2017, I was assigned to review this case

13      and examine the defendant's claim that he was wrongfully convicted.

14  2. In the early morning hours of March 11, 1995, Rodney Gochenour was

15      stabbed to death while walking home on the Burke-Gilman trail in Bothell,

16      Washington.

17  3. A few days after the murder, defendant Ian Simmers was identified as a

18      suspect after he was arrested for committing a series of burglaries and other

19      crimes in the same vicinity of the murder. His juvenile accomplice to those

20      crimes, when asked about the murder, suggested to police that Simmers was

21      involved. Simmers was 16 years old at this time.

22  4. The police then interviewed Simmers about the murder, and he confessed to

23      stabbing Mr. Gochenour. As was the custom at the time, Simmers' initial

24

MOTION TO VACATE CONVICTION - 2

**Daniel T. Satterberg**, Prosecuting Attorney
W554 King County Courthouse
516 Third Avenue
Seattle, Washington 98104
(206) 296-9000, FAX (206) 296-0955

57555882

confession was not recorded.  The police then conducted a tape-recorded interview where Simmers repeated his confession.

5. Simmers' confession contained facts that should have been known only by the killer or investigating detectives, such as the number and location of stabs wounds.  He also described how his knife bent during the crime; the knife found by the police had a bent blade.

6. Simmers' confession also contained facts that were incorrect, such as the day of the murder.  His drawing of the murder weapon was not accurate.  He also made a series of other obviously false statements, such as claiming that he killed many other people.

7. On March 20, 1995, the State charged Simmers with Murder in the First Degree.  Simmers was represented by a series of different defense attorneys.

8. At trial, Simmers' confession was the primary evidence against him.  There was no forensic evidence linking him to the murder.  The State also called a jail house informant who testified that Simmers had admitted to deliberately including false details of the crime in his confession.

9. Simmer's defense at trial was that his confession was false.  Though one of his former attorneys had explored calling an expert on false confessions, his trial attorney did not present such an expert.

10. Simmers presented evidence that he had an alibi at the time of the murder.  Several family members testified in support of this alibi, which included the fact he was home the night of the murder watching the movie "The Lion King."

MOTION TO VACATE CONVICTION - 3

**Daniel T. Satterberg,** Prosecuting Attorney
W554 King County Courthouse
516 Third Avenue
Seattle, Washington 98104
(206) 296-9000, FAX (206) 296-0955

Simmers also briefly testified and recounted the plot of that movie. In his testimony, he did not explain how he knew specific details about the murder.

11. On March 28, 1996 a jury convicted Simmers as charged.

12. After his conviction, Simmers moved to vacate his conviction on the basis, among other things, that the jail house informant had received monetary compensation from Crime Stoppers for providing information about Simmers and that this witness had testified falsely when he did not reveal this information. The trial court denied the motion on the basis that this witness had been effectively impeached at trial and the State had acknowledged his lack of reliability.

13. Simmers received a sentence of 548 months (plus twelve months for deadly weapon) in prison. To date, Simmers has served approximately 23 ½ years of his sentence.

14. On May 24, 1999, the Court of Appeals affirmed Simmer's conviction.

15. In 2017, Simmers' current attorney, Maureen Devlin, contacted the King County Prosecutor's Office ("KCPAO") and requested the KCPAO review this case. His attorney expressed concern about the integrity of the conviction, and submitted a report by Steven Drizin at Northwestern University, an expert on false confessions. Upon review of the report and the case, the King County Prosecutor's Office agreed to reexamine the case.

16. I was assigned the task of reexamining the case and determining whether any more evidence could be gathered that would assist in our review of the conviction. After approximately a year of reinvestigation on the case, no

MOTION TO VACATE CONVICTION - 4

57555882

1    additional evidence was obtained that significantly inculpated or exculpated

2    Mr. Simmers.

3    17. During the course of my investigation, I interviewed Simmers and the

4    surviving detective who took his confession was interviewed by a detective

5    assisting in our reinvestigation.  The other detective present during the

6    confession is now deceased.

7    18. For the first time, in my interview, Simmers specifically claimed that he heard

8    the police discussing the details about the murder before the tape recording

9    began.  The detective denied that this occurred.

10   19. Mr. Simmers' current attorney is moving for a new trial based on newly

11   discovered evidence relating to false confessions.  She has cited to recent

12   studies relating to false confessions and juveniles.

13   20. Based upon my review of the facts of the case, the material submitted by

14   Simmer's attorney, and in consultation with other experts on personal

15   restraint petitions, we have concluded that a trial court is likely to grant a

16   motion for a new trial.

17   21. Moreover, based upon my review of the currently available evidence and

18   witnesses, this would be an extremely difficult case to retry almost 24 years

19   after the murder.  Several witnesses, including a witness to Simmers'

20   confession, are deceased.

21   22. This matter was staffed with King County Prosecuting Attorney Dan

22   Satterberg, who met with Simmers' attorney.  We have decided that rather

23

24

MOTION TO VACATE CONVICTION - 5

**Daniel T. Satterberg**, Prosecuting Attorney
W554 King County Courthouse
516 Third Avenue
Seattle, Washington 98104
(206) 296-9000, FAX (206) 296-0955

57555882

1    than require the defendant to litigate a motion for new trial, which he would

2    likely win, the office would move to vacate the conviction.

3    23. To be clear, the State has not concluded that the evidence establishes that

4        Simmers did not commit this murder.  ABA Model Rule 3.8(h) provides that,

5        "When a prosecutor knows of clear and convincing evidence establishing that

6        a defendant in the prosecutor's jurisdiction was convicted of an offense that

7        the defendant did not commit, the prosecutor shall seek to remedy the

8        conviction."  One of my tasks was to determine if this standard was met.  It

9        was not; there is not clear and convincing evidence that Simmers did not

10       commit the murder.  The evidence that led a jury to convict him remains

11       essentially the same; his confession contains facts that only the killer should

12       have known.  The surviving detective denies providing this information, and

13       Simmers never, until very recently, provided any explanation how he knew

14       these facts.

16   Under penalty of perjury under the laws of the State of Washington, I certified

17   that the foregoing is true and correct to the best of my knowledge.

18       DATED this 19th day of February, 2019.

20       *Carla B. Calbt*

         CARLA B. CARLSTROM, WSBA #27521
21       Senior Deputy Prosecuting Attorney

24
MOTION TO VACATE CONVICTION - 6

Daniel T. Satterberg, Prosecuting Attorney
W554 King County Courthouse
516 Third Avenue
Seattle, Washington 98104
(206) 296-9000, FAX (206) 296-0955

57555882

1

## ARGUMENT

2     Criminal Rule 7.8(b) provides in relevant part:

3         On motion and upon such terms as are just, the court may relieve a party
          from a final judgment, order, or proceeding for the following reasons:
4
          (1) Mistakes, inadvertence, surprise, excusable neglect or irregularity in
5         obtaining a judgment and order;
          (2) Newly discovered evidence which by due diligence could not have
6         been discovered in time to move for a new trial under rule 7.5;
          (3) Fraud (whether heretofore denominated intrinsic or extrinsic),
7         misrepresentation, or other misconduct of an adverse party;
          (4) The judgement is void; or
8         (5) *Any other reason justifying relief from the operation of the judgment.*

9     (Emphasis added).

10    Simmers has brought a motion for a new trial based on newly discovered

11    evidence under CrR 7.8(b)(2).  He has provided information to the State that would

12    justify a trial court granting his motion for a new trial.  The primary evidence against him

13    was his confession, his defense was that he falsely confessed, his attorney failed to call

14    a false confession expert, and since his trial there is a greater recognition of the

15    phenomena of juvenile false confessions.

16    While the State could make valid arguments in opposition to this motion, under

17    the unique facts of this case and the recent literature and recognition of the possibility of

18    juvenile false confessions, a trial court would be likely to grant the motion, either on a

19    newly discovered evidence theory or an ineffective assistance of counsel claim.

20    Because Simmers was 16 years old at the time of the murder, under the Miller-fix

21    statute (RCW 9.94A.730) he is entitled to petition the ISRB for early release after

22    serving 20 years.  Simmers has served 23 ½ years in prison.  Simmers' next hearing

23    before the ISRB is scheduled for Spring of 2019, and it is expected he will be released.

24

MOTION TO VACATE CONVICTION - 7

**Daniel T. Satterberg,** Prosecuting Attorney
W554 King County Courthouse
516 Third Avenue
Seattle, Washington 98104
(206) 296-9000, FAX (206) 296-0955

1    In consideration of the evidence available supporting guilt, analysis of the legal

2  issues, and the 23 ½ years already served by Simmers, the State now moves to vacate

3  Mr. Simmers' conviction under CrR 7.8(b)(5).

4

5                              DATED this 19th day of February, 2018.

6                              DANIEL T. SATTERBERG
                              King County Prosecuting Attorney
7

8                              By: _____

9                              CARLA B. CARLSTROM, WSBA #27521
                              Senior Deputy Prosecuting Attorney
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

MOTION TO VACATE CONVICTION - 8

# Exhibit M

Sub 162 - Order Vacating



FILED
KING COUNTY, WASHINGTON

FEB 2 6 2019

SUPERIOR COURT CLERK
BY Kristel Tugublimas
DEPUTY



CERTIFIED COPY TO WSP    FEB 2 6 2019

SUPERIOR COURT OF WASHINGTON FOR KING COUNTY

THE STATE OF WASHINGTON,

      Plaintiff,

 v.

IAN MONROE SIMMERS,

      Defendant.

)
)
)
)
)
)
)
)
)
)

No. 95-1-02102-2
No. ~~95-1-02101-2~~ SEA

ORDER VACATING CONVICTION

  THIS MATTER having come on regularly before the undersigned judge of the above-entitled court upon the motion of the State of Washington, plaintiff and defendant Ian Simmers, for an order vacating the defendant's conviction for murder in the first degree, in the above entitled cause, and the court being fully advised in the premises; now, therefore,

  BASED upon the motion by the parties, review of the motions by the State and Simmers, and statements by counsel for the State of Washington and Ian Simmers,

  IT IS HEREBY ORDERED, ADJUDGED and DECREED that the defendant's conviction for murder in the first degree in King County Superior Court No. 95-1-02101-2 SEA is hereby vacated and it is ordered that Simmers be immediately released by the Department of Corrections under this cause number.

  DONE IN OPEN COURT this 26th day of February, 2019.

              JUDGE PATRICK OISHI

Presented by:
DANIEL T. SATTERBERG
King County Prosecuting Attorney

By:

Carla B. Carlstrom, WSBA #27521
Senior Deputy Prosecuting Attorney

ORDER ON CRIMINAL
MOTION - 1

**Daniel T. Satterberg**, Prosecuting Attorney
CRIMINAL DIVISION
W554 King County Courthouse
516 Third Avenue
Seattle, WA 98104-2385
(206) 477-9497  FAX (206) 259-2795

1

Approved for entry:

2

3    Maureen Devlin, WSBA #23911
     Attorney for Defendant

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

ORDER ON CRIMINAL
MOTION - 2

**Daniel T. Satterberg**, Prosecuting Attorney
CRIMINAL DIVISION
W554 King County Courthouse
516 Third Avenue
Seattle, WA 98104-2385
(206) 477-9497  FAX (206) 259-2795

# Exhibit N

Sub 45 - Statement on Plea of Guilty

SUPERIOR COURT OF THE STATE OF WASHINGTON
FOR KING COUNTY

FILED

95 DEC 21  AM 9: 23

KING COUNTY
SUPERIOR COURT CLERK
SEATTLE, WA

_____ Accelerated
_____ Non Accelerated
_____ DPA _____ Defense

STATE OF WASHINGTON,

        Plaintiff,

v.

IAN M. SIMMERS ,

        Defendant,

NO. _95-1-05833-3_

STATEMENT OF DEFENDANT
ON PLEA OF GUILTY
(Felony)

1.  My true name is ___Ian  Monroe  Simmers___.

2.  My age is ___17___. Date of Birth ▮▮▮▮▮ -78

3.  I went through the ___10th  + GED___ grade.

4.  I HAVE BEEN INFORMED AND FULLY UNDERSTAND THAT:

    (a)  I have the right to representation by a lawyer and that if I cannot afford to pay for a lawyer, one

will be provided at no expense to me. My lawyer's name is ___Ken Scearce___.

    (b)  I am charged with the crime(s) of ___Arson 2 (Counts I-II) Vehicle Prowl 1st Degree (Counts III - XII)___

The elements of this crime(s) are ___see attached Information___

5.  I HAVE BEEN INFORMED AND FULLY UNDERSTAND THAT I HAVE THE FOLLOWING
    IMPORTANT RIGHTS, AND I GIVE THEM ALL UP BY PLEADING GUILTY:

    (a)  The right to a speedy and public trial by an impartial jury in the county where the crime is alleged

to have been committed;

    (b)  The right to remain silent before and during trial, and the right to refuse to testify against myself;

STATEMENT OF DEFENDANT ON
PLEA OF GUILTY  1 of 8

SC FORM CLD 100 Rev. 5/13/94
WP - A:\VED\Statemen.Fel



(c) The right at trial to hear and question the witnesses who testify against me;

(d) The right at trial to have witnesses testify for me. These witnesses can be made to appear at no expense to me;

(e) The right to be presumed innocent until the charge is proven beyond a reasonable doubt or I enter a plea of guilty;

(f) The right to appeal a determination of guilt after a trial.

6.    IN CONSIDERING THE CONSEQUENCES OF MY GUILTY PLEA(S), I UNDERSTAND THAT:

(a) The crime with which I am charged carries a maximum sentence of _____ years imprisonment and a $_____ fine.

RCW 9.94A.030(21), provides that for a third conviction for a "most serious offense" as defined in that statute, I may be found to be a Persistent Offender. If I am found to be a Persistent Offender, the Court must impose the mandatory sentence of life imprisonment without the possibility of early release of any kind, such as parole or community custody. RCW 9.94A.120(4). The law does not allow any reduction of this sentence.

(b) The standard sentence range is from _____ (days) months to _____ (days) months confinement, based on the prosecuting attorney's understanding of my criminal history. The standard sentence range is based on the crime charged and my criminal history. Criminal history includes prior convictions, whether in this state, in federal court, or elsewhere. Criminal history always includes juvenile convictions for sex offenses and also for Class A felonies that were committed when I was 15 years of age or older. Criminal history also may include convictions in juvenile court for felonies or serious traffic offenses that were committed when I was 15 years of age or older. Juvenile convictions, except those for sex offenses and Class A felonies, count only if I was less than 23 years old when I committed the crime to which I am now pleading guilty.

(c) The prosecuting attorney's statement of my criminal history is attached to this agreement. Unless I have attached a different statement, I agree that the prosecuting attorney's statement is correct and complete.

STATEMENT OF DEFENDANT ON
PLEA OF GUILTY  2 of 8

SC FORM CLD 100 Rev. 5/13/94
WP - A:\JED\Statemen.Fel

35410627

If I have attached my own statement, I assert that it is correct and complete. If I am convicted of any additional crimes between now and the time I am sentenced, I am obligated to tell the sentencing judge about those convictions.

(d) If I am convicted of any new crimes before sentencing, or if I was on community placement at the time of the offense to which I am now pleading guilty, or if any additional criminal history is discovered, both the standard sentence range and the prosecuting attorney's recommendations may increase. Even so, my plea of guilty to this charge is binding on me. I cannot change my mind if additional criminal history is discovered even though the standard sentencing range and the prosecuting attorney's recommendation increase.

If the current offense to which I am pleading guilty is a most serious offense as defined by RCW 9.94A.030(21), and additional criminal history is discovered, not only do the conditions of the prior paragraph apply, but also if my discovered criminal history contains two prior convictions, whether in this state, in federal court, or elsewhere, of most serious offense crimes, I may be found to be a Persistent Offender. If I am found to be a Persistent Offender, the Court must impose the mandatory sentence of life imprisonment without the possibility of early release of any kind, such as parole or community custody. RCW 9.94A.120(4).

Even so, my plea of guilty to this charge may be binding on me. I may not be able to change my mind if additional criminal history is discovered, even though it will result in the mandatory sentence that the law does not allow to be reduced.

(e) In addition to sentencing me to confinement for the standard range, the judge will order me to pay $ __100. 00__ as a victim's compensation fund assessment. If this crime resulted in injury to any person or damages to or loss of property, the judge will order me to make restitution, unless extraordinary circumstances exist which make restitution inappropriate. The judge may also order that I pay a fine, court costs and attorney fees. Furthermore, the judge may place me on community supervision, impose restrictions on my activities, and order me to perform community service.

STATEMENT OF DEFENDANT ON
PLEA OF GUILTY  3 of 8

SC FORM CLD 100 Rev. 5/13/94
WP - A:\JED\Statemen.Fel

(f) The prosecuting attorney will make the following recommendation to the judge: _____

*84 months confinement on Arson 2 counts, concurrent with 29 months confinement on Vehicle Prowl counts, credit for time served, pay court costs, penalty assessment recoupment, restitution, DNA testing, no contact with victims, 12 months community supervision. State's recommendation is not*

(g) The judge does not have to follow anyone's recommendation as to the sentence. The judge may *pursuant* impose a sentence within the standard range unless the judge finds substantial and compelling reasons not to do *to a plea agreement.* so. If the judge goes outside the standard range, either I or the State can appeal that sentence. If the sentence is within the standard range, no one can appeal the sentence.

(h) The crime of _____ has a mandatory minimum sentence of at least _____ years of total confinement. The law does not allow any reduction of this sentence. [If not applicable, this paragraph should be stricken and initialed by the defendant and the judge.]

The crime of _____ *Arson 2* _____ is a most serious offense as defined by RCW 9.94A.030(21), and if a fact finder determines that I have at least two prior convictions on separate occasions whether in this state, in federal court, or elsewhere, of most serious offense crimes, I may be found to be a Persistent Offender. If I am found to be a Persistent Offender, the Court must impose the mandatory sentence of life imprisonment without the possibility of early release of any kind, such as parole or community custody. RCW 9.94A.120(4).

(i) The sentence imposed on counts *I through XII* will run concurrently unless the judge finds substantial and compelling reason to do otherwise. [If not applicable, this paragraph should be stricken and initialed by the defendant and the judge.]

(j) In addition to confinement, the judge will sentence me to community placement for at least one year. During the period of community placement, I will be under the supervision of the Department of Corrections, and I will have restrictions placed on my activities. [If not applicable, this paragraph should be stricken and initialed by the defendant and the judge.]

STATEMENT OF DEFENDANT ON
PLEA OF GUILTY  4 of 8

SC FORM CLD 100 Rev. 5/13/94
WP - A:\VED\Statemen.Fsl

(k) The judge may sentence me as a first time offender instead of giving a sentence within the standard range if I qualify under RCW 9.94A.030(20). This sentence could include as much as 90 days' confinement plus all of the conditions described in paragraph (e). Additionally, the judge could require me to undergo treatment, to devote time to a specific occupation, and to pursue a prescribed course of study or occupational training. [If not applicable, this paragraph should be stricken and initialed by the defendant and the judge.]

(l) This plea of guilty will result in revocation of my privilege to drive. If I have a driver's license, I must now surrender it to the judge. [If not applicable, this paragraph should be stricken and initialed by the defendant and the judge.]

(m) If this crime involves a sexual offense, prostitution, or a drug offense associated with hypodermic needles, I will be required to undergo testing for the human immunodeficiency (AIDS) virus. [If not applicable, this paragraph should be stricken and initialed by the defendant and the judge.]

(n) If I am not a citizen of the United States, a plea of guilty to an offense punishable as a crime under state law is grounds for deportation, exclusion from admission to the United States, or denial of naturalization pursuant to the laws of the United States.

(o) If this crime involves a sex offense or a violent offense, I will be required to provide a sample of my blood for purposes of DNA identification analysis. [If not applicable, this paragraph should be stricken and initialed by the defendant and the judge.]

(p) If this crime involves a sex offense, I will be required to register with the sheriff of the county in this state where I reside. I must register immediately upon completion of being sentenced if I am not sentenced to begin serving a term of confinement immediately upon completion of being sentenced. Otherwise, I must register within 24 hours of the time of my release if I am sentenced to the custody of the Department of Corrections, Department of Social and Health Services, a local division of youth services, a local jail, or a juvenile detention facility.

If I do not now reside, in Washington, but I subsequently move to this state, I must register within 24 hours of the time I begin to reside in this state, if at the time of my move I am under the jurisdiction of the

35410627

Department of Corrections, the Indeterminate Sentence Review Board, or the Department of Social and Health Services. If at the time I move to this state I am not under the jurisdiction of one of those agencies, then I must register within 30 days of the time I begin to reside in this state.

If I subsequently change residences within a county in this state, I must notify the county sheriff of that change of residence in writing within 10 days of my change of residence. If I subsequently move to a new county within this state, I must register all over again with the sheriff of my new county, and I must notify my former county sheriff (that is, the county sheriff of my former residence) of that change of residence in writing, and I must complete both acts within 10 days of my change of residence. [If none of the above three paragraphs is applicable, they should all be stricken and initialed by the defendant and the judge.]

7.    I plead _guilty_ to the crime of _Arson 2 (Counts I-II)_ _and Vehicle Prowl 1 (counts III - XII)_ as charged in the _2d amended Information_ information. I have received a copy of that information.

8.    I make this plea freely and voluntarily.

9.    No one has threatened harm of any kind to me or to any other person to cause me to make this plea.

10.    No person has made promises of any kind to cause me to enter this plea except as set forth in this statement.

11.    The judge has asked me to state briefly in my own words what I did that makes me guilty of this (these) crime(s). This is my statement:

_Although I am not guilty of all of the counts alleged in the Information, I nevertheless voluntarily choose to plead guilty to Counts I through XII, on my lawyer's advice. I have reviewed this case with my attorney and based upon his opinion I believe there is a substantial likelihood I would be convicted in a trial. The Court can review the probable cause certification to find a factual basis for my plea of guilty to each count, I Through XII, and for sentencing purposes (although I do not stipulate to the sentencing court considering "real facts")._

**STATEMENT OF DEFENDANT ON**    **SC FORM CLD 100 Rev. 5/13/94**
**PLEA OF GUILTY  6 of 8**    WP - A:\VED\Statemen.Fel

35410627

12.   My lawyer has explained to me, and we have fully discussed, all of the above paragraphs. I understand them all. I have been given a copy of this "Statement of Defendant on Plea of Guilty." I have no further questions to ask the judge.

_____
**DEFENDANT**

I have read and discussed this statement with the defendant and believe that the defendant is competent and fully understands the statement.

_____     _____
**PROSECUTING ATTORNEY**                          **DEFENDANT'S LAWYER**
JIM MARNER

The foregoing statement was signed by the defendant in open court in the presence of the defendant's lawyer and the undersigned judge. The defendant asserted that [check appropriated box]:

☐  (a) The defendant had previously read; or

☐  (b) The defendant's lawyer had previously read to him or her; or

☐  (c) An interpreter had previously read to the defendant the entire statement above and that the defendant understood it in full.

I find the defendant's plea of guilty to be knowingly, intelligently and voluntarily made. Defendant understands the charges and the consequences of the plea. There is a factual basis for the plea. The defendant is guilty as charged.

DATED this ____ day of _____, 19__

_____
**JUDGE**
R. JOSEPH WESLEY

**STATEMENT OF DEFENDANT ON
PLEA OF GUILTY  7 of 8**

**SC FORM CLD 100 Rev. 5/13/94**
WP - A:\JED\Statemen.Fal

35410627

1

2

3          SUPERIOR COURT OF WASHINGTON FOR KING COUNTY

4    THE STATE OF WASHINGTON,        )
                                     )
5                    Plaintiff,      )   No.  95-1-05833-3
                                     )
6         v.                         )   SECOND AMENDED INFORMATION
     IAN M. SIMMERS                  )
7                                    )
                                     )
8                                    )
                                     )
9                    Defendant.      )
                                     )
10   ───────────────────────────────

11                        COUNT I

12       I, Norm Maleng, Prosecuting Attorney for King County in the
     name and by the authority of the State of Washington, do accuse IAN
13   M. SIMMERS of the crime of **Arson in the Second Degree**, committed as
     follows:
14
         That the defendant IAN M. SIMMERS, together with another, in
15   King County, Washington on or about March 12, 1995, did knowingly
     and maliciously cause a fire and explosion which damaged a boat,
16   property located in the 14000 block of Northeast 145th Street,
     Seattle, in said county and state;
17
         Contrary to RCW 9A.48.030, and against the peace and dignity of
18   the State of Washington.

19                        COUNT II

20       And I, Norm Maleng, Prosecuting Attorney aforesaid further do
     accuse IAN M. SIMMERS of the crime of **Arson in the Second Degree**,
21   based on the same conduct as another crime charged herein, which
     crimes were so closely connected in respect to time, place and
22   occasion that it would be difficult to separate proof of one charge
     from proof of the other, committed as follows:
23
         That the defendant IAN M. SIMMERS, together with another, in
24   King County, Washington on or about March 12, 1995, did knowingly
     and maliciously cause a fire and explosion which damaged a restroom,
25

                                        **Norm Maleng**
                                        Prosecuting Attorney
                                        W 554 King County Courthouse
                                        Seattle, Washington 98104-2312
                                        (206) 296-9000

     SECOND AMENDED INFORMATION- 1

1  property located at Northeast 145th and Sammamish River Trail in
   said county and state;
2
       Contrary to RCW 9A.48.030, and against the peace and dignity of
3  the State of Washington.

4                              COUNT III

5       And I, Norm Maleng, Prosecuting Attorney aforesaid further do
   accuse IAN M. SIMMERS of the crime of **Vehicle Prowl in the First
6  Degree**, based on the same conduct as another crime charged herein,
   which crimes were so closely connected in respect to time, place and
7  occasion that it would be difficult to separate proof of one charge
   from proof of the other, committed as follows:
8
       That the defendant IAN M. SIMMERS, together with another, in
9  King County, Washington during a period of time intervening between
   March 11, 1995 through March 15, 1995, did enter or remain
10 unlawfully in a vessel belonging to Harvy Noble and Randy Gehrke,
   equipped for propulsion by mechanical means or by sail, which has a
11 cabin equipped with permanently installed sleeping quarters and
   cooking facilities, located at 6201 Northeast 175th, Seattle, in
12 said county and state, with intent to commit a crime against a
   person or property therein;
13
       Contrary to RCW 9A.52.095, and against the peace and dignity of
14 the State of Washington.

15                             COUNT IV

16      And I, Norm Maleng, Prosecuting Attorney aforesaid further do
   accuse IAN M. SIMMERS of the crime of **Vehicle Prowl in the First
17 Degree**, based on the same conduct as another crime charged herein,
   which crimes were so closely connected in respect to time, place and
18 occasion that it would be difficult to separate proof of one charge
   from proof of the other, committed as follows:
19
       That the defendant IAN M. SIMMERS, together with another, in
20 King County, Washington during a period of time intervening between
   March 11, 1995 through March 15, 1995, did enter or remain
21 unlawfully in a vessel belonging to Jeffrey McClure, equipped for
   propulsion by mechanical means or by sail, which has a cabin
22 equipped with permanently installed sleeping quarters and cooking
   facilities, located at 6155 Northeast 175th, Seattle, in said county
23 and state, with intent to commit a crime against a person or
   property therein;
24
       Contrary to RCW 9A.52.095, and against the peace and dignity of
25 the State of Washington.

Norm Maleng
Prosecuting Attorney
W 554 King County Courthouse
Seattle, Washington 98104-2312
(206) 296-9000

SECOND AMENDED INFORMATION- 2

COUNT V

And I, Norm Maleng, Prosecuting Attorney aforesaid further do accuse IAN M. SIMMERS of the crime of **Vehicle Prowl in the First Degree**, based on the same conduct as another crime charged herein, which crimes were so closely connected in respect to time, place and occasion that it would be difficult to separate proof of one charge from proof of the other, committed as follows:

That the defendant IAN M. SIMMERS, together with another, in King County, Washington during a period of time intervening between March 11, 1995 through March 15, 1995, did enter or remain unlawfully in a vessel belonging to Tony Simonelli, equipped for propulsion by mechanical means or by sail, which has a cabin equipped with permanently installed sleeping quarters and cooking facilities, located at 6155 Northeast 175th, Seattle, in said county and state, with intent to commit a crime against a person or property therein;

Contrary to RCW 9A.52.095, and against the peace and dignity of the State of Washington.

COUNT VI

And I, Norm Maleng, Prosecuting Attorney aforesaid further do accuse IAN M. SIMMERS of the crime of **Vehicle Prowl in the First Degree**, based on the same conduct as another crime charged herein, which crimes were so closely connected in respect to time, place and occasion that it would be difficult to separate proof of one charge from proof of the other, committed as follows:

That the defendant IAN M. SIMMERS, together with another, in King County, Washington during a period of time intervening between March 11, 1995 through March 15, 1995, did enter or remain unlawfully in a vessel belonging to Fred Romvari, equipped for propulsion by mechanical means or by sail, which has a cabin equipped with permanently installed sleeping quarters and cooking facilities, located at 6155 Northeast 175th, Seattle, in said county and state, with intent to commit a crime against a person or property therein;

Contrary to RCW 9A.52.095, and against the peace and dignity of the State of Washington.

COUNT VII

And I, Norm Maleng, Prosecuting Attorney aforesaid further do accuse IAN M. SIMMERS of the crime of **Vehicle Prowl in the First Degree**, based on the same conduct as another crime charged herein,

**Norm Maleng**
Prosecuting Attorney
W 554 King County Courthouse
Seattle, Washington 98104-2312
(206) 296-9000

SECOND AMENDED INFORMATION- 3

1  which crimes were so closely connected in respect to time, place and
   occasion that it would be difficult to separate proof of one charge
2  from proof of the other, committed as follows:

3      That the defendant IAN M. SIMMERS, together with another, in
   King County, Washington during a period of time intervening between
4  March 11, 1995 through March 15, 1995, did enter or remain
   unlawfully in a vessel belonging to Thomas Paine, equipped for
5  propulsion by mechanical means or by sail, which has a cabin
   equipped with permanently installed sleeping quarters and cooking
6  facilities, located at 6155 Northeast 175th, Seattle, in said county
   and state, with intent to commit a crime against a person or
7  property therein;

8      Contrary to RCW 9A.52.095, and against the peace and dignity of
   the State of Washington.
9

              COUNT VIII
10

11     And I, Norm Maleng, Prosecuting Attorney aforesaid further do
   accuse IAN M. SIMMERS of the crime of **Vehicle Prowl in the First
11 Degree**, based on the same conduct as another crime charged herein,
   which crimes were so closely connected in respect to time, place and
12 occasion that it would be difficult to separate proof of one charge
   from proof of the other, committed as follows:
13

14     That the defendant IAN M. SIMMERS, together with another, in
   King County, Washington during a period of time intervening between
15 March 11, 1995 through March 15, 1995, did enter or remain
   unlawfully in a vessel belonging to Allen Wells, equipped for
16 propulsion by mechanical means or by sail, which has a cabin
   equipped with permanently installed sleeping quarters and cooking
17 facilities, located at 6201 Northeast 175th, Seattle, in said county
   and state, with intent to commit a crime against a person or
18 property therein;

19     Contrary to RCW 9A.52.095, and against the peace and dignity of
   the State of Washington.
20

              COUNT IX
21

22     And I, Norm Maleng, Prosecuting Attorney aforesaid further do
   accuse IAN M. SIMMERS of the crime of **Vehicle Prowl in the First
22 Degree**, based on the same conduct as another crime charged herein,
23 which crimes were so closely connected in respect to time, place and
   occasion that it would be difficult to separate proof of one charge
24 from proof of the other, committed as follows:

25

                                    **Norm Maleng**
                                    Prosecuting Attorney
                                    W 554 King County Courthouse
                                    Seattle, Washington 98104-2312
SECOND AMENDED INFORMATION- 4         (206) 296-9000

5410627

1       That the defendant IAN M. SIMMERS, together with another, in
King County, Washington during a period of time intervening between
2   March 11, 1995 through March 15, 1995, did enter or remain
unlawfully in a vessel belonging to Diane Pratt, equipped for
3   propulsion by mechanical means or by sail, which has a cabin
equipped with permanently installed sleeping quarters and cooking
4   facilities, located at 6201 Northeast 175th, Seattle, in said county
and state, with intent to commit a crime against a person or
5   property therein;

6       Contrary to RCW 9A.52.095, and against the peace and dignity of
the State of Washington.
7

8                                COUNT X

9       And I, Norm Maleng, Prosecuting Attorney aforesaid further do
accuse IAN M. SIMMERS of the crime of **Vehicle Prowl in the First
10  Degree**, based on the same conduct as another crime charged herein,
which crimes were so closely connected in respect to time, place and
occasion that it would be difficult to separate proof of one charge
11  from proof of the other, committed as follows:

12      That the defendant IAN M. SIMMERS, together with another, in
King County, Washington during a period of time intervening between
13  March 11, 1995 through March 15, 1995, did enter or remain
unlawfully in a vessel belonging to Howard Plimpton, equipped for
14  propulsion by mechanical means or by sail, which has a cabin
equipped with permanently installed sleeping quarters and cooking
15  facilities, located at 6155 Northeast 175th, Seattle, in said county
and state, with intent to commit a crime against a person or
16  property therein;

17      Contrary to RCW 9A.52.095, and against the peace and dignity of
the State of Washington.
18

19                               COUNT XI

20      And I, Norm Maleng, Prosecuting Attorney aforesaid further do
accuse IAN M. SIMMERS of the crime of **Vehicle Prowl in the First
Degree**, based on the same conduct as another crime charged herein,
21  which crimes were so closely connected in respect to time, place and
occasion that it would be difficult to separate proof of one charge
22  from proof of the other, committed as follows:

23      That the defendant IAN M. SIMMERS, together with another, in
King County, Washington during a period of time intervening between
24  March 11, 1995 through March 15, 1995, did enter or remain
unlawfully in a vessel belonging to Lee Lannoye, equipped for
25  propulsion by mechanical means or by sail, which has a cabin

**Norm Maleng**
Prosecuting Attorney
W 554 King County Courthouse
Seattle, Washington 98104-2312
(206) 296-9000

SECOND AMENDED INFORMATION- 5

1  equipped with permanently installed sleeping quarters and cooking
   facilities, located at 6155 Northeast 175th, Seattle, in said county
2  and state, with intent to commit a crime against a person or
   property therein;

3

   Contrary to RCW 9A.52.095, and against the peace and dignity of
4  the State of Washington.

5                              COUNT XII

6      And I, Norm Maleng, Prosecuting Attorney aforesaid further do
   accuse IAN M. SIMMERS of the crime of **Vehicle Prowl in the First**
7  **Degree**, based on the same conduct as another crime charged herein,
   which crimes were so closely connected in respect to time, place and
8  occasion that it would be difficult to separate proof of one charge
   from proof of the other, committed as follows:

9

       That the defendant IAN M. SIMMERS, together with another, in
10 King County, Washington during a period of time intervening between
   March 11, 1995 through March 15, 1995, did enter or remain
11 unlawfully in a vessel belonging to Ralph Dreitzler, equipped for
   propulsion by mechanical means or by sail, which has a cabin
12 equipped with permanently installed sleeping quarters and cooking
   facilities, located at 6155 Northeast 175th, Seattle, in said county
13 and state, with intent to commit a crime against a person or
   property therein;

14

       Contrary to RCW 9A.52.095, and against the peace and dignity of
15 the State of Washington.

16                              NORM MALENG
                                Prosecuting Attorney
17

18                              By: _____
                                Jim Marner, WSBA #91002
19                              Deputy Prosecuting Attorney

20

21

22

23

24

25

Norm Maleng
Prosecuting Attorney
W 554 King County Courthouse
Seattle, Washington 98104-2312
(206) 296-9000

SECOND AMENDED INFORMATION- 6

5410627

CAUSE NO. 95-1-05833-3

SECOND SUPPLEMENTAL CERTIFICATION FOR DETERMINATION
OF PROBABLE CAUSE

That Jim Marner is a Deputy Prosecuting Attorney for King County and is familiar with the police report and investigation conducted in King County Department of Public Safety case No. 95-060415, 95-079427, 95-079471, 95-082173, 95-083878, and 95-084257;

That this case contains the following upon which this motion for the determination of probable cause is made;

On Saturday, March 11, 1995, the defendant, Ian M. Simmers, walked along the Burke-Gilman trail, located in Bothell, King County, Washington, with his fourteen-year-old friend, Jonathan Wyatt. They came upon a 35-year-old man, whom the defendant is currently charged with murdering. On Wednesday, March 15, 1995, the defendant and Wyatt were arrested after they were found setting off flares in a residential neighborhood. Wyatt and the defendant were both advised of their <u>Miranda</u> warnings, which they acknowledged and waived. Besides confessing to the murder, the defendant showed police several boats he entered and places he had set on fire. The defendant also confessed to stealing a boat.

COUNT I

William Buchanan owns a twenty-one foot 1987 Campion boat which he keeps on a trailer near his house in King County, Washington. The boat is valued at $15,000.

Early in the morning on March 12, 1995, a neighbor of Mr. Buchanan's saw heavy smoke coming from the direction of the boat. A newspaper deliverer also noticed the fire and 911 was called. An examination of the fire revealed Mr. Buchanan's boat was deliberately set on fire with hand held flares and an accelerant. When Mr. Buchanan thoroughly examined his boat after the fire was out, he discovered a burnt flare wedged under a seat cushion. The two fire extinguishers he kept on board were missing; one was found floating in the Sammamish River later in the day. A flare gun was also missing. The defendant confessed to breaking into the boat and to taking a flare gun from it.

The defendant and Wyatt broke into the boat and found flare guns and various types of flares. The defendant set the boat on fire with the flares. Wyatt described the defendant as laughing throughout the incident. The boat was destroyed; the estimated damage is $15,000.

Second Supplemental Certification
for Determination of Probable Cause - 1

Norm Maleng
Prosecuting Attorney
W 554 King County Courthouse
Seattle, Washington 98104-2312
(206) 296-9000

1    The defendant and Wyatt continued down the trail. They came to
2  an apartment complex parking lot. The defendant broke into about
   twenty cars looking for money.

3                              COUNT II

4     The defendant continued down the trail until he came upon a
   King County Parks Department restroom located in King County,
5  Washington. The defendant started firing flares into the restroom.
   Three separate fires were started in the women's restroom, and two
6  fires were started in the adjoining men's restroom. Investigators
   found numerous aerial and hand held flares and caps on the floors.
7  Damage was estimated at over $5,000. Again, Wyatt described the
   defendant as being quite pleased with himself and his destruction.
8  The defendant confessed to shooting flares off and to starting the
   fire in the restroom.

9

10                       COUNTS III through XII

11    Between March 11, 1995, and March 15, 1995, the defendant
   climbed over a fence and entered two different marinas. He
   proceeded to break into at least thirteen yachts in Harbour Village
12 Marina, located at 6155 Northeast 175th, Seattle, King County,
   Washington. The defendant also broke into at least nineteen yachts
13 at Davidson's Marina, located at 6201 Northeast 175th, in Seattle,
   King County, Washington. All of the boats entered are equipped with
14 permanently installed sleeping quarters and cooking facilities.
   Each of the boats entered suffered varying degrees of damage. Many
15 boats had items stolen or ruined. Some of the stolen items included
   flares or flare guns which were used in the arsons. The defendant
16 took alcohol from any of the boats that had alcohol. The defendant
   ate, drank, and slept on these boats. Thousands and thousands of
17 dollars in damage occurred.

18    Randy Gehrke and Harvy Noble own a 26-foot boat which was
   moored at Davidson's Marina. The boat is equipped with permanent
19 sleeping quarters and cooking facilities. They examined their boat
   and discovered that door lock had been broken and a window had been
20 smashed. Upon entering the boat, Mr. Gehrke and Mr. Noble
   discovered that the door to the refrigerator had been broken and the
21 carpet had been burnt. They also noticed a flare gun and flares
   were missing. They did not give anyone permission to enter the
22 boat.

23    Jeffrey McClure owns a 48-foot motor boat that he keeps moored
   at the Harbour Village Marina. The boat is equipped with permanent
24 sleeping facilities and a galley. Mr. McClure examined his boat and
   discovered a door pried open, cabinets open, and several bottles of
25 alcohol missing, as well as a marine band radio. A flare gun had

   Second Supplemental Certification          **Norm Maleng**
   for Determination of Probable Cause - 2    Prosecuting Attorney
                                              W 554 King County Courthouse
                                              Seattle, Washington 98104-2312
                                              (206) 296-9000

5410627

1   been fired and other flares were missing.  No one had permission to
2   enter or remain on Mr. McClure's boat.

3       Tony Simonelli owns a boat that he keeps moored at the Harbour
    Village Marina.  The boat has permanent sleeping quarters and a
4   galley.  Mr. Simonelli examined his boat and discovered cabinets
    opened, a flare gun and flares missing, and window frames broken.
5   No one had permission to enter or remain on Mr. Simonelli's boat.

6       Fred Romvari owns a boat that he keeps moored at Harbour
    Village Marina.  The boat is equipped with permanent sleeping
7   quarters and a galley.  Mr. Romvari examined his boat and discovered
    the entry hatch damaged, and flares were missing.  No one had
8   permission to be on Mr. Romvari's boat.  Latent prints taken from
    the boat's interior were found to belong to the defendant.

9       Thomas Paine owns a boat which was moored at the Harbour
    Village Marina.  The boat is equipped with permanent sleeping
10  quarters and cooking facilities.  Mr. Paine examined the boat and
    found that the latch securing the door had been pried off.  Inside
11  he found marine equipment, including a flare gun kit, spread on a
    bed.  He also noticed that a marine radio he had just purchased for
12  $250 was missing.  Mr. Paine did not give anyone permission to enter
    the boat.
13
        Allen Wells owns a 28-foot boat which was moored at Davidson's
14  Marina.  The boat is equipped with permanent sleeping quarters and
    cooking facilities.  He examined his boat and found that the door
15  lock had been broken.  Inside his boat he found cigarette butts and
    open cans of beer and soda which had not been in the boat when he
16  had last been aboard.  He also found two sleeping bags, a heater,
    and an alarm clock which did not belong to him.  Mr. Wells did not
17  give anyone permission to enter his boat.

18      Diane Pruitt owns a 24-foot boat which is moored at Davidson's
    Marina.  The boat is equipped with permanent sleeping quarters and
19  cooking facilities.  When Ms. Pruitt examined the boat, she found
    that the hinge to the entry door had been broken and the interior
20  had been ransacked.  Ms. Pruitt did not give anyone permission to
    board her boat.
21
        Howard Plimpton owns a boat moored at the Harbour Village
22  Marina.  The boat is equipped with permanent sleeping quarters and
    cooking facilities.  Mr. Plimpton examined the boat and discovered
23  that the rear entry hatch lock had been broken.  When he inspected
    the interior of the boat, Mr. Plimpton discovered that a bottle of
24  scotch and a bottle of vodka were missing from the liquor cabinet.
    Mr. Plimpton also noticed that many knives were on the galley floor.
25

Second Supplemental Certification
for Determination of Probable Cause - 3

**Norm Maleng**
Prosecuting Attorney
W 554 King County Courthouse
Seattle, Washington 98104-2312
(206) 296-9000

1      Lee Lannoye owns a boat which is moored at the Harbour Village
2  Marina.  The boat is equipped with permanent sleeping quarters and
   cooking facilities.  When Mr. Lannoye inspected his boat after the
3  reported break-ins, he discovered that his boat had been broken into
   and ransacked.  Liquor and various personal items were missing. Mr.
4  Lannoye did not give anyone permission to enter his boat.

5      Ralph Dreitzler owns a boat moored at Harbour Village Marina.
   The boat is equipped with permanent sleeping quarters and cooking
6  facilities.  When Mr. Dreitzler inspected his boat after the break-
   ins were reported, he discovered that the lock on the pilot door had
7  been broken and the interior had been ransacked.  Beer and wine were
   missing.  Mr. Dreitzler did not give anyone permission to enter his
8  boat.

9      Later on Wednesday, at approximately 12 p.m., King County
   Police were called on a report of juveniles firing flare guns.  The
10  defendant was arrested.  A flare gun was found in the defendant's
   waistband.   The defendant admitted to committing all of the above
11  offenses.  He led police to the marinas and tried to remember which
   boats he had entered.  The ones he remembered, he pointed out to
12  police.

13  Under penalty of perjury under the laws of the State of Washington,
   I certify that the foregoing is true and correct.  Signed and dated
14  by me this _____ day of November, 1995, at Seattle, Washington.

15

16

17                                  Jim Marner, WSBA #91002

18

19

20

21

22

23

24

25

Second Supplemental Certification
for Determination of Probable Cause - 4

**Norm Maleng**
Prosecuting Attorney
W 554 King County Courthouse
Seattle, Washington 98104-2312
(206) 296-9000

35410627

☒ PLEA AGREEMENT / ☐ TRIAL

Date: _12/20/95_

Defendant: _Simmons, Ian_    Cause No: _95-1-05433-3_

On Plea To: ☐ As Charged_____

☐ Special Finding/Verdict; ☐ Deadly Weapon (RCW 9.94.125); ☐ School Zone-VUCSA (RCW 69.50) on Count(s) _____

The State of Washington and the defendant enter into this PLEA AGREEMENT which is accepted only by a guilty plea. This agreement may be withdrawn at any time prior to entry of the guilty plea. The PLEA AGREEMENT is indicated above and as follows:

1. ☐ DISMISS: Upon disposition of Count(s) _____, the
State moves to dismiss Count(s): _____

2. ☐ REAL FACTS OF HIGHER/MORE SERIOUS AND/OR ADDITIONAL CRIMES: In accordance with RCW 9.94A.370, the parties have stipulated that the court, in sentencing, may consider as real and material facts information as follows:
   ☐ as set forth in the certification(s) of probable cause filed herein.
   ☐ as set forth in the attached Appendix C.

3. ☐ RESTITUTION: Pursuant to RCW 9.94A.140(2), the defendant agrees to pay restitution as follows:
   ☐ in full to the victim(s) on charged counts.
   ☐ as set forth in attached Appendix C.

4. ☐ OTHER: _____
_____

5. ☒ SENTENCE RECOMMENDATION:
   a. ☐ The defendant agrees to the foregoing Plea Agreement and that the attached sentencing guidelines scoring form(s) (Appendix A) and the attached Procecutor's Understanding of Defendant's Criminal History (Appendix B) are accurate and complete and that the defendant was represented by counsel or waived counsel at the time of prior conviction(s). The State makes the sentencing recommendation set forth in the State's sentence recommendation.
   b. ☒ The defendant disputes the Prosecutor's Statement of the Defendant's Criminal History, and the State makes no agreement with regards to a sentencing recommendation and may make a sentencing recommendation for the full penalty allowed by law.

Maximum on Count _I & II_ is not more than _10_ years and/or $ _20,000_ fine.
Maximum on Count _III - XII_ is not more than _5_ years and /or $ _10,000_ fine.
Mandatory Minimum Term (RCW 9.94A.120(4) only): _____
☐ Mandatory license revocation RCW 46.20.285
Ten years jurisdiction and supervision for monetary payments. RCW 9.94A.120d(9).

The State's recommendation will increase in severity if additional criminal convictions are found or if the defendant commits any new crimes, fails to appear for sentencing or violates the conditions of his release.

_Ian M. Simmons_
Defendant

_# 17818_
Attorney for Defendant

Deputy Prosecuting Attorney 22566
JIM MANNER

_12/20/95_
Judge, King County Superior Court
R. JOSEPH WESLEY

King County Prosecuting Attorney
Rev. 8/25/89

White Copy: Court
Canary Copy: Defense
Pink Copy: Prosecutor

**STATE'S SENTENCE RECOMMENDATION**
**(CONFINEMENT OF OVER ONE YEAR)**

Date: _12/20/95_

Defendant: _Ian Simmons_     Cause No: _95-1-05833-3_

State recommends that the sentence of this defendant be as follows:

☐ **TOTAL CONFINEMENT:** State recommmends that the defendant be sentenced to a term of total confinement in the custody of the Department of Corrections as follows:

| | | | | | |
|---|---|---|---|---|---|
| Count I | 84 | months/years. | Count IV | 29 | months/years. |
| Count II | 84 | months/years. | Count V | 29 | months/years. |
| Count III | 29 | months/years. | Count VI | 29 | months/years. |

_Count VII 29 months, Count VIII 29 months, Count IX 29 months,_
_Count X 29 months, Count XI 29 months, Count XII 29 months_

Terms on each count to run concurrently/consecutively with each other.
Terms to be served concurrently/consecutively with: _____
Terms to be consecutive to any other terms(s) not specifically referred to in this form.

☐ **SENTENCE MODIFICATION:** State recommends modification of community supervision on King County Cause Number(s) _____ and recommends that terms be run concurrently/consecutively.

☒ **NO CONTACT:** For the maximum term, defendant have no contact with _Davidson's Marina + Harbour Village Marina_

☒ **MONETARY PAYMENTS:** The defendant shall make the following monetary payments under the supervision of the Department of Corrections (RCW 9.94A.120(11)) within 10 years:
  a. ☒ Restitution as set forth on attached page entitled "Plea Agreement/Trial" and ☐ Appendix C.
  b. ☒ Pay Costs, mandatory $100 Victims Penalty Assessment, recoupment of cost of defense attorney fees, if appointed.
  c. ☐ Pay to King County Local Drug Fund $ _____
  d. ☐ Pay a fine of $ _____; ☐ $1000, fine for VUCSA; ☐ $2000, fine for subsequent VUCSA.
  e. ☐ Other _____

**COMMUNITY PLACEMENT:** For any sex offense, serious violent offense; assault 2°; deadly weapon finding or drug offense under 69.50 or 69.52 RCW (committed after 1 July 1988) defendant be on community placement on conditions set forth in RCW 9.94A.120 8(b) and the following conditions under 8(c) (crime-related prohibitions only): _____

☐ **OFF-LIMITS ORDER:** The defendant is a "known drug trafficker" and the state recommends defendant shall neither enter nor remain in the protected against drug trafficking area (described in the attachment) during the term of community placement.
DNA                      DNA
☒ **HIV TESTING:** State recommends HIV testing and counseling.

☐ **EXCEPTIONAL SENTENCE:** This is an exceptional sentence, and the substantial and compelling reasons for departing from the presumptive sentence range are set forth on the attached form.

Approved by: _____

Deputy Prosecuting Attorney
JIM MARNER

King County Prosecuting Attorney
Rev. 8/25/89

White Copy: Court
Canary Copy: Defense
Pink Copy: Prosecutor

# GENERAL SCORING FORM
## Violent Offenses

Use this form only for the following offenses: Arson 1; Arson 2; Assault 2; Assault of a Child 2; Bail Jumping with Murder 1; Damaging Building, etc., by Explosion with Threat to Human Being; Endangering Life and Property by Explosives with Threat to Human Being; Explosive Devices Prohibited; Extortion 1; Kidnapping 2; Leading Organized Crime; Manslaughter 1; Manslaughter 2; Robbery 1 and 2.

| OFFENDER'S NAME Ian Summers | OFFENDER'S DOB 8-11-78 | STATE ID# |
|---|---|---|
| JUDGE | CAUSE# 051-05E37-7 | FBI ID# |

**ADULT HISTORY:** (If the prior offense was committed before 7/1/86, count prior adult offenses served concurrently as one offense; those served consecutively are counted separately. If both current and prior offenses were committed after 7/1/86, count all convictions separately, except (a) priors found to encompass the same criminal conduct under RCW 9.94A.400(1)(a), and (b) priors sentenced concurrently that the current court determines to count as one offense.)

Enter number of serious violent and violent felony convictions . . . . . . . . . . . . . . . . . . . . . . . . _____ x 2 = _____

Enter number of other nonviolent felony convictions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . _____ x 1 = _____

**JUVENILE HISTORY:** (Adjudications entered on the same date count as one offense, except for violent offenses with separate victims)

Enter number of serious violent and violent felony adjudications . . . . . . . . . . . . . . . . . . . . . . . _____ x 2 = _____

Enter number of other nonviolent felony adjudications . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1 x ½ = ½

**OTHER CURRENT OFFENSES:** (Those offenses not encompassing the same criminal conduct)

051-02 2102-2

Enter number of other serious violent and violent felony convictions  CT. II ..II.\ . . . . . . . . . . 2 x 2 = 4

Enter number of other nonviolent felony convictions  CT.IV.V..VI..VII.VIII. . . . . 6 x 1 = 10
                                                                                                                     IX

**STATUS AT TIME OF CURRENT OFFENSES:**

If on community placement at time of current offense, add 1 point . . . . . . . . . . . . . . . . . . . . . . + 1 = _____

Add the scores in each category . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **TOTAL OFFENDER SCORE** 12
(round down to the nearest whole number)

## STANDARD RANGE CALCULATION*

month

| ARSON 2° CT I & II | 10 | 13 | 63 | TO | 84 |
|---|---|---|---|---|---|
| CURRENT OFFENSE BEING SCORED | SERIOUSNESS LEVEL | OFFENDER SCORE | LOW STANDARD SENTENCE RANGE | | HIGH |

* Multiply the range by .75 if the current offense is an attempt, conspiracy, or solicitation.
* Add 24 months to the standard range if the current offense is Robbery 1 and includes a deadly weapon finding.
* Add 12 months to the standard range if the current offense is Assault 2 or Kidnapping 2 and includes a deadly weapon finding.

## GENERAL SCORING FORM
### Nonviolent Offenses

Use this form only for the following offenses: Advancing Money or Property for Extortionate Extension of Credit; Assault 3; Assault of a Child 3; Bail Jumping with Class A Felony; Bail Jumping with Class B or C Felony; Bribe Received by Witness; Bribery; Bribing a Witness; Computer Trespass 1; Criminal Mistreatment 1; Criminal Mistreatment 2; Custodial Assault; Damaging Building, etc. by Explosion with no Threat to Human Being; Dealing in Depictions of Minor Engaged in Sexually Explicit Conduct; Delivery of Imitation Controlled Substance by Person 18 or Over to Person Under 18; Endangering Life and Property by Explosives with no Threat to Human Being; Escape 1; Escape 2; Extortion 2; Extortionate Extension of Credit; Extortionate Means to Collect Extensions of Credit; False Verification for Welfare; Forged Prescription (Legend Drug); Forged Prescription for a Controlled Substance; Forgery; Harassment; Inciting Criminal Profiteering; Influencing Outcome of a Sporting Event; Intimidating a Judge; Intimidating a Juror; Intimidating a Public Servant; Intimidating a Witness; Introducing Contraband 1; Introducing Contraband 2; Knowingly Trafficking in Stolen Property; Malicious Harassment; Malicious Mischief 1; Malicious Mischief 2; Manufacture, Distribute, or Possess with Intent to Distribute an Imitation Controlled Substance; Patronizing a Juvenile Prostitute; Perjury 1; Perjury 2; Possession of a Controlled Substance that is a Narcotic from Schedule I or II; Possession of Phencyclidine (PCP); Possession of Stolen Property 1; Possession of Stolen Property 2; Promoting Prostitution 1; Promoting Prostitution 2; Reckless Burning 1; Reckless Endangerment 1; Recklessly Trafficking in Stolen Property; Rendering Criminal Assistance 1; Securities Act Violation; Sending, Bringing into the State Depictions of Minor Engaged in Sexually Explicit Conduct; Sexual Exploitation; Taking Motor Vehicle Without Permission; Tampering with a Witness; Theft 1; Theft 2; Theft of Livestock 1; Theft of Livestock 2; Threats to Bomb; Unlawful Imprisonment; Unlawful Issuance of Checks or Drafts; Unlawful Possession of a Short Firearm or Pistol; Unlawful Use of Food Stamps; Use of Proceeds of Criminal Profiteering; Vehicle Prowl 1.

| OFFENDER'S NAME  LAH M  Summers | OFFENDER'S DOB  6-11-28 | STATE ID# |
| JUDGE | CAUSE#  95-1-05E33-3 | FBI ID# |

**ADULT HISTORY:** (If the prior offense was committed before 7/1/86, count prior adult offenses served concurrently as one offense; those served consecutively are counted separately. If both current and prior offenses were committed after 7/1/86, count all convictions separately, except (a) priors found to encompass the same criminal conduct under RCW 9.94A.400(1)(a), and (b) priors sentenced concurrently that the current court determines to count as one offense.)

Enter number of felony convictions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . :_____ x 1 = _____

**JUVENILE HISTORY:** (Adjudications entered on the same date count as one offense, except for violent offenses with separate victims)

Enter number of serious violent and violent felony adjudications . . . . . . . . . . . . . . . . . . . . . _____ x 1 = _____

Enter number of other nonviolent felony adjudications . . . . . . . . . . . . . . . . . . . . . . . . . . . 1 x ½ = ½

**OTHER CURRENT OFFENSES:** (Those offenses not encompassing the same criminal conduct)

Enter number of other felony convictions  95- ( .1). .!!!. .J. .01. 0!! ..0!! .(.(  8 x 1 = 8

**STATUS AT TIME OF CURRENT OFFENSES:**  95-1-0 2002-3

If on community placement at time of current offense, add 1 point . . . . . . . . . . . . . . . . . . . . . . . . . . . + 1 = _____

Add the scores in each category . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **TOTAL OFFENDER SCORE**  9 ½

(round down to the nearest whole number)

| vehicle   ct # II III - XII STANDARD RANGE CALCULATION* | | | | | months |
|---|---|---|---|---|---|
| Prowl 1 | I | 9 | 22 | TO | 29 |
| CURRENT OFFENSE BEING SCORED | SERIOUSNESS LEVEL | OFFENDER SCORE | LOW | | HIGH |
| | | | STANDARD SENTENCE RANGE | | |

* Multiply the range by .75 if the current offense is an attempt, conspiracy, or solicitation under RCW 9A.28. For Possession of a Controlled Substance or Forged Prescription of a Controlled Substance, see RCW 69.50.407.
* Add 12 months to the standard range if the current offense is Escape 1, Theft of Livestock 1, or Theft of Livestock 2 and includes a deadly weapon finding.

SGC 1993                                    III-18

# APPENDIX B TO PLEA AGREEMENT
## PROSECUTOR'S UNDERSTANDING OF DEFENDANT'S CRIMINAL HISTORY
### (SENTENCING REFORM ACT)

Defendant: IAN M Simmons                    Date: 24 AUG 1995

| CRIME | DATE OF CONVICTION | PLACE OF CONVICTION | DISPOSITION (Probation and/or incarceration and length) SRA — Counts as Prior |
|---|---|---|---|

**ADULT FELONIES:**

3-20-95 Murder 1°  King 95-1-0 21022 Gbd
TO 9-18-95

**ADULT MISDEMEANORS:**

**JUVENILE FELONIES:**

6-16-94 Burglary 2° schemuch cn 94-8-0 8638-8 P6

**JUVENILE MISDEMEANORS:**

7-2-91 vehicle prowl 2° diverted
6-16-94 Assault 4° theft 3° P6 theft 3° (4) PC
10-20-94 minor Poss P6

_____
Deputy Prosecuting Attorney

**King County Prosecuting Attorney**

# Exhibit O

Dkt 57 - Judgment and Sentence

## STATE'S SENTENCE RECOMMENDATION
### (CONFINEMENT OF OVER ONE YEAR)

*Clem Sem*
*Gloria Goch*
*Kathleen Joh*

Date: _12/20/95_

Defendant: _Ian Simmons_    Cause No: _95-1-05833-3_

State recommends that the sentence of this defendant be as follows:

☐ **TOTAL CONFINEMENT:** State recommmends that the defendant be sentenced to a term of total confinement in the custody of the Department of Corrections as follows:

| | | | |
|---|---|---|---|
| Count I _84_ months/years. | | Count IV _29_ months/years. | |
| Count II _84_ months/years. | | Count V _29_ months/years. | |
| Count III _29_ months/years. | | Count VI _29_ months/years. | |

_Count VII 29 months, Count VIII 29 months, Count IX 29 months,_
_Count X 29 months, Count XI 29 months, Count XII 29 months_

Terms on each count to run concurrently/consecutively with each other.
Terms to be served concurrently/consecutively with: _____
Terms to be consecutive to any other terms(s) not specifically referred to in this form.

☐ **SENTENCE MODIFICATION:** State recommends modification of community supervision on King County Cause Number(s) _____ and recommends that terms be run concurrently/consecutively.

☒ **NO CONTACT:** For the maximum term, defendant have no contact with _Davidson's Marina + Harbour Village Marina_

☒ **MONETARY PAYMENTS:** The defendant shall make the following monetary payments under the supervision of the Department of Corrections (RCW 9.94A.120(11)) within 10 years:
   a. ☒ Restitution as set forth on attached page entitled "Plea Agreement/Trial" and ☐ Appendix C.
   b. ☒ Pay Costs, mandatory $100 Victims Penalty Assessment, recoupment of cost of defense attorney fees, if appointed.
   c. ☐ Pay to King County Local Drug Fund $ _____
   d. ☐ Pay a fine of $ _____ ; ☐ $1000, fine for VUCSA; ☐ $2000, fine for subsequent VUCSA.
   e. ☐ Other _____

**COMMUNITY PLACEMENT:** For any sex offense, serious violent offense; assault 2°; deadly weapon finding or drug offense under 69.50 or 69.52 RCW (committed after 1 July 1988) defendant be on community placement on conditions set forth in RCW 9.94A.120 8(b) and the following conditions under 8(c) (crime-related prohibitions only): _____

☐ **OFF-LIMITS ORDER:** The defendant is a "known drug trafficker" and the state recommends defendant shall neither enter nor remain in the protected against drug trafficking area (described in the attachment) during the term of community placement.

☒ ~~HIV~~ DNA **TESTING:** State recommends ~~HIV~~ DNA testing and counseling.

☐ **EXCEPTIONAL SENTENCE:** This is an exceptional sentence, and the substantial and compelling reasons for departing from the presumptive sentence range are set forth on the attached form.

Approved by: _____

Deputy Prosecuting Attorney
_Jim Marner_

King County Prosecuting Attorney
Rev. 8/25/89

White Copy: Court
Canary Copy: Defense
Pink Copy: Prosecutor

5410627

# SUPERIOR COURT OF WASHINGTON FOR KING COUNTY

| | |
|---|---|
| STATE OF WASHINGTON | ) |
| Plaintiff, | ) No. 95-1-05833-3 |
| v. | ) **JUDGMENT AND SENTENCE** |
| IAN M. SIMMERS | ) |
| Defendant. | ) |

FILED

95 MAY 13 AM 7:11

KING COUNTY
SUPERIOR COURT CLERK
SEATTLE, WA.

COMMITMENT ISSUED MAY 13 1996

## I. HEARING

1.1 The defendant, the defendant's lawyer, KENNETH SCEARCE / BARRY GAY , and the deputy prosecuting attorney were present at the sentencing hearing conducted today. Others present were: _____

1.2 The state has moved for dismissal of count(s) _____

## II. FINDINGS

Based on the testimony heard, statements by defendant and/or victims, argument of counsel, the presentence report(s) and case record to date, and there being no reason why judgment should not be pronounced, the court finds:

2.1 CURRENT OFFENSE(S): The defendant was found guilty on (date): 12-20-95 by plea of:

Count No.: I        Crime: ARSON IN THE 2ND DEGREE
RCW 9A.48.030        Crime Code 02016
Date of Crime 03-12-95        Incident No. _____

Count No.: II        Crime: ARSON IN THE 2ND DEGREE
RCW 9A.48.030        Crime Code 02016
Date of Crime 03-12-95        Incident No. _____

Count No.: III        Crime: VEHICLE PROWL IN THE 1ST DEGREE
RCW 9A.52.095        Crime Code 02374
Date of Crime 03-15-95        Incident No. _____

■ Additional current offenses are attached in **Appendix A.**

**SPECIAL VERDICT/FINDING(S):**

(a) ☐ A special verdict/finding for being armed with a **deadly weapon** was rendered on Count(s):_____
(b) ☐ A special verdict/finding was rendered that the defendant committed the crimes(s) with a **sexual motivation** in Count(s):_____
(c) ☐ A special verdict/finding was rendered for **Violation of the Uniform Controlled Substances Act** offense taking place ☐ in a school zone ☐ in a school ☐ on a school bus ☐ in a school bus route stop zone ☐ in a public park ☐ in public transit vehicle ☐ in a public transit stop shelter in Count(s):_____
(d) ☐ **Vehicular Homicide** ☐ Violent Offense (D.W.I. and/or reckless) or ☐ **Nonviolent** (disregard safety of others)
(e) ☐ Current offenses **encompassing** the same criminal conduct and counting as one crime in determining the offender score (RCW 9.94A.400(1)(a)) are: _____

2.2 **OTHER CURRENT CONVICTION(S):** Other current convictions listed under different cause numbers used in calculating the offender score are (list offense and cause number): MURDER 1 951021022
(Current offenses not listed here are not encompassed)

CPROC
CUST
CASH
JUDG
DISS
CRIM
ACCTG
EXH

COPY TO SENTENCING GUIDELINES COMMISSION, MAY 13 1996

PRESENTENCING STATEMENT & INFORMATION ATTACHED

96 9 11967 4    JUDGMENT NUMBER



2.3 **CRIMINAL HISTORY:** Prior ~~victions~~ constituting criminal history for pur~~~es~~ of calculating the offender score are (RCW 9.94A.360):

| Crime | Sentencing Date | Adult or Juv. Crime | Cause Number | Location |
|-------|-----------------|---------------------|--------------|----------|
| (a) BURG 2 | 06-16-94 | JUV | 948036388 | SNOHOMISH CTY |
| (b) | | | | |
| (c) | | | | |
| (d) | | | | |

☐ Additional criminal history is attached in **Appendix B**.
☐ Prior convictions (offenses committed before July 1, 1986) served concurrently and counted as one offense in determining the offender score are (RCW 9.94A.360(6)(c)): _____
☐ One point added for offense(s) committed while under community placement for count(s) _____

2.4 **SENTENCING DATA:**

| | OFFENDER SCORE | SERIOUSNESS LEVEL | RANGE | MAXIMUM TERM |
|--|----------------|-------------------|-------|--------------|
| Count I : | 14 | IV | 63 TO 84 MONTHS | 10 YRS AND/OR $20,000 |
| Count II : | 14 | IV | 63 TO 84 MONTHS | 10 YRS AND/OR $20,000 |
| Count III : | 11 | I | 22 TO 29 MONTHS | 5 YRS AND/OR $10,000 |

■ Additional current offense sentencing data is attached in **Appendix C**.

2.4 **EXCEPTIONAL SENTENCE:**
☐ Substantial and compelling reasons exist which justify a sentence above/below the standard range for Count(s) _____

Findings of fact and conclusion(s) are attached in **Appendix D**.

### III. JUDGMENT

IT IS ADJUDGED that defendant is guilty of the current offenses set forth in Section 2.1 above and Appendix A.
☐ The Court DISMISSES Count(s) _____

### IV. ORDER

IT IS ORDERED that the defendant serve the determinate sentence and abide by the other terms set forth below.

4.1 **RESTITUTION AND VICTIM ASSESSMENT:**
☐ Defendant shall pay restitution to the Clerk of this Court as set forth in attached **Appendix E**.
☐ Defendant shall **not** pay restitution because the Court finds that extraordinary circumstances exist, and the court, pursuant to RCW 9.94A.142(2), sets forth those circumstances in attached **Appendix E**.
☒ Restitution to be determined at future hearing on (Date) _June 25_ at _8:30_ a.m. ☐ Date to be set.
☒ Defendant waives presence at future restitution hearing(s) 1996

✓ Defendant shall pay $100 Victim Assessment, pursuant to RCW 7.68.035.

4.2 **OTHER FINANCIAL OBLIGATIONS:** Having considered the defendant's present and likely future financial resources, the Court concludes that the defendant has the present or likely future ability to pay the financial obligations imposed. The Court waives financial obligation(s) that are checked below because the defendant lacks the present and future ability to pay them. Defendant shall pay the following to the Clerk of this Court:
(a) ☐ $_____, Court costs; ☒ Court costs are waived;
(b) ☐ $_____, Recoupment for attorney's fees to King County Public Defense Programs, 2015 Smith Tower, Seattle, WA 98104; ☒ Recoupment is waived (RCW 10.01.160);
(c) ☐ $_____, Fine; ☐ $1,000, Fine for VUCSA; ☐ $2,000, Fine for subsequent VUCSA; ☐ VUCSA fine waived (RCW 69.50.430);
(d) ☐ $_____, King County Interlocal Drug Fund; ☐ Drug Fund payment is waived;
(e) ☐ $_____, State Crime Laboratory Fee; ☐ Laboratory fee waived (RCW 43.43.690);
(f) ☐ $_____, Incarceration costs; ☐ Incarceration costs waived (9.94A.145(2));
(g) ☐ $_____, Other cost for:_____.

4.3 **PAYMENT SCHEDULE:** Defendant's **TOTAL FINANCIAL OBLIGATION** is: $ _100.00 + restitution_. The payments shall be made to the King County Superior Court Clerk according to the rules of the Clerk and the following terms:
☐ Not less than $_____ per month; ☒ On a schedule established by the defendant's Community Corrections Officer. ☐ :_____The
defendant shall remain under the Court's jurisdiction and the supervision of the Department of Corrections for up to ten years from date of sentence or release from confinement to assure payment of financial obligations.

4.4 **CONFINEMENT OVER ONE** YEAR: Defendant is sentenced to a term of total confinement in the custody of the Department of Corrections as follows, commencing: ☒ Immediately; ☐ (Date):_____ by _____ _____.m.

_____84_____ months on Count No. _I_

_____84_____ months on Count No. _II_

_____29_____ (each) months on Counts No. _III - XII_

The terms in Count(s) No. _I - XII_ are (concurrent) consecutive
The sentence herein shall run (concurrently) consecutively with the sentence in cause number(s) _95-1-05833·3_
_____ but consecutive to any other cause not referred to in this Judgment.

Credit is given for ~~time~~ served ☒ days as determined by the King County Jail solely for conviction under this cause number pursuant to RCW 9.94A.120(13). Shall also include time in Juvenile Detention

4.5 ☒ **NO CONTACT:** For the maximum term of ~~15 yrs~~ _10_ years, defendant shall have no contact with _Victims on Counts I - XII and Davidson's Marina_
Violation of this no contact order is a criminal offense under chapter 10.99 RCW and will subject a violator to arrest; any assault or reckless endangerment that is a violation of this order is a felony.

4.6 **BLOOD TESTING:** (sex offense, violent offense, prostitution offense, drug offense associated with the use of hypodermic needles) **Appendix G** is a blood testing and counseling order that is part of and incorporated by reference into this Judgment and Sentence.

4.7 **COMMUNITY PLACEMENT:** Community Placement is ordered for sex offense, serious violent offense, second degree assault, deadly weapon finding, Chapter 69.50 or 69.52 RCW offense. Any standard mandatory conditions are ordered. Community placement is ordered for the maximum period of time provided by law. ☐ **Appendix H** (for additional conditions) is attached and incorporated by reference in this Judgment and Sentence.

4.8 ☐ **WORK ETHIC CAMP:** The court finds that the defendant is eligible for work ethic camp and is likely to qualify under Sec. 4(3), Chap. 338, Laws of 1993 and the Court recommends that the defendant serve the sentence at a work ethic camp. If the defendant successfully completes the program, the Department of Corrections shall convert the period of work ethic camp confinement at the rate of one day of work ethic camp confinement to three days of total standard confinement. Upon completion of the work ethic camp program, the defendant shall be released on community custody for any remaining time of total confinement.

4.9 ☐ **SEX OFFENDER REGISTRATION** (sex offender crime conviction): **Appendix J** is attached and incorporated by reference into this Judgment and Sentence.

4.10 ☐ **OTHER:** _____

The defendant shall report to an assigned Community Corrections Officer upon release from confinement for monitoring of the remaining terms of this sentence.

Date: _5/10/96_

Presented by:

Deputy Prosecuting Attorney,
Office WSBA ID #91002

Judge, King County Superior Court
Approved as to form:

Attorney for Defendant, WSBA # _10644_

F I N G E R P R I N T S




BEST AVAILABLE COPY

RIGHT HAND
FINGERPRINTS OF:

IAN MONROE SIMMERS

DATED: 5/10/96

_____
JUDGE, KING COUNTY SUPERIOR COURT

DEFENDANT'S SIGNATURE: _Ian M Simmers_
DEFENDANT'S ADDRESS: _KC JAIL_

ATTESTED BY:
M. JANICE MICHELS, SUPERIOR COURT CLERK
    BY: _Joyce Zamelia_
            DEPUTY CLERK

CERTIFICATE

I, _____,
CLERK OF THIS COURT, CERTIFY THAT
THE ABOVE IS A TRUE COPY OF THE
JUDGEMENT AND SENTENCE IN THIS
ACTION ON RECORD IN MY OFFICE.
DATED: _____

_____
        CLERK

BY: _____
        DEPUTY CLERK

PAGE 4 - FINGERPRINTS

OFFENDER IDENTIFICATION

S.I.D. NO.

DATE OF BIRTH: ██████ 1976

SEX: M

RACE: WHITE

# SUPERIOR COURT OF WASHINGTON FOR KING COUNTY

STATE OF WASHINGTON )
                                  )    No. 95-1-05833-3
              Plaintiff,    )
                                    )    (FELONY) - APPENDIX A
         v.                 )    ADDITIONAL CURRENT OFFENSES
                                    )
IAN M. SIMMERS              )
                                    )
               Defendant.   )

2.1   The defendant is also convicted of these additional current offenses:

Count No.: IV          Crime: VEHICLE PROWL IN THE 1ST DEGREE
RCW 9A.52.095                    Crime Code 02374
Date of Crime 03-15-95         Incident No.

Count No.: V           Crime: VEHICLE PROWL IN THE 1ST DEGREE
RCW 9A.52.095                    Crime Code 02374
Date of Crime 03-15-95         Incident No.

Count No.: VI          Crime: VEHICLE PROWL IN THE 1ST DEGREE
RCW 9A.52.095                    Crime Code 02374
Date of Crime 03-15-95         Incident No.

Count No.: VII         Crime: VEHICLE PROWL IN THE 1ST DEGREE
RCW 9A.52.095                    Crime Code 02374
Date of Crime 03-15-95         Incident No.

Count No.: VIII        Crime: VEHICLE PROWL IN THE 1ST DEGREE
RCW 9A.52.095                    Crime Code 02374
Date of Crime 03-15-95         Incident No.

Count No.: IX          Crime: VEHICLE PROWL IN THE 1ST DEGREE
RCW 9A.52.095                    Crime Code 02374
Date of Crime 03-15-95         Incident No.

Count No.: X           Crime: VEHICLE PROWL IN THE 1ST DEGREE
RCW 9A.52.095                    Crime Code 02374
Date of Crime 03-15-95         Incident No.

Count No.: XI          Crime: VEHICLE PROWL IN THE 1ST DEGREE
RCW 9A.52.095                    Crime Code 02374
Date of Crime 03-15-95         Incident No.

Count No.: XII         Crime: VEHICLE PROWL IN THE 1ST DEGREE
RCW 9A.52.095                    Crime Code 02374
Date of Crime 03-15-95         Incident No.

APPENDIX A

35410627

# SUPERIOR COURT OF WASHINGTON FOR KING COUNTY

STATE OF WASHINGTON )
                                   Plaintiff, )
                 v. )
IAN M. SIMMERS )
                           Defendant. )

No. 95-1-05833-3

(FELONY) - APPENDIX C
ADDITIONAL CURRENT OFF
SENTENCING DATA

**2.4 SENTENCING DATA**: Additional current offense(s) sentencing information is as follows:

| | OFFENDER SCORE | SERIOUSNESS LEVEL | RANGE | MAXIMUM TERM |
|---|---|---|---|---|
| Count IV : | 11 | I | 22 TO 29 MONTHS | 5 YRS AND/OR $10,000 |
| Count V : | 11 | I | 22 TO 29 MONTHS | 5 YRS AND/OR $10,000 |
| Count VI : | 11 | I | 22 TO 29 MONTHS | 5 YRS AND/OR $10,000 |
| Count VII : | 11 | I | 22 TO 29 MONTHS | 5 YRS AND/OR $10,000 |
| Count VIII : | 11 | I | 22 TO 29 MONTHS | 5 YRS AND/OR $10,000 |
| Count IX : | 11 | I | 22 TO 29 MONTHS | 5 YRS AND/OR $10,000 |
| Count X : | 11 | I | 22 TO 29 MONTHS | 5 YRS AND/OR $10,000 |
| Count XI : | 11 | I | 22 TO 29 MONTHS | 5 YRS AND/OR $10,000 |
| Count XII : | 11 | I | 22 TO 29 MONTHS | 5 YRS AND/OR $10,000 |

☐ The following real and material facts were considered by the court pursuant to RCW 9.94A.370:

Date: 5/10/96

JUDGE, KING COUNTY SUPERIOR COURT

APPENDIX C

35410627

# SUPERIOR COURT OF WASHINGTON FOR KING COUNTY

STATE OF WASHINGTON )
                        Plaintiff, )

           v. )

IAN M. SIMMERS )
                    Defendant. )

No. 95-1-05833-3

APPENDIX G
ORDER FOR BLOOD TESTING
AND COUNSELING

(1) ☐ **HIV TESTING AND COUNSELING:**

    (Required for defendant convicted of sexual offense, drug offense associated with the use of hypodermic needles, or prostitution related offense committed after March 23, 1988. RCW 70.24.340):

    The Court orders the defendant contact the Seattle-King County Health Department and participate in human immunodeficiency virus (HIV) testing and counseling in accordance with Chapter 70.24 RCW. The defendant, if out of custody, shall promptly call Seattle-King County Health Department at 296-4848 to make arrangements for the test to be conducted **within 30 days.**

(2) ☒ **DNA IDENTIFICATION:**

    (Required for defendant convicted of sexual offense or violent offense. RCW 43.43.754):

    The Court orders the defendant to cooperate with the King County Department of Adult Detention and/or the State Department of Corrections in providing a blood sample for DNA identification analysis. The defendant, if out of custody, shall promptly call the King County Jail at 296-1226 between 8:00 a.m. and 1:00 p.m., to make arrangement for the test to be conducted **within 15 days.**

If both (1) and (2) are checked, two independent blood samples shall be taken.

Date: _5/10/96_                           _____
                                                Judge, King County Superior Court

APPENDIX G

Rev 10/11/93

35410627

Submitted to:

Department of Licensing
Business & Professions
Firearms Unit
PO Box 9649
Olympia, WA 98507-9649

✓FILED

96 MAY 15  AM 9: 05

KING COUNTY
SUPERIOR COURT CLERK
SEATTLE, WA.

## NOTICE OF INELIGIBILITY
## TO POSSESS A FIREARM

**May 14, 1996**

Cause Number: **95-1-05833-3**

Court NCIC Number: ▮▮▮▮▮▮▮

**FOR INFORMATION REGARDING NAME, ADDRESS, ETC. OF DEFENDANT, SEE
ATTACHED DOCUMENTS**

The above named individual may not possess a firearm until his/her right has been restored by a court of
record.  The reason for this ineligibility is:

Pursuant to RCW 9.41.404, an order was signed on **SEE ATTACHED** in cause number **SEE
ATTACHED.**

Notifying authority: **KING COUNTY SUPERIOR COURT**     Phone: **206-296-7854**
Address: **DEPARTMENT OF JUDICIAL ADMIN. 516 3RD AVE #E609 SEATTLE WA 98104-
2386**

Effective Date: **SEE ATTACHED**          Authorized Signature _____
                                          Title:          Deputy Clerk

