1            UNITED STATES DISTRICT COURT

2           WESTERN DISTRICT OF WASHINGTON

3                    AT SEATTLE

4  _____

5  IAN SIMMERS,                )
                               )
6          Plaintiff,          )
                               )
7          vs.                 )
                               ) No. 2:21-cv-00100-TL-JRC
8                              )
   KING COUNTY, et al.,        )
9                              )
           Defendants.         )
10 _____

11

12   VIDEO-TAPED ZOOM DEPOSITION UPON ORAL EXAMINATION

13                        OF

14                   IAN SIMMERS

15                    VOLUME 1

16    (CONTAINS CONFIDENTIAL TESTIMONY SUBJECT TO

17                 PROTECTIVE ORDER)

18 _____

19

20                   9:33 A.M.

21                 JULY 6, 2022

22             SEATTLE, WASHINGTON

23

24

25   REPORTED BY: LESLIE POST, CCR No. 2378

# Exhibit B

Page 1

Ian Simmers - July 6, 2022

```
 1                    A P P E A R A N C E S
 2           (All parties appearing remotely via Zoom)
 3
 4      FOR THE PLAINTIFF:
 5              DAVID B. OWENS
                Loevy & Loevy
 6              PO Box 85110
                Seattle, Washington 98145-1110
 7              312.243.5900
                david@loevy.com
 8
 9      FOR THE DEFENDANTS KING COUNTY, McSWAIN, BAXTER and
10      RAFTUS:
11              GEOFFREY M. GRINDELAND
                Seamark Law Group, PLLC
12              400 Winslow Way East, Suite 230
                Bainbridge Island, Washington 98110-2402
13              206.502.2510
                geoff@seamarklaw.com
14
15      FOR THE DEFENDANTS CITY OF BOTHELL, HOPKINS,
16      SCHLAEGEL, MINER, ERICKS:
17              PAUL J. TRIESCH
                SHANNON RAGONESI
18              Keating, Bucklin & McCormack, Inc., P.S.
                801 Second Avenue, Suite 1210
19              Seattle, Washington 98104-1518
                206.623.8861
20              ptriesch@kbmlawyers.com
                sragonesi@kbmlawyers.com
21
22      ALSO PRESENT:
23              LORI TALBOTT, Videographer
24              EDWARD HOPKINS
25
```

Page 2

Ian Simmers - July 6, 2022

```
 1              SEATTLE, WASHINGTON; JULY 6, 2022

 2                      9:33 A.M.

 3                      --oOo--

 4

 5              THE VIDEOGRAPHER:  Good morning.  We're

 6      going on the record at 9:33 a.m. on July 6, 2022.

 7      Please note that this deposition is being conducted

 8      virtually.  The quality of recording depends on the

 9      quality of camera and Internet connection of

10      participants.  What is seen from the witness and heard

11      on the screen is what will be recorded.  Audio- and

12      video-recording will continue to take place unless all

13      parties agree to go off the record.

14              This is media unit one in the video-recorded

15      deposition of Ian Simmers taken by counsel for

16      defendant in the matter of Ian Simmers versus

17      King County, et al., filed in the United States

18      District Court, Western District of Washington at

19      Seattle, Case Number 2:21-cv-00100-TL-JRC.

20              My name is Lori Talbott representing

21      Veritext, I am the videographer.  The court reporter

22      is Leslie Post from the firm Veritext.  I am not

23      related to any party in this action nor am I

24      financially interested in the outcome.

25              If there are any objections to proceeding,
```

Ian Simmers - July 6, 2022

1    please state them at the time of your appearance.

2    Counsel will now state their appearances and

3    affiliations for the record beginning with the

4    noticing attorney.

5            MR. GRINDELAND:  Good morning.  This is

6    Geoff Grindeland, I represent King County and the

7    individual King County Sheriff's Deputies.

8            MR. TRIESCH:  Good morning.  This is Paul

9    Triesch, I represent the City of Bothell and the

10   City of Bothell Defendants, Detective Ed Hopkins,

11   Detective David Schlaegel, Detective Rebecca Donnelly,

12   who's captioned as Rebecca Miner, and former

13   Bothell Chief of Police Mark Ericks.

14           MS. RAGONESI:  Good morning.  This is

15   Shannon Ragonesi, I am also representing the

16   Bothell defendants.

17           MR. OWENS:  This is David Owens offscreen, I

18   represent Mr. Simmers.

19           THE VIDEOGRAPHER:  Thank you.

20           Would the court reporter -- oh, Mr. Hopkins,

21   go ahead.

22           MR. HOPKINS:  Yeah, this is Edward Hopkins,

23   the defendant.

24           THE VIDEOGRAPHER:  Thank you.

25           Will the court reporter please swear in the

Ian Simmers - July 6, 2022

```
 1      witness.

 2

 3                      IAN SIMMERS,

 4       sworn as a witness by the Certified Court Reporter,

 5                   testified as follows:

 6

 7                      EXAMINATION

 8      BY MR. TRIESCH:

 9          Q.    Would you please state your full name.

10          A.    Ian Monroe Simmers.

11          Q.    Have you gone by any aliases during your

12      life?

13          A.    No.

14          Q.    What's your residential address?

15              MR. OWENS:  Objection.  If you want his

16      address, you can contact him through us.

17              MR. TRIESCH:  I'm not trying to contact him.

18          Q.   (By Mr. Triesch)  What's your residential

19      address?

20              MR. OWENS:  We have an objection to this.

21              Are you going to put this under

22      protective order?

23          Q.   (By Mr. Triesch)  What's your residential

24      address?

25              MR. OWENS:  I'm going to instruct him not to
```

Page 7

Ian Simmers - July 6, 2022

```
 1      which you explained the details of slashing and
 2      repeatedly stabbing Rodney Gochanaur, correct?
 3           A.    That is correct.
 4                 MR. TRIESCH:  Okay.  I'm going to share my
 5      screen with you.
 6                 And David and Geoff, I will send you copies
 7      of these exhibits, any screen share that I do.
 8           Q.   (By Mr. Triesch)  Can you see my screen,
 9      Mr. Simmers?
10           A.    Yes.
11                 MR. TRIESCH:  Okay.  Give me a second here
12      to rearrange my desktop.
13                      (Deposition Exhibit No. 1 was marked
14                       for identification.)
15           Q.   (By Mr. Triesch)  I'm going to show you by
16      scrolling through what's been marked as Exhibit No. 1
17      to your deposition, and then I'll go back and let you
18      go in whatever detail and whatever speed to look at it
19      when I ask you questions.  Okay?
20           A.    Okay.
21           Q.    I'll tell you in advance there's some
22      highlighting on this document that is mine which I
23      have placed there in order to remind me of things I
24      want to ask you about.  Okay?
25           A.    Okay.
```

Page 16

Ian Simmers - July 6, 2022

1        Q.    So I'm not representing to you that the

2     highlighting is original.  Okay?

3        A.    Okay.

4        Q.    All right.  This is the first page of the

5     transcript, which I will just pull through fairly

6     quickly to the end.

7              Is this the transcript you recall reviewing

8     preliminary to your deposition today?

9        A.    Basically, yes.

10       Q.    When you say "basically," why do you insert

11    the qualifier?

12       A.    Because you are moving it quickly.

13       Q.    Is this page one of the typed transcript of

14    your audiotaped confession to detectives that you

15    reviewed prior to your deposition today?

16             MR. OWENS:  Objection to the form of the

17    question.

18             You can answer.

19       A.    If that is -- that does look to be page one,

20    yes.

21       Q.    (By Mr. Triesch)  Same question with

22    reference to this page; is this page two of your typed

23    transcript of the audiotaped confession to detectives

24    that you reviewed prior to your deposition today?

25       A.    Yes, that is page two.

                                          Page 17

Ian Simmers - July 6, 2022

```
 1              Q.     Is this page three of the transcript of your
 2        audiotaped confession to detectives which you reviewed
 3        prior to your deposition today?
 4              A.     Yes, that is page three.
 5              Q.     Is this page four to the typed transcript of
 6        your audiotaped confession to detectives that you
 7        reviewed prior to your deposition today?
 8              A.     That is page four.
 9              Q.     Is this page five of your typed transcript
10        of your audiotaped confession to detectives that you
11        reviewed prior to your deposition today?
12              A.     That is page five.
13              Q.     Is this page six of the typed transcript of
14        your audiotaped confession to detectives which you
15        reviewed prior to your deposition today?
16              A.     That is page six.
17              Q.     Is this page seven of your audiotaped --
18                     MR. TRIESCH:  Strike that.
19              Q.     (By Mr. Triesch)  Is this page seven of the
20        typed transcript of your audiotaped confession to
21        detectives that you reviewed prior to your deposition
22        today?
23              A.     That is page seven.
24              Q.     Is this page eight of the typed transcript
25        of your audiotaped confession to detectives that you
```

Page 18

Ian Simmers - July 6, 2022

```
 1        reviewed --
 2            A.    That looks like page nine.
 3                  MR. TRIESCH:  Strike that.
 4            I went too far.  I apologize.  And thank you
 5        for pointing that out.
 6            Q.    (By Mr. Triesch)  Is this page seven --
 7            A.    That is page seven.
 8            Q.    Let me get the whole question out.
 9            Is this page seven of the typed transcript
10        of your audiotaped confession to detectives that you
11        reviewed prior to your deposition today?
12            A.    Yes.
13            Q.    Is this page eight of your -- of the typed
14        transcript of your audiotaped confession to detectives
15        that you reviewed prior to your deposition today?
16            A.    Yes.
17            Q.    Is this page nine of the typed transcript of
18        your audiotaped confession that you reviewed prior to
19        your deposition today?
20            A.    Yes.
21            Q.    Is this page ten of the typed transcript of
22        your audiotaped confession to detectives that you
23        reviewed prior to your deposition today?
24            A.    Yeah.
25            Q.    Is this page eleven of the typed transcript
```

Page 19

Ian Simmers - July 6, 2022

```
1        of your audiotaped confession to detectives that you

2        reviewed prior to your deposition today?

3            A.    Yeah.

4            Q.    Is this page twelve of the typed transcript

5        of your audiotaped confession to detectives that you

6        reviewed prior to your deposition today?

7            A.    Yeah.

8            Q.    Is this page 13 of the typed transcript of

9        your audiotaped confession to detectives that you

10       reviewed prior to your deposition today?

11           A.    Yeah.

12           Q.    Is this page 14 of the typed transcript of

13       your audiotaped confession to detectives that you

14       reviewed prior to your deposition today?

15           A.    Yeah.

16           Q.    Is this page 15 of your -- of the typed

17       transcript of your audiotaped confession to detectives

18       that you reviewed prior to your deposition today?

19           A.    Yeah.

20           Q.    Is this page 16 of the typed transcript of

21       your audiotaped confession to detectives that you

22       reviewed prior to your deposition today?

23           A.    Yeah.

24           Q.    Is this page 17 and the final page of the

25       typed transcript to your audiotaped confession to
```

Page 20

Ian Simmers - July 6, 2022

1    detectives that you reviewed prior to your deposition

2    today?

3        A.    Yeah.

4        Q.    Did you also, prior to your deposition

5    today, review what is page one to Exhibit 1, and that

6    is the explanation of your constitutional rights?

7        A.    I don't remember.

8        Q.    When did you review the typed transcript

9    that we've just gone through?

10       A.    Yesterday.

11       Q.    Do you recall whether you reviewed this

12   explanation of your constitutional rights yesterday

13   when you read the transcript that I've attached to

14   this document?

15       A.    Not specifically.

16       Q.    Did you review any other documents other

17   than the ten-page typed transcript of your audiotaped

18   confession to detectives in order to explain the

19   details of how you slashed and repeatedly stabbed

20   Rodney Gochanaur?

21           MR. OWENS:  Objection to the form of the

22   question, it's argumentative.

23       Q.    (By Mr. Triesch)  Go ahead.

24       A.    I don't recall specifically.

25       Q.    So just to make sure I understand your

                                              Page 21

Ian Simmers - July 6, 2022

```
 1        question.
 2               You can answer.
 3        A.    That is true.
 4        Q.    (By Mr. Triesch)  Do you recognize the
 5   document that is on the screen at this time?
 6        A.    Yes.
 7        Q.    Is that your signature?
 8               MR. OWENS:  Objection, vague.
 9        Q.    (By Mr. Triesch)  You can answer.
10               MR. OWENS:  Well, since you want to like put
11   up a version that doesn't have highlights on it or
12   make clear what you're referring to, because that --
13   it actually is vague.  There's I think five different
14   signatures on this.
15        Q.    (By Mr. Triesch)  Mr. Simmers, do you see
16   your signature anywhere on the document that is
17   Exhibit 1 that's displayed on the screen?
18        A.    Yes.
19        Q.    Where do you see it appear?
20        A.    Under two locations that say "Signature."
21        Q.    Do you see it appear after the statement of
22   constitutional rights one through five?
23        A.    Yes.
24        Q.    That's your signature where I've got the
25   cursor going back and forth there that's highlighted
```

Page 23

Ian Simmers - July 6, 2022

1      in yellow?

2              A.     That was, yes.

3              Q.     Do you also see it appear under the

4      statement "Waiver of Constitutional Rights" that I'm

5      going to highlight in yellow now?

6              A.     Yes.

7              Q.     Those are both your signatures, correct?

8              A.     Yes.

9              Q.     Okay.  So you do recognize that, right?

10                    MR. OWENS:  Objection to the form of the

11     question, it's argumentative.

12             Q.     (By Mr. Triesch)  You can answer.

13             A.     Yes.

14             Q.     So do you recall when you signed these

15     statements on page one of Exhibit 1?

16                    MR. OWENS:  Objection, vague.

17                    You can answer to the extent you understand

18     it.

19             A.     I do recognize it.  Yes, I signed those.

20             Q.     (By Mr. Triesch)  Did you understand my

21     question to ask whether you knew when you signed them?

22             A.     When I signed them?

23             Q.     Yeah.

24             A.     On the date that is also highlighted.

25             Q.     Okay.  So you signed this form on March 15,

                                                    Page 24

Ian Simmers - July 6, 2022

```
 1              A.    That is incorrect.  The last time I read it

 2        was in the neighborhood of about ten minutes ago when

 3        you showed it to me.

 4              Q.    (By Mr. Triesch)  Okay.  Well, I stand

 5        corrected then.

 6                    With the additional review ten minutes ago

 7        when you first saw it, the last time you saw this

 8        transcript was yesterday, correct?

 9              A.    Correct.

10              Q.    You were present in court during your

11        March 1996 murder trial when this typed transcript of

12        your audiotaped confession to detectives was admitted

13        into evidence, correct?

14              A.    Correct.

15              Q.    When is the last time you listened to your

16        audiotaped confession to detectives in which you

17        explained to them the details of how you slashed and

18        repeatedly stabbed Rodney Gochanaur?

19                    MR. OWENS:  Objection to the form of the

20        question, again with respect to this assertion about

21        "how you repeatedly stabbed Mr. Gochanaur."

22                    To the extent you understand the question,

23        you can answer.

24              A.    I don't know.

25              Q.    (By Mr. Triesch)  Mr. Simmers, just to follow
```

Page 28

1    up on your counsel's objections; you did confess to

2    detectives that you slashed Rodney Gochanaur, correct?

3         A.    That was part of the confession, yes.

4         Q.    And just to follow up on your counsel's

5    objections; you did confess to detectives that you

6    repeatedly stabbed Rodney Gochanaur, correct?

7         A.    That was part of the confession, yes.

8         Q.    Okay.  So did you listen to the audiotaped

9    confession to detectives in which you explained to

10   them the details of how you slashed and repeatedly

11   stabbed Rodney Gochanaur in the last 30 days?

12            MR. OWENS:  Objection to the form of the

13   question, same objections as earlier, but you asked it

14   different than what you asserted there.

15            You can answer

16        A.    No, I have not listened to it in the last

17   30 days.

18        Q.    (By Mr. Triesch)  Have you listened to the --

19   your audiotaped confession to detectives in which you

20   explained to them the details of how you slashed and

21   repeatedly stabbed Rodney Gochanaur in the last year?

22            MR. OWENS:  Same objections earlier.

23        A.    No.

24        Q.    (By Mr. Triesch)  When is the last time that

25   you heard --

                                           Page 29

```
 1        Bates numbers.
 2                 MR. OWENS:  This says Exhibit 4, Paul.
 3                 MR. TRIESCH:  My bad.  Thank you, David.
 4                 MR. OWENS:  No problem.
 5                 MR. TRIESCH:  Exhibit 3, pages Simmers,
 6        S-I-M-M-E-R-S, 000260 through 000262.
 7                 So I'll go back to the start.
 8                      (Deposition Exhibit No. 3 was marked
 9                      for identification.)
10        Q.    (By Mr. Triesch)  Do you recognize this
11   document?
12        A.    Not specifically.
13        Q.    Do you recognize the signature that appears
14   at the bottom of the explanation of constitutional
15   rights that I've highlighted here?
16        A.    Yes.
17        Q.    Is that your signature?
18        A.    Yes.
19        Q.    Do you recognize the signature that appears
20   at the bottom of the statement "Waiver of
21   Constitutional Rights"?
22        A.    Yes.
23        Q.    Is that your signature?
24        A.    Yes.
25        Q.    So is it true that you, based on
```

YOM: Full Service Court Reporting, A Veritext Company
800.831.6973

1    Exhibit Nos. 2 and 3, had explained to you on

2    March 15, 1995, your constitutional rights and waived

3    those rights at 1:15 p.m. and again at 1:45 p.m.?

4              MR. OWENS:  Objection to the form of the

5    question.

6              You can answer.

7         A.    Yes.

8         Q.    (By Mr. Triesch)  Okay.  And then when you

9    talked with Detective Hopkins at 2240 you again had

10   your constitutional rights read to you and explained

11   to you and you again waived them, correct?

12        A.    Correct.

13        Q.    Okay.  And I think you already told me that

14   a fourth explanation of your constitutional rights

15   occurred before you gave an audiotaped confession to

16   detectives, explained to them the details of how you

17   slashed and repeatedly stabbed Rodney Gochanaur,

18   correct?

19             MR. OWENS:  Objection to the form of the

20   question, it's argumentative yet again.

21        A.    I do not believe that I said that, no.

22        Q.    (By Mr. Triesch)  You did not have your

23   constitutional rights explained to you and again waive

24   them before you gave the audiotaped confession to

25   detectives explaining to them the details of your

                                              Page 50

1       Q.    You also told the detectives during that

2   audiotaped confession that the blade of the knife bent

3   when you stabbed the individual in the shoulder,

4   correct?

5       A.    Correct.

6       Q.    Looking at page seven, which is Bates

7   000062, Sergeant Rusk asked you to confirm that you

8   had stabbed him six times, correct?

9       A.    That does look to be what it says, yes.

10      Q.    And he also asked you to qualify what you

11  meant by the word "shanked," correct?

12      A.    Correct.

13      Q.    And you explained to him that means

14  stabbing, right?

15      A.    I explained to him that it's a juvenile

16  knife.

17      Q.    Okay.  So the question from Sergeant Rusk

18  was, quote, OK, when you said you shanked him, I think

19  you used the word shanked him six times.  What does

20  that mean, question mark, end quote.

21            Did I accurately state his question to you?

22      A.    Yes.

23      Q.    And your answer was, "It's another word for

24  knife, it's a juvenile knife," correct?

25      A.    Correct.

Ian Simmers - July 6, 2022

```
 1        you provided the audiotaped confession on March 15,
 2        1995 how deeply you stabbed Mr. Gochanaur in the back
 3        when you shanked him those six times?
 4               MR. OWENS:  Objection to the form of the
 5        question, it's argumentative.
 6        A.     I do not specifically recall giving a depth
 7        or volume at the time, so no.
 8        Q.     (By Mr. Triesch)  Well, when you say
 9        "volume," you're not referring to the number of times
10        that you confessed to stabbing Rodney Gochanaur, are
11        you?
12               MR. OWENS:  Objection, vague.
13        A.     I'm not understanding what you were talking
14        about in the first place.
15        Q.     (By Mr. Triesch)  Well, you testified already
16        this morning that you confessed to detectives in an
17        audiotaped interview to having stabbed Rodney
18        Gochanaur in the back six times, correct?
19        A.     Correct.
20        Q.     When you used the word "volume" in your most
21        recent response, were you referring to the number of
22        times you confessed to having stabbed Rodney Gochanaur
23        in the back?
24               MR. OWENS:  Objection to the form of the
25        question.
```

Page 79

Ian Simmers - July 6, 2022

```
 1          Q.    And they asked you questions about how you
 2    originally got arrested, correct?
 3          A.    Correct.
 4          Q.    And you were originally arrested by
 5    King County Officers for shooting flares, correct?
 6          A.    Correct.
 7          Q.    You were arrested along with Jon Wyatt at
 8    that time, correct?
 9          A.    Correct.
10          Q.    And then you and Jon Wyatt were both taken
11    to the North Precinct in Kenmore and split apart into
12    separate rooms, correct?
13          A.    Correct.
14          Q.    Okay.  And during the initial conversations
15    with officers you were questioned about the alcohol
16    use, the boats you entered and you ended up taking a
17    trip to the marina, correct?
18          A.    Correct.
19          Q.    Okay.  And your testimony to Ms. Thompson
20    and -- Mr. Thompson and Ms. Carlstrom was that you
21    were taken to the marina separately, you and Jon
22    Wyatt, correct?
23          A.    Correct.
24          Q.    How did you know Jon Wyatt was taken to the
25    marina?
```

```
 1        anybody's here, everyone's gone.  So I don't think we
 2        can just be on the record by ourselves for ten
 3        minutes.  So we'll see you in ten.
 4                   THE VIDEOGRAPHER:  Okay, thanks.
 5                        (Recess.)
 6                   THE VIDEOGRAPHER:  We are back on the
 7        record.  The time is 12:02.  Please proceed.
 8                   MR. TRIESCH:  Thank you.
 9             Q.    (By Mr. Triesch)  Mr. Simmers, when you were
10        interviewing with Detective Sergeant Rusk at the
11        North Precinct and you disclosed that you had gone on
12        some boats, the idea came up that you would show him
13        which boats you went on, to clarify, correct?
14             A.    Correct.
15             Q.    And then you went to the marina --
16                   MR. OWENS:  Just hold on one second.  Sorry,
17        Paul.  There we go.
18             A.    So I would actually like to caveat that with
19        the understanding that I am not 100 percent certain
20        that it was Rusk who I was talking to.
21             Q.    (By Mr. Triesch)  Sure.  You were talking to
22        an officer about the vehicle prowls at the marina,
23        correct?
24             A.    Correct.
25             Q.    And you agreed to go to the marina with that
```

                                             Page 104

Ian Simmers - July 6, 2022

1    officer to show that officer which boats you entered,

2    correct?

3         A.    Correct.

4         Q.    So then you went to the marina with that

5    officer and another officer driving, correct?

6         A.    Correct.

7         Q.    And to the best of your knowledge those were

8    both King County Officers, correct?

9         A.    I honestly don't know.

10        Q.    At that time, however, there had been no

11   discussion in your presence about a murder, correct?

12        A.    I don't know.

13        Q.    Okay, you don't know.

14              On the way to the marina, was there any

15   conversation about a murder?

16        A.    To my recollection, yes.

17        Q.    What was the conversation about a murder on

18   the way to the marina?

19        A.    I could not give you the details after so

20   long.

21        Q.    And in fact, back in March of 2018 you

22   couldn't give details then either, correct?

23              MR. OWENS:  Objection, vague.

24              You can answer.

25        A.    No.

Ian Simmers - July 6, 2022

```
 1                    THE VIDEOGRAPHER:  All right, thank you.
 2         We're going off the record at 12:10.
 3                         (Recess.)
 4                    THE VIDEOGRAPHER:  We are back on the
 5         record.  The time is 12:14.  Please proceed.
 6                    MR. TRIESCH:  Thank you.
 7              Q.    (By Mr. Triesch)  Mr. Simmers, when you were
 8         on the way to the marina with the two officers, they
 9         were primarily interested in the boat prowling,
10         correct?
11              A.    Correct.
12              Q.    And the question of the murder came up like
13         an inquiry, "what did you know about it," correct?
14              A.    I don't recall.
15              Q.    When you got back to the Kenmore station and
16         you were placed into whatever room you were placed in,
17         the holding cell or the interview room, you received a
18         blanket and food, correct?
19              A.    Correct.
20              Q.    Can you describe the blanket you received?
21              A.    Emergency blanket, so very thin,
22         plastic-ishy with fuzzy foam.
23              Q.    Did you want something better or more --
24         with higher insulation value?
25                    MR. OWENS:  Objection to the form of the
```

Page 112

Ian Simmers - July 6, 2022

```
 1        and, if so, by who or if I was released on my own and
 2        I made my own way.  Both have been situations that
 3        have occurred.
 4             Q.   And you don't remember on this occasion
 5        which --
 6             A.   No.
 7             Q.   When you were -- was that Echo Glen or was
 8        that somewhere -- another facility?
 9             A.   No.  That was the King County Juvenile
10        Detention Center in Seattle.
11             Q.   Oh, all right.  So when you -- on the
12        occasions that -- let me ask you a different question.
13             You were in and out of Juvenile Detention on
14        numerous occasions, right?
15             A.   Yes.
16             Q.   And so on the occasions where they just
17        released you without somebody picking you up, how
18        would you get home then?
19             A.   Either hitchhike, the bus, or walk or not go
20        home at all and go about what I was doing.
21             Q.   Okay.  And that was actually something you
22        frequently did, right?
23             MR. OWENS:  Objection to the form of the
24        question.
25             A.   It was a practice that I was comfortable
```

Page 183

Ian Simmers - July 6, 2022

```
 1        you're a smart guy?
 2            A.    I'm confident that there are a lot of people
 3        who would argue that due to past actions, but I would
 4        say that I'm no longer a stupid person.
 5            Q.    Have you been told in the past that your --
 6        you've been tested at above average IQ?
 7            A.    Yes.
 8            Q.    And even though you had difficulties in
 9        school that I do want to discuss a little bit, you've
10        always read at way above your grade level, right?
11            A.    That is true.
12            Q.    All right.   And so you never asked to speak
13        to an attorney before giving your statement about the
14        murder?
15            A.    I believe I did, but much of -- much the
16        same as a lot of the other answers, this was a long
17        time ago, so these are not things that are very clear
18        to me anymore.
19            Q.    So what is it --
20                  MR. OWENS:   Can we take a break?   Sorry, I
21        just need to use the bathroom.
22                  MR. GRINDELAND:   Yeah, you bet.   You want to
23        take --
24                  MR. OWENS:   Just -- just nine minutes.   It
25        takes seven minutes to smoke a cigarette, so -- is
```

Page 195

Ian Simmers - July 6, 2022

```
 1        that all right, ten minutes?
 2                  MR. GRINDELAND:  Yeah, I work better with
 3        round numbers, so how about --
 4                  MR. OWENS:  Ten minutes.
 5                  MR. GRINDELAND:  Let's make it 2:55.
 6                  MR. OWENS:  Perfect, sure.  Thank you.
 7                  THE VIDEOGRAPHER:  And all counsel agreed?
 8                  MR. TRIESCH:  Yes, Paul Triesch agrees.
 9                  THE VIDEOGRAPHER:  Thank you.  We're going
10        off the record at 2:44.
11                     (Recess.)
12                  THE VIDEOGRAPHER:  We are back on the
13        record.  The time is 2:56.  Please proceed.
14        Q.    (By Mr. Grindeland)  So Mr. Simmers, before
15        the break you mentioned that you believed you had
16        requested an attorney at some point before --
17        A.    Yes.
18        Q.    When did you do that?
19        A.    At some point during my stay in the holding
20        cell prior to the interview process.
21        Q.    Did you also say you don't have a clear
22        recollection of that, you just believe that's what
23        happened?
24        A.    Yes.
25        Q.    So you're not sure which detective you said
```

Ian Simmers - July 6, 2022

1      that to?

2           A.    That's correct.

3           Q.    Was that before or after they took you out

4      to the marina?

5           A.    I don't recall.

6           Q.    All right.  How about did you ever ask to

7      speak to your parents?

8           A.    I don't know.

9           Q.    All right.  But in any event you ended up

10     giving a statement in part because you were trying to

11     build up your reputation as a gangster, is that right?

12               MR. OWENS:  Objection to the form of the

13     question.

14               You can answer.

15          A.    Yes, that is part of my rationale for the

16     confession, yes.

17          Q.    (By Mr. Grindeland)  Okay.  What -- what --

18     what other reasons did you have for giving a

19     statement?

20          A.    So I would have to caveat my response to

21     that with the understanding that this is an evaluation

22     of my thought processes looking at it from now as

23     opposed to then.  Am I clear for that?

24          Q.    Yeah, understood.  It's you --

25          A.    Okay.

Ian Simmers - July 6, 2022

```
 1          Q.      Did detectives ever yell at you or even just
 2      raise their voices?
 3          A.      Not to my recollection.
 4          Q.      Did they curse at you?
 5          A.      Not to my recollection.
 6          Q.      Did they threaten you in any way?
 7          A.      Not to my recollection, no.
 8          Q.      Were you afraid of them?
 9          A.      No.  And -- yeah, no.
10          Q.      Okay.  You weren't really afraid of anyone
11      at that time in your life, were you?
12              MR. OWENS:  Objection to the form of the
13      question.
14          A.      I would say that I had not yet met anyone
15      that was truly fear-inducing.
16          Q.    (By Mr. Grindeland)  Maybe with the benefit
17      of hindsight and perspective now, was there a -- was
18      there a component of sort of self-destructiveness
19      that --
20              MR. OWENS:  Object --
21          Q.    (By Mr. Grindeland)  -- to give a --
22      voluntarily give a statement?
23              MR. OWENS:  Objection to the form of the
24      question, it's compound and calls for a legal
25      conclusion about the ultimate issue in this case,
```

Page 200

Ian Simmers - July 6, 2022

1          You can answer.

2    A.    I -- not to my recollection.

3    Q.    (By Mr. Grindeland)  You were trying to lead

4    detectives to believe that you had killed Rodney

5    Gochanaur, correct?

6          MR. OWENS:  Objection to the form of the

7    question.

8    A.    Yes, I was attempting to get them to believe

9    that I had committed the murder.

10   Q.    (By Mr. Grindeland)  So I gathered from your

11   testimony earlier today you believe there were other

12   suspects that police should have pursued?

13   A.    Given the information that I received

14   post -- well, post-incident, I should say, yes, I do

15   believe that there were a number of suspects who would

16   have fit the bill much better without my confession.

17   Q.    And don't tell me anything that your -- that

18   you just learned from your attorney, but if you could

19   tell me anything else, do you have any specific

20   suspects in mind?

21   A.    Well, according to the trial transcript,

22   there was an ex-boyfriend who had been accused of

23   having anger issues.  There was a person who was at

24   the crime scene during forensics who had been taking

25   what was called I believe undue attention to the scene

                                        Page 207

Ian Simmers - July 6, 2022

```
 1              Q.    All right.  I want to briefly sort of run

 2       down the timeline on March 15th and see if it jibes

 3       with your memory.  All right?

 4              A.    Okay.

 5              Q.    So you and Jon Wyatt were picked up for

 6       shooting flares around 11:45 in the morning.

 7                    Does that sound right?

 8                    MR. OWENS:  Objection to the form of the

 9       question.

10                    On what day?

11                    MR. GRINDELAND:  March 15th, 1995.

12                    MR. OWENS:  Got it.  Sorry.  I got a little

13       confused there.  I thought you were talking about the

14       11th.

15                    Go ahead.

16              A.    Okay.  So with -- with the caveat that

17       specific time may be fuzzy, yes.

18              Q.    (By Mr. Grindeland)  Is that whole week a

19       little bit of a blur in your memory?

20                    MR. OWENS:  Objection to the form of the

21       question, asked and answered.

22              A.    More than that whole week is fuzzy for me.

23              Q.    (By Mr. Grindeland)  That time period in your

24       life is fuzzy?  What do you mean?

25                    MR. OWENS:  Objection to the form of the
```

Page 212

Ian Simmers - July 6, 2022

```
 1        question.
 2                  Just answer the question.
 3        A.    Time, distance from the time is why I have
 4    difficulty remembering.
 5        Q.    (By Mr. Grindeland)  Just because it was so
 6    long ago?
 7        A.    Correct.
 8        Q.    Not -- not because you were drinking heavily
 9    at the time?
10                  MR. OWENS:  Objection to the form of the
11    question, it's argumentative.  It's already been asked
12    as well.
13        A.    I would say no.
14        Q.    (By Mr. Grindeland)  Were you well rested
15    that day?
16        A.    I don't remember.
17        Q.    All right.  So does it sound right that you
18    were picked up a little before noon for shooting off
19    the flares?
20        A.    Basically right, yeah.
21        Q.    And do you remember that both you and Jon
22    Wyatt were listed as runaways?
23                  MR. OWENS:  Objection, foundation.
24        A.    I don't recall that, in particular,
25    information being passed on, but it does not surprise
```

Page 213

```
 1                    REPORTER'S CERTIFICATE

 2           I, LESLIE POST, the undersigned Certified Court

 3      Reporter, pursuant to RCW 5.28.010, authorized to

 4      administer oaths and affirmations in and for the State

 5      of Washington, do hereby certify that the sworn

 6      testimony and/or proceedings, a transcript of which is

 7      attached, was given before me at the time and place

 8      stated therein; that any and/or all witness(es) were

 9      by me duly sworn to testify to the truth; that the

10      sworn testimony and/or proceedings were by me

11      stenographically recorded and transcribed under my

12      supervision, to the best of my ability; that the

13      foregoing transcript contains a full, true, and

14      accurate record of all the sworn testimony and/or

15      proceedings given and occurring at the time and place

16      stated in the transcript; that a review of which was

17      reserved; that I am in no way related to any party to

18      the matter, nor to any counsel, nor do I have any

19      financial interest in the event of the cause.

20           WITNESS MY HAND AND SIGNATURE THIS 10TH DAY OF

21      JUNE 2022.

22

23                  Leslie Post

24      LESLIE POST

25      Washington State Certified Court Reporter No. 2378

                                              Page 234
```

```
 1                UNITED STATES DISTRICT COURT

 2              WESTERN DISTRICT OF WASHINGTON

 3                       AT SEATTLE

 4    _____

 5    IAN SIMMERS,              )
                                )
 6            Plaintiff,         )
                                )
 7          vs.                  )
                                ) No. 2:21-cv-00100-TL-JRC
 8                               )
      KING COUNTY, et al.,       )
 9                               )
              Defendants.        )
10    _____

11

12     VIDEO-TAPED ZOOM DEPOSITION UPON ORAL EXAMINATION

13                          OF

14                     IAN SIMMERS

15                      VOLUME 2

16      (CONTAINS CONFIDENTIAL TESTIMONY SUBJECT TO

17                  PROTECTIVE ORDER)

18    _____

19

20                     1:15 P.M.

21                  JULY 28, 2022

22              SEATTLE, WASHINGTON

23

24

25    REPORTED BY: LESLIE POST, CCR No. 2378
```

Page 235

```
 1                    A P P E A R A N C E S
 2              (All parties appearing remotely via Zoom)
 3
 4        FOR THE PLAINTIFF:
 5                 DAVID B. OWENS
                   Loevy & Loevy
 6                 PO Box 85110
                   Seattle, Washington 98145-1110
 7                 312.243.5900
                   david@loevy.com
 8
 9        FOR THE DEFENDANTS KING COUNTY, McSWAIN, BAXTER and
10        RAFTUS:
11                 GEOFFREY M. GRINDELAND
                   Seamark Law Group, PLLC
12                 400 Winslow Way East, Suite 230
                   Bainbridge Island, Washington 98110-2402
13                 206.502.2510
                   geoff@seamarklaw.com
14
15        FOR THE DEFENDANTS CITY OF BOTHELL, HOPKINS,
16        SCHLAEGEL, MINER, ERICKS:
17                 PAUL J. TRIESCH
                   SHANNON RAGONESI
18                 Keating, Bucklin & McCormack, Inc., P.S.
                   801 Second Avenue, Suite 1210
19                 Seattle, Washington 98104-1518
                   206.623.8861
20                 ptriesch@kbmlawyers.com
                   sragonesi@kbmlawyers.com
21
22        ALSO PRESENT:
23                 STEPHAN ANDREYCHUK, Videographer
24
25

                                            Page  236
```

```
 1                 SEATTLE, WASHINGTON; JULY 28, 2022

 2                          1:15 P.M.

 3                          --oOo--

 4

 5             THE VIDEOGRAPHER:  Here begins the video

 6      deposition of Ian Simmers, Volume 2.  Today's date is

 7      July 28th, 2022 and the time is 1:15 p.m.,

 8      Pacific Time.

 9

10                       IAN SIMMERS,

11       sworn as a witness by the Certified Court Reporter,

12                   testified as follows:

13

14                    EXAMINATION RESUMED

15      BY MR. GRINDELAND:

16          Q.    Good afternoon, Mr. Simmers.  How are you

17      today?

18          A.    Uh-huh.

19          Q.    I want to talk about damages first this

20      afternoon.

21             How do you think your life would have been

22      different if you had not been convicted of murdering

23      Mr. Gochanaur?

24          A.    That is difficult to say because it would

25      have been different.  I could easily say that anything
```

                                          Page 238

Ian Simmers, Volume 2 - July 28, 2022

```
 1                    MR. OWENS:  Yeah, thanks.

 2              It is harassing, that's inappropriate.

 3                    THE VIDEOGRAPHER:  Going off the record, the

 4        time is 2:02.

 5                        (Recess.)

 6                    THE VIDEOGRAPHER:  Going back on the record,

 7        the time is 2:13.

 8         Q.    (By Mr. Triesch)  Mr. Simmers, when you

 9        confessed to the detectives at the police precinct,

10        you confessed to stabbing Rodney Gochanaur six times

11        in the back as opposed to one, two, three or some

12        other number, correct?

13                    MR. OWENS:  Objection to the form of the

14        question for the same reasons previously stated.

15                    You can answer.

16         A.    If my confession states specifically that I

17        said six, then that would be correct.

18         Q.    (By Mr. Triesch)  When you confessed to the

19        detectives at the police precinct, you confessed to

20        slashing and stabbing Rodney Gochanaur's face,

21        correct?

22         A.    Correct.

23         Q.    When you confessed to the detectives at the

24        police precinct, you confessed to stabbing -- slashing

25        and stabbing Rodney Gochanaur's face on the front of
```

Page  272

1        his body, correct?

2                MR. OWENS:  Objection to the form of the

3        question.  It doesn't make sense to me.

4                But you can answer to the extent you

5        understand.

6            A.    A stab or slash to the face typically does

7        indicate from the front, yes.

8            Q.    (By Mr. Triesch)  Okay.  And when you

9        confessed to the detectives at the police precinct,

10       you confessed to how Rodney Gochanaur's body was

11       turned during his slashing and stabbing murder,

12       correct?

13               MR. OWENS:  Objection to the form of the

14       question, it's vague.

15           A.    I don't understand your question.

16           Q.    (By Mr. Triesch)  Okay.  When you confessed

17       to the detectives at the police precinct, you

18       confessed to Rodney Gochanaur turning his body after

19       you slashed and stabbed him in the face, correct?

20               MR. OWENS:  Objection to the form of the

21       question, it's vague.

22           A.    That was part of my confession, yes.

23           Q.    (By Mr. Triesch)  And when you confessed to

24       the detectives at the police precinct, you confessed

25       to the turning of Rod -- that Rodney Gochanaur turned

Veritext Legal Solutions
800.831.6973

1    his body after you slashed him and stabbed him in the

2    face and you followed him stabbing him in the back,

3    correct?

4            MR. OWENS:   Objection, form, it's compound

5    and it's harassing.

6        A.   That is a correct estimate of my statement,

7    yes.

8        Q.   (By Mr. Triesch)  And when you confessed to

9    the detectives at the police precinct, you confessed

10   to stabbing Rodney Gochanaur's back down and back up

11   the back, correct?

12           MR. OWENS:  Objection to the form of the

13   question.

14       A.   Correct.

15       Q.   (By Mr. Triesch)  And when you confessed to

16   the detectives at the police precinct, you confessed

17   that when you were stabbing Rodney Gochanaur in the

18   back, the knife bent when it hit Mr. Gochanaur's

19   shoulder blade, correct?

20           MR. OWENS:  Objection, vague and harassing.

21       A.   That is correct, according to the

22   confession.

23       Q.   (By Mr. Triesch)  Okay.  And that confession

24   contained crime-related facts, right?  It contained

25   facts about how you claimed this slashing and murder

```
 1                    REPORTER'S CERTIFICATE
 2          I, LESLIE POST, the undersigned Certified Court
 3     Reporter, pursuant to RCW 5.28.010, authorized to
 4     administer oaths and affirmations in and for the State
 5     of Washington, do hereby certify that the sworn
 6     testimony and/or proceedings, a transcript of which is
 7     attached, was given before me at the time and place
 8     stated therein; that any and/or all witness(es) were
 9     by me duly sworn to testify to the truth; that the
10     sworn testimony and/or proceedings were by me
11     stenographically recorded and transcribed under my
12     supervision, to the best of my ability; that the
13     foregoing transcript contains a full, true, and
14     accurate record of all the sworn testimony and/or
15     proceedings given and occurring at the time and place
16     stated in the transcript; that a review of which was
17     waived; that I am in no way related to any party to
18     the matter, nor to any counsel, nor do I have any
19     financial interest in the event of the cause.
20          WITNESS MY HAND AND SIGNATURE THIS 3RD DAY OF
21     AUGUST 2022.
22
23
24     LESLIE POST
25     Washington State Certified Court Reporter No. 2378

                                                Page 292
```

**SIMMERS DEPOSITION
EXHIBIT 1**

EXHIBIT

1

KING COUNTY DEPARTMENT OF PUBLIC SAFETY

# EXPLANATION OF RIGHTS

95 1570

Date 3/15/95  Time 2240 Hrs.  Place KING COUNTY POLICE — PCT-2.

Statement of: IAN MONROE SIMMERS (78)

## EXPLANATION OF MY CONSTITUTIONAL RIGHTS

Before questioning and the making of any statement, I, IAN MONROE SIMMERS, have been advised

by DETECTIVE HOPKINS of the following rights:

(1) I have the right to remain silent.

(2) Anything that I say or sign can be used against me in a court of law. (I understand that if I am a juvenile, anything that I say or sign can be used against me in a criminal prosecution in the event that Juvenile Court declines jurisdiction in my case.

(3) I have the right at this time to an attorney of my own choosing, and to have him present before and during questioning and the making or signing of any statement.

(4) If I cannot afford an attorney, I am entitled to have one appointed for me by a court without cost to me and to have him present before and during questioning and the making or signing of any statement.

(5) I further understand that I have the right to exercise any of the above rights at any time before or during any questioning and the making or signing of any statement.

Signature X Ian M. Simmers

## WAIVER OF CONSTITUTIONAL RIGHTS

I have read the above explanation of my constitutional rights and I understand them. I have decided not to exercise these rights at this time. The following statement is made by me freely and voluntarily and without threats or promises of any kind.

Signature X Ian M. Simmers

Witnesses 1726

KCDPS B-118 (2/82)



CITYDEFS 000047

CITYDEFS 000048



| ☐ | Continuation | | | Incident Number | | | | |
|---|---|---|---|---|---|---|---|---|
| ☐ | Statement | | | — | | | | |
| ☐ | Officers Witness Statement | | | Date | | Time | | |
| ☐ | Officers Report | | | | | | | |

**King County Police**
**Continuation/Statement/O.R.**

| Name (Last, First, Middle) | | | | Residence Phone | Business Phone | | |
|---|---|---|---|---|---|---|---|
| Residence Address | City | State | Zip | Occupation | Race | Sex | DOB |

| To | Via | Subject |
|---|---|---|

| Officer(s) reporting | Serial No. | Unit No. | Supervisor reviewing | Date | Copies to |
|---|---|---|---|---|---|

KCP (C-102A) 1/91

CITYDEFS 000049

Page ___ of ___

**BOTHELL POLICE DEPARTMENT**
**CASE 95-1570 TAPED INTERVIEW**
**IAN M. SIMMERS**

**DATE: 3/15/95     TIME: 10:40 PM**

The following is a taped interview conducted by Detective E. J. Hopkins of the Bothell Police Department with Sergeant Rusk at the King County Police North Precinct also present. The interview is with suspect:

> Ian Monroe Simmers  DOB:  ███-78

Hopkins:  OK, this is Detective Hopkins with the Bothell Police Department present with Sgt. Rusk and Ian would you go a head and state your full name for me?

Simmers:  Ian Monroe Simmer.

Hopkins:  And Ian how do you spell your last name?

Simmers:  S-I-M-M-E-R-S.

Hopkins:  OK, what's your birth date Ian?

Simmers:  ███-78.

Hopkins:  OK Ian, this is a taped interview at the King County North Precinct. I would like to know if we have your permission to tape this interview at this time. It's 2240 hours, which is 10:40 PM, and today's date is March 15, 1995, Wednesday evening.

Simmers:  Yeah.

Hopkins:  So we have your full knowledge and consent?

Simmers:  Yes.

Hopkins:  Sgt. Rusk, is this being recorded with your knowledge and consent?

Rusk:      It is.

Hopkins:  And I have stated I'm Detective Hopkins and this will be Ian's statement with an issue we just finished talking about. The first thing I would like to do Ian, I'd like to read you your rights again as we did before.

Simmers:  Alright.

1

**BOTHELL POLICE DEPARTMENT**
**CASE 95-1570 TAPED INTERVIEW**
**IAN M. SIMMERS**

Hopkins:  Before questioning and the making of any statement I, Ian Simmers, have been advised by Detective Hopkins the following rights:

> I have the right to remain silent.
> Anything that I say or sign can be used against me in a court of law.
> I understand that if I am a juvenile, anything that I say or sign can be used against me in criminal prosecution in the event that juvenile court declines jurisdiction in my case.
> I have the right at this time to an attorney of my own choosing and to have him present, before and during questioning or the making of any statement.
> If I cannot afford an attorney, I'm entitled to have one appointed for me by a court without cost to me and to have him present before and during questioning and the making of or signing of any statement.

I further understand that I have the right to exercise any of the above rights at any time before or during questioning or the making of.... or signing of any statement.

Do you understand each of those?

Simmers:  Yes.

Hopkins:  Any questions about any of those?

Simmers:  No.

Hopkins:  OK, will you sign on the X there to indicate you understand those?

Simmers:   (sound of writing)

Hopkins:  Let me read you that part first, OK?

Simmers:  Oh, OK.

Hopkins:  This is the Waiver of Constitutional Rights and it says:

I have read the above explanation of my Constitutional Rights and I understand them.  I have decided not to exercise these rights at this time and the following statement is made by me freely and voluntarily without threats or promises of any kind.

OK, do you understand that?

CITYDEFS 000052

**BOTHELL POLICE DEPARTMENT**
**CASE 95-1570 TAPED INTERVIEW**
**IAN M. SIMMERS**

Simmers:  Yep.

Hopkins:  OK.  Sign on the X for that also.  Shall we pause the the tape and check to make sure it is recording.

Rusk:  Oh we could.  Ian, just one more thing, is there anything you don't understand about any of your rights?

Simmers:  No.

Rusk:  OK.  If you want, I can go a head and check the tape.  This is Sgt. Rusk and it's about two minutes after we started.  After a pause of about 15 seconds, this is Sgt. Rusk and I have restarted the taping again and this is still being taped with your permission?

Simmers:  Yes.

Rusk:  And Ed this is being taped with your permission?

Hopkins:  Yes it is.

Rusk:  OK, that will be the last interruption.  Go ahead it seems to be running and functioning well.

Hopkins:  OK, Ian as we just finished talking a little bit ago, or I should say, started talking a few minutes ago about the incident that occurred with the man walking on the trail and you and your friend John.   John's last name again was?

Simmers:  Wyatt.

Hopkins:  John Wyatt and you were together that evening.  What I would like to do is first start out by talking about earlier that afternoon or that day when you guys got together and when the knife came into play and where it came from.  Can you tell me a bit about that.

Simmers:  Ah...he, I was at home around like 7:30 or 8 on Saturday evening.  I was bored so I called John up and he was thinking about trying to call me but he didn't have my number.  And so we were chatting for a while.  He had his mom come and pick me up and so we were down in Redmond for a while just kicking it.  Went to the store, got some munchies, went back up to the cabana which has a work out and all that.  And upstairs there was a fat chunky knife.

Hopkins:  Can you describe it for me as best you can?

3

**BOTHELL POLICE DEPARTMENT**
**CASE 95-1570 TAPED INTERVIEW**
**IAN M. SIMMERS**

Simmers:  It's like almost....it's a bit bigger than a paring knife, like almost ah.....four or five inch blade.  Ah.......four or three inch black handle, ah....like a little stopper thing at the very end.

Hopkins:  Do you remember what the blade looked like specifically?

Simmers:  Ah........

Rusk:  On the back of this form maybe you can draw me a little picture.

Simmers:  Ah...I'm master at drawing blades.

Rusk:  OK, as best you can recall.

Hopkins:  And during the silence here, Ian is going to go ahead a draw a picture of the knife the way he recalls it.   (long pause)  Shall we pause the tape during the drawing, no? (long pause)  The little lines that you are drawing at the edge of the blade... .

Simmers:  They're the serrations and

Hopkins: Partially serrated.

Simmers:  Yeah.

Hopkins:  Mildly or what ever.  Do you recall on the tip of this blade having one or two points, thin back.

Simmers:  It had one.

Hopkins:  Do you remember ah....

Rusk:  Can I clarify something.  When you mean a serration, what do you mean by a serration?

Simmers:  It had groves in it.

Rusk:  Like grooves like...what is a groove to you?

Simmers:  It...you know how steak knives, you look at them sideways and they have those dips in them?

Rusk?  Yeah, why don't you draw the blade sideways or what ever so you can show the dips in it?

4

**BOTHELL POLICE DEPARTMENT**
**CASE 95-1570 TAPED INTERVIEW**
**IAN M. SIMMERS**

You mean like, I'm not sure if I understand what you mean serrations.

Hopkins:  Or would it be sufficient to say the blade was not a flat standard sharp blade...

Simmers:  Yeah, if you put your fingers on it and went along side the blade you would feel bumps.

Rusk: OK, OK, that's sufficient, that's sufficient.

Hopkins:  Alright...OK

Rusk:  Ed one thing, we've got to be real careful, it drives the typist crazy if one or two, or actually two or three of us are talking at the same time so we just need to be a little bit careful about that.  I'm sorry.

Hopkins:  OK, ah..... with......so the knife  you received out of the cabana from John's apartment complex.

Simmers:  Yeah

Hopkins:  Later that evening you had cause to be on the Burke Gilman Trail.

Simmers:  Yeah.

Hopkins:  OK, tell me about that, what was the weather conditions, what was the light conditions, do you recall any of that?

Simmers:  Ah...it was around like 9:30 or 10:00 o'clock, yeah a quarter after nine, we were over at the Burke Gilman Trail, just sitting there chatting underneath the bridge.

Hopkins:  OK, and you...backing up.  You spent...did you have a watch on that night.

Simmers:  No.

Hopkins:  So all you know is necessarily that it was dark.

Simmers:  Uh-huh.

Hopkins:  And was it raining or was it dry that night.

CITYDEFS 000058

**BOTHELL POLICE DEPARTMENT**
**CASE 95-1570 TAPED INTERVIEW**
**IAN M. SIMMERS**

Simmers:  It was...it had rained a little bit and it was just a little bit and then it stopped.

Hopkins:  OK, but it was dark when you were out there?

Simmers:  Yeah.

Hopkins:  Had you had anything to drink or any dope that night?

Simmers:  No.

Hopkins:  So you were sober and everything was cool, OK

Simmers:  Surprising enough.

Rusk:  Go a head, what happened then?

Simmers:  And we were chatting and since we both been thinking about hitting the boats up here in Kenmore already, we were thinking about it again and just thought, hummm.  We can get there if we wanted to.  And we both just said, the hell with it let's go.

Rusk:  Then what happened?

Simmers:  And so we started walking towards Woodinville because you can get to here from there.  And, so we was walking on the road.......on the trail, talking all sorts of craziness and I could figure he was high, it's like dude's tweeked and dude socked me up in  my rib and I took and I reached back grabbed up on the knife where I normally keep it or normally keep mine.

Hopkins:  Where do you keep it at?

Simmers:  Right on my ah.....right in between my pocket and my belt and put it in my waist there. I normally have a fat throwing knife.  And I grabbed for it and I knew that I didn't have my knife but subconsciously I knew that there was a knife there so I thought OK.  I grabbed it and when dude came at me again I just pulled it out, went up towards his face, caught him like in his chin and a little bit on his cheek.  He looked surprised and stupid, it was like, oh shit.  He turned on his right heel and I just jumped forward and I shanked him about six times, shoulder blade to mid back and then back up.  Bent the blade when I stabbed him in the shoulder.

Hopkins:  Did he try to run at some point after he started to get hit?

Simmers:  Yeah, he turned on his heel.  He got like maybe three steps.  Because what I do was I

6

CITYDEFS 000060

**BOTHELL POLICE DEPARTMENT**
**CASE 95-1570 TAPED INTERVIEW**
**IAN M. SIMMERS**

hit...grabbed shoulder when I knife somebody, because I've done it before.  Is grab the shoulder to keep it going.

Hopkins:  Do you remember what happened, did he have a coat on then?  Do you remember what happened when you grabbed?

Simmers:  I don't remember.  I don't pay attention to well to what I'm doing.

Rusk:  OK, when you said you shanked him, I think you used the word shanked him six times.  What does that mean?

Simmers:  It's another word for a knife, it's a juvenile knife.

Rusk:  So you like you stabbed him six......

Simmers:  Yeah.

Rusk:  That's what you mean by shanked?

Simmers:  Yes.

Rusk:  OK, and when you said you did this, was that on the back or the front?

Simmers:  It was on the back.

Rusk:  You hit him on the back?

Simmers:  Yeah, what he did was when he realized that I had cut him on his face, he swiveled on his right foot so he turned his left side and like he was going to take off and then I thought OK, I just went and stabbed this fool already.  I can get in deep shit, might just as well finish it off and I just jumped forward.

Hopkins:  So you just went a head and finished him off then?

Simmers:  Yeah, cause once I do something and I get the ah.....I'll see the consequences way a head of what even the incident might have.  And it's like OK, I stabbed this guy.  I can have....he can come at me again because what it looked like he was doing was....turn, run back a little bit, then maybe turn.  And I thought, I ain't having that or just go straight to the police and it's like OK this guy tried to stab me.

7

CITYDEFS 000062

**BOTHELL POLICE DEPARTMENT**
**CASE 95-1570 TAPED INTERVIEW**
**IAN M. SIMMERS**

Rusk:  So you were worried about him going to the police?

Simmers:  Yeah.

Rusk:  OK, what happened then?

Simmers:  I just like, me , I'm not really sure where John was because when that kind of feeling runs through my body of, OK, you need to attack or be caught or do something like that.  Then everything blanks out of my mind.  I see one thing and that's it.  And that's my target.

Rusk:  You just saw the dude then.

Simmers:  Yeah.

Rusk:  What did he look like.

Simmers:  I want to say he was dark haired, but it wasn't really.

Rusk:  Medium hair?

Simmers:  Yeah, almost like mine but not really.

Rusk:  OK, was he a white guy or a black guy?

Simmers:  White.

Rusk:  And how old do you think he was?

Simmers:  I'd ..........ah.....I'd say like mid thirties.

Rusk:  Do you remember what he was wearing at all?  What color of clothes?

Simmers:  Uh-uh, I don't even pay attention to those.

Rusk:  OK.

Hopkins:  Light colors or dark colors?

Simmers:  Ah........dark.

8

CITYDEFS 000064

**BOTHELL POLICE DEPARTMENT**
**CASE 95-1570 TAPED INTERVIEW**
**IAN M. SIMMERS**

Hopkins:  Do you remember specifically when he turned on his heel and you grabbed for him, could his jacket have come off?  Do you recall?

Simmers:  It could have.  All I felt was just like a shirt or something.

Hopkins:  OK, after when you finished him, did you finish him up by the trail or did you finish him down by the slough more or do you recall?

Simmers:  It was....he'd tried to move in that direction and I just kept on going with him.

Hopkins.  In what direction?

Simmers:  Towards the slough.

Hopkins:  Towards the slough.

Simmers:  And then when I was shanking  I just (phoosh sound).

Hopkins:  Do you remember running through any particular types of brush or anything like that?

Simmers:  Uh-uh.

Hopkins:  When he got to that spot, did he fall or did you knock him down or.....

Simmers:  He kind of stumbled to the ground and that's when we both left.  But he could have gotten up again and moved because I don't think there were any vital shots.

Hopkins:  OK, did you take anything off of his body or anything?

Simmers:  No.

Hopkins:  Do you remember doing anything with his coat.  Afterwards do you remember, oh shit there's his coat we've got to put it some place.

Simmers:  No.

Hopkins:  Anything like that?

Simmers:  No.

9

CITYDEFS 000066

**BOTHELL POLICE DEPARTMENT**
**CASE 95-1570 TAPED INTERVIEW**
**IAN M. SIMMERS**

Hopkins:  Do you remember anything about his shoes at all?

Simmers:  No.  You asked me about that earlier and it's like I've been trying to remember..

Hopkins:  OK, when you left there, which direction did you head?

Simmers?  Towards Woodinville.  So that's from Redmond, which direction is that?

Hopkins:  Think, think back real clearly.

Rusk:  You came from Redmond

Simmers:  Yeah, I was...we were coming from Redmond.

Hopkins:  OK, you were coming like towards here?

Simmers:  Yeah. Here's  Woodinville here.

Hopkins:  So do you remember,  after you left, OK after you left do you remember your path? How the trail went?  Can you like describe the trail after you ran out, where it went?

Simmers: Uhmmmmmm

Hopkins:  Did you stay on the same side of the slough or did you cross the slough.

Simmers:  Stayed on the same side.

Hopkins:  OK, then did you follow the trail across the bridge?  Do you recall that?

Simmers:  Uh-uh.

Hopkins:  Do you remember the bridge.  OK, it was dark.  At what point.....did you keep the knife initially in case you ran into some other problem?  Maybe he wasn't alone or something like that?

Simmers:  No, I was just

Hopkins:  As you were running or, you recall when you tossed it.

Simmers:  Yeah, when I realized that I had the knife still in my hand it was like, I don't want it

10

CITYDEFS 000068

**BOTHELL POLICE DEPARTMENT**
**CASE 95-1570 TAPED INTERVIEW**
**IAN M. SIMMERS**

now.

Hopkins:  So you chucked it while you were running?

Simmers:  Yeah.

Hopkins:  OK, were you a little ways a way from him after you had started to take off.

Rusk:  I'm sorry I don't think that came across.  When you answered...when he asked you if you chucked the knife, did you chuck it when you were running away from the guy.

Simmers:  Yeah.

Rusk:  Do you remember how far away?

Simmers:  It wasn't too far.  It was pretty close but.....

Rusk:  Like what's pretty close, 100 yards, 200 yards, a mile, I mean I know what close is to me but what's close to you?

Simmers:  Like fifty feet.

Rusk:  OK.

Hopkins:  You ran from the area and it's a little way away from him.  OK, and then where did you go afterwards?

Simmers:  To Woodinville.

Hopkins:  OK, did you tell anybody afterwards what happened?

Simmers:  (can't hear)

Hopkins:  Did you discuss it with John?

Simmers:  No, I totally blanked it out of my memory.  And so when you guys questioned me about it earlier today, I was just like I don't know what your talking about.

Hopkins:  OK.  Then to recap that then, the reason you finished him off was because....

11

CITYDEFS 000070

**BOTHELL POLICE DEPARTMENT**
**CASE 95-1570 TAPED INTERVIEW**
**IAN M. SIMMERS**

Simmers:  He presented a physical threat to me and that's why I made the first one.

Hopkins:  And then after you made the first one....

Simmers:  Because I was in a position to be threatened by police, and it was like no, I can't have the police, I have too many things to do.

Hopkins:  OK, up to this point you do understand that you have been recorded and this is a taped statement.

Simmers:  Yes.

Hopkins:  There have not been any threats or promises made to you at this point by myself or Sgt. Rusk?

Simmers:  No.

Hopkins:  OK.  Can you think of anything else Sarge?

Rusk:  Just a couple of quick questions.  This was the same night as that stuff we talked about earlier that you gave me the statement about?

Simmers:  Yes.

Rusk:   The boat fire  and everything else.

Simmers:   Yes.

Rusk:  Same night?

Simmers:  Yeah.

Rusk:  OK, this Saturday night.  Where did you spend the rest of the night at that night?

Simmers:  Just going down the trail.

Rusk:  OK, did you end up in Kenmore or did you end up in Woodinville?

Simmers:  Woodinville.

12

**BOTHELL POLICE DEPARTMENT**
**CASE 95-1570 TAPED INTERVIEW**
**IAN M. SIMMERS**

Rusk:  OK, and was this before or after the boat fire?

Simmers:  Ah....after.

Rusk:  This would have been after the boat fire then.

Simmers:  Yeah.

Rusk:  OK, and then what part of the slough were you and Mike in, were you like in downtown Bothell, or downtown Kenmore, or downtown Woodinville?  Did you see any lights, anything familiar?

Simmers:  No, when I go into that kind of a daze when somebody hits me, I don't see anything but them.

Rusk:  You mentioned earlier that you were under a bridge I think.  I think you said that you and John ......

Simmers:  Yeah but that was way over in Redmond.

Rusk:  OK, so that was a long ways away.  And you walked from Redmond down to where this happened.

Simmers:  Yeah.

Rusk:  And is this where this happended more or less downtown Woodinville ro downtown Bothell or downtown Kenmore.

Simmers:  I'd say it would be more the Bothell area.

Rusk:  More the Bothell area.

Simmers:  Yeah.

Rusk:  And go back to this guy.  Stand up here for a minute Ed will you?  And why don't you go ahead and stand up too Ian.  Was this guy about the same height of Ed.

Simmers:  I'd say like right about there.

Hopkins:  A couple inches shorter?

13

CITYDEFS 000074

**BOTHELL POLICE DEPARTMENT**
**CASE 95-1570 TAPED INTERVIEW**
**IAN M. SIMMERS**

Simmers:  Yeah.  Because when I grabbed for his shoulder I had to reach up a little bit.

Hopkins:  I'm 6/3 so maybe this guy would have been ………

Simmers:  6/2 or 6/1, because I'm 5/10.

Hopkins:  OK and can you show me again how the first cut went?

Simmers:  This dude hit me like that and I went back like that, grabbed at the knife

Hopkins:  Back handed.....

Simmers:  Yeah, and came up like that and then he swiveled like that and I just grabbed his shoulder and went whack, flipped it over and just started sticking him in the back.

Hopkins:  OK, what you showed me is you started like mid-back and worked your way up to the shoulder.

Simmers:  Yeah.

Hopkins:  When you hit the shoulder what happened

Simmers:  That...the blade bent like that a bit...

Hopkins:  The blade bent kind of in an arc?

Simmers:  It was still at an arc any way so it was hitting straight.

Rusk:  A couple more questions brought up, were you wearing the same clothes you're wearing now.

Simmers:  Yeah.

Rusk:  OK, same clothes?

Simmers:  Uh-huh.

Rusk:  OK did the dude bleed alot.

Simmers:  Not really.

CITYDEFS 000076

**BOTHELL POLICE DEPARTMENT**
**CASE 95-1570 TAPED INTERVIEW**
**IAN M. SIMMERS**

Rusk:  OK, and what did he say or do before he nailed you in the ribs.

Simmers:  He was just oh.....(blah type noise) talking nonsense.  It was like HUH....

Rusk:  What kind of nonsense?

Simmers:  It didn't make any sense and that's why I can't like really repeat it because it was like gibberish.  We were looking at him  like, what the hell is this?

Rusk:  And I think talked about him being kind of tweeked.

Simmers:  Yeah.

Rusk:  OK, I don't know, I think you used the word tweeked, I'm not positive.  What does tweeked mean to you?

Simmers:  Well, when you are on cocaine, like if you look at somebody and like their eye will twitch or something, it's like a threatening remark to you is like (cough sound) dude, what are you doing that for?  It's like what?  Your eye is twitching.  It's like, no.  The smallest thing will set you off.

Hopkins:  Did he give you any warning before he nailed you in the ribs?

Simmers:  No.

Rusk:  How close was he when he hit you.

Simmers:  About like....

Rusk:  I've got to you the tape recorder can't record hands....OK, when you are saying that, your saying like a foot, two feet, three feet?

Simmers:  Two, three feet away.

Rusk:  And what hand did he hit you with?

Simmers:  His right.

Rusk:  And what side did he hit you on?

CITYDEFS 000078

**BOTHELL POLICE DEPARTMENT**
**CASE 95-1570 TAPED INTERVIEW**
**IAN M. SIMMERS**

Simmers:  My left.

Rusk:  OK, and you kind of pointed to.........

Simmers:  About mid-side in the middle.

Rusk:  Like underneath your arm pit.

Simmers:  Yeah, there's a bruise too.

Rusk:  OK,  the area you're pointing to.....go a head and tell me what area you're pointing  at because again the tape recorder isn't going.....

Simmers:  That's what I was saying.  It's between my hip and my arm pit, like right dead in the middle.

Rusk:  Ok, on which side of your body.

Simmers:  On my left side.

Rusk:  And you carry the knife .......

Simmers:  On my right side  up on the back of my hip.

Rusk:  And you used your......

Simmers:  My right hand to grab it real quick.

Hopkins:  Do we have your permission to come back and talk to you some more if we have any more questions in a few minutes.

Simmers:  Yeah.

Hopkins:  OK, the date is still the 15th and it's 11:03 or 2303 hrs., twenty-four hour time. Detective Hopkins, Sgt. Rusk and Ian.  And Ian again this was voluntarily and freely given with your knowledge and consent.

Simmers:  Yes.

Hopkins:  OK, we will stop the tape at this time and if  we have more questions we'll come back.

16

CITYDEFS 000080

**BOTHELL POLICE DEPARTMENT**
**CASE 95-1570 TAPED INTERVIEW**
**IAN M. SIMMERS**

Rusk:  And Ian, just once more, this is recorded with your permission correct?

Simmers:  Yes.

Rusk:  OK, I'm going to go ahead an end the tape.

17

CITYDEFS 000082

**SIMMERS DEPOSITION**
**EXHIBIT 3**

EXHIBIT

3

KING COUNTY DEPARTMENT OF PUBLIC SAFETY

95 079427

# EXPLANATION OF RIGHTS

Date 3/15/95 Time 1345 Hrs. Place PCT 2

Statement of: IAN Simmers

## EXPLANATION OF MY CONSTITUTIONAL RIGHTS

Before questioning and the making of any statement, I, IAN Simmers , have been advised

by Clement D. Rusk of the following rights:

(1)  I have the right to remain silent.

(2)  Anything that I say or sign can be used against me in a court of law. (I understand that if I am a juvenile, anything that I say or sign can be used against me in a criminal prosecution in the event that Juvenile Court declines jurisdiction in my case.

(3)  I have the right at this time to an attorney of my own choosing, and to have him present before and during questioning and the making or signing of any statement.

(4)  If I cannot afford an attorney, I am entitled to have one appointed for me by a court without cost to me and to have him present before and during questioning and the making or signing of any statement.

(5)  I further understand that I have the right to exercise any of the above rights at any time before or during any questioning and the making or signing of any statement.

Signature X Ian M Simmers

## WAIVER OF CONSTITUTIONAL RIGHTS

I have read the above explanation of my constitutional rights and I understand them. I have decided not to exercise these rights at this time. The following statement is made by me freely and voluntarily and without threats or promises of any kind.

Signature X Ian M Simmers

Witnesses:

_____

I was with John Wyatt last Saturday. I've known John about 5 or 6 months. We were out at about 11:30 or midnight and we were on the Burke & Snow trail. We were walking to Woodinville. There was a boat on a trailer. John went over to the boat and I walked over with him. He got into the boat first and I followed him into the boat. He went in through a window and opened the door for me. He found two flare guns and gave me one of them. Then we went back on the trail. I wanted to go take a leak so I went to a public restroom about a block from where the apartments were

KCDPS B-118 (2/82)

Simmers 000266

☐ Continuation
☐ Statement
☐ Officers Witness Statement
☐ Officers Report

**King County Police**
**Continuation/Statement/O.R.**

Incident Number
Date        Time

Name (Last, First, Middle)        Residence Phone    Business Phone

Residence Address        City    State    Zip    Occupation    Race    Sex    DOB

To        Via        Subject

I went into the bathroom and was taking a piss, the bathroom was open and is right by the Burke Gilman Trail in Woodinville. John shot a flare gun near my head and the flare ricocheted around past me. I shot the the flare gun that I had. I hit the mirror and then the ceiling and then into the garbage can. Then the garbage can caught on fire and I left in a hurry. We weren't trying to burn the building down. Today we were just shooting they said flare guns and weren't trying to burn anything down. The police caught us today. The above statement is true + correct + given by me freely + voluntarily. X _____

I need to add we got into 7 cars there at the same apartment. Actually it was a bunch of cars. We got mostly change from the cars. The same night I went down to Davidson's Marine, I was alone because John cruised. I went and got into about 22 boats. I popped a lock on them. Some were unlocked dhd I used a flat head screwdriver to get into them. I took alcohol out of most of them. I drank the booze and shared it with people. John was with me for a little while. John & I picked the lock because I know how to do that. You can also just go around them, the gates. I can show somebody which boats I was on. _____

Officer(s) reporting    Serial No.    Unit No.    Supervisor reviewing    Date    Copies to

KCP (C-102A) 1/91

COPY

King County Police

Continuation/Statement/O.R.

| Continuation | | | Case Number | | |
|---|---|---|---|---|---|
| Statement | | | Date | | Time |
| Officers Witness Statement | | | | | |
| Officers Report | | | | | |

| Name (Last, First, Middle) | | | | Residence Phone | Business Phone |
|---|---|---|---|---|---|
| ence Address | | City | State | Zip | Occupation | Race | Sex | DOB |

| To | Via | Subject |
|---|---|---|

When we left the boat that we took the flare guns off of I saw that it was on fire. I think John set the boat on fire with a flare. I t w, I could see the light through the fiberglass of the boat John was just laughing about it. It was almost day light. We actually left Redmond about 10:30 pm. John had a piece of a car phone. I also have a set of keys that I took out of the same car. The keys also say apartment on the. I tried to start the car with the keys so I could take it but the engine wouldn't turn over. The phone was out of the same car. I think it was a toyota Corolla. The car was in Redmond near Olson's by some apartments. It's near where John lives. the car was in the garage in the same apartments that John lives at. x *Jan M. Simmers*

I also tagged the ground with NWM at the apartments with a fire extinguisher I took. x *Jan M. Simmers*

| Officer(s) reporting | Serial No. | Unit No. | Supervisor reviewing | Date | Copies to |
|---|---|---|---|---|---|

KCP (C-102A) 1/91