Honorable Barbara J. Rothstein

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

| | |
|---|---|
| ESTATE OF IAN SIMMERS, by and through administrator, Donna Berube,<br><br>                    Plaintiff,<br><br>       v.<br><br>KING COUNTY, et al.,<br><br>                    Defendants. | No. 2:21-cv-00100-BJR<br><br>**PLAINTIFF'S SECOND *CORRECTED* OMNIBUS RESPONSE TO KING COUNTY DEFENDANTS' AND BOTHELL DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT (DKTS. 137, 142).** |

# TABLE OF CONTENTS

Introduction ........................................................................................................................... 1

GOVERNING LEGAL STANDARDS ................................................................................ 2

MATERIAL FACTS THAT PRECLUDE SUMMARY JUDGMENT ............................... 4

Ian Simmers Was with Family on Friday March 15, 1995 ................................................. 4

The Murder of Rodney Gochanour ..................................................................................... 4

Promising Leads Are Developed ......................................................................................... 6

An Honest Murder Investigation Is Disregarded and a Child Is Framed ........................... 8

An Agreement Between Bothell and King County Officers to Attempt to Convict Simmers for the Gochanour Murder Is Formed ........................................................................................... 9

The Unlawful, Unrecorded Interrogation of Ian Simmers ............................................... 10

McSwain's Fabrication of Reports Regarding Jon Wyatt .................................................. 16

Hopkins, Rusk, and Miner Fabricate Additional Evidence .............................................. 16

Defendants Knew, or Should Have Known, Simmers Was Innocent .............................. 18

Conviction and Exoneration ............................................................................................. 20

ARGUMENT ..................................................................................................................... 21

I.    Defendants' Motions Should Be Denied Because They Are Premised upon a Refusal to Construe the Facts in the Light Most Favorable to Plaintiff ........................................ 21

II.   Plaintiff's Fifth Amendment Claim Must Proceed to Trial ..................................... 21

      A. A Reasonable Jury Can Find a Fifth Amendment Violation ............................. 21

      B. The Recorded False Confession Caused Simmers Harm in His Criminal Case ... 30

      C. Defendants' Contrary Arguments Are Meritless ............................................... 33

III.  Plaintiff's Due Process Claims Must Proceed to Trial ........................................... 35

      A. A Reasonable Jury Can Find Defendants Fabricated Evidence ........................ 36

      B. A Reasonable Jury Can Find Defendants Rusk, McSwain, Hopkins, Miner, and Schlagel Failed to Disclose Information in Violation of Due Process .................................... 41

          1.  Bothell Defendants Have Not Addressed Plaintiff's *Brady* Claim ............... 41

          2.  The County's Cursory *Brady* Argument Fails ............................................ 41

IV.    A Reasonable Jury Can Find Defendants Conspired to Harm Simmers ...............................43

V.    The Individual Defendants Had the Opportunity to Stop the Violation of Simmers' Rights But Refused to Do So........................................................................................44

VI.    Plaintiff's *Monell* Claims Must Proceed to Trial...........................................................46

    A.    Governing Standards........................................................................................................46

    B.    Bothell and King County Failed to Include Adequate Safeguards and Inadequately Trained Their Officers Concerning the Conduct of Juvenile Interrogations .....................47

VII.    Disputes of Material Fact Preclude Summary Judgment ...........................................................49

VIII.    Filing a WCPA Claim Did Not Itself Waive Simmers' § 1983 Claims ...............................51

IX.    Qualified Immunity Is Unavailable ...........................................................................54

CONCLUSION.......................................................................................................................56

## Introduction

This action seeks redress for Ian Simmers' having spent decades imprisoned for the 1995 murder of Rodney Gochanour. Ian Simmers, just 16 years old at the time, did not commit this crime. Jon Wyatt, just 14 years old at the time, did not witness Ian Simmers commit a murder that Simmers did not commit. Yet, police documents purport to have Simmers providing information about a crime he did not know about but-for the police. How can that be the case? How is it that Ian Simmers came to falsely confess to something he did not do? A reasonable jury can find that, given Simmers' innocence, the details about the murder contained in police reports and statements came from the police, not Simmers or Wyatt.

A reasonable jury can find that Defendants Hopkins and Rusk violated Simmers' Fifth Amendment rights by interrogating him after he invoked his right to silence and to counsel.[1] A reasonable jury can find Bothell Defendants Detective Hopkins, Detective Miner, Sergeant Schlaegel, and King County Defendants Detective Sergant Rusk and Detective McSwain violated Simmers' right to a fair trial when they fabricated evidence, including police reports attributing statements the police made up to Simmers, to Wyatt, and to Kevin Scott Olsen. A reasonable jury can find these Defendants failed to intervene and conspired with one another to violate Simmers' rights. A reasonable jury can also find each of these Defendants failed to disclose favorable information in violation of due process. The foreseeable consequence of this conduct was Simmers' (wrongful) conviction—which is exactly what happened. So, these claims must proceed to trial as a reasonable jury can (easily) find Defendants' acts harmed Simmers by causing him to be prosecuted as an adult and then wrongfully convicted of a murder he did not commit.

Plaintiff's *Monell* claims against King County and Bothell must proceed to trial, too. Both municipalities had deficient practices, lacked adequate policies, and provided insufficient training concerning the interrogation of juvenile suspects even though the constitutional requirement to

---

[1] Respectfully, this Court should reconsider the decision forbidding Plaintiff from pursuing claims against Rusk's estate. Dkt. 47. Regardless, Rusk's violation of Simmers' rights remains relevant to Plaintiff's claims against King County and his agreement with the Bothell Defendants to violate Simmers' constitutional rights. As a result, this brief sets out some facts relevant to Rusk's liability.

question children differently than adults had been established for decades, *e.g.*, *Haley v. Ohio*, 332 U.S. 596 (1948), *Gallegos v. Colorado*, 370 U.S. 49, 54 (1962), and *In re Gault*, 387 U.S. 1, 47 (1967).

Courts at summary judgement may not weigh evidence or assess credibility and must make inferences in the non-movant's favor. Defendants here turn the standards upside down. Defendants ask the court to weigh evidence, find Simmers incredible, and make inferences in their own favor. Summary judgment cannot be granted on such a basis. Because a jury at trial, not a judge at summary judgment, must resolve the myriad disputes, this matter must proceed to trial.[2]

## GOVERNING LEGAL STANDARDS

The Constitution guarantees a right to a jury trial. *See* U.S. CONST. AMD. VII. As a result, in our system, it is the jury that decides factual disputes, not judges. A limited exception to this background rule is set forth in Rule 56, which permits summary judgment only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

Where "'evidence is such that a reasonable jury could return a verdict for the nonmoving party,'" a genuine issue of material fact exists. *Sierra Medical Services Alliance v. Kent*, 883 F.3d 1216, 1222 (9th Cir. 2018) (quoting *Anderson*, 477 U.S. at 248). In making this determination, the evidence must be construed "'in the light most favorable to the opposing party,'" and the court must also "draw inferences in favor of the nonmovant." *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)); *accord Holley v. Techtronic Indus. N. Am.*, 812 F. App'x 517, 517 (9th Cir. 2020). As a result, every reasonable factual inference must be drawn in favor of the party opposing the motion for summary judgment," which includes "both direct and circumstantial evidence." *Coghlan v. Am. Seafoods Co. LLC.,* 413 F.3d 1090, 1095 (9th Cir. 2005); *cf. Baker v. Roman*

---

[2] Ken Baxter, Pat Raftis, and Mark Ericks may be dismissed, without prejudice, as Defendants. For economy, and though Defendants' fabrications of evidence so undermine any claims there was probable cause for murder, *see Manuel v. Joliet*, 137 S. Ct. 911, 920 n.8 (2017), *Scafidi v. LVMPD*, 966 F.3d 960, 963-64 (9th Cir. 2020), Plaintiff no longer pursues claims arising under the Fourth Amendment or state-law malicious prosecution. Plaintiff no longer pursues a substantive due process claim with respect to the interrogation.

*Catholic Archdiocese*, 725 F. App'x 531, 532 (9th Cir. 2018) (failure to "properly consider various pieces of circumstantial evidence" warrants reversal).

The Ninth Circuit has emphasized that where the civil plaintiff has passed away, courts "cannot 'simply accept what may be a self-serving account by the police officer.'" *Cruz v. City of Anaheim*, 765 F.3d 1076, 1080 (9th Cir. 2014) (quoting *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994)). Though this rule has been applied primarily in police violence cases, the same principle holds elsewhere. *See, e.g.*, *Curtis v. ABB Inc.*, 622 F. App'x 661, 662 (9th Cir. 2015) (explaining that "any discrepancies should be resolved in favor of the nonmoving party at summary judgment" because they "raise issues of credibility for a factfinder to resolve," which included the deceased plaintiff's testimony that was even more important given the fact the plaintiff had died after being deposed). Indeed, with the massive records adduced, wrongful conviction suits, like excessive force claims, "nearly always require[] a jury to sift through disputed factual contentions, and to draw inferences therefrom*," Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005) (*en banc*). Summary judgment should be rarely granted.

Finally, where, as here, a case spans decades and involves numerous statements by witnesses or parties who have arguably been inconsistent at times, this Court still has "the responsibility to construe all facts in the light most favorable to the non-moving party." *Nelson v. City of Davis*, 571 F.3d 924, 928 (9th Cir. 2009); *see id.* (reversing rejection of "equivocal" testimony as "just the type of credibility determination that must be left to the factfinder, and not made by a judge on summary judgment" because a "judge must not grant summary judgment based on his determination that one set of facts is more believable than another"); *Emeldi v. Univ. of Oregon*, 698 F.3d 715, 730 n.9 (9th Cir. 2012) (denying summary judgment though plaintiff's testimony was arguably inconsistent); *Abdo v. Fitzsimmons*, 2021 WL 616324, at *14 (N.D. Cal. Feb. 17, 2021) (finding witnesses who "were plainly inconsistent with each other" meant that "'credibility is at issue'" and "'summary judgment [] singularly inappropriate.'" (quoting *S.E.C. v. M & A W., Inc.*, 538 F.3d 1043, 1055 (9th Cir. 2008)); *Gress v. Conover Ins., Inc.*, 2011 WL 4352316, at *2 n.2 (E.D. Wash. Sept. 16, 2011) (construing and accepting account most favorable to plaintiff even if some statements were arguably inconsistent); *Wilson v. J.P. Allen Co.*, 57 F. Supp. 3d 1249, 1262 (C.D. Cal. 2014) (similar).

**MATERIAL FACTS THAT PRECLUDE SUMMARY JUDGMENT**

In the light favorable to Plaintiff, with references a "Statement of Facts" (SOF) throughout, material facts include:

**Ian Simmers Was with Family on Friday March 15, 1995**

1.     On <u>Friday</u>, March 10, 1995, Ian Simmers spent the evening at his mother's home where he watched a movie (The Lion King) with family, and where Simmers stayed all night. Ex. 1, Simmers Dep., at 184; Ex. 2, Simmers Interview, at 25, 44; Ex. 9, Donna Berube Trial Testimony, 137-38.[3]

2.     On <u>Saturday</u>, Simmers spent the afternoon bowling with family and returned home, in Carnation, at approximately 4:30-5:00 that afternoon, Ex. 9 at 139, 141, 154. Simmers's mother, Donna Berube, left the home around 6:00 that evening. *Id.* at 164. Sometime later, Simmers, who was just 16 years old, left home and set out to meet his friend, Jonathan Wyatt, a 14-year-old boy. Ex. 1 at 184; *see* Dkt. 149-1 at 10. Simmers walked some of the way before Wyatt's mom picked him up and drove Simmers to the Wyatts' apartment in Redmond. Ex. 1 at 185; Ex. 2 at 26.

3.     Over the next few days, beginning <u>Saturday evening</u>, Simmers and Wyatt engaged in criminal, albeit reckless and childish, behavior that included breaking into cars and boats, stealing alcohol, shooting off flare guns taken from those boats, taking girls for a ride on a stolen boat, and setting small fires. *See* Ex. 2 at 6-7; Ex. 13, Property Crimes Form; Ex. 3, Wyatt Interview, at 9-10.

**The Murder of Rodney Gochanour**

4.     Unbeknownst to Simmers and Wyatt, Rodney Gochanour had spent the Friday evening of March 10 hanging out at Bothell restaurants and bars near the Burke-Gillman trail with a woman named Hope Fleischaker. Dkt. 149-1, Miner Report, at 8-9.[4] Gochanour would never make it home; he was killed after leaving a bar on the <u>Friday night-come-Saturday morning</u> of March 10, 1995. *Id.* at 1; Ex. 14, Hopkins Dep., at 100-01.

---

[3] Exhibits to the contemporaneous declaration are cited by exhibit number and documents already in the record are cited by docket entry.

[4] The bar was at Main Street and 103 Ave NE in Bothell, just next to the Burke-Gilman trail (which Google maps calls the "Sammamish River Trail"). *See* Ex. 10, Google Map.

5.     Ian Simmers is innocent of the Gochanour murder and neither he nor Jon Wyatt had anything to do with the crime whatsoever. *See* Ex. 1 at 137-38, 150, 188-89, 193, 266; Ex. 12, Berube Dep, at 50; Ex. 3 at 7-8.

6.     Saturday around 4:00 p.m. (before Simmers and Wyatt got together, and while Simmers was still with family), Gochanour's shoeless body was found off the Burke-Gilman trail near the water, Dkt. 149-1 at 1; Ex. 4, Hopkins Initial Report, at 1.

7.     Bothell Police initially investigated the crime. Defendant Hopkins was the lead investigator; Defendant Miner, a BPD officer, processed evidence; and Defendant Schlaegel, a BPD Sergeant at the time, supervised both Hopkins and Miner, signed off on their reports, and participated in the investigation. *See* Dkt. 149-1; Ex. 4; Ex. 11, Schlaegel Report.

8.     When Hopkins and Miner reported to the scene, Gochanour had "blood on his face" Dkt. 149-1 at 2; his clothing was saturated to the point where items in his pockets were "wet and blood stained," *id.* at 3; there was a "large degree of blood" on trees, Ex. 4 at 1; and the "significant amount of blood still present in the area" limited search efforts. Dkt. 149-1 at 5. Near the body, investigators found the victim's glasses with blood inside the lenses. *Id.* at 7.

9.     Gochanour's clothing and items were strewn about near a slough (aka the Sammamish River) off the trail and out of sight from the trail. *Id.* at 1-3. Defendant Schlaegel found Gochanour's jacket west of the body, investigators found Gochanour's boots in the slough near where the jacket had been found, and both were close to the body. *Id.* at 3, 7-8.

10.    The murder weapon was a large "Ginsu" type knife with an approximately 10-12 inch serrated blade and a double-pointed tip. Dkt. 149-1 at 6; Ex. 15, Rusk Pretrial Hrg. Tr. at 117-18; Ex. 21, Hopkins Pretrial Hr. Tr. (Part 2), at 11. The 10-12 inch blade was bent and had fiber and blood stains on it. Dkt. 149-1 at 6. Investigators confirmed they found the murder weapon when Hopkins attended the autopsy and made a positive comparison of the knife to the wounds. Ex. 14 at 124-25.

11.    The autopsy also confirmed Gochanour had been stabbed once in the face, Ex. 16, Autopsy Report, at 4-6 (wounds #1), six times in the back with the double-pointed knife, *id.* at 4-6

(wounds #6-7), and that he had a number of other scrapes and abrasions on his hands and arms consistent with defensive wounds, *id.* at 7-8 (wounds #12-28).

12.     As a team, Schlagel, Hopkins, and Miner learned about the non-public information about the murder, from both the crime scene and autopsy. Dkt. 149-1; Ex. 4, Ex. 11; Ex. 14 at 94.

13.     The investigators understood the importance of not releasing non-public information—what they call "hold back" information—to the public and even others within the department to prevent the contamination of an investigation and because, in the interrogation context, it is important that non-public details come from the suspect, not the police, either directly or indirectly. Ex. 14 at 110-11.

**Promising Leads Are Developed**

14.     Bothell investigators learned that Gochanour was into drug dealing and was a frequent marijuana and alcohol user. Ex. 4 at 3. Hopkins pursued leads and people who might have any background information about the victim, including someone acting suspiciously near the scene. *Id.* at 2-4. The investigators also found a coaster with a phone number on it in Gochanour's pocket. *Id.* at 3. Hopkins found its likely origin, *id.* and figured out the phone number belonged to Hope Fleischaker. *Id.* Hopkins, Schlaegel, and Miner learned Fleishacker rode motorcycles, Ex. 4 at 5, and hung out with and dated members of "outlaw motorcycle gangs." Dkt. 149-1 at 9.

15.     On <u>March 12</u>, the Bothell investigators learned Gochanour was well known in area bars and restaurants and had been seen Friday evening with Fleischaker. Dkt. 149-1 at 8-9; Ex. 4 at 6. The same day, Hopkins and Schlaegel were also given a "tip" of people who may be of interest from Gochanour's former roommate. Ex. 4 at 6. The tip pointed to two people (1) a person believed to be violent and whom the victim owed "a large amount of money" and (2) a man named Fred, Fleischaker's ex-boyfriend and an outlaw biker. *Id.*.

16.     The next day, <u>now March 13</u>, Hopkins and Miner interviewed Fleischaker at her home. Ex. 4 at 6; Dkt. 149-1 at 9. Fleischaker reported she and Gochanour had eaten dinner together Friday night at "Shirley's Bar" and had drinks afterwards at "Nieuw Amsterdam," a bar at Main Street and 103rd. Dkt. 149-1 at 9. Fleischaker also powerfully implicated Fred, confirming Fred was an abusive

outlaw biker; was jealous and stalking her; and had potentially killed people in the past. *Id.* In fact, Fred left two angry voicemails at Fleischaker's—one confirming he had followed her bar hopping Friday and another calling her a "worthless slut." Ex. 4 at 6. Fleischaker further described that while she was at Nieuw Amsterdam with Gochanour that someone she believed was a private investigator took a photo of them, which Fred had done before. *Id.* at 7.

17.    Investigators further learned Fred had seen Gochanour the night before the murder (Thursday); confirmed that Fred was jealous; and that Fleischaker had just seen Fred the week before. *Id.* at 6-7. Hopkins and Miner told Fleischaker the victim had been stabbed and her demeanor changed. Fleischaker asked suspicious questions about whether Gochanour's throat had been slashed and whether he had his glasses or hat on. *Id.* Fleischaker then changed her tone and became more restrictive in speaking about Fred, and she was instructed not contact Fred and claimed to agree to this. *Id.* at 7-8.

18.    The next day, <u>March 14,</u> Bothell investigators received further corroboration about: (1) what happened Friday night, (2) the nature of Gochanour's debts, and (3) Fred's background. Ex. 4 at 8-9. First, Hopkins and Miner learned that Gochanour had been to another establishment other than the two he'd gone to with Fleischaker. *Id.* at 8. Second, the officers learned the victim was addicted to cocaine and that his best friend was concerned because he had "received dope fronted to him and wouldn't pay for it later." *Id.* Indeed, the officers learned that Gochanour had a conflict while at Shirley's (where he ate dinner with Fleischaker) Friday. *Id.* at 10. Third, Gochanour's best friend confirmed rumors were circulating that Gochanour and Fleischaker had been seen together and that Fred "may have become jealous." *Id.* at 9. Fleischaker's suspicious conduct also continued: (1) she had disregarded the instructions and told Fred about police interest in the murder; and (2) she lied to the police about giving Gochanour her phone number found on the coaster in Gochanour's pocket. *Id.*

19.    All the while, the officers learned that when Gochanour and Fleischaker had been seen at Shirley's on Friday, *Fred was also at the establishment. Id.* at 10. This information called into question Fleischaker's claim that she had left Gochanour much earlier in the evening, too. *Id.*

**An Honest Murder Investigation Is Disregarded and a Child Is Framed**

20.    The next day, <u>March 15, 1995</u>, totally unrelated to the Gochanour homicide investigation, and as part of their childishness, Simmers and Wyatt shot off flare guns in the mid-morning, drawing attention to themselves and were then unsurprisingly arrested by County officers. Ex. 2 at 6-7; Dkt. 144.

21.    Simmers and Wyatt were taken into custody and arrested shortly before noon on March 15, 1995. Dkt. 144 at ¶¶5-6. Before being arrested, Simmers and Wyatt did not know anything about the Gochanour murder. Ex. 1 at 202.

22.    Simmers and Wyatt were taken to King County's Kenmore station, separated, and interrogated about various property crimes. Ex. 2 at 7-9. Over the next few hours, Simmers was repeatedly questioned by Rusk: about a flare gun fire for which Simmers gave a statement; about vehicle prowls for which Simmers gave a statement; and then about breaking into boats for which Simmers also made a statement. Ex. 15 at 64-65, 71-75, 77-78, 82-83; Ex. 1 at 104. When being questioned about these property crimes, Simmers indicated that his time as a runaway with Wyatt began on Saturday evening (after Gochanour had been killed, not Friday). *See, e.g.*, Dkt. 146-2.[5]

23.    Simmers was taken to the marina by Rusk and Det. Raftis. In a conversation between the officers, Rusk brought up the murder (while Simmers was in the back seat), which included saying the victim had been stabbed and was "a transient." Ex. 2 at 13, *see id.* at 7-8, 63; Ex. 1 at 106. Rusk asked Simmers whether he committed the murder, and Simmers truthfully denied it. Ex. 2 at 7. Rusk asked Simmers how he heard that the victim was a "bum" and—as Rusk admits—Simmers truthfully responded he had learned the information from Rusk himself. Ex. 15 at 85-86; Ex. 20, Rusk Report, at 2. Simmers was placed in a holding cell at the station and tried to sleep. Dkt. 157-2 at 2; Ex. 2 at 8.

24.    In the meantime, 14-year-old Wyatt had been questioned by numerous officers, and eventually admitted involvement in property crimes to King County Detective John McSwain. Dkt. 145-2. Wyatt was obviously vulnerable, emotional, and should not have been questioned at all, as he

---

[5] Though McSwain's reports contain fabrications, they indicate Wyatt also said the misadventures began the evening of Saturday March 11 (after Gochanour's body had been found). Dkt. 145-2 at 1, 3; Dkt. 145 ¶20(a).

had he invoked his right to counsel and his counsel even told the officers he would not be making a statement. *Id.* Nonetheless, in derogation of Wyatt's rights, the Detectives questioned him anyway when they should have left him alone altogether. *Id.*; *see also* Ex. 5, Craig Miller Report, at 8-9.

25.    Though they should not have been interacting with him at all, Rusk and McSwain then took Wyatt to the marina, and Rusk again brought up the murder. Though Rusk and McSwain make it seem as if Wyatt was emotional because of some sort of consciousness of guilt or because he had seen a homicide, that was simply not the case—he was being accused of being a party to a murder he did not commit, that Simmers did not commit, and that he did not witness. SOF ¶¶ 5, 53-55. Wyatt invoked his right to counsel a second time and McSwain, even on his own account, *still* did not cease questioning Wyatt about the murder. *See* Dkt. 145, ¶46.

**An Agreement Between Bothell and King County Officers**
**to Attempt to Convict Simmers for the Gochanour Murder Is Formed**

26.    Back at the station, Simmers was still in the holding cell trying to sleep. Dkt. 157-2 at 2; Ex. 2 at 8. Around 5:30 p.m., via Major Jackson Beard, Rusk notified Bothell PD Simmers and Wyatt had been arrested and falsely reported Simmers and Wyatt had provided inculpatory information about the murder. Ex. 8, Hopkins Report, at 1; Dkt. 149-1 at 10; Ex. 11 at 5. Hopkins, Miner, and Schlaegel soon reported to the station. *Id.* (all sources).

27.    There, County officers Rusk, McSwain, and Beard, and Bothell officers Hopkins, Miner, and Schlaegel, literally had a meeting of the minds off and on for hours. *See* Ex. 17, Hopkins Pretrial Tr. (Part One), 158-59. In that meeting, among other things, they decided to accuse Simmers of the crime, to treat Wyatt as a witness against Simmers, and to attempt to get a confession from Simmers and, as Miner wrote, they decided that "Hopkins and Rusk would interview Simmers," while Miner would "obtain a warrant for their clothing." Dkt. 149-1 at 10; *see also* Ex. 8 at 2. As Hopkins described it, they worked together over hours "discussing what [their] plan would be before the interview." Ex. 17 at 160-61. Though he did not question anyone, Schlagel stayed the "next several hours," "discussed interview strategies and investigative matters" with the Bothell and County officers and completed booking paperwork on Simmers. Ex. 11 at 5.

28.     Defendants reached this agreement despite the fact that they all knew, as a result of the conversation where Bothell officers provided information to the County officers about the crime, that no one had believed the victim was homeless. *See* Ex. 14 at 115:17-19. In other words, though they knew the thing that Simmers allegedly said about a "bum" had come from Rusk and was not suspicious whatsoever as it related to Gochanour—and, in fact, not even worth asking about, Ex. 14 at 299—the officers pressed ahead.

**The Unlawful, Unrecorded Interrogation of Ian Simmers**

29.     Rusk and Hopkins were the only ones who attempted to speak with Simmers about the Gochanour murder after returning from the marina. Ex. 1 at 211; Ex. 2 at 14-15; Ex. 8 at 1.[6]

30.     Defendants claim they did not begin questioning Simmers until around 9:30 or 9:45 p.m., meaning he had been in prolonged isolation in a holding cell for hours. Ex. 15 at 94-95. Isolation is a powerful interrogation strategy because it "engenders feelings of hopelessness," Ex. 6, Dr. Haley Cleary Report, at 17. During that time, Simmers' mother had been informed Simmers had been picked up and went to the Youth Center (where she thought he would be) to try to locate her son but he was not there. Ex. 12 at 44. Thereafter, the family called the station to attempt to contact Simmers and find out what was going on. *Id.* These phone calls from a concerned parent whose 16-year-old was, unbeknownst to her, being accused of murder were ignored by Rusk and Hopkins. Ex. 15 at 108-09; Ex. 21 at 17. Had Simmers' mother known her child was being questioned about something as serious as a murder—not just held as a runaway for violating juvenile probation—she would have gone to the station. Ex. 29, Decl. of Donna Berube, ¶2.

31.     During these hours—between roughly 6 and 9:30 or 9:45 p.m.—Simmers tried to sleep but Rusk and Hopkins attempted several times to question Simmers about the murder. Ex. 2 at 8; Ex. 1 at 118. This process was repeated. As Simmers put it: "A number of instances where they continued

---

[6] Understandably, as a 16 year old being questioned by plainclothes officers, Simmers did not understand the exact agency affiliations of Rusk and Hopkins, though he knew their names, Ex. 2 at 14-15, 18-20, 63-64; Ex. 1 at 211. It is also undisputed Hopkins and Rusk were the only officers to question Simmers about the murder. The best interpretation of the record is that Rusk and Hopkins were the ones trying to question Simmers about murder when he invoked his right to silence and when he sought counsel.

to ask me whether or not I wanted to talk with them. I would tell them no, so they would leave. An indeterminate amount of time later they would come back, ask me if I want to talk. Tell them no. They would leave." Ex. 2 at 8. At that point, "under established policing standards applicable in 1995, all questioning should have immediately ceased," and not doing so was a "significant departure from established policing standards." Ex. 5 at 9.

32.    Eventually, as Simmers put it, "I was mentally exhausted, so I just agreed to talk so they would leave me alone." Ex. 2 at 8. When asked why he spoke to the officers about a murder when he "originally didn't want to," Simmers explained, "The major point of it was they continued to interrupt my sleeping with their requests to interview me. And I came to the conclusion that they weren't going to stop until I talked to them." *Id.* at 15.

33.    Before speaking with the officers about the murder, Simmers also invoked his right to counsel. Ex. 1 at 195, 254. At that point, "under established policing standards applicable in 1995, all questioning should have immediately ceased," and not doing so was a "significant departure from established policing standards" Ex. 5 at 9.

34.    Defendants did provide a rote reading of Simmers' *Miranda* rights but failed to explain to him the gravity of the situation, and Simmers did not actually understand the significance of the interrogation being about a real murder. Ex. 1 at 193-94. And, in practice, Simmers had just been shown that the rights were meaningless—they had been invoked but ignored. SOF¶¶31-33.

35.    In addition, consistent with the fact Simmers asked for counsel, the officers implied leniency if he waived his right to an attorney and was told cooperating by waiving his right to counsel would make things "go better for him." Ex. 12 at 47-48; Ex. 29, Berube Declaration, ¶3.

36.    The "vulnerabilities of juveniles were very well known to law enforcement in 1995," Ex. 5 at 25, and those vulnerabilities made Simmers more susceptible to providing a false confession, to being compliant with their requests, to having poor impulse control, and to be inherently more suggestible. Ex. 6 at 10-11. Yet, acting pursuant to County and City practices respectively, Rusk and Hopkins did not adjust their tactics from what might be used on an adult because they were questioning a child. Ex. 15 at 62; Ex. 14 at 274.

37.    Rusk and Hopkins did not attempt to learn or account for the length of time Simmers had been in custody before they questioned him. Ex. 15 at 107; Ex. 21 at 17. The interrogation was unrecorded and Hopkins destroyed his contemporaneous notes. Ex. 14 at 89-90.

38.    Hopkins and Rusk engaged in guilt-presumptive questioning that accused Simmers of committing the crime right off the bat. Ex. 21 at 18. They also included a false evidence ploy—saying Wyatt had told them Simmers committed the crime and led them to the murder weapon—and Simmers truthfully denied killing Gochanour. Ex. 15 at 97; Ex. 8 at 3. Hopkins threatened that the murder weapon included fibers that would link Simmers to the crime. *Id.* These were lies, Ex. 8 at 3; Ex. 21 at 19; Ex. 15 at 112, made while rejecting Simmers' denials and accusing him of murder. Ex. 21 at 18.

39.    The officers observed Simmers become upset when they again claimed Wyatt had told them Simmers did it and identified the knife but continued to accuse him and reject his truthful denials and protestations of innocence. Ex. 20 at 3; Ex. 17 at 169.

40.    Hopkins and Rusk turned to psychologically manipulative efforts—they call "themes" and scientists call "minimization"—to obtain a confession, even if the things Simmers said were obviously false or invented by them. Ex. 15 at 97-98; Ex. 17 at 170-72; Ex. 6 at 18. These sorts of techniques focus on a "soft sell" in which investigators try to lull the suspect into a "false sense of security by offering sympathy, tolerance, face-saving excuses, and even moral justification" for the crime. Ex. 6 at 18. The "themes" were specifically used to obtain a confession. *Id.* at 19.

41.    To set things up, with Simmers upset, Hopkins and Rusk suggested to Simmers a false form of relief—a cigarette—with Rusk even pretending to leave the room to go get one, which was a lie, as they were not going to give him a cigarette. Ex. 8 at 3; Ex. 15 at 97. Instead, they came back and continued their manipulative efforts to obtain a confession, with Rusk making up the idea that Gochanour had been accosting people on the Burke-Gilman trail and that Simmers must have acted in self-defense, Ex. 15 at 97-98; Ex. 8 at 3, and a broader suggestion that Simmers would not want to be seen as "someone who killed for no reason," and so he should tell the police that reason (again, because of the false claim that Wyatt had already told them Simmers committed the murder and

showed them to the murder weapon). Ex. 17 at 170-72; Ex. 15 at 97-98. Hopkins also suggested that Simmers should not have to go down for this alone, Ex. 20 at 3. Simmers was especially bothered by the false claim Wyatt had told the police he committed a murder he had not committed. Ex. 12 at 50.

42.     His will overborne by a combination of an entire day in custody, his age, the impact of maximization (the false evidence ploys) and minimization, Simmers relented and agreed to go along with the totally fake suggestion (which the officers knew was fake) he had committed the crime and done so in self-defense. Ex. 15 at 98.

43.     Showing his susceptibility and the obvious falsity of what he was saying, Simmers adopted the notion of self-defense by saying he had been attacked and the dude "socked me up in my ribs." Hopkins noticed that Simmers had to pause to make up the story of where he was going to say he had been attacked. Ex. 8 at 3.

44.     The problem, then, was that Simmers did not actually know the details of the crime but understood that the police wanted him to claim he committed the Gochanour murder, even though he (obviously) had not. Ex. 1 at 198. Simmers obviously could not tell the detectives about the crime, so when he would say things about the wound locations, or pantomime how he thought the murder took place, he would "evolve" his interpretation until they were happy with his answers. Ex. 2 at 16-17; see Ex. 1 at 205-06. In this way, and others, the interrogators disclosed non-public information to Simmers. Examples include that (1) Simmers thought that the wounds were on the front of the body—which is consistent with a claim of self-defense that the offices had suggested—but was corrected to describe them in the back (and so he had to make up a story to fit that); (2) Simmers was asked suggestive and leading questions about where wounds were located; and (3) the process continued until they reached a "satisfactory scenario," which included physical re-creations. Ex. 2 at 20-21. The non-public facts had to have come from the police, including the fact the knife was bent. Id. at 62. In addition, during the non-recorded rehearsal, the officers used leading questions to make sure Simmers understood when it was "not the right answer I was giving." Ex. 1 at 205-06.

45.     As Defendants point out but mischaracterize, after Simmers' will was overborne and he was going along with the false suggestions, Simmers was attempting to comply with what had been

communicated and tell a semblance of a story that would sound believable. *Id.* The manner in which this played out actually confirmed that Simmers was innocent. *Id.* Being an immature child, and as he had done at the marina (*e.g.*, claiming to sell 100 hits of acid a week, Dkt. 147, and that he had killed 13 people all of whom were gangsters, Ex. 20 at 3), Simmers actually said and did things that showed the police he was obviously engaged in juvenile flights of fancy or just making stuff up, including: (1) saying he would never kill a "regular guy" and "not a gangster" the latter of which he would not regret killing, Ex. 20 at 3; (2) dividing the world into "regular people" and "gangsters," Ex. 15 at 109; and (2) by again saying he had "killed 13 people in the past" who were "all gangsters," Ex. 20 at 3.

46.    Hopkins knew Simmers was not a member of a gang, believed Simmers was a "suburban kid[] who had fallen under the influence of pop culture," and knew it "wasn't uncommon for kids" like Simmers to "act like they were tough and sag their pants and think they were cool." Ex. 14 at 300. This did not make the kid a "gang member or mobster"; it made them a "wannabe." Simmers obviously fit this description, *see* Ex. 19, Photo of Simmers. There "was no actual gang," Ex. 1 at 252, and Simmers confirmed Hopkins' description of the juvenile dynamic was correct, *id.* at 130 ("So when I was a kid, I didn't really fit into the social stratus. I wanted to look as though I was cool and popular. That was the gang-style mentality of the time.").

47.    Defendants admit they engaged in some sort of "demonstration"—what Plaintiff calls a rehearsal—of the manner the crime allegedly happened during the non-recorded interrogation and again during the recording, corroborating Simmers account. Ex. 20 at 6; Ex. 15 at 99; Ex. 21 at 4-5.

48.    A taped recording of the false confession followed. Part of the rehearsal and error-correction efforts used to overcome Simmers' inability to provide non-public details succeeded, as Simmers said: (1) Gochanour was slashed in the face; (2) Gochanour was stabbed in the back six times; and (3) the blade was bent. Dkt. 143-4 at 6.

49.    However, there were still details irreconcilable with the actual crime, including:

(1)  Simmers still described going out Saturday night, not Friday. *Id.* at 3.

(2)  Simmers was asked to describe the knife but gave a description that was *far* too small, comparing it to a paring knife or a "shank" described as a "juvenile knife" about 4-5 inches, not the large 10-12-inch murder weapon. *Id.* at 3, 7.

14

(3) Simmers described, and drew a picture of, a knife with one point, not two. *Id.*

(4) Simmers did not know anything about the shoes (and indicated he'd been asked about it before). *Id.* at 10.

(5) Simmers claimed that Gochanour did not really bleed a lot, *id.* at 14, when in fact it was an extremely bloody crime scene and crime, SOF ¶8.

50.    Moreover, the recording shows that even with the tape rolling, the interrogators *still* used leading questions that introduced facts or guided Simmers to certain answers. Hopkins is the one who introduces being on the Burke Gilman trail, Dkt. 143-4 at 5; Hopkins is the one who introduces that the victim was killed near the slough (or suggests that Simmers might not recall, and Simmers adopts the suggestion), *id.* at 9; Hopkins introduces running through brush, *id.*; Hopkins introduces the idea that something was done with the coat (knowing it was in the slough), *id.*; Hopkins suggests, and has Simmers agree, he had "chucked" the knife while running; and then coaches Simmers on which direction he was supposed to have fled telling Simmers to "think back real clearly" when he struggles to answer, *id.* at 10; *see also* Ex. 6 at 11 (discussing relationship between leading questions and suggestibility); *id.* at 21-22 (describing contamination of the recorded statement).

51.    The recording also shows that Simmers's childish and outlandish/fantasy comments continued, including Simmers: saying it was a "fat chunky knife," Dkt. 143-4 at 3; saying "I'm a master at drawing blades," *id.* at 4; describing normally having a "fat throwing knife"; making statements implying he has a typical process for killing people with knives (like "when I knife somebody, because I've done it before," is to grab the shoulder, *id.* at 7); and his repeated references to "shanking," *id.* at 6, 7, 9.

52.    Keeping in mind Defendants suggested entirely the "self-defense" notion, Simmers' obvious attempts at grandiose storytelling about the motive and victim being "kind of tweeked" before attacking him were obviously a teenager making things up, like:

> Well, when you are on cocaine, like if you look at somebody and like their eye will twitch or something, it's like a threatening remark to you is like (cough sound) dude, what are you doing that for? It's like what? Your eye is twitching. It's like, no. The smallest thing will set you off.

*Id.* at 15. The recording ended at 11:03 p.m., with Simmers in custody for over 11 hours. *Id.* at 16.

**McSwain's Fabrication of Reports Regarding Jon Wyatt**

53.    With Simmers being innocent, it necessarily follows that much of what McSwain and Rusk claim happen with Wyatt cannot be true and Wyatt has confirmed that he did not ever see Simmers have a confrontation with anybody on the trail, including "any kind of violence" or an "altercation [that] took place for someone to stab." Ex. 3 at 7-8. Like Simmers, Wyatt learned about the murder after they were arrested, *id.* at 8, and it was the police who informed him of Gochnour and that it was via stab wound. *Id.* 18.

54.    McSwain's reports make it seem as if Wyatt was upset because he did not want to talk about a murder he had seen Simmers commit but, in reality, he was being pressured into making a false accusation and did not want to make it and, therefore suffered what he called "investigation abuse." *Id.* 14. Contrary to McSwain's suggestion that Wyatt was eager to speak to him, Wyatt actually had asked for his mom, his dad, and a lawyer repeatedly, but they bushed him off, would not stop the questioning, and "were like Gestapo." *Id.* Rather than honor these requests for a concerned adult, Defendant McSwain wrote reports falsely claiming that Wyatt equivocated about whether he wanted to talk to the police because, according to McSwain's false reports, Wyatt was eager to tell the authorities that he had witnessed Simmers murder someone. *See* Ex. 28, McSwain Reports.

55.    This never happened—Simmers did not murder Gochanour, Wyatt did not see Simmers commit a crime that Simmers did not himself commit, and Wyatt did not tell McSwain or Rusk this whatsoever. Ex. 3 at 23-24. When informed police wrote Simmers was confronted with a statement that Wyatt told them Simmers "had hurt that man on the trail at all," Ex. 3 at 23, Wyatt confirmed these reports are "not true at all." *Id.*  Indeed, when Wyatt was told an officer put into a police report Wyatt said he saw Simmers hurt a main on the trail, Wyatt explained that: "cop that typed that into there [i]s a flagrant, baldfaced liar." *Id.* at 24.

**Hopkins, Rusk, and Miner Fabricate Additional Evidence**

56.    Despite the promising leads consistently developed day after day following the discovery of Gochanour's body, the honest investigation (concerning drug debts, the night of the crime, into Fleischaker's suspicious behavior, and into Fred) were completely abandoned on March

15—acts inconsistent with established police practices, and any reasonably trained officers would have continued to pursue these leads. Ex. 14 at 135-36; Ex. 5 ¶¶66-68, 77.

57.    Instead, as they had already decided to do before the interrogation of Simmers, Ex. 11 at 5, Defendant Miner wrote out a search warrant affidavit and obtained a warrant for the search and seizure of Wyatt and Simmers. Ex. 18, Miner Affidavit. The teens were stripped down in a police station, photographed, and had their clothing confiscated; it was humiliating. Ex. 3 at 17. In addition, the investigators knew—or should have known—that Simmers' clothing did not reflect participation in the crime as he was not covered in blood, not covered in mud, and they believed that the boys were wearing the same clothes for days, which is what precipitated the search in the first place. Ex. 18.

58.    Various reports, including that of Miner, Hopkins, and Schlaegel all repeat, as if inculpatory, that Simmers said something about he wouldn't kill a "bum" when that information was (1) not suspicious, and (2) was information Rusk had provided Simmers, and (3) the authors of each report knew these facts when they wrote their reports *well* after their afternoon meeting on March 15, 1995. *See* Ex. 11 at 5 (Schlaegel's report dated June 1995); Ex. 8 at 1-2 (Hopkins report dated March 21, 1995); Dkt. 149-1 at 10 (Miner's report dated March 17, 1995); Ex. 18 at 2 (Miner's affidavit written *after* the interrogation).

59.    Hopkins's report concerning the interrogation—over which Hopkins destroyed the contemporaneous notes of the non-recorded interrogation and wrote six days later—includes additional false claims, mischaracterizations, and material omissions beyond the issue of whether Simmers said Gochnour was homeless and beyond repeating fabrications he obtained from McSwain. For example, quite egregiously, Hopkins wrote that Simmers "appeared to have some confusion as to exactly the date the incident took place, whether it was Friday or Saturday," Ex. 8 at 4. But Simmers was not ever "confused" about this at all, SOF ¶¶44-45. Hopkins admits he included this characterization because he knew Simmers had to have been talking about the wrong date. Ex. 21 at 12. Hopkins wrote that Simmers said he could not remember stabbing anyone and that it "wasn't in his memory." Ex. 8 at 3. But, as Hopkins himself later admitted, Simmers had actually repeatedly continued to deny involvement. Ex. 17 at 167; *see also* Ex. 2 at 7; Ex. 15 at 96. Hopkins' misleading

claims include that Simmers was "reminded of" his *Miranda* rights before being questioned and then agreed to speak with the officers when, in fact, he had invoked his right to silence and did not want to speak with them about the murder. SOF¶33. As for material omissions, Hopkins' report includes nothing about the fact that he supplied with Simmers the non-public details that would appear in the recorded statement, that a rehearsal (not a demonstration) took place, or that Simmers had invoked his right to counsel. SOF ¶59.

### Defendants Knew, or Should Have Known, Simmers Was Innocent

60.    Despite Defendants' attempts to paint a teenager as some sort of criminal mastermind, they actually knew that Simmers was innocent of the murder and a misguided child. Simmers (and Wyatt) consistently described their interactions beginning after Gochanour had been killed on Saturday; the alleged motive for the crime was entirely fabricated by the officers; Simmers made obviously unreliable and made-up statements; Simmers' description of the murder weapon was wrong; Defendants supplied the non-public facts to Simmers during the course of the day; and Defendants abandoned legitimate leads—like drug debts and Fred—that were entirely unrelated to Simmers but were directly related to the victim. SOF ¶¶14-52.

61.    In addition, zero physical or forensic evidence linked to Simmers. In March, Defendants had collected both the murder weapon and Simmers' clothing for DNA testing, and Hopkins sent those materials to the lab in June 1995. Ex. 7, DNA Results, at 2.

62.    On <u>November 14, 1995</u>, the DNA testing results came back—Simmers's blood was on his own pants (and Gochanour could not have been the source of the DNA on Simmers' pants). *Id.* at 5-6. As to the knife, Simmers was eliminated as a potential source for the blood recovered therefrom. *Id.*

63.    At that point, there were a number of obvious problems with the claim Simmers committed the murder, including: (1) the confession and other statements from both Simmers and Wyatt indicated they met up on Saturday not Friday, (2) Simmers' description of the knife contradicted the murder weapon (both in terms of length and having two points, not one), (3) Simmers's drawing of the knife matched his oral description that, again, could not have been the murder weapon, (4) the

false confession could not account for the location of the victim's shoes, and (5) now it was confirmed the DNA did not link Simmers to the crime. SOF ¶¶29-52, 61-62.

64.    Just two days later, <u>on November 16, 1995</u>, Kevin Olsen entered the conversation. Kevin Olsen was incarcerated for an unrelated crime, had a lengthy criminal history including crimes of dishonesty, was a heroin user, was a serial incentivized "informant," and was known to be unreliable. Ex. 26, Olsen Tr., at 39-41, 76-77, 89; Ex. 27, Det. Robert H. Hickock Tr., 127-30. Simmers never spoke with Olsen. Ex. 2 at 33, 56.

65.    But, to Hopkins, following the direction of Sergeant Schlaegel, Olsen was an opportunity to fabricate additional evidence to advance his obviously defunct case against Simmers. Hopkins met with Olsen at the jail and had a private, unrecorded meeting with him where Hopkins took contemporaneous notes, which he later destroyed. Ex. 14 at 90, 291. Having an unrecorded one-on-one meeting with a potential jailhouse informant was a departure from accepted policing standards at the time, as was destroying the notes. Ex. 5 at 28-29. Hopkins two-page report is the only documentation of this meeting, and that report is undated but was necessarily written days after the interaction with Olsen (because it includes information about November 17, 1995), Dkt. 153-4. Going into the meeting, Hopkins knew that the knife drawn by Simmers did not have two tips, Ex. 14 at 289, no physical evidence linked to Simmers, Ex. 7, the date in the confession was wrong, and Simmers could not explain why the shoes were in the slough. Ex. 14 at 289, 291-92.

66.    Hopkins admits that his report about Olsen and Olsen's purported statement address discrepancies in the original investigation and interrogation. Ex. 14 at 291. In fabricating evidence, this is what Hopkins had Olsen say: (1) that Simmers wore gloves (mistakenly thinking this means Simmers DNA could not be found); (2) that Simmers intentionally gave investigators the wrong day; (3) that Simmers purposefully misdrew the knife; and (4) that Simmers provided a reason for why the shoes were not found with the body (because Simmers wanted them but they did not fit). Dkt. 153-4; Ex. 14 at 289, 291-92; Ex. 5 at 28. These claims—exceedingly "convenient" solutions to the exact discrepancies in the false confession just two days after the DNA cleared Simmers—were made-up by Hopkins, who had knowledge of the discrepancies. There is also evidence that Hopkins gave Olsen

the details—the "notes" Hopkins now claims Olsen made but, in actuality, were used to assist Olsen provide a statement to the prosecutor, which he did the next day, and to testify at trial based upon the non-public information Hopkins provided to Olsen. Dkt. 153-4 at 3; Dkt. 153-5; Dkt. 153-6; Ex. 5 at 27-29.[7]

### Conviction and Exoneration

67.    Simmers was charged with murder based upon (1) the police reports Defendants wrote concerning March 15, 1995, and (2) the oral recording of the false confession that was taken from Simmers. *See generally* Dkt. 174-10. Simmers's defense presented honest evidence of Simmers' innocence in pretrial proceedings and subsequent jury trial where Olsen's false claims were added to the mix. *Id.* Simmers was nonetheless wrongfully convicted of a murder he did not commit. *Id.*; SOF ¶¶5,21. Given the murder charge, Simmers was prosecuted as an adult, sentenced to 46 years and 8 months incarceration, and spent decades in prison while the real killer remained free. Ex. 1 at 190, 266, 285; Dkt. 174-7 at 4. Indeed, though he would have undoubtedly received a lesser sentence prosecuted as a juvenile for the property crimes (which are unchallenged), Simmers still served an additional 18 years and 14 days imprisoned for the murder alone. Dkt. 146-12 at 3.

68.    On February 13, 2019, after significant post-conviction investigation, and the presentation of evidence concerning juvenile brain science as well as new DNA evidence on the murder weapon pointing to another person, Simmers' counsel filed a motion for a new trial. *See* Ex. 22, Motion for New Trial. Exhibits to the motion included the 1995 DNA results, *id.* at 57-65, an article about juvenile brain development, *id.* at 68-83, *and* the 2019 DNA results, *id.* at 84-85.[8]

69.    Days later, on February 19, 2019, the State moved to vacate the conviction. Dkt. 174-12. The Court entered an order February 26, 2019, vacating the conviction, Dkt. 174-13, the State declined to retry Simmers, and he was released from prison the same day.[9]

---

[7] As with the interrogation, the non-public facts either came from Hopkins or from Simmers. Simmers denies providing them to Olsen, and Hopkins had an unrecorded meeting with Olsen after which he provided these details. Simmers' account must be credited at this juncture.

[8] In 2021, King County filed the motion for a new trial as Exhibit K to a Declaration but omitted the 2019 DNA testing results. That version, the same one recently re-filed, Dkt. 174-12, is *not* complete.

[9] Additional facts concerning Plaintiff's *Monell* claims are provided below.

**ARGUMENT**

**I.    Defendants' Motions Should Be Denied Because They Are Premised upon a Refusal to Construe the Facts in the Light Most Favorable to Plaintiff**

To even hypothetically obtain judgment as a matter of law, Defendants are required to "accept the nonmoving party's evidence as true." *Mayes v. WinCo Holdings, Inc.*, 846 F.3d 1274, 1277 (9th Cir. 2017). Defendants bear the initial burden of showing either that, *on Plaintiff's facts*, an element in their case had been negated or there was insufficient evidence of Plaintiff's claims. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158 (1970); *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1106 (9th Cir. 2000). Defendants have failed to meet this burden. Defendants ignore that Simmers is innocent and that he had not heard about the murder before the interrogation—facts that are fatal to the animating theories of their brief. SOF ¶¶5, 21, 60-66. Indeed, Defendants know and understand that Hopkins and Simmers provided directly contrary testimony about how non-public details emerged in the confession. Ex. 14 at 13-16. But, they pretend this evidence does not exist.

Failing to acknowledge this known contradictory evidence alone warrants denying the motion, as Defendants cannot meet their initial burden. *Nissan Fire*, 210 F.3d at 1006*; see, e.g., TCB Remarketing LLC v. Metro Auto Auction LLC*, 2022 WL 16640665, at *1 (D. Ariz. Oct. 27, 2022) (denying motion for summary judgment for moving party's failure to satisfy initial burden). It is an abuse of the process for Defendants to seek summary judgment while ignoring the disputed facts they well and truly know are at the core of the case. But, by presenting the facts in a self-serving and Simmers-negating fashion, and never once addressing what follows given Simmers' innocence and ignorance of the murder, Defendants have failed to show the absence of any genuine issue of material fact, *Nissan Fire*, 210 F.3d at 1006. They have forfeited the argument, too, and cannot try for the first time in reply. *Eberle v. City of Anaheim*, 901 F.2d 814, 818 (9th Cir. 1990).

**II.    Plaintiff's Fifth Amendment Claim Must Proceed to Trial**

**A.    A Reasonable Jury Can Find a Fifth Amendment Violation**

The Fifth Amendment provides: "No person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. AMEND. V. As a result, due process requires "defendants be

able to exercise their constitutional right to remain silent and not be penalized at trial for doing so." *United States v. Baker*, 999 F.2d 412, 415 (9th Cir.1993) (quoting *United States v. Negrete-Gonzales*, 966 F.2d 1277, 1280-81 (9th Cir. 1992)). It is well recognized that coerced confessions violate the constitution, *see, e.g.*, *Brown v. Mississippi*, 297 U.S. 278 (1936), and that confessions cannot be obtained via "'improper influence.'" *United States v. Tingle*, 658 F.2d 1332, 1335 (9th Cir. 1981) (quoting *Malloy v. Hogan*, 378 U.S. 1, 8 (1964)). It is also well established that "law enforcement conduct which renders a confession involuntary does not consist only of express threats so direct as to bludgeon a defendant into failure of the will. Subtle psychological coercion suffices as well, and at times more effectively, to overbear 'a rational intellect and a free will.'" *Id.* (quoting *Malloy*, 378 U.S. at 7).

In assessing whether the Fifth Amendment has been violated, the inquiry "must be broad," *Blackburn v. Alabama*, 361 U.S. 199, 205 (1960), and "'take[] into consideration the totality of all the surrounding circumstances—*both* the characteristics of the accused and the details of the interrogation.'" *United States v. Preston*, 751 F.3d 1008, 1016 (9th Cir. 2014) (*en banc*) (quoting *Dickerson v. United States*, 530 U.S. 428, 434 (2000)); *United States v. Andaverde*, 64 F.3d 1305, 1311 (9th Cir. 1995) (voluntariness "is determined by the totality of the circumstances"). The totality of circumstances requires evaluating an interrogation in the aggregate not piecemeal. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973) (decisions do not turn "on the presence or absence of a single controlling criterion; each reflect[s] a careful scrutiny of all the surrounding circumstances").

As a result, "the voluntariness inquiry 'is not limited to instances in which the claim is that the police conduct was 'inherently coercive,' but 'applies equally when the interrogation techniques were improper only because, in the particular circumstances of the case, the confession is unlikely to have been the product of a free and rational will." *Preston*, 751 F.3d at 1016 (citing *Miller v. Fenton*, 474 U.S. 104, 110 (1985)). As "interrogators have turned to more subtle forms of psychological persuasion, courts have found the mental condition of the defendant a more significant factor in the 'voluntariness' calculus." *Colorado v. Connelly*, 479 U.S. 157, 164 (1986).

Here, in a variety of ways and for a variety of reasons, a reasonable jury can easily find Simmers's constitutional rights were violated during the custodial interrogation. Factors include:

**First**, throughout the afternoon and evening as he was trying to sleep, Simmers invoked his right to silence but Rusk and Hopkins would not let him be. SOF ¶¶31-32. "When a suspect invokes his right to silence, the officers' interrogation must cease. Period." *Jones v. Harrington*, 829 F.3d 1128, 1132 (9th Cir. 2016). "Refusal to cooperate is every defendant's right under the Fifth Amendment. Under our adversary system of criminal justice, a defendant may not be made to suffer for his silence." *Tingle*, 658 F.2d at 1336 n.5. As a result, the request to cease questioning must be "scrupulously honored." *Michigan v. Mosely*, 423 U.S. 96, 103-04 (1975).

It has long been established that pressuring a suspect to answer questions after they have invoked their right to silence is coercive. *Collazo v. Estelle* 940 F.2d 411, 417 (9th Cir. 1991) (*en banc*). Here, just as in *Collazo*, "[a]t a point where the law required" Hopkins and Rusk to "back off" they did not honor Simmers' "right to cut off questioning"; they "stepped on it." *Id.* As was true in 1982 (when the *Collazo* interrogation occurred), it remained true in 1995 that "[a]ny minimally trained police officer should have known such pressure was improper and likely to produce involuntary statements." *Id.*

Because pressuring a suspect to change their mind about being silent "can only be seen as menacing," *id.* at 416, the analysis could stop here—a reasonable jury can conclude that questioning following Simmers's (repeated) invocation of his right to silence is involuntary. There is more.

**Second**, Simmers invoked his right to counsel. SOF ¶33. Since at least *Edwards v. Arizona*, 451 U.S. 477 (1981), the law has presumed that a confession extracted during custodial interrogation after invocation of the right to counsel violates the Constitution. *See Smith v. Illinois*, 469 U.S. 91, 95 (1984) (noting the "bright-line rule that all questioning must cease after an accused requests counsel"); *Fare v. Michael C.*, 442 U.S. 707, 719 (1979). Defendants knew—or should have known—in 1995 that they were required to stop questioning Simmers when he asked for an attorney, and their failure to do so would permit a reasonable jury to conclude, with other circumstances, that the interrogation was unconstitutional. *See, e.g., Henry v. Kernan*, 197 F.3d 1021, 1028 (9th Cir. 1999); *Cooper v. Dupnik*, 963 F.2d 1220, 1240-41 (9th Cir. 1992) (*en banc*).

**Third**, Simmers was just 16 but the Defendants treated him like an adult. SOF ¶36. It has "long been established that the constitutionality of interrogation techniques is judged by a higher

standard when police interrogate a minor." *Crowe*, 608 F.3d at 431 (citing *In re Gault*, 387 U.S. 1, 55 (1967)). That Simmers was a juvenile "is of critical importance in determining the voluntariness of his confession." *Doody v. Ryan*, 649 F.3d 986, 1008 (9th Cir. 2011). In 1967, the Supreme Court emphasized that, for juveniles, "the greatest care must be taken to assure that [any] admission was voluntary, in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair." *Gault*, 387 U.S. at 56. Before that, the Court explained it would be a "callous disregard of … constitutional rights" to treat every child like "an adult in full possession of his senses and knowledgeable of the consequences of his admissions." *Gallegos v. Colorado*, 370 U.S. 49, 54 (1962). That is true no matter how "sophisticated" the juvenile may appear to be, *id.,* as "youth is more than a chronological fact" and, instead, is "a time and condition of life when a person may be most susceptible to influence and to psychological damage." *Eddings v. Oklahoma*, 455 U.S. 104, 115 (1982). The rule that special care must be taken when interrogating juveniles, who cannot be treated by "more exacting standards of maturity" applicable to adults, was thus well established long before 1995, *Haley v. Ohio*, 332 U.S. 596 (1948), and in fact goes back to the law of England. *See* J.D.B. *v. North Carolina*, 564 U.S. 261, 273 (2011) (citing BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND *464–*465).

Here, Hopkins and Rusk took zero steps to exercise any care concerning Simmers as a juvenile, which alone would lead a reasonable jury to be able to find for Plaintiff. SOF ¶36. The refusal to stop questioning after Simmers said he did not want to talk to them and Simmers' invocation of his right to counsel, *id.* XX, are particularly egregious given that Simmers was just 16 years old

Moreover, owing to the fact that Hopkins and Rusk ignored that Simmers was a juvenile, there are obvious statements he made that let the officers know the statements were the products of "adolescent fantasy," including that Simmers killed 13 "gangsters"; that the world is distinguished between regular people and "gangsters"; that Simmers is a "master at drawing blades"; that Simmers was using a "fat chunky knife" and normally carries a "fat throwing knife"; that Simmers had a process for when he knifes someone; and the list goes on. *Id.* ¶45. Hopkins recognized the childish nature of Simmers being a wannabe but ignored it and honed-in on getting a confession from a child. *Id.* ¶¶46.

In addition, that Simmers consistently described events on the wrong day, that his description and drawing of a knife could not have been the murder weapon, and that Defendants repeatedly had to rehearse and suggest to Simmers details he could not provide and that were wrong is further evidence that Defendants knew, or should have known, they were dealing with a juvenile that, after his invocation of his rights to silence and for counsel had been ignored, was simply making stuff up. *Id.* ¶¶43-44.

Despite all of that, Hopkins and Rusk deliberately used tactics—false evidence ploys, "themes" (or minimization), contamination, etc.—designed to produce a confession just the same as if Simmers were an adult. SOF ¶¶38-41. Defendants did not at all adjust their tactics or behaviors because they were questioning a child; they pressed on as if he were an adult, in violation of clearly established law (like *Hayley*, *Gault*, *Eddings*, and *Gallegos*). Their conduct would permit a reasonable jury to find these tactics contributed to overbearing Simmers's will as well.

Related, **and fourth**, Simmers was interrogated about the murder without the presence of his mother or a concerned adult, despite the Court's established "concern over the inability of children to make mature choices." *Bellotti v. Baird*, 443 U.S. 622, 636 (1979). "A lawyer or an adult relative or friend could have given the petitioner the protection which his own immaturity could not. Adult advice would have put him on a less unequal footing with his interrogators." *Gallegos*, 370 U.S. at 54. Here, no "counsel or friend was called during the critical hours of questioning." *Haley v. State of Ohio*, 332 U.S. 596, 600 (1948), despite Simmers's family making efforts to learn what was going on, SOF ¶30. Had Berube been notified, she would have been at the station. *Id.*

**Fifth**, "mental condition is surely relevant to an individual's susceptibility to police coercion." *Connelly*, 479 U.S. at 165. Under established law, Defendants had an obligation to "ascertain the petitioner's character and background," including his mental health vulnerabilities. *Fikes v. Alabama*, 352 U.S. 191, 193 (1957). Simmers obviously outlandish statements, the lack of a parent, and age should have alerted Defendants to the fact that Simmers had, or may have had, mental health vulnerabilities. Ex. 6 at 13-14. While police are not doctors, Simmers displayed obvious red flags, and Defendants could have also learned the specific diagnosis had they inquired of Simmers' mother, Ex.

29¶3, but they refused. Persisting in this manner can be coercive. *E.g. Spano v. New York*, 360 U.S. 315, 321-23 (1959) (finding questioning of adult suspect with mental instability as unconstitutional); *Gladden v. Unsworth*, 396 F.2d 373, 381 (9th Cir. 1968) ("If by reason of mental illness, use of drugs, or extreme intoxication, the confession in fact could not be said to be the product of a rational intellect and a free will . . . it is not admissible and its reception in evidence constitutes a deprivation of due process.").

In fact, as a combination of his age and mental health status, Simmers was obviously "highly suggestable." *Fikes*, 352 U.S. at 197. Even on their own account, Defendants made up the theory of self-defense, and Simmers acquiesced. SOF ¶¶40-43. And, Simmers did not push back or resist when he was corrected, asked leading questions, or when the Defendants rehearsed the "demonstration" of the murder. *Id.* ¶¶44. The resort to suggestion and leading questions, etc., contributed to overbearing Simmers' will and a false confession.

**Sixth**, the questioning was guilt presumptive, rather than a search for the truth. SOF ¶38. Interrogators "concerned primarily with securing a statement from defendant on which they could convict him," rather than obtaining information, will be subject "the most careful scrutiny." *Spano*, 360 U.S. at 324; *cf. Haynes*, 373 U.S. at 511 (criticizing police for being obsessed with obtaining a confession and affirming *Spano*). From the outset, interrogators were not trying to simply ask Simmers what happened; they rejected his honest denials of involvement; confronted him with false evidence; lied to him about it being better if he cooperated; and had zero regard that they were being given information that was obvious fantasy. SOF ¶¶43, 45-46, 50. Doing so bespeaks coerciveness.

**Seventh,** Simmers is innocent of the crime (and the confession is false), *id.* ¶5, which supports an inference of involuntariness. "Police conduct that influences a rational person who is innocent to view a false confession as more beneficial than being honest is necessarily coercive, because of the way it realigns a suspect's incentives during interrogation." *United States v. Villalpando,* 588 F.3d 1124, 1128 (7th Cir. 2009). Whether "a confession was false is relevant to, though not dispositive of, the determination of whether the confession was involuntary" and "innocence can be used to rebut testimony that a person has reliably confessed to a crime and increases the likelihood that a confession was coerced." *Tarlton v. Sealey*, 2021 WL 1845171, at *1 (E.D.N.C. May 7, 2021); *see Taylor v. Cnty. of*

*Pima*, 2021 WL 9406846, at *8 (D. Ariz. Feb. 17, 2021) (evidence of innocence relevant, in § 1983 case, of whether plaintiff was coerced to pleading guilty). Simmers' innocence "makes it more likely Defendants knew Plaintiff's confession was false, but nevertheless used 'psychological pressure' to coerce him." *Black v. West Virginia State Police*, 2023 WL 6520079, at *2 (S.D. W. Va. Oct. 5, 2023). Simmers was innocent of the murder, SOF ¶5; a fact that powerfully corroborates the contention that his Fifth Amendment rights were violated.

**Eighth**, especially given Simmers' innocence, the fact that the recorded confession includes non-public crime details is indicative of involuntariness. *Plascencia v. Estelle*, 990 F.2d 1259 (9th Cir. 1993); *Hill v. City of Chicago*, 2009 WL 174994, at *8 (N.D. Ill. Jan. 26, 2009). That is, evidence showing "Plaintiff had no connection to the crime scene helps prove 'he could not have known certain details about the crime that nevertheless were included in his confession.'" *Black*, 2023 WL 6520079, at *2 (quoting *Halsey v. Pfeiffer*, 750 F.3d 273, 306 n.31 (3d Cir. 2014)). The nature of the wounds, the bent blade, and other non-public facts came from the police, as Simmers was innocent. SOF ¶¶23, 44, 48. Indeed, Hopkins and Rusk provided Simmers details of the crime to use in the confession by suggesting answers to him, by using leading questions, and "correcting" his "mistakes" along the way. SOF ¶44-45, 47, 50. These sorts of tactics demonstrate coercion. *See Fikes*, 352 U.S. at 195 (leading nature of questioning supported finding of involuntary confession); *Spano*, 360 U.S. at 322 ("He did not make a narrative statement, but was subject to the leading questions of a skillful prosecutor in a question and answer confession."); *Preston*, 751 F.3d at 1014 ("The officers also asked a number of leading and suggestive questions that introduced facts Preston himself never mentioned until the officers brought them up."); *Wilson*, 260 F.3d at 953 ("Of particular concern … is the fact that the officers relied largely on leading questions to secure this confession from Wilson."); *Woods v. City of Reno, Nevada*, 2020 WL 4194844, at *8 (D. Nev. July 21, 2020) (denying summary judgment on coerced confession claim where interrogator's "questions were highly suggestive" and "supplied Plaintiff with non-public facts that made her confession seem more reliable").

Put differently, supplying the non-public facts to Simmers was a form of *pressure* and *influence*. Especially when combined with the fact that Simmers did not want to speak to the officers about the

murder, the tactics here violated clearly established law. Long before 1995, it was well established badgering a suspect to confess and then giving them no option but to say specific things not only contradicts the right to *silence*, but further amounts to a tenacity that can break a suspect's will and "render[] them helpless to resist their accusers further." *Chambers v. Florida*, 309 U.S. 227, 240 (1940). Such acts were obviously coercive, as a "confession 'must not be extracted by any sort of . . . any improper influence.'" *Malloy*, 378 U.S. at 7 (quoting *Bram v. United States*, 168 U.S. 532 542-43 (1897)); *see also Spano*, 360 U.S. at 323 (confession involuntary where "will was overborne by official pressure, fatigue and sympathy falsely aroused after considering all the facts").

**Ninth**, is the duration for which Simmers was in custody—some 8 or 9 hours before he was interrogated about the murder and over 11 hours when the recording was done. Defendants took no steps, and did not concern themselves with, the length of confinement overall or the taxing impact that being questioned early afternoon might have on a juvenile, which was then followed by a period of isolation in which Simmers' only interactions were telling people he did not want to talk about the murder. SOF ¶¶29-37. This contributes to an involuntary statement. *See Blackburn*, 361 U.S. at 206 ("A prolonged interrogation of an accused who is ignorant of his rights and who has been cut off from the moral support of friends and relatives is not infrequently an effective technique of terror.").

**Tenth**, Simmers was lied to and tricked in various ways, and "psychological coercion can constitute police misconduct." *Com. of N. Mariana Islands v. Mendiola*, 976 F.2d 475, 485 (9th Cir. 1992). While it is true that deception *alone* does not automatically render a confession involuntary, because the inquiry turns on the totality of the circumstances, *Schneckloth*, 412 U.S. at 226; *Tingle*, 658 F.2d at 1335, things like "ruses"—*i.e.* lies—must still be considered. *See, e.g.*, *Crowe* v. *Cnty. of San Diego*, 608 F.3d 406, 432 (9th Cir. 2010) (considering fact juveniles were "lied to" as part of totality of circumstances).

When coupled with his age and denials, the officers' false promises (like it would be better for him if he cooperated and waived his right to counsel) and manipulative tactics would permit a reasonable jury to find the ploys used against a juvenile in these circumstances contributed to overbearing Simmers' will. Because the "the test of voluntariness" includes "whether the confession

was extracted by any sort of threats or violence, or obtained by any direct or implied promises, however slight, or by the exertion of any improper influence," this factor contributes to involuntariness. *Hutto v. Ross*, 429 U.S. 28, 30 (1976) (per curiam); *see also Williams v. Woodford,* 384 F.3d 567, 595 (9th Cir. 2004) ("[A] promise of leniency accompanied by threats or other coercive practices constitutes improper influence and makes a subsequent inculpatory statement involuntary.").

*    *    *

The inquiry is one of the totality of these circumstances *combined*, not in isolation. A "compartmentalized view of the interrogation process cannot be squared with settled Supreme Court precedent" *Halsey*, 750 F.3d at 305; *see also Wilson v. Lawrence County*, 260 F.3d 946, 953 (8th Cir. 2001) ("[A] totality of the circumstances analysis does not permit state officials to cherry-pick cases that address individual potentially coercive tactics, isolated one from the other, in order to insulate themselves when they have combined all of those tactics in an effort to overbear an accused's will."). The foregoing is beyond sufficient to deny summary judgment.

**B.  The Recorded False Confession Caused Simmers Harm in His Criminal Case**

There is no dispute the false confession was used against Simmers in the criminal proceedings. SOF ¶67. And, there is no reasonable dispute that the Defendants interrogated Simmers and memorialized the false confession understanding it could be used in a murder prosecution. Defendants nonetheless argue they did not "cause" Simmers harm. The argument is baseless.

Section 1983 must be read "against the background of tort liability that makes a man responsible for the natural consequences of his actions." *Monroe v. Pape*, 365 U.S. 167, 189 (1961). Causation exists where a plaintiff suffers an injury "a reasonable person would see as a likely result of the conduct in question." *Spencer v. Peters*, 857 F.3d 789, 798 (9th Cir. 2017). The Ninth Circuit has repeatedly applied these rules to confessions introduced in a criminal proceeding, *Crowe*, 608 F.3d at 430; *Stoot v. City of Everett*, 582 F.3d 910, 926 (9th Cir. 2009). The Court even recognized that causation principles may extend to situations where a statement is not introduced, *Cooper v. Dupnik*, 963 F.2d 1220 (9th Cir. 1992), though such a rule was limited by *Chavez v. Martinez*, 538 U.S. 760, (2003), to require "use" in a criminal case (which is satisfied here).

*Stoot* affirmed that police can cause damages from confession later admitted in a criminal proceeding, because officers "are generally responsible for the 'natural' or 'reasonably foreseeable' consequences of their actions." 582 F.3d at 926. As a result, a "prosecutor's decision to use the allegedly coerced statements in the affidavit and at arraignment did not serve, as a matter of law, as an intervening or superseding cause that cut off [the officer's] liability." *Id.* Instead, "just as a police officer may be held liable when a prosecutor files criminal charges against a defendant without probable cause, so too may an officer be held liable for wrongfully procuring statements then used by the prosecutor to initiate legal proceedings." *Id.* In other words, because use in a criminal proceeding is the "very purpose of obtaining" confessions, it is "uncontroversial to state that an officer should reasonably foresee that obtaining a coerced confession from an individual would result in a Fifth Amendment violation when that coerced confession was subsequently used against the individual in a criminal proceeding." *Johnson v. Bay Area Rapid Transit Dist.*, 2013 WL 6155266, at *6 (N.D. Cal. Nov. 22, 2013).

Likewise, in *Crowe*, the Ninth Circuit rejected a rule that police officers were not the proximate harm of introducing the confession because the prosecutor, not the officer, introduced the statement. 608 F.3d at 430. As remains true, a police officer may be liable "by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury." *Id.* (quoting *Johnson v. Duffy*, 588 F.2d 740, 743-44 (9th Cir.1978)). *Crowe* explained: "When a police officer questions a suspect, he knows that any statement the suspect gives may be used to prosecute that suspect. *A fortiori*, he knows that an obtained *confession* will almost certainly be used to prosecute. Thus, while the officer may not actually introduce the statement into court, coercing the confession "set[s] in motion a series of acts by others which the [officer] knows or reasonably should know would cause" the statement to be introduced. *Id.*

In *Crowe*, the Ninth Circuit "join[ed] the Sixth Circuit" and held that "ordinarily, 'in actions brought under § 1983 for alleged violations of [the Fifth Amendment], it is the person who wrongfully coerces or otherwise induces the involuntary statement who causes'" the Fifth Amendment violation. *Id.* at 927 (quoting *McKinley v. City of Mansfield*, 404 F.3d 418, 437 (6th Cir. 2005) ("We are not aware of any reported decision in which a federal court dismissed a § 1983 action based on an alleged Fifth

Amendment violation solely on the grounds that the defendants were police officers and thus did not 'use' the plaintiff's statements at trial.").

Attempting an end-run around *Monroe*, *Stoot*, and *Crowe*, Defendants argue that the trial court's decision to admit the statements constitutes a "superseding cause" that breaks the chain of causation, including by citing inapposite cases and by failing to contend with *Monroe*, *Stoot*, and *Crowe*. As other courts have recognized, this attempted maneuver fails. *See, e.g.*, *Garcia v. Moreno Valley Police Dep't*, 2018 WL 7571322, at *12 (C.D. Cal. Nov. 19, 2018) (applying *Stoot*, *Crowe*, and other authorities to reject same "superseding cause" argument made here).

This court must follow established law in *Monroe*, *Stoot*, and *Crowe*. Indeed, under general tort principles firmly established in 1871 when § 1983 was enacted, if the injury was foreseeable, there may be liability. *Milwaukee & St. P.R. Co. v. Kellogg*, 94 U.S. 469, 475 (1876) (noting proximate cause required "that the injury was the natural and probable consequence of the negligence or wrongful act, and that it ought to have been foreseen in the light of the attending circumstances").[10]

The law of superseding cause also focuses on foreseeability. A "cause can be thought 'superseding' only if it is a 'cause of independent origin that was not foreseeable.'" *Staub v. Proctor Hosp.*, 562 U.S. 411, 420 (2011) (quoting *Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 837 (1996)). As a result, though an independent decisionmaker's decision might also be a proximate cause, where it is foreseeable, the "ultimate decisionmaker's" judgment cannot be deemed a superseding cause of the harm." *Id.* In other words, because the use of a confession in a criminal proceeding is foreseeable, its

---

[10] Authorities at the time § 1983 was enacted provided the same. See, *e.g.*, C.G. ADDISON, WRONGS AND THEIR REMEDIES, BEING A TREATISE ON THE LAW OF TORTS 5 (2d ed. 1869) ("The general rule of law, however, is, that whoever does an illegal or wrongful act is answerable for all the consequences that ensue in the ordinary and natural course of events, though those consequences be immediately and directly brought about by the intervening agency of others, provided the intervening agents were set in motion by the primary wrong-doer, or provide their acts, causing the damage, were the necessary or legal and natural consequence of the original wrongful act."); F. HILLIARD, I THE LAW OF TORTS OR PRIVATE WRONGS 94 (1859) ("But every person, who does a wrong, is, at least, responsible for all the mischievous consequences that may be reasonable expected to result under ordinary circumstances from such misconduct So where one does an illegal or mischievous act, which is likely to prove injurious to others, and when he does a legal act in such a careless and improper manner that injury to third persons may probably ensue, he is answerable in some form of action for all the consequences which may directly and naturally result from his conduct.") (internal citations and quotes to English common law omitted)).

admission at trial cannot be a superseding cause. In fact, Defendants fail to appreciate that the Supreme Court has already rejected their "no causation" argument in *Malley v. Briggs*, 475 U.S. 335, 345 n.7 (1986), by holding that an officer who submits a facially invalid affidavit can be liable for violating the Constitution even though it was a judge who later issued the arrest warrant. *Malley* made clear that a "'no causation' rationale . . . is inconsistent with" § 1983. *Id.* "Since the common law recognized the causal link between the submission of a complaint and an ensuing arrest," the Court reads § 1983 "as recognizing the same causal link." *Id.*

Coming full circle, *Crowe* and *Stoot* acknowledge the same is true of involuntary confessions. Though a prosecutor might introduce the involuntary confession in a criminal case, and though there may be some judicial hearing about its admissibility, the constitutional violation that results is not only the foreseeable result of police obtaining a confession it is "the whole point." *Avery v. City of Milwaukee*, 847 F.3d 433, 443 (7th Cir. 2017).

The cases cited by defendants are inapposite and actually support Plaintiff. For example, the County cites *Sabbe v. Washington Cnty. Bd. of Commissioners*, 84 F.4th 807, 817 (9th Cir. 2023), an excessive force case that explained it is only when "the 'the injury was actually brought about by a later cause of independent origin that was not foreseeable[]" that superseding cause cuts off the chain of causation." *Id.* (quoting *Exxon*, 517 U.S. at 837). As above, the touchtone of causation in a § 1983 action is foreseeability. *Id.* The other Ninth Circuit opinion cited by the County, *Galen v. City of Los Angeles*, 477 F.3d 652 (9th Cir. 2007), is not about admitting a confession at all; it is about the contention that officers were liable for a judge's decision to set bail the plaintiff thought was excessive under the Eighth Amendment, over which the judge had "exclusive authority." Finally, the County's citation to a Second Circuit decision, *Higazy v. Templeton*, 505 F.3d 161, 177 (2d Cir. 2007), is doctrinally consistent because it focuses on foreseeability, emphasized the question of causation is typically one for the jury, and remanded the case for trial because "a fact finder could conclude that [the defendant] could

reasonably have foreseen that a coerced confession would be used against [the plaintiff] and would lead to [the plaintiff's] detention." *Id.* at 177.[11] The same is true here and Defendants' argument fails.

## C. Defendants' Contrary Arguments Are Meritless

In addition to failing to construe the record in the light most favorable to Simmers, ignoring his invocation of his right to silence, ignoring his invocation of a right to an attorney, and ignoring Simmers' innocence (meaning he could not provide the non-public details), both sets of Defendants make a handful of arguments that also fail.

First, Bothell defendants attempt to isolate specific tactics—which they call various "ruses" rather than lies and deception—to argue that Hopkins cannot have violated Simmers' rights. Dkt. 142 at 14-15. Putting aside that Defendants misunderstand the legal limits of the tactics, this is the wrong analysis. The totality of the circumstances involves a "multivariate inquiry." *Preston*, 751 F.3d at 1017. As the Ninth Circuit has emphasized twice *en banc*, courts "may not 'tick[ ] off the list of circumstances rather than actually considering them in their totality.'" *Id.* (quoting *Doody v. Ryan*, 649 F.3d 986 (9th Cir. 2011) (*en banc*)). It is insufficient for "courts to 'list[ ] the circumstances of [an] interrogation separately on a piece-meal basis.'" *Id.* Tellingly, Defendants do "not cite any authority in support of this piecemeal approach," and this Court should "not engage in dissecting" tactics individually. *Milke v. City of Phoenix*, 2016 WL 5339693, at *12 (D. Ariz. Jan. 8, 2016).[12]

Second, the Bothell Defendants inflate the legal standard, seemingly invoking something like a "shocks the conscience" standard. They cite *Ortiz v. Uribe*, 671 F.3d 863, 869 (9th Cir. 2011), which

---

[11] The Fifth Circuit's outlier decision cited by King County, *Murray v. Earle*, 405 F.3d 278, 293 (5th Cir. 2005), is irrelevant, and is based upon a misunderstanding—rejected in *Stoot* and *Crowe*—that the Fifth Amendment only applies at trial and not to stages before. *See, e.g.*, *Vogt v. City of Hays, Kansas*, 844 F.3d 1235, 1242 (10th Cir. 2017) (rejecting *Murray*'s view and adopting the view of the Ninth Circuit and other circuits). *Stoot* itself rejected the analysis from *Murray* as well. 582 F.3d. at 926. It is inexplicable that counsel for the County would not have at least cited *Stoot* as directly contrary binding authority (as Bothell at least did).

[12] Defendants do cite *United States v. Orso*, 266 F.3d 1030, 1039 (9th Cir. 2001), but adopt a piecemeal approach about that case. *Orso* applied a totality of the circumstances when assessing an interrogation that, unlike the interrogation here, did not involve a juvenile who had invoked their right to silence and counsel before providing a later-challenged inculpatory statement. *Id.* Plaintiff does not claim that lying to Simmers *alone* made the interrogation unconstitutional, but it is part of the circumstances that must be considered in totality. And, as the sources above confirm, deception can overbear a suspect's will and a reasonable jury can easily find this component contributed to a coerced confession. Defendants also omit that *Orso* was abrogated by *Missouri v. Seibert*, 542 U.S. 600 (2004).

was a *habeas* case that was citing *Moran v. Burbine*, 475 U.S. 412, 433-34 (1986), also a *habeas* case. The cited passage involves the Court's discussion of a higher standard for intervening in state convictions—where the shocks the conscience and civilized society language originates. These heightened standards do not apply to standard claims arising under the Fifth Amendment. *See, e.g.*, *Crowe*, 608 F.3d at 430 (analyzing the claims separately); *Tobias v. Arteaga*, 996 F.3d 571, 584 (9th Cir. 2021) (same and advancing Fifth Amendment claim while granting qualified immunity on the higher "shocks the conscience" standard).

Third, *Vega v. Tekoh*, 597 U.S. 134, 141 (2022), has no impact here. *Vega* holds that the failure to provide prophylactic *Miranda* warnings is not independently actionable under § 1983 but that the core trial right under the Fifth Amendment is of course unaltered. The core Fifth Amendment right against self-incrimination necessarily includes the right to stop custodial questioning, or else there would be no such right. *Tingle*, 658 F.2d at 1336 n.5. Accordingly, invocation of a right to silence (which Defendants do not address at all) is not a mere prophylactic like the administration of *Miranda* warnings themselves. But, even if it hypothetically were, Simmers' claim is that invoking his right to silence is *part* of the totality of the circumstances even if not actionable on its own. The same is true of Simmers' request for counsel (which Defendants do mention). This Court need not reach the question of whether invocation of the right to counsel is independently actionable because Plaintiff argues Simmers' invocation of the right to counsel is *part of* the totality of the circumstances that would enable a reasonable jury to find involuntariness. As a result, *Vega* is inapposite.[13]

---

[13] The County Defendants ask this Court to ignore that Simmers requested an attorney, because they find his testimony incredible. Dkt. 137 at 18-19. Making credibility determinations and weighing evidence is prohibited at summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986). Simmers testified he asked for an attorney and the only reasonable inference of this testimony was about the murder (and not the property crimes to which he freely admitted committing and later pleaded guilty to, rendering reference to *Heck v. Humphrey*, 512 U.S. 477 (1994), irrelevant), Ex. 1 at 194-96, 254-55. Whether Simmers could provide further specifics go to the weight of his testimony, and Defendants themselves failed to follow-up with Simmers in any detail at his deposition. While it is tragic that Simmers has passed away and can no longer provide the detail Defendants did not meaningfully attempt to elicit, that is no reason to disregard the testimony he did provide. Summary judgment works the other way around. *Cruz*, 765 F.3d at 1080. In addition, even if Simmers' request for counsel were found to be vague (which it cannot be at summary judgment), questioning about the murder *still* should have ceased. *See Smith v. Endell*, 860 F.2d 1528, 1529 (9th Cir. 1988) ("[W]hen the initial request for counsel is ambiguous or equivocal, all questioning must cease, except inquiry strictly limited to clarifying the request."). Last, Simmers did not testify at the pretrial hearing and only testified at trial about

Fourth, Defendants seem to imply that because they did not yell at or physically threaten Simmers, they cannot possibly have violated his Fifth Amendment rights. Such a view is inconsistent with the fact that "law enforcement conduct which renders a confession involuntary does not consist only of express threats so direct as to bludgeon a defendant into failure of the will. Subtle psychological coercion suffices as well, and at times more effectively, to overbear 'a rational intellect and a free will.'" *Tingle*, 658 F.2d at 1335 (quoting *Malloy*, 378 U.S. at 7).

Finally, though all Defendants acknowledge Simmers was just 16 years old, they nonetheless imply Simmers' age—and the law pertaining to juvenile interrogations—somehow does not apply given that he'd been arrested before. But there is no legal or scientific support for this assertion. Simmers *was* a child. His brain development, regardless of prior arrests, did not make him an adult. Thus, regardless of any "sophistication," special caution was still required. *Eddings*, 455 U.S. at 115.

King County Defendants suggest that being provided with *Miranda* warnings somehow means that Simmers could not have had his will overborne, invoking Simmers' intelligence and prior arrests. Dkt. 137 at 15-16. They are wrong. For one, they ignore that Simmers invoked both his right to silence and his right to counsel before they questioned him further about the murder. There was a substantial period of isolation between questioning about the property crimes and the murder, and so it is irrelevant that he *previously* waived his *Miranda* rights. In addition, the County Defendants ignore that Simmers was told that he should give up his right to counsel because it would benefit him, undermining these rights as well. Defendants' arguments are for trial, not summary judgment.

**D.  Plaintiff's Due Process Claims Must Proceed to Trial**

Plaintiff's Due Process/Fair Trial claims encompass two theories. Though he would be entitled to proceed to trial on even just one (warranting denial of the motion), both are discussed.

---

his innocence (and alibi specifically). The suggestion Simmers was required to spontaneously offer up, at some point, testimony about asking for an attorney makes no sense and his counsel's "tactical decisions" at the pretrial hearing cannot be personally imputed to Simmers, *Florida v. Nixon*, 543 U.S. 175, 187 (2004), especially given that he was a child (and not an attorney).

**A. A Reasonable Jury Can Find Defendants Fabricated Evidence**

There is a clearly established due process right not to be subjected to criminal charges on the basis of fabricated evidence; the "proposition is virtually self-evident." *Devereaux v. Abbey*, 263 F.3d 1070, 1074-75 (9th Cir. 2001) (*en banc*). Evidence can be fabricated in myriad ways. *Spencer*, 857 F.3d at 798.

First, **direct fabrication** can occur where reports or documents include things that are simply false; where reports or documents, for example, "contain[] evidence" that does not exist or purport to record statements that were "never made" *Costanich v. Dep't of Social & Health Servs.*, 627 F.3d 1101, 1112 (9th Cir. 2010). Direct fabrication also occurs where officials "deliberately mischaracterize[]" evidence, *Spencer*, 857 F.3d at 798, either by affirmative misstatements or via "material omissions." *Liston v. Cnty. of Riverside*, 120 F.3d 965, 973 (9th Cir. 1997). Under the direct method, the investigator's knowledge or reason to know of the plaintiff's innocence is irrelevant, because the Constitution "prohibits the deliberate fabrication of evidence whether or not the officer knows that the person is innocent." *Spencer*, 857 F.3d at 800. Put differently, "motive evidence is never *required*." *Richards v. Cnty. of San Bernardino*, 39 F.4th 562, 569 (9th Cir. 2022) (emphasis in original).

Second, **under the circumstantial method**, fabrication can be proven showing that "(1) [d]efendants continued their investigation . . . despite the fact that they knew or should have known that [the plaintiff] was innocent; or (2) [d]efendants used investigative techniques that were so coercive and abusive that they knew or should have known that those techniques would yield false information." *Caldwell v. City & Cnty. of San Francisco*, 889 F.3d 1105, 1112 (9th Cir. 2018) (quoting *Devereaux*, 263 F.3d at 1076); *see Spencer*, 857 F.3d at 799.[14] As to the route involving knowledge of innocence, if "an investigator knows that a person is innocent, yet continues the investigation nevertheless, then the evidence suggests circumstantially that the investigator has an unlawful

[14] Bothell defendants ignore the first type of proof entirely and misunderstand how circumstantial proof works under the second. As cases like *Caldwell*, *Spencer*, *Richards*, *Costanich* and others make clear, there is no separate "shocks the conscience" showing beyond these requirements as Bothell Defendants claim, Mot. at 142 (citing *Gantt v. City of Los Angeles*, 717 F.3d 702, 702 (9th Cir. 1993)). Instead, what *Gantt* confirmed was that what "shocks the conscience" means "'depends on the context'" (quoting *Tennison v. City and Cnty. of San Francisco*, 570 F.3d 1078, 1089 (9th Cir. 2009)), and myriad other cases provide further context.

36

motivation to frame an innocent person, which supports a claim that the investigator deliberately fabricated evidence." *Id.* The test "envisions an investigator whose unlawful motivation is illustrated by her state of mind regarding the alleged perpetrator's innocence." *Costanich*, 627 F.3d at 1111.

Here, a reasonable jury could find the following were directly fabricated:

(1) reports of the interrogation of Simmers (by Hopkins, Ex. 8, and Rusk, Ex. 20);

(2) reports repeating claims that Simmers said he had not killed a bum and suggesting those facts came from Simmers instead of Rusk and that Wyatt knew about the homicide at the marina (by Rusk, Ex. 20, Hopkins, Ex. 8, Dkt. 149-3, and Schlaegel, Ex.11);

(3) Miner's probable cause affidavit, Ex. 18;

(4) McSwain's report concerning Wyatt, Ex. 28; and

(5) Hopkins' report and "Notes" concerning Olsen, Dkt. 153-4 at 1-2; Dkt. 153-5, Dkt. 153-6, Dkt. 153.

**First**, reports from both Hopkins and Rusk omit that Simmers invoked his right to silence, his right to counsel, and that they falsely told him he would be better off if he waived an attorney and cooperated. SOF ¶¶31-35, 59. Both of these reports indicate that Simmers confessed to them, as if he provided the non-public facts of the crime on his own when, in reality, they provided those details. Ex. 8, Ex. 20. In the same vein, Rusk's report claims that Simmers "demonstrated" how the stabbing occurred when, in fact, the Detectives had to rehearse and correct his incorrect guesses at what happened. Ex. 20; SOF ¶¶44, 50. Hopkins's report goes further. Hopkins characterizes Simmers's denials as "having no memory," and—as a blatant fabrication—claims Simmers had "some confusion as to exactly what date the incident took place, whether it was Friday or Saturday," though this was completely untrue. Ex. 8; SOF ¶59.

**Second**, as detailed above, the reports by Rusk, Hopkins, Schlaegel, and Miner (including both her report and the search warrant affidavit), each include the false claim that Simmers had offered up that the victim was "a bum" when—by the time the reports were written after their hours together in the north precinct—all of them knew that Simmers had learned this information from Rusk (while Rusk knew this all along). SOF ¶58. The same reports include statements attributed to Wyatt about

the knife at the marina as if Wyatt had seen Simmers commit the murder (which he had not) and is information that should never have been attempted after Wyatt requested an attorney. *Id.*

As to McSwain's report, there are number of issues but most salient is the false claim that Wyatt told or otherwise implied to McSwain he saw Simmers commit the murder, which Wyatt described as a bold-faced lie. SOF ¶¶53-55.

Finally, as to Olsen, a reasonable jury can find that Hopkins fabricated his own report, the notes he gave to Olsen and then attributed as having come *from* Olsen, as well as the content of the interview with the prosecutor. Indeed, while Hopkins denies any wrongdoing regarding Olsen, a reasonable jury can find he fabricated these documents given: (1) Olsen emerges just after the DNA clears Simmers; (2) Olsen's account purports to resolve the exact discrepancies in the false confession (*e.g.*, the date, the description of the murder weapon, the location of the victim's shoes, etc.); (3) Simmers denies providing any of this information to Olsen; (4) Hopkins had the opportunity, in an unrecorded interview with an informant, to concoct this scheme; (5) Hopkins destroyed his contemporaneous notes of his interactions with Olsen; and (6) this entire course of conduct was a departure from accepted police practices. SOF ¶¶62-66.

Here, there is no dispute that these reports were generated as part of the case and used to further the prosecution. Police can be liable for fabricating police reports even if the underlying documents are not admitted at trial (because police reports are almost never introduced as substantive evidence), as "an interviewer who deliberately mischaracterizes witness statements in her investigative report . . . commits a constitutional violation." *Costanich*, 627 F.3d at 1112. Under the causation rules discussed above, "a § 1983 plaintiff need not be convicted on the basis of the fabricated evidence to have suffered a deprivation of liberty—being criminally charged is enough." *Caldwell*, 889 F.3d at 1115 (citing *Devereaux*, 263 F.3d at 1074-75, and NINTH CIR. JUR. INST. § 9.33). As a result, police conduct that becomes part of the "evidentiary record" in the criminal prosecution is sufficient to permit a jury to find causation. *Id.* at 1117; *see also Gregory v. City of Louisville,* 444 F.3d 725, 741 (6th Cir. 2006) (holding that officer's investigatory notes "were the result of pretrial fabrication efforts by [the officers]," and "comprise[d] part of the documentary record before the prosecution and defense and

affected the course of the criminal proceedings independent of any testimony to the notes' contents. . . . Their very existence, even if not introduced as evidence at trial, affected Plaintiff's criminal prosecution."). Thus, officers who submit false reports "to the prosecutor may be held liable for damages incurred as a proximate result of those reports," *Blankenhorn v. City of Orange*, 485 F.3d 463, 482 (9th Cir. 2007) (citing *Barlow v. Ground*, 943 F.2d 1132, 1136 (9th Cir. 1991)).

In addition, each of the noted reports were generated despite the fact a reasonable jury can easily conclude that the Defendants knew, or should have known, Simmers was innocent. SOF ¶¶60-63. The Bothell Defendants were initially engaged in a legitimate, honest investigation with many leads they completely abandoned; a departure from established policing practices. *Id.* ¶56. The entire team of officers knew that they were hearing outrageous things (such as dealing 100 hits of acid or killing 13 people) from Simmers, and that both Simmers and Wyatt described events beginning on Saturday night (the day after the victim was killed). *Id.* ¶¶26-28, 49, 51-52, 57-58. They knew, as part of the long discussion involving investigative techniques (with Schlaegel, Hopkins, Rusk, and the others) that the non-public facts about the crime had come from the officers and not Simmers. *Id.* And, for Hopkins in particular, just after DNA cleared Simmers and knowing the many discrepancies in the false confession, he doubled down and fabricated more evidence. *Id.* ¶¶59-66. Defendants may disagree with all of these things, but their challenges to the evidence must come at trial given this is sufficient to find the investigators knew Simmers was innocent but pressed forward anyway. *See Spencer*, 857 F.3d at 799; *Costanich*, 627 F.3d at 1111.

Defendants do not address the bulk of this evidence, including the written reports about the interrogation or about Rusk's lies (spread to others) about going to the marina. They cannot, then, meet their initial burden and these claims must proceed to trial. The Bothell Defendants do not address the direct method of proving fabrication whatsoever, or the method of proving the claim via innocence and cannot meet their initial burden for that reason as well. *Adickes*, 398 U.S. at 158; *Nissan Fire*, 210 F.3d at 1006; *Eberle*, 901 F.2d at 818.

The Bothell Defendants focus instead on whether Simmers' interrogation was so coercive and abusive it would produce a false confession. Dkt. 142 at 21. Though their discussion is self-serving and misconstrues the evidence, that is not the basis of Plaintiff's fabrication claim for trial.

Next, though the arguments are undeveloped, both sets of Defendants at least do mention Olsen. The Bothell Defendants simply deny liability and ignore the key evidence where the evidence was principally fabricated—the one-on-one unrecorded and undocumented meeting for which Hopkins destroyed his contemporaneous notes. SOF ¶65. If the Bothell Defendants want to contend it is sheer coincidence that on November 14 the crime lab produced a report finding none of Simmers DNA on the murder weapon and none of the victim's DNA on Simmers clothing, and then just two days later Olsen emerges from the woodwork and somehow resolves all of the key discrepancies in the case without any sort of inducement or information from Hopkins, Defendants must make the argument to a jury. Unlike Simmers, Hopkins is the one who *did* speak with the snitch. SOF ¶¶64-65.

The County's contentions fail for the same reason; they simply ignore the facts in the record, including that Simmers never spoke with Olsen. That being taken as a fact at this juncture, the question is where Olsen obtained the non-public information that helped "fix" the case? The answer is obvious—Defendant Hopkins. Nor is there any basis for finding the role of Olsen immaterial to the prosecution. Dkt. 137 at 22. The reports were part of the evidentiary record in the case, they were used by prosecutors and defense attorneys in examining Olsen (who did testify), and they led the defense to seek out and call additional witnesses. *See* Ex. 27.[15] This is sufficient. *Costanich*, 627 F.3d at 1112; *Spencer*, 857 F.3d at 799.

Finally, the County's argument—that Simmers was not impacted by the reports about Wyatt—cannot be squared with established law. There is no requirement that the fabricated evidence be admitted at trial, there is no dispute that part of the basis for charging Simmers with murder involved Wyatt, and there is no dispute that criminal proceedings were impacted by the reports about Wyatt (as

---

[15] The County points out that Olsen has not recanted but omits that Olsen is deceased.

they were specifically litigated). That is sufficient. *Caldwell*, 889 F.3d at 1115; *Devereaux*, 263 F.3d at 1074-75.

### III.   A Reasonable Jury Can Find Defendants Rusk, McSwain, Hopkins, Miner, and Schlagel Failed to Disclose Information in Violation of Due Process

The Due Process Clause requires police to affirmatively produce material information—*i.e.*, exculpatory and impeachment information—to the accused. *Brady v. Maryland*, 373 U.S. 83 (1963). Under *Brady* and its progeny, the prosecution's suppression of evidence favorable to the defense violates due process where that evidence is material either to guilt or to punishment *regardless* of the good faith or bad faith of the prosecution. 373 U.S. 83 (1963); *Youngblood v. West Virginia*, 547 U.S. 867 (2006) (*per curiam*); *Giglio v. United States*, 405 U.S. 150 (1972).

### 1.   Bothell Defendants Have Not Addressed Plaintiff's *Brady* Claim.

The Bothell Defendants have said nothing of Plaintiff's *Brady* Claim in the case. They have forfeited any possible motion on this issue and Hopkins, Miner, Schlaegel and the City itself, as they cannot attempt to raise this issue for the first time in reply and have forfeited the issue. *Eberle*, 901 F.2d at 818. Forfeiture aside, failure to say anything about Plaintiff's *Brady* claim necessitates a conclusion that the Bothell Defendants have not—and cannot—met their initial burden at summary judgment on this theory. *Nissan Fire*, 210 F.3d at 1006.  Either way, the claim should proceed to trial.

### 2.   The County's Cursory *Brady* Argument Fails

Though the County Defendants at least mention *Brady* they simply deny liability. They point to no facts or substantive reason why Plaintiff's claim cannot proceed other than a blanket, unsupported assertion there was no *Brady* material and they were not require to "*create* evidence that does not exist." Dkt. 137 at 22 (citing *United States v. Monroe*, 943 F.3d 1007, 10011 n.2 (9th Cir. 1991)).

That point is irrelevant. Instead, the "'government cannot satisfy its *Brady* obligation to disclose exculpatory evidence by making some evidence available and claiming the rest would be cumulative. Rather, the government is obligated to disclose *all* material information casting a shadow

on a government witness's credibility.'" *Mellen v. Winn*, 900 F.3d 1085, 1097-98 (9th Cir. 2018) (quoting *Carriger v. Stewart*, 132 F.3d 463, 481-82 (9th Cir. 1997) (*en banc*)).

Here, as it relates to Rusk and McSwain, Plaintiff's principal *Brady* theory involves the fact that they did not disclose their own misconduct, both with respect to the reports they fabricated; that Rusk made-up that Simmers independently offered, as if it were suspicious, that he did not kill a "bum"; and that McSwain had made up, almost entirely, the notion that Wyatt claimed he saw Simmers commit a murder. *E.g.*, SOF ¶¶23, 26-28, 53-58.

A reasonable jury could easily conclude that such disclosures would have been favorable to Plaintiff, as Due Process requires disclosure of impeachment evidence including that would illustrate police misconduct. *United States v. Bagley*, 473 U.S. 667 (1976); *Atkins v. Cty. of Riverside*, 151 F. App'x 501, 505 (9th Cir. 2005) (*Brady* violation for suppressing evidence that "would have cast a shadow across" the police investigation); *Fields v. Wharrie*, 672 F.3d 505, 517 (7th Cir. 2012) ("The constitutional violation occurs when the means by which the testimony was acquired are not disclosed at trial—or when other information that impeach the testimony's reliability are not shared with the defense."). That is the sort of information suppressed here and its suppression violated Simmers' clearly established constitutional rights. *See Carillo v. County of Los Angeles*, 798 F.2d 1210, 1219-25 (9th Cir. 2015) (holding law in 1984, and as far back as 1978, clearly established that police officers were bound to disclose material exculpatory evidence).

Indeed, had Rusk and McSwain admitted their misconduct, they would have become *defense* witnesses at trial impeaching the interrogation, and testifying—essentially—about Simmers's innocence. That is more than enough for a reasonable jury to find that the suppression harmed Simmers. *See, e.g.*, *Gonzalez v. Wong*, 667 F.3d 965, 984 (9th Cir. 2011) ("Where the withheld evidence opens up new avenues for impeachment, it can be argued that it is still material."). Indeed, as in *Mellen*, the "possibility for the defense to use statements from" several police officers "'would have provided the defense with a

new and different ground of impeachment.'" 900 F.3d at 1098 (quoting *Benn v. Lambert*, 283 F.3d 1040, 1056 (9th Cir. 2002).[16]

### IV.    A Reasonable Jury Can Find Defendants Conspired to Harm Simmers

A § 1983 conspiracy involves showing "show an agreement or 'meeting of the minds' to violate [the plaintiff's] constitutional rights." *Ward v. EEOC*, 719 F.2d 311, 314 (9th Cir. 1983). Such an agreement "may be inferred from conduct and need not be proved by evidence of an express agreement"; a plaintiff need only point to some "facts probative of a conspiracy." *Id.*; *see also Mendocino Envtl. Ctr. v. Mendocino Cnty.*, 192 F.3d 1283, 1301-02 (9th Cir. 1999). An agreement "may be inferred on the basis of circumstantial evidence such as the actions of the defendants" meaning, for example, a showing that the alleged conspirators have committed acts that 'are unlikely to have been undertaken without an agreement' may allow a jury to infer the existence of a conspiracy. *Mendocino*, 192 F.3d at 1301-02 (quoting *Kunik v. Racine County,* 946 F.2d 1574, 1580 (7th Cir. 1991)). In addition, while each participant must "share the common objective[,] … each participant in the conspiracy need not know the exact details of the plan." *Franklin v. Fox*, 312 F.3d 423, 441 (9th. Cir. 2002); *see United Steelworkers of Am. v. Phelps Dodge Corp.,* 865 F.2d 1539, 1541 (9th Cir. 1989) (*en banc*) (same).

As a consequence, the existence of an "unlawful conspiracy is generally a factual issue and should be resolved by the jury, "so long as there is a possibility that the jury can 'infer from the circumstances (that the alleged conspirators) had a 'meeting of the minds' and thus reached an understanding' to achieve the conspiracy's objectives." *Mendocino Envtl Ctr.*, 192 F.3d at 1301-02 (quoting *Hampton v. Hanrahan,* 600 F.2d 600, 621 (7th Cir. 1979)). Likewise, to the extent there is an issue of a defendant's intention or state of mind, such a question is also a factual issue "'inappropriate for resolution by summary judgment." *Mendocino Envtl Ctr.*, 192 F.3d at 102 (quoting *Braxton-Secret v. Robins Co.*, 769 F.2d 528, 531 (9th Cir.1985)).

A defendant need not be physically or directly involved in every aspect of the conspiracy to be liable for their agreement. Defendants have not admitted to their conspiracy; most never do.

---

[16] County Defendants make no arguments about mental state (which is a trial issue, *Vucinich v. Paine, Webber, Jackson & Curtis, Inc.*, 739 F.2d 1434, 1436 (9th Cir. 1984)), and so the element is unaddressed here.

Indeed, the Ninth Circuit has cautioned: "'Direct evidence of improper motive or an agreement among the parties to violate a plaintiff's constitutional rights will only rarely be available. Instead, it will almost always be necessary to infer such agreements from circumstantial evidence or the existence of joint action.'" *Mendocino Envt'l. Ctr.*, 192 F.3d at 102; *see also Gilbrook v. City of Westminster*, 177 F.3d 839, 856-57 (9th Cir. 1999) ("A defendant's knowledge of and participation in a conspiracy may be inferred from circumstantial evidence and from evidence of the defendant's actions." (citation omitted)).

Here, there was quite literally a meeting of the minds about the strategy to interrogate Simmers for the murder and a conversation that took place for hours. SOF ¶¶26-28. As pointed out above, the reports all have nearly identical information in them concerning Rusk's interactions with Simmers saying he did not kill a "bum" at the marina and about Wyatt's alleged comments at the marina, too. This bespeaks conspiracy as this type of coordinate action is consistent with a joint scheme not likely to have been so similar without a joint action. *Mendocino Envt'l. Ctr.*, 192 F.3d at 1301-02.

In seeking dismissal, Defendants offer a paucity of analysis and have not met their initial burden. The Bothell Defendants simply assert there is no evidence of conspiracy, but their assertions simply misconstrue the record, which is beyond sufficient to show a "meeting of the minds" particularly given the fact the police reports *say* there was a meeting of the minds to strategize the interrogation and pursuit of Simmers for the Gochanour murder. SOF ¶¶26-28, 56-58. The same is true of the County motion, which simply denies liability with no analysis. The arguments fail.

## V.    The Individual Defendants Had the Opportunity to Stop the Violation of Simmers' Rights But Refused to Do So.

Police officers cannot sit idly by and permit a blatant violation of someone's constitutional rights when they have the opportunity to stop it from occurring. It is well established that "'police officers have a duty to intercede when their fellow officers violate the constitutional rights of'" civilians. *Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir. 2000) (quoting *United States v. Koon*, 34 F.3d 1416, 1447 n. 25 (9th Cir.1994)). Accordingly, officers can be held liable for failing to intervene where they had an opportunity to do so, *id.* and if "an officer fails to intercede, 'the constitutional right

violated by the passive defendant is analytically the same as the right violated by the person who performed the offending action." *Tobias v. Arteaga*, 996 F.3d 571, 583 (9th Cir. 2021) (quoting *Koon*, 34 F.3d at 1447 n.25).

Here, as the foregoing shows, each of the Individual Defendants had the opportunity to intervene but failed. Hopkins, Miner, Rusk, Schlagel, and McSwain were all in the police station and strategized to violate Simmers's rights. SOF ¶¶26-28, 56-58. They could have spoken up and stopped the actions; they each could have phoned Simmers' mother. They each could have stated the obvious—that they should not be pursuing an innocent child and abandoned their actual leads instead of focusing on a vulnerable teenager. *Id.* Bothell Defendants' entire argument is entirely disposed by the facts in the record when those facts are properly construed.

Finally, despite the fact that neither *Cunningham* or *Koon* limit the analysis to excessive-force claims, despite the fact these authorities used broader language (*i.e.*, involving *any constitutional rights* of a suspect), and despite the fact that the Ninth Circuit just cited these cases as having broadly established the obligation to intervene in the context of an interrogation specifically, *Tobias*, 996 F.3d at 583, the County Defendants imply a obligation to intervene does not exist here.[17] Dkt. 137 at 25. They are mistaken. In addition to the language of *Cunningham*, *Koon*, and *Tobias*, myriad authorities recognize that failure to intervene claims are not limited to excessive-force cases. *E.g.*, *Ramirez v. Butte-Silver Bow County*, 298 F.3d 1022, 1029-30 (9th Cir. 2002) (acknowledging that an officer can be held liable under *Koon* for failing to intercede in an unconstitutional search); *Robins v. Meecham*, 60 F.3d 1436, 1442 (9th Cir. 1995) (holding that "a prison official can violate a prisoner's Eighth Amendment rights by failing to intervene" when another official acts unconstitutionally). The claim must proceed to trial.

---

[17] In emphasizing the word "may," the KCDs misrepresent what *Tobias* held. Nothing in that decision equivocated or even mentioned that a failure-to-intervene claim "may" exist in the interrogation context, as if it was established in the excessive force context and there was a question as to whether it should extend to interrogations. Instead, the word "may" turned on the Court's question about whether each of the detectives in that case actually had observed and then had the opportunity to observe another detective's unconstitutional conduct. *Tobias*, 996 F.3d at 584.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

**VI.    Plaintiff's *Monell* Claims Must Proceed to Trial**

**A. Governing Standards**

Under current law, municipalities cannot be liable under a *respondeat superior* theory but may be liable where employees are "acting pursuant to an expressly adopted official policy," or pursuant to a "longstanding practice or custom." *Thomas v. County of Riverside*, 763 F.3d 1167, 1170 (9th Cir. 2014). A "policy" is "'a deliberate choice to follow a course of action . . . made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.'" *Long v. Cnty. of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006).

Beyond affirmative acts, an actionable practice or custom can be found in municipal inaction or a refusal to act. A policy "of inaction or omission may be based on failure to implement **procedural safeguards** to prevent constitutional violations." *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1143 (9th Cir. 2012) (citing *Oviatt v. Pearce*, 954 F.2d 1470, 1477 (9th Cir. 1992)). A policy of omission can also involve failing to adequately train police officers, where the municipality has "disregarded the known or obvious consequence that a particular omission in their training program would cause municipal employees to violate citizens' constitutional rights." *Id.*

To establish causation, "Plaintiff need only demonstrate that 'the identified deficiency . . . [is] closely related to the ultimate injury.'" *Id.* (quoting *Canton v. Harris*, 489 U.S. 378, 391(1989)). This showing is made by pointing to the "likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights," which can "justify a finding that policymakers' decision not to train the officer reflected "deliberate indifference" to the obvious consequence of the policymakers' choice—namely, a violation of a specific constitutional or statutory right." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 409-10 (1997). In addition, the "high degree of predictability may also support an inference of causation—that the municipality's indifference led directly to the very consequence that was so predictable." *Id.* That said, whether "a local government entity has displayed a policy of deliberate indifference is generally a question for the jury." *Oviatt by & through Waugh v. Pearce*, 954 F.2d 1470, 1478 (9th Cir. 1992).

In addition, when a municipality approves "a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final." *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 123-24, 127 (1988); *see also Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1097 (9th Cir. 2013); *Larson v. Napier*, 700 F. App'x 609, 611 (9th Cir. 2017) (affirming judgment against municipality where, among other things, there was "an admission by the Sheriff that the deputies complied with the department's policy"; chief testified that "he would expect deputies to do the same thing"; and the deputy's actions were "taught and accepted as the department approach.").

## B. Bothell and King County Failed to Include Adequate Safeguards and Inadequately Trained Their Officers Concerning the Conduct of Juvenile Interrogations

Plaintiff pursues three related theories against both Bothell and King County related to juvenile interrogations including: (1) that failing to distinguish between juveniles and adults was an unconstitutional practice; (2) failing to adopt written policies or other procedural safeguards for juvenile interrogations was obviously necessary; and (3) each agency failed to adequately train their officers in how to interrogate juveniles. None of these theories require a pattern of violations because the risks are plainly obvious. *Brown*, 520 U.S. at 407. Liability may lie in "a situation that demands a policy," where the municipality "ignored a plainly obvious danger." *Armstrong v. Squadrito*, 152 F.3d 564, 577-78 (7th Cir. 1998); *see Tsao*, 698 F.3d at 1143. That is the case here.

Relevant facts include:

The Supreme Court has consistently for decades before 1995 required that special care be taken when it comes to interrogating juveniles. *See Haley v. Ohio*, 332 U.S. 596 (1948); *Gallegos v. Colorado*, 370 U.S. 49, 54 (1962); *In re Gault*, 387 U.S. 1, 47 (1967).

Neither Rusk nor Hopkins treated Simmers differently due to his age. SOF ¶36.[18] That was no accident. Instead, neither King County nor Bothell have produced any written policies that existed in 1995 for the conduct of juvenile interrogations. Ex. 25 at 1. Neither agency required officers to

---

[18] That Rusk is deceased is irrelevant as the County may still be liable even if he is not added as a defendant. *See, e.g., Fairley v. Luman*, 281 F.3d 913 (9th Cir. 2002) ("If a plaintiff establishes he suffered a constitutional injury by the City, the fact that individual officers are exonerated is immaterial to liability under § 1983."). This rule is apt in wrongful conviction cases. *Richards v. Cnty. of San Bernardino*, 39 F.4th 562, 574 (9th Cir. 2022)

treat juveniles differently in the actual manner in which an interrogation was undertaken, or in how detectives were supposed to treat (or not treat) the people being questioned. *Id*. Sixteen-year-old children, like Simmers, were not entitled to have a parent, concerned adult, or other person present. There were no rules about the duration of questioning juveniles. The list goes on. *Id*.

A reasonable jury could easily find an unconstitutional practice of treating juveniles as adults because the agencies have admitted this is what they did.

A reasonable jury could easily find that there were insufficient procedural safeguards here because neither agency "had any written policies concerning" interviewing juveniles in custody (including the type of techniques to be used), explaining *Miranda* warnings in a manner juveniles might understand and how the rights may be waived (beyond an admonition on a form they could be prosecuted in adult court), the length of detention for juveniles, or for appropriate (or in appropriate) types of questions for juvenile suspects. *Id*. Written policies, including procedural safeguards for things like interrogating juveniles are "important in ensuring that police officers act in accordance with agency policy and comply with the constitution," but neither Bothell nor the County had such safeguards in 1995. *Id*. Though the need for such standards is obvious, supplying an inference of deliberate indifference, the absence of written policies was a substantial departure from minimal standards for effective policing in 1995. *Id*.

Finally, a reasonable jury could find that the inadequate training provided to Rusk and McSwain by the County and to Hopkins by Bothell caused Simmers harm. The detectives claim they used the "REID Technique," and there is substantial evidence their tactics reflect the Reid method, *see* Ex. 6 at 16 n.iv, 17, 19, but neither agency, per the testimony from their Rule 30(b)(6) witnesses, undertook any inquiry into whether the training provided by Reid was constitutional. Ex. 25. The failure to inform officers that "juveniles cannot be treated the same as adults" was something that any reasonable officer should have known and any reasonable agency should have trained on in 1995. *Id*. at 1-2.

In sum, the testimony of the officers in the case, the 30(b)(6) testimony of each agency, and expert testimony would permit a reasonable jury to find King County and Bothell each liable here, as

"evidence pointing to a City's failure to provide any training on key duties with direct impact on the constitutional rights of citizens is sufficient to survive summary judgment with a *Monell* failure to train claim," *Gregory v. City of Louisville*, 444 F.3d 725, 754 (6th Cir. 2006) (where the evidence included expert testimony, deposition testimony from Rule a 30(b)(6) witness, testimony from the involved officers, and lack of internal documentation of any formal training, as here).

Indeed, in the face of arguably *some* evidence of written policies that is absent here, the court in *Tobias v. City of Los Angeles*, 2018 WL 6003559, at *10 (C.D. Cal. Sept. 17, 2018), denied summary judgment to the City of Los Angeles on a substantially identical *Monell* claim. The result here should be the same.

**VII.    Disputes of Material Fact Preclude Summary Judgment**

As noted above, but is worth emphasizing, the Court's determination at this juncture is limited to determining whether a reasonable jury could find for Plaintiff, not that it would be required to. Where disputes of material fact exist, summary judgment cannot be granted. Here, though Defendants contend otherwise, the core, material facts in this case are well and truly disputed.

- Simmers is innocent of the murder. SOF ¶¶5, 21. Defendants never accept this fact.

- Simmers did not know (and could not know) the non-public facts of the crime. Defendants contend otherwise. *Compare* SOF ¶¶5, 21, *with* Dkt. 137 at 8, and Dkt. 142 at 21:3-12.

- Simmers was a 16-year-old child who should have been treated with care, saying obviously outlandish things that indicated his innocence. Defendants imply he was some sort of hardened criminal. *Compare* SOF ¶¶36, 45, 51-52, *with* Dkt. 142 at 17, and Dkt. 173 at 15-16.

- Simmers invoked his right to silence. Defendants contend that he wanted to speak to them. *Compare* SOF ¶¶30-31, *with* Dkt. 142 at 12.

- Simmers invoked his right to counsel. Defendants contend this never happened. *Compare* SOF ¶¶33-35, *with* Dkt. 137 at 18, and Dkt. 142 at 12.

These disputes of fact are material and preclude summary judgment.

Defendants' remaining arguments only confirm that summary judgment cannot be granted and that their motions are based on flawed premises. For example, the Bothell Defendants claim

Simmers wanted them to believe he had committed the crime, but Defendants ignore the cited testimony was only *after* Simmers will was overborne and that Simmers' efforts—like claiming he had killed 13 people, that he is a "master of drawing blades" and the list goes on—were obvious signs of his innocence, not guilt.

Throughout their brief—in which they make credibility determinations about the passage of time and ignore Simmers' innocence (*i.e.*, that he did not know the details of the crime)—Bothell Defendants fault Simmers for the fact that he could not attest to the exact manner in which they fed him details of the murder. Dkt. 142 at 2. But, Simmers did provide testimony about this topic including that Defendants provided the details of the crime to him when he said things that were wrong (because he was making things up and guessing). SOF ¶¶44-45. These issues are for a jury to weigh at trial.

The argument is also based on a flawed premise: that Plaintiff must prove her case with direct evidence alone. That is not true. A party may prove her case with "both direct and circumstantial evidence." *Coghlan*, 413 F.3d at 1095. Indeed, circumstantial evidence is often more probative than other forms of evidence *Cf. United States v. Gardner*, 475 F.2d 1273, 1277 (9th Cir. 1973) ("Circumstantial evidence is not less probative than direct evidence, and, in some instances, is even more reliable."); *United States v. Nelson*, 419 F.2d 1237, 1240 (9th Cir. 1969) ("But since under some conditions circumstantial evidence may be equally or more reliable than direct evidence, it would be wholly irrational to impose an absolute bar upon the use of circumstantial evidence to prove any fact, including a fact from which another fact is to be inferred."). And, as with the law of conspiracy, circumstantial evidence may be the only form of proof available because people being accused of misconduct rarely admit their own wrongdoing. *See Costanich*, 627 F.3d at 1113. ("It is true that, despite Costanich's claims to the contrary, Duron never admitted to falsifying the record. An admission by a defendant, however, is not required to survive summary judgment. Resolution of disputed material facts is the special province of the factfinder."); *Mellen*, 900 F.3d at 1101 (pointing to circumstantial evidence of intent as basis for denying summary judgment in wrongful conviction case on due process claim); *Mendocino Envtl. Ctr.,* 192 F.3d at 1302 ("Direct evidence of improper motive or an agreement

among the parties to violate a plaintiff's constitutional rights will only rarely be available. Instead, it will almost always be necessary to infer such agreements from circumstantial evidence or the existence of joint action.").

Here, a reasonable jury could easily conclude: (1) the police had the non-public facts about the crime (which they admit), (2) Simmers is innocent (as he testified he was), (3) Simmers did not know about the murder before being arrested and interrogated (as he testified), (4) the false confession includes non-public details about the crime, and (5) though Simmers did not recall, decades later, all of the exact details of the interrogation or exactly how the Defendants supplied him with non-public facts, the non-public facts that match the crime came are included in the false confession came from the police and not the innocent child being interrogated throughout the course of a day.

Indeed, in many ways, the disputes about the interrogation process effectively boil down to a binary related to Simmers' innocence and ignorance of the crime. Either the non-public details came from Simmers (because he is guilty) or the non-public details came from the police who had those details (because Simmers is innocent). *See, e.g., Black*, 2023 WL 6520079, *2. At summary judgment, the Court—and Defendants—must accept what flows from the latter scenario and leave it for trial to test the first.

Finally, the Bothell Defendants double-down on trying to construe the facts against Simmers by including a section of purported "admissions" in their brief. Dkt. 142 at 8-12. Nearly every sentence in this section involves gross departures from the summary judgment standards. Defendants make inferences against Simmers; cherry-picking bits and pieces of his testimony to twist them into "admissions"; they ignore Simmers' contrary testimony explaining or contextualizing the parts they have cherry-picked; and they also misrepresent what Simmers had actually said. The Court must disregard and ignore these efforts and rely on the facts presented above.

**VIII.    Filing a WCPA Claim Did Not Itself Waive Simmers' § 1983 Claims**

Defendants argue that Simmers' § 1983 claims were waived by the mere filing of a claim for compensation under Washington's Wrongly Convicted Person's Act (WCPA). *See* RCW 4.100, *et seq.* The argument is meritless and warrants little attention.

The provision at issue, RCW 4.100.080, requires a release of all claims—via an executed legal release prior to payment—upon payment in a state court action. *See* RCW 4.100.080 ("The claimant must execute a legal release prior to the payment of any compensation under this chapter."). That is the moment when any potential waiver occurs; not at the mere filing of an action or pursuant of the two actions concurrently.

This interpretation comports with the plain reading of RCW 4.100.080, which is where interpretation begins, *United States v. Anderson*, 46 F.4th 1000, 1005 (9th Cir. 2022), both because it has an execution-of-a-release requirement but also because it contemplates reimbursement if that release is held invalid. *Id.* This reading also comports with the structure of the WCPA, which moves from the beginning of the pleadings phase (.040) to the adjudication phase (.060), and then the exclusive remedy provision (.080)—a section that is operative only when a claimant prevails. *See id.* (requiring interpretation of a statute to include the "specific provision at issue, but also the structure of the statute as a whole, including its object and policy"). In addition, this interpretation comports with the policy behind the statute by seeking to provide a remedy, but only allowing WCPA payment to be made to claimants who had actually *obtained* some other remedy. *See* RCW 4.100.010, .080.

Plaintiff's interpretation, unlike Defendants' proposed view, also comports with all of the law interpreting the WCPA. Section .080 has been interpreted by one federal court and in the published decisions of two state courts. All three rejected the argument the KCDs make here and recognize that a claimant can concurrently pursue both remedies. First, the Eastern District of Washington, in *Statler v. Spokane Cnty.*, 2016 WL 5219594, at *3 (E.D. Wash. Sept. 20, 2016), first rejected the argument that "whether or not Plaintiffs collect any money under the WCPA, once they file a WCPA suit, all other suits or claims are barred" *Id.* The Court held: "Plaintiffs are free to pursue a claim under 42 U.S.C. § 1983 until they execute a legal release to all other claims. Plaintiffs must execute a legal release of all their other claims, including § 1983 claims, prior to the payment of compensation under the WCPA. Reading the entire statute in context, this is the time at which Plaintiffs will waive (legally release) their other remedies." *Id.*

Then, in *Larson v. State*, Division III of the Washington Court of Appeals agreed with "the federal court that notwithstanding the requirement that a WCPA claimant 'waives any and all other remedies, causes of action, and other forms of relief or compensation" against the State and state actors, the WCPA allows for concurrent actions as long as the claimant does not both recover relief from the State or state actors *and* receive and retain compensation under the WCPA." 9 Wash. App. 2d 730, 738-39 (2019). In addition, bolstering the plain language and structural arguments above, the *Larson* Court pointed to the fact the WCPA requires "claimant must execute a legal release" before obtaining payment. *Id.* Such a release would be which "would be unnecessary if the waiver was binding at the inception of a request for relief under the WCPA." In addition, the notion that merely filing a concurrent action cannot be squared with the WCPA because .080 recognizes that "even a claimant who has requested relief and signed a legal release might recover a tort award if the release were held invalid." *Id.*

Third, *Allen v. State* confirmed that "a person may maintain a WCPA claim and a non-WCPA claim at the same time" but if they obtain *"relief"* under the WCPA, then they forgo all other available remedies, such as a settlement agreement with another entity that wrongfully prosecuted them or a lawsuit under 42 U.S.C. § 1983." 19 Wash. App. 2d 895, 911 (2021).

The rule from these cases is that a claimant may pursue concurrent actions but may not obtain a recovery in a WCPA action if *payment* has been made by another source. Merely filing both claims does not constitute a waiver, and such an interpretation of the WCPA—which could leave an innocent person with *no* remedy if they do not prevail in a WCPA case—has been roundly rejected and would be unconstitutional.[19] The argument fails.

---

[19] This would be an unconstitutional condition under *Perry v. Sindermann*, 408 U.S. 593, 597 (1972), and *United States v. Scott*, 450 F.3d 863, 866-67 (9th Cir. 2006). In addition, Defendants' argument raises other constitutional concerns under *Town of Newton v. Rumery*, 480 U.S. 386 (1987), and *Lynch v. City of Alhambra*, 880 F.2d 1122, 1127-28 (9th Cir. 1989). Constitutional avoidance is another reason to reject Defendants' argument. *United States v. Hansen,* 599 U.S. 762, 781 (2023).

### IX.    Qualified Immunity Is Unavailable

The County Defendants mention their belief they should be entitled to qualified immunity, Dkt. 137 at 29. Aside from boilerplate language about the existence of qualified immunity, Defendants offer but one sentence by way of "argument," simply denying any wrongdoing. *Id.* at 30:4-6. The Bothell Defendants offer even less on behalf of Hopkins. Dkt. 142 at 29. These threadbare references are too cursory to constitute an argument or warrant a response and have, therefore, been waived. *See Christian Legal Soc'y Chapter of Univ. of Cal. v. Wu*, 626 F.3d 483, 487 (9th Cir. 2010) (refusing to consider summarily raised issue that had no supporting argument); *Maldonado v. Morales*, 556 F.3d 1037, 1048 n.4 (9th Cir. 2009) ("Arguments made in passing and inadequately briefed are waived.").

The County Defendants do not identify which claims, or on what basis, they believe they are entitled to qualified immunity. Hopkins does not do so either, though he does claim he was permitted to lie to Simmers during the interrogation (a contention that misunderstands how the totality of the circumstances works, as set forth above). These lapses are fatal and Defendants may not attempt to cure them for the first time in reply. *See Personalize Inc. v. Magnetize Consultants Ltd.,* 2020 WL 2512906, at *1 (W.D. Wash. May 15, 2020) ("[C]ourts will not consider new arguments raised for the first time in a reply brief.") (internal quotes and citations omitted).

But, even assuming *arguendo* the issue had not been waived, Hopkins, Rusk, McSwain, Schlagel, and Miner are not entitled to qualified immunity. As a general matter, in reviewing a request for qualified immunity at summary judgment, this Court asks whether the record—properly construed in plaintiff's favor—illustrates that (1) a constitutional violation, and (2) that the right in question was "clearly established" at the time of the conduct. *Tolan*, 572 U.S. at 655-56. As to the later, the core issue is notice; *i.e.,* the "'salient question … is whether the state of the law' at the time of an incident provided 'fair warning' to the defendants 'that their alleged [conduct] was unconstitutional.'" *Id.* at 656 (quoting *Hope v. Pelzer,* 536 U.S. 730 (2002)); *see also Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam) ("[T]he focus" of qualified immunity "is on whether the officer had fair notice that her conduct was unlawful.").

As the myriad cases cited above (and incorporated by reference here) show, each of the constitutional rights at issue here was clearly established in 1995 and Defendants had beyond fair notice of their existence, and of the potential constitutional violations here, for what they did.

The Fifth Amendment prohibited officers from ignoring an invocation of silence or counsel and pestering a suspect until they agree to speak, *Malloy*, 378 U.S. at 7-8; *Collazo*, 940 F.2d at 417; *Tingle*, 658 F.2d at 1335; *Jones*, 829 F.3d at 1132; *Cooper*, 963 F.2d at 1240-41. For decades before 1995, the law required officers to take special care to ensure that juvenile confessions were not false or the product of "adolescent fantasy," *Gault*, 387 U.S. at 47; *see Gallegos*, 370 U.S. at 54; *Haley*, 332 U.S. 596. It is well established the totality of the circumstances must be evaluated, *Schneckloth*, 412 U.S. at 226, and that when those circumstances overbear someone's will, including by suggestion and scripting, the constitution will be violated. *Blackburn*, 361 U.S. at 206; *Bram v. United States*, 168 U.S. 532, 542-43 (1897); *Spano*, 360 U.S. at 323; *Fikes,* 352 U.S. at 195.

The Constitution obviously prohibits the fabrication of evidence, *Devereaux*, 263 F.3d at 1074-75, and the Ninth Circuit has repeatedly reiterated the idea this right is clearly established in cases decades before the prosecution of Simmers in 1995. *See, e.g., Richards*, 39 F.4th at 569-71 (1993 fabrication of evidence); *Caldwell*, 889 F.3d at 1112, 1114-15 (1990 attribution of fabricated statement to plaintiff in notes).

Likewise, the Ninth Circuit has recognized that the law in 1984, and as far back as 1978, clearly established that police officers were bound to disclose material exculpatory information. *Carillo*, 798 F.2d at 1219-25 (citing *United States v. Butler*, 567 F.2d 885 (9th Cir. 1978)); *see also Giglio*, 405 U.S. at 154 (decided in 1972). In short, the argument—though to cursory to warrant response and forfeited—must fail.[20]

---

[20] Qualified immunity also cannot be lawfully applied because the text of the statute forecloses its application. For one, the U.S. Code version of the statute provides that a person who, under color of law, violates causes a rights violation "*shall be liable*" to the party injured, 42 U.S.C. § 1983, foreclosing a massive exception if one were to find the law were not sufficiently "clearly established." In addition, the actual text passed by Congress further eliminates the availability of an exception like immunity because it provides that a rights violator "shall **any such law, statute, ordinance, regulation, custom, or usage of the State to the contrary notwithstanding,** be liable to the party injured." Civil Rights Act of 1871, ch. 22, § 1, 17 Stat. 13 (1871) (emphasis added); *see* Alexander A. Reinert, *Qualified Immunity's Flawed Foundation*, 111 Cal. L. Rev. 201 (2023).

**CONCLUSION**

Defendants' motions for summary judgment as to Plaintiff's Fifth Amendment, Due Process, Conspiracy, Failure to Intervene, and *Monell* Claims should be respectfully denied.

Respectfully submitted,

/s/ David B. Owens
*One of Plaintiff's attorneys*

David B. Owens
LOEVY & LOEVY
Civil Rights and Justice Clinic
University of Washington Law School
William H. Gates Hall, Suite 265
P.O. Box 85110, Seattle, WA 98145-1110
(312) 243-5900

As a result, "modern immunity jurisprudence is not just atextual but *counter*textual." *Rogers v. Jarrett*, 63 F.4th 971, 980 (5th Cir. 2023) (Willett, J., concurring).

56