The Honorable Barbara J. Rothstein

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ESTATE OF IAN SIMMERS, by and through administrator, Donna Berube,

　　　　　　Plaintiff,

　　v.

KING COUNTY, *et al*.

　　　　　　Defendants.

Civil Action No. 2:21-cv-100-BJR

**ORDER GRANTING SUMMARY JUDGMENT TO ALL DEFENDANTS**

## TABLE OF CONTENTS

I. INTRODUCTION ..................................................................................................1

II. FACTUAL BACKGROUND ................................................................................2

　A. The Parties to this Lawsuit ..........................................................................2

　B. Gochanour's Murder ....................................................................................2

　C. Ian Simmers...................................................................................................3

　D. The Arrest......................................................................................................4

　E. Simmers' Interrogation .............................................................................10

　F. Simmers' Motivation for Confessing to Gochanour's Murder ..............13

　G. The Suppression Hearing ...........................................................................14

　H. The Criminal Trial .....................................................................................16

　I. Post-Trial Proceedings ...............................................................................17

　J. Sentence Vacated in 2019 ...........................................................................18

　K. Instant Lawsuit............................................................................................20

III. STANDARD OF REVIEW ................................................................................20

IV.    DISCUSSION ......................................................................................22

         A.    Whether Simmers' Confession Was Voluntary.............................22

                1.    Legal standard ......................................................22

                2.    Analysis ...............................................................24

                            a.    Simmers' age ...........................................25

                            b.    mental health vulnerabilities.......................26

                            c.    absence of parent .....................................28

                            d.    length of detention and interrogation...................28

                            e.    interrogation tactics.................................29

                            f.    Simmers' alleged innocence..........................30

                            g.    Simmers' alleged invocation of right to silence and
                                  counsel......................................................32

         B.    Whether Defendants Violated Simmers' Fourteenth Amendment Rights
               by Fabricating Evidence................................................34

                1.    Legal standard ......................................................34

                2.    Analysis ...............................................................35

                            a.    Hopkins' and Rusk's interrogation reports .........................36

                            b.    Hopkins', Rusk's, Miner's, and Schlaegel's
                                  investigation reports claiming that Simmers stated that
                                  he "had not killed a bum".................................37

                            c.    McSwain's investigation notes regarding Wyatt.................38

                            d.    Hopkin's report concerning Olsen.........................39

         C.    Whether Defendants Violated Simmer's Fourteenth Amendment Rights
               by Failing to Disclose Exculpatory Evidence................................40

                1.    Legal standard ......................................................40

                2.    Analysis ...............................................................41

         D.    Whether Defendants Conspired to Harm Simmers......................41

                1.    Legal standard ......................................................41

                2.    Analysis ...............................................................42

         E.    Whether Defendants Failed to Intervene to Protect Simmers'
               Constitutional Rights..................................................42

                1.    Legal standard ......................................................42

                2.    Analysis ...............................................................43

F.     Plaintiff's *Monell* Claim ........................................................... 43

     1.     Legal standard ................................................................ 43

     2.     Analysis ......................................................................... 43

**V.     CONCLUSION ...........................................................................44**

## I.   INTRODUCTION

This lawsuit arises from the 1995 investigation of Ian Simmers for the murder of Rodney Gochanour. Simmers, who confessed to the murder, was 16 years old at the time, tried as an adult in Washington State court, convicted of first-degree murder, and sentenced to 46 years in prison. In 2017, Simmers requested that the King County Prosecutor's Office investigate his claim that he had been wrongfully convicted based on his false confession. After reexamining Simmers' case, the prosecutor's office determined that Simmers was neither innocent nor wrongfully convicted; however, it also concluded that a recently filed defense motion for a new trial would likely be granted and a new trial would not be in the interest of justice given the difficulty of retrying a decades old case, the fact that Simmers was a juvenile at the time of his conviction, and that he had already spent over two decades in prison. Thus, in 2019, the prosecutor's office moved the state court to vacate Simmers' murder conviction. A week later, the motion was granted, and Simmers was released from prison.

In January 2021, Simmers instituted this 42 U.S.C. § 1983 civil rights lawsuit against King County, the City of Bothell, and multiple King County Sheriff's Department and City of Bothell Police Department employees who were involved in Simmers' investigation. The complaint alleges thirteen causes of action for violation of Simmers' Fourth, Fifth, Sixth, and Fourteenth Amendment rights. It also asserts state law claims for outrage, civil conspiracy, malicious prosecution, and negligence. Defendants moved to dismiss the lawsuit, and, on August 22, 2023, this Court entered an order dismissing with prejudice Simmers' state law claims for civil outrage and negligence but declined to dismiss all other claims. Dkt. No. 94.

Currently before the Court are Defendants' motions for summary judgment on the remaining claims. Dkt. Nos. 137 and 142. Having reviewed the motions, Plaintiff's omnibus opposition to the motions, the replies and sur-reply thereto, the motions to strike, the record of the

case, and the relevant legal authority, the Court will grant the motions. The reasoning for the Court's decision follows.

## II.     FACTUAL BACKGROUND

### A.     The Parties to this Lawsuit

As stated above, Ian Simmers filed this lawsuit in January 2021. Tragically, he died in a traffic accident in July 2023. Simmers' estate, administered by his mother, Donna Berube, was substituted as Plaintiff in September 2023. Dkt. No. 124. Defendants to this lawsuit are King County and the City of Bothell, as well as Mark Ericks, Edward J. Hopkins, David Schlaegel, and Rebecca Miner who were officers with the Bothell Police Department at the time relevant to this lawsuit (collectively, the "Bothell PD Officers"), and John McSwain who was an officer with the King County Police Department (now called the King County Sheriff's Department) during the relevant timeframe.[1]

### B.     Gochanour's Murder

On March 11, 1995, two joggers on the Burke-Gilman Trail discovered Gochanour's body in the vegetation between the trail and the Sammamish River. He had been slashed across the face, stabbed six times in the back, and was lying in a "large degree of blood." Dkt. No. 153, Ex. 4 at 4. Gochanour was shoeless and jacket-less and these items were later discovered by the police in the river near where his body was located. The murder weapon, a partially serrated knife with a flexible, 10 to 12-inch blade and a double-pointed tip and a black handle, was also recovered near the scene. When recovered, the blade of the knife was bent. The medical examiner determined

---

[1] Plaintiff also named Bothell Police Department officers Clement Rusk and Jackson Beard as defendants, but Rusk and Beard are deceased, and this Court declined Plaintiff's motion to substitute their estates. Dkt. No. 47.

that Gochanour died sometime in the early morning hours of March 11 and the autopsy report shows that he had multiple defense wounds on his hands and arms.

The Bothell Police Department began investigating the crime, with Bothell Detective Ed Hopkins as the lead detective. The Bothell PD Officers pursued several leads including the fact that Gochanour was an alleged drug dealer who owed at least one individual "a large amount of money." Dkt. No. 176, Ex. 4 at 6. The police also learned that Gochanour had spent the evening before his death with a woman whose ex-boyfriend was allegedly known to be jealous and violent, and the ex-boyfriend had seen the two of them together that evening. The police also questioned an individual who was seen at the crime scene acting strangely.

**C.  Ian Simmers**

In March 1995, Simmers was 16 years old and living in Carnation, Washington with his mother, stepfather (David Berube), and occasionally with his stepbrother (Bryan Berube). Simmers would frequently hang out in the Bothell and Kenmore area, biking or walking the Burke-Gilman Trail to get there from his home. Even though he had an above-average IQ and read above grade-level, he had a difficult time getting along in school, describing himself as "antisocial" and "standoffish[]". Dkt. No. 146, Ex. 6 at 5. He was diagnosed with Attention Deficient Hyperactivity Disorder ("ADHD") and frequently abused alcohol, drugs, and inhalants. He was sent to at least one residential treatment program but was kicked out before completing the program. He claimed to be part of a gang called the Northwest Mobsters and wanted to be affiliated with the Southern California street gang, the Crips, wearing Crip colors and flashing its gang signs; however, there is no evidence that Simmers was part of a gang nor that one called Northwest Mobsters existed. Friends and family members described Simmers as having a propensity to grossly exaggerate and brag about his criminal exploits.

Simmers was detained and arrested by law enforcement on numerous occasions during this timeframe and was in and out of juvenile detention multiple times. He would frequently leave home for days at a time. His mother was "in the habit of notifying [his] probation officer" whenever Simmers failed to return home, and he would then be arrested. Dkt. No. 194 at 122:9-13.

### D.   The Arrest

On Friday, March 10, 1995, Simmers completed another stay at the King County Juvenile Detention Center and his mother picked him up and drove him to meet friends in Redmond. When she returned home around 10:00pm that evening, Simmers was there watching *The Lion King* with his stepfather and stepbrother. His mom, stepfather, and stepbrother all claim that Simmers did not leave the house all night (Simmers shared a bedroom with his stepbrother that night) and that the family dogs would have notified them if he had. The following afternoon or early evening on Saturday, March 11, Simmers met his friend, 14-year-old Jonathon Wyatt, at Wyatt's apartment complex. From there, Simmers and Wyatt "took off down the Burke-Gilman Trail" (Dkt. No. 176, Ex. 3 at 7) and went on what Simmers described as "a road trip of crime to [his] usual hangout in [the] Bothell-Kenmore area." Dkt. No. 146, Ex. 6 at 25. This included breaking into vehicles and boats, stealing alcohol and flare guns, shooting the flare guns, setting small fires in a public restroom and on a boat, and other property crimes. He and Wyatt continued this for four days, sometimes separating for a while, but eventually coming back together. They did not return to their respective houses during this time.

On March 15, at approximately 11:45 am, King County Officers Michael Janasz and Orville Fuller were dispatched to respond to a report of two juveniles firing flare guns near an apartment complex in Kenmore. The officers responded to the scene, found Simmers and Wyatt, patted them down, and discovered that each had a flare gun. Janasz suspected that they had stolen

the flare guns from the boats moored at a nearby marina, so he placed Simmers and Wyatt under arrest and advised them of their *Miranda* rights. When he called their names into the Department, he discovered that both teens were listed as runaways.

Simmers and Wyatt were taken to the King County Police Department's North Precinct in Kenmore where they were placed in separate holding cells. Before placing them in the holding cells, Janasz collected a pair of gloves that Simmers had with him and, per protocol, he and Wyatt were required to place their shoes outside the cells. Janasz then readvised Simmers of his *Miranda* rights and Simmers initialed and signed an explanation-of-rights form but declined to sign the portion of the form waiving his constitutional rights. Dkt. No. 144, Ex. A. Janasz asked Simmers if he wanted to provide a statement at that time and Simmers declined. The officer then contacted Simmers' mother to let her know that Simmers was in custody, and she informed Janasz that her son had an outstanding warrant. Janasz then called the juvenile detention center, which verified that there were outstanding warrants for both Simmers and Wyatt.

Based on the teens' shoes and footprints discovered at a couple of arsons in Woodinville that were started with flare guns a few days earlier, the officers began to suspect that Simmers and Wyatt were connected to the arsons. King County Detective Amy Jarboe readvised Simmers of his *Miranda* rights and he waived them in writing. Dkt. No. 30 at 137:16-24. However, Simmers was angry at Jarboe for another, unrelated interaction they had previously at the juvenile detention center and Simmers cursed at her and said he did not want to speak with her, so she stopped the interview.

Shortly thereafter at approximately 1:45 pm, Simmers agreed to talk to King County Sergeant Rusk. Rusk first readvised Simmers of his *Miranda* rights, which Simmers again waived in writing. *Id*. at 69:19-71:3. The interview took place on and off over the next couple of hours,

during which Simmers had several breaks and time alone in his holding cell. During the

interview, Simmers admitted that, starting on Saturday, March 11, he and Wyatt had stolen flare

guns and alcohol from boats, prowled vehicles, and set fire to a public restroom and a boat.

Wyatt, who was also advised of and waived his *Miranda* rights, was interviewed in a

separate room where he also admitted to their involvement in the property crimes. Dkt. No. 145,

Exs. A & B.[2] Both teens agreed to go to the marina with the officers and point out which boats

_____

[2] Plaintiff asserts that the officers should not have spoken to Wyatt at this time because Wyatt "was obviously vulnerable, emotional" and "had [] invoked his right to counsel and his counsel even told the officers he would not be making a statement." Dkt. No. 182 p.8-9 at ¶ 24. This allegation is not supported by the record evidence. Plaintiff cites to Wyatt's March 15, 1995 written statement (that is accompanied by a signed acknowledgment of rights and a signed waiver of constitutional rights) in support of her allegation. However, the written statement confirms that Wyatt voluntarily chose to make the statement. *See* Dkt. No. 145, Ex. 2 at 1 ("On March 15th 1995 at about 2:10 pm I spoke with my attorney on a phone in the police station. My attorney told me not to give a statement but I want to anyway. Nobody made me give this statement. I am giving it freely and voluntarily understanding my rights."). In addition, Plaintiff's claim that Wyatt's attorney told the officers at this time that Wyatt would not be making a statement is not accurate. That did not occur until much later in the evening.

 Officer McSwain, who interviewed Wyatt, testified as follows on this issue:

He encountered Wyatt in the precinct and Wyatt was clearly upset. McSwain confirmed with Wyatt that he had been advised of his *Miranda* rights and showed him the explanation-of-rights forms that Wyatt had previously signed. *See* Dkt. No. 145 at ¶ 15, Ex. A. McSwain alleges that Wyatt acknowledged that he had signed the form and understood his rights. McSwain claims that he then asked Wyatt if he wanted to talk, Wyatt said he did, and then proceeded to describe his and Simmers' involvement in the property crimes as set forth in his written statement. *See Id.* at Ex. 2. When McSwain asked Wyatt if he would be willing to memorialize what he said in a statement, he responded that he would but that he wanted to speak to his attorney first. *Id.*at ¶ 22. McSwain then claims that the following happened:

"At approximately 2:05 p.m., I called the Society of Counsel Representing Accused Persons … and spoke to Ms. Bennett-Bertrand. I explained that Mr. Wyatt was in custody and wanted to speak to her. I handed the phone to Mr. Wyatt in the fingerprint station and left him there to speak privately with his attorney. I could observe Mr. Wyatt through a window but could not hear any part of his conversation. At about 2:09 p.m., Mr. Wyatt motioned that he was finished with the call, so I returned him to the interview room. I asked Mr. Wyatt what his attorney told him to

they prowled. Officers Pat Raftis and Rusk first drove Simmers to the marina. While driving to

the marina, Rusk asked Simmers if he knew anything about someone getting stabbed on the

Burke-Gilman Trail and Simmers replied, "I didn't stab no old bum." Dkt. No. 146, Ex. 1, 86:7.

When Rusk asked Simmers why he thought the victim was a "bum", Simmers claimed that Rusk

had told him that the victim was a bum. *Id.* at 86:7-18. Rusk claims that he did not describe the

victim as a "bum" and the fact that Simmers did of his own accord raised Rusk's suspicions.[3]

They arrived at the marina at approximately 3:25 pm and Simmers pointed to over thirty

boats from which he and/or Wyatt had stolen alcohol, tools, flare guns, and other property. While

do. He said she instructed him not to give a statement. I assumed Mr. Wyatt would
follow his attorney's advice, so I stood up to return him to the holding cell. Mr.
Wyatt told me that he still wanted to give a statement. I asked him why when his
attorney had instructed him not to. Mr. Wyatt said he wanted to because he felt it
was important. He said that he had already told me everything and did not think it
was a big deal to write it down. To be clear, after Mr. Wyatt spoke to his attorney, I
did not ask for a statement. Instead, he told me that he wanted to give a statement
even without his attorney present. He appeared to understand his constitutional
rights, given that he previously waived his rights and then subsequently invoked his
right to counsel. Nor do I recall being concerned that Mr. Wyatt was intoxicated or
sleep deprived. Had I suspected that, I would have documented it in my report, and
there's no mention of any such thing. Although it was rare, Mr. Wyatt was not the
only suspect I have interviewed who invoked his right to counsel and then declined
to follow his attorney's advice. Out of an abundance of caution, I readvised Mr.
Wyatt of his constitutional rights, which he said he understood and waived. Mr.
Wyatt again described his activities with Mr. Simmers, and I wrote down what he
said. I tried to recite his exact wording in the statement. I also noted the fact that Mr.
Wyatt was giving a statement against his attorney's advice. When he was finished
describing what happened, Mr. Wyatt reviewed the statement. I asked him to initial
the beginning and end of each page, as well as any corrections, to show that I didn't
alter the statement after he signed it. Mr. Wyatt complied and signed the statement.
This process took about ten minutes."

Dkt. No. 145, ¶¶ 22-27.

[3] Plaintiff alleges that "Rusk admits" that Simmers learned that the victim was a "bum" from
Rusk. *See* Dkt. No. 182, p. 11 at ¶ 23. The citations in support of this allegation say no such thing;
indeed, they say the opposite, that Rusk claims he did not tell Simmers that the victim was a
"bum".

at the marina, Simmers allegedly bragged that he sold marijuana and up to "100 hits of acid a week" to kids in Kenmore and Woodinville. Dkt. No. 153, Ex. 10 at 3. He also allegedly claimed to get high on acid for 32 hours at a time and that the "more fried his brain gets on drugs, the better it is." *Id*. at 3-4. Raftis wrote in his investigative notes that Simmers "seemed to be bragging" the whole time, "seemed very proud of his lifestyle", was proud of "being a gang member", and that "he showed no remorse what-so-ever." *Id*. at 4. The officers and Simmers spent approximately 45 minutes at the marina and then they returned to the precinct and put Simmers back in the holding cell.

Rusk and McSwain then drove Wyatt to the marina and during the drive Rusk asked Wyatt if he knew anything about the stabbing on the Burke-Gilman Trail. McSwain alleges that Wyatt immediately began crying and stated that Simmers had a knife with a black handle and a shiny blade. Wyatt allegedly stated that Simmers had stolen it from Wyatt's apartment complex but that Simmers no longer had the knife when they arrived at Kenmore. According to McSwain, Wyatt was upset, crying, visibly shaking, and stated that he was afraid of Simmers. McSwain claimed that "[a]t this point, I considered Mr. Wyatt to be a witness to the homicide, not a suspect. I thought his emotional state, as well as his desire to process what he'd seen, was probably explained by witnessing something horrible that Mr. Simmers had done. I tried to confirm that Mr. Wyatt had seen Mr. Simmers stab someone, and he replied that he wanted an attorney present during his answer so he would 'say it right.'" Dkt. No. 145 at ¶ 46. McSwain claims that he then "told Mr. Wyatt that [he] did not want to let Mr. Simmers go if he stabbed someone and asked if [he] should let Mr. Simmers go. Mr. Wyatt looked [him] in the eye and said 'no.'" *Id*.

The officers and Wyatt returned to the precinct at approximately 5:25 pm and Wyatt was placed in an unsecure room at the other end of the precinct from Simmers. McSwain attempted unsuccessfully to reach Wyatt's attorney and left a voicemail message. Just before 6:00 pm, Wyatt asked to speak with his mom, so McSwain called her and let Wyatt speak privately with her. Wyatt's attorney arrived at the precinct at approximately 7:45 pm and spoke privately with Wyatt. After about 10 minutes, she came out and informed McSwain that she did not want Wyatt to make a statement. McSwain claims that he did not attempt to speak to Wyatt about the murder again after that. At 8:45 pm, Wyatt asked to call his mom again, which he was allowed to do. After he hung up, McSwain alleges that Wyatt started crying and said he was having a difficult time dealing with what he saw on the trail. Wyatt then called his dad at approximately 9:15 pm and requested that he come to the precinct. Wyatt's dad arrived at approximately 10:15 pm and talked to Wyatt privately for about 25 minutes. At 10:52 pm they called Wyatt's mom and at about 11:15 pm Wyatt's dad left the precinct.

At approximately 12:16 am on March 16, the Bothell Police Department served a search warrant on Wyatt for his clothing. He was then fingerprinted, photographed, and driven to the juvenile detention center, where they arrived at approximately 12:53 am. The next day, Wyatt informed McSwain that he did not want to give a statement and McSwain claims that he did not hear from Wyatt again until after Simmers' trial when he received a letter from Wyatt in which Wyatt thanked McSwain for "holding [him] responsible" and invited McSwain to the juvenile detention center to visit him. Dkt. No. 145, Ex. C.

Wyatt never provided a statement about Gochanour's murder, and he did not testify at Simmers' criminal trial, asserting his Fifth Amendment rights. Wyatt was not charged in

connection with the murder but did plead guilty to the vehicle prowls and other property crimes and spent three years in juvenile detention as a result.

In 2017, Wyatt was interviewed by Robert Thompson from the King County Prosecutor's Office as part of its investigation into Simmers' claim that he had been wrongfully convicted. Wyatt stated the following during the interview:

- He never witnessed Simmers do anything violent during the time that they were together over March 11-15, 1995, but he also admits that they separated multiples throughout that time period, including on the first evening that they were together;

- It is possible that he "erase[d] [witnessing the murder] from [his] memory … because [he] wouldn't want to remember;

- Simmers told the police that he had stabbed Gochanour. Wyatt claims that Simmers spontaneously and voluntarily made this confession when they were being driven from the marina to the police precinct;

- Wyatt "freaked out" when Simmers confessed to the murder;

- When Simmers' claimed to have murdered Gochanour, it "kind of made sense" to Wyatt because Gochanour had been stabbed and Simmers had stolen "some sort of kitchen knife" from the cabana in Wyatt's apartment complex before they took off down the Burke-Gilman Trail to Kenmore;

- The police involved in the investigation were all "pieces of shit", abusive, and "super horrible". Wyatt claimed that they delayed giving him access to his parents and a lawyer; and

- When the interviewer suggested that the officers confronted Simmers about the murder because Wyatt had told them that he was afraid of Simmers and that he knew that Simmers had hurt someone on the Burke-Gilman Trail, Wyatt objected that he had ever said that and claimed that the officers confronted Simmers because Simmers confessed to the murder when he was in the police car.

Dkt. No. 187, Ex. 1 at 5, 10-11, 13, 21-22, 26-28.

### E.    Simmers' Interrogation

After the Rusk and McSwain returned from the marina with Wyatt and while they were waiting for Wyatt's attorney to come to the precinct to speak with him, the officers notified the

Bothell Police Department that they had two individuals in custody who might have information about Gochanour's murder. Bothell Officers Hopkins, Rebecca Miner, and David Schlaegel came to the precinct where they were informed about Wyatt's behavior and description of the knife that Simmers allegedly had. Based on Wyatt's description of the knife, Hopkins "strongly believed that Wyatt and/or Simmers were involved with the stabbing death of [] Gochanour." Dkt. No. 176, Ex. 8 at 2. Hopkins was informed that Wyatt wanted to make a statement but was waiting to speak with his attorney before doing so and that the attorney was on her way to the precinct. Hopkins and Rusk decided to wait until after they had Wyatt's statement before interviewing Simmers, but in the meantime, obtained a warrant for Simmers' and Wyatt's clothing. Hopkins, Rusk, Miner, and Schlaegel spent "the next several hours [] discuss[ing] interview strategies" for Simmers while they waited for Wyatt's attorney to arrive at the precinct. Dkt. No. 176, Ex. 11 at 5.

During this time, Simmers was alone in his holding cell. He was given a Happy Meal from McDonalds around dinnertime and provided a blanket when he complained that he was cold. Defendants claim that no one questioned Simmers about his alleged criminal activity during this time.[4] At approximately 9:45 pm after Wyatt's attorney came to the precinct and the officers learned that Wyatt would not be making a statement after all, Hopkins and Rusk decided to

_____

[4] In the meantime, Simmers' mother drove to the youth detention center where she had assumed that Simmers was being held. She was informed that Simmers was at the King County North Precinct, so she returned home and Simmers' stepfather called the precinct. Simmers' mother claims that Simmers' stepfather was told by the person who answered the phone that the sergeant in charge of Simmers' case was busy, but that the sergeant would return his call later. Simmers' mother alleges that this phone call and others she made to the precinct were not returned. She further alleges if she had known that Simmers was being interrogated about a homicide, she would have gone to the precinct and demanded to see her son. *See* Dkt. No. 176, Ex. 29 at ¶ 2.

interview Simmers. The officers claim that Simmers confirmed that he remembered his *Miranda* rights and agreed to speak with them.

Pursuant to standard procedures at the time, Hopkins and Rusk did not immediately start recording the interview, claiming that they first wanted to establish a rapport with Simmers and determine whether he had relevant information. Everyone agrees that Simmers initially denied any involvement with the murder, stating that he would not kill a "regular guy" and that he only kills "gangsters". Dkt. No. 176, Ex. 8 at 3. At one point, Simmers allegedly claimed to have "killed 13 people in the past" who were "all gangsters." *Id*.[5] However, the officers told Simmers that they had information that would link him to the murder. The officers claim that Simmers became upset after this and requested a cigarette to help calm his nerves. Rusk exited the room ostensibly to get Simmers a cigarette and Hopkins continued to interview Simmers. He told Simmers that Wyatt had already admitted his involvement in the murder and had shown the officers where the knife was thrown after the stabbing.[6] Hopkins claims that at this point he told Simmers that he did not believe that Simmers had acted alone and Simmers allegedly responded "Yea, I don't wanna go down for this alone." *Id*.

Rusk then returned to the room and stated that he had heard rumors that Gochanour had been accosting individuals on the trail and wondered if perhaps Gochanour had accosted Simmers and Simmers had stabbed him in self-defense.[7] Simmers responded "Yea, that's it, dude socked me up in my ribs" and then Simmers proceeded to describe the murder, including that he had slashed Gochanour across the face and then repeatedly stabbed him in the back. *Id*. Hopkins

---

[5] Defendants admit that Hopkins and Rusk did not believe that Simmers had killed 13 people.
[6] Defendants admit that this was false.
[7] Defendants admit that Rusk made up the claim that Gochanour had been accosting people on the trail.

claims that it is at this point that he decided to start recording the interview. Simmers was readvised of his *Miranda* rights, which he again waived in writing before giving the taped confession. The taped confession started at 10:40 pm and concluded at 11:03 pm. Dkt. No. 143, Ex. 4. At that point, Simmers had been in police custody for over eleven hours.

Defendants allege that Simmers' confession contained details only the perpetrator would have known, including that (1) Gochanour was first cut on the face and then stabbed six times in the back; (2) the blade of the knife was serrated; (3) the shape and color of the knife's handle; and (4) the knife blade became bent when the victim was stabbed in the shoulder. Plaintiff, on the other hand, argues that there were significant discrepancies in the confession, including (1) Simmers said the murder happened on Saturday, not Friday night; (2) Simmers described the knife blade as about 4-5 inches when the murder weapon had a 10-12 inch blade; (3) Simmers described, and drew a picture of, a knife with one point, not two; (4) Simmers could not remember anything about Gochanour's shoes; and (4) Simmers claimed that Gochanour did not bleed that much when stabbed when in fact the crime scene had a lot of blood in it.

After the taped confession concluded, Simmers was fingerprinted and photographed, his clothing collected pursuant to the warrant, and he was taken to King County Jail.

### F.    Simmers' Motivation for Confessing to Gochanour's Murder

Simmers acknowledges that the officers treated him kindly and professionally during his arrest, interrogation, and confession. Dkt. No. 194 at 200:1-9. He concedes that they did not raise their voices nor curse at him, and that they did not threaten him. He also admits that he was not afraid of the officers. *Id*. Rather, Simmers claims that his confession was an ill-conceived ploy to gain respect from the police and to cement his reputation in the neighborhood as a gangster. Simmers confirmed this during his 2018 interview with the King County Prosecutor's Office and again during his 2022 deposition that was taken as part of this case. He stated that he wanted the

police to believe his confession because he wanted to impress them and because he wanted to be tried for murder. *Id.* at 207:3-9 ("Yes, I was attempting to get them to believe that I had committed the murder."); Dkt. No. 178, Ex. 3 at 22:21-23 ("I think one of the things that made me work with the detectives as much as I did was that I wanted them to, I guess [r]espect me for, A, doing it; B, being so accommodating in working with them."). Simmers further clarified that he was "happ[y] that [he] was being recognized for the troublemaker that [he] was and the gangster that [he] wanted to be… In [his] mindset at the time, it was an opportunity for [him] to be able to increase [his] street cred and reputation by being able to go through a murder investigation, a trial, and then being able to walk away from it….it was going to come out that [he] didn't do it, but [he] would still end up going through the murder trial and investigation and that was a good thing." Dkt. No. 178, Ex. 3 at 16: 11-16, 17: 21-25, 22:12-15. When asked if he was worried about the possibility of being in jail leading up to the trial, he responded that he'd "been doing short stints of probation violations for at least a couple of years, so juvenile, to [him] [it] wasn't a big concern, and [he] … just assumed that jail was really no different." *Id.* at 23:6-13.

### G.    The Suppression Hearing

On March 20, 1995, Simmers was charged with murder in the first degree. Prior to the criminal trial, he challenged the validity of his confession pursuant to Washington Criminal Rule 3.5 and the criminal trial court held a three-day evidentiary hearing in which Simmers was represented by counsel. Simmers argued that his confession should be suppressed because "under the totality of the circumstances, [he] did not knowingly and intelligently waive his rights to remain silent and to have an attorney, and [he] did not freely and voluntarily make [the confession]." Dkt. No. 174, Ex. B at i. Specifically, Simmers argued that his confession should be suppressed because:

- The police did not contact Simmers' parents once he became a murder suspect;

14

- The police employed deception in overstating the evidence against Simmers and claiming that Wyatt had implicated him;

- The police fed Simmers and allowed him to sleep at his leisure, suggesting to Simmers that the situation was not adversarial in nature;

- The police should have known that Simmers was not telling the truth because he initially claimed to have killed 13 gangsters;

- Simmers had a propensity and reputation for exaggerating his criminal exploits;

- Simmers was particularly vulnerable to the deceptive police tactics because he was a juvenile;

- Simmers was tired and slurring his words during the taped confession;

- Simmers' drawing of the knife during the confession did not look like the knife used to kill Gochanour;

- Simmers had claimed that Gochanour was killed on Saturday, March 11, not Friday, March 10; and

- Simmers had been diagnosed with ADHD.

*Id*. at 7-8; Dkt. No. 174, Ex. A at 10:23-5, 43:13-44:2, 48:14-52:22, 61:13-63:3, 64:4-22, 68:18-69:11, 80:20-83:12, 105:3-109:1, 121:23-128:19, 133:12-138:16.

The trial court heard testimony from Officers Fuller, Rusk, Raftis, Jarboe, and Hopkins. The court also heard testimony from Simmers' mother, stepfather, and stepbrother, Bob Setzer (Simmers' youth pastor), and Steven Carrier (family friend). The court considered the totality of the circumstances, including Simmers' age, experience, education, background, intelligence, ADHD diagnoses, capacity to understand the warnings given to him, and found that: (1) although Simmers was in custody for a long period of time, he was not subject to lengthy sessions of on-going interrogation; (2) Simmers was repeatedly advised of his *Miranda* rights; (3) at no time during the interrogation did Simmers request an attorney, request to speak to a parent, or refuse to answer questions; (4) Simmers was not threatened nor did the police make promises to him; (5)

15

1   although he is diagnosed with ADHD, Simmers' mother testified that he is capable of thinking

2   through decisions even though he sometimes exercised bad judgment; (6) the court reviewed

3   Simmers' taped confession three times and found no evidence that Simmers' did not understand

4   his rights or that he was under the influence of drugs or alcohol; and (7) the police engaged in

5   deceptive tactics, but the tactics did not "rise to the level of overcoming [Simmers'] ability to

6   understand his rights or overbear [his] ability to freely determine whether he wished to make a

7   statement." Dkt. No. 174, Ex. 3 at Finding of Fact, ¶¶ 22-27.

8

9        The trial court concluded that Simmers had been properly advised of his constitutional

10   rights on numerous occasions, which he acknowledged verbally and in writing, and that under the

11   totality of the circumstances, he "understood his rights and the consequences of his decision to

12   knowingly and voluntarily waive his rights. [Simmers'] statements to the police were freely and

13   voluntarily given and are therefore admissible at trial." *Id.* at Conclusions of Law, ¶¶ 1-2.

14

15        **H.      The Criminal Trial**

16        Simmers was tried as an adult in King County Superior Court for the State of Washington.

17   At trial, Simmers' confession was the primary evidence against him as there was no forensic

18   evidence linking him to the murder. Gochanour's blood was not found on the clothing that the

19   police believe Simmers was wearing at the time of Gochanour's murder and the State stipulated to

20   the fact that DNA testing showed that Simmers' blood was not on the knife that was used to kill

21   Gochanour. Dkt. No. 176, Ex. 7 at 5-6. The State also called a jailhouse informant, Kevin Olsen,

22   who testified that Simmers had admitted to the murder and to deliberately including false details

23   of the crime in his confession.[8]

24

25   _____

26   [8] On November 16, 1995, Hopkins was advised that Kevin Olsen, an inmate at the King County

27   Jail, had contacted the King County Prosecutor's Office to report that he had information related
     to Gochanour's murder. Hopkins met with Olsen later that day at the jail and Olsen claimed that

Simmers' defense at trial was that his confession was false. His family members testified that he was home on the night of the murder watching *The Lion King* and Simmers briefly testified only to recount the plot of the movie. He did not testify about his confession, nor did he claim that he had invoked his *Miranda* rights or that he had not understood them.

On March 28, 1996, a jury convicted Simmers as charged and he received a sentence of 548 months (plus twelve months for the use of a deadly weapon).

## I.    Post-Trial Proceedings

Simmers moved post-trial to vacate his conviction on the basis that Olsen had received approximately $200 from Crime Stoppers for providing information about Simmers to the police and that Olsen had testified falsely when he did not reveal this information. The trial court denied

---

he and Simmers had adjoining cells and Simmers had admitted to him that he murdered Gochanour. According to Olsen, Simmers told him that he killed Gochanour because he wanted his shoes but when they did not fit him, he threw the shoes in the river. He allegedly told Olsen that he was not worried about being convicted because he had purposefully provided incorrect information in his confession, including that the murder happened on Saturday rather than Friday, that the knife had a single point instead of a double point, and that he was drunk at the time of the murder when in fact he was not. According to Olsen, Simmers also allegedly told him that he was not worried about the police finding his prints on the knife because he was wearing gloves when he killed Gochanour. Olsen claimed to have taken notes while Simmers was talking to him, and he showed the notes to Hopkins.

Hopkins returned to the jail the next day and took Olsen to the precinct with him where he and someone from the King County Prosecutor's Office took his taped statement. Defendants claim that Olsen approached them independently, that they offered him no incentive to provide a statement, and that he was not treated more favorably by the prosecutor's office because of his testimony.

Plaintiff counters that Hopkins coached Olsen to make these statements because Hopkins knew that there were inconsistencies with Simmers' confession and knew that the DNA testing did not establish that Simmers was at the crime scene. Plaintiff alleges that Hopkins found a jailhouse informant, Olsen, to explain those inconsistencies. As evidence of this, Plaintiff cites to the report of Craig Miller, one of Plaintiff's expert witnesses, who opines that having an "unrecorded one-on-one meeting with a potential jailhouse informant was a departure from accepted policing standards at the time." Dkt. No. 182, p. 22 at ¶ 65. Plaintiff also points out that Hopkins destroyed his notes from that meeting, which is another departure from policing standards. *Id*.

the motion on the basis that Olsen had been effectively impeached at trial and the State had acknowledged his lack of reliability. The Court of Appeals affirmed Simmers' conviction on May 24, 1999.

**J.     Sentence Vacated in 2019**

As stated above, in May 2017, Simmers contacted the King County Prosecutor's Office and requested that it review his case. Simmers challenged the integrity of his conviction and submitted a report from an expert on false confessions. After receiving the request, the prosecutor's office spent over a year reinvestigating Simmers' case, including interviewing witnesses, police officers, Simmers, and Wyatt. The State also ordered additional DNA testing, the results of which excluded Simmers as being a possible donor of the mixture of DNA found on the knife's blade and handle[9] and on Gochanour's fingernail clippings. Dkt. No. 176, Ex. 22 at 84-85. During his 2018 interview with the prosecutor's office, Simmers claims the following for the *first time*:

- That while he was in the holding cell at the precinct, officers repeatedly asked him if he wanted to make a statement "to the point that [he] was mentally exhausted" and that he "just agreed to talk so they would leave [him] alone";

- He claimed that "they continued to interrupt [his] sleeping with their requests to interview [him]" and he "came to the conclusion that they weren't going to stop until I talked to them";

- That he overheard the officers discussing the murder investigation before they interrogated him, including that Gochanour had been stabbed and appeared to be a transient;

- That he changed his story based on his interrogators' reactions until he "perceived that they were happy with [his] answers";

---

[9] Note, Simmers had already been eliminated as a potential source of the blood found on the knife with the DNA testing done in 1995. *See* Dkt. No. 176, Ex. 22 at 57-62.

1
2

- That he had assumed that Gochanour had been stabbed on the front of his body, but the officers' facial expressions, posture, and questions directed his statements to "a closer proximity of what actually transpired"; and

3
4

- That it was only once he got "to what seemed like a satisfactory scenario" that the officers started the tape recording of the confession.

5

Dkt. No. 178, Ex. 3 at 8:5-12, 12:13-23, 13:11-23. 14:22-25, 15:17-25, 17:10-15, 8:8-15, 20:17-

6

23, 21:10-18. Simmers continued to admit, however, that he had wanted the officers to believe

7

that he had murdered Gochanour because he wanted to impress them and he wanted "to increase

8

[his] street cred and reputation by being able to go through a murder investigation, a trial, and

9

then being able to walk away from it." *Id.* at 17:16-25.

10
11

    After reinvestigating the case, the prosecutor's office found "no additional evidence" that

12

"significantly inculpated or exculpated Mr. Simmers" and the office could "not conclude[] that

13

the evidence establishes that Simmers did not commit [the] murder...[because] there is not clear

14

and convincing evidence that Simmers did not commit the murder. The evidence that led a jury to

15

convict him remains essentially the same; his confession contains facts that only the killer should

16

have known. The surviving detective denies providing this information, and Simmers, never, until

17

very recently, provided any explanation how he knew these facts." Dkt. No. 174, Ex 12 at ¶¶ 16,

18

23. However, the prosecutor's office concluded that Simmers' recently filed motion for a new

19

trial would likely be granted and "this would be an extremely difficult case to retry almost 24

20

years after the murder" because "[s]everal witnesses, including a witness to Simmers' confession,

21

are deceased." *Id.* at 21. The office further pointed to the fact that Simmers was "16 years old at

22

the time of the murder" and had already "served over 23 years in confinement." *Id.* at 1. Thus, it

23

concluded that a new trial "would not be in the interests of justice" and, accordingly, moved for

24

an order vacating Simmers' conviction of first-degree murder, which the trial court granted in

25

February 2019. *Id.* at 2.

26
27

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

### K.      Instant Lawsuit

Plaintiff filed the instant § 1983 civil rights action against Defendants in January 2021. Plaintiff's claims have been narrowed through motion practice, as well as her response to the instant summary judgment motions because Plaintiff either voluntarily dismisses some claims and/or Defendants or she fails to oppose some arguments. Specifically, Plaintiff: (1) dismisses all claims against King County Officers Baxter and Raftis (Dkt. No. 182 at 5 fn. 2); (2) dismisses the Fourteenth Amendment Due Process claims based on the interrogation in Counts I and II[10] (*Id.*); (3) dismisses the malicious prosecution claims under the Fourth Amendment in Count 4 and state law in Count 8; (4) does not oppose dismissal of the respondeat superior claim in Count 11; and (5) does not oppose dismissal of the indemnification claim in Count 13.

Thus, the claims that remain are: (1) Count 1—Defendants "forced [Simmers] to incriminate himself falsely and against his will" in violation of the Fifth Amendment; (2) Count 3—Defendants "deprived [Simmers] of his constitutional right to a fair trial" under the Sixth and Fourteenth Amendments; (3) Count 5—Defendants failed to intervene "to prevent the violation of [Simmer's] constitutional rights"; (4) Count 6—Defendants conspired to deprive Simmers of his constitutional rights; and (5) Count 7—a *Monell* claim against Defendant King County and Defendant City of Bothell.

### III.      STANDARD OF REVIEW

Rule 56 provides that a district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Fed. Home Loan Mortg. Corp. v. SFR Investments Pool 1,*

---

[10] Plaintiff's Fifth Amendment Claim in Count I remains.

*LLC*, 893 F.3d 1136, 1144 (9th Cir. 2018). "Materiality" is based on the substantive law, making disputes over facts material only where they "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute of material fact occurs where the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.

The moving party bears the "initial responsibility of informing the district court of the basis for its motion," including "identifying those portions of the pleadings ... which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal citations and quotations removed). Further, "[w]here the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). On an issue where the nonmovant bears the burden of proof, however, "the moving party can prevail merely by pointing out to the district court that there is an absence of evidence to support the non-moving party's case." *Macareno v. Thomas*, 378 F. Supp. 3d 933, 940 (W.D. Wash. 2019) citing *Celotex Corp.*, 477 U.S. at 325.

Where the moving burden has met its initial burden, the nonmovant must respond showing that there is a genuine issue for trial. *Anderson*, 477 U.S. at 250. "If the nonmoving party fails to establish the existence of a genuine issue of material fact, 'the moving party is entitled to judgment as a matter of law.'" *Perfect Co. v. Adaptics Ltd.*, 374 F. Supp. 3d 1039, 1041 (W.D. Wash. 2019) quoting *Celotex*, 477 U.S. at 323–24. In conducting its evaluation of the merits of a motion for summary judgment, "the court does not make credibility determinations or weigh conflicting evidence." *Soremekun*, 509 F.3d at 984. Instead, the court must "view 'the evidence in the light most favorable to the nonmoving party.'" *Universal Cable Prods., LLC v. Atl. Specialty*

*Ins. Co.*, 929 F.3d 1143, 1151 (9th Cir. 2019) quoting *Pension Tr. Fund for Operating Eng'rs v. Fed. Ins. Co.*, 307 F.3d 944, 949 (9th Cir. 2002).

## IV.   DISCUSSION

### A.   Whether Simmers' Confession Was Voluntary

#### 1.   Legal standard

"The Constitution demands that confessions be made voluntarily." *United States v. Haswood*, 350 F.3d 1024, 1027 (9th Cir. 2003); *see also*, *Vega v. Tekoh*, 597 U.S. 134, 141 (2022) (the Fifth Amendment "bars the introduction against a criminal defendant of out-of-court statements obtained by compulsion"); *Mincey v. Arizona*, 437 U.S. 385, 398 (1978) (stating "*any* criminal trial use against a defendant of his *involuntary* statement is a denial of due process of the law") (italics in original). A confession is involuntary if the circumstances that surround the giving of the confession are such that the suspect's "will was overborne at the time he confessed." *Haynes v. Washington*, 373 U.S. 503, 513 (1963) quoting *Lynumn v. Illinois*, 372 U.S. 528, 534 (1963); *see also Cunningham v. City of Wenatchee*, 345 F.3d 802, 810 (9th Cir. 2003) (a confession is coerced if the totality of the circumstances shows that the interrogation tactics "undermined the suspect's ability to exercise his free will").

In determining whether a confession was involuntary, courts assess the totality of the circumstances involved—both the characteristics of the accused and the details of the interrogation—and their effect upon the will of the accused. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973) (noting that no one criterion is controlling; rather, scrutiny must be done of all the surrounding circumstances); *United States v. Preston*, 751 F.3d 1008, 1016 (9th Cir. 2014) ("Ultimately, the voluntariness 'determination depend[s] upon a weighing of the circumstance of pressure against the power of resistance of the person confessing.'") quoting *Dickerson v. United States*, 530 U.S. 428, 434 (2000); *Doody v. Ryan*, 649 F.3d 986, 1011 (9th Cir. 2011) (noting that

courts may not simply "tick[] off the list of circumstances" but must consider the circumstances "in their totality"). Lastly, the question of whether a confession was voluntary is "to be answered with complete disregard of whether or not [the confessor] in fact spoke the truth." *Rogers v. Richmond*, 365 U.S. 534, 544 (1961) ("The attention of the trial judge should have been focused, for purposes of the Federal Constitution, on the question whether the behavior of the State's law enforcement officials was such as to overbear petitioner's will to resist and bring about confessions not freely self-determined—a question to be answered with complete disregard of whether or not petitioner in fact spoke the truth."); *see also*, *United States v. Preston*, 751 F.3d 1008, 1018 (9th Cir. 2014) ("In evaluating the voluntariness of a confession under the totality of the circumstances, [courts should] not try[] to determine whether the suspect told the truth when he confessed.").

The Supreme Court has long cautioned that the "admissions and confessions of juveniles require special caution." *In re Gault*, 387 U.S. 1 at 45 (1967) (noting that what could "leave a man … unimpressed can overawe and overwhelm a lad in his early teens"). Thus, "[i]t has long been established that the constitutionality of interrogation techniques is judged by a higher standard when police interrogate a minor." *Crowe v. County of San Diego*, 608 F.3d 406, 431 (9th Cir. 2010). This is true no matter "how sophisticated" the juvenile may appear to be. *Gallegos v. Colorado*, 370 U.S. 49, 54 (1962); *see also*, *Edmonds v. Oktibbeha County*, 675 F.3d 911, 915 (5th Cir. 2012) ("Police must take special care to ensure the voluntariness of a minor suspect's confession."). When the suspect is a child, the evaluation of the circumstances surrounding the confession must include his "age, experience, education, background, and intelligence, and [inquire] into whether he has the capacity to understand the warnings given him, the nature of this Fifth Amendment rights, and the consequences of waiving those rights." *Fare v. Michael C.*, 442

U.S. 707, 725 (1979). "If counsel was not present for some permissible reason when an admission was obtained, the greatest care must be taken to assure that the admission was voluntary, in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair." *In re Gault*, 387 U.S. 1, 55 (1967).

### 2.    Analysis

Plaintiff argues that Simmers' ability to exercise his free will during the interrogation was undermined by the following circumstances: (a) he was a juvenile; (b) he had "mental health vulnerabilities" that rendered him "highly suggestable"; (c) he was interrogated without the presence of a parent or other concerned adult; (d) he was in custody for nearly twelve hours; (e) Rusk and Hopkins used deceptive interrogation tactics, including using "false evidence ploys" and suggesting answers, asking leading questions, and correcting Simmers' mistakes; (f) Simmers is innocent; and (g) Simmers invoked his right to silence and counsel, which was ignored. Plaintiff argues that these circumstances, considered in totality, create a genuine issue of material fact as to whether Simmers' confession was voluntary and, therefore, Defendants' motion on this claim must be dismissed.

This Court disagrees with Plaintiff and instead concludes that in light of the totality of the circumstances—including Simmers' individual characteristics—no reasonable jury could find that Simmers' confession was compelled. As an initial matter, this Court notes that another court has already determined that Simmers' confession was voluntary. The Superior Court made that determination after hearing testimony from multiple witnesses over three days on nearly all of the same challenges to Simmers' confession that Plaintiff raises now—*i.e.* Simmers' age, ADHD, tendency to brag, the officers' failure to notify his parents that he was being questioned about a murder, the officers' use of deceptive tactics when questioning him, the inconsistencies in his confession with the murder, and that Simmers appeared tired and was slurring his words during

the taped confession. The Superior Court concluded, and this Court agrees, that the foregoing

circumstances, considered in their totality, did not overbear Simmers' will and that he knowingly

and voluntarily confessed to murdering Gochanour.

### a.   Simmers' age

One of the concerns about a juvenile confession is that the child was unduly intimidated

by the officers asking the questions, or even just by suddenly being involved with the criminal

justice system itself. And, even if properly *Mirandized*, there is a concern that the child did not

sufficiently understand the consequences of waiving those rights. Here, Defendants concede as

they must that Simmers was 16 years old at the time of his confession, and Rusk and Hopkins

further admit that despite Simmers age, they did not adjust the way they interrogated him.

However, the evidence also establishes that Simmers had extensive experience with police

officers and the criminal justice system, including prior arrests for second-degree burglary and

second-degree escape, as well as multiple misdemeanor convictions for minor in possession of

alcohol, theft, and assault. In fact, he had been investigated and *Mirandized* for another crime by

the Redmond Police Department just a month earlier and had been released from the King County

Juvenile Detention Center just five days before the arrest relevant to this lawsuit. His IQ was

above average, he read above grade level, he had obtained his GED, and the Superior Court Judge

concluded at his Suppression Hearing that Simmers was "by all accounts intelligent and bright."

Dkt. No. 30 at 318:6-10, 321:18-20. Further, Simmers admitted that he was not frightened by the

officers. To the contrary, when questioned, he indicated that the officers never raised their voices,

yelled, cursed, or threatened him. He also testified that he was pleased that he was finally being

acknowledged as the "troublemaker" that he was and the "gangster" that he wanted to be. There is

no doubt that he understood the potential consequences of providing a taped confession because

he testified that he *wanted* to be charged with and tried for murder; indeed, he admitted that he *wanted* Rusk and Hopkins to believe that he had committed the murder.

### b.    mental health vulnerabilities

Plaintiff argues that Simmers' "mental health vulnerabilities" made him susceptible to psychological tactics by the police. The evidence establishes that Simmers had been diagnosed with ADHD, but there is no evidence in the record that the ADHD diagnosis rendered him mentally unstable, incompetent to provide a statement, or "highly suggestible" as Plaintiff argues. To the contrary, Simmers' mother testified at the suppression hearing that despite his ADHD diagnosis, Simmers was capable of thinking through decisions even though he sometimes exercised bad judgment, and the Superior Court concluded at the end of the hearing that Simmers' ADHD did not "in any way impact [his] ability to make an intelligent decision" to waive this *Miranda* rights. Dkt. No. 174, Ex. A at 136:21-137:12. Thus, the Superior Court concluded that Simmers understood his rights and the consequences of his decision to waive those rights despite having ADHD.

Plaintiff submits an expert report from Hayley Cleary, MPP, PhD, an Associate Professor of Criminal Justice and Public Policy at Virginia Commonwealth University. Dkt. No. 176, Ex. 6. In her report, Cleary opines that Simmers' ADHD symptomatology was not well managed at the time of his confession and could have "impacted his functioning during his custody and interrogation." *Id*. at 14. She opines that ADHD "is a risk factor for false confessions in both adults and adolescents", that "[n]umerous studies have linked ADHD with increased risk for false confession in adolescents", and that "youth with ADHD were significantly more likely to self-report having falsely confessed to a crime than youth without ADHD." *Id*. at 13. However, whether Simmers' confession was false is not the relevant issue in this lawsuit; the relevant issue is whether the confession was compelled. As discussed, *infra*, the fact that a suspect falsely

confesses to a crime does not mean that the confession was compelled. Indeed, Cleary acknowledges in her report that suspects sometimes voluntarily confess to crimes that they did not commit, referring to such confessions as "voluntary false confessions." *Id.* at 3. She notes that "*[v]oluntary* false confessions occur when an individual willingly admits guilt to a crime they did not commit in the absence of pressure from police, perhaps to gain notoriety or to protect someone else." *Id.* (emphasis in original). Here, Simmers repeatedly claimed that he falsely confessed to the crime in order to shore up his reputation as a gangster, *i.e.* to "gain notoriety". Moreover, Cleary's opinion that Simmers' ADHD was not "well managed" at the time of the confession is based on information that was also before the Superior Court at the time of the suppression hearing (other than Simmers' 2022 deposition and Steven Drizin's 2017 report, neither of which discuss Simmers' ADHD diagnosis or symptoms). *See* Dkt. No. 176, Ex. 22 at 4, 8-11, Dkt. Nos. 194-195. There is no reason why Cleary's interpretation of this information should supplant the Superior Court who heard the testimony and, thus, was better able to make credibility determinations.

Plaintiff also argues that Rusk and Hopkins should have known that Simmers was not telling the truth because he bragged about killing thirteen gangsters, something the officers did not believe. But, that statement from Simmers is not all that the officers had before them. They also knew that Simmers had an extensive criminal history, that he admitted to using the Burke-Gilman Trail in the general timeframe of the murder, that he had just completed a string of property crimes, and that Wyatt had told them that Simmers had stolen a knife from his apartment complex. The officers also knew that Wyatt had become quite emotional and frightened when

asked about the murder.[11] This was certainly enough to give them probable cause to question Simmers about the murder and then when he confessed, they had no reason to doubt him.

### c.    absence of parent

There is also no evidence in the record that Simmers ever asked to speak to his mother or another supportive adult.[12] To the contrary, Rusk testified that Simmers never asked to speak to his parent and during his 2022 deposition for this lawsuit, Simmers testified that he did not know if he ever asked to speak to his parents. And, while Simmers' mother claims that she called the police precinct after Simmers' arrest and she did not receive a return phone call, she does not allege that she attempted to see him while he was at the precinct. She does claim that if she had been aware that Simmers was being questioned about a murder, she would have gone to the precinct. There is no evidence in the record to suggest that either Rusk or Hopkins was aware that Simmers' mother had called the precinct.

### d.    length of detention and interrogation

Plaintiff also argues that the length of Simmers detention and interrogation, in combination with the admittedly deceptive tactics Rusk and Hopkins used during the interrogation, factored in Simmers decision to confess. Once again, the evidence does not bear this out. The parties agree that Simmers was in detention for nearly twelve hours, but the evidence

---

[11] Plaintiff accuses McSwain of fabricating this testimony, citing to a short portion of Wyatt's 2017 interview. However, the cited portion does not establish that McSwain fabricated his testimony. Rather, when read in context of the entire interview, it substantiates McSwain's testimony because Wyatt admits that he was "freak[ing] out" in the presence of the officers. He claims that he was freaking out because he had just heard Simmers confess to the murder to the officers. While Wyatt's 2017 claim that he heard Simmers tell the officers that he murdered Gochanour does not comport with the remaining evidence in this case, Wyatt's claim that he was freaking out in the presence of the officers does.

[12] This contrasts with Wyatt who asked to speak to both his mother and father on multiple occasions, spoke to each on the telephone, and met with his father who came to the police precinct.

shows that Simmers was left alone for a significant portion of that time. Indeed, his criminal

attorney stated that Simmers was allowed to sleep and eat at his leisure. At most, Simmers'

interrogation regarding the murder lasted for an hour and ten minutes before the recording started

and Simmers testified that the officers were not abusive or otherwise threatening during this time.

Courts have routinely sustained interrogations of far greater lengths, *see e.g., Cunningham v. City

of Wenatchee*, 345 F.3d 802, 810 (9th Cir. 2003) (eight-hour interrogation was not coercive);

*United States v. Haswood*, 350 F.3d 1024, 1028 (9th Cir. 2003) ("Even if we assume that the

interrogation lasted all day … coercion typically involves far more outrageous conduct).

### e.   interrogation tactics

Defendants admit that Simmers initially denied involvement in Gochanour's murder, and

that Rusk and Hopkins employed several tactics during the interrogation. Specifically, they told

Simmers that they had evidence linking him to the crime scene and that Wyatt had already

admitted to his involvement in the murder and had shown them where the knife had been

thrown.[13] Defendants also admitted that Rusk and Hopkins suggested to Simmers that he did not

act alone and/or that he acted in self-defense. Courts routinely hold that such police tactics do not

render a confession involuntary. *See United States v. Crawford*, 372 F.3d 1048, 1061 (9th Cir.

2004) ("[T]rickery is not automatically coercion. Indeed, the police commonly engage in such

ruses as suggesting to a suspect that a confederate has just confessed or that police have or will

secure physical evidence against the suspect. While the line between ruse and coercion is

sometimes blurred, confession procured by deceits have been held voluntary in a number of

---

[13] Plaintiff alleges that the officers "observed [Simmers] become upset" at this point in the interrogation, but the evidence cited for this proposition states no such thing. *See*, Dkt. No. 176, Ex. 20 at 3; Ex. 17 at 169. On the other hand, the notes that Hopkin's wrote after the interrogation state that "Simmers appeared very interested in this discovery". Ex. 8 at 3.

situations.") quoting *United States v. Byram*, 145 F.3d 405, 408 (1st Cir. 1998); *Holland v. McGinnis*, 963 F.2d 1044, 1051 (7th Cir. 1992 ("Inflating evidence of [suspect's] guilt interfered little, if at all, with his 'free and deliberate choice' of whether to confess.").

There is no reason to believe that such a relatively short interrogation, particularly one that lacked aggressive or other intimidating behavior, overcame Simmers' free will, even when coupled with the tactics that the officers' employed during the interrogation. This is particularly true considering Simmers' repeated and undisputed testimony that he wanted to confess to the crime so that he would be charged and tried for murder to burnish his reputation as a gangster, a motivation that Simmers entirely owns and does not claim that Rusk or Hopkins suggested to him during the interrogation.[14] Moreover, the Court has listened to the taped confession, and like the Superior Court, concludes that Simmers does not sound tired or otherwise impaired.

### f.    Simmers' alleged innocence

Plaintiff also argues that Simmers is innocent of Gochanour's murder, "which supports an inference" that his confession was involuntary. Dkt. No. 182 at 26. Even assuming that Simmers is innocent, this fact does not establish that his confession was coerced. *See Halsey v. Pfeiffer*, 750 F.3d 273, 306, fn. 31 (3d. Cir. 2014) ("[W]e reject [plaintiff's] broader proposition that his innocence, by itself, could establish that he had been coerced into confessing…If we accepted this view we would eviscerate the required causal link between police misconduct and the confession."). A false confession does not necessarily mean that the confession was involuntary.

---

[14] The Court's analysis may be different if there was evidence that the officers promised or otherwise implied to Simmers that he would not be *convicted* of the murder given that Simmers admits that he assumed that he would not be convicted after the trial, but no such evidence exists in the record.

1    *Id.* ("Indeed, sometimes individuals confess on a completely voluntary basis to the commission of

2    crimes that they did not commit.").

3            The instant case is remarkably similar to a case from the Fifth Circuit, *Edmonds v.*

4    *Oktibbeha County*, 675 F.3d 911 (2012). That case was also a §1983 case brought by a mother

5    and son against police officers who obtained a false murder confession from the boy. Two days

6    before the boy's arrest his sister told him that she had shot her husband and urged her brother to

7    take the blame to protect her from the death penalty. A day later, when the police questioned the

8    sister, she professed her innocence and claimed her brother shot her husband. The police

9    requested that the boy's mother bring him in for questioning, which she did. The boy was 13

10   years old at the time, had no prior contacts with the criminal justice system, his *Miranda* rights

11   were explained three times and he and his mother signed two waivers, the interrogation totaled

12   three hours (with multiple breaks), the police repeatedly rejected his claims of innocence and

13   continued to question him, and his mother was escorted from the interrogation room against her

14   will. As soon as the mother left the room, the boy confessed to the murder. The boy later admitted

15   that he wanted to confess to the murder so that he could help his sister. The boy was tried,

16   convicted, and sentenced to life, but the judgment was overturned, and he was acquitted on retrial.

17           Thereafter, the boy and his mother brought the § 1983 lawsuit against the officers, among

18   others, for violating his Fifth Amendment rights by allegedly coercing him into confessing to the

19   murder. The district court entered summary judgment for the defendants and the boy and his

20   mother appealed. The Fifth Circuit affirmed the district court, concluding that the totality of the

21   circumstances indicated that the boy's confession was voluntary. The Court stated that

22   "[a]lthough a thirteen-year-old's separation from his mother, his desire to please adults, and his

23   inexperience with the criminal justice system all weigh against voluntariness, his express desire to

help his sister decides the issue. There is no evidence that, absent [the boy's] resolve to reduce [his sister's] punishment, the [officers'] interrogation tactics would have produced a confession. [The sister] may have used her brother's love to make him lie on her behalf, but there is no evidence that the deputies knew of her plan." 675 F.3d at 914. The Court further concluded that although "some circumstances in this case may indicate susceptibility to police coercion, their relevance pales beside [the boy's] stated desire to help his sister. Improper police tactics did not implant that desire[.]" *Id*. at 915. So to here. While some of the foregoing circumstances surrounding Simmers' confession indicate a susceptibility to police coercion, their relevance pales in comparison to Simmers' stated desire to confess to Gochanour's murder to cement his reputation as a gangster and there is no evidence that Defendants were aware of or implanted Simmers' ill-conceived plan. Thus, this Court agrees with the Superior Court before it and concludes that the foregoing circumstances, taken in totality, did not act to overbear Simmers' will and his confession was voluntarily made.

> **g.    Simmers' alleged invocation of right to silence and counsel**

With this lawsuit, Plaintiff raises *for the first time* two additional circumstances that were not before the Superior Court at the time of the suppression hearing—that Simmers invoked his right to remain silent and that he invoked his right to an attorney, both of which Plaintiff alleges were ignored by the officers. The Court concludes that these allegations defy credibility, and no reasonable jury could believe them. Simmers waited 23 and 27 years, respectively, to raise these allegations. The first time that he alleged that officers Rusk and Hopkins ignored his request to remain silent in 1995 was during his 2018 interview with the prosecutor's office, and the first time that he raised the possibility that he had asserted his right to counsel in 1995 was during his 2022 deposition for this lawsuit. He did not assert these alleged constitutional violations during the three-day suppression hearing, the criminal trial, the post-trial proceedings, or the parole

hearing. Nor did he assert these alleged violations in his 2019 motion for a new trial. Simmers was represented by counsel in each of the foregoing proceedings (apart from the parole hearing) and it is simply inconceivable that a competent attorney would not have questioned Simmers about these fundamental rights and then failed to argue that his rights had been violated if he had truly invoked them back in 1995. And, of course, Plaintiff's claim is contradicted by the fact that Simmers repeatedly waived his *Miranda* rights before the interrogation, and well as Rusk's, Raftis', Jarboe's, and Janasz's testimony that Simmers never invoked his right to remain silent and/or to an attorney.

Finally, Simmers testimony is too vague to reasonably establish that he invoked his right to an attorney. First, he testified that he "believe[s]" he requested an attorney, rather than unequivocally stating that he asserted his right to one. Second, he did not clarify how, when, or to whom he allegedly asserted this right, making the testimony too vague to conclude that he adequately asserted his right to counsel. *See Davis v. United States*, 512 U.S. 452, 458 (1994) ("Invocation of the *Miranda* right to counsel 'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.'") quoting *McNeil v. Wisconsin*, 501 U.S. 171, 178 (1991); *Smith v. Illinois*, 469 U.S. 91, 94 (1984) ("[C]ourts must determine whether the accused actually invoked his right to counsel"); *Tobias v. Arteaga*, 996 F.3d 571, 581 (9th Cir. 2021) (noting that whether the suspect unambiguously invoked the right to counsel often hinges on whether the request was equivocal).[15]

---

[15] Simmers' mother submitted a declaration in support of Plaintiff's opposition to the summary judgment motions in which she claims that Simmers told her that the officers encouraged him to waive his right to an attorney. Defendants move to strike this testimony as inadmissible hearsay, while Plaintiff argues that it is not hearsay because the statement is not being offered for the truth of the matter asserted. Rather, Plaintiff argues, the statement is being offered to rehabilitate Simmers because Defendants claim that he fabricated his claim that he requested counsel. The

Not all disputes of fact preclude summary judgment; rather, the dispute of fact must be both material and genuine. *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012). A factual dispute is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* quoting *Anderson v. Liberty, Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Mere 'metaphysical doubt as to the material facts' is not enough'" to preclude summary judgment. *Id.* quoting *Matsushita Elect. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). This Court concludes that a reasonable jury could not conclude that Simmers confession was compelled and, therefore, Defendants are entitled to summary judgment on Plaintiff's Fifth Amendment claim.[16]

**B.     Whether Defendants Violated Simmers' Fourteenth Amendment Rights by Fabricating Evidence**

**1.     Legal standard**

The Fourteenth Amendment prohibits the deliberate fabrication of evidence by a state official. *Devereaux v. Abbey*, 263 F.3d 1070, 1074-75 (9th Cir. 2001). "[T]here is a clearly established constitutional due process right not to be subject to criminal charges on the basis of false evidence that was deliberately fabricated by the government." *Id.* A plaintiff can prove deliberate fabrication through direct or circumstantial evidence. *Caldwell v. City and Cnty of San Francisco*, 889 F.3d 1105, 1112 (9th Cir. 2018). To prove a fabrication claim using circumstantial evidence, a plaintiff must:

_____

Court does not need to resolve the admissibility issue because Ms. Berube's testimony has the same fatal flaws as Simmers' testimony. It is not credible that she would wait 27 years to claim that her son's *Miranda* rights were ignored. She did not make such a claim during her testimony at his suppression hearing or criminal trial, and there is no evidence to suggest that she raised the issue during his post-trial proceedings or in support of his 2019 motion to vacate. In addition, Ms. Berube's testimony lacks the required specificity to establish that Simmers unambiguously invoked his right to counsel.

[16] Because this Court determines that Simmers' confession was voluntary, the Court does not need to address whether the Superior Court's ruling that the confession was admissible constituted a superseding cause that broke the chain of causation.

support[] at least one of the following two proposition: (1) [d]efendants continued their investigation … despite the fact that they knew or should have known that [the plaintiff] was innocent; or (2) [d]efendants used investigative techniques that were so coercive and abusive that they knew or should have known that those techniques would yield false information.

*Id.* quoting *Devereaux*, 263 F.3d at 1076. Finally, a due process violation under the Fourteenth Amendment only occurs when official conduct "shocks the conscience", a determination that "depends on the context". *Tennison v. City and Cnty. of San Francisco*, 570 F.3d 1078, 1089 (9th Cir. 2009) (acting with "deliberate indifference to or reckless disregard for an accused's rights" was "consistent with the standard imposed in the substantive due process context").

If the plaintiff is successful in raising a triable issue on whether a government official deliberately fabricated evidence, then the plaintiff must "still come forward with a showing that the fabrication caused him some harm." *Cadwell*, 889 F.3d at 1115. To establish causation, the plaintiff must raise a triable issue that the fabricated evidence was the cause in fact and proximate cause of his injury. *Id.* "Like in any proximate cause analysis, an intervening event may break the chain of causation between the allegedly wrongful act and the plaintiff's injury. *Id.* citing *Beck v. City of Upland*, 527 F.3d 853, 862 (9th Cir. 2008).

### 2.    Analysis

Plaintiff argues that a reasonable jury could find that Defendants fabricated the following evidence: (1) Hopkins' and Rusk's interrogation reports; (2) Hopkins', Rusk's, Miner's, and Schlaegel's investigative reports claiming that Simmers stated that he "had not killed a bum"; (3) McSwain's investigative notes regarding Wyatt; and (4) Hopkin's report concerning Olsen.[17] The Court will address each in turn.

---

[17] Plaintiff also alleges that "Miner's probable cause affidavit" contained fabricated evidence but fails to provide any support for this allegation so the Court will not address this claim. Dkt. No. 176 at 37.

1

2

### a.    Hopkins' and Rusk's interrogation reports

Plaintiff alleges that Hopkins' and Rusk's interrogation notes omitted that Simmers

invoked his right to silence and to an attorney[18], omitted that they provided Simmers with "non-

public facts of the crime", claimed that Simmers demonstrated how the stabbing occurred when,

in fact, Hopkins and Rusk "reheare[d]" the demonstration with Simmers and "correct[ed]" his

guesses at what happened, and Hopkins claimed that Simmers had "some confusion" as to when

the murder happened when "this was completely untrue." Dkt. No. 182 at 40.

As evidence that Hopkins and Rusk provided Simmers with "non-public facts of the

crime" to include in his confession, Plaintiff points to statements Simmers made during his 2018

interview and his 2022 deposition. During those statements, Simmers testified <u>for the first time</u>

that officers fed him information about the murder so that he could confess to the crime.

However, Simmers' testimony lacks specificity. For instance, he claimed that officers fed him

details about the crime while they were at the marina, but he was not sure if the officers were

talking to him or if he overheard a conversation and he was able to "glean" information from it.

He could not recall the specifics of the conversation or even who the officers were who allegedly

had this conversation, other than he learned that Gochanour appeared to be a transient and that he

had been stabbed. He did not recall if the officers told him that Gochanour had been stabbed six

times, that he had been slashed on the face, that the knife used to stab Gochanour was bent and

had been found near the crime scene, or that Gochanour was stabbed near Sammamish River, all

details about the murder that were included in Simmers' confession. In fact, Simmers admitted

that he did not "remember with clarity" anything about the crime-related facts that he allegedly

---

[18] The Court has already concluded that a reasonable jury could not find that Simmers invoked his
right to silence and/or to counsel and will not address this argument again here.

learned from the officers. Dkt. No. 194 at 120:24-121:6. Lastly, Simmers admitted that he did not know whether the officers were intentionally coaching him, or if he was just picking up on "subconscious cue[s] on [the officers'] part." Dkt. No. 178, Ex. 3 at 62:23-63:3.

The foregoing falls far short of evidence sufficient to meet Plaintiff's burden of proving that Hopkins and/or Rusk acted with deliberate indifference or reckless disregard of Simmers' rights. Simmers' statements are unclear as to what was said, who was speaking, or even whether the alleged statements and/or actions were intentional on the officers' parts. Of course, Simmers' memory is less than stellar after 27 years, but fact that he waited 27 years to raise these allegations is his responsibility. In addition, each of the relevant Defendants to this claim has submitted declarations stating unequivocally that they did not provide Simmers with non-public crime-related information.

### b. Hopkins', Rusk's, Miner's, and Schlaegel's investigation reports claiming that Simmers stated that he "had not killed a bum"

Plaintiff accuses Rusk, Hopkins, Miner, and Schlaegel of fabricating evidence by stating in their respective investigative reports that Simmers' allegedly told Rusk that he did not kill a "bum" when asked about Gochanour's murder. Schlaegel's, Miner's, and Hopkins' reports merely repeat what Rusk allegedly told them and Rusk testified under oath during both the suppression hearing and the criminal trial that Simmers had been the first to refer to Gochanour as a "bum". He also disclosed that Simmers then backtracked and claimed it was Rusk who referred to Gochanour as a "bum", which Rusk testified was untrue. Rusk's testimony is unrebutted because Simmers has never testified that Rusk's description of the conversation was incorrect. Thus, Plaintiff can point to no evidence to support her contention that Rusk fabricated the details of the conversation.

1

2

            c.     **McSwain's investigation notes regarding Wyatt**

3       Plaintiff claims that McSwain fabricated evidence in his investigation notes by claiming

4  that Wyatt implied to him that he had witnessed Simmers commit the murder. As evidence of this,

5  Plaintiff points to Wyatt's 2017 interview with the prosecutor's office in which Plaintiff cherry-

6  picks statements from that interview and highlights that Wyatt referred to McSwain as "a flagrant,

7  baldfaced liar" when told that McSwain had indicated in his investigation notes that Wyatt was

8  afraid of Simmers because Wyatt knew Simmers had hurt someone on the Burke-Gilman Trail.

9  Dkt. No. 176, Ex. 3 at 24. However, when read in its entirety, Wyatt's interview does not

10 contradict McSwain's notes. To the contrary, Wyatt admitted in the interview that he was

11 "afraid", "in tears", and "freak[ing] out" when he was with the police because, according to him,

12 Simmers had spontaneously confessed to the murder immediately after being arrested and Wyatt

13 was suddenly "part of a murder investigation." *Id*. at 14. Wyatt went on to state that it "made

14 sense" to him that Simmers might have murdered Gochanour because Simmers had stolen a knife

15 from his apartment complex. *Id*. at 26. And when confronted with a taped statement from his

16 friend, Sue Ellen, who told the police in 1995 that Wyatt had told her that he had seen Simmers

17 "hugging some guy on the trail, but then he – the guy fell" and then Simmers came towards Wyatt

18 "with this grin or smile on his face and it scared him", Wyatt did not deny that occurred but,

19 instead, stated that he did not remember making that statement, but also volunteered that it was

20 "totally possible" that he had witnessed Simmers commit the murder but blocked it from his

21 memory. *Id*. at 15, 28. Rather than contradict McSwain's report in 1995 that Wyatt implied that

22 he had witnessed Simmers commit a murder, Wyatt's interview 22 years later substantiates

23 McSwain's claim.

24

25

26

27

1

### d.    Hopkin's report concerning Olsen

2

Plaintiff alleges that a reasonable jury could find that Hopkins fabricated his report about

3

his meeting with Olsen, the jailhouse informant. As evidence of this, Plaintiff cites to the fact that

4

(1) Oleon came forward after the DNA evidence demonstrated that Simmers' blood was not on

5

the knife and Gochanour's blood was not on Simmers' pants, (2) Olsen's statement resolves "the

6

exact discrepancies in the false confession", (3) Simmers denies having talked to Olsen, and (4)

7

Hopkins did not record his initial meeting with Olsen and destroyed the notes that he took during

8

the meeting, an alleged departure from accepted police practices. Once again, Plaintiff's cited

9

evidence does not support the argument she proffers. First, Plaintiff offers no declaration or

10

testimony from Olsen withdrawing his prior sworn testimony that Simmers confessed to him and

11

that Hopkins did not provide Olsen with details of the case. Second, Plaintiff does not dispute that

12

Olsen initiated contact with the Bothell police, not the other way around. Third, the DNA report

13

was mailed to the prosecutor's office on November 14, 1995, two days *after* November 12, 1995,

14

the date on which Olsen claims that Simmers confessed to him. Dkt. No. 176, Ex. 7, Dkt. No.

15

185, Ex. 3 at 46:14-24. Fourth, while Simmers claimed that he never spoke to Olsen, he did admit

16

during his 2018 interview that he discussed his case with another inmate and Olsen overheard and

17

"took what [Simmers] was discussing with [the other inmate] and used it to make a profit." Dkt.

18

No. 178, Ex. 3 at 32:4-33:21, 34:21-23 ("I remember that we were discussing the – that there

19

were aspects of the evidence that didn't match with the popular scenario of what happened.").

20

Fifth, after his criminal trial, Simmers moved for a new trial based in part on his claim that Olsen

21

had not revealed that he received money from Crime Stoppers for his testimony and that he had

22

not revealed all his arrests and pending charges. Dkt. No. 30 at 732. In denying the motion for a

23

new trial, the Superior Court concluded that:

24

25

26

27

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

> [t]he State neither focused its case nor relied heavily on Olsen's testimony. Olsen was effectively cross-examined and impeached. The State acknowledged his lack of reliability. The State's case was based almost entirely on the defendant's confession and the physical and circumstantial evidence that corroborated his confession. That evidence was overwhelming. Olsen's testimony was not material.

*Id.* at 738 at ¶ 7. Lastly, Plaintiff cites to the expert report from Craig Miller, a retired police officer from Texas for the proposition that it was a departure from accepted police practices for Hopkins to not record his initial meeting with Olsen and to destroy the notes he took during that meeting. *See* Dkt. No. 176, Ex. 5 at 28-29. There are at least two problems with this cited evidence. First, Mr. Miller does not claim to be an expert in Washington State police procedures, particularly in 1995. Second. Mr. Miller does not actually opine that Hopkins' deviated from accepted police procedure. At best, the cited portion of the report simply states that "Hopkins should have retained all of his notes" because "handwritten notes made by the investigator during and immediately following the interview generally serve as sufficient documentation." *Id.* This vague statement, untethered from citations to relevant police policies and/or procedures, is insufficient to create a genuine issue of material dispute.

Thus, the Court concludes that Plaintiff has failed to cite to any evidence in the record that is sufficient to create an issue of material fact to allow a reasonable jury to find that the Defendants fabricated evidence. Having failed to satisfy the first element of a deliberate fabrication claim, the Court does not need to address the second element—whether Simmers was prejudiced by the alleged fabrication. Defendants are entitled to summary judgment on this claim.

**C.      Whether Defendants Violated Simmer's Fourteenth Amendment Rights by Failing to Disclose Exculpatory Evidence**

**1.      Legal standard**

The government violates a suspect's due process rights if it fails to turn over evidence that is "material either to guilt or to punishment." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). To

prevail on such a claim, a defendant must demonstrate that: (1) the evidence at issue is favorable, either because it is exculpatory or because it is impeaching; (2) such evidence was suppressed by the government, either willfully or inadvertently; and (3) prejudice to defendant resulted. *Raley v. Ylst*, 470 F.3d 792, 804 (9th Cir. 2006).

### 2. Analysis

Plaintiff argues that Defendants violated Simmers' Fourteenth Amendment due process rights by "failing to disclose their own misconduct, both with respect to the reports they fabricated; that Rusk made-up that Simmers independently offered, as if it were suspicious, that he did not kill and 'bum'; and that McSwain had made up, almost entirely, the notion that Wyatt claimed he saw Simmers commit a murder." Dkt. No. 182 at 42. Because this Court has already concluded that Plaintiff failed to present evidence sufficient to allow a reasonable jury to conclude that Defendants fabricated evidence, this claim must likewise be dismissed.

### D. Whether Defendants Conspired to Harm Simmers

### 1. Legal standard

To establish liability for a conspiracy in a §1983 case, a plaintiff must "demonstrate the existence of an agreement or meeting of the minds" to violate constitutional rights. *Mendocino Envtl. Ctr. v. Mendocino County*, 192 F.3d 1283, 1301 (9th Cir.1999) (internal quotation marks omitted). "Such an agreement need not be overt, and may be inferred on the basis of circumstantial evidence such as the actions of the defendants." *Id.* "To be liable, each participant in the conspiracy need not know the exact details of the plan, but each participant must at least share the common objective of the conspiracy." *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1541 (9th Cir.1989).

1

2       **2.      Analysis**

3       Plaintiff alleges that the following is sufficient for a reasonable jury to find that

4  Defendants entered a conspiracy to violate Simmers' constitutional rights: (1) the officers

5  strategized for several hours on how to interrogate Simmers before interviewing him, and (2) the

6  officers' reports all contain "nearly identical information" regarding Simmers' alleged "bum"

7  comment and Wyatt's alleged comments at the marina. Dkt. No. 182 at 44. This Court concludes

8  that the foregoing is insufficient for a reasonable jury to find that Defendants conspired to harm

9  Simmers. At best, it demonstrates that the officers met, discussed the status of the investigation,

10  and strategized on how to best proceed. Sharing information and planning the next steps for an

11  investigation is not evidence of a conspiracy; it is evidence of standard police work. Plaintiff has

12  not identified any evidence that the officers agreed to violate Simmer's rights, agreed to

13  accomplish something unlawful, or agreed to use unlawful means. Plaintiff accuses Defendants of

14  nefarious motives, but the material she cites does not support her allegations. Instead, it merely

15  shows that the officers exchanged information, discussed strategy, and divided tasks—all

16  innocuous undertakings that, without more, in no way support a conspiracy claim. Thus,

17  Defendants are entitled to summary judgment on this claim.

18

19       **E.      Whether Defendants Failed to Intervene to Protect Simmers' Constitutional
20               Rights**

21       **1.      Legal standard**

22       Police officers "have a duty to intercede when their fellow officers violate the

23  constitutional rights of a suspect or other citizens." *Tobias*, 996 F.3d at 583 quoting *Cunningham*

24  *v. Gates*, 229 F.3d 1271, 1289 (9th Cir. 2000). If an officer fails to intercede, they are liable for

25  the deprivation of the constitutional right just the same as their colleague who actively deprived

26

27

the victim of his rights. *Id.* at 584. However, the officer can be held liable only if they "had an opportunity to intercede." *Cunningham*, 229 F.3d at 1289.

### 2.   Analysis

Plaintiff alleges that the Defendants are liable under a failure-to-intervene theory of liability because each: (1) failed to stop the others from strategizing to violate Simmers' rights, (2) failed to telephone Simmers' mother, and (3) failed to stop investigating a vulnerable teenager for murder. Dkt. No. 182 at 45.

As this Court has already determined that Plaintiff has failed to present evidence sufficient to allow a reasonable jury to conclude that Defendants knowingly violated Simmers' constitutional rights, Plaintiff cannot establish the first element of a failure-to-intervene claim and Defendants are entitled to summary judgment.

### F.   Plaintiff's *Monell* Claim

#### 1.   Legal standard

A municipality can be found liable under § 1983 only where the municipality *itself* causes the constitutional violation at issue. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989) (italics in original) citing *Monell v. New York City Dept. of Social Services*, 436 U.S. 658 (1978)). "It is only when the 'execution of the government's policy or custom … inflicts the injury' that the municipality may be held liable under § 1983." *Id*. quoting *Springfield v. Kibbe*, 480 U.S. 257, 267 (1987).

#### 2.   Analysis

Plaintiff asserts that King County and the City of Bothell are liable for violating Simmers' constitutional rights by failing to adopt written policies or other procedural safeguards to protect juveniles during police interrogations and failing to adequately train their officers on how to properly interrogate juveniles. Because this Court concludes that Plaintiff has not produced

sufficient evidence for a reasonable jury to find that any of the individual Defendants violated Simmers' constitutional rights, Plaintiff's *Monell* claim against King County and the City of Bothell likewise fails. *See, e.g., City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) ("[N]either *Monell* [], nor any other of our cases authorizes the award of damages against a municipal corporation based on the actions of one of its officers when … the officer inflicted no constitutional harm."); *Scott v. Henrich*, 39 F.3d 912, 916 (9th Cir. 1994) (liability of municipalities is contingent on a violation of constitutional rights); *Wagner v. County of Spokane*, 506 F. Supp. 3d 1091, 1104 (E.D. WA 2020) (plaintiff's *Monell* claim against the County of Spokane dismissed because County employees did not violate her constitutional rights). Thus, Defendants King County and the City of Bothell are entitled to summary judgment on Plaintiff's *Monell* claims.

## V.   CONCLUSION

For the foregoing reasons, the Court HEREBY RULES as follows. The Court:

(1) GRANTS the motion for summary judgment filed by King County and Officers Baxter, McSwain, and Raftus (Dkt. No. 137);

(2) GRANTS the motion for summary judgment filed by the City of Bothell and Officers Ericks, Hopkins, Miner, and Schlaegel (Dkt. No. 142);

(3) STRIKES as moot Defendants' motions to strike in their respective replies (Dkt. Nos. 184 and 186);

(4) STRIKES as moot Plaintiff's motion to strike set forth in her sur-reply (Dkt. No. 192); and

(5) STRIKES as moot the parties' respective motions to exclude expert testimony (Dkt. Nos. 138, 152, 155, and 156).

1    All of Plaintiff's claims against all Defendants are HEREBY DISMISSED and this matter

2  is closed.

3    Dated this 31st day of May 2024.

4

5

6    Barbara J Rothstein

7    Barbara Jacobs Rothstein
     U.S. District Court Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27